# Exhibit Q

**EXHIBIT Q** [1]

---

This is a digital version of the Federal Civil Rights Complaint that Guertin personally prepared, and filed in the Minnesota District Court on July 8, 2024.  CASE 0:24-cv-02646-JRT-DLM

The original complaint had to be printed, delivered in paper format, and scanned in order to initiate the case itself – meaning that Guertin was not able to submit a PDF version that maintained all of the hyperlinks, and bookmarks as he had hoped.

The submission of this exhibit resolves this issue by providing a fully digital, duplicate version of the original complaint which serves to aid in easy navigation, and research of the many issues Guertin is bringing to light through its filing with the Court.

---

1    Make use of the bookmarks for easy navigation of this exhibit.

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MATTHEW D. GUERTIN <br><br> Plaintiff, <br><br> v. <br><br> HENNEPIN COUNTY, a municipal entity; <br><br> KEITH ELLISON, in his official capacity as Minnesota Attorney General; <br><br> MARY MORIARTY, in her official capacity as Hennepin County Attorney; <br><br> CHELA GUZMAN-WEIGART, in her official capacity as Assistant County Administrator for Law, Safety, and Justice; <br><br> JULIA DAYTON-KLEIN, in her individual capacity; <br><br> GEORGE F. BORER, in his individual capacity; <br><br> DANIELLE C. MERCURIO, in her individual capacity; <br><br> DR. JILL ROGSTAD, in her official capacity as Senior Clinical Forensic Psychologist in the Fourth Judicial District; <br><br> DR. ADAM MILZ, in his official capacity with Hennepin County Mental Health; <br><br> JACQUELINE PEREZ, in her official capacity as Assistant Hennepin County Attorney; <br><br> BRUCE M. RIVERS, in his individual capacity. <br><br> Defendants. | Case No: 24-cv-2646-JRT-DLM <br><br><br><br><br><br><br><br><br><br><br> **COMPLAINT WITH JURY DEMAND** |

## <u>COMPLAINT</u>

Plaintiff Matthew Guertin, proceeding pro se, brings forth this action pursuant to 42 U.S.C. § 1983 for due process violations, ineffective assistance of counsel, denial of access to the courts, judicial misconduct, fraud on the court, civil conspiracy under 42 U.S.C. § 1985, gross negligence, violations of state laws governing forgery, and wire fraud under 18 U.S.C. § 1343.

1

## **APPENDIX**

**I.**      NATURE OF THE COMPLAINT…………………………………………………… 3

**II.**     INTRODUCTION……………………………………………………..……… 4

**III.**    PARTIES…………………………………………………………...………………… 14

**IV**.    JURISDICTION AND VENUE……………………………………………….....…..18

**V.**     CHRONOLOGICAL FACTS…………………………………………...……19

**VI.**    POTENTIALLY FRAUDULENT MCRO JUDICIAL RECORDS……………………... 70

**VII.**   PRE-EMPTIVE ADDRESS OF HECK V. HUMPHREY…………………………..… 71

**VIII.**  CLAIMS FOR RELIEF……………………………………………………………………73

          **COUNT I:**    Violation of Due Process Rights (42 U.S.C. § 1983)………………………… 73

          **COUNT II:**   Fraud & Forgery (18 U.S.C. § 1341; § 1343; Minn. Stat. § 609.63)………... 76

          **COUNT III:**  Ineffective Assistance of Counsel (Sixth Amendment)…………………... 77

          **COUNT IV:**  Violation of Equal Protection (42 U.S.C. § 1983)…………………………... 80

          **COUNT V:**   Denial of Right to Access to Courts (42 U.S.C. § 1983)…………………… 82

          **COUNT VI:**  Civil Conspiracy (42 U.S.C. § 1985)……………………………………… 86

          **COUNT VII:** Gross Negligence (Minn. Stat. § 604.03)………………………………... 90

          **COUNT VIII:** Judicial Misconduct (42 U.S.C. § 1983)…………………………………… 92

          **COUNT IX:**  Monell Claim (42 U.S.C. § 1983)………………………………………….. 93

          **COUNT X:**   Negligent Infliction of Emotional Distress (Minn. Stat. § 604.03)…………... 95

          **COUNT XI:**  Retaliation (42 U.S.C. § 1983)…………………………………………… 97

          **COUNT XII:** Federal Wire Fraud (18 U.S.C. § 1343)…………………………………… 99

          **COUNT XIII:** Fraud on the Court (42 U.S.C. § 1983)…………………………………… 101

          **COUNT XIV:** Misconduct of Public Officer or Employee (Minn. Stat. § 609.43)………... 103

          **COUNT XV:** Recording, Filing of Forged Instrument (Minn. Stat. § 609.64)…………… 104

**IX.**    PRAYER FOR RELIEF……………………………………………………………... 106

**X.**     JURY DEMAND……………………………………………………………… 107

**XI.**    VERIFICATION OF COMPLAINT……………………………………………… 108

Exhibit Q | Complaint | p. 2

# I.   NATURE OF THE COMPLAINT

1.      Plaintiff Matthew Guertin, proceeding pro se, brings this action pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights under the First, Sixth, and Fourteenth Amendments to the United States Constitution.

2.      The Plaintiff asserts claims for due process violations, ineffective assistance of counsel, denial of access to the courts, judicial misconduct, fraud on the court, civil conspiracy under 42 U.S.C. § 1985, gross negligence, wire fraud under 18 U.S.C. § 1343, and violations of state laws governing forgery and misconduct by public officials.

3.      This action includes Monell claims under 42 U.S.C. § 1983 against Hennepin County. These claims are based on, inter alia, the county's deliberate indifference to constitutional violations, failure to properly train and supervise its employees, and maintenance of policies, customs, and practices that directly resulted in the deprivation of Plaintiff's rights.

4.      The Plaintiff alleges that the defendants engaged in a series of unlawful actions and omissions that resulted in the deprivation of his constitutional rights.

5.      These actions include providing fraudulent discovery materials, creating and using forged documents, manipulating MCRO electronic court records, issuing fraudulent court orders, making court orders out of jurisdictional authority, including false statements in court orders, misrepresentation of authorship, manipulating forensic evaluation reports, and denying Plaintiff access to critical evidence.

6.      The defendants include Hennepin County, various county officials, defense counsel Bruce Rivers, and other involved parties who acted under color of state law. Defendant Keith Ellison, the Attorney General of Minnesota, is included for injunctive relief purposes only,

under the Ex parte Young doctrine, to prevent the ongoing enforcement of unconstitutional actions.

7.      The actions and omissions of the defendants have caused immediate and irreparable harm to the Plaintiff, necessitating an emergency temporary restraining order (TRO) to halt ongoing fraudulent actions and procedural violations.

8.      Plaintiff seeks an emergency TRO due to the imminent and irreparable harm he faces, with a critical review hearing scheduled for July 16, 2024. The ongoing fraud and denial of due process are causing Plaintiff significant distress and threaten his constitutional rights, warranting immediate court intervention.

9.      This action involves claims that are individually in excess of Fifteen Thousand Dollars ($15,000.00), exclusive of costs and interest, and includes requests for both compensatory and punitive damages to address the violations of Plaintiff's rights.

## II.   INTRODUCTION

10.      This case involves Matthew Guertin, a pro se filer, who thought up a brilliant idea in early February of 2021, which he then filed his first ever provisional patent application for with the USPTO on March 19, 2021. On March 18, 2022, Guertin filed US Patent application 17/698,420, which in turn resulted in being granted US Patent 11,577,177.

11.      This simple act of thinking up an idea, filing a patent, and attempting to successfully advance his newly formed company, InfiniSet, Inc., has turned out to be the single most brilliant, yet worst decision he has made in his life thus far.

12.      The nature of Guertin's patented technology has vast implications for military training simulations (Exh. C, Index 30, p. 34, 67-70), virtual reality experiences, and various

other industries. (Exh. D, Index 38, p. 135) Its revolutionary [1] aspects and significant financial value have placed Guertin in the crosshairs of powerful interests.

13.    As a result Guertin has faced surreal and unprecedented legal challenges, including constitutional violations, fraud on the court carried out by the State of Minnesota (Exh. A, Index 29), and judicial misconduct (Exh. A, Index 37), in both his civil commitment (27-MH-PR-23-815, Exh. F, Index 00) and criminal case (27-CR-23-1886, Exh. A, Index 00).

14.    Despite numerous pro se motions [2] and requests for relief, these issues remain unresolved, necessitating urgent federal intervention. The current status of the case involves ongoing harm to Mr. Guertin, as his legal and constitutional rights continue to be deprived. (Exh. A, Index 29, 36, 90-92)

15.    Imagine being declared incompetent to stand trial through a blatantly deceptive exam process (Exh. F, Index 27), which itself involves an additional element of fraud on the court through the misrepresentation of the exam report's true author (Exh. B, Index 28, p. 100-101, 262-263), while at the same time being granted your first-ever patent, US 11,577,177 (Exh. B, Index 28, p. 88-89), for a revolutionary VR treadmill technology [3] (Exh. D, Index 38, p. 135).

16.    You had been excitedly working on advancing this technology [4] (Exh. E, Index 39) before inadvertently stumbling upon a patent application [5] (Exh. C, Index 30, p. 3) filed just 12 days after your own (Exh. B, Index 28, p. 49) for the exact same technology (Exh. D, Index 38, p. 66-67), which had already been purchased by Netflix [6] for approximately 100 million

---

1    MattGuertin.Substack.com/p/consider-this-an-official-introduction
2    Exh. A, Index 22, 29, 36, 90-92 | Exh. B, Index 28 | Exh. K, Index 36-37, 43
3    MattGuertin.Substack.com/p/consider-this-an-official-introduction
4    MattGuertin.Substack.com/p/2021-2023-building-business-and-prototype
5    MattGuertin.Substack.com/p/netflix-patent-application-is-discovered
6    MattGuertin.Substack.com/p/netflix-press-release-acquiring-scanline-vfx;
     https://web.archive.org/web/20211122213954/https://about.netflix.com/en/news/bringing-more-vfx-magic-to-our-members-with-scanline-vfx

Exhibit Q | Complaint | p. 5

dollars [7] (Exh. B, Index 28, p. 44, 51). You then realize you've become the target of a very large, sophisticated intelligence operation utilizing advanced AI technology [8] (Exh. C, Index 30, p. 17-18), involving the Internet Archive [9] (Exh. C, Index 30, p. 11-13), observation of fraudulent websites evolving in real-time (Exh. D, Index 38, p. 76-84), your self-professed 'former CIA' and military-affiliated welder (Exh. C, Index 30, p. 60-66; Exh. D, Index 38, p. 14-15), and a set of circumstances that became more surreal and concerning with each passing day. [10]

17.     This included your computers being covertly accessed (Exh. C, Index 30, p. 16-17; Exh. D, Index 38, p. 94-95) and your phone calls seemingly being rerouted to people other than those you called (Exh. C, Index 30, p. 14-15), all while you desperately attempted to reach out to anyone and everyone who might be able to help you resolve the situation, including the FBI, Minnetonka Police Department (Exh. B, Index 28, p. 78-80), computer forensic experts (Exh. C, Index 30, p. 13-16, 129), your patent attorney (Exh. C, Index 30, p. 12-13, 102-107), your now-ineffective defense counsel, whom you've known for over 20 years (Exh. D, Index 38, p. 76-93), and even the US Secret Service (Exh. C, Index 30, p. 13-16, 129).

18.     On January 21, 2023, Guertin was charged with multiple felonies (Exh. A, Index 01, p. 1-3) after he made the decision to shoot a gun into the air for the explicit purpose of 'calling' the police. This date coincides with searches conducted by Forcepoint, FOX, and 3Gimbals (Exh. N, Index 02, p. 16-22) on Guertin's LinkedIn page.[11] These searches, revealed

---

7      MattGuertin.Substack.com/p/netflix-reports-100-million-to-trojansky; https://s22.q4cdn.com/959853165/files/doc_financials/2022/q1/FINAL-Q1-22-Shareholder-Letter.pdf
8      https://vimeo.com/794805917, MattGuertin.Substack.com/p/images-from-2006; MattGuertin.Substack.com/p/ai-generated-youtube-videos-from; MattGuertin.Substack.com/p/a-closer-look-at-the-photorobot-fraud
9      MattGuertin.Substack.com/p/the-internet-archive-fraud
10     MattGuertin.Substack.com/p/the-fake-ai-people-are-found
11     https://www.linkedin.com/comm/in/mattguertin612

Exhibit Q | Complaint | p. 6

through subsequent digital forensic analysis, suggest a broader conspiracy linked to Guertin's patent and claims of surveillance and hacking .

19.     Prior to January 21, 2023, Guertin had been collecting substantial digital forensic evidence to prove the fraud he discovered in December 2022. (Exh. C, Index 30, p. 7-11) His activities and attempts to reach out to government agencies made it evident to those involved in the fraudulent activities that Guertin had uncovered their actions. (Exh. B, Index 28, p. 78-80) This massive collection of evidence included upwards of 100Gb of digital forensic evidence, all of which was meticulously documented, and downloaded by Guertin.

20.     Forcepoint and 3Gimbals provide intelligence, investigations, and information solutions for statecraft, national security, and law enforcement missions (Exh. N, Index 02, p. 16-21). Their involvement indicates an emergency response to the problems Guertin's discoveries posed to significant interests. It is worth noting that Guertin was unaware of these LinkedIn searches until almost a year later, which supports his claims in a rather compelling, post-facto manner. (Exh. C, Index 30, p. 29)

21.     Mr. Guertin contends that his extreme and desperate decision to fire a gun into the air to summon police [12] was driven by a legitimate fear for his life (Exh. C, Index 30, p. 17-20; Exh. D, Index 38, p. 96) and that he had no intention of harming himself or anyone else. This is substantiated by the fact that he intentionally broke his patio door window with a fire extinguisher (Exh. A, Index 29, p. 26) and threw all of his patent documents out of the window so that police would know exactly where he was upon arrival, at which point Mr. Guertin never fired another shot and was the first to offer to throw his three guns out of the window to signal to police that he intended to fully comply.

---

12      MattGuertin.Substack.com/p/have-a-standoff-with-police-and-swat

22.     His intention to not harm anyone is further underscored by his lack of any violent criminal convictions throughout his entire lifetime (Exh. C, Index 30, p. 121-126), along with the message he wrote on his wall directly facing the door, which would be the first thing seen by police upon entering his apartment: "I didn't want to have to do this but it was the only way I could be sure that my call actually got through. They all went up into the sky out my bedroom window. I hope I don't die but this was the best option I could think of. -Matt"

(Exh. A, Index 29, p. 25).

23.     Matthew Guertin contends that his life has never been the same since. What started as one of the most exciting adventures of his life, filing his first-ever patent (Exh. B, Index 28, p. 39), trademarking the 'InfiniSet' name he thought up (Exh. B, Index 28, p. 41), securing the web domain (Exh. B, Index 28, p. 37-38), securing all of the social media accounts, designing a stylized logo he also trademarked (Exh. B, Index 28, p. 168-172), setting up his company InfiniSet, Inc. by registering it with the Delaware Secretary of State (Exh. B, Index 28, p. 69-70, 133) and the Minnesota Secretary of State (Exh. B, Index 28, p. 74), assigning shares to his two business partners, while simultaneously designing, engineering, fabricating, [13] and programming a fully functional prototype [14] for his idea (Exh. E, Index 39), has now turned into a literal nightmare.

24.     Even now, the situation remains almost as surreal and hard to believe as it was during those two days that he sat paralyzed in fear before finally mustering the courage to follow through with his plan to shoot the gun off in order to 'call' the police

_____

13      MattGuertin.Substack.com/p/2021-2023-building-business-and-prototype
14      MattGuertin.Substack.com/p/consider-this-an-official-introduction

25.    Guertin acknowledges that, even though he did not intend to hurt anyone, there were obvious risks involved, which is why he is including all of these additional details and hard-to-believe circumstances surrounding the origin of his criminal charges in this introduction.

26.    Ever since these events transpired, Guertin's entire life seems like it has been intentionally veered off the steadfast path he had been on for the previous nine years before this incident occurred, consisting of significant recognition and acclaim for his direct contributions and involvement in a long list of successful, high-profile projects. [15]

27.    He now finds himself on an alternate path, one which can only be described as a mix between the Twilight Zone and an unbelievably bad script for a Netflix movie, ironically involving Netflix itself as the villain, [16] along with a large cast of stand-in and supporting villains[17] (Exh. D, Index 38, p. 22-28) which has now very clearly extended to the involvement of the Plaintiff's defense counsel, the Hennepin County 4th Judicial District Court, the State of Minnesota, and all those currently acting on its behalf to help sustain the conspiracy being carried out against the Plaintiff, one perpetuating a web of deceit and corruption that undermines the very foundation of justice and constitutional rights that they are all obligated to uphold and protect as the core purpose of their respective roles within the judicial system.

28.    Mr. Guertin contends that it is precisely because of the 'breakthrough' and disruptive nature of the technology he invented (Exh. C, Index 30, p. 79 [Texts 04-06]) along with its incalculable financial value due to its profound implications for a variety of industries and use cases, that his criminal charges originated in the first place.

29.    He believes this is also the reason for the many unprecedented injustices currently taking place in his Hennepin County 4th Judicial District Court proceedings.

---

15      MattGuertin.Substack.com/p/create-matt-guertin-dot-com
16      MattGuertin.Substack.com/p/netflix-fraud-is-discovered
17      MattGuertin.Substack.com/p/netflix-criminal-fraud-proof

30.     Mr. Guertin is of the firm belief that the very same military, governmental, defense contractors, and intelligence-related entities that he has subsequently proven were monitoring (Exh. C, Index 30, p. 53-59, 145-213) his unused and still incomplete LinkedIn profile page [18], which has never had and still has zero employment history or background included as part of his profile, are also the very same 'powerful' external influences directly involved in and responsible for all the substantial injustices that have defined almost every single aspect of his court proceedings thus far.

31.     This assertion is not one that simply originated in Mr. Guertin's imagination but was in fact, a direct statement made to him over the phone on May 22, 2023, at 3:13 pm by his now ineffective defense counsel, Bruce Rivers, who told Guertin, "You have some very powerful people keeping an eye on you" only to then switch the topic abruptly.
(Exh. C, Index 30, p. 22-23, 84 [Calls 03], 86-93, 132)

32.     Not only did Bruce Rivers then refuse to expound upon this statement insofar as explaining what he meant due to Rivers mentioning his uncertainty about the "line being secure," but he would then also deny that he ever made the comment to begin with shortly after when Guertin met with him face-to-face at his downtown Minneapolis office not long after the comment was made.

33.     What very clearly appears to be taking place is an unprecedented situation involving collusion between Bruce Rivers, the Hennepin County Courts, the State of Minnesota,

---

18      https://www.linkedin.com/comm/in/mattguertin612

along with powerful corporate [19], governmental [20], and military [21] (Exh. C, Index 30, p. 145-213) financial interests [22], and external influences (Exh. C, Index 30, p. 58) - all of which are aligned in a massive criminal conspiracy - one which is entirely focused on Matthew Guertin, and the technology he is the true inventor of, as the target. (Exh. C, Index 30, p. 60)

34.     One of the most significant events that directly supports these claims via publicly accessible and *official* information is that Mr. Guertin's name and patent have actually ended up being listed at the VERY top of Netflix patent, US 11,810,254, [23] published on November 7, 2023.

35.     This resulted from his successful submission of a third-party prior art submission filed with the USPTO on February 17, 2023 [24] (Exh. B, Index 28, p. 90-95) - just three days after his patent, US 11,577,177, was officially published on February 14, 2023

(Exh. B, Index 28, p. 89).

36.     Since this occurred, Mr. Guertin conducted an analysis (Exh. C, Index 30, p. 94-95) using ChatGPT in which he input his InfiniSet, Inc. patent and the Netflix, Inc. patent, which contains the following statements in the resulting analysis:

---

19      MattGuertin.Substack.com/p/fox-entertainment-and-network-search-me
        MattGuertin.Substack.com/p/msg-entertainment-search-me
        MattGuertin.Substack.com/p/nfl-kimberly-clark-united-health-search-me
        MattGuertin.Substack.com/p/fox-corporation-3rd-search-me
20      MattGuertin.Substack.com/p/state-department-and-air-force-search-me
        MattGuertin.Substack.com/p/state-of-rhode-island-search-me
        MattGuertin.Substack.com/p/darpa-defense-intel-indopacom-search-me
21      MattGuertin.Substack.com/p/forcepoint-fox-3gimbals-search-me
        MattGuertin.Substack.com/p/triple-inc-aerospace-defense-search-me
        MattGuertin.Substack.com/p/janes-pixxel-boise-state-search-me
        MattGuertin.Substack.com/p/2nd-lockheed-martin-search-me
22      MattGuertin.Substack.com/p/morgan-stanley-search-me
        MattGuertin.Substack.com/p/moodys-analytics-search-me
23      https://patents.google.com/patent/US11810254B2/en
24      MattGuertin.Substack.com/p/3rd-party-prior-art-filed-against-netflix

Exhibit Q | Complaint | p. 11

a. "The Netflix patent appears to be a more technical and segmented description of essentially the same technology covered in the InfiniSet patent."

b. "Both patents aim to achieve the same outcome—allowing free movement and realistic filming within a confined virtual set, utilizing a combination of physical and digital elements."

c. "Given that the InfiniSet patent is acknowledged in the Netflix patent, it suggests that the Netflix patent may not meet the novelty requirement due to the prior existence of similar technology."

d. "Given these points, it is arguable that the Netflix patent does not sufficiently differentiate itself from the InfiniSet patent in terms of innovation and application."

e. "It's recommended to challenge the Netflix patent's validity based on these grounds."

37.    Matthew Guertin's case is a compelling saga of injustice and innovation, where corporate greed, espionage, and the unchecked power of the government and military-industrial complex, including entities like DARPA, the Defense Intelligence Agency, and the US Indo-Pacific Command, all appear to have played significant roles.

38.    This is evidenced by the fact that all three of these entities searched for Guertin's LinkedIn profile during the same one-week period when he was fighting against being committed to a mental institution (Exh. C, Index 30, p. 58, 198-201).

39.    During this time, fraudulent discovery was manipulated to hide his invention, significant business activities, and present a skewed portrayal of his living conditions to the psychological examiner (Exh. A, Index 29).

40.     It appears that Guertin's patent was stolen directly from the USPTO patent office upon his filing, discrediting the entire US patent system (Exh. C, Index 30, p. 53, 55).

41.     This situation illustrates the dangers and illegal practices that occur when government and corporate interests become intertwined without proper separation, undermining principles like those outlined in the Sherman Antitrust Act, 15 U.S.C. § 1 et seq., which seeks to prevent monopolies and promote fair competition. [25]

42.     What appears to be taking place is an unprecedented situation in which the very same 'powerful' external influences that Guertin contends are responsible for the origination of his criminal charges in the first place (Exh. N, Index 2, p. 16, Index 5) are now directly colluding with and influencing the court – either through coercion, financial incentives, or shared interests.

43.     It is more likely than not that Guertin's ineffective defense counsel, whom he has known and respected for over 20+ years [26] prior to retaining him for his current legal troubles, has been rendered ineffective by these very same external influences.

44.     The 'powerful people' that Bruce Rivers told Guertin were "keeping an eye on him" are likely also keeping an "eye" on Rivers, and influencing his actions through coercion, financial incentives, or ensuring the promotion of his YouTube channel, which is nearing 1.2 million subscribers. [27]

---

25      www.law.cornell.edu/uscode/text/15/chapter-1
26      Exh. C, Index 30, p. 79-80 [Texts 1-12] | Exh. D, Index 38, p. 2 [A], p. 33, 40, 10 [Al, Am, B], 74-76
27      YouTube.com/@CLRBruceRivers

Exhibit Q | Complaint | p. 13

45.     Mr. Guertin has proven that YouTube and Google are directly involved in the patent theft conspiracy [28], a significant conflict of interest which he directly addressed in a June 16, 2023, email to Bruce Rivers. (Exh. C, Index 30, p. 23-24, 73-76)

46.     This situation demands immediate federal oversight to prevent further miscarriage of justice and to ensure that Mr. Guertin's groundbreaking contributions to technology and, more importantly, his freedom are rightfully acknowledged and protected.

### III.   PARTIES

47.     **Plaintiff Matthew Guertin** is a resident of Minnesota. He is alleging significant violations of his constitutional rights, including due process violations, ineffective assistance of counsel, and judicial misconduct.

48.     Mr. Guertin has experienced substantial harm due to the defendants' actions, which have severely impacted his legal rights and personal well-being.

49.     **Defendant Hennepin County** is a municipal corporation duly organized and existing under the Constitution and laws of the State of Minnesota. The systemic issues and constitutional violations alleged in this complaint implicate Hennepin County, particularly concerning the gross negligence and civil conspiracy claims.

50.     Hennepin County is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiff's federal claims.

51.     **Defendant Mary Moriarty** is the elected Hennepin County Attorney.

---

28      Exh. B, Index 28, p. 45-48, 211-212 | Exh. D, Index 38, p. 22-29 | Exh. N, Index 1
        https://Rumble.com/user/MattGuertin
        MattGuertin.Substack.com/p/ai-generated-youtube-videos-from
        MattGuertin.Substack.com/p/netflix-criminal-fraud-proof
        MattGuertin.Substack.com/p/2013-holocaust-hologram

Exhibit Q | Complaint | p. 14

52.     She serves as the chief executive of Minnesota's largest public law office, overseeing the prosecution of criminal cases, child protection and support cases, and providing legal advice to county government. Her supervisory duties and direct involvement in prosecuting Mr. Guertin's case have led to allegations of prosecutorial misconduct and misrepresentation.

53.     She is sued in her official capacity and was acting under the color of law at all times relevant to this complaint.

54.     **Defendant Keith Ellison** is the Attorney General of Minnesota, and is responsible for overseeing the enforcement of state laws and representing the state in legal matters. Ellison is included as a defendant in his official capacity for the purpose of seeking prospective injunctive relief to prevent the ongoing enforcement of unconstitutional laws or actions that violate the Plaintiff's federal rights.

55.     This inclusion is based on the Ex parte Young exception to the Eleventh Amendment immunity, which allows suits against state officials for injunctive relief in cases of ongoing violations of federal law.

56.     **Defendant Chela Guzman-Weigart** is the Assistant County Administrator for Law, Safety, and Justice in Hennepin County. She is accused of being the true author and creator of Dr. Jill Rogstad's March 10, 2023 Rule 20.01 competency evaluation, implicating her in fraudulent actions against the Plaintiff.

57.     In her role, one of the areas she is responsible for is: 'Law, Safety, and Justice Information Technology'. She also serves as a liaison to the Fourth Judicial District Court and related offices.

58.     She is sued in her official capacity and was acting under the color of law at all times relevant to this complaint.

Exhibit Q | Complaint | p. 15

59.     **Defendant Julia Dayton Klein** is a Judge in the Hennepin 4th District Court. She has presided over Mr. Guertin's criminal cases and is accused of judicial bias and misconduct. Klein has been involved in every key decision of Mr. Guertin's case, allegedly contributing to procedural anomalies and granting orders for continuance on non-existent motions.

60.     These actions are challenged as being outside her judicial capacity, and she is sued in her individual capacity.

61.     **Defendant George F. Borer** is a Judicial Referee in the Hennepin 4th District Court, appointed in 2010 to the Probate/Mental Health Division. He is involved in Mr. Guertin's cases, contributing to the alleged judicial bias. Borer is considered an accomplice to Judge Julia Dayton Klein and is implicated in maintaining control over the proceedings.

62.     His actions are challenged as being outside his judicial capacity, and he is sued in his individual capacity.

63.     **Defendant Danielle C. Mercurio** is a Judicial Referee in the Hennepin 4th District Court, appointed on April 19, 2021. She is implicated in maintaining control over Mr. Guertin's case proceedings as part of the judicial trio alleged to exert undue influence.

64.     Her actions are challenged as being outside her judicial capacity, and she is sued in her individual capacity.

65.     **Defendant Jacqueline Perez** is an Assistant Hennepin County Attorney directly involved in prosecuting Mr. Guertin's case. Although she is not directly accused of fraudulent actions, her alleged failure to intervene and address the prosecutorial misconduct constitutes a significant oversight.

66.     Perez's involvement in the case underlines broader issues of legal and procedural fairness being contested in this complaint.

67.     She is sued in her official capacity and was acting under the color of law.

68.     **Defendant Dr. Jill Rogstad** is a Senior Clinical Forensic Psychologist in the Fourth Judicial District. She conducted the initial Rule 20.01 competency evaluation and is accused of participating in the fraudulent determination of Mr. Guertin's competency.

69.     Dr. Rogstad testified at a hearing to the validity of her report, maintaining that she was the true author despite allegations of misrepresentation.

70.     She is sued in her official capacity and was acting under the color of law.

71.     **Defendant Bruce Rivers** is Mr. Guertin's current defense counsel, accused of providing ineffective assistance of counsel. Rivers has a substantial legal background, having handled over 2,000 criminal cases and achieved numerous acquittals.

72.     Despite his experience, the allegations suggest that his representation of Mr. Guertin fell below professional standards, significantly impacting the case's outcomes.

73.     He is sued in his individual capacity for failing to provide adequate legal defense, contributing to the procedural and constitutional violations experienced by the Plaintiff.

74.     **Defendant Dr. Adam Milz** is affiliated with Hennepin County Mental Health and conducted the second Rule 20.01 exam on January 3, 2024, finding Mr. Guertin incompetent. Despite multiple requests, Mr. Guertin has never been provided with the exam report.

75.     Dr. Milz was notified via email prior to the exam meeting about the fraudulent discovery materials but failed to act. His inaction is part of the broader allegations of systemic negligence and fraud.

Exhibit Q | Complaint | p. 17

76.     He is sued in his official capacity and was acting under the color of law.

## IV.   JURISDICTION AND VENUE

77.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under the Constitution and laws of the United States. Specifically, this case involves violations of the Due Process Clause of the Fourteenth Amendment, the Sixth Amendment right to effective assistance of counsel, and the Eighth Amendment right against cruel and unusual punishment.

78.     Jurisdiction is further conferred by 28 U.S.C. § 1343(a)(3), which provides for jurisdiction in civil rights cases, and 42 U.S.C. § 1983, which provides a remedy for deprivation of rights secured by the Constitution and laws of the United States. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, as they are so related to the federal claims that they form part of the same case or controversy.

79.     Venue is proper in the District of Minnesota under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this district. The Defendants are subject to personal jurisdiction in this district, and the actions leading to the constitutional violations, including fraudulent misrepresentation, ineffective assistance of counsel, and judicial misconduct, took place here.

80.     Moreover, the denial of Mr. Guertin's petition for discretionary review by the Minnesota Court of Appeals exacerbates the procedural and substantive due process violations, effectively precluding him from reaching a final judgment.

81.     This denial reflects a systemic failure to address critical issues, further justifying federal oversight. The procedural anomalies and refusal to grant review despite substantial

Exhibit Q | Complaint | p. 18

unresolved issues highlight the inadequacies of state remedies, reinforcing the need for this Court's intervention.

82.     The systemic issues of gross negligence under Minn. Stat. § 604.01, civil conspiracy under 42 U.S.C. § 1985, and ongoing criminal fraud necessitate federal oversight.

83.     The Plaintiff's case aligns with *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which highlights a policy or custom of constitutional violations that require intervention by this Court.

## V.   CHRONOLOGICAL FACTS

84.     **4/2/2014:** Plaintiff is recognized in a blog article by Derivative, showcasing his early work in interactive media involving the very first version of the Oculus Rift Developer kit, which is a KickStarter project the Plaintiff contributed to in order to be sent the device. [29]

(Exh. B, Index 28, p. 22)

85.     **6/28/2016:** Hollywood Reporter article discussing Digital Domain's legal setback involving MOVA motion capture technology (Exh. B, Index 28, p. 23) – the same facial capture technology that is now being fraudulently attributed to Paul Debevec, instead of the authentic inventor Steve Perlman. [30]  (Exh. M, Index 03)

86.     **6/28/2016:** Verbatim quotes from the Hollywood Reporter article documenting Digital Domain's resulting legal, and business challenges due to the preliminary injunction issued by a federal judge preventing their use of the MOVA Contour facial capture technology.

(Exh. B, Index 28, p. 24)

---

29     https://derivative.ca/community-post/matt-guertins-epic-never-ending-oculus-rift-kinect-touchdesigner-3d-project/60736
30     https://www.hollywoodreporter.com/news/general-news/digital-domain-mova-tech-banned-906902/
       MattGuertin.Substack.com/p/mova-contour-facial-capture

Exhibit Q | Complaint | p. 19

87.   **7/17/2017:** Federal court case 3:17-cv-04006 is filed in the United States District Court of Northern California.

88.   The complaint alleges the intellectual property theft of Steve Perlman's MOVA Contour facial scanning technology. Defendants include: THE WALT DISNEY COMPANY, MANDEVILLE FILMS INC, and MARVEL STUDIOS LLC.

89.   Complaint also provides a significant amount of relevant background information pertaining to the Plaintiff's current legal and patent related issues insofar as its in depth examination of the MOVA Contour facial capture technology that is now being attributed to Paul Debevec (Exh. M, Index 03), who in turn is one of the key figures involved in the theft of Plaintiff's patented technology through the misrepresentation of previously stolen intellectual property that he did not actually invent. [31]

90.   **9/30/2018:** Plaintiff programs a completely custom media server in Touchdesigner[32] for the '100th Anniversary of the LA Philharmonic Orchestra at the Hollywood Bowl' which included performers such as Katy Perry, along with a surprise appearance by John Williams, who lead the orchestra in a live performance of the 'Star Wars' theme. [33] (Exh. B, Index 28, p. 26)

91.   **9/30/2018:** The Hollywood Bowl show is presented on Plaintiff's personal portfolio website. [34]  (Exh. B, Index 28, p. 27)

---

31   Exh. B, Index 28, p. 25 | Exh. D, Index 38, p. 22-28
     http://www.hbsscreative.com/complaints/07-17-17-Complaint-Rearden-v.-Disney.pdf
     MattGuertin.Substack.com/p/mova-contour-facial-capture
     MattGuertin.Substack.com/p/you-will-own-nothing-and-be-happy
     MattGuertin.Substack.com/p/how-benjamin-button-got-his-face
     MattGuertin.Substack.com/p/debevec-data-dump
32   https://derivative.ca/
33   https://xitelabs.com/portfolio/LaPhil_100th_Anniversary_Concert/
34   MattGuertin.com/portfolio/HollywoodBowl

92.     April of 2019: Plaintiff is recognized for his contributions to Bad Bunny's 2019 mainstage performance at Coachella Music Festival on the website of Xite Labs, whom the Plaintiff had a close working relationship with during the time he lived in Los Angeles which spanned May of 2014 to April of 2020. [35] (Exh. B, Index 28, p. 28)

93.     **April of 2019:** Plaintiff's design, engineering, and fabrication of the mainstage piece for Bad Bunny at Coachella is featured on his personal portfolio website. [36]

(Exh. B, Index 28, p. 29)

94.     **April of 2019:** Plaintiff is credited in a PLSN publication for his work on the 2019 Bad Bunny Coachella set piece. [37] (Exh. B, Index 28, p. 30)

95.     **April of 2019:** A custom pre-vis system for aiding in the programming and visual presentation of Bad Bunny's '360 Tour' performances is presented on Plaintiff's personal portfolio website. [38] (Exh. B, Index 28, p. 31)

96.     **August through Novemeber of 2019:** Plaintiff is credited on the website of Xite Labs as having engineered a 50-foot wide falcon for 'The UNESCO World Heritage Site World Inauguration of Diriyah' – An event which took place in Saudi Arabia and was attended by the Saudi Royal Family, including King Salman bin Abdulaziz and Prince Mohammed bin Salman.[39] (Exh. B, Index 28, p. 32)

97.     **August through Novemeber of 2019:** Presentation of the 50-foot Falcon project is featured on Plaintiff's personal portfolio website. [40] (Exh. B, Index 28, p. 33)

---

35      https://xitelabs.com/portfolio/bad-bunny-x100pre-tour/
36      MattGuertin.com/portfolio/BadBunnyEye
37      https://plsn.com/featured/featured-slider/xitelabs-taps-into-bad-bunnys-minds-eye-for-coachella-and-a-us-tour/
38      MattGuertin.com/portfolio/BadBunny360
39      https://XiteLabs.com/portfolio/diriyah-3d-projection-mapping/
40      MattGuertin.com/portfolio/Falcon

Exhibit Q | Complaint | p. 21

98.     Spring of 2020: Plaintiff participates in video conference discussing creation of the 50-foot Falcon. [41]  (Exh. B, Index 28, p. 34)

99.     **November of 2020:** Plaintiff sets up a custom Vimeo page to host videos for his personal portfolio website. [42]  (Exh. B, Index 28, p. 35)

100.    **November of 2020:** Plaintiff begins the creation of his personal portfolio website 'MattGuertin.com' now that he has extra time available due to to COVID-19. [43]

(Exh. B, Index 28, p. 35-36)

101.    **2/13/2021:** Plaintiff secures 'InfiniSet.com' domain name. [44]

(Exh. B, Index 28, p. 37)

102.    **2/3/2021:**  Plaintiff thinks up the idea for the InfiniSet concept. [45]

103.    **3/19/2021:** Plaintiff files his provisional patent application. [46]

(Exh. B, Index 28, p. 39)

104.    **3/31/2021:** Stephan Trojansky files his provisional patent application for the exact same technology as the Plaintiff's application filed just 12 days prior.  (Exh. B, Index 28, p. 40)

105.    **4/1/2021:** Plaintiff files US trademark application 90618638 for 'INFINISET' [47]

(Exh. B, Index 28, p. 41)

106.    **6/30/2021:** Eyeline Studios, with Nevada as its home, is registered as a foreig corporation with the California Secretary of State. [48]   (Exh. B, Index 28, p. 42)

---

41      https://blacktrax.cast-soft.com/showcase/tracking-a-50ft-falcon-with-xitelabs/
42      https://Vimeo.com/MattGuertin
43      MattGuertin.Substack.com/p/create-matt-guertin-dot-com
44      https://www.godaddy.com/whois/results.aspx?domainName=infiniset.com
45      MattGuertin.Substack.com/p/infiniset-concept-is-conceived
46      MattGuertin.Substack.com/p/my-provisional-patent-application-is-filed
47      https://uspto.report/TM/90618638
48      MattGuertin.Substack.com/p/eyeline-studios-registered-with-ca-sos

107. **11/22/2021:** Netflix Press Release announces acquisition of ScanlineVFX and Eyeline Studios. [49] (Exh. B, Index 28, p. 44)

108. **11/28/2021:** LinkedIn search for Plaintiff by United States Air Force Academy. [50] (Exh. C, Index 30, p. 145-152)

109. **12/2021:** Plaintiff's search for a local welder to assist with the fabrication of his prototype results in the procurement of a self-professed 'former CIA' and military-affiliated welder to meet his welding needs. (Exh. C, Index 30, p. 54)

110. **1/16/2022:** LinkedIn search for Plaintiff by United States Air Force. [51] (Exh. C, Index 30, p. 153-159)

111. **1/20/2022:** Google names their Bard Ai dataset 'Infiniset' which Plaintiff has a trademark application filed for and then begins flooding Google search results for 'Infiniset' with pointless, Ai generated articles. [52] (Exh. B, Index 28, p. 45)

112. **3/18/2022:** Plaintiff files US Patent application 17/698,420 (Exh. B, Index 28, p. 29)

113. **3/18/2022:** Plaintiff files PCT Patent application US2022/198028 [53] (Exh. B, Index 28, p. 71)

114. **3/30/2022:** Trojansky/Netflix files official US Patent application 17/709,126 [54] (Exh. B, Index 28, p. 49)

---

49    MattGuertin.Substack.com/p/netflix-press-release-acquiring-scanline-vfx
      https://web.archive.org/web/20211122213954/https://about.netflix.com/en/news/bringing-more-vfx-magic-to-our-members-with-scanline-vfx
50    MattGuertin.Substack.com/p/us-air-force-search-me-1
51    MattGuertin.Substack.com/p/us-air-force-search-me-2
52    MattGuertin.Substack.com/p/google-steals-infiniset-name
      https://arxiv.org/pdf/2201.08239.pdf
53    https://patents.google.com/patent/WO2022198028A1/en
54    https://patents.justia.com/patent/20220319115

115.   **3/31/2022:** Trojansky/Netflix files PCT application US2022/212761 [55]

(Exh. B, Index 28, p. 50)

116.   **4/19/2022:** Netflix's Q1 2022 Shareholders letter reveals $125 million spent acquiring Scanline VFX, Eyeline Studios, and small gaming company. [56]

(Exh. B, Index 28, p. 51)

117.   **6/8/2022:** Yuval Brodsky files US Patent application 17/843,960

(Exh. B, Index 28, p. 52-56)

118.   **6/24/2022:** PCT examiners' report for Plaintiff's application

(Exh. B, Index 28, p. 57-67)

119.   **7/12/2022:** Yuval Brodsky's US Patent 11,383,062 is published [57]

(Exh. B, Index 28, p. 68)

120.   **7/17/2022:** LinkedIn search for Plaintiff by Department of the Air Force. [58]

(Exh. C, Index 30, p. 160-166)

121.   **7/18/2022:** Plaintiff registers InfiniSet Inc. with Delaware Secretary of State

(Exh. B, Index 28, p. 69-70)

122.   **9/22/2022:** Plaintiff's PCT Patent Application US2022/020919 is published

(Exh. B, Index 28, p. 71)

123.   **9/22/2022:** Yuval Brodsky's US Patent application 17/834,960 is published. [59]

(Exh. B, Index 28, p. 72-73)

---

55    https://patents.google.com/patent/WO2022212761A1/en
56    https://s22.q4cdn.com/959853165/files/doc_financials/2022/q1/FINAL-Q1-22-Shareholder-Letter.pdf
57    https://patents.google.com/patent/US11383062B2/en
58    MattGuertin.Substack.com/p/us-air-force-search-me-3
59    https://patents.justia.com/patent/20220296848

Exhibit Q | Complaint | p. 24

124.   **9/22/2022:**  Plaintiff's US Patent application 17/698,420 is published. [60]

(Exh. B, Index 28, p. 89)

125.   **10/31/2022:** Email exchange with Assaff Rawner, CEO of Mark Roberts Motion

Control.[61]  (Exh. C, Index 30, p. 96)

126.   **11/6/2022:** Plaintiff discovers Trojansky/Netflix patent application 17/709,126 [62]

(Exh. C, Index 30, p. 3)

127.   **11/8/2022:** Plaintiff's patent attorney confirms that patent application 17/709,126

is for the exact same technology as his.  (Exh. D, Index 38, p. 66-67)

128.   **11/11/2022:** Email to Bruce Rivers regarding Plaintiff's Netflix patent discovery

(Exh. D, Index 38, p. 33-75)

129.   **11/13/2022:** Plaintiff registers his Delaware C-Corp with Minnesota Secretary of

State  (Exh. B, Index 28, p. 74)

130.   **12/5/2022:** Text messages between Plaintiff and his 'former CIA' welder about

Plaintiff's recent discovery of the Netflix patent application and its implications.

(Exh. C, Index 30, p. 3-7, 62-63)

131.   **12/9/2022:** After Plaintiff realizes that there are discrepancies between the

PhotoRobot.com website and archived versions of it saved on the internet archive he signs up for

an account so that he can capture an archived snapshot of PhotoRobot.com's current state for the

purpose of serving as evidence. [63]  (Exh. C, Index 30, p. 7-8, 97-98)

132.   **12/15/2022:** Plaintiff reached out to the Internet Archive querying their policy on

content removal requests. His primary concern, detailed in the correspondence, was the risk that

---

60      https://patents.google.com/patent/US11577177B2/en
61      MattGuertin.Substack.com/p/mark-roberts-motion-control-ceo-replies
62      MattGuertin.Substack.com/p/netflix-patent-application-is-discovered
63      MattGuertin.Substack.com/p/internet-archive-account-is-created

the opposing party could erase historical web content, undermining his evidence base against them. This engagement exhibits the Plaintiff's efforts to safeguard the integrity of his intellectual property and underscores the lengths he went to ensure the preservation of digital evidence critical to proving fraudulent activity.  (Exh. C, Index 30, p. 9, 99)

133.    **12/15/2022:** Stephan Trojansky's patent application is officially assigned to Netflix, Inc.  (Exh. B, Index 28, p. 75-77)

134.    **12/17/2022:**  LinkedIn search for Plaintiff by the USC School of Cinematic Arts and US Army Reserves. [64]  (Exh. C, Index 30, p. 167-174)

135.    **12/23/2022:** Text messages between Plaintiff and his 'former CIA' welder in which the Plaintiff's ongoing investigation of patent fraud is discussed in detail.

(Exh. C, Index 30, p. 9-10, 63-64)

136.    1**2/24/2022:** Plaintiff discovers a discrepancy in Internet Archive save counts which indicates their involvement in the patent fraud he is investigating. [65]

(Exh. C, Index 30, p. 11-12)

137.    **1/5-6/2023:** Emails exchanges between the Plaintiff and his former patent attorney discussing the PhotoRobot.com patent fraud he is actively investigating. [66]

(Exh. C, Index 30, p. 12-13, 102-107)

138.    **1/12/2023:** Plaintiff files police report #23-000151 with the Minnetonka, MN Police Department to address the patent fraud he has been actively investigating.

(Exh. B, Index 28, p. 78-80)

---

64      MattGuertin.Substack.com/p/debevec1-us-army-ukg3-search-me
65      MattGuertin.Substack.com/p/the-internet-archive-fraud
66      MattGuertin.Substack.com/p/a-closer-look-at-the-photorobot-fraud

139.   **1/13/2023:**   Plaintiff sends an email to Bruce Rivers, prior to retaining him as defense counsel, in which he is seeking help regarding the patent fraud he has been actively investigating.  (Exh. D, Index 38, p. 76-93)

140.   **1/14/2023:** Text messages between Plaintiff and his 'former CIA' welder about the patent fraud he is investigating. At 11:47am Plaintiff is sent a text message from his welder that simply contains the message "https://openai.com" (Exh. C, Index 30, p. 13-14, 64-66)

141.   **1/15/2023:** The Plaintiff began trying to contact digital forensic investigators and subsequently contacted the U.S. Secret Service. He spoke to a Chicago field agent for 22 minutes over the phone, who agreed with the Plaintiff's assessment that conspiracy and wire fraud are applicable to the described situation. (Exh. C, Index 30, p. 129)

142.   **1/18-19/2023:** Plaintiff returns to Minnetonka Police Department due to safety concerns but finds out he arrived too late and the lobby is closed. (Exh. C, Index 30, p. 17-18)

143.   **1/21/2023:** Plaintiff is arrested after firing a gun into the air to summon police. (Exh. B, Index 28, p. 81-87; Exh. N, Index 05)

144.   **1/21/2023:** LinkedIn profile search for Plaintiff by Forcepoint and 3Gimbals. (Exh. C, Index 30, p. 175-182; Exh. N, Index 02, p. 16)

145.   **1/24/2023:** Plaintiff's 'Order for Detention' is filed with the Hennepin County 4th Judicial District Court and assigned case number 27-CR-23-1886.  (Exh. A, Index 1)

146.   **1/25/2023:** Plaintiff's 1st 'in custody' court appearance takes place and a court order is issued for a Rule 20.01 evaluation of Plaintiff. (Exh. A, Index 4)

147.   **1/25/2023:** Plaintiff posts a $50,000 bail and is released from custody. (Exh. A, Index 5)

148.   **1/25/2023:** Notice of Release and Appearance is submitted to the court.

(Exh. A, Index 6)

149.   **1/30/2023:** Plaintiff sends an email to Detective Samantha Johnson of the Minnetonka Police Department in which he discusses details of the incident as well as his previously filed case #23-000151 concerning the patent fraud. (Exh. D, Index 38, p. 94-98)

150.   **2/5/2023:** LinkedIn profile search for Plaintiff by USC School of Cinematic Arts (Exh. C, Index 30, p. 183-190)

151.   **2/7/2023:** Plaintiff sends an email to Bruce Rivers detailing his welder's military and CIA background with pictures of 'special ops gear' sitting atop his prototype as it is being welded  (Exh. D, Index 38, p. 99-105)

152.   **2/7/2023:** Bruce Rivers responds to Plaintiff's email confirming receipt of the 'special ops gear' pictures and evidence of his welder's CIA and military affiliations

(Exh. D, Index 38, p. 103-105)

153.   **Special ops gear sitting atop Plaintiff's prototype:** A visual comparison showing the Plaintiff's invention alongside its perfectly matched patent drawing.

(Exh. C, Index 30, p. 60-61)

154.   **2/13/2023:** Plaintiff sends his first ever email to Dr. Jill Rogstad introducing himself, sharing his portfolio website MattGuertin.com, and provides in depth details about his current patent troubles  (Exh. B, Index 28, p. 105-108)

155.   **2/13/2023:** Plaintiff files continuation patent application US 18/108,858

(Exh. B, Index 28, p. 88)

156.   **2/14/2023:** Dr. Jill Rogstad responds to Plaintiff's email about sharing information during meeting  (Exh. B, Index 28, p. 109-110)

157.   **2/14/2023:** Plaintiff's US Patent 11,577,177 is published (Exh. B, Index 28, p. 89)

158.   **2/15/2023:** Plaintiff sends an email to Dr. Jill Rogstad inquiring about audio and video documentation of their scheduled March 1, 2023 Rule 20.01 exam meeting. This inquiry of Guertin's is based upon his desire of obtaining a documented account of the exam meeting for evidentiary purposes, and future review. (Exh. B, Index 28, p. 112-113)

159.   **2/17/2023:** Plaintiff files a successful third-party prior art submission with the USPTO against Netflix patent application 17/709,126  (Exh. B, Index 28, p. 90-95)

160.   **2/17/2023:** Dr. Jill Rogstad responds to Plaintiff's email inquiring about audio and video documentation of their scheduled Rule 20.01 exam meeting for evidentiary value, and later review by third parties. (Exh. B, Index 28, p. 114)

161.   **2/20/2023:** Bruce Rivers submits a 'Certfificate of Representation' into Plaintiff's case 27-CR-23-1886  (Exh. A, Index 9)

162.   **2/20/2023:** Bruce Rivers submits a 'Demand or Request for Discovery' into Plaintiff's case  (Exh. A, Index 10)

163.   **2/20/2023:** Bruce Rivers submits his 1st 'Request for Continuance Needing Judicial Approval' into Plaintiff's case  (Exh. A, Index 11)

164.   **Late February of 2023:** Plaintiff's handwritten criminal defense notes prepared prior to an in-person meeting with Bruce Rivers at his office.  (Exh. C, Index 30, p. 115)

165.   **3/1/2023:** Plaintiff's in-person Rule 20.01 exam with Dr. Jill Rogstad takes place (Exh. B, Index 28, p. 116-125)

166.   **3/2/2023:** Plaintiff sends email to Dr. Jill Rogstad with a language analysis matrix produced by Plaintiff  (Exh. B, Index 28, p. 115; Exh. C, Index 30, p. 64  [Text 14])

Exhibit Q | Complaint | p. 29

167.   **3/3/2023:** Plaintiff sends email to Dr. Jill Rogstad with additional evidence

(Exh. B, Index 28, p. 126; Exh. C, Index 30, p. 102-107)

168.   **3/3/2023:** Plaintiff sends email to Dr. Jill Rogstad with screen capture of

PhotoRobot Internet Archive page  (Exh. B, Index 28, p. 127)

169.   **3/3/2023:** Plaintiff sends email to Dr. Jill Rogstad with second screen capture of

PhotoRobot Internet Archive page  (Exh. B, Index 28, p. 128)

170.   **3/7/2023:** Dr. Jill Rogstad confirms receipt of the four emails containing

Plaintiff's evidence  (Exh. B, Index 28, p. 129)

171.   **3/7/2023:** USPTO Patent Examiner reviews and signs off on Plaintiff's third-party

prior art submission against Netflix  (Exh. B, Index 28, p. 98-99)

172.   **3/10/2023:** Plaintiff's Rule 20.01 Exam Report is submitted to the court

(Exh. B, Index 28, p. 116-125)

173.   **3/10/2023:** Metadata analysis of Dr. Jill Rogstad's Rule 20.01 exam report carried

out by Plaintiff reveals 'GuzmanC' as both the 'creator', and 'author', which indicates that

'Chela Guzman-Weigart' is almost certainly the true author of the blatantly deceptive exam

report submitted to the court.  (Exh. B, Index 28, p. 100-101)

174.   **Hennepin County Criminal Justice Coordinating Committee:** Composition

and potential conflicts of interest surrounding Chela Guzman-Weigart, and her role insofar as

being the actual author of the Plaintiff's Rule 20.01 exam report purported to be authored by Dr.

Jill Rogstad [67] (Exh. B, Index 28, p. 262)

_____

67       https://www.hennepin.us/cjcc/members

175.   **Assistant County Administrator:** Further highlighting of Chela Guzman-Weigart's role within the court as the 'Assistant County Administrator - Law, Safety, and Justice'[68] (Exh. B, Index 28, p. 263)

176.   **3/16/2023:** Plaintiff files an IDS for his continuation patent application US 18/108,858 which names Microsoft and Dimension Studios in it.  (Exh. B, Index 28, p. 130-132)

177.   **3/24/2023:** Plaintiff's email correspondence with Bruce Rivers about competency report  (Exh. B, Index 28, p. 102-104)

178.   **3/26/2023:** Plaintiff obtains 'Notice of Good Standing' for his company 'InfiniSet Inc.'  (Exh. B, Index 28, p. 133)

179.   **3/27/2023:** Plaintiff maintains evidence of communication with Netflix executives. [69] (Exh. B, Index 28, p. 134-158)

180.   **3/27/2023:**   Bruce Rivers submits his 2nd 'Request for Continuance Needing Judicial Approval' into Plaintiff's criminal case 27-CR-23-1886.  (Exh. A, Index 13)

181.   **4/7/2023:** Letter from Plaintiff's long-time California Psychiatrist Dr. Martin Schuster challenges Dr. Rogstad's Rule 20.01 report. This letter provides detailed insight into who the Plaintiff truly is, the challenges he has overcome in his life, and states that he is not a danger to anyone. Furthermore, Dr. Schuster directly attests to the 'revolutionary' nature of the Plaintiff's patented technology, and the fact that it will most certainly 'compete' with major corporations. (Exh. C, Index 30, p. 113-114)

182.   **4/26/2023:** Plaintiff sends an email to Dr. Jill Rogstad with Bruce Rivers CC'd, sharing references discrediting key points of her exam report. (Exh. D, Index 38, p. 113-120)

---

68      https://www.hennepin.us/your-government/leadership/county-administrator
69      MattGuertin.Substack.com/p/3rd-party-prior-art-filed-against-netflix

183.   **5/2/2023:** Plaintiff's email exchanges with Bruce Rivers discussing FTC fraud report and personal safety concerns.  (Exh. C, Index 30, p. 21, 71-72)

184.   **5/3/2023:** Plaintiff files incident report with the FBI via IC3.gov (Exh. B, Index 28, p. 161-165)

185.   **5/3/2023:** Plaintiff files incident report with the FTC via ReportFraud (Exh. B, Index 28, p. 166-167)

186.   **5/22/2023 at 3:13pm:** Plaintiff calls Bruce Rivers and is told "you have some very powerful people keeping an eye on you"  (Exh. C, Index 30, p. 22, 84 [Calls 03], 132)

187.   **5/23/2023:** Plaintiff begins sending duplicate text messages to all of his friends, alerting them to the 'powerful people' comment made by Bruce Rivers due to renewed personal safety concerns. These texts include technical discussions with a business partner, demonstrating Plaintiff's competence.  (Exh. C, Index 30, p. 22-23, 86-93, 132-133)

188.   **5/27/2023:** Plaintiff sends an email to Bruce Rivers discussing the upcoming June 14, 2023 court hearing and ensuring it would happen in person.  (Exh. D, Index 38, p. 121)

189.   **6/1/2023:** Plaintiff files international trademark application 97699805 for 'INFINISET' and pays $4,320.33 to the USPTO. [70] (Exh. B, Index 28, p. 168-170)

190.   **6/1/2023:** Plaintiff files international trademark application '1 739 675' with the WIPO for his stylized 'INFINISET' logo. [71] (Exh. B, Index 28, p. 171-172)

191.   **6/14/2023:** A court order by Judge Julia Dayton Klein is submitted into Guertin's criminal case. (Exh. A, Index 16)

---

70     https://trademarks.justia.com/976/99/infiniset-97699805.html
71     https://www.trademarkelite.com/wipo/trademark/trademark-detail/1739675/INFINISET

192.    This order grants a continuance, referencing a June 13, 2023 request for continuance made by Guertin's defense counsel, Bruce Rivers, which doesn't exist at all in Guertin's case timeline.

193.    Additionally, the June 14, 2023 'Taken Under Advisement' entry into the case record appears AFTER the order granting the continuance at Index 17, which disrupts the logical order one would expect them to be in. (Exh. A, Index 00, p. 8)

194.    Furthermore, even though a continuance was granted which re-schedules the hearing for July 7, 2023, the cancelled hearing is still indicated as being 'Held Off the Record' in the 'Hearing' section of the case timeline. (Exh. A, Index 00, p. 9)

195.    **6/16/2023:** Following the third cancellation of his scheduled court appearance, Plaintiff sends an email to Bruce Rivers expressing concerns about a conflict of interest surrounding his YouTube stardom [72] due to Plaintiff's assertion that YouTube is directly involved in the theft of his intellectual property. Plaintiff also addresses Rivers' previous 'powerful people' comment and questions the handling of his FBI report and AI-generated video [73] analysis.  (Exh. C, Index 30, p. 23-24, 73-76)

196.    **7/7/2023:** Plaintiff finally attends an in-person court hearing to contest the determination of his 'incompetence to stand trial' and Dr. Jill Rogstad's diagnosis of "Unspecified Schizophrenia Spectrum and Other Psychotic Disorder"
(Exh. B, Index 28, p. 122).

197.    He arrives with a significant amount of personally prepared evidence exhibits to demonstrate his competency, but Rivers advises against presenting them.

---

72    YouTube.com/@CLRBruceRivers
73    MattGuertin.Substack.com/p/ai-generated-youtube-videos-from

198.    As a result, Plaintiff's US Patent 11,577,177 is the only evidence entered into the record, despite Bruce Rivers possessing significant exculpatory evidence that could have very easily demonstrated Plaintiff's competency

(Exh. C, Index 30, p. 24, 60; Exh. D, Index 38, p. 99-105)

199.    **7/13/2023:**  A 'Finding of Incompetency and Order' recommended by Referee George Borer, is submitted in Plaintiff's case, (Exh. A, Index 00, p. 7) declaring that Plaintiff is 'incompetent to proceed.'

200.    This document has an e-file timestamp of 1:24pm. (Exh. A, Index 19)

201.    The order relies heavily on Dr. Jill Rogstad's initial Rule 20.01 exam report an testimony, yet it also contains multiple statements that affirm the Plaintiff's competence, (Exh. F, Index 27) clearly establishing that he understands the proceedings and has identified a defense strategy. (Exh. A, Index 19, p. 5)

202.    This situation highlights a fundamental constitutional violation: instead of the Plaintiff, it appears the evidence he wishes to present is being preemptively judged as delusional and invalid, thus undermining his right to a fair trial and due process.

203.    Guertin's competence to stand trial is supported by his ability to formulate a defense, yet the evidence that substantiates his claims is being used to label him delusional, effectively stripping him of due process, and a fair trial, as guaranteed by the Sixth and Fourteenth Amendments.

204.    **7/13/2023:** A duplicate of the above 'Finding of Incompetency and Order' is submitted in Plaintiff's case once again on the same day (Exh. A, Index 20).

205.    This submission into the record is listed as 'Order-Other' in the case timeline, (Exh. A, Index 00, p. 7) and contains two, separate e-file timestamps – the original stamp, in the

upper, right corner of the page lists a submission time of 1:24pm, as well as a second timestamp which reads '4:46pm', and only appears in a centered position on the first page

(Exh. A, Index 20, p. 1).

206.    The submission of a duplicate version of the same document that has two timestamps on it – with one of them containing a different positional placement, font, and font size, serves to support Guertin's many additional claims pertaining to the manipulation of his case records [74], orders that state he agreed to things he did not [75], repopulation of his MCRO criminal history back to 2002 [76], fruaudulent misrepresentation of document authorship [77], and fraudulent discovery materials [78] - where it would appear that almost every single aspect of Guertin's case, thus far consists of one procedural anomalie, after another.

207.    **7/13/2023:** Plaintiff's metadata analysis of Referee George Borer's competency order reveals that the true author and creator is actually Referee Danielle C. Mercurio.

(Exh. B, Index 28, p. 173)

208.    **7/20/2023:** A petition for civil commitment is filed against the Plaintiff in the Hennepin County 4th Judicial District Court and assigned to case 27-MH-PR-23-815

(Exh. K, Index 00)

209.    **7/20/2023:** The State of Rhode Island searches for Plaintiff on LinkedIn, documenting an all-time record of 25 searches in a single, one-week period. [79]

(Exh. C, Index 30, p. 58, 191)

---

74      Exh. K, Index 00, p. 1 | Exh. B, Index 30, p. 235-236
75      Exh. A, Index 25, p. 1 | Exh. C, Index 30, p. 35-36
76      Exh. C, Index 30, p. 40, 121
77      Exh. B, Index 28, p. 100, 173
78      Exh. A, Index 29
79      MattGuertin.Substack.com/p/state-of-rhode-island-search-me

210. **7/28/2023:** Plaintiff discovers the civil commitment order for the first time after receiving USPS mail from his new court-appointed attorney, Michael Biglow, whom he has never met before.

211. Confused about the situation, he reaches out to Bruce Rivers. Rivers assures the Plaintiff that he will represent him in the civil commitment proceedings.

(Exh. C, Index 30, p. 24, 81 [Text 17-22])

212. **8/1/2023 at 6:27am:** Plaintiff's desperate attempts to contact Bruce Rivers seeking advice for the civil commitment hearing after Rivers' fails to represent the Plaintiff as he promised  (Exh. C, Index 30, p. 25, 77, 82 [Text 23-26])

213. **8/1/2023 at 10:14am:** Plaintiff sends an email to Michael Biglow, hours ahead of their scheduled 2:30pm court appearance. The email contains 20 links and PDF documents that discredit Dr. Jill Rogstad's Rule 20.01 report. These documents aim to establish the Plaintiff's credibility by validating claims previously deemed 'delusional' and 'implausible,' which were used to support the diagnosis of incompetence.  (Exh. C, Index 30, p. 108-109)

214. **8/1/2023 at 10:14am:** Plaintiff's 2019 Wages and Income statement is provided to Michael Biglow as part of the email attachments, showing $218,385.00

(Exh. C, Index 30, p. 112)

215. **8/1/2023 at 10:25am:** Plaintiff sends a follow-up email to Michael Biglow emphasizing the provision of the same evidence to Dr. Jill Rogstad and her decision to ignore all of it.  (Exh. C, Index 30, p. 110)

216. **8/1/2023 at 2:24pm:** Out of the 20 total links and documents provided, Michael Biglow only forwards the letter from Plaintiff's California doctor to the court just six minutes before the remote Zoom hearing began. (Exh. C, Index 30, p. 111, 113)

217. **8/1/2023 at 2:30pm:** A remote Zoom hearing, including an interview with Psychologist Michael Robertson and the subsequent civil commitment court hearing, takes place (Exh. B, Index 28, p. 182-186; Exh. C, Index 30, p. 78)

218. **8/3/2023 at 3:19pm:** Michael Biglow sends an email to the Plaintiff that simply states, "Hi Matt, Here are the photos. Mike," with a PDF attachment titled '23-815 Guertin - photos of exterior, interior, person 1.21.pdf' (Exh. A, Index 29, p. 10)

219. This attachment contains photographs taken by the Minnetonka Police Department (Exh. A, Index 29, p. 13, 24-26) following the Plaintiff's arrest on January 21, 2023.

220. Plaintiff never requested these photographs and did not look at them until a couple of months later, at which point he realized there were signs of image manipulation (Exh. A, Index 29, p. 27-30).

221. Additionally, the PDF document contained only 80 photographs, compared to the 104 documented in Dr. Jill Rogstad's Rule 20.01 exam report (Exh. A, Index 29, p. 15-16).

222. The Plaintiff has since conducted a very detailed and thorough analysis of this PDF document (Exh. A, Index 29, p. 18-23), utilizing established digital forensic techniques. (Exh. A, Index 29, p. 14, 17, 28-29).

223. This analysis irrefutably proves that manual cropping was carried out to hide the prototype of his invention and to present a deceptive, and misleading narrative about the Plaintiff's living conditions and personal activities related to his business endeavors. (Exh. A, Index 29, p. 30-34)

224. **8/3/2023:** Documented LinkedIn searches for Plaintiff by DARPA, Defense Intelligence Agency, and US INDOPACOM which all happen to coincidentally be taking place at

the same time Plaintiff is having fraudulent discovery introduced into his case, and is fighting to not be committed to a mental institution. [80]  (Exh. C, Index 30, p. 58, 198-205)

225.   **8/4/2023:**  Psychologist   Michael   Robertson's   'Examiner's   Report   for Commitment', summarizing findings from the 45-minute Zoom meeting on August 1, 2023, between himself and the Plaintiff, is submitted to the court.

226.   Notably, this report references the fraudulent discovery photos contained in '23-815 Guertin - photos of exterior, interior, person 1.21.pdf' as 'documents reviewed,' which were relied on to produce his report.  (Exh. K, Index 21)

227.   **8/8/2023:** Plaintiff discovers a SIGGRAPH 2023 YouTube video titled "The Full Spectrum of Virtual Production," presented on behalf of Netflix and Eyeline Studios by Paul Debevec [81] (Exh. M, Index 01).

228.   Plaintiff instantly begins scanning through the video and finds at the fifty-nine minute mark a rotating treadmill that mirrors his own patented technology.

229.   He determines that the person shown running on the treadmill, purportedly video captured in 2006, is not authentic but instead computer-generated. [82]

230.   This rotating treadmill is identical to not only the Plaintiff's patented technology, but also the technology in the pending US Patent application 17/709,126, purportedly invented by Stephan Trojansky and now assigned to Netflix, Inc. [83]

231.   Paul Debevec is introducing the same technology that Netflix acquired for approximately $100 million through their acquisition of ScanlineVFX and Eyeline Studios.

---

80      MattGuertin.Substack.com/p/darpa-defense-intel-indopacom-search-me
81      www.youtube.com/watch?v=tMpg29Vc0bU
82      MattGuertin.Substack.com/p/netflix-fraud-is-discovered
83      MattGuertin.Substack.com/p/2006-debevec-netflix-tech-comparison

232.    Stephan Trojansky, the CEO of Eyeline Studios, is involved, suggesting that instead of Netflix or Eyeline Studios announcing their new technological capabilities, they instead created a new role for Paul Debevec, who then *supposedly* quit his position at Google Research to work for Netflix and Eyeline Studios [84] and coincidentally had already invented and researched the same rotating treadmill technology back in 2006.

233.    Despite this, he never filed a patent application for this significant technological achievement, even though he *supposedly* published academic research papers at the time regarding the technology's significant potential for use in military training simulations. [85]

234.    Paul Debevec also happens to be directly affiliated with the US Army, which has provided significant financial investment and resources for his research [86], with the US Army included in many of Debevec's US patents he has been granted throughout the years.
(Exh. C, Index 30, p. 27)

235.    **8/9/2023:** Plaintiff signs an 'Acceptance of Terms of Stay of Commitment' and a 'Plan for Services Agreement' in his civil commitment case 27-MH-PR-23-815 to avoid a court hearing.

236.    He is concerned that the hearing could lead to the stayed order of civil commitment being overturned or invalidated, resulting in a loss of his freedom.
(Exh. K, Index 22, 23)

237.    **8/9/2023 at 3:29pm:** Plaintiff sends an email whose subject line reads 'Emergency' to his patent attorney which reads "Amanda, If you are available to talk on the

---

84      MattGuertin.Substack.com/p/netflix-supposedly-hires-paul-debevec
85      MattGuertin.Substack.com/p/2006-paper-us-army-photoreal-simulations
86      MattGuertin.Substack.com/p/debevec-3-light-stage-patents

phone for a second I have a rather new and serious fraud problem I need to get an opinion on asap. It involves Netflix. Thanks, ~Matt" [87]  (Exh. C, Index 30, p. 27)

238.   **8/10/2023:** After receiving no response to his email sent to his patent attorney the previous day, Plaintiff sends an email with the subject line 'Need an in-person meeting at WCK asap' to the entire firm.

239.   In this email, he details the Netflix patent fraud and addresses their disregarded 'duty of candor' requirement and obligation to submit Information Disclosure Statements with known prior art references as required by the USPTO's formal examination process.

240.   Plaintiff's patent attorney promptly replies, providing her scheduling availability for the requested meeting. However, a few hours later, one of the firm's shareholders sends an email notifying Plaintiff that the firm is dropping him as a client.

241.   The email also states that his patent attorney no longer works at their downtown Minneapolis office and that the firm's email system has been modified to prevent Plaintiff from communicating with his patent attorney, with whom he had been working on all patent and trademark matters since the inception of his idea and patent. [88] (Exh. C, Index 30, p. 27-29)

242.   **8/11/2023: A fourth search for the Plaintiff's LinkedIn page is conducted by the US Air Force, in addition to a search by the US Department of State.** [89]

(Exh. C, Index 30, p. 206-213)

243.   **LinkedIn Search and Count Graph:** Following Plaintiff's discovery of the Paul Debevec SIGGRAPH video on YouTube and his realization that the USC School of Cinematic Arts, with which Paul Debevec is directly affiliated, conducted a LinkedIn search, Plaintiff

---

87      MattGuertin.Substack.com/p/emergency-email-to-patent-attorney
88      MattGuertin.Substack.com/p/dropped-as-client-by-patent-attorney
89      MattGuertin.Substack.com/p/state-department-and-air-force-search-me

begins a detailed and thorough analysis of his LinkedIn search history dating back to the inception of his patent.

244.    This analysis results in the creation of a compelling visual graph highlighting significant external interest in Plaintiff's activities by military and defense contractors, as well as governmental entities.

245.    The graph, completed in late December 2023, substantiates many of Plaintiff's claims surrounding surveillance and the theft of his intellectual property.

246.    It also confirms the previous comment by his now ineffective defense counsel, Bruce Rivers, about "powerful people keeping an eye on him." [90]

(Exh. C, Index 30, p. 29-33, 53-59)

247.    **8/16/2023:** Correspondence received by Plaintiff from Westman, Champlin, and Koehler after being dropped as a client, contradicts the firms reason for withdrawal filed with the USPTO  (Exh. C, Index 30, p. 116-118)

248.    **8/21/2023:** Westman, Champlin, and Koehler's formal 'Request For Withdrawal As Attorney Or Agent' submitted to the USPTO in Plaintiff's patent dossier for his US Patent continuation application 18/108,858 states the reason for withdrawal as "non-detrimental to the client's interests." even though Guertin was working with his attorney at the time to file international patent applications, and running up against an approaching filing deadline

(Exh. B, Index 28, p. 187-188)

249.    **9/7/2023:** Plaintiff files a second police report for patent fraud with the Plymouth, MN Police Department. This resulted in police report #23-033797

(Exh. B, Index 28, p. 189-190)

---

90      MattGuertin.Substack.com/p/linked-in-search-count-graph

250.   **9/20/2023:** Plaintiff uses the US Senate website to send an email message to US Senator Amy Klobuchar, detailing the challenges he is experiencing due to patent theft and fraudulent activities by Netflix and others.

251.   In the email, he also addresses his belief that advanced AI technology is being utilized to facilitate the theft through the production of fraudulent documents and videos. [91] (Exh. B, Index 28, p. 191-197)

252.   **10/2023:** While using ChatGPT to help analyze and better understand the purpose of academic research papers that Plaintiff identified as fraudulently created and backdated to an accredited academic publishing sites, Plaintiff inadvertently produced **an analysis which indicated that his patented technology has 'vast' implications in military training simulations.** [92] (Exh. C, Index 30, p. 34, 67-70)

253.   **10/3/2023:** Plaintiff is emailed a Privacy Act Release Form from Senator Amy Klobuchar's office via staffer Hanna Welch (Exh. B, Index 28, p. 198)

254.   **10/6/2023:** Plaintiff returns the signed Privacy Act Release Form to Senator Klobuchar's office, enabling assistance with the USPTO, and his patent fraud concerns

(Exh. B, Index 28, p. 199-203)

255.   **10/10/2023 at 1:02pm:** Senator Klobuchar's office confirms receipt of Plaintiff's Privacy Act Release Form, and requests supporting documents for the inquiry

(Exh. B, Index 28, p. 204)

256.   **10/10/2023 at 3:36pm:** Plaintiff sends additional evidence and Substack article links to Senator Klobuchar's office to support his claims of fraudulent activities

(Exh. B, Index 28, p. 205-208)

---

91      MattGuertin.Substack.com/p/us-senator-amy-klobuchar-contacted
92      MattGuertin.Substack.com/p/you-are-not-a-computer-you-are-a

Exhibit Q | Complaint | p. 42

257.   **10/10/2023:** As part of the Plaintiff's investigation into the searches occurring for his LinkedIn page, he suddenly realizes that searches were also conducted by the US State Department, US Army, 4 searches by the US Air Force, 2 searches by Lockheed Martin, and 2 searches by DARPA.

258.   The Plaintiff makes this shocking discovery public by publishing a post to his Substack page, which serves as a historical record of the unfolding, and completely surreal events that continue to take place in the Plaintiff's life due to him filing a patent, and trying to start a successful business based on the idea he thought up. [93]

259.   **10/11/2023 at 11:18am:** Plaintiff informs Senator Klobuchar's office about the identical nature of the Netflix patent application when compared to his own granted US Patent 11,577,177.  (Exh. B, Index 28, p. 209)

260.   **10/11/2023 at 11:39am:** A comprehensive collection of documents related to Plaintiff's patent and the USPTO is emailed to Senator Klobuchar's office

(Exh. B, Index 28, p. 210)

261.   **10/11/2023 at 12:07pm:** Plaintiff sends additional evidence to Senator Klobuchar's office regarding AI-generated, backdated content on YouTube and its inconsistencies.  (Exh. B, Index 28, p. 211-212)

262.   **10/12/2023:** Plaintiff sends certified mail to Senator Klobuchar's office which includes a Substack article highlighting the search for Plaintiff's LinkedIn page by the US State Department.  (Exh. B, Index 28, p. 216-222)

263.   **10/16/2023 at 3:43pm:** Plaintiff sends a follow-up email to Senator Klobuchar's asking about updates on the status of his case, and expressing concerns about US Army involvement in the theft of his intellectual property.  (Exh. B, Index 28, p. 213-214)

---

93       MattGuertin.Substack.com/p/none-of-them-ever-say-hello

264. **10/23/2023 at 12:51pm:** Plaintiff receives a response from Senator Klobuchar's office seeking further clarification on how they can assist with his case

(Exh. B, Index 28, p. 215)

265. **10/30/2023:** As part of the Plaintiff's signed 'Plan for Care Agreement' and his stayed order of civivl commitment, the mental health case worker he has been meeting with every month submits a '60 90 Day Report' to the court for his civil commitment case.

(Exh. K, Index 26)

266. **11/7/2023:** Netflix patent US 11,810,254 is published, and has the Plaintiff's name and patent number listed at the VERY top of it. [94] (Exh. B, Index 28, p. 224)

267. **InfiniSet vs. Netflix Patent Analysis:** Plaintiff conducts a comparative analysis of US11,577,177 and US11,810,254 which suggests the Netflix patent should not have been granted based on a lack of novelty. [95] (Exh. C, Index 30, p. 94-95)

268. **11/8/2023:** An article by Thomas L. Hamlin discusses generative AI and legal implications, supporting the Plaintiff's concerns about AI's role in the theft of his intellectual property. [96] (Exh. B, Index 28, p. 264)

269. **11/15/2023:** An 'Order evaluation for Competency to Proceed' is submitted to the court by Judge Julia Dayton Klein resulting in the Plaintiff having to partake in another Rule 20.01 exam meeting to determine his competency. (Exh. A, Index 21)

270. **11/15/2023:** A Notice of Inquiry is issued by the FCC, document FCC 23-101, discussing concerns about AI voice cloning. This further supports Plaintiff's initial claims

---

94      https://patents.justia.com/patent/11810254#citations
95      MattGuertin.Substack.com/p/infiniset-and-netflix-patent-comparison
96      https://www.robinskaplan.com/resources/publications/2023/11/generative-artificial-intelligence-llms-and-fair-use-after-warhol

surrounding the origination of his criminal charges, which were deemed 'delusional' and 'implausible' by Dr. Jill Rogstad. [97]  (Exh. B, Index 28, p. 265-270)

271.   **12/5/2023:** Plaintiff receives a Non-Final Office Action from the USPTO for his continuation patent application US 18/108,858  (Exh. B, Index 28, p. 225-231)

272.   **1/3/2024:** Plaintiff participates in his second Rule 20.01 exam meeting via a two hour long Zoom meeting with Dr. Adam Milz.

273.   Prior to the Zoom meeting Plaintiff sends an email to Dr. Adam Milz alerting him to the fraudulent discovery materials.  (Exh. A, Index 29, p. 36-40)

274.   **Early January of 2024:** Plaintiff personally captured what he believes to be 'irrefutable' video evidence of the alleged fraud involving Netflix, YouTube, and the US Army, among others.

275.   This evidence comprises recordings from three separate video sources and two separate audio sources, all captured simultaneously in real-time. The process involved reviewing various YouTube videos identified as part of the alleged fraud, recording their content, and capturing the actual YouTube video file metadata.

276.   Plaintiff used 'Exiftool' to view the embedded metadata within the videos, including the video's creation date, which often featured a 'Handler Description' property formatted as 'ISO Media file produced by Google Inc. Created on: MM/DD/YYYY.'

277.   The documentation method included a 3840x1920 screen capture and two 1920x1080 camera feeds showing different views of the monitor, along with two separate microphones capturing audio.

278.   This multi-source approach resulted in a 3840x2160 (4K) video at 60 frames per second, robustly documenting the online investigations.

---

97      https://docs.fcc.gov/public/attachments/FCC-23-101A1.pdf

279.    By including the date and time in each recording and visibly navigating the web, the authenticity of the evidence is enhanced.

280.    The meticulous setup ensures that even slight discrepancies in video and audio are preserved, making the evidence difficult to dispute.  (Exh. N, Index 01, p. 5)

281.    The documentation process unveiled significant discrepancies in video production dates, suggesting recent creation of content subsequently uploaded to backdated YouTube channels. (Exh. N, Index 01, p. 13-52)

282.    This pattern aims to fabricate a historical narrative directly intertwining with the intellectual property conflict central to Plaintiff's ongoing criminal and civil cases.

283.    The fraudulent creation of a historical record through manipulated timelines on digital content platforms forms a pivotal aspect of the evidence, highlighting a deliberate attempt to alter historical context and mislead investigations connected to Plaintiff's intellectual property disputes. [98]

284.    **1/5/2024:** Plaintiff files his first ever court motion, a 'Demand or Request for Discovery'.

285.    This request specifically cited Minn. R. Crim. P. 9, and included requests for all Brady material, squad video, audio tapes, and all 104 police photographs taken by the Minnetonka Police Department on January 21, 2023 (Exh. A, Index 22)

286.    **1/10/2024 at 4:59pm:** Plaintiff emails his recently completed 'LinkedIn Search Graph' to Bruce Rivers.  (Exh. D, Index 38, p. 22-27, 130-135)

---

[98]    MattGuertin.Substack.com/p/netflix-criminal-fraud-proof
        Rumble.com/user/MattGuertin

287. **1/10/2024 at 5:03pm:** Plaintiff sends a follow-up email to Bruce Rivers about his supposed incompetency and a sudden, recent realization about the theft of his intellectual property. (Exh. D, Index 38, p. 27-28)

288. **1/10/2024 at 5:12pm:** Plaintiff sends an email to Bruce Rivers sharing a brief investor pitch for his patented technology and mentions the LinkedIn Search Graph previously sent to him. (Exh. D, Index 38, p. 134-135)

289. **1/11/2024:** Plaintiff's Rule 20.01 exam report resulting from his two hour meeting with Dr. Adam Milz is submitted to the court.

290. Plaintiff has yet to receive this report at all despite multiple requests to his ineffective defense counsel, and multiple pro se filed motions and correspondences into both his criminal and civil cases. (Exh. A, Index 00, p. 7 [Index 23])

291. **1/12/2024 at 2:16pm:** Plaintiff sends an email to Bruce Rivers highlighting the extreme stress and dangers he believes he is facing, mentioning patent theft and the involvement of the US government. (Exh. D, Index 38, p. 28-29, 136-137)

292. **1/12/2024 at 3:04pm:** Plaintiff recieves an email reply from Bruce Rivers which simply says "Call me" - Petitioner called Bruce using his mom's cell phone.

293. When Plaintiff mentioned that he was working on starting a fundraising campaign Bruce Rivers told him to "be careful" in a rather ominous tone and delivery. (Exh. D, Index 38, p. 29, 138-139)

294. **1/12/2024 at 3:37pm:** Following the Plaintiff's brief phone call with Bruce Rivers, he sends an email to him requesting discovery materials once again, and once again receives no response. (Exh. D, Index 38, p. 30, 140)

295. **1/14/2024 at 12:00pm:** Plaintiff sends an email to Bruce Rivers about his upcoming January 16, 2024, 1:30 pm court date and whether or not it could be conducted over Zoom.  (Exh. D, Index 38, p. 30, 141)

296. **1/15/2024 at 3:02pm:** Plaintiff sends a second email to Bruce Rivers about his upcoming January 16 court date.  (Exh. D, Index 38, p. 30, 142)

297. **1/15/2024:** The evening before Plaintiff's scheduled court hearing Bruce Rivers tells him there is "No court" via text message.  (Exh. C, Index 30, p. 35, 83 [Text 27], 135)

298. **1/16/2024:** A court order is signed at 8:27am by Referee Danielle C. Mercurio, and then subsequently signed at 9:22am by Judge Julia Dayton Klein which states "Prior to the hearing, the parties agreed to a finding of incompetency entered administratively."

(Exh. A, Index 25; Exh. C, Index 30, p. 36)

299. This court order also contains the following two statements:

a. "the Defendant may be committed directly to an appropriate safe and secure facility" ( Exh. A, Index 25, p. 3 [Id. 9])

b. "The head of the treatment facility shall submit a written report addressing the Defendant's competency to proceed in the criminal case when the Defendant has attained competency, or at least every six months." (Exh. A, Index 25, p. 3 [Id. 10])

300. **1/16/2024:** A 'Notice of Remote Zoom Hearing' is submitted to the court for the Plaintiff's next scheduled court appearance - six months away - on July 16, 2024

(Exh. A, Index 26).

301. The metadata for this submitted document, as retrieved using 'ExifTool', indicates that it was created at 4:19pm that afternoon.   (Exh. B, Index 28, p. 233-234)

Exhibit Q | Complaint | p. 48

302.   **1/17/2024:** The court order signed at 8:27am, and 9:22am on January 16, 2024 is officially submitted to the court at 7:29am on January 17, 2024.

(Exh. A, Index 25, p. 1, 4; Exh. C, Index 30, p. 36-37)

303.   **1/17/2024:** A language analysis conducted by the Plaintiff of the January 16-17 court order confirms his initial personal assessment of its extremely concerning language.

304.   The order implies his detainment and commitment to a 'safe and secure facility' where his competency will be assessed every six months and reported to the court.

(Exh. C, Index 30, p. 119-120)

305.   **1/26/2024 at 4:38pm:** Following Plaintiff's discovery of an unexpected civil commitment hearing scheduled for February 1, 2024, he sends an email to Bruce Rivers requesting the Rule 20.01 exam report submitted to the court on January 11, 2024, by Dr. Adam Milz after their two-hour Zoom meeting on January 3, 2024. (Exh. D, Index 38, p. 30, 143)

306.   **1/26/2024:** Plaintiff's follow-up attempts to receive Rule 20.01 exam report from Bruce Rivers.  (Exh. C, Index 30, p. 37-38)

307.   **1/28/2024:**   Plaintiff's continued attempts to contact Bruce Rivers for the exam report.  (Exh. C, Index 30, p. 38, 83 [Text 29], 85 [Calls-05], 135)

308.   **1/29/2024:** Plaintiff's text message exchange with Bruce Rivers, with Rivers still not providing the requested report.  (Exh. C, Index 30, p. 38, 83 [Text 29], 135)

309.   **1/29/2024 at 11:14am:** Plaintiff's court-appointed attorney, Joel Fisher, alerts him via email that the court provided him with the wrong phone number to contact him.

310.   If the Plaintiff hadn't been diligent in proactively monitoring his case files and finding the contact information for his newly appointed attorney in the service contacts section of the court's online records system, there's a very good chance that the Plaintiff and his attorney

may never have had a chance to confer about the civil commitment proceeding prior to the completely last minute, unexpected appearance. (Exh. B, Index 28, p. 250)

311.   **1/30/2024:** Plaintiff files a motion for continuance into his civil case, addressing the need for additional time due to insufficient preparation and lack of essential medical records. (Exh. K, Index 36)

312.   **1/30/2024:** Plaintiff files a motion for production of medical records into his civil case, seeking to compel provision of Dr. Adam Milz's Rule 20.01 exam report. (Exh. K, Index 37)

313.   **1/31/2024:** Plaintiff signs a 'Waiver' consenting to the extension of his 'Stayed Order of Civil Commitment' for an additional nine months to avoid appearing in person at the court hearing, without being provided with the Rule 20.01 exam report. (Exh. K, Index 38)

314.   The contents of this report could be detrimental in the court's justification of whether he would be directly detained and committed to a 'safe and secure facility,' as stated in the January 16-17 court order. (Exh. A, Index 25 [Id. 9])

315.   **2/1/2024:** An 'order for continued commitment', recommended by Referee George Borer, and signed by Judge Julia Dayton Klein, is submitted into the Plaintiff's civil commitment case. (Exh. K, Index 41) This order contains the following two statements:

316.   "Prior to the scheduled hearing, Respondent executed a written waiver whereby Respondent waived his right to a hearing and agreed to a continuation of his Stayed Commitment for a period of nine (9) months. The court notes that Respondent had filed a Motion for Continuance and a Motion for Production of Medical records on January 30, 2024."

(Exh. K, Index 41, p. 1)

317.   "Respondent's Motion for Continuance and Motion for Production of Medical Records are dismissed without prejudice" (Exh. K, Index 41, p. 1 [Id. 2])

318.   **2/1/2024:** Plaintiff requests the court to judicially notice the absence of index number '40' in his civil case timeline, suggesting procedural irregularities.

319.   This gap is significant because it coincides with the Plaintiff's narrowly avoided in-person appearance at the surprise civil commitment hearing and could potentially contain the pre-determined outcome the court had in store for him had he been forced to appear in person at the hearing without being able to review the contents of the withheld Rule 20.01 exam report. (Exh. B, Index 28, p. 235)

320.   **Mid-February, 2024:** Between January and February 2024, Plaintiff developed and published a video on his Rumble channel titled 'Matthew David Vs. Goliath,' after approximately 44 days of work.

321.   This documentary introduces Plaintiff's invention and its capabilities, underscores significant projects he has been involved in, and establishes his professional credibility.

322.   The video provides a detailed timeline of events leading up to the January 21, 2023 incident, which initiated Plaintiff's involvement in criminal and civil court cases.

323.   It also delves into the complexities of the suspected fraudulent intellectual property activities at the core of his legal challenges.

324.   A particularly compelling segment of the video begins at the 24:18 mark, highlighting discernible age discrepancies in the appearances of Paul Debevec (Exh. N, Index 01, p. 9), suggesting that the videos were recently produced and then backdated on YouTube.

325.     At the 24:43 mark, the video presents two different portrayals of Paul Debevec - one significantly younger and the other visibly older (Exh. N, Index 01, p. 50-52) - yet intriguingly, he wears the same outfit in both. [99]

326.     This evidence is pivotal, as replicating such distinct age representations in a single video under identical conditions would require a highly advanced and intricate production process, making it nearly impossible to fabricate.

327.     This portion of the video stands as particularly strong evidence, underscoring its near-irrefutable nature and the substantial challenges in alleging it as manufactured or fraudulent.[100]

328.     **2/20/2024:** Plaintiff verifies the standing of his company 'InfiniSet, Inc.' through the Minnesota Secretary of State website.  (Exh. B, Index 28, p. 254)

329.     **3/4/2024:**  Plaintiff mails a 'PETITION FOR EXTENSION OF TIME UNDER 37 CFR 1.136(a)' to the USPTO, requesting a two-month extension to respond to the non-final office action issued for his continuation patent application 18/108,858.
(Exh. B, Index 28, p. 255-261)

330.     **3/13/2024:** Plaintiff discovers that his criminal history has been repopulated in the MCRO court records system and now shows records dating back to 2002, including multiple petty misdemeanor parking tickets. (Exh. C, Index 30, p. 39-40, 121-126)

331.     **4/3/2024:** Plaintiff files a pro se 'Petition to Proceed as Pro Se Counsel' in his criminal case, seeking to assume the responsibility of defending himself.

332.     This decision is prompted by Bruce Rivers' refusal to provide discovery and exam reports, and his failure to actively advocate for his client's interests.  (Exh. A, Index 27)

---

99      Younger Paul Debevec - https://www.youtube.com/watch?v=k_6LL0DUdFI&t=25s
        Much Older Debevec - https://www.youtube.com/watch?v=k_6LL0DUdFI&t=104s
100     Rumble.com/v4d6i1r-Matthew-David-vs.-Goliath.html

Exhibit Q | Complaint | p. 52

333.    **4/3/2024:** Plaintiff sends an email to Bruce Rivers advising him that he would like to dismiss him as his defense counsel and represent himself moving forward. (Exh. D, Index 38, p. 144-147)

334.    **4/3/2024:** Plaintiff files a pro se 'Motion for Judicial Notice' in his criminal case, consisting of 78 individually labeled exhibits spanning a total of 271 pages, including the body of the motion itself.  (Exh. B, Index 28)

335.    **4/4/2024:** Plaintiff files a pro se 'Motion to Compel Discovery and Affidavit of Fact' in his criminal case, highlighting the State's failure to provide requested discovery materials and exposing fraudulent discovery photographs.

336.    This motion includes a total of 15 exhibits: Plaintiff's Affidavit of Fact, an email from Michael Biglow verifying the Plaintiff's original source of the fraudulent discovery, the PDF containing the fraudulent discovery and its metadata, excerpts from Dr. Jill Rogstad's and Michael Robertson's reports highlighting discrepancies in the total number of images, analyses of photographic aspect ratios and evidence of manipulation, and an email correspondence with Dr. Adam Milz prior to the Plaintiff's meeting with him on January 3, 2024, in which he alerted him to the fraudulent discovery.

337.    This motion contains a total of 40 pages, which serve to irrefutably prove the fraudulent and manipulated nature of the discovery photographs.  (Exh. A, Index 29)

338.    **4/4/2024:** Plaintiff files a pro se 'Motion to Compel the Production of Medical Records' into his civil commitment case, as he has still not been provided with the Rule 20.01 Exam Report from January. (Exh. K, Index 43)

339.   **4/9/2024:** Plaintiff files a pro se 'Affidavit of Fact' in his criminal case, providing extensive background information and insight into events related to his court case, as well as the broader criminal conspiracy involving the theft of his intellectual property.

340.   This affidavit consists of 32 individually labeled exhibits and spans a total of 213 pages, 52 of which make up the motion itself.  (Exh. C, Index 30)

341.   **4/12/2024:** A handwritten letter that Guertin's mother wrote, and mailed to Judge Jay Quam (Exh. A, Index 31, p. 4) is scanned, and submitted into the case record at 2:10 pm (Exh. A, Index 31) as an incoming correspondence.

342.   Notably, Judge Quam has been the judge assigned to Guertin's case the entire time, yet he has never been involved in a single decision at all thus far. (Exh. A, Index 00, p. 7)

343.   **4/12/2024:** Judge Julia Dayton Klein submits a court order denying Plaintiff's 'Petition to Proceed as ProSe Counsel' at 2:28 pm which includes the statement: "Defendant's Motion to Represent Self Pro Se is DENIED, and Mr. Bruce Rivers shall proceed as the attorney of record."  (Exh. A, Index 33)

344.   **4/12/2024:** An outgoing correspondence is submitted into the record at 4:42 pm (Exh. A, Index 00, p. 7) which serves as a response to the letter written by Guertin's mother on his behalf. Notably, even though the letter was personally addressed to Judge Jay Quam (Exh. A, Index 31, p. 4), the response, which states that the letter has been "cirulated...to the parties" is made by 'Lee Cuellar - Judicial Clerk to the Honorable Julia Dayton Klein'.  (Exh. A, Index 34)

345.   **4/18/2024 at 7:27am:** Plaintiff sends Bruce Rivers a text message advising him to withdraw as defense counsel, to which Rivers replies, "Call me."

346.    Plaintiff did not call him and has no further intention of communicating with him, having lost all trust and respect for Mr. Rivers, which had been a cornerstone of their 20+ year relationship. (Exh. D, Index 38, p. 31, 148)

347.    **5/3/2024:** Plaintiff files a pro se follow-up correspondence into his criminal case, addressing both the court's and his defense counsel's failure to acknowledge his previously filed motions for judicial notice, discovery, and medical records.

348.    He emphasizes the detrimental impact of the State's failure to provide requested materials, particularly fraudulent discovery photographs.

349.    The correspondence highlights the court's procedural obligations and the significant anxiety and concern caused by the court's inaction.

350.    Plaintiff requests an expedited review of his pending motions and an update on the court's intended actions to ensure procedural fairness and his mental well-being.

351.    Additionally, Plaintiff alerts the court that he is meeting all the terms of his agreement for his stayed order of civil commitment as required.  (Exh. A, Index 36)

352.    **5/3/2024:** Plaintiff files a pro se 'Affidavit of Fact' in his criminal case, detailing his extensive data analysis of Minnesota Court Records Online (MCRO) case files.

353.    This analysis involved downloading and examining 3,556 criminal case files [101] across 163 unique case IDs, focusing on the involvement of three judicial officers: Judge Julia Dayton Klein, Referee Danielle C. Mercurio, and Referee George Borer.

354.    With these three judicial officers being involved in ALL hearings and decisions carried out in his criminal proceedings, besides Plaintiff's initial 'in-custody' appearance on January 25, 2023.

_____

101    MCRO case files share link containing all of the official court records Guertin
        downloaded -  https://drive.proton.me/urls/QA8TBVTHEC#Wy7ygZMVpev7

Exhibit Q | Complaint | p. 55

355.    The affidavit aims to highlight procedural irregularities and an established pattern of 'circular handling' of cases and key decisions among these three judicial officers.

356.    The document includes detailed exhibits on shared judicial assignments, analysis of case handling, and evidence of potential manipulation in the assignment of judges to specific cases.

357.    Plaintiff asserts that this analysis supports concerns about the fairness and impartiality of his own court proceedings.

358.    Furthermore, Plaintiff is of the belief that many of the court records he downloaded are highly indicative of not being authentic, and possibly fraudulently produced altogether. One only need to examine the names of of some of the defendant's, the individual case filings - such as detention orders, and the individual case timelines to perhaps arrive at a similar conclusion.

359.    Although Plaintiff believes there are many aspects of the case files themselves that are highly 'suspicious', he intentionally chose not to pursue it further. (Exh. A, Index 37)

360.    **5/6/2024:** Plaintiff files a pro se 'Affidavit of Fact' in his criminal case, sharing a substantial amount of additional emails between himself and Bruce Rivers.

361.    These communications are all relevant to Plaintiff's claims of misconduct, bias, and ineffective assistance of counsel, among other issues.  (Exh. D, Index 38)

362.    **5/6/2024:** Plaintiff files a pro se 'Affidavit of Fact' into his criminal case sharing a chronological photo timeline detailing his extensive business and patent related endeavors both before, and after January 21, 2023 when his criminal charges originated.  (Exh. E, Index 39)

363.    **5/9/2024:** An 'Order evaluation for Competency to Proceed' signed by Judge Julia Dayton Klein is submitted into the Plaintiff's criminal case.  (Exh. A, Index 40)

364.   **5/10/2024:** Plaintiff files a 'Petition for Discretionary Review' pursuant to Minn. R. Crim. P. 28.02 and Minn. R. Civ. App. P. 105 with the Minnesota Court of Appeals, citing the April 12, 2024 court order by Judge Julia Dayton Klein denying his petition to proceed as pro se counsel.

365.   This order is used to bring the many unprecedented and extremely concerning issues before the appellate court that have been, and are continuing to take place in his Hennepin County District Court proceedings.

366.   The petition includes a total of ten individual addenda submitted as part of the original filing to comply with the appellate court's 50-page limit imposed in Minn. R. Civ. App. P. 130.02(b).  (Exh. F, Index 1)

367.   **5/13/2024:** Plaintiff's filing is accepted by the Minnesota Court of Appeals and assigned case number A24-0780.  (Exh. F, Index 15)

368.   **5/14/2024:** Plaintiff submits a pro se 'Correspondence of Supplementary Addendum Information' in his appellate case to provide the court with an organized and 'all in one' detailed overview of the 10 addenda submitted in his initial filing.

369.   He was unable to incorporate proper citation references into the petition itself due to the last-minute nature of the case and the demands of ensuring it was filed before the 30-day deadline.  (Exh. F, Index 16)

    a.   **ADDENDUM-01: *Key Motions and Orders*** (Exh. G, Index 4)

        Includes orders denying the petition to proceed pro se, orders of detention, continuances, and motions for judicial notice.

    b.   **ADDENDUM-02: *FRAUD ON THE COURT*** (Exh. G, Index 5)

Addresses the manipulation and editing of crucial discovery photographs, providing a motion to compel discovery and related exhibits.

c. **ADDENDUM-03:** *Data Analysis of MCRO Court Records*  (Exh. G, Index 6)

Presents an affidavit and exhibits analyzing judicial assignments and case handling, indicating potential procedural irregularities.

d. **ADDENDUM-04:** *Chronological Cell Phone Image Timeline* (Exh. H, Index 7)

Documents Plaintiff's personal and business activities before and after his criminal charges.

e. **ADDENDUM-05:** *Petitioner's Rule 20.01 Exam Report*  (Exh. H, Index 8)

Includes email history with Dr. Jill Rogstad and metadata analysis of the exam report.

f. **ADDENDUM-06:** *Communications 01*  (Exh. I, Index 9)

Contains LinkedIn search data, emails discussing patent issues, and interactions with Bruce Rivers.

g. **ADDENDUM-07:** *Communications 02*  (Exh. I, Index 10)

Further LinkedIn searches, text messages, and call history with Bruce Rivers, emphasizing defense counsel's ethics and misconduct violations.

h. **ADDENDUM-08:** *Communications 03*  (Exh. J, Index 11)

Additional emails and evidence related to the Plaintiff's patent and military training simulation implications.

i. **ADDENDUM-09:** *Patent and Business Dealings 01* (Exh. J, Index 12)

Highlights Plaintiff's professional accomplishments, business dealings, and interactions with Netflix.

    j.   **ADDENDUM-10:** *Patent and Business Dealings 02*  (Exh. J, Index 13)

          Covers communications with Senator Amy Klobuchar, patent filings, and FBI reports.

370.   **5/14/2024:** Plaintiff files a pro se 'Motion for Public Access to Appellate Filings' in his appellate case. This motion emphasizes the need for transparency and public trust in the judicial process, citing significant allegations of judicial misconduct, procedural errors, and evidence manipulation.

371.   Guertin highlights his waiver of confidentiality regarding his medical records, implied by his strategic decision to submit them as evidence exhibits in his criminal case.

(Exh. F, Index 17)

372.   **5/14/2024:** Plaintiff files a pro se 'Motion for IFP' into his appellate case pursuant to Minn. R. Civ. App. P. 103.01, subd. 3(c), and seeks to waive the $550 filing fee due to his involvement in proceedings under Minnesota Statutes chapter 253B. Guertin provides supporting documentation, including his waiver and acceptance of the terms of his stayed order of civil commitment.

373.   He argues that his appeal qualifies for the fee waiver despite not directly appealing the civil commitment case, due to his status as a party in related proceedings.

(Exh. F, Index 18)

374.   **5/16/2024:** Plaintiff filed a 'Corrective Affidavit of Service' into his appellate case to address potential discrepancies in his initially filed proof of service.

375.   Guertin realized the discrepancies after noticing that his petition for discretionary review and other key documents were marked as 'under review' in the Hennepin County District Court's e-file and serve system.

376.    To correct this, he resubmitted all original appellate court documents into his criminal case, while being sure to select the 'e-file and serve' option instead of only 'serve.' (Exh. F, Index 20)

377.    **5/17/2024:** The State of Minnesota, represented by the Hennepin County Attorney's Office, submitted a response objecting to the discretionary review requested by the Plaintiff.

378.    The response argues against granting discretionary review of the district court's April 12, 2024, order denying Guertin's motion to represent himself pro se.

379.    The State contends that the district court's order is based on well-established law, asserting that an incompetent defendant cannot waive the right to counsel.

380.    However, the State's response completely ignores the irrefutable evidence of fraud that was filed as evidence with the petition and duly served upon them.

381.    This omission is critical, as it overlooks substantial procedural misconduct and constitutional violations, highlighting a systemic issue under the *Monell* criteria that necessitates federal oversight.  (Exh. F, Index 21)

382.    **5/17/2024:** Chief Judge Susan L. Segal issued an order denying the Plaintiff's motions. The order denied Guertin's motion to proceed in forma pauperis (IFP), stating that this determination must be made by the district court, not the appellate court.

383.    The order also denied Guertin's motion for public access to appellate filings.

384.    At Id. 9, Chief Judge Segal explicitly states: **"Because the current scope of this court's review in this matter is to determine whether the issues presented by the district court's April 12, 2024 order merit an immediate appeal, this court's disposition of the petition for discretionary review will not involve an examination of district court decisions**

**other than that for which review is being sought and will not provide any other form of relief. See Minn. R. Civ. App. P. 105.01-.03. Petitioner's request for a broader scope of review is accordingly denied."**

385.    Notably, the order improperly asserts authority beyond the chief judge's jurisdiction, as per Minn. Civ. App. P. 105, which reserves such determinations for a three-judge panel.

386.    This explicit denial of broader relief, coupled with the refusal to address the irrefutable evidence of fraud and constitutional violations presented, underscores a systemic issue within the judicial process.

387.    It highlights a deliberate indifference to the Plaintiff's rights and procedural safeguards, fitting the criteria under *Monell* for demonstrating a policy or custom of constitutional violations that necessitates federal intervention.

388.    Additionally, the statement made at Id. 10: **"Because petitioner provides no authority compelling this court to provide an affirmation that its disposition of this case will 'align[ ] with the highest standard of justice,' we decline to do so,"** could be seen as unprofessional and not reflecting the expected decorum of the appellate court.  (Exh. F, Index 23)

389.    **5/23/2024:**  Hennepin County District Court Judge Julia Dayton Klein issues an order denying Plaintiff's 'Motion for IFP' filed into his appellate case.

390.    This denial cites insufficient information to determine his eligibility for a full or partial fee waiver.

391.    Notably, Guertin never officially filed a separate motion for a fee waiver into his district court case as instructed by the appellate court. Instead, Judge Klein based her decision on Guertin's motion submitted to the appellate court itself.  (Exh. F, Index 24)

392.    **5/28/2024:** Plaintiff files a pro se 'Motion for Waiver of Fees Pursuant to Rule 103.01 subd. 3(c)' into his appellate case.

393.    This follow-up motion renames the original filing to directly reference the specific rule, which was not addressed in Chief Judge Susan L. Segal's prior order.

394.    The motion again seeks to waive the $550 filing fee based on Guertin's involvement in proceedings under Minnesota Statutes Chapter 253B.

395.    The motion clarifies the applicability of the rule and addresses previous procedural misunderstandings by focusing on the individual meanings of words and language in the argument. It cites the case law *G&I IX OIC LLC v. County of Hennepin*, 979 N.W.2d 52, 58 (Minn. 2022), which states that statutes should be interpreted "so as to give effect to each word and phrase," and that dictionary definitions may be consulted to determine a word's plain meaning, ensuring compliance with court requirements. (Exh. F, Index 25)

396.    **5/28/2024:** Plaintiff files a pro se 'Motion for Judicial Notice: A' into his appellate case, requesting the court to acknowledge Exhibit A.

397.    The exhibit contains a chronological event timeline, providing a detailed and comprehensive overview of the case proceedings and significant events.

398.    This compilation is essential for understanding the case history and the context of the issues raised.

399.    The motion aims to ensure that the appellate court has a clear and accurate record of all relevant events and documents.  (Exh. F, Index 26)

400.    **5/28/2024:** Plaintiff files a pro se 'Motion for Judicial Notice: B' into his appellate case, requesting the court to acknowledge Exhibit A.

401.    This exhibit provides a detailed, factual account challenging the findings of incompetency in the initial forensic evaluation report by Dr. Jill Rogstad.

402.    It includes records, correspondence, and evidence supporting the Plaintiff's competency and mental state.

403.    The motion aims to highlight procedural irregularities and discrepancies in the forensic evaluation report, presenting a thorough examination of the petitioner's ability to understand the legal proceedings, participate in his defense, and consult rationally with counsel.

404.    Notably, every fact the court is being requested to take notice of is part of the lower court case record, due to the Plaintiff personally and systematically submitting all of into the record via his many pro se submitted filings.  (Exh. F, Index 27)

405.    **5/28/2024:** Plaintiff files a pro se 'Motion for Judicial Notice: C' into his appellate case, requesting the court to acknowledge Exhibit A.

406.    This exhibit contains documentation related to Guertin's USPTO extension request, including scans of payment receipts, shipping labels, and correspondence with the USPTO.

407.    The motion aims to provide essential context and support for the case, specifically relating to the petitioner's patent and related legal proceedings.  (Exh. F, Index 28)

408.    **5/28/2024:** Plaintiff files a pro se 'Motion for Judicial Notice: D' into his appellate case, highlighting a profound inconsistency between the lower and higher courts.

409.    This concise motion requests the court to acknowledge that he is recognized as a pro se litigant by the appellate court, which stands in contrast to the lower court's finding of incompetence.

410.    The motion presents a significant discrepancy in judicial recognition of competence, raising a substantial legal question that the court must address.

411.    Despite its brevity, the motion is notably compelling, underscoring a substantial judicial inconsistency.  (Exh. F, Index 29)

412.    **5/29/2024:** Despite firmly believing that he met the criteria for a waiver of the filing fee, Guertin decided not to let the progression of his appellate case hinge on this single argument.

413.    On May 29, 2024, he drove to the State capital and paid the $550 filing fee in cash, to the clerk of the appellate court.

414.    This resolved the only remaining deficiency in his appellate case, allowing it to continue forward unabated.

415.    **5/30/2024:** Hennepin County District Court Judge Julia Dayton Klein issues an order denying Plaintiff's pro se 'Motion for Waiver of Fees Pursuant to Rule 103.01 subd. 3(c)'.

416.    This order, like the previous denial on May 23, 2024, is based on the understanding that Guertin did not file a separate motion specifically for the district court.

417.    Instead, Judge Julia Dayton Klein is ruling on a motion directed solely to the appellate court. The order notes that the rule cited by Guertin does not apply as the order he seeks relief from is not related to proceedings under Minnesota Statutes Chapter 253B or 253D. (Exh. F, Index 33)

418.    **5/30/2024:** Plaintiff files a pro se 'Motion for Leave to File Late Response to Respondent's Objection' to his petition for discretionary review.

419.    Guertin cites the complexity of his case and his pro se status as reasons for the delay, emphasizing the need for thorough research and preparation to ensure a comprehensive response.

420.    In his response to the State's objection, Guertin strategically begins by redirecting the focus back to the serious allegation of fraud on the court, which the State ignored in its response. His well-structured arguments highlight significant procedural and evidentiary inconsistencies, including numerous index citations referencing a substantial amount of supporting evidence.

421.    Guertin's response effectively challenges the State's position and underscores the need of addressing the fraudulent discovery, judicial misconduct, and the continuing ineffective assistance of his defense counsel, Bruce Rivers.  (Exh. F, Index 30)

422.    **5/31/2024:** Chief Judge Susan L. Segal issues an order addressing several motions filed by the Plaintiff. The order denies Guertin's motion for a waiver of the filing fee, citing Minn. R. Civ. App. P. 103.01, subd. 3(c), and clarifying that the rule does not apply to his criminal proceeding.

423.    Despite this denial, the deficiency is deemed satisfied due to the $550 filing fee being paid on May 29, 2024.

424.    The order also defers the decision on Guertin's motions for judicial notice to the panel assigned to address the merits of his petition.

425.    Furthermore, the court grants Guertin's motion for late acceptance of his reply to the State's response, acknowledging his self-represented status and finding good cause to accept the late filing.

426.    The response to the State was ordered filed on May 30, 2024, and is recorded in the case file as filed on that date.  (Exh. F, Index 34)

427.    **5/31/2024:** Plaintiff received a letter from the Hennepin County District Court on May 31, 2024, requesting that he participate in a third Rule 20.01 psychological evaluation.

428.    The court and defense counsel have still not provided Guertin with the report from his last Rule 20.01 exam conducted on January 3, 2024.

429.    In light of the fraudulent authorship of the initial exam report, the concerning events following the second exam, and the non-compliance with court rules and Minnesota statutes requiring the report's provision, Guertin has significant reservations about participating in another evaluation.

430.    Guertin's stayed order of civil commitment is set to expire on November 8, 2024, and cannot be extended further.

431.    He has been fulfilling all obligations under his original plan for care agreement, including obtaining health insurance, meeting monthly with his case worker from Vail Place, attending therapy sessions, and maintaining regular contact with his case worker.

432.    His case worker has indicated that his visits and the stayed order do not need to continue past November 2024 and will submit a final report to the court which conveys this.

433.    Given the lack of effective defense counsel and the previous deceptive actions, the Plaintiff will not consider another exam unless he has effective defense counsel present to protect his rights.

434.    Additionally, he believes his competency is clearly evident based upon the numerous legal filings he has successfully submitted in both the district and appellate courts, and

Exhibit Q | Complaint | p. 66

now this Court as well - an assertion which is in fact supported by a significant amount of Minnesota case law. [102]

435.     Consequently, Guertin has decided not to participate in a third Rule 20.01 exam, thanking the court but declining their request.  (Exh. K, Index 100)

436.     **6/3/2024:** Plaintiff filed a pro se 'Motion to Compel Discovery' addressing critical constitutional violations in his case.

437.     It highlights the failure of the State to provide essential discovery materials despite multiple formal requests and follow-ups, undermining his due process rights and ability to prepare a proper defense.

438.     The document details procedural violations and ineffective assistance of counsel, requesting urgent court intervention to ensure transparency and fairness in the judicial process.

439.     Notably this is the third motion filed pro se by Plaintiff requesting discovery, and the second 'Motion to Compel Discovery' he has filed. (Exh. A, Index 22, 29, 90)

440.     **6/3/2024:** Plaintiff filed a pro se 'Motion for Substitute Counsel' requesting the appointment of substitute counsel due to significant constitutional violations and ineffective assistance of his current attorney, Bruce Rivers.

441.     The motion details multiple instances where Mr. Rivers failed to provide essential discovery materials, present exculpatory evidence, and honor commitments, including a conflict of interest that undermines his ability to provide effective representation.

---

102     *Droher v. State*, 303 Minn. 188, 191-92 (1975)
        *State v. Thompson*, 988 N.W.2d 149, 157-158 (Minn. App. 2023)
        *State v. Sabahot*, A10-2174, p. 10 (Minn. App. Jan. 3, 2012)
        *State v. Ganpat*, 732 N.W.2d 232, 238 (Minn. 2007)
        *State v. Foss*, A09-2152, p. 4 (Minn. App. Oct. 19, 2010)
        *State v. Sabahot*, A10-2174, p. 8, 10 (Minn. App. Jan. 3, 2012)
        *State v. Camacho*, 561 N.W.2d 160, 173 (Minn. 1997)

442.    Previous attempts to address these issues have been ignored, necessitating urgent Federal intervention to ensure a fair trial and protect the Plaintiff's constitutional rights. (Exh. A, Index 91)

443.    **6/3/2024:** Plaintiff submitted his second follow-up correspondence to the MN 4th Judicial District Court addressing ongoing constitutional violations due to the failure to provide essential discovery materials.

444.    Despite multiple formal requests and a motion to compel discovery, the Plaintiff has not received the necessary materials for his defense.

445.    This letter underscores the significant impairment of his right to due process and requests prompt court intervention. It also references the previously filed motions for substitute counsel and to compel discovery, emphasizing the need for transparency and effective legal representation.  (Exh. A, Index 92)

446.    **6/6/2024 at 6:56am:** Plaintiff sends a third request to his currently ineffective defense counsel, Bruce Rivers, to withdrawal from his case which states the following:

> "I DO NOT WANT TO BE REPRESENTED BY YOU ANYMORE.
>
> I DON'T TRUST YOU.
>
> PLEASE WITHDRAWAL FROM MY CASE.
>
> I want a public defender.
>
> I want discovery.
>
> I still want my Rule 20 exam from last January.
>
> I'm not calling you"  (Exh. N, Index 04, p. 16, 26)

447.    **6/6/2024 at 7:51am:** Rivers replies: "What did I do to you?"

(Exh. N, Index 04, p. 16, 26)

448.   **6/6/2024 at 7:53am:** Rivers replies: "Where do I send your file?"

(Exh. N, Index 04, p. 16)

449.   **6/6/2024 at 4:20pm:** Guertin replies with a very long, and very direct message which was intended to thoroughly 'hammer it home'. (Exh. N, Index 04, p. 16, 26) [103]

450.   He apparently succeeded as Bruce Rivers has never responded.

451.   Bruce Rivers is still currently representing the Plaintiff despite multiple requests for him to withdrawal, leaving the Plaintiff in a completely surreal situation where he was competent enough to hire Rivers as his defense counsel, but is now unable to fire him due to supposedly being incompetent.

452.   Meanwhile the court refuses to appoint substitutue counsel, and continues to completely ignores Guertin's many motions he's filed to try and address the substantial, and ongoing constitutional violations.

453.   **7/2/2024:** The Minnesota Court of Appeals issued an order denying the Plaintiff's petition for discretionary review.

454.   This decision disregarded the substantial and well-documented evidence presented by Guertin, including irrefutable proof of fraud, ineffective assistance of counsel, and significant procedural and constitutional violations.

455.   Despite the district court's determination of Guertin's incompetency to stand trial, his petition highlighted systemic issues and misconduct by judicial and prosecutorial entities that demanded review.

---

[103]   This text message is considered 'Must Read' material in the Plaintiff's opinion, as he did a rather good job of thoroughly 'laying it all out' in what is still a rather concise fashion considering it is only a text message.

456.    The appellate court's refusal to consider these critical issues perpetuates the ongoing injustices faced by Guertin, failing to address the severe implications for his due process rights and the integrity of the judicial system.

457.    The Court also denied Plaintiff's motions for judicial notice, deeming them as 'unnecessary'. These motions were aimed at bringing additional evidence to light, demonstrating Guertin's competency and further exposing the misconduct in the lower court proceedings.

## VI.   POTENTIALLY FRAUDULENT MCRO JUDICIAL RECORDS

458.    A recent data analysis conducted by the Plaintiff from the Minnesota Court Records Online (MCRO) reveals several irregularities that raise concerns about potential fraud and misconduct within the judicial system.

459.    The data reveals several defendants with very similar or slightly varied names, raising concerns about record accuracy and potential fraud. (Index 37, pp. 2-3)

460.    An unusually high number of competency evaluations relative to the number of defendants suggests possible fabrication of evaluation orders. (Index 37, pp. 16-17)

461.    A disproportionately high number of detention and release orders compared to the number of active defendants indicates possible misuse of these orders. (Index 37, pp. 15-18)

462.    The data shows repeated and unusual defendant names, suggesting potential issues with the integrity of court records. (Index 37, pp. 10-12)

463.    There is a pattern of the same judges repeatedly making decisions on the same cases, raising concerns about impartiality and fairness. (Index 37, pp. 21-23)

464.    Extensive use of remote hearings with multiple Meeting IDs and Passcodes indicates potential irregularities in hearing conduct. (Index 37, pp. 15-16)

465.    The same judicial officers involved in the Plaintiff's proceedings are implicated in these systemic issues. These patterns of misconduct may have contributed to the unfair and biased treatment the Plaintiff has experienced, thus impacting his constitutional rights to due process and a fair trial.

466.    The Plaintiff requests the court to take judicial notice of these systemic issues and consider them as part of the broader context when evaluating the specific claims of judicial misconduct and due process violations presented in this complaint.

## VII.   PRE-EMPTIVE ADDRESS OF HECK V. HUMPHREY

467.    The Plaintiff, Matthew Guertin, has not been convicted or sentenced in the criminal case associated with these claims. Furthermore, the civil commitment order issued against the Plaintiff has been stayed, as detailed in the "Respondent's Stayed Order of Civil Commitment Agreement" and the "Plan for Services Agreement" (Exhibit K, Index 22).

468.    This stay means that the Plaintiff is not currently committed or confined. There is no conviction or sentence to invalidate, as required under *Heck v. Humphrey*, 512 U.S. 477 (1994). Therefore, the principles outlined in *Heck* do not apply to this case.

469.    The core element of this case is the invalid and fraudulent determination of incompetence. The claims presented focus on procedural due process violations, including but not limited to:

   a.   The use of fraudulent discovery materials provided to the psychological examiner.

   b.   The denial of access to the second Rule 20.01 exam report, despite multiple requests.

   c.   The lack of implied consent for the second determination of incompetence.

470.    These procedural violations have deprived the Plaintiff of a fair trial and due process, warranting corrective measures and injunctive relief. Courts have long recognized that individuals can sue those who pursue "unfounded proceedings ... to have [them] declared insane" for malicious prosecution, even if the proceedings are "not criminal in their nature" (*Thomas M. Cooley, A Treatise on the Law of Torts* 188 712 (1879); see also *Lockenour v. Sides*, 57 Ind. 360, 364-65 (1877)). Those who "institute[] and carr[y] on" such proceedings are liable for any false representations they make about the victim's competency (*Lockenour,* 57 Ind. at 360, 364).

471.    Given the Plaintiff's current status without confinement, habeas corpus does not apply. Habeas corpus is designated for those in custody challenging their detention, which is not the situation here. The procedural due process claims presented do not imply the invalidity of any conviction or sentence, distinguishing this case from those addressed by Heck.

472.    The Supreme Court has clearly established that § 1983 claims are valid for procedural challenges that do not imply the invalidity of confinement. In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Court held that such claims are not barred by *Heck,* as they focus on procedural violations rather than the validity of a conviction or sentence.

473.    Additionally, in *Preiser v. Rodriguez*, 411 U.S. 475 (1973), the Court established habeas corpus as the exclusive remedy for challenging the fact or duration of confinement but explicitly stated that this does not preclude § 1983 claims for procedural violations.

474.    These cases support the argument that Mr. Guertin's due process claims, which address procedural defects and not the validity of a conviction, are valid and should proceed.

475.    In summary, the Plaintiff's claims focus on procedural due process violations and fraudulent actions that do not challenge the validity of any existing conviction or sentence.

476.    The stayed order of civil commitment confirms that the Plaintiff is not currently confined, distinguishing this case from those addressed by *Heck v. Humphrey*.

477.    Therefore, the Plaintiff respectfully requests that this Court recognize the inapplicability of *Heck* to this case and allow the due process claims to proceed.

## VIII.   CLAIMS FOR RELIEF

### COUNT I

**- Violation of Procedural Due Process - 42 U.S.C. § 1983 -**
*Plaintiff v. Hennepin County, Mary Moriarty, Chela Guzman-Weigart, Dr. Jill Rogstad*
*Judge Julia Dayton Klein, Keith Ellison (prospective injunctive relief), and Bruce Rivers*

478.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

479.    This action is brought against the defendants for violations of the Plaintiff's procedural due process rights under the Fourteenth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

480.    The defendants engaged in fraudulent and deceptive practices during the competency determination proceedings. These actions include but are not limited to providing fraudulent discovery materials to the psychological examiner and denying the Plaintiff access to critical forensic examination reports.

481.    Defendants engaged in the creation and use of forged documents, including manipulated court orders and examination reports. (Exh. B, Index 28, p. 173, 235-236)

482.    Defendants issued backdated court orders and misleading notices about court hearings to intentionally mislead Mr. Guertin.

(Exh. A, Index 25, p. 1, 3, Exh. C, Index 30, p. 35-37)

483.    Discovery materials provided to Mr. Guertin contained manipulated photographs (Exh. A, Index 29, p. 27-34), and missing images. (Exh. A, Index 29, p. 15)

484.    This has been proven through an analysis in which Mr. Guertin utilized established forensic methodologies (Exh. A, Index 29, p. 14, 17, 29), resulting in irrefutable proof of not only the manipulation of the images themselves, but also the carefully crafted narrative that the manipulation served to create. (Exh. A, Index 29, p. 21-23)

485.    In May of this year, Mr. Guertin submitted two separate motions to the appellate court, each focused solely on his belief that he met the criteria set forth in Minn. R. Civ. App. P. 103.01, subd. 3(c), thereby justifying a waiver of the $550 filing fee. (Exh. F, Index 18, 25)

486.    Neither of these motions was directed at, captioned for, or explicitly prepared for the Hennepin County 4th District Court, or Judge Julia Dayton Klein (Exh. F, Index, 24, 33), and therefore never fell within her jurisdiction.

487.    This jurisdictional overreach is evidenced by the fact that both orders issued by Judge Julia Dayton Klein denying the fee waiver being sought by Guertin, contain the following statement: "Based on the affidavit of the applicant, Matthew David Guertin, and the authority of Minn. Stat. § 563.01." However, Mr. Guertin did not prepare or file an affidavit as outlined in Minn. Stat. § 563.01 and never intended to.

488.    The language in his motions clearly indicates that his focus was solely on Minn. R. Civ. App. P. 103.01, subd. 3(c), despite the initial motion being misnamed due to Mr. Guertin's lack of formal legal education.

489.    The implication of the phrase "the affidavit of the applicant, Matthew David Guertin" is that Judge Julia Dayton Klein not only ruled on matters outside her jurisdiction but also included false and misleading statements in her orders.

490.   This misrepresentation suggests that the Judge's actions were not only procedurally improper but also substantively flawed, potentially constituting judicial misconduct.

491.   These actions by Judge Julia Dayton Klein fall outside the scope of her judicial capacity, and thus do not qualify for judicial immunity. Her orders, based on non-existent affidavits and misapplied legal standards, demonstrate a clear overstep of judicial boundaries and a violation of procedural due process.

492.   These actions, which do not qualify for judicial immunity, highlight a significant overreach of judicial authority and contribute to the ongoing harm experienced by Mr. Guertin.

493.   Mary Moriarty, in her supervisory capacity, failed to address the blatant procedural violations despite being aware of the fraudulent activities.

494.   Keith Ellison, in his capacity as Attorney General of Minnesota, failed to intervene to correct the known procedural and constitutional violations, thereby allowing the violations to persist. (Exh. F, Index 21).

495.   42 U.S.C. § 1983 provides a remedy for violations of constitutional rights by individuals acting under color of state law.

496.   Minn. Stat. § 609.63 addresses forgery and the falsification of records. Minn. Stat. § 609.43 covers misconduct by public officers, including falsifying documents.

## COUNT II

### - Fraud and Forgery - Minn. Stat. § 609.63 -

*Plaintiff v. Hennepin County, Chela Guzman-Weigart, Dr. Jill Rogstad*

497.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

498.    This action is brought against the defendants for their involvement in fraudulent actions and forgery related to the competency evaluations and court documents.

499.    The defendants engaged in actions that constituted fraud and forgery, significantly impacting the Plaintiff's legal proceedings and competency evaluations.

500.    Chela Guzman-Weigart and Dr. Jill Rogstad were directly responsible for the misrepresentation of the forensic evaluation report authorship. The forensic evaluation report purportedly authored by Dr. Jill Rogstad contained metadata indicating it was actually created by Chela Guzman-Weigart. (Exh. B, Index 28, p. 100-101, 262-263)

501.    Evidence was manipulated to hide the Plaintiff's significant business-related activities, particularly those connected to his patent. Additionally, this manipulation aimed to misrepresent his living conditions, which were crucial in the psychological evaluations and subsequent court proceedings. (Exh. A, Index 29, p. 15-16, 24-26)

502.    Minn. Stat. § 609.63 (Forgery) addresses the falsification of documents with the intent to defraud.

503.    Minn. Stat. § 645.25 (Intent to Defraud) pertains to misrepresenting the authorship of documents with the intent to deceive the court and the Plaintiff.

504.    Document properties and metadata from the disputed discovery PDF.

(Exh. A, Index 29, p. 13-16)

Exhibit Q | Complaint | p. 76

505.    Excerpts from the forensic examination report conducted by Dr. Jill Rogstad.

(Exh. B, Index 28, p. 100-101, 262-263)

506.    Analysis of manipulated discovery photographs. (Exh. A, Index 29, p. 18-35)

507.    Punitive damages in an amount to be determined by the jury are available against

defendants and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461

U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard

of proof set forth in Minn. Stat. § 549.20.

508.    Defendants are jointly and severally liable to Plaintiff.


## COUNT III

### - Ineffective Assistance of Counsel - Sixth Amendment -
*Plaintiff v. Bruce Rivers*

509.    Plaintiff incorporates by reference all preceding paragraphs as though fully set

forth herein.

510.    This action is brought against the defendant for failing to provide effective

assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution.

511.    Defendant Bruce Rivers, the Plaintiff's defense counsel, provided ineffective

assistance during critical stages of the Plaintiff's legal proceedings. His actions and omissions

contributed significantly to the deprivation of the Plaintiff's constitutional rights.

512.    Bruce Rivers failed to adequately challenge the fraudulent discovery materials

presented by the prosecution, including manipulated photographs.

513.    Rivers did not properly address or contest the fraudulent competency examination

report by Dr. Jill Rogstad, nor did he seek to expose the manipulation and forgery involved in its

creation.

514.    Rivers neglected to develop and implement a comprehensive defense strategy to counteract the fraudulent actions and procedural anomalies orchestrated by the defendants, significantly undermining the Plaintiff's ability to receive a fair trial.

515.    Rivers failed to investigate and present critical evidence that would have challenged the fraudulent activities and supported the Plaintiff's case.

(Exh. D, Index 38, p. 99-103)

516.    Despite multiple requests from the Plaintiff to withdraw from the case, Rivers continues to represent the Plaintiff, thereby contributing to the ongoing deprivation of rights.

(Exh. D, Index 38, p. 144, 148; Exh. N, Index 4, p. 16, 26-27)

517.    Rivers failed to maintain adequate communication with the Plaintiff, including not responding to his inquiries and not keeping him informed about the progress and strategy of the case. (Exh. C, Index 30, p. 83; Exh. D, Index 38, p. 140-144)

518.    Rivers had a conflict of interest related to his financial incentives and the promotion of his YouTube channel, which could have influenced his representation of the Plaintiff. (Exh. C, Index 30, p. 73)

519.    Rivers failed to present significant exculpatory evidence, including FTC and FBI reports, patent documentation, and professional accomplishments of the Plaintiff, which were crucial for challenging the competency determination.

(Exh. B, Index 28, p. 161-167; Exh. C, Index 30, p. 21; Exh. D, Index 38, p. 99-103)

520.    Prior to a civil commitment hearing, the Plaintiff provided Rivers with substantial evidence to challenge Dr. Rogstad's report, but Rivers failed to forward this critical information, impacting the Plaintiff's defense. (Exh. D, Index 38, p. 113-116, 118-119)

Exhibit Q | Complaint | p. 78

521.    Rivers misled the Plaintiff by stating there was "No court" for a scheduled appearance (Exh. C, Index 30, p. 35, 83 [Text 27]), resulting in the Plaintiff's absence and a subsequent court order which stated: "Prior to the hearing, the parties agreed to a finding of incompetency entered administratively" (Exh. A, Index 25, p. 1)

522.    Despite being aware of judicial misconduct and fraud on the court, Rivers has not taken appropriate legal actions to address these issues, thereby failing to protect the Plaintiff's constitutional rights. (Exh. N, Index 4, p. 16, 26-27)

523.    Rivers failed to properly address procedural irregularities, such as backdated and improperly signed court orders that affected the Plaintiff's legal standing. (Exh. A, Index 16)

524.    On July 28, 2023, the Plaintiff discovered an 'Order of Civil Commitment' filed against him on July 20, 2023, through a letter from Michael Biglow, a court-appointed attorney. This was alarming as the Plaintiff was unaware of this order and believed Bruce Rivers was representing him. (Exh. C, Index 30, p. 24-25, 81-82 [Texts 17-22])

525.    Despite assurances, Bruce Rivers did not represent the Plaintiff during civil court proceedings, causing confusion and fear of unjust commitment to a mental institution. (Exh. C, Index 30, p. 25 77-78, 82-83 [Texts 23-26], p. 134)

526.    On May 22, 2023, Rivers mentioned to the Plaintiff that "powerful people" were keeping an eye on him, which Rivers later denied saying, causing confusion and mistrust. (Exh. C, Index 30, p. 22, 73, 84 [Calls-03], p. 86-93, 132)

527.    During a telephone conversation in January 2024, Rivers inaccurately claimed the Plaintiff already had the discovery materials, which was false and hindered the Plaintiff's defense. (Exh. C, Index 30, p. 39)

528.    The Sixth Amendment guarantees the right to effective assistance of counsel in all criminal prosecutions.

529.    Strickland v. Washington, 466 U.S. 668 (1984): Establishes the standard for determining ineffective assistance of counsel, requiring proof that counsel's performance was deficient and that the deficient performance prejudiced the defense.

## **COUNT IV**

### **- Violation of Equal Protection - 42 U.S.C. § 1983-**
*Plaintiff v. Hennepin County, Mary Moriarty, Chela Guzman-Weigart,*
*Dr. Jill Rogstad, Dr. Adam Milz, and Bruce Rivers*

530.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

531.    Plaintiff asserts a claim under 42 U.S.C. § 1983 for the denial of his right to equal protection under the law. This claim arises from systemic and individual failures by the defendants, which have significantly impaired his ability to seek justice and fair treatment.

532.    Hennepin County, through its policies, customs, or practices, exhibited a pattern of indifference to constitutional violations, facilitating the fraudulent actions and procedural misconduct of its employees.
(Exh. F, Index 01, p. 4, Index 20, p. 4, Index 21; Exh. G, Index 04, p. 10, Index 05)

533.    Hennepin County failed to address the fraudulent discovery materials, including manipulated photographs and inconsistent counts documented in exam reports, impacting the forensic evaluation and subsequent rulings. (Exh. A, Index 29, p. 15, 18-22)

534.    Mary Moriarty, in her capacity as Hennepin County Attorney, failed to supervise county attorneys and address known fraudulent activities, allowing a culture of constitutional violations to persist.

535.   Despite being aware of the fraudulent actions and due process violations, Mary Moriarty did not take appropriate actions to rectify these issues, contributing to the ongoing harm to the Plaintiff.

536.   The sudden reappearance of previously absent records (Exh. C, Index 30, p. 40, 121) is suggestive of manipulation by Chela Guzman-Weigart, whose role within the court includes 'Law, Safety and Justice Information Technology' (Exh. B, Index 28, p. 263), presumably granting her access to electronic records within the court system.

537.   Chela Guzman-Weigart participated in the deceptive exam process that declared the Plaintiff incompetent, using manipulated reports.  (Exh. B, Index 28, p. 100-101, 262-263)

538.   Dr. Jill Rogstad manipulated the competency evaluation report, falsely representing critical information that influenced judicial decisions.  (Exh. F, Index 27, p. 5-34)

539.   Bruce Rivers failed to provide critical discovery materials (Exh. D, Index 38, p. 140-143), respond to urgent communications (Exh. C, Index 30, p. 82-83 [Text 23-24, 28-29]), and effectively represent the Plaintiff's interests. (Exh. D, Index 38, p. 144, 148) This includes not addressing fraudulent discovery materials and not providing the Rule 20.01 exam report, as addressed in Plaintiff's June 3, 2024 pro se motion for substitute counsel. (Exh. A, Index 91)

540.   Text message exchanges and emails between Plaintiff and Bruce Rivers highlight a lack of substantive response and support.

(Exh. C, Index 30, p. 82-83; Exh. N, Index 04, p. 16-19, 26-27)

541.   All defendants, including Hennepin County, have been made officially aware of the substantial issues through service of all evidence via the appellate case and required service entailed. Despite being provided with clear evidence of fraud and procedural irregularities, the defendants have failed to act or address these issues.

542.    Multiple instances of evidence served on Hennepin County Attorney's Office, detailing fraudulent actions and procedural irregularities, were ignored.

(Exh. F, Index 01, p. 4; Exh. F, Index 20, p. 4; Exh. G, Index 04, p. 10; Exh. G, Index 05; Exh. H, Index 08, p. 1, 44; Exh. F, Index 21, 31, 32)

## COUNT V

### - Denial of Right to Access to Courts  - 42 U.S.C. § 1983 -
*Plaintiff v. Hennepin County, Mary Moriarty, Chela Guzman-Weigart,*
*Dr. Jill Rogstad, Dr. Adam Milz, and Bruce Rivers, and Jacqueline Perez*

543.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

544.    Plaintiff asserts a claim under 42 U.S.C. § 1983 for the denial of his right to access the courts. This claim arises from systematic failures by the defendants, including Hennepin County and involved county officials, which have effectively barred him from seeking justice.

545.    The fraudulent incompetency determination and the complete disregard for procedural fairness have significantly impaired his ability to participate in his legal proceedings and prepare an effective defense.

546.    Plaintiff has made multiple formal requests for discovery materials essential to his defense, which have been ignored by both the court and his defense counsel. Despite filing motions to compel discovery, no action has been taken to provide the necessary documents.

547.    Bruce Rivers has failed to provide discovery materials despite repeated requests.

548.    Jacqueline Perez, the prosecuting attorney, has failed to ensure the provision of discovery materials.

Exhibit Q | Complaint | p. 82

549.    Mary Moriarty, as the supervisor of the county attorney's office, failed to oversee and ensure proper conduct in the handling of the case.

550.    Plaintiff's April 4, 2024, Pro Se Motion to Compel Discovery and Affidavit of Fact. (Exh. A, Index 29)

551.    Plaintiff's June 3, 2024, second Pro Se Motion to Compel Discovery. (Exh. A, Index 90)

552.    Plaintiff's May 3, 2024, Pro Se Follow-Up Correspondence Addressing Refusal to Provide Discovery and Rule 20.01 Exam. (Exh. A, Index 36)

553.    Plaintiff's defense counsel, Bruce Rivers, has failed to provide critical discovery materials, respond to urgent communications, and effectively represent the Plaintiff's interests. This includes not addressing fraudulent discovery materials and not providing the Rule 20.01 exam report.

554.    Bruce Rivers is directly responsible for providing ineffective assistance of counsel.

555.    Plaintiff's June 3, 2024, Pro Se Motion for Substitute Counsel. (Exh. A, Index 91)

556.    Text message exchanges and emails between Plaintiff and Bruce Rivers highlight a lack of substantive response and support.
(Exh. C, Index 30, p. 82-83; Exh. N, Index 04, p. 16-19, 26-27)

557.    The court has failed to respond to multiple motions filed by the Plaintiff, including motions for substitute counsel, motions to compel discovery, and motions for production of medical records.

558.    This lack of response has left the Plaintiff without adequate legal representation and without the necessary materials to prepare his defense.

559.     Hennepin County, as the overarching entity responsible for the administration of justice, has failed to ensure proper handling of the Plaintiff's motions.

560.     Plaintiff's June 3, 2024, Second Pro Se Follow-Up Correspondence. (Exh. A, Index 36, 92)

561.     Discovery materials provided to the Plaintiff have been manipulated and are fraudulent. This includes altered photographs and other evidence intended to misrepresent the Plaintiff's activities and living conditions, which were used to support the fraudulent incompetency determination.

562.     Dr. Jill Rogstad carried out the initial Rule 20.01 competency evaluation on March 1, 2023, resulting in a report which was submitted to the court on March 10, 2023 with her signature on it. (Exh. B, Index 28, p. 100) Dr. Jill Rogstad would then directly attest, under oath, during the Plaintiff's July 7, 2023 court appearance that the March 10, 2023 report was her work product both through testimony, and through it being submitted into evidence as 'Exhibit 3' during the hearing. (Exh. A, Index 19, p. 1)

563.     Chela Guzman-Weigart, or rather 'GuzmanC' as it appears in the PDF properties, fraudulently authored the initial Rule 20.01 competency evaluation which contained Dr. Jill Rogstad's signature on it. (Exh. B, Index 28, p. 101)

564.     Dr. Adam Milz conducted the Plaintiff's second Rule 20.01 exam on January 3, 2024, and failed to address the fraudulent discovery materials Plaintiff brought to his attention via email prior to their two hour meeting. (Exh. A, Index 29, p. 37)

565.     All defendants, including Hennepin County, have been made officially aware of the substantial issues through service of all evidence via the appellate case (Exhibits G, H, I, and

J) and the proof of service requirement for all filings. Despite being provided with clear evidence of fraud and procedural irregularities, the defendants have failed to act or address these issues.

566.    The Hennepin County Attorney, Mary Moriarty, is responsible for oversight of the Hennepin County Attorney's Office, who was also served all of this evidence, and she failed to take action.

567.    The Assistant Hennepin County Attorney, Jacqueline Perez, was served evidence and ignored proof of fraud.

568.    It is Hennepin County who is ultimately responsible for ensuring the proper administration of justice, addressing substantial issues brought to their attention, and ensuring that those they employ are properly trained, and managed.

569.    The right to access the courts is a fundamental constitutional right protected by the First and Fourteenth Amendments. By failing to provide necessary discovery materials and ignoring the Plaintiff's motions, the defendants have effectively denied the Plaintiff this right.

570.    Under 42 U.S.C. § 1983, individuals can seek redress for the deprivation of constitutional rights by persons acting under color of state law. The systematic failures and procedural violations by the defendants constitute a deprivation of the Plaintiff's right to access the courts.

## COUNT VI

### - Civil Conspiracy - 42 U.S.C. § 1985 -

*Plaintiff v. Mary Moriarty, Chela Guzman-Weigart, Dr. Jill Rogstad, Judge Julia Dayton Klein, Referee George Borer, Referee Danielle Mercurio, Bruce Rivers, and other county officials*

571.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

572.    This claim asserts a civil conspiracy under 42 U.S.C. § 1985, alleging that the defendants engaged in a coordinated effort to violate the Plaintiff's constitutional rights through a series of unlawful actions and omissions.

573.    Plaintiff's LinkedIn 'Search and Count Graph' was completed in late December 2023 / early January 2024, based on automated LinkedIn emails retrieved from the Plaintiff's email inbox. (Exh. C, Index 30, p. 29-33, 53-59, 145-213; Exh. N, Index 02)

574.    Plaintiff was not active at all on LinkedIn during this period, underscoring the post-facto nature of the analysis.

575.    The graph, constructed nearly a year after the inception of his criminal charges on January 21, 2023, aligns perfectly with significant events in his life, validating claims of surveillance and external influences.

576.    This graph substantiates Bruce Rivers' statement that "powerful people" were monitoring the Plaintiff (Exh. C, Index 30, p. 22-24, 73-76 86-93), thus corroborating claims about the criminal charges (Exh. A, Index 01, p. 3; Exh. N, Index 05, p.1), surveillance (Exh. C, Index 30, p. 60-66; Exh. N, Index 02, p. 16-21), and patent theft.

(Exh. B, Index 28, p. 224, Exh. F, Index 26, p. 7, Index 27, p. 5-6, Exh. N, Index 01, p. 49-52)

577.     Significant search spikes are evident at the exact same time the Plaintiff filed his provisional patent application, and then again when he filed his actual patent application. (Exh. C, Index 30, p. 53, 55)

578.     This serves as compelling evidence supporting Guertin's claims that his patent was stolen directly out of the USPTO office itself. This theft undermines the integrity of not just the USPTO but has far-reaching implications for the broader trust in the patent system and governmental institutions as a whole.

579.     The likelihood that all these entities independently conducted searches around the same events, without explicit coordination, strengthens the argument for a broader, indirect conspiracy. These entities may have been in communication about related interests, even if not directly coordinating the searches.

580.     Searches by Forcepoint and 3Gimbals occurring during the prior week leading up to January 21, 2023, the day of the Plaintiff's criminal charge's origin, suggest their involvement or interest in the events leading to the charges. (Exh. C, Index 30, p. 175-182)

581.     Forcepoint, known for cybersecurity, and 3Gimbals, involved in technology and defense, might have been monitoring the Plaintiff's activities due to his patent and related technological advancements. (Exh. N, Index 02, p. 16-21)

582.     Multiple searches by entities directly connected to Netflix, and the military before the public disclosure of the Plaintiff's patent indicate their vested interest in the Plaintiff's technology. This aligns with the hypothesis that there was a coordinated effort to surveil and potentially undermine the Plaintiff's patent claims. (Exh. N, Index 02, p. 1-11)

583.    The evidence of coordinated searches, especially by entities with vested interests in related technology, supports a claim of civil conspiracy. This involves multiple parties working towards a common objective that infringes on the Plaintiff's rights and interests. (Exh. C, Index 30, p. 53-59)

584.    The involvement of interstate and potentially international communications and actions could justify federal charges, including wire fraud and conspiracy under federal statutes.

585.    The manipulation of court records and surveillance activities further bolster these claims.

586.    The spike in LinkedIn searches on July 20, 2023, aligns precisely with the day the Plaintiff's civil commitment order was filed. This indicates heightened interest and possibly coordinated surveillance by multiple entities around significant judicial actions involving the Plaintiff. (Exh. C, Index 30, p. 58, 191-197)

587.    The alignment of surveillance activity with key legal events suggests a concerted effort by various entities to monitor and possibly influence the outcomes of the Plaintiff's legal battles, substantiating claims of civil conspiracy and the orchestrated theft of the Plaintiff's patent.

588.    August 3, 2023, saw significant searches by the Defense Intelligence Agency (DIA), DARPA, and the US Indo-Pacific Command. This period was marked by intense legal battles and the introduction of fraudulent evidence into the Plaintiff's case. (Exh. C, Index 30, p. 58, 198-205)

589.    The involvement of major defense and intelligence entities such as the DIA, DARPA, and the US Indo-Pacific Command indicates a high level of interest and potential coordination.

590.    These organizations typically engage in surveillance and intelligence activities related to national security, advanced technology, and strategic interests.

(Exh. C, Index 30, p. 67)

591.    The fraudulent discovery materials received by the Plaintiff on August 3, 2023, included manipulated photographs that intentionally cropped out images of the Plaintiff's prototype, light boxes, and anything directly related to his patent.

(Exh. A, Index 29, p. 18-23, 31-33)

592.    This manipulation not only undermines the integrity of the evidence but directly connects the actions within the court to external influences and the Plaintiff's patent, providing irrefutable proof of a coordinated effort to deceive and manipulate legal proceedings.

593.    The involvement of high-profile defense and intelligence entities in the surveillance of the Plaintiff, particularly around critical dates, suggests a coordinated effort to monitor and potentially influence the Plaintiff's legal and technological standing.

(Exh. F, Index 26, p. 5-36)

594.    This aligns with the Plaintiff's claim of patent theft and supports the notion of a broader conspiracy involving significant stakeholders. (Exh. F, Index 27, p. 5-34)

595.    Given the evidence of coordinated searches and interest from entities involved in defense and intelligence, there is a strong basis for civil conspiracy claims.

596.    Additionally, the potential unauthorized access and monitoring of the Plaintiff's patent filings could justify federal charges, including wire fraud.

597.    Punitive damages in an amount to be determined by the jury are available against defendants, excluding judges acting within their judicial capacity, and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not

subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

598.    Defendants, excluding judges acting within their judicial capacity, are jointly and severally liable to Plaintiff.

## COUNT VII

### - Gross Negligence - Minn. Stat. § 604.01 -

*Plaintiff v. Hennepin County, Mary Moriarty, Chela Guzman-Weigart, Dr. Jill Rogstad, Judge Julia Dayton Klein, Keith Ellison (in his official capacity for prospective injunctive relief), and Bruce Rivers*

599.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

600.    This action is brought against the defendants for gross negligence related to the administration of justice and handling of the Plaintiff's case, which resulted in significant harm to the Plaintiff's legal rights and interests.

601.    The defendants' actions, inactions, and systemic failures have significantly impaired the Plaintiff's ability to receive a fair and just legal process. These failures include the mishandling of discovery materials, fraudulent incompetency determinations, and procedural misconduct.

602.    Hennepin County exhibited a pattern of indifference to constitutional violations through its policies, customs, or practices, facilitating the fraudulent actions and procedural misconduct of its employees.

603.    Mary Moriarty, ss Hennepin County Attorney, failed to supervise county attorneys and address known fraudulent activities, allowing constitutional violations to persist.

Exhibit Q | Complaint | p. 90

604.    Chela Guzman-Weigart participated in the deceptive exam process that declared the Plaintiff incompetent, using manipulated reports, and potentially had access to electronic records within the court system.

605.    Dr. Jill Rogstad manipulated the competency evaluation report, falsely representing critical information that influenced judicial decisions.

606.    Judge Julia Dayton Klein engaged in procedural irregularities and judicial overreach by preemptively ruling on appellate motions outside her jurisdiction.

607.    Bruce Rivers failed to provide critical discovery materials, respond to urgent communications, and effectively represent the Plaintiff's interests.

608.    The defendants failed to address the fraudulent discovery materials, including manipulated photographs and altered metadata, which impacted the forensic evaluation and subsequent rulings, and amounts to gross negligence under Minn. Stat. § 604.01.

609.    The collective inaction and procedural misconduct by the defendants represent a systemic failure in the administration of justice, including acts or omissions that are negligent or reckless toward the person or property of others.

610.    Minn. Stat. § 604.01 addresses comparative fault and negligence, including acts that are negligent or reckless toward the person or property of others.

611.    The Fourteenth Amendment ensures due process and equal protection under the law, which were violated through the defendants' gross negligence and misconduct.

612.    Punitive damages in an amount to be determined by the jury are available against defendants, excluding Keith Ellison in his official capacity, and are hereby claimed as a matter of federal common law under *Smith v. Wade,* 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

613.    Defendants, excluding Keith Ellison in his official capacity, are jointly and severally liable to Plaintiff.

## **COUNT VIII**

### **- Judicial Misconduct - 42 U.S.C. § 1983 -**

*Plaintiff v. Judge Julia Dayton Klein, Referee George Borer, and Referee Danielle C. Mercurio*

614.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

615.    This claim asserts judicial misconduct under 42 U.S.C. § 1983, alleging that the defendants engaged in actions outside their judicial capacity, resulting in procedural anomalies and undue influence that violated the Plaintiff's constitutional rights.

616.    Judge Julia Dayton Klein issued rulings on motions not directed at her court, exceeding her judicial authority, and submitted court orders with false statements. This includes her ruling on a non-existent continuance motion on June 14, 2023, where she referenced a motion that was never filed, further indicating actions outside her judicial capacity and jurisdiction.

617.    Referee George Borer misrepresented the authorship of competency orders, indicating potential fraud and manipulation of official documents, and is involved in creating orders outside his judicial role, impacting the Plaintiff's due process rights.

618.    Referee Danielle C. Mercurio authored orders under the guise of other judicial officers, violating judicial integrity and due process, and participated in procedural manipulation and undue influence, impacting the Plaintiff's legal proceedings.

Exhibit Q | Complaint | p. 92

619.     These actions demonstrate a pattern of judicial misconduct that falls outside the scope of judicial immunity, as they were non-judicial acts or acts taken in complete absence of all jurisdiction.

620.     The procedural anomalies, including the submission of fraudulent documents and manipulation of court records, directly violated the Plaintiff's right to due process as guaranteed by the Fourteenth Amendment.

621.     The involvement of external influences and the deliberate manipulation of judicial proceedings further substantiate the claim of judicial misconduct, highlighting a coordinated effort to undermine the Plaintiff's legal rights.

622.     These actions have caused significant harm to the Plaintiff, including emotional distress, legal costs, and impairment of his ability to seek justice.

### COUNT IX
### - *Monell* Claim - 42 U.S.C. § 1983 -
*Plaintiff v. Hennepin County*

623.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

624.     Plaintiff asserts a claim under 42 U.S.C. § 1983 against Hennepin County, alleging that the policies, customs, or practices of the county led to the constitutional violations he experienced. This claim focuses on systemic failures within the county's administration of justice that facilitated or failed to prevent the unlawful actions against the Plaintiff.

625.     Hennepin County exhibited a pattern of indifference to constitutional violations.

626.     Hennepin County allowed the submission of manipulated photographs and altered metadata, which impacted the forensic evaluation and subsequent rulings. These actions demonstrate a systemic failure to ensure the integrity of discovery materials.

627.    Mary Moriarty, in her capacity as Hennepin County Attorney, failed to supervise county attorneys adequately and did not take appropriate actions to address known fraudulent activities and procedural misconduct, allowing a culture of constitutional violations to persist.

628.    Evidence indicates that court officials, including Judge Julia Dayton Klein, engaged in actions such as issuing rulings on non-existent motions and submitting court orders with false statements. These actions were outside the scope of their judicial capacity and jurisdiction, further demonstrating a systemic problem within the county's judicial system.

629.    The Plaintiff was repeatedly denied access to the second, January 3, 2024, Rule 20.01 exam report and other critical discovery materials despite multiple requests. This denial significantly impaired the Plaintiff's ability to defend himself and is indicative of a broader systemic issue within the county's administration of justice.

630.    The involvement of external entities, such as defense contractors and intelligence agencies, in monitoring the Plaintiff's activities related to his patent claims points to a broader conspiracy that Hennepin County officials either participated in or failed to prevent. This collusion further highlights the county's failure to protect the Plaintiff's constitutional rights.

631.    The presence of procedural anomalies, such as the sudden reappearance of previously absent records and the manipulation of case records, indicates a systemic failure to maintain the integrity of judicial proceedings. These actions undermined the Plaintiff's right to a fair trial and due process.

632.    These systemic failures and the county's indifference to constitutional violations directly contributed to the harm suffered by the Plaintiff. Under *Monell v. Department of Social Services*, municipalities can be held liable for constitutional violations resulting from their

policies, customs, or practices. The evidence presented supports the claim that Hennepin County's actions and inactions amounted to a violation of the Plaintiff's constitutional rights.

## COUNT X

**- Negligent Infliction of Emotional Distress - Minn. Stat. § 604.01 -**
*Plaintiff v. Hennepin County, Mary Moriarty, Chela Guzman-Weigart,*
*Dr. Jill Rogstad, Dr. Adam Milz, Bruce Rivers, and Jacqueline Perez*

633.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

634.    The defendants, through their actions and omissions, have caused significant emotional distress to the Plaintiff, impacting his mental and emotional well-being.

635.    Hennepin County, through its policies, customs, or practices, exhibited a pattern of indifference to constitutional violations and procedural misconduct, contributing to the Plaintiff's distress.

636.    Mary Moriarty, as Hennepin County Attorney, failed to supervise county attorneys and address known fraudulent activities, allowing a culture of constitutional violations to persist.

637.    Chela Guzman-Weigart participated in the deceptive exam process that declared the Plaintiff incompetent, using manipulated reports, thereby causing emotional distress.

638.    Dr. Jill Rogstad manipulated the competency evaluation report, falsely representing critical information that influenced judicial decisions, contributing to the Plaintiff's distress. (Exh. F, Index 27, p. 5-34)

639.    Dr. Adam Milz failed to address the fraudulent discovery materials brought to his attention and participated in the process that led to the Plaintiff's wrongful incompetency determination.

640.    Bruce Rivers, the Plaintiff's defense counsel, failed to provide critical discovery materials, respond to urgent communications, and effectively represent the Plaintiff's interests, exacerbating the Plaintiff's emotional distress.

641.    Jacqueline Perez, as Assistant Hennepin County Attorney, failed to ensure the provision of discovery materials and participated in prosecutorial misconduct, causing additional emotional distress to the Plaintiff.

642.    The defendants' collective inaction and procedural misconduct represent a systemic failure in the administration of justice, amounting to gross negligence under Minn. Stat. § 604.01.

643.    The right to access the courts is a fundamental constitutional right protected by the First and Fourteenth Amendments. By failing to provide necessary discovery materials and ignoring the Plaintiff's motions, the defendants have effectively denied the Plaintiff this right, causing significant emotional distress.

644.    The fraudulent discovery materials, including manipulated photographs and altered metadata, directly impacted the forensic evaluation and subsequent rulings, further contributing to the Plaintiff's emotional distress.
(Exh. A, Index 29, p. 1-7, 15-16, 21-23; Exh. F, Index 31)

645.    The defendants' actions and inactions have caused the Plaintiff severe emotional distress, necessitating legal redress.

## COUNT XI

### - Retaliation - 42 U.S.C. § 1983 -

*Plaintiff v. Hennepin County, Mary Moriarty, Chela Guzman-Weigart,*
*Dr. Jill Rogstad, Dr. Adam Milz, Bruce Rivers, and Jacqueline Perez*

646.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

647.    This claim is asserted against Hennepin County, Mary Moriarty, Chela Guzman-Weigart, Dr. Jill Rogstad, Dr. Adam Milz, Bruce Rivers, and Jacqueline Perez for retaliation under 42 U.S.C. § 1983.

648.    The defendants, through their actions and omissions, have retaliated against the Plaintiff for exercising his constitutional rights and seeking redress, resulting in significant harm and violations of his rights.

649.    Hennepin County, through its policies, customs, or practices, exhibited a pattern of retaliation against individuals who assert their constitutional rights, contributing to the Plaintiff's harm.

650.    Mary Moriarty, as Hennepin County Attorney, failed to supervise county attorneys and address retaliatory actions, allowing a culture of constitutional violations to persist.

651.    Chela Guzman-Weigart participated in the deceptive exam process that declared the Plaintiff incompetent, using manipulated reports to retaliate against him for asserting his rights.

652.    Dr. Jill Rogstad manipulated the competency evaluation report, falsely representing critical information to retaliate against the Plaintiff for his legal actions.

Exhibit Q | Complaint | p. 97

653.    Dr. Adam Milz failed to address the fraudulent discovery materials and participated in the process that led to the Plaintiff's wrongful incompetency determination, in retaliation for his attempts to challenge the legal process.

654.    Bruce Rivers, the Plaintiff's defense counsel, failed to provide critical discovery materials, respond to urgent communications, and effectively represent the Plaintiff's interests, exacerbating the Plaintiff's harm and contributing to the retaliatory actions.

655.    Jacqueline Perez, as Assistant Hennepin County Attorney, failed to ensure the provision of discovery materials and participated in prosecutorial misconduct, retaliating against the Plaintiff for exercising his rights.

656.    The defendants' collective inaction and procedural misconduct represent a systemic failure in the administration of justice, amounting to retaliation under 42 U.S.C. § 1983.

657.    The fraudulent discovery materials, including manipulated photographs and altered metadata, were used to retaliate against the Plaintiff for his legal actions, directly impacting the forensic evaluation and subsequent rulings. (Exh. A, Index 29, p. 1-7, 15-16, 21-23; Exh. F, Index 31)

658.    The defendants' actions and inactions have caused the Plaintiff severe harm and violated his constitutional rights, necessitating legal redress.

## COUNT XII

### - Federal Wire Fraud - 18 U.S.C. § 1343 -

*Plaintiff v. Chela Guzman-Weigart, Mary Moriarty, Dr. Jill Rogstad,*
*Bruce Rivers, Jacqueline Perez, and other involved county officials*

659.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

660.    The defendants engaged in a scheme to defraud the Plaintiff through the use of interstate wire communications, including the manipulation of electronic court records and communications.

661.    Chela Guzman-Weigart, in her role overseeing Law, Safety, and Justice Information Technology, is likely responsible for electronic record discrepancies documented due to her high-level administrative position.

662.    Chela Guzman-Weigart aka 'GuzmanC' and Dr. Jill Rogstad were directly responsible for the misrepresentation of the forensic evaluation report authorship. The forensic evaluation report purportedly authored by Dr. Jill Rogstad contained metadata indicating it was actually created by Chela Guzman-Weigart. (Exh. B, Index 28, p. 100-101, 262-263)

663.    Mary Moriarty, as Hennepin County Attorney, failed to supervise her subordinates and address known fraudulent activities, allowing the manipulation of electronic records and communications to persist.

664.    Dr. Jill Rogstad manipulated the competency evaluation report, falsely representing critical information that influenced judicial decisions, and this report was transmitted electronically as part of the scheme to defraud.

Exhibit Q | Complaint | p. 99

665.   Bruce Rivers, the Plaintiff's defense counsel, failed to provide critical discovery materials and engaged in misleading communications that contributed to the scheme to defraud the Plaintiff.

666.   Jacqueline Perez, as Assistant Hennepin County Attorney, failed to ensure the integrity of electronic records and participated in prosecutorial misconduct, including the manipulation of evidence and electronic communications.

667.   The defendants' use of interstate wire communications to transmit manipulated and fraudulent documents constitutes a violation of 18 U.S.C. § 1343, which prohibits schemes to defraud using wire, radio, or television communication in interstate or foreign commerce.

668.   The fraudulent discovery materials, including altered photographs and metadata, were used to deceive the court and obstruct justice, directly impacting the Plaintiff's legal proceedings and causing significant harm.  (Exh. A, Index 29, p. 1-7, 15-16, 21-23; Exh. F, Index 01, p. 4, Index 20, p. 4, Index 21, Index 31; Exh. G, Index 05)

669.   The evidence shows a coordinated effort among the defendants to manipulate electronic records and communications, supporting the claim of wire fraud under federal law.

670.   The involvement of interstate communications and actions taken by the defendants justifies federal charges, including wire fraud and conspiracy under 18 U.S.C. § 1343.

671.   Punitive damages in an amount to be determined by the jury are available against defendants, including any officials found to have acted outside their lawful authority, and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

672.    Defendants, including any officials found to have acted outside their lawful authority, are jointly and severally liable to Plaintiff.

## COUNT XIII

### - Fraud on the Court - 42 U.S.C. § 1983 -

*Plaintiff v. Hennepin County, Mary Moriarty, Chela Guzman-Weigart, Dr. Jill Rogstad,*
*Bruce Rivers, and involved judges including Judge Julia Dayton Klein,*
*Referee George Borer, and Referee Danielle C. Mercurio*

673.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

674.    The defendants engaged in intentional manipulation of discovery materials, non-disclosure of critical evidence, and systemic influences that impacted the fairness of the judicial process.

675.    The defendants, through their actions and omissions, have perpetrated a fraud on the court, undermining the integrity of the judicial process and violating the Plaintiff's constitutional rights.

676.    Hennepin County, through its policies, customs, or practices, facilitated or failed to prevent the fraudulent actions and procedural misconduct that occurred in the Plaintiff's case.

677.    Mary Moriarty, as Hennepin County Attorney, failed to supervise county attorneys and address known fraudulent activities, contributing to the culture of constitutional violations.

678.    Chela Guzman-Weigart engaged in the manipulation of discovery materials, including altering photographs and metadata to hide the Plaintiff's prototype, light boxes, and other items related to his patent.

679.    Dr. Jill Rogstad manipulated the competency evaluation report, misrepresenting critical information that influenced judicial decisions and contributed to the fraudulent determination of the Plaintiff's competency.

680.    Bruce Rivers, as the Plaintiff's defense counsel, failed to provide critical discovery materials, respond to urgent communications, and effectively represent the Plaintiff's interests, thereby facilitating the fraud on the court.

681.    Judge Julia Dayton Klein issued rulings on motions not directed at her court, exceeded her judicial authority, and submitted court orders with false statements, including a ruling on a non-existent continuance motion, indicating actions outside her judicial capacity and jurisdiction. (Exh. A, Index 16; Exh. F, Index 24, 33)

682.    George Borer and Danielle C. Mercurio, through their involvement in creating and submitting fraudulent court orders, further contributed to the fraud on the court and the violation of the Plaintiff's constitutional rights.

683.    The fraudulent discovery materials, including manipulated photographs and altered metadata, directly impacted the forensic evaluation and subsequent rulings, constituting fraud on the court. (Exh. A, Index 29, p. 1-7, 15-16, 21-23; Exh. F, Index 31)

684.    The defendants' actions and inactions represent a systemic failure in the administration of justice, undermining the integrity of the judicial process and causing significant harm to the Plaintiff.

685.    Punitive damages in an amount to be determined by the jury are available against defendants, including judges if found to have acted outside their judicial capacity, and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as

such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

686.     Defendants, including judges if found to have acted outside their judicial capacity, are jointly and severally liable to Plaintiff.

## COUNT XIV

### - Misconduct of Public Officer or Employee - Minn. Stat. § 609.43 -
*Plaintiff v. Hennepin County, Mary Moriarty, Chela Guzman-Weigart,*
*Dr. Jill Rogstad, and involved county officials*

687.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

688.     The defendants, through their actions and omissions, have engaged in intentional misconduct, including the failure to perform known mandatory duties, acts in excess of lawful authority, and making false reports or documents.

689.     Mary Moriarty, in her capacity as Hennepin County Attorney, failed to supervise county attorneys and address known fraudulent activities, allowing a culture of constitutional violations to persist.

690.     Chela Guzman-Weigart participated in the deceptive exam process that declared the Plaintiff incompetent, using manipulated reports and false information.

691.     Dr. Jill Rogstad manipulated the competency evaluation report, falsely representing critical information that influenced judicial decisions.

692.     The involved county officials failed to ensure the integrity of court records and procedures, contributing to the Plaintiff's wrongful incompetency determination and subsequent harm.

Exhibit Q | Complaint | p. 103

693.    The defendants' actions and inactions represent a systemic failure in the administration of justice, amounting to misconduct under Minn. Stat. § 609.43.

694.    The fraudulent discovery materials, including manipulated photographs and altered metadata, directly impacted the forensic evaluation and subsequent rulings, contributing to the Plaintiff's harm.

695.    The defendants' actions have caused the Plaintiff significant harm, necessitating legal redress.

## COUNT XV

### - Recording, Filing of Forged Instrument - Minn. Stat. § 609.64 -
*Plaintiff v. Chela Guzman-Weigart, Dr. Jill Rogstad, Judge Julia Dayton Klein,*
*Referee George Borer, Referee Danielle C. Mercurio, and involved county officials*

696.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

697.    Defendants, through their actions and omissions, intentionally presented for filing or recording false or forged documents which had a direct and adverse effect on the Plaintiff's legal proceedings and personal property.

698.    Chela Guzman-Weigart 'GuzmanC' - fraudulently authored the initial Rule 20.01 competency evaluation which contained Dr. Jill Rogstad's signature on it, thus filing a forged document that significantly impacted the Plaintiff's case. (Exh. B, Index 28, p. 100-101)

699.    Dr. Jill Rogstad contributed to the fraud by submitting and validating the forged competency evaluation report, which misrepresented critical information.

(Exh. A, Index 19; Exh. B, Index 28, p. 100-101, 262-263)

700.    Judge Julia Dayton Klein issued rulings on motions not directed at her court and submitted court orders with false statements, including referencing non-existent affidavits, indicating actions outside her judicial capacity and jurisdiction.

(Exh. A, Index 16; Exh. F, Index 18, 24, 25, 33)

701.    Referee George Borer's competency order, which metadata analysis revealed was actually authored by Referee Danielle C. Mercurio, constitutes a forged document that was presented and relied upon in the Plaintiff's legal proceedings. (Exh. B, Index 28, p. 173-174)

702.    Involved county officials, including those in the Hennepin County Attorney's Office, were complicit in these fraudulent activities by failing to address and rectify the presentation of false documents despite being made aware of them through official service of evidence. (Exh. F, Index 01, p. 4, Index 20, p. 4, Index 21; Exh. G, Index 04, p. 10, Index 05)

703.    The actions of the defendants have caused the Plaintiff significant harm, including emotional distress, loss of legal rights, and adverse legal outcomes due to the reliance on forged documents in judicial proceedings.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.  Issue an emergency temporary restraining order and preliminary injunction to prevent any further harm to the Plaintiff, including but not limited to the immediate cessation of all surveillance and manipulation activities, the cessation of any further actions within the Hennepin County District Court, and the postponement of the July 16, 2024, review hearing. This is to prevent retaliation and potential unjust detention of the Plaintiff.

B.  Declare that the actions of the Defendants violated Plaintiff's constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as his rights under federal and state law.

C.  Issue a permanent injunction requiring Defendants to cease all unlawful activities, including surveillance, manipulation of court records, and any retaliatory actions against the Plaintiff.

D.  Mandate changes in the policies and procedures of Hennepin County to prevent future violations, including proper supervision, training, and disciplinary measures for county officials.

E.  Award Plaintiff compensatory damages for emotional distress and mental anguish in an amount in excess of $5,000,000.

F.  Award Plaintiff compensatory damages for financial losses and lost employment opportunities as CEO of InfiniSet, Inc., in an amount in excess of $10,000,000.

Exhibit Q | Complaint | p. 106

G.  Award Plaintiff punitive damages in an amount to be determined by the jury, pursuant to federal common law under Smith v. Wade, 461 U.S. 30 (1983), to punish the Defendants for their reckless and callous indifference to Plaintiff's rights and to deter similar misconduct in the future. Such damages are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

H.  Award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law, recognizing that Plaintiff, acting as his own attorney, has been forced to dedicate an untold number of hours to his own defense.

I.  Award Plaintiff prejudgment and post-judgment interest as allowed by law.

J.  Grant such other and further relief as the Court deems just and equitable.

## X.   JURY DEMAND

Plaintiff demands a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  July 8, 2024

Respectfully submitted,

 /s/ Matthew D. Guertin

Matthew David Guertin
Pro Se Plaintiff
1075 Traditions Ct.
Chaska, MN  55318
Telephone: 763-221-4540
MattGuertin@protonmail.com
www.MattGuertin.com

Exhibit Q | Complaint | p. 107

## XI.   VERIFICATION OF COMPLAINT

Matthew D. Guertin, under penalty of perjury, states the following:

1.   I affirm that the contents of the complaint and all corresponding exhibits are true to the best of my knowledge and belief.

2.   I further declare that the information contained within the complaint and the exhibits consists of content that I, as the pro se Plaintiff, personally prepared and compiled.


Dated:  July 8, 2024                                    Respectfully submitted,

                                                         _/s/ Matthew D. Guertin_

                                                        Matthew David Guertin
                                                        Pro Se Plaintiff
                                                        1075 Traditions Ct.
                                                        Chaska, MN  55318
                                                        Telephone: 763-221-4540
                                                        MattGuertin@protonmail.com
                                                        www.MattGuertin.com