**STATE OF MINNESOTA**                        **DISTRICT COURT**

**COUNTY OF HENNEPIN**                  **FOURTH JUDICIAL DISTRICT**

---

State of Minnesota,                              Court File No.: 27-CR-23-1886

                            Plaintiff,

vs.                                                   **DEFENDANT'S MOTION**
                                                      **FOR JUDICIAL NOTICE OF**
                                                      **INDISPUTABLE FACTS**

Matthew David Guertin,

                            Defendant.                Judicial Officer: <u>Jay Quam</u>

---

TO:        THE HONORABLE JAY QUAM, JUDGE OF THE DISTRICT COURT; THE
           CLERK OF THE FOURTH JUDICIAL DISTRICT COURT; MS. JACQUELINE
           PEREZ, ASSISTANT HENNEPIN COUNTY ATTORNEY; AND THE OFFICE
           OF THE HENNEPIN COUNTY ATTORNEY.


### MOTION

COMES NOW Matthew David Guertin, the Defendant in the above-entitled action, and respectfully moves this Court to take judicial notice of the following indisputable facts, pursuant to Rule 201 of the Federal Rules of Evidence, which are applicable in this case by virtue of Rule 9.01 of the Minnesota Rules of Evidence:


**Exhibit A** (4/2/2014):

> The Defendant is recognized in a blog article on the Touchdesigner software website by Derivative.

**Exhibit B** (6/28/2016):

> For the purposes of public record and documenting the 'bigger picture' related to alleged patent fraud, this exhibit is intentionally kept concise without elaborate detail.

**Exhibit C** (6/28/2016):

> This exhibit is associated with Exhibit B and is introduced to document specific quotes from an article relevant to the Defendant's case. These quotes are requested to be judicially noticed without further commentary, yet recorded in the public record.

**Exhibit D** (7/17/2017):

> Similar to Exhibit B, this entry is maintained in a deliberately straightforward manner to document elements pertinent to the 'bigger picture' of the Defendant's situation.

**Exhibit E** (9/30/2018):

> Defendant programmed the custom media server for a free show at the Hollywood Bowl which was celebrating the 100th Anniversary of the LA Philharmonic Orchestra in with there were 20,000 people in attendance, marking a notable accomplishment. This event featured well know performers including Katy Perry, Herbie Hancock, and a surprise performance by John Williams who lead the LA Philharmonic Orchestra in a live performance of the 'Main Theme' from the movie 'Star Wars' which John Williams was the original producer of.

**Exhibit F** (9/30/2018):

> Presentation of the aforementioned Hollywood Bowl show on the Defendant's personal portfolio website.

**Exhibit G** (April 2019 - Week 1 & 2 of Coachella):

> Defendant received significant credits and recognition for his contributions to Coachella Music Festival as a result of the Bad Bunny set piece he designed and built on the website of XiteLabs.com, whom the defendant had a significant working relationship with during his time in Los Angeles.

**Exhibit H** (April 2019 - Week 1 & 2 of Coachella):

> The Defendant's personal portfolio website features the presentation of the set piece for Bad Bunny at Coachella.

**Exhibit I** (April 2019 - Week 1 & 2 of Coachella):

The Defendant is credited in online and print publications of PLSN (Projection, Lights, and Staging News) for his significant role in the creation of Bad Bunny's mainstage Coachella set piece.

**Exhibit J** (April 2019 - Week 1 & 2 of Coachella):

The Defendant's personal portfolio website showcases the custom Pre-Vis system developed for Bad Bunny's performances, aiding in recording specific visual effects for songs and presenting them to Bad Bunny's management team for approval prior to the concert tour taking place.

**Exhibit K** (August-November 2019):

The Defendant is formally credited as an "engineer" for the construction of a 50-foot Falcon structure, highlighting his technical expertise and contribution to significant projects.

**Exhibit L** (August-November 2019):

Presentation of the 50-foot Falcon on the Defendant's personal portfolio website, showcasing his engineering achievement.

**Exhibit M** (August-November 2019):

The Defendant participates in an hour-long video conference, serving as a workshop discussing the intricate creation process and behind-the-scenes aspects of the 50-foot wide Falcon, further establishing his role and expertise in the project.

**Exhibit N** (November 2020):

Defendant sets up his custom Vimeo page, which serves as the hosting platform for videos produced and edited for his personal portfolio, demonstrating his commitment to professional presentation and content curation.

**Exhibit O** (November 2020):

Prior to the Defendant conceiving the idea for his patent/invention, he dedicated his time to developing his personal portfolio website to highlight his projects, evidencing his

proactive approach and responsiveness to the time made available to him because of
COVID-19.

**Exhibit P** (2/13/2021):

Defendant completes the official registration of the domain name 'InfiniSet.com,' marking
a significant step in establishing his business and patent-related endeavors.

**Exhibit Q** (2/13/2021):

The 'InfiniSet.com' website displays a static page with the InfiniSet logo, for which the
Defendant has filed trademark applications, reinforcing the brand identity he has
developed for his invention.

**Exhibit R** (3/19/2021):

The Defendant files his first-ever patent application, a provisional patent with the USPTO
(Provisional Application # 63/163,135), signifying a pivotal moment in his journey as an
inventor and entrepreneur.

**Exhibit S** (3/31/2021):

Shortly following the Defendant's provisional patent filing, Stephan Trojansky files a
provisional patent with the USPTO (Provisional Application # 63/168,558), which may
bear relevance to the Defendant's own patent-related dealings.

**Exhibit T** (4/1/2021):

The Defendant files a trademark application with the USPTO for the original name
'INFINISET' (USPTO Serial # 90618638) he conceptualized for his business idea,
reflecting the continuous development and protection of his intellectual property.

**Exhibit U** (6/30/2021):

Eyeline Studios, with Nevada as its home jurisdiction, is officially registered as a foreign
corporation with the California Secretary of State. The signatory is "Scott Miller."

**Exhibit V**:

Tied to the events of 6/30/2021 and the registration of Eyeline SOS, "Scott Miller," an
executive of EyeLine Studios with Trojansky listed as CEO, signed the CA SOS filing.

**Exhibit W** (11/22/2022):

    The official Netflix Press Release announces the acquisition of Scanline and Eyeline Studios, underscoring the significance of the technology within both Trojansky and the Defendant's patent applications.

**Exhibit X** (1/20/2022):

    Google names the dataset for their 'Bard Ai' the same as the Defendant's company, for which a trademark application was filed.

**Exhibit Y** (1/21/2022):

    Google's continued use of 'InfiniSet' as a dataset name for 'Bard Ai,' directly coinciding with the Defendant's trademark efforts.

**Exhibit Z** (2/10/2022):

    Repetition of Google's action in naming the 'Bard Ai' dataset after the Defendant's trademarked company name.

**Exhibit Oa** (3/18/2022):

    The Defendant files official US Patent application 17/698,420.

**Exhibit Aa** (3/30/2022):

    Trojansky/Netflix files official US Patent application 17/709,126.

**Exhibit Ba** (3/31/2022):

    Trojansky/Netflix files official PCT application US2022/022914.

**Exhibit Ca** (4/19/2022):

    Netflix's Q1 2022 Shareholders letter reveals $125 million spent acquiring Trojansky's companies and a small gaming company, indicating a significant financial transaction.

**Exhibit Da** (6/8/2022):

    Yuval Brodsky's US Patent application 17/843,960, is filed with the USPTO.

**Exhibit Ea** (6/24/2022):

    PCT examiners' report for the Defendant's PCT application indicates the same June 24th date for the 'Date of Mailing', 'Date of the actual completion of the international search',

and the 'Date of completion of this opinion' and also references Yuval Brodsky's patent
application as prior art to the Defendant's PCT application.

**Exhibit Fa** (7/12/2022):

Yuval Brodsky's US Patent 11,383,062 officially published.

**Exhibit Ga** (7/18/2022):

Defendant registers InfiniSet Inc. with the Delaware Secretary of State. This document is
also notarized with a date of February 2nd, 2024.

**Exhibit Ha** (9/22/2022):

Defendant's PCT Patent Application US2022/020919 is officially published.

**Exhibit Ia** (9/22/2022):

Yuval Brodsky US Patent application 17/843,960 is officially published.

**Exhibit Oa** (9/22/2022):

Defendant's US Patent application 17/698,420 is officially published.

**Exhibit Ja** (11/13/2022):

Defendant officially registers his Delaware C-Corp with the MN SOS as a foreign
corporation.

**Exhibit Ka** (12/15/2022):

Netflix patent assignment takes place - Conveying Party 'EYELINE STUDIOS GMBH'
Receiving Party 'NETFLIX, INC.' Signed by Stephan Trojansky.

**Exhibit La** (1/12/2023):

Defendant files police report # 23-000151 with the Minnetonka, MN Police Department
detailing suspected patent theft. The police report includes the following key statements
made by Minnetonka Police Officer Brandon Harris who spoke with Guertin for
approximately 45 minutes and prepared the report:

- "He has filed for and acquired a patent for his invention, 'Motorized Rotatable
  Treadmill and System for Creating the Illusion of Movement.' "

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

- "The machine is used for filming cinema."
- "He pitched the patent to Mark Roberts Motion Control (mrmoco.com)."
- "The CEO, Mark Roberts, advised that the technology already existed and is used by Photo Robot (photorobot.com)."
- "He looked at the Photo Robot website and observed the technology used to be similar but different from his."
- "While reviewing the website over a number of days he realized the website was changing to reflect his patent."
- "The website is being updated in real-time with information from his design."
- "He has proof of the fraud."
- "Photo Robot is effectively stealing his patent by making it look like they have already had the technology."
- "He has been downloading the website and has noticed a number of discrepancies between the current version and the old version of the website."
- "He believes that he could sell the patent to Netflix for 100 Million dollars."
- "He originally called the FBI who advised he needed to file a report with his local police agency."
- "He understands there is nothing the police can do."
- "Guertin advised that he has many gigabytes of evidence to show the fraud."
- "I advised Guertin to connect with a computer forensicator in order to parse the data into a readable format."
- "I agreed with Guertin that this issue is beyond the scope of the local police department."
- "I advised Guertin to provide the FBI with the case number and the parsed data when he files the report with them."

**Exhibit Ma** (1/21/2023):

Defendant is arrested after firing a gun to summon police, claiming his devices were hacked, and fearing for his life. This arrest led to criminal charges, which are suggested to be part of a broader pattern of events related to the 'bigger picture' of the case.

**Exhibit Na** (2/13/2023):

Defendant files a continuation patent application US 18/108858.

**Exhibit Oa** (2/14/2023):

Defendant's official patent is published - US 11577177.

**Exhibit Pa** (2/17/2023):

Defendant files a third-party prior art submission against the Netflix patent application 17/709126, citing his now-granted patent US 11577177 which was subsequently reviewed, deemed relevant, and entered into the official record of the Trojansky/Netflix US patent application.

**Exhibit Qa** (3/1/2023):

A previous assignment of the Trojansky 'EyeLine Studios' patent rights to 'Netflix Inc.' is signed by Greg Lunt of the firm 'Greenberg Traurig.'

**Exhibit Ra** (3/7/2023):

USPTO Patent Examiner Abderrahim Merouan reviews Defendant's third-party prior art submission and signs off on it.

**Exhibit Sa** (3/10/2023):

Dr. Jill Rogstad's forensic examination report, submitted to the court, concludes with a diagnosis of the Defendant with an unspecified schizophrenia spectrum and other psychotic disorder, subsequently influencing a finding of incompetence to stand trial. Notably, the report lists and discusses materials reviewed during the evaluation, including Police Report #23-000151 filed by the Defendant with the Minnetonka, MN Police Department on January 12, 2023 and referenced in Exhibit 'La'. This police report, which documents the Defendant's detailed concerns about suspected patent theft and outlines his extensive efforts to protect his intellectual property, contrasts starkly with the conclusions drawn in Dr. Rogstad's report. The inclusion of this police report as a reviewed material raises questions about the thoroughness and impartiality of the forensic examination, particularly when considering the Defendant's active and rational steps to address his legal and business concerns. Furthermore, the report's metadata and standard document

properties identifying 'GuzmanC' as the author adds an additional layer of inquiry regarding the report's preparation and authenticity.

**Exhibit Ta** (3/16/2023):

Following discussions about potential patent fraud with his patent attorney, the Defendant files an Information Disclosure Statement (IDS) for his continuation patent application (US 18/108,858). This IDS notably references Microsoft and Dimension Studios, shedding light on the Defendant's concerns regarding corporate attention. The inclusion of these references directly contradicts Dr. Jill Rogstad's assessment, which classified the Defendant's apprehensions of being targeted by such entities as delusional. This filing demonstrates the Defendant's legitimate engagement with notable companies, challenging the basis of the diagnosis in Dr. Rogstad's report.

**Exhibit Ua** (3/26/2023):

Defendant pays to obtain an online 'Notice of Good Standing' for his company InfiniSet Inc. from the Delaware Secretary of State.

**Exhibit Va** (3/27/2023):

Defendant maintains evidence, including certified mail return cards, post office receipts, and photographs, documenting his communication with Netflix, EyeLine Studios, Scanline VFX, and others concerning his patent US 11577177.

**Exhibit Wa** (3/27/2023):

A document appearing to be an assignment of Trojansky 'EyeLine Studios' patent rights to 'Netflix Inc.' is signed by Greg Lunt of 'Greenberg Traurig', corresponding with earlier exhibits Ka and Qa.

**Exhibit Xa** (5/3/2023):

Defendant files a report detailing suspected fraud with Photo Robot to the FBI via 'ic3.gov', as referenced in his earlier police report filed on 1/12/2023 and presented in Exhibit 'La'.

**Exhibit Ya** (5/3/2023):

Defendant submits a report to the FTC concerning suspected fraud with Photo Robot, as also detailed in the police report from 1/12/2023 and presented in Exhibit 'La'.

**Exhibit Za** (6/1/2023):

Defendant files international trademark application 97699805 for 'INFINISET' in various countries, paying a total of $4,320.33, as indicated on the application.

**Exhibit Ab** (6/1/2023):

Defendant files international trademark application '1 739 675' with WIPO for the 'INFINISET' logo in multiple countries.

**Exhibit Bb** (7/13/2023):

A court order in criminal case 27-CR-23-1886 is issued by Referee George Borer, declaring the Defendant 'Incompetent to Stand Trial', with the document metadata as well as standard document properties revealing 'Danielle C Mercurio' as the author and a document title of 'Conservator (All Powers; Unlimited Duration)'.

**Exhibit Cb** (8/4/2023):

An Examiner's Report for commitment, citing photos and statements which suggest Defendant's beliefs about a conspiracy involving large enterprises like Microsoft and Netflix, is submitted to the civil court case 27-MH-PR-23-815.

**Exhibit Db** (8/21/2023):

Defendant's patent attorney files a 'Request For Withdrawal As Attorney Or Agent' in the USPTO file for the continuation patent application US 18/108,858, with withdrawal listed as non-detrimental to the client's interests.

**Exhibit Eb** (9/7/2023):

Defendant files a second police report for possible patent fraud with the Plymouth, MN Police Department (Report # 23033797), described as an "informational report."

**Exhibit Fb** (9/20/2023):

Defendant contacts US Senator Amy Klobuchar, detailing alleged patent fraud related to his US patent 11,577,177. He receives a response from Senator Klobuchar's official 'senate.gov' email address.

**Exhibit Gb** (10/3/2023):

The Defendant received a response from Hanna Welch, Constituent Advocate & Intern Coordinator for Senator Amy Klobuchar, including a Privacy Act Release Form, which the Defendant completed and returned. This form highlighted the involvement of the US Army in matters the Defendant perceives as fraudulent. The Defendant also included a link to his Substack page analyzing the vast military applications of his patented virtual immersion technology, emphasizing its potential to revolutionize military training simulations by enhancing safety, realism, and cost-effectiveness.

**Exhibit Hb** (10/12/2023):

The Defendant proactively sent certified mail to Senator Klobuchar's office to Hanna Welch, enclosing the completed Privacy Act Release Form, which again points to the US Army's alleged involvement. Also enclosed were prints of Substack articles, notably one titled "None of them ever say hello," which discusses LinkedIn searches by the US Air Force and the US State Department, hinting at a possible connection to military interest in the Defendant's work, alongside the discovery of further patent-related anomalies involving prominent figures in technology and visual effects.

**Exhibit Ib**:

In the context of ongoing legal proceedings, the Defendant urges the court to consider Referee Danielle C. Mercurio's established ties to the US Army, as detailed in her Minnesota Judicial Branch biography. These ties include her education as a Judge Advocate and her decorated service within the United States Army-National Guard, where she was recognized for her excellence in legal roles. This history is pertinent given the Defendant's concerns regarding military interest and its potential influence on his criminal and civil cases.

**Exhibit Jb** (11/7/2023):

On November 7th, 2023, the USPTO published Netflix, Inc.'s patent 11,810,254, listing Stephan Trojansky as the inventor. Notably, this document references the Defendant's patent (US Patent 11,577,177) as prior art, with the Defendant's last name, 'Guertin,' prominently cited. This citation is a procedural outcome within the USPTO's operations, independent of Netflix's preferences. The presence of the Defendant's patent in such a significant position contrasts with Dr. Jill Rogstad's evaluation, which described the Defendant's concerns about corporate targeting as delusional. This official acknowledgment by the USPTO indirectly validates the Defendant's contributions to the field, challenging the characterization of his beliefs as unfounded in Dr. Rogstad's report.

**Exhibit Kb** (12/5/2023):

Defendant receives a Non-Final Office Action from the USPTO for his continuation patent application US 18/108,858.

**Exhibit Lb** (1/5/2024):

Defendant files a motion for discovery in criminal case 27-CR-23-1886, requesting all 104 police photographs referenced in Dr. Jill Rogstad's "Confidential Forensic Evaluation Report," taken by the Minnetonka Police Department on January 21st, 2023.

**Exhibit Mb** (1/16/2024):

A Notice of Remote Zoom Hearing is filed for a hearing set for July 16th, 2024, in Defendant's criminal case, notably missing the standard time stamp typically included on documents filed through the court's E-File system.

**Exhibit Nb** (1/16/2024):

The Defendant requests the court to judicially notice the absence of index number '40' within the case timeline of his civil court case (27-MH-PR-23-815). This missing index number raises procedural questions, especially when considered alongside other irregularities noted in the case documentation. The absence of sequential order in case filings, as exemplified by this missing index, may suggest administrative oversight or, more concerningly, indicative of non-standard handling of the Defendant's case records.

**Exhibit Ob** (1/16/2024):

Additionally, the Defendant highlights an anomaly in the chronological order of index numbers '25' and '26' within the timeline of his criminal case (27-CR-23-1886). Notably, index number '25', which pertains to a crucial court order discussed in Exhibit 'Pb', is filed out of sequence with respect to the events it relates to, particularly the 'Notice of Remote Zoom Hearing' listed as index number '26'. This discrepancy not only disrupts the logical sequence of case events but also warrants scrutiny in the context of ensuring procedural integrity. Given the significant content of the court order at index '25', which predetermines a key aspect of the Defendant's case, the irregularity in filing order further accentuates concerns over the case's administrative handling and the implications for the Defendant's legal rights.

**Exhibit Pb** (1/17/2024):

On January 17th, 2024, a court order pertaining to Defendant's criminal case 27-CR-23-1886 was filed with the courts, raising procedural concerns. This order, listing Danielle C. Mercurio as the signing officer and presumed preparer, was finalized and signed on the morning of January 16th, 2024, prior to the schedule 1:30pm hearing. Notably, the order includes statements about an agreement on incompetency, which was reached "administratively" before the hearing could occur, and outlines the possibility of direct commitment "to an appropriate safe and secure facility." The filing of this order on January 17th, despite being signed and effectively completed the morning of January 16th, is unusual and reflects a break from typical procedural order. Furthermore, this court order, completed in advance of the scheduled hearing, is cataloged as index #25 in the case timeline with a filing date of January 17th, 2024, which is paradoxically listed AFTER index #26—the 'Notice for Remote Zoom Hearing' that was filed on January 16th, 2024. The juxtaposition of these index numbers and their corresponding dates suggests a procedural anomaly or clerical oversight that warrants judicial scrutiny, as it could indicate premeditation or irregular processing of court documents.

**Exhibit Qb** (1/30/2024):

On January 30th, 2024, the Defendant files a 'Motion for Continuance' in his civil case 27-MH-PR-23-815. The motion addresses the Defendant's need for additional time due to insufficient preparation and the lack of essential medical records, specifically Dr. Adam Milz's exam report, which are critical for an effective defense. Notably, the motion underscores a significant communication breakdown, evidenced by emails showing that the court-appointed attorney, Joel Fisher, was provided with an incorrect phone number to reach the Defendant. These emails are pivotal as they reveal the Defendant's initiative in proactively reaching out to Joel Fisher upon learning of the unexpected court hearing, reflecting the Defendant's diligence and active role in his legal matters. This mix-up not only hampered the necessary attorney-client communication but also speaks to the broader challenges faced by the Defendant in navigating the court proceedings. The motion requests the court to recognize these impediments and grant a continuance to ensure fairness and due process.

**Exhibit Rb** (1/30/2024):

On January 30th, 2024, the Defendant exhibits further assertiveness in his legal affairs by filing a 'Motion for Production of Medical Records' in his civil case. The motion seeks to compel the provision of Dr. Adam Milz's exam report—a document of significant pertinence to his defense. Despite previous requests directed to his former criminal defense attorney, Bruce Rivers, the Defendant has not yet received this critical medical report. The filing underscores the Defendant's active pursuit of necessary documentation and highlights a troubling lack of compliance from his defense counsel, which could impede the Defendant's right to a fair legal process. This motion reflects the Defendant's persistence in obtaining all relevant records to ensure a comprehensive and fair consideration of his case in the court proceedings.

**Exhibit Sb** (1/31/2024):

To preclude the need for attendance at the scheduled hearing on February 1st, 2024, which is the result of a court order that explicitly outlines the possibility of Defendant being detained at court and directly committed "to an appropriate safe and secure

facility." the Defendant signs a 'Waiver' consenting to the extension of his 'Stayed Order of Commitment' for an additional nine months. This agreement was reached under the constraints of not being able to assert his rights as delineated under Minnesota Statute 253B.05 subd.3, 08, and .09, indicating a significant curtailment of the Defendant's legal rights.

**Exhibit Tb** (2/20/2024):

Defendant verifies the standing of his company 'InfiniSet, Inc.' through the Minnesota Secretary of State, confirming it remains in good standing and that he is registered as the 'Chief Executive Officer,' affirming his ongoing entrepreneurial activities and responsibilities.

**Exhibit Ub** (3/4/2024):

The Defendant personally undertook the handling of his patent matters by mailing a 'PETITION FOR EXTENSION OF TIME UNDER 37 CFR 1.136(a)' to the USPTO, requesting a two-month extension. This action, executed with precision and adhering to procedural requirements, illustrates the Defendant's legal competency and intellectual capacity to manage complex patent processes independently. The petition was confirmed to have been successfully delivered and signed for at the USPTO's offices on March 5th, 2024, with the payment of $128 verified as cashed on March 7th, 2024. Moreover, the Defendant provided a USPS tracking number, further substantiating the delivery and affirming his detailed attention to the procedural aspects of patent management. This self-directed engagement with the USPTO is a testament to the Defendant's cognitive abilities, standing in contrast to the questions of competency raised in other legal contexts.

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

**Exhibit Vb**:

The Defendant requests the court to take judicial notice of the composition of the Hennepin County Criminal Justice Coordinating Committee (CJCC), notably highlighting the role of Chela Guzman-Weigart, alongside other prominent figures. This request for notice is crucial due to the discovery that 'GuzmanC'—presumed to be Chela Guzman-Weigart—is the author and creator of Dr. Jill Rogstad's forensic exam report. The detailed roster of CJCC members includes:

- Jacob Frey, Mayor of Minneapolis
- Brian O'Hara, Chief of Police, Minneapolis Police Department
- Kerry Meyer, Chief Judge of the Fourth Judicial District Court
- Hilary Caligiuri, Presiding Judge of the Fourth Judicial District Criminal Court
- Sara Gonsalves, Administrator of the Fourth Judicial District
- Dawanna Witt, Sheriff of Hennepin County
- Jason Nelson, representing the Hennepin Police Chiefs Association

The Defendant posits that the inclusion of such influential members within the CJCC, along with the notable role played by Chela Guzman-Weigart, raises substantial questions about the integrity and impartiality of the judicial process concerning his case. The fact that 'GuzmanC' is tied to the production of a critical document in his case warrants the court's attention to potential conflicts of interest and underscores the necessity for this judicial notice.

**Exhibit Wb**:

In further consideration of Guzman-Weigart's role, the court is asked to note her position as 'Assistant County Administrator - Law, Safety, and Justice,' with specific reference to "Safety and Justice Information Technology." This role, linked to the production of Dr. Rogstad's exam report, may suggest a deeper level of involvement in the Defendant's case, amplifying the need for judicial notice of these potential procedural conflicts.

**Exhibit Xb** (11/8/2023):

An insightful article by Thomas L. Hamlin from the Minneapolis law firm 'Robins & Kaplan,' entitled 'Generative Artificial Intelligence, LLMs, And Fair Use After Warhol,' highlights the complex landscape of generative AI and its potential legal implications. This publication, particularly relevant given its origin from a firm with a rich history in intellectual property law, underscores the significant challenges and concerns raised by AI technologies in the realm of copyright and fair use. Notably, the article presents the following key statements on its front page, directly aligning with the Defendant's apprehensions regarding AI's role in intellectual property disputes:

- "Generative Artificial Intelligence (AI) has been characterized as the greatest invention since the Internet, the new new thing, a plagiarism engine, and a technology that will destroy civilization."

- "While some or all of these descriptions may or may not be accurate, one thing is abundantly clear: the technology raises serious copyright infringement and fair-use issues that the United States Copyright Office must address to introduce accountability to a handful of Silicon Valley entrepreneurs and large tech companies who control this technology."

The inclusion of these statements serves to substantiate the Defendant's concerns about AI and intellectual property theft, reflecting a broader recognition within the legal community of the challenges posed by AI technologies. This exhibit underscores the necessity of acknowledging the legitimate and pressing legal issues that the Defendant has raised regarding the protection of his intellectual property in the context of AI advancements.

**Exhibit Yb** (11/15/2023):

A pivotal Notice of Inquiry by the Federal Communications Commission (FCC), document number FCC 23-101, titled "Implications of Artificial Intelligence Technologies on Protecting Consumers from Unwanted Robocalls and Robotexts," sheds light on the profound concerns surrounding generative AI technologies, notably voice cloning. This document, emerging from a federal agency vested with the regulation of communications technologies, acknowledges the potential misuse of AI to deceive and harm consumers. Key excerpts from the document underscore the gravity and immediacy of these concerns:

- "Voice cloning, for example, is a type of generative AI technology which attempts to emulate a human voice to generate speech using a recording of that voice." (Part 10, Page 4)

- "For example, are bad actors cloning the voices of specific persons to persuade consumers of call legitimacy-and will bad actors do so with increasing frequency and impact as the quality of voice cloning increases and the cost decreases?" (Part 20, Page 8)

- "We believe that certain AI technologies such as "voice cloning" appear to fall within the TCPA's existing prohibition on artificial or prerecorded voice messages because this technology artificially simulates a human voice." (Part 25, Page 9)

- "As noted above, "voice cloning" and other similar technologies involve emulating human voices for telephone calls to consumers, but such calls may not involve actual direct interaction with a live person" (Part 25, Page 9)

- Chairwoman Jessica Rosenworcel's statement highlights: "I learned about how voice cloning scams are growing and how they can cause special harm for older adults." "The anxiety about these technology developments is real. Rightfully so." (Page 13)

- Commissioner Geoffrey Starks statement echoes concerns:

  "The clearest example of this to date is voice cloning – generative AI technology that uses a recording of a human voice to generate speech sounding like that voice."

  "White House Deputy Chief of Staff Bruce Reed, charged with developing the administration's AI strategy, says "voice cloning is one thing that keeps me up at night" "

  "Of course, voice cloning is an already-known issue, and one that falls within our existing statutory authority (i.e., the Telephone Consumer Protection Act's ("TCPA") prohibition on calls using artificial or prerecorded voices without consent)"

  (Page 15)

The inclusion of this FCC inquiry not only corroborates the Defendant's assertions regarding the potential misuse of AI in intellectual property theft and personal security breaches but also aligns with wider governmental recognition of these issues. By highlighting specific statements from federal regulators, this exhibit underlines the relevance and urgency of addressing AI's implications within the legal framework of the Defendant's case, providing a critical backdrop to the challenges he faces.

**Exhibit Zb** (January 2024):

An influential article from 'Robins Kaplan Business Litigation Quarterly Volume 4.1', penned by Bryan Mechell and titled 'Navigating the Legal Landscape: Generative AI and Copyright Law', captures the zeitgeist of 2023 regarding generative artificial intelligence. The article succinctly begins with a powerful acknowledgment of AI's significant impact on society and the legal world: "Generative artificial intelligence captivated the world in 2023 and is firmly positioned to remain center stage in the coming year. In the United States, the introduction and early-stage use of generative AI have been plagued with legal disputes and speculation."

27-CR-23-1886

This statement not only acknowledges the transformative influence of generative AI technologies over the past year but also highlights the burgeoning legal challenges and disputes arising from its application and misuse. The article, emerging from a publication associated with Robins Kaplan, a firm noted for its expertise in intellectual property law, lends further credibility to the Defendant's expressed concerns regarding AI and its potential to infringe on intellectual property rights, including his own. By highlighting this broad yet acute observation of AI's impact, this exhibit aims to contextualize the Defendant's challenges within the wider legal and technological discourse, emphasizing the need for judicial awareness and consideration of these rapidly evolving issues.

## SUPPORT OF THIS MOTION

In support of this Motion, the Defendant states as follows:

1. The aforementioned exhibits constitute matters that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

2. Each exhibit is capable of accurate and ready determination by resort to sources whose accuracy is beyond dispute, including official records, documented communications, and public statements or documents.

3. The evidentiary materials supporting these facts have been marked with digital exhibit stickers by the Defendant and will be submitted to the Court as part of the instant motion.

4. The exhibits presented herein range from personal accomplishments and business developments to interactions with governmental entities and patent filings, all of which are pertinent to the Defendant's ongoing legal proceedings and the establishment of his competence, character, and involvement in significant technical and legal activities.

5. Taking judicial notice of these facts will assist in the just determination of this proceeding, as it will provide the Court with a well-documented context within which the current charges and the Defendant's legal and mental competency can be assessed.

6. The Defendant's right to a fair trial is substantially affected by the Court's awareness and consideration of these indisputable facts, particularly in light of the challenges to the Defendant's competency and the allegations of patent fraud.

## RELIEF SOUGHT

WHEREFORE, the Defendant respectfully requests that this Court take judicial notice of the facts enumerated in Exhibits A through Zb, as set forth in the attached list, and make them a part of the record in the above-entitled action.

Respectfully submitted,

Date: <u>April 3, 2024</u>

By: <u>/s/ Matthew Guertin</u>
Matthew David Guertin
Defendant Pro Se
4385 Trenton Ln N #202
Plymouth, MN 55442
Telephone: 763-221-4540
Email: MattGuertin@Protonmail.com

Matt Guertin's Epic, Never Ending, Oculus Rift, Kinect, TouchDesigner 3D Project | Derivative



(https://derivative.ca/sites/default/files/field/body-images/mattg_1200_09.jpg)

Generated In Real Time By The Kinect.



EXHIBIT
A

# FINGER TRACKING AND DRAWING

The finger tracking is achieved by determining where the center of the hand is and then centering a 3D sphere on that point. Instead of using the Kinect's skeletal hand output which is intermittent I use the wrist points. I then figure out the hands center point by getting the averages for all of the RGB pixel values which make up the hand (RGB = XYZ).

The 3D sphere that I center on that point - and I guess the technique overall could best be described as a basketball, with your hand perfectly in the center. I am searching in the front hemisphere for the five points closest to the inside edge of the ball. I do this by running my hand and the ball into a GLSL shader I wrote which compares the two against each other using the GLSL distance function.

Digital Domain MOVA Tech Banned by Federal Judge



**SUBSCRIBE**

# Digital Domain's New Legal Setback Freezes VFX Tech Used by Major Studios

The vaunted motion capture technology known as MOVA can no longer be used by its exclusive licensee, prominent Hollywood visual effects company Digital Domain, according to a recent preliminary injunction issued by a federal judge in San Francisco.

**BY SCOTT JOHNSON**   JUNE 28, 2016 12:28PM



COURTESY OF TWENTIETH CENTURY FOX FILM CORPORATION

Prominent Hollywood visual effects company Digital Domain 3.0 has lost the right to use one of its most powerful tools, a facial motion capture technology known as MOVA that has been featured in such top-grossing hits as *Deadpool, Guardians of the Galaxy* and *The Curious Case of Benjamin Button.*

https://www.hollywoodreporter.com/news/general-news/digital-domain-mova-tech-banned-906902/

# Digital Domain's New Legal Setback Freezes VFX Tech Used by Major Studios

Hollywood Reporter

Scott Johnson

June 28th, 2016



## DIRECT QUOTES FROM ARTICLE -

"If DD3 is prohibited from using MOVA, DD3 cannot complete pending MOVA projects, develop new MOVA work, and is hindered in developing non-MOVA business of which MOVA is a component. After selling clients on MOVA for almost three years, Digital Domain would be required to tell its clients that MOVA is not available at Digital Domain — or anywhere. This information inevitably, indeed necessarily, will cause clients to seek alternatives to MOVA, which will permanently injure MOVA's brand and advance competitor interests."

"DD3/Digital Domain already has captured data of an Academy Award-winning actress for a $120 million motion picture," Digital Domain's lawyers wrote. "The movie release date is December 2016. Although the capture is complete, the data from this project has not been processed and must be. In addition, DD3/Digital Domain also has captured another well-known actress for a character that is integral to the story of a sequel of a well-known science fiction film."

It also has put Digital Domain in the awkward position of being obliged to put several of Hollywood's most prominent studios — including 20th Century Fox and Marvel, both of whom are listed as production companies for Deadpool — on notice that some of their biggest and most successful movie franchises could be dragged into further lawsuits and other legal entanglements.

Perlman then left open the possibility that the technology itself might have uses other than purely for entertainment value. "The parties that have been involved with this technology were not working for me," he said, without specifying who the parties were working for.

There was someone else who had gotten an inkling that the MOVA tech might be interesting beyond just the entertainment field: one of Digital Domain's founders, Dr. Scott Ross.

Ross and Perlman had spoken once and the topic had come up briefly. "The ability to be able to read lips, do lip sync, do digital avatars, I'm not quite sure what one would do with it," Ross tells THR, "But Perlman seemed to feel there was [Department of Defense] interest into what MOVA was and what he was doing and couldn't talk about it when I asked him."

https://www.hollywoodreporter.com/news/general-news/digital-domain-mova-tech-banned-906902/

27-CR-23-1886

CASE 0:24-cv-02646-JRT-DLM    Doc. 38-4    Filed 08/02/24    Page 25 of 271

Filed in District Court
State of Minnesota
4/3/2024 7:55 AM

Case 3:17-cv-04006    Document 1    Filed 07/17/17    Page 1 of 307

1   Rio S. Pierce, CBA No. 298297
    HAGENS BERMAN SOBOL SHAPIRO LLP
2   715 Hearst Avenue, Suite 202
    Berkeley, CA 94710
3   Telephone: (510) 725-3000
    Facsimile: (510) 725-3001
4   riop@hbsslaw.com

5   Steve W. Berman (*pro hac vice* pending)
    Mark S. Carlson (*pro hac vice* pending)
6   HAGENS BERMAN SOBOL SHAPIRO LLP
    1918 Eighth Avenue, Suite 3300
7   Seattle, WA 98101
    Telephone: (206) 623-7292
8   Facsimile: (206) 623-0594
    steve@hbsslaw.com
9   markc@hbsslaw.com

10  *Attorneys for Plaintiff*
    Rearden LLC and Rearden Mova LLC

11

12                  UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                     SAN FRANCISCO DIVISION

15  REARDEN LLC, REARDEN MOVA LLC,          No. ____
    California limited liability companies,
16
                              Plaintiffs,
17                                           **COMPLAINT FOR COPYRIGHT,**
                                             **PATENT, AND TRADEMARK**
18          v.                               **INFRINGEMENT**

19  THE WALT DISNEY COMPANY, a Delaware
    corporation, WALT DISNEY MOTION
20  PICTURES GROUP, INC., a California
    corporation, BUENA VISTA HOME
21  ENTERTAINMENT, INC. a California
    corporation, MARVEL STUDIOS, LLC, a      **DEMAND FOR JURY TRIAL**
22  Delaware limited liability company,
    MANDEVILLE FILMS, INC., a California
23  corporation,

24                            Defendants.

25

26          http://www.hbsscreative.com/complaints/07-17-17-Complaint-Rearden-v.-Disney.pdf

27

28  COMPLAINT
    Case No.:

EXHIBIT
D

## LA Phil 100th Anniversary Concert at the Hollywood Bowl - XiteLabs



**Portfolio     Services     Virtual     Production     Team     Press     Clients     Contact**

An overview of some of the work involved in creating this show at XiteLabs

As part of our discovery process, the XiteLabs team explored the relationship between color and sound. It drew on previous studies conducted around  synesthesia, "the production of a sense impression relating to one sense or part of the body by stimulation of another sense or part of the body."

Using the scheduled music programming as a base, the XiteLabs team began assigning color palettes and visual storytelling that would perfectly match   the orchestra's musical selections for that evening. The planned music selections ranged from popular, well-known pieces such as Stravinsky's *'Firebird Suite'* to the debut performance of a 12-minute atonal modern work *'Guasamacabra'* by Venezuelan composer Paul Desenne under the direction of the LA Philharmonic's famed conductor and music director Gustavo Dudamel. The Youth Orchestra of Los Angeles (YOLA) also made an appearance on Arturo  Marquez's modern classic "Conga Del Fuego Nuevo."

To encourage attendance from a wider demographic, the LA Phil invited guest pop star Katy Perry, Herbie Hancock (the LA Phil Creative Chair for Jazz), and  Kali Uchis to join in and perform some of their popular hits. These performances highlighted the magic of the LA Phil—and with wonderful orchestral  arrangements by David Campbell *(Joy, Brokeback Mountain, Spider Man, and Bob Dylan, The Rolling Stones, Paul McCartney)* brought well known pieces  such as Katy Perry's *'Firework'* to new life in front of the full-capacity audience of 17,500 in attendance. The encore and finale to the evening was the  emotional and iconic Main Theme from *'Star Wars'*, with guest conductor and original composer John Williams wielding his (light saber!) wand.

For the LAPhil 100th Anniversary Concert our production approach integrated real-time visuals, reactive to both audio and the conductor's wand motions,  pre-rendered CG material, and live performance controls via Midi/Osc,  XiteLabs created the most robust real-time visual mapping show ever done at the  Hollywood Bowl, re configurable to any venue or scale of show in the future. With the interactive tracking data of Gustavo Dudamel's performance feeding  into Touch Designer and passed to Notch via OSC, and 8 discrete channels of submixed audio from the orchestra driving our pre-programmed looks for  pieces such as Star Wars, it was evident to attendees that this was no ordinary projection mapping show!

==Our chief technical artist Matt Guertin designed our show system== using the Luminosity framework created by Keith Lostracco in Touch Designer 099.  Luminosity allowed us to save presets and cue the generative system in a very advanced fashion. We had a 3D 4k previz view of the stage and a complete  UV mapping pipeline with real time tracing and chasing geometries.

For *'Star Wars'* our programming in Notch accounted for any given section of the orchestra, e.g., 'Hi Strings' to illuminate and animate certain areas of the  the arch or 'proscenium' of the Hollywood Bowl, which, for the John William's masterpiece theme for *'Star Wars'*, was skinned to look very much like the  interior of the iconic Millennium Falcon ship that Han Solo pilots in the Star Wars films. In this way, XiteLabs fostered a direct relationship between the  musical performance and composition and the audience's visual experience of the music, while incorporating themed elements that spoke to the originality  and beauty of the original IP. We were in awe witnessing The Master John Williams conducting this timeless epic, as our visuals surrounded him and the  LA Phil orchestra in fields of asteroids, and onward through a warp-speed tunnel that bridged the past and future!

https://xitelabs.com/portfolio/LaPhil_100th_Anniversary_Concert/

MattGuertin.com/portfolio/HollywoodBowl

EXHIBIT
**F**



### LA Philharmonic 100yr Anniversary – Hollywood Bowl

Custom Media Server, D3 Media Server, Rhino, Touchdesigner, Notch, Kinect
2018   MattGuertin.com/portfolio/HollywoodBowl

**Client:** LAPhil
**Production Company:** Xitelabs
**Production Design:** Xitelabs
**Creative Direction:** Vello Virkhaus & Greg Russell
**Producer:** Vello Virkhaus
**Lighting Designer:** Robin Gray
**Animator:** Tanner Thompson, Brian Egan, Danil Tabacari, VJ Yarkus, Andrew Williams, Miguel Monteagudo
**Additional Artists:** Matt Guertin – system design
**Equipment Vendors:** LMG, Gear Tech Systems
**Media Server Operation:** XiteLabs



# Bad Bunny X100 Pre World Tour Visual Experience

 **xitelabs** creative sciences

Portfolio    Services    Virtual    Production    Team    Press    Clients    Contact

*"Bad Bunny Slays Coachella With Mind-Blowing Performance"* ET online

*"Bad Bunny's First Coachella Performance Was A Site To Behold"* Buzz Feed

*"Bad Bunny – had one of the most elaborate and dazzling performances of the weekend."* Billboard.com

Tour Info:

CMN  Events/Bad-Bunny-Live

**EXHIBIT G**

Client: Buena Vibra Group

Buena Vibra Executive Producers: Max Perez and Nino

Jimenez Xite Creative Directors: Vello Virkhaus & Greg Russell

Production Manager: Rolando Garbalosa

Producer: Amish Dani

LED Eye Design, Fabrication & Implementation: Matt OneUp Guertin

LED Eye Team : PRG Josh Huffman & Cameron Trosper

Staging & Engineering Team: All Access-  Producer Graham Forrester

Notch: Tanner Thompson, Richard De Souza, Mike Estacio

Lighting: Max McDougall & 4Wall

Illustrator & Animator: Dan Bigelow

Photographer: Vello Virkhaus

Animation Companies: Optical Animal, Volume Tricks

Animators: Ofer Zamora, Danil Tabacari, Grant Davis, Gabriel Hall, Andrew Williams, Fezz Stenton, Kyle Gordon, David Kupferburg, George Berlin, Elad Magdasi, Gerard Gonzalez, Alena Cochran, Caegan Meagher, Talon Nightshade, John Federico

VJ/Resolume Artists: Ivan Ceron, Tanner Thompson, Vello Virkhaus

Big Thanks to everyone who helped make this awesome!

https://xitelabs.com/portfolio/bad-bunny-x100pre-tour/

MattGuertin.com/portfolio/BadBunnyEye



**XiteLabs Taps into Bad Bunny's Mind's Eye for Coachella, and a US Tour – PLSN**




EXHIBIT
I

The tour then headed to the United States with a big multi-weekend stop in Coachella featuring a separate, one-off stage.  The team built an entirely new set piece, with technical design and fabrication/supervision by Xitelabs' Matt Guertin, to flt the staging parameters of the Coachella Music Festival. With only hours to build it onsite before each show, and minutes to execute the staging between acts, Xitelabs executed a not-so-mini miracle.



The design — a giant LED and lighted acrylic eye based on Bad Bunny's signature icon — was created for his stage entrance, and for content that was experienced in real time. LED tiles were custom conflgured by Xitelabs for the outer circles of the eye and played their own content while the center of eye acted as a revolving video portal through which Bad Bunny made his dramatic entrance. In addition, the center was outfltted with custom LED panels which were re-engineered by Xitelabs to flt the shape of the eye.



https://plsn.com/featured/featured-slider/xitelabs-taps-into-bad-bunnys-minds-eye-for-coachella-and-a-us-tour/

MattGuertin.com/portfolio/BadBunny360



**Bad Bunny – 360 Tour**
Touchdesigner, and Rhino
2019





## The 50' Falcon

Custom Designed Carbon Fiber Skeleton, Fabrication, Infrared Tracking, Puppeing Setup, Live Projection Mapping

Falconry is a tradition in Saudi Arabia practiced with passion and joy. So much so that UNESCO has declared falconry a living cultural heritage. No portrayal of the Saudi Kingdom could be considered authentic without showcasing its historical significance. The symbolism of the falcon was extremely important, so it had to be represented in a truly imaginative way. To fulfill the vision, a massive carbon-fiber, projection-mapped Falcon was designed and created at XiteLabs. An essential character in the story line, the falcon was controlled by 24 performers, and functioned as a giant puppet (like the Lion King ). With a 50 foot wingspan, it made an awe-inspiring impression. Utilizing a Blacktrax system, the falcon system was outfitted with 50+ stringers (Infrared beacons) and 20 IR cameras, allowing it to be tracked and projection-mapped in real time with ultra-precision. Multiple projectors painted the bird with beautiful, real-time content as it soared on a majestic journey across the massive city walls. The falcon's exact position on stage was then relayed back to a Disguise GX2 media server. On the Disguise server, UV mapped, pre-produced animation content played out to multiple projectors on the falcon, in perfect sync with the projection mapping on the walls of Diryah.

The original falcon model was produced by Greg Russell and Miguel Monteagudo, and then handed off to XiteLabs' Matt Guertin who masterminded the trellis structure of the bird, the puppet pole functionality, the wing rotation mechanism, BlackTrax stringer installation and more. All fabrication was completed in the XiteLabs workshop, where costumers wrapped the giant bird in lycra that ultimately acted as the projection surface. The finished design incorporated thousands of interlinks parts, and weighed roughly 420 pounds. Fun Fact: a special perch had to be produced for the bird to provide a nesting place when it was not in rehearsals.

## XiteLabs Credits:

Client: Executive Visions

Executive Creative Director:
Greg Russell

Technical / Creative Director:
Vello Virkhaus

Falcon Design, Fabrication Direction and Engineering:
Matt Guertin

BlackTrax System Design & Live Operations / Disguise Programming:
Simon Anaya

Technical Director / CG Lead:
Aaron Kaminar

BlackTrax / Disguise support and operation:
Vincent Steenhoek

Producers:
Jessica Tedder and Jackie Evans

https://XiteLabs.com/portfolio/diriyah-3d-projection-mapping/

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

MattGuertin.com/portfolio/Falcon





## Tracking a 50ft Falcon with XiteLabs

PROJECT DESCRIPTION

For the UNESCO World Heritage Site World Inauguration of Diriyah, XiteLabs took the lead on creating a world record-breaking, largest projection mapping show on an ancient city ever produced. For this historic show, XiteLabs introduced a 50-foot projection mapped falcon puppet supported by 24 dancers and puppet poles. Outfitted with over 50 BTStringers and 20 BTSensors, the falcon gracefully "flew" across the stage with synchronized projection mapping.  Read More

PRODUCERS / COPYRIGHT

Xite Labs Credits:

Client: Executive Visions

Executive Creative Director:
Greg Russell

Technical / Creative Director:
Vello Virkhaus

Falcon Design, Fabrication Direction and Engineering:
Matt Guertin

https://blacktrax.cast-soft.com/showcase/tracking-a-50ft-falcon-with-xitelabs/

Matthew David Guertin







# Matthew David Guertin

📍 Minneapolis, MN

Founder / Inventor / CEO -
InfiniSet, Inc.

[www.MattGuertin.com](http://www.MattGuertin.com)

 

## Activity

| | |
|---|---|
| Showcases | 0 |
| Followers | 0 |
| Following | 0 |
| Collections | 0 |
| Member since | Nov 2020 |

## 31 videos



# Search the WHOIS Database



EXHIBIT
P

⊘ infiniset.com is taken

We still might be able to get it for you . See How

Broker Service Fee



$69.99 ⓘ

Add to Cart

## WHOIS search results

Domain Name: infiniset.com
Registry Domain ID: 2591251121_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: https://www.godaddy.com
Updated Date: 2022-09-11T08:22:54Z
Creation Date: 2021-02-13T18:02:07Z
Registrar Registration Expiration Date: 2028-02-13T18:02:07Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email:
abuse@godaddy.com Registrar Abuse Contact
Phone: +1.4806242505 Domain Status:
clientTransferProhibited
https://icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited
https://icann.org/epp#clientUpdateProhibited
Domain Status: clientRenewProhibited
https://icann.org/epp#clientRenewProhibited
Domain Status: clientDeleteProhibited
https://icann.org/epp#clientDeleteProhibited
Registry Registrant ID: Not Available From
Registry Registrant Name: Registration Private
Registrant Organization: Domains By Proxy,
LLC Registrant Street:
DomainsByProxy.com Registrant Street:
2155 E Warner Rd
Registrant City: Tempe
Registrant State/Province: Arizona
Registrant Postal Code: 85284

## Find your Domain

Find your perfect domain 🔍



Take a look at these alternate options

infiniset.org    $9.99  $22.99
                 for the first year ⓘ

infiniset
.net        $14.99  $24.99
            for the first year ⓘ

infiniset.co    $11.99  $47.99
                for the first year ⓘ

infinise
t.ai        $59.99  $139.99
            for the first year with a 2
            year ⓘ
            registration



Under Construction | https://infiniset.com



https://infiniset.com



# UNITED STATES PATENT AND TRADEMARK OFFICE



UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 63/163,135 | 03/19/2021 | | 75 | G185.0001US0 | | |

**CONFIRMATION NO. 1603**
**FILING RECEIPT**

27367
WESTMAN CHAMPLIN & KOEHLER, P.A.
121 South Eighth Street
Suite 1100
Minneapolis, MN 55402



OC000000124398770

Date Mailed: 03/26/2021

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF FIRST INVENTOR, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection.

**Please verify the accuracy of the data presented on this receipt.** If an error is noted on this Filing Receipt, please submit a written request for a corrected Filing Receipt identifying the requested changes, preferably by including a properly marked-up ADS showing the changes with strike-through for deletions and underlining for additions. If you received a "Notice to File Missing Parts" or other Notice requiring a response for this application, please submit any request for correction to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections provided that the request is grantable.

**Inventor(s)**
      Matthew Guertin, Minnetonka, MN;
**Applicant(s)**
      Matthew Guertin, Minnetonka, MN;
**Power of Attorney:**
Amanda Prose--72345

**Permission to Access Application via Priority Document Exchange:** Yes

**Permission to Access Search Results:** Yes

Applicant may provide or rescind an authorization for access using Form PTO/SB/39 or Form PTO/SB/69 as appropriate.

**If Required, Foreign Filing License Granted:** 03/25/2021
The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 63/163,135**

**Projected Publication Date:** None, application is not eligible for pre-grant publication
**Non-Publication Request:** No
**Early Publication Request:** No
**\*\* MICRO ENTITY \*\***

page 1 of 3

(19) **United States**

(12) **Patent Application Publication**
Trojansky

(10) Pub. No.: **US 2022/0319115 A1**
(43) Pub. Date: **Oct. 6, 2022**

(54) **DISPLAYING A SCENE TO A SUBJECT WHILE CAPTURING THE SUBJECT'S ACTING PERFORMANCE USING MULTIPLE SENSORS**

(71) Applicant: **Eyeline Studios GmbH,** Los Gatos, CA (US)

(72) Inventor: **Stephan Trojansky**, Los Angeles, CA (US)

(21) Appl. No.: **17/709,126**

(22) Filed: **Mar. 30, 2022**

**Related U.S. Application Data**

(60) Provisional application No. 63/168,558, filed on Mar. 31, 2021.

**Publication Classification**

(51) **Int. Cl.**

| | |
|---|---|
| *G06T 17/20* | (2006.01) |
| *G06T 1/00* | (2006.01) |
| *G06T 7/73* | (2006.01 |
| *G06T 15/04* | (2006.01) |
| *B25J 19/02* | (2006.01) |

(52) **U.S. Cl.**

CPC ................*G06T 17/20* (2013.01); *G06T 1/0014* (2013.01); *G06T 7/74* (2017.01); *G06T 15/04* (2013.01); *B25J 19/021* (2013.01)

(57) **ABSTRACT**

A system surrounds an area with a first set of display panels. A second set of display panels is positioned above the area, and a third set of display panels is positioned below the area. A subject is positioned within the area and may be on an omnidirectional treadmill within the area. A controller communicates content to the first set of display panels, the second set of display panels, and the third set of display panels that presents a multidimensional scene when displayed. A set of sensors capture sensor data of the subject within the area while content is displayed. One or more of the sensors may be coupled to a repositioning system that repositions sensors so the subject remains in a field of view of different sensors. From sensor data of the subject, a representation of the subject may be generated for insertion into other video content.





https://patents.google.com/patent/US11810254B2/en

# Application

INFINISET
Guertin, Matthew

USPTO.report (https://uspto.report/TM/)  /  Guertin, Matthew (/company/Guertin-Matthew)
  /  INFINISET Application #90618638 (/TM/90618638/) /  Application (/TM/90618638/APP20210405111120/)



Trademark/Service Mark Application, Principal Register

https://uspto.report/TM/90618638/APP20210405111120/

PTO- 1478
Approved for use through 02/28/2021. OMB 0651-0009
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

## Trademark/Service Mark Application, Principal Register

**Serial Number: 90618638**
 **Filing Date: 04/01/2021**

## The table below presents the data as entered.

| Input Field | Entered |
| --- | --- |
| SERIAL NUMBER | 90618638 |
| MARK INFORMATION | |
| *MARK | INFINISET (/TM/90618638/APP20210405111120/2.jpg) |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | INFINISET |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font style, size, or color. |
| REGISTER | Principal |
| APPLICANT INFORMATION | |
| *OWNER OF MARK | Guertin, Matthew |
| INTERNAL ADDRESS | #304 |
| *MAILING ADDRESS | 10233 W 34th St |
| *CITY | Minnetonka |
| *STATE (Required for U.S. applicants) | Minnesota |
| *COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| *ZIP/POSTAL CODE (Required for U.S. and certain international addresses) | 55305 |
| *EMAIL ADDRESS | XXXX |
| LEGAL ENTITY INFORMATION | |
| TYPE | individual |
| COUNTRY/REGION/JURISDICTION/U.S. TERRITORY OF CITIZENSHIP | United States |
| GOODS AND/OR SERVICES AND BASIS INFORMATION | |
| INTERNATIONAL CLASS | 009 |

EXHIBIT
T



### Secretary of State
### Statement and Designation by
### Foreign Corporation

EXHIBIT
U



**Secretary of State**
**State of California**

4761111

Filing Number

06/30/2021

Filing Date

**IMPORTANT — Read Instructions before completing this form.**

Must be submitted with a current **Certificate of Good Standing** issued by the government agency where the corporation was formed. See Instructions.

**Filing Fee** – **$100.00** (for a foreign stock corporation) or
**$30.00** (for a foreign nonprofit corporation)

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00

*Note:* Corporations may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to ftb.ca.gov.

**This Space For Office Use Only**

1. **Corporate Name** (Go to www.sos.ca.gov/business/be/name-reservations for general corporate name requirements and restrictions.)

2. **Jurisdiction** (State, foreign country or place where this corporation is formed - **must match** the Certificate of Good Standing provided.)

EYELINE STUDIOS, INC

NEVADA

3. **Business Addresses** (Enter the **complete** business addresses. Items 3a and 3b cannot be a P.O. Box or "in care of" an individual or entity.)

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Initial Street Address of Principal Executive Office - **Do not enter a P.O. Box**<br>2505 ANTHEM VILLAGE DR., SUITE E-191 | HENDERSON | NV | 89052 |
| b. Street Address of Principal Office in California, **if any - Do not enter a P.O. Box**<br>12910 CULVER BLVD STE C | LOS ANGELES | CA | 90066 |
| c. Mailing Address of Principal Executive Office, **if different than item 3a**<br>12910 CULVER BLVD STE C | LOS ANGELES | C A | 90066 |

4. **Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 4a and 4b only.  Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation)<br>SCOTT | Middle Name | Last Name<br>MILLER | | Suffix |
|---|---|---|---|---|
| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box**<br>12910 CULVER BLVD STE C | City (no abbreviations)<br>LOS ANGELES | State<br>CA | Zip Code<br>90066 | |

**CORPORATION** – Complete Item 4c.  Only include the name of the registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 4a or 4b

5. **Read and Sign Below** (See instructions.  Office or title not required.)

I am a corporate officer and am authorized to sign on behalf of the foreign corporation.

Signature

John Gosch

Type or Print Name

S&DC-S/N (REV 12/2020)

2020 California Secretary of State
bizfile.sos.ca.gov

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM



CONTACT - Eyeline Studios - Powered by Netflix



## INQUIRIES

contact(at)eyelinestudios.com

## STEPHAN TROJANSKY

### PRESIDENT

stephan.trojansky(at)eyelinestudios.com

## PERRY KAIN

### EXECUTIVE PRODUCER

perry.kain(at)eyelinestudios.com

## SCOTT MILLER

### CHIEF OPERATING OFFICER

scott.miller(at)eyelinestudios.com

https://www.eyelinestudios.com/eyelinestudios/contact/

**NETFLIX**



EXHIBIT
W

→ **Back to All News**

# Bringing More VFX Magic to Our Members With the Acquisition of Scanline VFX



**Amy Reinhard**
VP of Studio Operations

**Business** · 22 November 2021

Global    Canada    United Kingdom (Great Britain)    South Korea (Republic of Korea)    Germany

From the interstellar landscape of *Cowboy Bebop* and the ravenous vampires of *Blood Red Sky* to the exploding underground reactor in *Stranger Things 3*, we want to surprise and delight our members by pushing the boundaries of visual effects. So we're pleased to announce today our plans to acquire  Scanline VFX, one of the most creative and innovative VFX studios in the world.*

Scanline was founded in 1989 and is now led by Stephan Trojansky, a trailblazing VFX Supervisor whose proprietary fluid rendering system Flowline won an Academy Award for Technical Achievement in 2008. The company has offices in Vancouver, Montreal, Los Angeles, London, Munich, Stuttgart, and  Seoul.

Scanline is known for its complex, photorealistic effects and expertise in virtual production. It's also done an extraordinary job of supporting our creators on everything from the above-mentioned VFX achievements to those in upcoming titles like *Don't Look Up*, *The Gray Man*, *Slumberland*, *The Adam Project* and *Stranger Things 4*.

Netflix will invest in Scanline's pipeline, infrastructure and workforce and continue to support the pioneering work that Scanline's Eyeline Studios is doing in virtual production to push the boundaries of what is visibly possible.

https://web.archive.org/web/20211122213954/https://about.netflix.com/en/news/bringing-more-vfx-magic-to-our-members-with-scanline-vfx



## D Model hyper-parameters

Table 27: Hyper-parameters for pre-training 2B, 8B and 137B models. All models were trained with 256K tokens per batch.

| Parameters | Layers | Units | Heads | pre-train steps | pre-train chips | pre-train time (days) | fine-tune chips | fine-tune time (hours) |
|---|---|---|---|---|---|---|---|---|
| 2B | 10 | 2560 | 40 | 501k | 64 | 1.5 | 16 | 3 |
| 8B | 16 | 4096 | 64 | 521k | 64 | 23 | 16 | 6 |
| 137B | 64 | 8192 | 128 | 3M | 1024 | 57.7 | 64 | 36 |

## E  Pre-training data composition

The pre-training data, called Infiniset, is a combination of dialog data from public dialog data and other public web documents. It consists of 2.97B documents and 1.12B dialogs with 13.39B utterances. The composition of the data is as follows: 50% dialogs data from public forums; 12.5% C4 data [ 11 ]; 12.5% code documents from sites related to programming like Q&A sites, tutorials, etc; 12.5% Wikipedia (English); 6.25% English web documents; and 6.25% Non-English web documents. The total number of words in the dataset is 1.56T. Note that this composition was chosen to achieve a more robust performance on dialog tasks (Section 4) while still keeping its ability to perform other tasks like code generation. As future work, we can study how the choice of this composition may affect the quality of some of the other NLP tasks performed by the model.

## F  Pre-training and fine-tuning results

Table 28: Results for Foundation Metrics

| Treatment | Sensibleness | Specificity | Interestingness | Safety | Groundedness | Informativeness |
|---|---|---|---|---|---|---|
| PT (2B) | 76.6 | 46.5 | 10.8 | 84.8 | 45 | 29.2 |
| PT (8B) | 79.1 | 46.5 | 11.3 | 87.5 | 47.1 | 29.5 |
| PT (137B) | 80.2 | 49.8 | 15.8 | 88 | 57.9 | 41.3 |
| FT quality-safety (137B) | 92.8 | 77.1 | 23.2 | 94.6 | 67.9 | 50.5 |
| LaMDA (2B) | 81.8 | 74.8 | 23.4 | 93.8 | 53 | 41.8 |
| LaMDA (8B) | 88 | 77.4 | 22.2 | 93.5 | 64.6 | 50.2 |
| LaMDA (137B) | 92.3 | 79 | 25.7 | 95.2 | 73.2 | 62.3 |

https://arxiv.org/pdf/2201.08239v1.pdf

January 20th, 2022

47



# D Model hyper-parameters

Table 27: Hyper-parameters for pre-training 2B, 8B and 137B models. All models were trained with 256K tokens per batch.

| Parameters | Layers | Units | Heads | pre-train steps | pre-train chips | pre-train time (days) | fine-tune chips | fine-tune time (hours) |
|---|---|---|---|---|---|---|---|---|
| 2B | 10 | 2560 | 40 | 501k | 64 | 1.5 | 16 | 3 |
| 8B | 16 | 4096 | 64 | 521k | 64 | 23 | 16 | 6 |
| 137B | 64 | 8192 | 128 | 3M | 1024 | 57.7 | 64 | 36 |

# E  Pre-training data composition

The pre-training data, called Infiniset, is a combination of dialog data from public dialog data and other public web documents. It consists of 2.97B documents and 1.12B dialogs with 13.39B utterances. The composition of the data is as follows: 50% dialogs data from public forums; 12.5% C4 data [ 11 ]; 12.5% code documents from sites related to programming like Q&A sites, tutorials, etc; 12.5% Wikipedia (English); 6.25% English web documents; and 6.25% Non-English web documents. The total number of words in the dataset is 1.56T. Note that this composition was chosen to achieve a more robust performance on dialog tasks (Section 4) while still keeping its ability to perform other tasks like code generation. As future work, we can study how the choice of this composition may affect the quality of some of the other NLP tasks performed by the model.

# F  Pre-training and fine-tuning results

Table 28: Results for Foundation Metrics

| Treatment | Sensibleness | Specificity | Interestingness | Safety | Groundedness | Informativeness |
|---|---|---|---|---|---|---|
| PT (2B) | 76.6 | 46.5 | 10.8 | 84.8 | 45 | 29.2 |
| PT (8B) | 79.1 | 46.5 | 11.3 | 87.5 | 47.1 | 29.5 |
| PT (137B) | 80.2 | 49.8 | 15.8 | 88 | 57.9 | 41.3 |
| FT quality-safety (137B) | 92.8 | 77.1 | 23.2 | 94.6 | 67.9 | 50.5 |
| LaMDA (2B) | 81.8 | 74.8 | 23.4 | 93.8 | 53 | 41.8 |
| LaMDA (8B) | 88 | 77.4 | 22.2 | 93.5 | 64.6 | 50.2 |
| LaMDA (137B) | 92.3 | 79 | 25.7 | 95.2 | 73.2 | 62.3 |

https://arxiv.org/pdf/2201.08239v2.pdf

January 21st, 2022

47

EXHIBIT
Z


# LaMDA: Language Models for Dialog Applications

Romal Thoppilan    Daniel De Freitas    Jamie Hall    Noam Shazeer    Apoorv Kulshreshtha

Heng-Tze Cheng    Alicia Jin    Taylor Bos    Leslie Baker    Yu Du    YaGuang Li    Hongrae Lee

Huaixiu Steven Zheng    Amin Ghafouri    Marcelo Menegali    Yanping Huang    Maxim Krikun

Dmitry Lepikhin    James Qin    Dehao Chen    Yuanzhong Xu    Zhifeng Chen    Adam Roberts

Maarten Bosma    Vincent Zhao    Yanqi Zhou    Chung-Ching Chang    Igor Krivokon    Will Rusch

Marc Pickett    Pranesh Srinivasan    Laichee Man    Kathleen Meier-Hellstern

Meredith Ringel Morris    Tulsee Doshi    Renelito Delos Santos    Toju Duke    Johnny Soraker

Ben Zevenbergen    Vinodkumar Prabhakaran    Mark Diaz    Ben Hutchinson    Kristen Olson

Alejandra Molina    Erin Hoffman-John    Josh Lee    Lora Aroyo    Ravi Rajakumar

Alena Butryna    Matthew Lamm    Viktoriya Kuzmina    Joe Fenton    Aaron Cohen

Rachel Bernstein    Ray Kurzweil    Blaise Aguera-Arcas    Claire Cui    Marian Croak    Ed Chi

Quoc Le

Google

## Abstract

We present LaMDA: Language Models for Dialog Applications. LaMDA is a family of Transformer-based neural language models specialized for dialog, which have up to 137B parameters and are pre-trained on 1.56T words of public dialog data and web text.While model scaling alone can improve quality, it shows less improvements on safety and factual grounding. We demonstrate that fine-tuning with annotated data and enabling the model to consult external knowledge sources can lead to significant improvements towards the two key challenges of safety and factual grounding. The first challenge, safety, involves ensuring that the model's responses are consistent with a set of human values, such as preventing harmful suggestions and unfair bias.We quantify safety using a metric based on an illustrative set of human values, and we find that filtering candidate responses using a LaMDA classifier fine-tuned with a small amount of crowdworker-annotated data offers a promising approach to improving model safety. The second challenge, factual grounding, involves enabling the model to consult external knowledge sources, such as an information retrieval system, a language translator, and a calculator. We quantify factuality using a groundedness metric, and we find that our approach enables the model to generate responses grounded in known sources, rather than responses that merely sound plausible. Finally, we explore the use of LaMDA in the domains of education and content recommendations, and analyze their helpfulness and role consistency.

https://arxiv.org/pdf/2201.08239.pdf
February 10th, 2022

_____

*Work done while at Google.

arXiv:2201.08239v3 [cs.CL] 10 Feb 2022

# D  Model hyper-parameters

Table 27: Hyper-parameters for pre-training 2B, 8B and 137B models. All models were trained with 256K tokens per batch.

| Parameters | Layers | Units | Heads | pre-train steps | pre-train chips | pre-train time (days) | fine-tune chips | fine-tune time (hours) |
|---|---|---|---|---|---|---|---|---|
| 2B | 10 | 2560 | 40 | 501k | 64 | 1.5 | 16 | 3 |
| 8B | 16 | 4096 | 64 | 521k | 64 | 23 | 16 | 6 |
| 137B | 64 | 8192 | 128 | 3M | 1024 | 57.7 | 64 | 36 |

# E  Pre-training data composition

The pre-training data, called Infiniset, is a combination of dialog data from public dialog data and other public web documents. It consists of 2.97B documents and 1.12B dialogs with 13.39B utterances. The composition of the data is as follows: 50% dialogs data from public forums; 12.5% C4 data ; [11] 12.5% code documents from sites related to programming like Q&A sites, tutorials, etc; 12.5% Wikipedia (English); 6.25% English web documents; and 6.25% Non-English web documents. The total number of words in the dataset is 1.56T. Note that this composition was chosen to achieve a more robust performance on dialog tasks (Section 4) while still keeping its ability to perform other tasks like code generation. As future work, we can study how the choice of this composition may affect the quality of some of the other NLP tasks performed by the model.

# F  Pre-training and fine-tuning results

Table 28: Results for Foundation Metrics

| Treatment | Sensibleness | Specificity | Interestingness | Safety | Groundedness | Informativeness |
|---|---|---|---|---|---|---|
| PT (2B) | 76.6 | 46.5 | 10.8 | 84.8 | 45 | 29.2 |
| PT (8B) | 79.1 | 46.5 | 11.3 | 87.5 | 47.1 | 29.5 |
| PT (137B) | 80.2 | 49.8 | 15.8 | 88 | 57.9 | 41.3 |
| FT quality-safety (137B) | 92.8 | 77.1 | 23.2 | 94.6 | 67.9 | 50.5 |
| LaMDA (2B) | 81.8 | 74.8 | 23.4 | 93.8 | 53 | 41.8 |
| LaMDA (8B) | 88 | 77.4 | 22.2 | 93.5 | 64.6 | 50.2 |
| LaMDA (137B) | 92.3 | 79 | 25.7 | 95.2 | 73.2 | 62.3 |

https://arxiv.org/pdf/2201.08239.pdf

February 10th, 2022

47

EXHIBIT

Aa

(19) **United States**

(12) **Patent Application Publication**     (10) Pub. No.: US 2022/0319115 A1

Trojansky     (43) Pub. Date:     **Oct. 6, 2022**

(54) **DISPLAYING A SCENE TO A SUBJECT WHILE CAPTURING THE SUBJECT'S ACTING PERFORMANCE USING MULTIPLE SENSORS**

(71) Applicant: **Eyeline Studios GmbH,** Los Gatos, CA (US)

(72) Inventor: **Stephan Trojansky,** Los Angeles, CA (US)

(21) Appl. No.: **17/709,126**

(22) Filed: **Mar. 30, 2022**

**Related U.S. Application Data**

(60) Provisional application No. 63/168,558, filed on Mar. 31, 2021.

**Publication Classification**

(51) **Int. Cl.**
*G06T 17/20* (2006.01)
*G06T 1/00* (2006.01)
*G06T 7/73* (2006.01)
*G06T 15/04* (2006.01)
*B25J 19/02* (2006.01)

(52) **U.S. Cl.**
CPC ............ *G06T 17/20* (2013.01); *G06T 1/0014* (2013.01); *G06T 7/74* (2017.01); *G06T 15/04* (2013.01); *B25J 19/021* (2013.01)

(57) **ABSTRACT**

A system surrounds an area with a first set of display panels. A second set of display panels is positioned above the area, and a third set of display panels is positioned below the area.

A subject is positioned within the area and may be on an omnidirectional treadmill within the area. A controller communicates content to the first set of display panels, the second set of display panels, and the third set of display panels that presents a multidimensional scene when displayed. A set of sensors capture sensor data of the subject within the area while content is displayed. One or more of the sensors may be coupled to a repositioning system that repositions sensors so the subject remains in a field of view of different sensors. From sensor data of the subject, a representation of the subject may be generated for insertion into other video content.





EXHIBIT
**Ba**

(43) International Publication Date

06 October 2022 (06.10.2022)

**WIPO | PCT**

# WO 2022/212761 A1

(51) **International Patent Classification:**
*G06T 7/11* (2017.01)   *H04N 5/232* (2006.01)
*G06V 20/40* (2022.01)   *G06T 15/04* (2011.01)
*H04N 13/243* (2018.01)

(21) **International Application Number:**
PCT/US2022/022914

(22) **International Filing Date:**
31 March 2022 (31.03.2022)

(25) **Filing Language:** English

(26) **Publication Language:** English

(30) **Priority Data:**
63/168,558   31 March 2021 (31.03.2021)   US
17/709,126   30 March 2022 (30.03.2022)   US

(71) **Applicant:** EYELINE STUDIOS GMBH [US/US]; 100 Winchester Circle, Los Gatos, CA 95032 (US).

(72) **Inventor:** TROJANSKY, Stephan; 100 Winchester Circle, Los Gatos, CA 95032 (US).

(74) **Agent:** HULSE, Robert, A. et al.; Fenwick & West LLP, Silicon Valley Center, 801 California Street, Mountain View, CA 94041 (US).

(81) **Designated States** (*unless otherwise indicated, for every kind of national protection available*): AE, AG, AL, AM, AO, AT, AU, AZ, BA, BB, BG, BH, BN, BR, BW, BY, BZ, CA, CH, CL, CN, CO, CR, CU, CZ, DE, DJ, DK, DM, DO, DZ, EC, EE, EG, ES, FI, *GB*, GD, GE, GH, GM, GT, HN, HR, HU, ID, IL, IN, IR, IS, IT, JM, JO, JP, KE, KG, KH, KN, KP, KR, KW, KZ, LA, LC, LK, LR, LS, LU, LY, MA, MD, ME, MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI, NO, NZ, OM, PA, PE, PG, PH, PL, PT, QA, RO, RS, RU, RW, SA, SC, SD, SE, SG, SK, SL, ST, SY, SY, TH, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, WS, ZA, ZM, ZW.

WO 2022/212761 A1

(54) **Title:** DISPLAYING A SCENE TO A SUBJECT WHILE CAPTURING THE SUBJECT'S ACTING PERFORMANCE USING MULTIPLE SENSORS



(57) **Abstract:** A system surrounds an area with a first set of display panels. A second set of display panels is positioned above the area, and a third set of display panels is positioned below the area. A subject is positioned within the area and may be on an omnidirectional treadmill within the area. A controller communicates content to the first set of display panels, the second set of display panels, and the third set of display panels that presents a multidimensional scene when displayed. A set of sensors capture sensor data of t11e subject within the area while content is displayed. One or more of the sensors may be coupled to a repositioning system that repositions sensors so the subject remains in a field of view of different sensors. From sensor data of the subject, a representation of the subject may be generated for insertion into other video content.

*[Continued on next page]*

https://patents.google.com/patent/US11810254B2/en



increase in ARM on a F/X neutral basis. We still target a 19%-20% operating margin for the full
2022, assuming no material swings in F/X rates from when we set this goal in January of 2022.

## Cash Flow and Capital Structure

Net cash generated by operating activities in Q1 was $923 million vs. $777 million in the prior year
period. Free cash flow[3] amounted to $802 million vs. $692 million. We continue to expect to be free cash
flow positive for the full year 2022 and beyond.

During the quarter, we completed two acquisitions (leading visual effects company Scanline and gaming
studio Boss Fight Entertainment), which had a -$125 million impact on cash. We also announced our
purchase of Helsinki-based gaming company Next_Games. We've completed the tender offer and expect
to complete the transaction in the second half of 2022.

We finished Q1 with gross debt of $14.6 billion after repaying $700 million of our senior notes. We're
now within the top end of our gross debt target range of $10-$15 billion. With cash of $6.0 billion, net
debt was $8.6 billion at the end of the quarter, equating to a 1.3x LTM leverage ratio[4]. Given those uses
of cash and our minimum cash target, we didn't engage in share repurchase activity during the quarter.

## Environmental, Social, and Governance (ESG)

We recently published our 2021_ESG Report (March 30, 2022). We've made good progress on our climate
commitments announced last year - reducing or avoiding more than 14,000 metric tons of emissions in
2021. This enabled us to reduce our Scope 1 and 2 footprint by more than 10% from what it otherwise
would have been and puts us on track to cut 45% of these emissions by 2030.

We continue to develop our inclusion lens. In 2021, women made up 51.7% of our global workforce[5], up
from 48.7% in 2020. Half of our US workforce (50.5%) is made up of people from one or more historically
excluded ethnic and/or racial backgrounds, including Asian, Black, Hispanic or Latino, Middle Eastern,
Native American, and Pacific Islander[6]. That's up from 46.8% in the previous year. The number of US
Black employees increased from 8.6% to 10.7% and Black leadership increased from 10.9% to 13.3%. The
number of US Hispanic or Latino employees increased from 7.9% to 8.6%, and US Hispanic or Latino
leadership grew slightly from 4.3% to 4.4%.

As noted in our last investor letter and our 2022_preliminary proxy, the board has decided to
recommend to shareholders that Netflix evolve to a more standard large cap company governance
structure. At this year's annual meeting in June, we'll present proposals to declassify our board, remove
supermajority

---

[3] For a reconciliation of free cash flow to net cash provided by (used in) operating activities, please refer to the
reconciliation in tabular form on the attached unaudited financial statements and the footnotes thereto.
[4] Defined as net debt divided by last twelve months (LTM) adjusted EBITDA (Net income before interest expense
and other income/expense, income taxes, depreciation and amortization of property, plant and equipment and
further adjusted to exclude other non-cash charges).
[5] 2020 numbers as of December 2020, and 2021 numbers as of December 2021.
[6] Categories based on US reporting requirements.



**5**



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 17/834,960 | 06/08/2022 | 2642 | 830 | 6378/8 | 20 | 3 |

**CONFIRMATION NO. 8731**

44696
Dr. Mark M. Friedman
Moshe Aviv Tower, 54th floor
7 Jabotinsky St.
Ramat Gan, 5252007
ISRAEL

**FILING RECEIPT**




OC000000134535011

Date Mailed: 06/16/2022

Receipt is acknowledged of this non-provisional utility patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF FIRST INVENTOR, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection.

**Please verify the accuracy of the data presented on this receipt.** If an error is noted on this Filing Receipt, please submit a written request for a corrected Filing Receipt, including a properly marked-up ADS showing the changes with strike-through for deletions and underlining for additions. If you received a "Notice to File Missing Parts" or other Notice requiring a response for this application, please submit any request for correction to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections provided that the request is grantable.

**Inventor(s)**
    Yuval BRODSKY, Tel Aviv, ISRAEL;

**Applicant(s)**
    NEWTON VR LTD., Tel Aviv-Yafo, ISRAEL;

**Power of Attorney:** The patent practitioners associated with Customer Number 44696

**Domestic Priority data as claimed by applicant**
    This application is a CON of 16/329,231 02/28/2019
    which is a 371 of PCT/IL2017/050983 09/03/2017
    which claims benefit of 62/382,279 09/01/2016

**Foreign Applications** for which priority is claimed  (You may be eligible to benefit from the **Patent Prosecution Highway** program at the USPTO. Please see http://www.uspto.gov for more information.)  - None.
*Foreign application information must be provided in an Application Data Sheet in order to constitute a claim to foreign priority. See 37 CFR 1.55 and 1.76.*

**Permission to Access Application via Priority Document Exchange:** Yes

**Permission to Access Search Results:** Yes

Applicant may provide or rescind an authorization for access using Form PTO/SB/39 or Form PTO/SB/69 as appropriate.

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 45901011 |
| **Application Number:** | 17834960 |
| **International Application Number:** | |
| **Confirmation Number:** | 8731 |
| **Title of Invention:** | IMMERSIVE MULTISENSORY SIMULATION SYSTEM |
| **First Named Inventor/Applicant Name:** | Yuval  BRODSKY |
| **Customer Number:** | 44696 |
| **Filer:** | Mark Friedman/Freddie Artaza |
| **Filer Authorized By:** | Mark Friedman |
| **Attorney Docket Number:** | 6378/8 |
| **Receipt Date:** | 08-JUN-2022 |
| **Filing Date:** | |
| **Time Stamp:** | 05:50:00 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | DA |
| Payment was successfully received in RAM | $830 |
| RAM confirmation Number | E202268655501796 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Application Data Sheet | 6378-8_ADStbf.pdf | 114179<br>0e812af1170ff61a351795d0d88620b71bad7c0b | no | 8 |

**Warnings:**

**Information:**

This is not an USPTO supplied ADS fillable form

| 2 | Drawings-only black and white line drawings | 6378-8_Figs.pdf | 10426237<br>98f03f668b5f26f953b38c4634036e8fde034bc4 | no | 39 |

**Warnings:**

**Information:**

| 3 | Internet Communications Authorization | 6378-8_InternetAuthorizationTBF.pdf | 83855<br>422a0a36232bafe442fdbf71134d28ae25f878d1 | no | 2 |

**Warnings:**

**Information:**

| 4 | Oath or Declaration filed | 6378-8_Oath-Signed.pdf | 698652<br>5a4bfd99aaf1ca2deec4f702b39fab42bfe76fc0 | no | 1 |

**Warnings:**

**Information:**

| 5 | Power of Attorney | 6378-8_POA-Signed.pdf | 873014<br>361347d41baa82e68bba6c60dcdb82b814468e86 | no | 1 |

**Warnings:**

**Information:**

| 6 | | 6378-8_Specs.pdf | 4954809<br>2243dbce6658779cd54226ad35f9cd5004ab8e43 | yes | 57 |

CASE 0:24-cv-02646-JRT-DLM   Doc. 38-4   Filed 08/02/24   Page 55 of 271

**Multipart Description/PDF files in .zip description**

| Document Description | Start | End |
|---|---|---|
| Specification | 1 | 51 |
| Claims | 52 | 56 |
| Abstract | 57 | 57 |

**Warnings:**

**Information:**

| 7 | Fee Worksheet (SB06) | fee-info.pdf | 43936 | no | 2 |
|---|---|---|---|---|---|
| | | | 05259f652262cbebe8a048eb18ca5b09322852de | | |

**Warnings:**

**Information:**

| Total Files Size (in bytes): | 17194682 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Yuval Brodsky Patent Application 17/834,960   USPTO Dossier

| Description | Date | Code | Group |
|---|---|---|---|
| Internet Communications Authorization | 06/08/2022 | ECOMM.AUTH | unknown |
| Power of Attorney | 06/08/2022 | PA.. | 4 |
| Specification | 06/08/2022 | SPEC | 1 |
| Claims | 06/08/2022 | CLM | 1 |
| Abstract | 06/08/2022 | ABST | 1 |
| Fee Worksheet (SB06) | 06/08/2022 | WFEE | 5 |
| Electronic Filing System Acknowledgment Receipt | 06/08/2022 | N417 | 2 |
| Drawings-other than black and white line drawings | 06/08/2022 | DRW.NONBW | unknown |
| Filing Receipt | 06/16/2022 | APP.FILE.REC | unknown |
| Fee Worksheet (SB06) | 06/16/2022 | WFEE | 5 |
| Placeholder sheet indicating presence of supplemental content in Supplemental Complex Repository for Examiners(SCORE) | 06/08/2022 | SCORE | unknown |
| Notice of Publication | 09/22/2022 | NTC.PUB | unknown |

PCT/US2022/020919

## PATENT COOPERATION TREATY

From the INTERNATIONAL SEARCHING AUTHORITY



To:
PROSE, Amanda

WESTMAN, CHAMPLIN & KOEHLER, P.A. 121 South
Eighth Street, Suite 1100 Minneapolis, Minnesota 55402
USA

## PCT

**NOTIFICATION OF TRANSMITTAL OF
THE INTERNATIONAL SEARCH REPORT AND
THE WRITTEN OPINION OF THE INTERNATIONAL
SEARCHING AUTHORITY, OR THE DECLARATION**

(PCT Rule 44.1)

| | |
|---|---|
| Date of mailing *(day/month/year)* | 24 June 2022 (24.06.2022) |

| Applicant's or agent's file reference | |
|---|---|
| G185-0001WO1 | **FOR FURTHER ACTION**   See paragraphs 1 and 4 below |

| International application No. | International filing date *(day/month/year)* |
|---|---|
| **PCT/US2022/020919** | **18 March 2022 (18.03.2022)** |

Applicant

**GUERTIN, Matthew**

---

1. ☒   The applicant is hereby notified that the international search report and the written opinion of the International Searching
Authority have been established and are transmitted herewith.
**Filing of amendments and statement under Article 19:**
The applicant is entitled, if he so wishes, to amend the claims of the international application (see Rule 46):
   **When?** The time limit for filing such amendments is normally two months from the date of transmittal of the
       international search report.
   **How?** Directly to the International Bureau of WIPO preferably through ePCT or on paper to, 34 chemin des
       Colombettes 1211 Geneva 20, Switzerland, Facsimile No.: +41 22 338 82 70
**For more detailed instructions,** see *PCT Applicant's Guide*, International Phase, paragraphs 9.004 . 9-011.

2. ☐   The applicant is hereby notified that no international search report will be established and that the declaration under
Article 17(2)(a) to that effect and the written opinion of the International Searching Authority are transmitted herewith.

3. ☐   **With regard to any protest** against payment of (an) additional fee(s) under Rule 40.2, the applicant is notified that:
   ☐ the protest together with the decision thereon has been transmitted to the International Bureau together with any
      request to forward the texts of both the protest and the decision thereon to the designated Offices.

   ☐ no decision has been made yet on the protest; the applicant will be notified as soon as a decision is made.

4. **Reminders**

   The applicant may submit comments on an informal basis on the written opinion of the International Searching Authority to the
International Bureau. These comments will be made available to the public after international publication. The International
Bureau will send a copy of such comments to all designated Offices unless an international preliminary examination report has
been or is to be established.

   Shortly after the expiration of **18 months** from the priority date, the international application will be published by the International
Bureau. If the applicant wishes to avoid or postpone publication, a notice of withdrawal of the international application, or of the
priority claim, must reach the International Bureau before the completion of the technical preparations for international publication
(Rules 90*bis*.1 and 90*bis*.3).

   Within **19 months** from the priority date, but only in respect of some designated Offices, a demand for international preliminary
examination must be filed if the applicant wishes to postpone the entry into the national phase **until 30 months** from the priority date
(in some Offices even later); otherwise, the applicant must, **within 20 months** from the priority date, perform the prescribed acts for
entry into the national phase before those designated Offices. In respect of other designated Offices, the time limit of **30 months** (or
later) will apply even if no demand is filed within 19 months. For details about the applicable time limits, Office by Office, see
www.wipo.int/pct/en/texts/time_limits.html and the *PCT Applicant's Guide*, National Chapters.

   Within **22 months** from the priority date, the applicant may request that a supplementary international search be carried out by a
different International Searching Authority, that offers this service (Rule 45*bis*.1). The procedure for requesting supplementary
international search is described in the *PCT Applicant's Guide*, International Phase, paragraphs 8.006-8.032.

---

| Name and mailing address of the ISA/KR | Authorized officer |
|---|---|
| International Application Division<br>Korean Intellectual Property Office<br>189 Cheongsa-ro, Seo-gu, Daejeon, 35208, Republic of Korea | COMMISSIONER |
| Facsimile No.  82-42-481-8578 | Telephone No. 82-42-481-5571 |

Form PCT/ISA/220 (July 2017)

\* Attention

Copies of the documents cited in the international search report can be searched in the following Korean Intellectual Property Office English website for six months(expire date : 2022.12.24　) from the date of mailing of the international search report.

http://www.kipo.go.kr/en/ => PCT ISA Portal => PCT Status

ID　: PCT international application number

PW : 44F4L384^

Inquiries related to PCT International Search Report or Written Opinion prepared by KIPO as an International Searching Authority can be answered not only by KIPO but also through IPKC (Intellectual Property Korea Center), located in Vienna, VA, which functions as a PCT Help Desk for PCT applicants.

Homepage: http://www.ipkcenter.com

Email: ipkc@ipkcenter.com

Notes to Form PCT/ISA/220  (July 2014)

PATENT COOPERATION TREATY

# PCT

## INTERNATIONAL SEARCH REPORT

(PCT Article 18 and Rules 43 and 44)

| Applicant's or agent's file reference<br>G185-0001WO1 | FOR FURTHER ACTION<br>see Form PCT/ISA/220 as well as,<br>where applicable, item 5 below. | |
|---|---|---|
| International application No.<br>**PCT/US2022/020919** | International filing date *(day/month/year)*<br>**18 March 2022** | (Earliest) Priority Date *(day/month/year)*<br>**19 March 2021** |
| Applicant<br> **GUERTIN, Matthew** | | |

This international search report has been prepared by this International Searching Authority and is transmitted to the applicant according to Article 18. A copy is being transmitted to the International Bureau.

This international search report consists of a total of __4__ sheets.

☐ It is also accompanied by a copy of each prior art document cited in this report.

1. **Basis of the report**

   a. With regard to the **language**, the international search was carried out on the basis of:

      ☑ the international application in the language in which it was filed.

      ☐ a translation of the international application into _____ which is the language of a translation furnished for the purposes of international search (Rules 12.3(a) and 23.1(b)).

   b. ☐ This international search report has been established taking into account the **rectification of an obvious mistake** authorized by or notified to this Authority under Rule 91 (Rule 43.6*bis*(a)).

   c. ☐ With regard to any **nucleotide and/or amino acid sequence** disclosed in the international application, see Box No. I.

2. ☐ **Certain claims were found unsearchable** (see Box No. II).

3. ☐ **Unity of invention is lacking** (see Box No. III).

4. With regard to the **title**,

   ☑ the text is approved as submitted by the applicant.

   ☐ the text has been established by this Authority to read as follows:

5. With regard to the **abstract**,

   ☑ the text is approved as submitted by the applicant.

   ☐ the text has been established, according to Rule 38.2, by this Authority as it appears in Box No. IV. The applicant may, within one month from the date of mailing of this international search report, submit comments to this Authority.

6. With regard to the **drawings**,

   a. the figure of the **drawings** to be published with the abstract is Figure No. __1__

      ☑ as suggested by the applicant.

      ☐ as selected by this Authority, because the applicant failed to suggest a figure.

      ☐ as selected by this Authority, because this figure better characterizes the invention.

   b. ☐ none of the figures is to be published with the abstract.

Form PCT/ISA/210 (first sheet) (July 2019)

## INTERNATIONAL SEARCH REPORT

| | International application No. |
|---|---|
| | **PCT/US2022/020919** |

| A. | CLASSIFICATION OF SUBJECT MATTER |
|---|---|

**H04N 5/262**(2006.01)i; **H04N 9/75**(2006.01)i; **H04N 5/06**(2006.01)i; **G03B 15/05**(2006.01)i; **G03B 17/56**(2006.01)i; **A63B 22/02**(2006.01)i; **A63B 22/00**(2006.01)i

According to International Patent Classification (IPC) or to both national classification and IPC

| B. | FIELDS SEARCHED |
|---|---|

Minimum documentation searched (classification system followed by classification symbols)

H04N 5/262(2006.01); A61B 6/00(2006.01); A61B 6/04(2006.01); A61M 21/00(2006.01); A63B 22/00(2006.01); A63B 22/02(2006.01); B25J 3/04(2006.01); B25J 9/16(2006.01); G06F 15/16(2006.01)

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Korean utility models and applications for utility models
Japanese utility models and applications for utility models

Electronic data base consulted during the international search (name of data base and, where practicable, search terms used)

eKOMPASS(KIPO internal) & Keywords: treadmill, turntable, vibration, control, film

| C. | DOCUMENTS CONSIDERED TO BE RELEVANT |
|---|---|

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | US 2019-0307982 A1 (NEWTON VR LTD.) 10 October 2019 (2019-10-10) paragraphs [0055]-[0271] and figure 14A | 17,19,20 |
| Y | | 1-13 |
| A | | 14-16,18 |
| Y | KR 10-2020-0091594 A (LEANTECH CMS CO., LTD.) 31 July 2020 (2020-07-31) paragraphs [0016]-[0041] | 1-13 |
| A | US 2017-0129105 A1 (KENNETH DEAN STEPHENS, JR.) 11 May 2017 (2017-05-11) claims 1-10 | 1-20 |
| A | US 2015-0150522 A1 (GEORGE PAPAIOANNOU) 04 June 2015 (2015-06-04) claims 1-10 | 1-20 |

| ☑ | Further documents are listed in the continuation of Box C. | ☑ | See patent family annex. |
|---|---|---|---|

| * | Special categories of cited documents: |
|---|---|
| "A" | document defining the general state of the art which is not considered to be of particular relevance |
| "D" | document cited by the applicant in the international application |
| "E" | earlier application or patent but published on or after the international filing date |
| "L" | document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified) |
| "O" | document referring to an oral disclosure, use, exhibition or other means |
| "P" | document published prior to the international filing date but later than the priority date claimed |

| "T" | later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention |
|---|---|
| "X" | document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone |
| "Y" | document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art |
| "&" | document member of the same patent family |

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 24 June 2022 | 24 June 2022 |

| Name and mailing address of the ISA/KR | Authorized officer |
|---|---|
| **Korean Intellectual Property Office**<br>**189 Cheongsa-ro, Seo-gu, Daejeon**<br>**35208, Republic of Korea** | **YANG, JEONG ROK** |
| Facsimile No. **+82-42-481-8578** | Telephone No. **+82-42-481-5709** |

Form PCT/ISA/210 (second sheet) (July 2019)

## INTERNATIONAL SEARCH REPORT

International application No.

**PCT/US2022/020919**

| C. | DOCUMENTS CONSIDERED TO BE RELEVANT | |
|---|---|---|
| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
| A | KR 10-2021-0023190 A (SO, HO SUNG et al.) 04 March 2021 (2021-03-04) claims 1-10 | 1-20 |

## INTERNATIONAL SEARCH REPORT
### Information on patent family members

International application No.

**PCT/US2022/020919**

| Patent document cited in search report | | | Publication date (day/month/year) | Patent family member(s) | | | Publication date (day/month/year) |
|---|---|---|---|---|---|---|---|
| US | 2019-0307982 | A1 | 10 October 2019 | IL | 265092 | A | 30 April 2019 |
| | | | | WO | 2018-042442 | A1 | 08 March 2018 |
| KR | 10-2020-0091594 | A | 31 July 2020 | KR | 10-2191218 | B1 | 15 December 2020 |
| US | 2017-0129105 | A1 | 11 May 2017 | US | 2013-0211587 | A1 | 15 August 2013 |
| | | | | US | 2013-0211594 | A1 | 15 August 2013 |
| | | | | US | 9573276 | B2 | 21 February 2017 |
| | | | | US | 9975248 | B2 | 22 May 2018 |
| US | 2015-0150522 | A1 | 04 June 2015 | EP | 2348980 | A1 | 03 August 2011 |
| | | | | US | 2010-0098316 | A1 | 22 April 2010 |
| | | | | US | 2010-0110075 | A1 | 06 May 2010 |
| | | | | US | 2013-0294575 | A1 | 07 November 2013 |
| | | | | US | 2017-0049411 | A1 | 23 February 2017 |
| | | | | US | 8147139 | B2 | 03 April 2012 |
| | | | | US | 8525833 | B2 | 03 September 2013 |
| | | | | US | 8770838 | B2 | 08 July 2014 |
| | | | | US | 9289180 | B2 | 22 March 2016 |
| | | | | WO | 2010-044844 | A1 | 22 April 2010 |
| KR | 10-2021-0023190 | A | 04 March 2021 | KR | 10-2300669 | B1 | 09 September 2021 |

Form PCT/ISA/210 (patent family annex) (July 2019)

## PATENT COOPERATION TREATY

From the INTERNATIONAL SEARCHING AUTHORITY

| | |
|---|---|
| To:<br><br>**PROSE, Amanda**<br><br>**WESTMAN, CHAMPLIN & KOEHLER, P.A.**<br>**121 South Sixth Street, Suite 1100**<br>**Minneapolis, Minnesota 55402**<br>**USA** | **PCT**<br><br>WRITTEN OPINION OF THE<br>INTERNATIONAL SEARCHING AUTHORITY<br><br>(PCT Rule 43*bis*.1) |

| | |
|---|---|
| | Date of mailing<br>*(day/month/year)*   **24 June 2022** |
| Applicant's or agent's file reference<br>**G185-0001WO1** | **FOR FURTHER ACTION**<br>See paragraph 2 below |

| International application No.<br>**PCT/US2022/020919** | International filing date *(day/month/year)*<br>**18 March 2022** | Priority date *(day/month/year)*<br>**19 March 2021** |
|---|---|---|

International Patent Classification (IPC) or both national classification and IPC
**H04N 5/262**(2006.01)i; **H04N 9/75**(2006.01)i; **H04N 5/06**(2006.01)i; **G03B 15/05**(2006.01)i;
**G03B 17/56**(2006.01)i; **A63B 22/02**(2006.01)i; **A63B 22/00**(2006.01)i

| Applicant | |
|---|---|
| | **GUERTIN, Matthew** |

1. This opinion contains indications relating to the following items:

| | | |
|---|---|---|
| ☑ | Box No. I | Basis of the opinion |
| ☐ | Box No. II | Priority |
| ☐ | Box No. III | Non-establishment of opinion with regard to novelty, inventive step and industrial applicability |
| ☐ | Box No. IV | Lack of unity of invention |
| ☑ | Box No. V | Reasoned statement under Rule 43*bis*.1(a)(i) with regard to novelty, inventive step and industrial applicability;<br>citations and explanations supporting such statement |
| ☐ | Box No. VI | Certain documents cited |
| ☐ | Box No. VII | Certain defects in the international application |
| ☑ | Box No. VIII | Certain observations on the international application |

2. **FURTHER ACTION**

If a demand for international preliminary examination is made, this opinion will be considered to be a written opinion of the International Preliminary Examining Authority ("IPEA") except that this does not apply where the applicant chooses an Authority other than this one to be the IPEA and the chosen IPEA has notified the International Bureau under Rule 66.1*bis*(b) that written opinions of this International Searching Authority will not be so considered.

If this opinion is, as provided above, considered to be a written opinion of the IPEA, the applicant is invited to submit to the IPEA a written reply together, where appropriate, with amendments, before the expiration of 3 months from the date of mailing of Form PCT/ISA/220 or before the expiration of 22 months from the priority date, whichever expires later.

For further options, see Form PCT/ISA/220.

| Name and mailing address of the ISA/KR<br><br>**Korean Intellectual Property Office**<br>**189 Cheongsa-ro, Seo-gu, Daejeon,**<br>**35208** | Date of completion of this opinion<br><br>**24 June 2022** | Authorized officer<br><br>**YANG, JEONG ROK** |
|---|---|---|
| Facsimile No. **+82-42-481-8578** | | Telephone No. **+82-42-481-5709** |

Form PCT/ISA/237 (Cover sheet) (revised January 2019)

## WRITTEN OPINION OF THE
## INTERNATIONAL SEARCHING AUTHORITY

| International application No. |
| --- |
| **PCT/US2022/020919** |

| Box No. I | Basis of the opinion |
| --- | --- |

1. With regard to the **language**, this opinion has been established on the basis of:

   ☑ the international application in the language in which it was filed.

   ☐ a translation of the international application into ........................................ which is the language of a translation furnished for the purposes of international search (Rules 12.3(a) and 23.1(b)).

2. ☐ This opinion has been established taking into account the **rectification of an obvious mistake** authorized by or notified to this Authority under Rule 91 (Rule 43*bis*.1(b)).

3. ☐ With regard to any **nucleotide and/or amino acid sequence** disclosed in the international application, this opinion has been established on the basis of a sequence listing:

   a. ☐ forming part of the international application as filed:

      ☐ in the form of an Annex C/ST.25 text file.

      ☐ on paper or in the form of an image file.

   b. ☐ furnished together with the international application under PCT Rule 13*ter*.1(a) for the purposes of international search only in the form of an Annex C/ST.25 text file.

   c. ☐ furnished subsequent to the international filing date for the purposes of international search only:

      ☐ in the form of an Annex C/ST.25 text file (Rule 13*ter*.1(a)).

      ☐ on paper or in the form of an image file (Rule 13*ter*.1(b) and Administrative Instructions, Section 713).

4. ☐ In addition, in the case that more than one version or copy of a sequence listing has been filed or furnished, the required statements that the information in the subsequent or additional copies is identical to that forming part of the application as filed or does not go beyond the application as filed, as appropriate, were furnished.

5. Additional comments:

Form PCT/ISA/237 (Box No. I) (revised January 2019)

## WRITTEN OPINION OF THE
## INTERNATIONAL SEARCHING AUTHORITY

| International application No. |
| --- |
| **PCT/US2022/020919** |

| Box No. V | Reasoned statement under Rule 43*bis*.1(a)(i) with regard to novelty, inventive step and industrial applicability; citations and explanations supporting such statement |
| --- | --- |

1.  Statement

| | | | |
| --- | --- | --- | --- |
| Novelty (N) | Claims | 1-20 | YES |
| | Claims | NONE | NO |
| Inventive step (IS) | Claims | 14-16,18 | YES |
| | Claims | 1-13,17,19-20 | NO |
| Industrial applicability (IA) | Claims | 1-20 | YES |
| | Claims | NONE | NO |

2.  Citations and explanations :

Reference is made to the following documents:

D1: US 2019-0307982 A1 (NEWTON VR LTD.) 10 October 2019
D2: KR 10-2020-0091594 A (LEANTECH CMS CO., LTD.) 31 July 2020
D3: US 2017-0129105 A1 (KENNETH DEAN STEPHENS, JR.) 11 May 2017
D4: US 2015-0150522 A1 (GEORGE PAPAIOANNOU) 04 June 2015
D5: KR 10-2021-0023190 A (SO, HO SUNG et al.) 04 March 2021

I. Novelty and Inventive Step (PCT Article 33(2) and (3))

1. Claims 1-13

1.1. Claim 1

   D1, which is considered to be the closest prior art to the subject matter of claim 1, discloses a motorized treadmill comprising: a linear treadmill belt located on a rotatable surface; and a base upon which a user may walk in all directions with the user's motion uninhibited, wherein the base includes a surface, on which the user contacts the base, with an underlying support (see paragraphs [0180], [0201], [0218] and figure 14A).
   Claim 1 differs from D1 in one or more sources of vibration for providing selected vibration to one or more locations on a belt. However, the different feature can be easily derived from the feature of D2 considering a plurality of vertically driven cylinders that allow vibration to be transmitted to specific positions of the treadmill (see paragraphs [0018]-[0019]).
   Therefore, claim 1 is considered to lack an inventive step over a combination of D1, D2.

1.2. Claims 2-13

   The additional feature of claim 2 can be easily derived from the feature of D2 considering that a control unit controls the operation of the vibrating treadmill (see paragraph [0018]).
   The additional feature of claim 3 can be easily derived from the feature of D2 considering that the vertical motion part for generating vibration of the treadmill includes a vertical drive cylinder, an elastic body, and a support plate (see paragraph [0041]).
   The additional feature of claim 4 can be easily derived from the feature of D1 considering a controller in communication with the force applying unit, the controller for controlling the amount of positive or negative force to simulate a predetermined force (see paragraph [0055]).
   The additional feature of claim 5 can be easily derived from the feature of D2 considering a plurality of vertically driven cylinders that allow vibration to be transmitted to specific positions of the treadmill (see paragraphs [0018]-[0019]).
   The additional feature of claim 6 can be easily derived from the feature of D2 considering that the vibration of the earthquake output through the VR device is transmitted to the vibrating treadmill through wired/wireless communication between the vibrating treadmill and the VR device (see paragraph [0016]).
   The additional feature of claim 7 can be easily derived from the feature of D1 considering that the omnidirectional treadmill surface is removable (see paragraph [0198]).

## WRITTEN OPINION OF THE
## INTERNATIONAL SEARCHING AUTHORITY

| International application No. |
| --- |
| PCT/US2022/020919 |

| Box No. V | Reasoned statement under Rule 43*bis*.1(a)(i) with regard to novelty, inventive step and industrial applicability; citations and explanations supporting such statement |
| --- | --- |

The additional features of claims 8-9 can be easily derived from the feature of D1 considering that the linear treadmill is located on the rotatable surface which is rotated by one or more actuators (see paragraph [0218]).

The additional feature of claim 10 can be easily derived from the feature of D1 considering within the base are actuators or other lift and/or retraction members, placed at various locations beneath the surface, to raise and depress the surface, resulting in changes, e.g., elevations, in the surface (see paragraph [0192]).

The additional feature of claim 11 can be easily derived from the feature of D1 considering that a batter provides power to all of the electrical components of the omnidirectional treadmill (see paragraph [0210]).

The additional feature of claim 12 can be easily derived from the feature of D1 considering a user wearing a virtual reality headset (see paragraph [0228]).

The additional feature of claim 13 can be easily derived from the feature of D1 considering that one of the advantages of such a harness design is that it can conform to a very wide range of user shapes and sizes with minimal adjustment (see paragraph [0271]).

Therefore, claims 2-13 are considered to lack an inventive step over a combination of D1, D2.

2. Claims 14-16

None of the cited documents disclose the features of claim 14: "wherein the treadmill base is configured to support the user thereon and wherein the treadmill base remains stationary, and the user movement is confined to a surface area of the belt, and the illusion of unrestricted movement is created". And claim 14 is not obvious to a person skilled in the art from the documents individually or in any combination.

Claims 15-16 are dependent on claim 14.

Therefore, claims 14-16 are novel and involve an inventive step.

3. Claims 17-20

3.1. Claim 17

D1, which is considered to be the closest prior art to the subject matter of claim 17, discloses a method of creating the illusion of movement comprising: providing a linear treadmill belt located on a rotatable surface (see paragraphs [0201], [0218] and figure 14A).

Claim 17 differs from D1 in controlling a speed of an endless track; controlling a direction of the endless track by rotating a turntable; and synching movement of a camera with a real-world speed of the endless track and a distance traveled by a track. However, the different feature can be easily derived from the feature of D1 considering that cameras and sensors are used for tracking the user's motion and physiological parameters, wherein the parameters include position, distance, speed, acceleration, force, energy (see paragraphs [0212], [0245]).

Therefore, claim 17 is considered to lack an inventive step over D1.

3.2. Claims 18-20

The additional feature of claim 18 is not disclosed in any of the documents, nor is it obvious to a person skilled in the art over the documents individually or in combination.

The additional feature of claim 19 can be easily derived from the feature of D1 considering a user wearing a virtual reality headset (see paragraph [0228]).

The additional feature of claim 20 can be easily derived from the feature of D1 considering that cameras and sensors are used for tracking the user's motion and physiological parameters, wherein the parameters include position, distance, speed, acceleration, force, energy (see paragraphs [0212], [0245]).

Therefore, claims 19-20 are considered to lack an inventive step over D1, and claim 18 is novel and involves an inventive step.

II. Industrial Applicability (PCT Article 33(4))

Claims 1-20 are industrially applicable.

Form PCT/ISA/237 (Box No. V) (revised January 2019)

## WRITTEN OPINION OF THE
## INTERNATIONAL SEARCHING AUTHORITY

| International application No. |
| --- |
| **PCT/US2022/020919** |

**Box No. VIII     Certain observations on the international application**

The following observations on the clarity of the claims, description, and drawings or on the question whether the claims are fully supported by the description, are made:

The term "the scene" in claims 6, 18 has not been previously defined. Therefore, claims 6, 18 are not clear, contrary to the requirements of PCT Article 6.

The term "the user" in claim 20 has not been previously defined. Therefore, claim 20 is not clear, contrary to the requirements of PCT Article 6.

Form PCT/ISA/237 (Box No. VIII) (revised January 2019)

(12) **United States Patent**
Brodsky

(10) Patent No.: **US 11,383,062 B2**
(45) Date of Patent: **Jul. 12, 2022**

**EXHIBIT Fa**

(54) **IMMERSIVE MULTISENSORY SIMULATION SYSTEM**

(71) Applicant: **NEWTON VR LTD.**, Tel Aviv-Jaffa (IL)

(72) Inventor: **Yuval Brodsky**, Tel Aviv (IL)

(73) Assignee: **NEWTON VR LTD.**, Tel Aviv-Jaffa (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 32 days.

(21) Appl. No.: **16/329,231**

(22) PCT Filed: **Sep. 3, 2017**

(86) PCT No.: **PCT/IL2017/050983**
§ 371 (c)(1),
(2) Date: **Feb. 28, 2019**

(87) PCT Pub. No.: **WO2018/042442**
PCT Pub. Date: **Mar. 8, 2018**

(65) **Prior Publication Data**
US 2019/0307982 A1      Oct. 10, 2019

**Related U.S. Application Data**

(60) Provisional application No. 62/382,279, filed on Sep. 1, 2016.

(51) **Int. Cl.**
*A61M 21/00*        (2006.01)
*A63B 22/02*        (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............. *A61M 21/00* (2013.01); *A61H 3/008* (2013.01); *A63B 22/02* (2013.01); *G05B 13/042* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ... A63B 22/00; A63B 22/00181; A63B 22/02; A63B 22/0207; A63B 22/0228;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,812,010 A * 11/1957 Abdallah ............... A61H 3/008
482/69
4,907,571 A * 3/1990 Futakami ............... A61H 3/008
482/901
(Continued)

*Primary Examiner* — Nyca T Nguyen
*Assistant Examiner* — Zachary T Moore
(74) *Attorney, Agent, or Firm* — Mark M. Friedman

(57) **ABSTRACT**

A Multisensory Simulation System comprises systems including: an Omni-Directional Treadmill (ODT), a Gravity Modification System (GMS), a Motion and gesture Tracking System (MTS), a Data Analytics System (DAS), a Visual Stimulation System (VSS), an Auditory Stimulation System (AUSS), an Operator Interface System (OIS), a User Harness System (UHS), a Tactile Stimulation System (TSS), an Atmospheric Simulation System (ATSS), a Neurological Stimulation System (NSS), an Olfactory Stimulation System (OSS), a Gustatory System Stimulation System (GSS), a User Monitoring System (UMS), a Controller, a Game Engine System (GES), database, a Communication Unit (CU), a User Safety System (USS), and a communication bus.

**20 Claims, 39 Drawing Sheets**



Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:35 PM 07/18/2022
FILED 01:35 PM 07/18/2022
SR 20223015163 - File Number 6917475

# CERTIFICATE OF INCORPORATION

## OF

## INFINISET, INC.



EXHIBIT
Ga

### ARTICLE I

The name of the corporation is InfiniSet, Inc. (the "**Corporation**").

### ARTICLE II

The address of the Corporation's registered office in the state of Delaware is 251 Little Falls Drive, Wilmington, New Castle County, Delaware 19808. The name of its registered agent at such address is Corporation Service Company.

### ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

### ARTICLE IV

The aggregate number of shares which the Corporation shall have authority to issue is 10,000,000 shares of capital stock all of which shall be designated "Common Stock" and have a par value of $0.00001 per share.

### ARTICLE V

The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. Elections of directors need not be by written ballot unless otherwise provided in the Bylaws of the Corporation. In furtherance of and not in limitation of the powers conferred by the laws of the state of Delaware, the Board of Directors of the Corporation is expressly authorized to make, amend or repeal Bylaws of the Corporation.

### ARTICLE VI

(A)     To the fullest extent permitted by the Delaware General Corporation Law, as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

(B)     The Corporation shall indemnify to the fullest extent permitted by law any person made or threatened to be made a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he, his testator or intestate is or was a director or officer of the Corporation or any predecessor of the Corporation, or serves or served at any other enterprise as a director or officer at the request of the Corporation or any predecessor to the Corporation.

Page 1 of 2

(C)     Neither any amendment nor repeal of this Article VI, nor the adoption of any provision of the Corporation's Certificate of Incorporation inconsistent with this Article VI, shall eliminate or reduce the effect of this Article VI in respect of any matter occurring, or any action or proceeding accruing or arising or that, but for this Article VI, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

## ARTICLE VII

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (A) any derivative action or proceeding asserting a claim on behalf of the Corporation, (B) any action or proceeding asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (C) any action or proceeding asserting a claim against the Corporation arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's Certificate of Incorporation or Bylaws, (D) any action or proceeding asserting a claim as to which the Delaware General Corporation Law confers jurisdiction upon the Court of Chancery of the State of Delaware, or (E) any action or proceeding asserting a claim governed by the internal affairs doctrine, in each case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein.

## ARTICLE VIII

The name and mailing address of the incorporator are as follows:

Matthew D Guertin



Executed on July 18, 2022.

E-signed using Clerky (9b9A0f3eae7d92b8786B1650-ad6b611)

Matthew D Guertin

**Matthew D Guertin, Incorporator**

2/20/2024

CEO / President

State of Minnesota,  County of Hennepin
City of Plymouth

This Instrument was acknowledged before me on:

20 day of Feb , 2024

by Matthew David Guertin

Jennifer L Ott ___ notary public

My Commission Expires: 01/31/2025

JENNIFER L OTT
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2025

Page 2 of 2

**PATENT COOPERATION TREATY**

WO 2022/198028
PCT/US2022/020919



From the INTERNATIONAL BUREAU

## PCT

NOTIFICATION CONCERNING
AVAILABILITY OF THE PUBLICATION
OF THE INTERNATIONAL APPLICATION

To:

PROSE, Amanda
WESTMAN, CHAMPLIN & KOEHLER, P.A.
121 South Eighth Street, Suite 1100
Minneapolis, Minnesota 55402
**ETATS-UNIS D'AMERIQUE**

| Date of mailing (day/month/year) | |
| --- | --- |
| 22 September 2022 (22.09.2022) | |

| Applicant's or agent's file reference | |
| --- | --- |
| G185-0001WO1 | **IMPORTANT NOTICE** |

| International application No. | International filing date (day/month/year) | Priority date (day/month/year) |
| --- | --- | --- |
| PCT/US2022/020919 | 18 March 2022 (18.03.2022) | 19 March 2021 (19.03.2021) |

Applicant

GUERTIN, Matthew

---

The applicant is hereby **notified** that the International Bureau:

**[X]** has **published** the above-indicated international application on 22 September 2022 (22.09.2022)
under No. WO 2022/198028

**[ ]** has **republished** the above-indicated international application on_____
under No. WO
For an explanation as to the reason for this republication of the international application, reference is made to INJD codes (15),
(48) or (88) (as the case may be) on the front page of the published international application.


- A copy of the international application is available for viewing and downloading on WIPO's website at the
following address: https://patentscope.wipo.int/ (in the appropriate field of the structured search, enter the PCT or
WO number).

- The applicant may also obtain a paper copy of the published international application from the International Bureau
by sending an e-mail to patentscope@wipo.int or by submitting a written request to the contact details provided
below.


**Warning:** Following publication of the international application, applicants, agents and inventors may receive misleading requests for
payment of fees that appear to come from the International Bureau of WIPO or other patent Offices which are unrelated to the processing of
international applications under the PCT.

Agents are particularly encouraged to be vigilant and alert their clients about this practice. Examples of such requests for payment which have
been received by the Intenmtio1ml Bureau can be found at: http://www.wipo.int/pct/en/wanting/pct_warning.html.

Please forward copies of any such requests to pct.legal@wipo.int.

---

| The Intenmtional Bureau ofWIPO<br>34, chemin des Colombettes<br>1211 Geneva 20, Switzerland | Autllo1ized officer<br><br>Sun Hwa Lee<br><br>e-mail pct.team1@wipo.int<br>Telephone No. +41 22 338 74 01 |
| --- | --- |

Fonn PCT/IB/311 (revised January 2020)

(19) **United States**

(12) **Patent Application Publication**   (10) Pub. No.: **US 2022/0296848 A1**
BRODSKY                                   (43) Pub. Date:        **Sep. 22, 2022**



(54) **IMMERSIVE MULTISENSORY SIMULATION SYSTEM**

(71) Applicant: **NEWTON VR LTD.**, Tel Aviv-Yafo (IL)

(72) Inventor: **Yuval BRODSKY**, Tel Aviv (IL)

(21) Appl. No.: **17/834,960**

(22) Filed: **Jun. 8, 2022**

**Related U.S. Application Data**

(63) Continuation of application No. 16/329,231, filed on Feb. 28, 2019, now Pat. No. 11,383,062, filed as application No. PCT/IL2017/050983 on Sep. 3, 2017.

(60) Provisional application No. 62/382,279, filed on Sep. 1, 2016.

**Publication Classification**

(51) Int. Cl.
  *A61M 21/00* (2006.01)
  *A61H 3/00* (2006.01)
  *A63B 22/02* (2006.01)
  *G05B 13/04* (2006.01)

(52) **U.S. Cl.**
  CPC .............. *A61M 21/00* (2013.01); *A61H 3/008* (2013.01); *A63B 22/02* (2013.01); *G05B 13/042* (2013.01); *A61M 2021/0022* (2013.01); *A61M 2021/0027* (2013.01); *A61M 2021/005* (2013.01); *A61M 2205/056* (2013.01); *A63B 2022/0271* (2013.01)

(57)                     **ABSTRACT**

A Multisensory Simulation System comprises systems including: an Omni-Directional Treadmill (ODT), a Gravity Modification System (GMS), a Motion and gesture Tracking System (MTS), a Data Analytics System (DAS), a Visual Stimulation System (VSS), an Auditory Stimulation System (AUSS), an Operator Interface System (OIS), a User Harness System (UHS), a Tactile Stimulation System (TSS), an Atmospheric Simulation System (ATSS), a Neurological Stimulation System (NSS), an Olfactory Stimulation System (OSS), a Gustatory System Stimulation System (GSS), a User Monitoring System (UMS), a Controller, a Game Engine System (GES), database, a Communication Unit (CU), a User Safety System (USS), and a communication bus.



https://patents.google.com/patent/US20220296848A1/en



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia  22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 17/834,960 | 06/08/2022 | Yuval BRODSKY | 6378/8 |

**CONFIRMATION NO. 8731**

44696
Dr. Mark M. Friedman
Moshe Aviv Tower, 54th floor
7 Jabotinsky St.
Ramat Gan, 5252007
ISRAEL

**PUBLICATION NOTICE**

*OC000000136365797*

**Title:**IMMERSIVE MULTISENSORY SIMULATION SYSTEM

**Publication No.**US-2022-0296848-A1
**Publication Date:**09/22/2022

## NOTICE OF PUBLICATION OF APPLICATION

The above-identified application will be electronically published as a patent application publication pursuant to 37 CFR 1.211, et seq. The patent application publication number and publication date are set forth above.

The publication may be accessed through the USPTO's publically available Searchable Databases via the Internet at www.uspto.gov. The direct link to access the publication is currently http://www.uspto.gov/patft/.

The publication process established by the Office does not provide for mailing a copy of the publication to applicant. A copy of the publication may be obtained from the Office upon payment of the appropriate fee set forth in 37 CFR 1.19(a)(1). Orders for copies of patent application publications are handled by the USPTO's Public Records Division. The Public Records Division can be reached by telephone at (571) 272-3150 or (800) 972-6382, by facsimile at (571) 273-3250, by mail addressed to the United States Patent and Trademark Office, Public Records Division, Alexandria, VA 22313-1450 or via the Internet.

In addition, information on the status of the application, including the mailing date of Office actions and the dates of receipt of correspondence filed in the Office, may also be accessed via the Internet through the Patent Electronic Business Center at www.uspto.gov using the public side of the Patent Application Information and Retrieval (PAIR) system. The direct link to access this status information is currently https://portal.uspto.gov/pair/PublicPair. Prior to publication, such status information is confidential and may only be obtained by applicant using the private side of PAIR.

Further assistance in electronically accessing the publication, or about PAIR, is available by calling the Patent Electronic Business Center at 1-866-217-9197.

---

Office of Data Managment, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101



EXHIBIT

Ja

# Office of the Minnesota Secretary of State
## Certificate of Authority

   I, Steve Simon, Secretary of State of Minnesota, do certify that: The following business entity has duly complied with the relevant provisions of Minnesota Statutes listed below, and is formed or authorized to do business in Minnesota on and after this date with all the powers, rights and privileges, and subject to the limitations, duties and restrictions, set forth in that chapter.

The business entity is now legally registered under the laws of Minnesota.

| | |
|---|---|
| Name in Minnesota: | InfiniSet Inc. |
| Name in Home Jurisdiction: | InfiniSet, Inc. |
| File Number: | 1348699500021 |
| Minnesota Statutes, Chapter: | 303 |
| Home Jurisdiction: | Delaware |
| This certificate has been issued on: | 11/13/2022 |



*Steve Simon*

Steve Simon
Secretary of State
State of Minnesota

*Page 1 of 3*

**EXHIBIT**
**Ka**

**507664879   12/23/2022**

## PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

EPAS ID: PAT7

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| EYELINE STUDIOS GMBH | 12/15/2022 |

**RECEIVING PARTY DATA**

| | |
|---|---|
| Name: | NETFLIX, INC. |
| Street Address: | 100 WINCHESTER CIRCLE |
| City: | LOS GATOS |
| State/Country: | CALIFORNIA |
| Postal Code: | 95032 |

**PROPERTY NUMBERS Total: 3**

| Property Type | Number |
|---|---|
| Application Number: | 63168558 |
| Application Number: | 17709126 |
| PCT Number: | US2022022914 |

**CORRESPONDENCE DATA**

**Fax Number:**

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| | |
|---|---|
| Email: | nflx-docketing@gtlaw.com |
| Correspondent Name: | GREENBERG TRAURIG, LLP - NETFLIX, INC. |
| Address Line 1: | 77 WEST WACKER DRIVE |
| Address Line 2: | SUITE 3100 |
| Address Line 4: | CHICAGO, ILLINOIS 60601 |

| NAME OF SUBMITTER: | JONATHAN R. LEE |
|---|---|
| SIGNATURE: | /Jonathan R. Lee/ |
| DATE SIGNED: | 12/23/2022 |

**Total Attachments: 3**
source=[FINAL]_Eyeline_GmbH_to_Netflix,_Inc._Assignment_Agreement#page1.tif
source=[FINAL]_Eyeline_GmbH_to_Netflix,_Inc._Assignment_Agreement#page2.tif
source=[FINAL]_Eyeline_GmbH_to_Netflix,_Inc._Assignment_Agreement#page3.tif

**507664879**

**PATENT**
**REEL: 062197 FRAME: 0127**

DocuSign Envelope ID: 36766A1E-FA03-43B8-8D2C-174DF8CB2EFF

# ASSIGNMENT OF PATENT RIGHTS

This Assignment of Patent Rights ("**Assignment**") is made and entered into on <u>December 15, 2022</u> by and between:

Eyeline Studios GmbH, having a place of business at 100 Winchester Circle, Los Gatos, California 95032 ("**Assignor**") and Netflix, Inc., a Delaware corporation, having a place of business at 100 Winchester Circle, Los Gatos, California 95032 ("**Assignee**").

**WHEREAS** Assignor is the owner of all right, title, and interest in and to the patent applications set forth on Exhibit 1 attached hereto ("**Assigned Patent Assets**") and has agreed to assign and transfer to Assignee all right, title, and interest in and to the Assigned Patent Assets;

**WHEREAS** Assignee is desirous of acquiring all right, title, and interest in and to the Assigned Patent Assets.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns to Assignee, or its designees, all right, title, and interest in and to all of the following (collectively, the "**Patent Rights**"): (a) the Assigned Patent Assets, including all rights pursuant to 35 U.S.C. § 154; (b) all patents or patent applications (i) to which any of the foregoing claim priority and/or (ii) for which any of the foregoing forms a basis for priority; (c) any and all continuing, divisional, and continuation-in-part applications of any of the foregoing; (d) all requests for continuing examination, substitutions, reissues, extensions, renewals, and reexaminations of any of the foregoing; (e) all foreign patents, patent applications, and counterparts to any of the foregoing, including certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances; and (f) all rights to apply in any country for patents, certification of invention, utility models, industrial design protections, design patent protection, or other governmental grants or issuances corresponding to any of the foregoing throughout the world, including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding; (g) all inventions set forth in any of the Assigned Patent Assets; (h) all past, present, and future causes of action (whether currently pending, filed, or otherwise) and other enforcement actions (including, without limitation, all rights to damages, injunctive remedies, and relief, and other remedies of any kind for past, current, and future infringement) and all rights to collect royalties (other than royalties or other payments due under agreements entered into by Assignor and third parties prior to the date of this Assignment), damages and profits, due or accrued, relating to any of the foregoing, including the right to sue and recover for, and the right to profits and damages, due or accrued, arising out of or in connection with, any and all past, present or future infringements or dilutions. The assignment of the Assigned Patent Assets includes all documents related to the conception, diligence, and reduction to practice of the inventions disclosed in the Assigned Patent Assets in a manner that satisfies the requirements of 35 U.S.C. § 112 for patent claims in the Assigned Patent Assets and all domestic and international patent filing documents.

Assignor hereby authorizes and requests the Director of the U.S. Patent and Trademark Office, and any official of any other country whose duty it is to issue patents on the applications included in the Patent Rights, to issue all Letters Patent, patents, certificates of invention, utility models, or other governmental

PATENT
REEL: 062197 FRAME: 0128

DocuSign Envelope ID: 36766A1E-FA03-43B8-8D2C-174DF8CB2EFF

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

grants or issuances for the inventions disclosed in the Assigned Patent Assets in a manner that satisfies the requirements of 35 U.S.C. § 112 for the patent claims in the Assigned Patent Assets to Assignee, its successors and assigns, as the assignee to the entire interest therein.

The terms and conditions of this Assignment of Patent Rights will inure to the benefit of Assignee, its successors, assigns, and other legal representatives and will be binding upon Assignor, its successors, assigns, and other legal representatives.

**IN WITNESS WHEREOF**, Assignor has caused this Assignment of Patent Rights to be executed by its duly authorized representative on the date set forth below.

**ASSIGNOR**: Eyeline Studios GmbH
Signature:
Date: December 15, 2022
Name: Stephan Trojansky
Title: CEO

**IN WITNESS WHEREOF**, Assignee has caused this Assignment of Patent Rights to be executed by its duly authorized representative on the date set forth below.

**ASSIGNEE**: Netflix Inc.
Signature: Reg Thompson
Date: December 15, 2022
Name: Reg Thompson
Title: Assistant Secretary

**PATENT
REEL: 062197 FRAME: 0129**

# Minnetonka Police Department

14600 Minnetonka Blvd Minnetonka, MN 55345

(952) 939-8510

Case #:MP23000151                                    Incident #: MP23000151



| Event |
|---|

## 14600 MINNETONKA BLVD Apt #1 MINNETONKA, MINNESOTA 55345

| | |
|---|---|
| Description of Incident: | INFORMATION |
| Reported Date/Time: | 01/12/2023 14:02:34 |
| Occurred Start Date: | 01/12/2023 14:02:34 |
| Occurred End Date: | |
| Latitude: | 44.940109 |
| Longitude: | -93.465489 |
| Brief synopsis of incident: | RP reporting a company is attempting to steal his patent. Information report. |
| Disposition: | INACTIVE |
| Exceptional Clearance (For Office Use Only): | NOT APPLICABLE |
| Exceptional Clearance Date (For Office Use Only): | |
| Case Status: | ASSISTED/ADVISED |
| MPtest: | No |
| Confidential?: | No |
| Request Formal Complaint: | No |
| State Accident Report Completed: | No |
| Photos Taken: | No |
| MHU Report: | No |
| Case Status Date: | 01/13/2023 |

| Person Reporting Incident Data (1) |
|---|

## GUERTIN, MATTHEW DAVID

| | |
|---|---|
| DOB: | 07/17/1981 |
| Age: | 41 |
| Driver's License Number: | ███████ |
| Driver's License State: | Minnesota |
| Home Phone: | |
| Cell Phone: | (763)-221-4540 |
| Address: | 10233 34TH ST W |
| Apartment: | 304 |
| City: | MINNETONKA |
| State: | Minnesota |
| Zip Code: | 55305 |
| Latitude: | 44.942249587379074 |
| Longitude: | -93.40873527526688 |
| Height: | 510 |
| Weight: | 180 |
| Eye Color: | Brown |

# Minnetonka Police Department

14600 Minnetonka Blvd Minnetonka, MN 55345

(952) 939-8510



Case #:MP23000151                                    Incident #: MP23000151

| Offenses (1) |
|---|

**MISINFO MISC OFCR INFORMATION**

| | |
|---|---|
| **Offense Status:** | ASSISTED/ADVISED |
| **UCR/NIBRS Code:** | 999 NIBRS Non-Reportable |
| **Severity Level:** | |
| **State Code:** | |
| **Location Type:** | Residence/Home |
| **Bias Motivation:** | NONE |
| **Attempted/Completed:** | Completed |
| **Offender Suspected of Using:** | Not Applicable |
| **MHU Report:** | No |
| **Cargo Theft:** | |
| **Number of Premises Entered:** | |
| **Criminal Activity or Gang Info:** | |

| Vehicle (0) |
|---|

**Involvement Type:**

| Property (0) |
|---|

**Date of Theft:**

**Property Status:**

| Narrative (1) |
|---|

**MAIN REPORT. BHARRIS, 166**

**HARRIS, BRANDON 62166**                                    01/12/2023

On 01/12/2023 I responded to the Minnetonka Police Department lobby for a report of fraud. I made contact with reporting party MATTHEW DAVID GUERTIN DOB 07/17/1981 in the department lobby.

GUERTIN STATEMENT:

- He has filed for and acquired a patent for his invention, "Motorized Rotatable Treadmill and System for Creating the Illusion of Movement."
- The machine is used for filming cinema.
- He pitched the patent to Mark Roberts Motion Control (mrmoco.com).
- The CEO, Mark Roberts, advised that the technology already existed and is used by Photo Robot (photorobot.com).
- He looked at the Photo Robot website and observed the technology used to be similar but different from his.
- While reviewing the website over a number of days he realized the website was changing to reflect his patent.
- The website is being updated in real time with information from his design.

# Minnetonka Police Department

14600 Minnetonka Blvd Minnetonka, MN 55345

(952) 939-8510



Case #:MP23000151

Incident #: MP23000151

- Photo Robot is effectively stealing his patent by making it look like they have already had the technology.
- He has proof of the fraud.
- He has been downloading the website and has noticed a number of discrepancies between the current version and the old version of the website.
- He believes the master mind behind all of this is Mark Roberts who he initially discussed the patent with.
- He believes that he could sell the patent to Netflix for 100 Million dollars.
- He originally called the FBI who advised he needed to file a report with his local police agency.
- He understands there is nothing the local police can do.

OFFICER OBSERVATIONS ACTIONS:

- Guertin advised that he has many gigabytes of evidence to show the fraud.
- I advised Guertin to connect with a computer forensicator in order to parse the data into a readable format.
- I agreed with Guertin that this issue is beyond the scope of the local police department.
- I advised Guertin to provide the FBI with the case number and the parsed data when he files the report with them.

DISPOSITION:

- Information Report.

| Officer (2) | | |
|---|---|---|
| Approving Officer: | THOELE, KAREN (621040) | 01/12/2023 17:43:11 |
| Reporting Officer: | HARRIS, BRANDON (62166) | 01/12/2023 15:17:00 |

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

State of Minnesota
County of Hennepin



District Court
4th Judicial District

Prosecutor File No.    23A00785
Court File No.    27-CR-23-1886

**State of Minnesota,**

                    Plaintiff,

        vs.

**MATTHEW DAVID GUERTIN    DOB: 07/17/1981**

10233 34th St W
#304
Minnetonka, MN 55305

                    Defendant.

**COMPLAINT**

Order of Detention

*27-CR-23-1886*

*Filed in District Court
State of Minnesota
1/24/2023*

The Complainant submits this complaint to the Court and states that there is probable cause to believe Defendant committed the following offense(s):

### COUNT I

**Charge: Dangerous Weapons-Reckless Discharge of Firearm Within a Municipality**
Minnesota Statute: 609.66.1a(a)(3), with reference to: 609.66.1a(b)(2)
Maximum Sentence: 2 YEARS AND/OR $5,000
Offense Level: Felony

Offense Date (on or about): 01/21/2023

Control #(ICR#): 23000258

Charge Description: That on or about January 21, 2023, in Hennepin County, Minnesota, MATTHEW DAVID GUERTIN recklessly discharged a firearm within a municipality.

### COUNT II

**Charge: Firearm-Serial Number-Receive/Possess With No Serial Number**
Minnesota Statute: 609.667(3), with reference to: 609.667
Maximum Sentence: 5 YEARS AND/OR $10,000
Offense Level: Felony

Offense    Date    (on    or    about):

01/21/2023 Control #(ICR#): 23000258

Charge Description: That on or about January 21, 2023, in Hennepin County, Minnesota, MATTHEW DAVID GUERTIN received or possessed a firearm that was not identified by a serial number: an automatic rifle.

## COUNT III

**Charge: Firearm-Serial Number-Receive/Possess With No Serial Number**
Minnesota Statute: 609.667(3), with reference to: 609.667
Maximum Sentence: 5 YEARS AND/OR $10,000 Offense Level: Felony

Offense Date (on or about): 01/21/2023

Control #(ICR#): 23000258
Charge Description: That on or about January 21, 2023, in Hennepin County, Minnesota, MATTHEW DAVID GUERTIN received or possessed a firearm that was not identified by a serial number: a full-size pistol.

## COUNT IV

**Charge: Firearm-Serial Number-Receive/Possess With No Serial Number**
Minnesota Statute: 609.667(3), with reference to: 609.667
Maximum Sentence: 5 YEARS AND/OR $10,000
Offense Level: Felony

*Filed in District Court*
*State of Minnesota*
*1/24/2023*

Offense Date (on or about):01/21/2023

Control #(ICR#): 23000258

Charge Description: That on or about January 21, 2023, in Hennepin County, Minnesota, MATTHEW DAVID GUERTIN received or possessed a firearm that was not identified by a serial number: a compact pistol.

**2**

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

# STATEMENT OF PROBABLE CAUSE

Complainant has investigated the facts and circumstances of this offense and believes the following establishes probable cause:

On January 21, 2023, officers with the Minnetonka Police Department were dispatched to a report of shots being fired from an apartment at 102XX 34th St. W., Minnetonka, Hennepin County, Minnesota.

Upon arriving in the area officers heard shots and were able to confirm where the apartment shots were coming from, and that the occupant of the apartment was MATTHEW DAVID GUERTIN, dob 7/17/1981, "Defendant" herein. Defendant was yelling "I'm going to die because they stole my patent" and repeatedly yelled a Minnetonka Police Department case number. Defendant spoke with a negotiator and after some time threw two firearms out of the window: an automatic rifle and a pistol in a case. Defendant eventually came out of the apartment and was placed under arrest. In a post-Miranda statement Defendant reported that he had fired multiple rounds to get the police to respond to his location, and that he had shot into the sky and trees. Defendant estimated he had fired approximately twenty rounds. Defendant said that he could not communicate via his computer or phone because other people had gained control of his computer and other devices. Defendant also said that he had bought the parts and put together the firearms that he had used.

Officers recovered three firearms from the incident: an automatic rifle, a full-size pistol, and a compact pistol. None of the firearms had serial numbers on them. Officers also recovered additional ammunition and body armor inside Defendant's apartment.

Defendant is currently in custody.

State of Minnesota
1/24/2023

27-CR-23-1886   Filed in District Court
State of Minnesota
1/24/2023

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

## SIGNATURES  AND APPROVALS

Being authorized to prosecute the offenses charged, I approve this complaint.

**Prosecuting Attorney**         Erin Goltz 300 S 6th St                    Electronically Signed:
                                 Minneapolis, MN 55487                     01/24/2023 10:23 AM
                                 (612) 348-5550

State of Minnesota
1/24/2023

27-CR-23-1886   Filed in District Court
State of Minnesota
1/24/2023

## FINDING OF PROBABLE CAUSE

From the above sworn facts, and any supporting affidavits or supplemental sworn testimony, I, the Issuing Officer, have determined that probable cause exists to support, subject to bail or conditions of release where applicable, Defendant's arrest or other lawful steps be taken to obtain Defendant's appearance in court, or Defendant's detention, if already in custody, pending further proceedings. Defendant is therefore charged with the above-stated offense(s).

### [ ] SUMMONS

THEREFORE YOU, THE DEFENDANT, ARE SUMMONED to appear as directed in the Notice of Hearing before the above-named court to answer this complaint.

IF YOU FAIL TO APPEAR in response to this SUMMONS, a WARRANT FOR YOUR ARREST shall be issued.

### [ ] WARRANT

To the Sheriff of the above-named county; or other person authorized to execute this warrant: I order, in the name of the State of Minnesota, that the Defendant be apprehended and arrested without delay and brought promptly before the court (if in session), and if not, before a Judge or Judicial Officer of such court without unnecessary delay, and in any event not later than 36 hours after the arrest or as soon as such Judge or Judicial Officer is available to be dealt with according to law.

**[ ]** *Execute in MN Only*     **[ ]** *Execute Nationwide*     **[ ]** *Execute in Border States*

### [X] ORDER OF DETENTION

Since the Defendant is already in custody, I order, subject to bail or conditions of release, that the Defendant continue to be detained pending further proceedings.

Bail: $50,000.00
Conditions of Release: No use of drugs/alcohol; Make All Appearances; Remain Law Abiding; No Possession of Weapons

This complaint, duly subscribed and sworn to or signed under penalty of perjury, is issued by the undersigned Judicial Officer as of the following date: January 24, 2023.

**Judicial Officer**

Edward Thomas Wahl          Electronically Signed: 01/24/2023 11:40 AM
District Court Judge

Sworn testimony has been given before the Judicial Officer by the following witnesses:

---

**COUNTY OF HENNEPIN**
**STATE OF MINNESOTA**

**State of Minnesota**

Plaintiff

vs.

**MATTHEW DAVID GUERTIN**

Defendant

***LAW ENFORCEMENT OFFICER RETURN OF SERVICE***
*I hereby Certify and Return that I have served a copy of this Order of Detention upon the Defendant herein named.*

Signature of Authorized Service Agent:

*27-CR-23-1886   Filed in District Court*
*State of Minnesota*
*1/24/2023*

**5**

CASE 0:24-cv-02646-JRT-DLM   Doc. 38-4   Filed 08/02/24   Page 86 of 271

# DEFENDANT FACT SHEET

| | |
|---|---|
| **Name:** | MATTHEW DAVID GUERTIN |
| **DOB:** | 07/17/1981 |
| **Address:** | 10233 34th St W<br>#304<br>Minnetonka, MN 55305 |
| **Alias Names/DOB:** | |
| **SID:** | MN00417780 |
| **Height:** | |
| **Weight:** | |
| **Eye Color:** | |
| **Hair Color:** | |
| **Gender:** | MALE |
| **Race:** | White |
| **Fingerprints Required per Statute:** | Yes |
| **Fingerprint match to Criminal History Record:** | Yes |
| **Driver's License #:** | |
| **SILS Person ID#:** | 403932 |
| **SILS Tracking No.** | 3316315 |
| **Alcohol Concentration:** | |

**6**

## STATUTE AND OFFENSE GRID

| Cnt Nbr | Statute Type | Offense Date(s) | Statute Nbrs and Descriptions | Offense Level | MOC | GOC Controlling Agencies | Case Numbers |
|---------|--------------|-----------------|-------------------------------|---------------|-----|--------------------------|--------------|
| | Charge | 1/21/2023 | 609.66.1a(a)(3)<br>Dangerous Weapons-Reckless Discharge of Firearm Within a Municipality | Felony | W1E40 | MN0271200 | 23000258 |
| | Penalty | 1/21/2023 | 609.66.1a(b)(2)<br>Dangerous Weapons-Other Offenses | Felony | W1E40 | MN0271200 | 23000258 |
| 2 | Charge | 1/21/2023 | 609.667(3)<br>Firearm-Serial Number-Receive/Possess With No Serial Number | Felony | W1840 | MN0271200 | 23000258 |
| | Penalty | 1/21/2023 | 609.667<br>Firearms-Removal or Alteration of Serial Number | Felony | W1840 | MN0271200 | 23000258 |
| 3 | Charge | 1/21/2023 | 609.667(3)<br>Firearm-Serial Number-Receive/Possess With No Serial Number | Felony | W1840 | MN0271200 | 23000258 |
| | Penalty | 1/21/2023 | 609.667<br>Firearms-Removal or Alteration of Serial Number | Felony | W1840 | MN0271200 | 23000258 |
| 4 | Charge | 1/21/2023 | 609.667(3)<br>Firearm-Serial Number-Receive/Possess With No Serial Number | Felony | W1840 | MN0271200 | 23000258 |
| | Penalty | 1/21/2023 | 609.667<br>Firearms-Removal or Alteration of Serial Number | Felony | W1840 | MN0271200 | 23000258 |

*27-CR-23-1886*    *Filed in District Court*
*State of Minnesota*
*1/24/2023*

**7**



c19) **United States**

c12) **Patent Application Publication**    c10) Pub. No.: **US 2023/0182034 Al**

Guertin    (43) Pub. Date: **Jun. 15, 2023**

---

(54) **MOTORIZED ROTATABLE TREADMILL AND SYSTEM FOR CREATING THE ILLUSION OF MOVEMENT**

(71) Applicant: **InfiniSet, Inc.,** Edina, MN (US)

(72) Inventor: **Matthew Guertin,** Minnetonka, MN (US)

(21) Appl. No.: **18/108,858**

(22) Filed: **Feb. 13, 2023**

**Related U.S. Application Data**

(63) Continuation of application No. 17/698,420, filed on Mar. 18, 2022, now Pat. No. 11,577,177.

(60) Provisional application No. 63/163,135, filed on Mar. 19, 2021.

**Publication Classification**

(51) **Int. Cl.**
    *A63J 5/02* (2006.01)
    *A63J 1/00* (2006.01)

(52) **U.S. Cl.**
    CPC .. *A63J 5/02* (2013.01); *A63J 1/00* (2013.01)

(57)    **ABSTRACT**

A motorized, rotatable treadmill and a system for creating the illusion of user movement while the user is stationary with respect to an environment as the user walks or otherwise moves on an endless track of the treadmill. The user can then travel an unlimited distance in unlimited directions while remaining stationary in physical location. The speed of the treadmill is precisely controlled and/or precisely matched with movement of a camera and a real-world speed of movement of the user and the distance the user travels on the belt to create the illusion of movement of the person being filmed. When the treadmill is provided within an LED virtual film set or green screen set, background imagery is added to further supplement the movement in a selected environment.



https://patents.google.com/patent/US20230182034A1/en

(12) **United States Patent**

Guertin

(10) **Patent No.:** US 11,577,177 B2

(45) **Date of Patent:** Feb.14,2023

EXHIBIT

0a

(54) **MOTORIZED ROTATABLE TREADMILL AND SYSTEM FOR CREATING THE ILLUSION OF MOVEMENT**

(71) Applicant: **Matthew Guertin,** Minnetonka, MN (US)

(72) Inventor: **Matthew Guertin,** Minnetonka, MN (US)

(73) Assignee: **INFINISET, INC.,** Edina, MN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/698,420**

(22) Filed: **Mar. 18, 2022**

(65) **Prior Publication Data**

US 2022/0297024 Al     Sep. 22, 2022

**Related U.S. Application Data**

(60) Provisional application No. 63/163,135, filed on Mar. 19, 2021.

(51) **Int. Cl.**
*A63G 31/16*          (2006.01)
*A63J 5/02*           (2006.01)
*A63J 1/00*           (2006.01)

(52) **U.S. Cl.**
CPC .. *A63J 5/02* (2013.01); *A63J 1/00* (2013.01)

(58) **Field of Classification Search**
CPC...............A63G 31/16; H04N 5/262; A61B 6/04
USPC................................472/60, 61, 130; 482/66, 68
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2015/0150522 Al | 6/2015 | Papaioannou | 5/2017 |
| 2017/0129105 Al | | Stephens, Jr. | |
| 2018/0053349 Al* | 2/2018 | Chen.........................G06T 19/006 | |
| 2019/0086996 Al | 3/2019 | Bahrami et al. | |
| 2019/0307982 Al | 10/2019 | Brodsky | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 104740829 A | 7/2015 |
| CN | 105396261 A | 3/2016 |
| CN | 206026963 U | 3/2017 |

(Continued)

OTHER PUBLICATIONS

International Search Report and Written Opinion issued for PCT/US2022/020919, dated Jun. 24, 2022.

(Continued)

*Primary Examiner* - Kien T Nguyen
(74) *Attorney, Agent, or Firm* - Westman, Champlin & Koehler, P.A.; Amanda M. Prose

(57)          **ABSTRACT**

A motorized, rotatable treadmill and a system for creating the illusion of user movement while the user is stationary with respect to an environment as the user walks or other wise moves on an endless track of the treadmill. The user can then travel an unlimited distance in unlimited directions while remaining stationary in physical location. The speed of the treadmill is precisely controlled and/or precisely matched with movement of a camera and a real-world speed of movement of the user and the distance the user travels on the belt to create the illusion of movement of the person being filmed. When the treadmill is provided within an LED virtual film set or green screen set, background imagery is added to further supplement the movement in a selected environment.

**6 Claims, 18 Drawing Sheets**



https://patents.google.com/patent/US11577177B2/en

**Doc Code:** 3P.RELEVANCE
**Document Description:** Concise Description of Relevance

**U.S. Patent and Trademark Office**
**Department of Commerce**

| THIRD-PARTY SUBMISSION UNDER 37 CFR 1.290 CONCISE DESCRIPTION OF RELEVANCE | EXHIBIT Pa |
|---|---|

| Application Number | 17709126 |
|---|---|

| **U.S. PATENTS** | | |
|---|---|---|
| **Cite No** | **Patent Number** | **Concise Description of Relevance** |
| 1 | 11577177 | The prior art teaches a subject positioned within an array of panels on an omnidirectional treadmill, the repositioning systems, the sensors and controller as claimed. The prior art also teaches See at least paragraphs [0018], [0021]-[0024], [0050], [0053], [0058] and [0101]. See also at least FIGS. 1, 2, 25-28. |

| **U.S. PATENT APPLICATION PUBLICATION** | | |
|---|---|---|
| **Cite No** | **Publication Number** | **Concise Description of Relevance** |
| | | |

**FOREIGN PATENT DOCUMENTS**

| CiteNo | Foreign Document Number | Concise Description of Relevance |
|--------|------------------------|---------------------------------|
|        |                        |                                 |

**NON-PATENT PUBLICATIONS**

| Cite No | Reference | Concise Description of Relevance |
|---------|-----------|---------------------------------|
|         |           |                                 |

Doc Code:IDS.3P
Document Description: Third-Party Submission Under 37 CFR 1.290

Approved for use through 07/31/2015. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| THIRD-PARTY SUBMISSION UNDER 37 CFR 1.290 | Application Number | 17709126 |
|---|---|---|
| | | |

### U.S. PATENTS

| Cite No | Patent Number | Kind Code[1] | Issue Date (YYYY-MM-DD) | First Named Inventor |
|---|---|---|---|---|
| 1 | 11577177 | | 2023-02-14 | Matthew Guertin |

### U.S. PATENT APPLICATION PUBLICATIONS

| Cite No | Publication Number | Kind Code[1] | Publication Date (YYYY-MM-DD) | First Named Inventor |
|---|---|---|---|---|
| | | | | |

### FOREIGN PATENTS AND PUBLISHED FOREIGN PATENT APPLICATIONS

| Cite No | Foreign Document Number[3] | Country Code[2] | Kind Code[1] | Publication Date (YYYY-MM-DD) | Applicant, Patentee or First Named Inventor | T[5] |
|---|---|---|---|---|---|---|
| | | | | | | ☐ |

### NON-PATENT PUBLICATIONS (e.g., journal article, Office action)

| Cite No | Author (if any), title of the publication, page(s) being submitted, publication date, publisher (where available), place of publication (where available). | T[5] | E[6] |
|---|---|---|---|
| | | | |

EFS Web 2.1.17

| THIRD-PARTY SUBMISSION UNDER 37 CFR 1.290 | Application Number | 17709126 |
|---|---|---|
| | | |

| | | | ☐ | ☐ |
|---|---|---|---|---|

## STATEMENTS

The party making the submission is not an individual who has a duty to disclose information with respect to the above-identified application under 37 CFR 1.56.

This submission complies with the requirements of 35 U.S.C. 122(e) and 37 CFR 1.290.

☐ The fee set forth in 37 CFR 1.290(f) has been submitted herewith.

☒ The fee set forth in 37 CFR 1.290(f) is not required because this submission lists three or fewer total items and, to the knowledge of the person signing the statement after making reasonable inquiry, this submission is the first and the only submission under 35 U.S.C 122(e) filed in the above-identified application by the party making the submission or by a party in privity with the party.

☐ This resubmission is being made responsive to a notification of non-compliance issued for an earlier filed third-party submission. The corrections in this resubmission are limited to addressing the non-compliance. As such, the party making this resubmission: (1) requests that the Office apply the previously-paid fee set forth in 37 CFR 1.290(f), or (2) states that no fee is required to accompany this resubmission as the undersigned is again making the fee exemption statement set forth in 37 CFR 1.290(g).

| Signature | /Amanda M. Prose/ | | |
|---|---|---|---|
| Name/Print | Amanda M. Prose | Registration Number (if applicable) | 72345 |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Signature indicates all documents listed above have been considered,except for citations through which a line is drawn. Draw line through citation if not considered. Include a copy of this form with next communication to applicant. 1. If known, enter kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16. See MPEP 901.04(a). 2. Enter the country or patent office that issued the document, by two-letter code under WIPO standard ST.3. See MPEP 1851. 3. For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 4. If known, enter the kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 . See MPEP 901.04(a). 5. Check mark indicates translation attached. 6. Check mark indicates evidence of publication attached.

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFSID:** | 47550239 |
| **Application Number:** | 17709126 |
| **International Application Number:** | |
| **Confirmation Number:** | 3367 |
| **Title of Invention:** | DISPLAYING A SCENE TO A SUBJECT WHILE CAPTURING THE SUBJECT'S ACTING PERFORMANCE USING MULTIPLE SENSORS |
| **First Named Inventor/Applicant Name:** | Stephan  Trojansky |
| **Customer Number:** | 176294 |
| **Filer:** | Amanda Morgan Prose |
| **Filer Authorized  By:** | |
| **Attorney Docket Number:** | 36651-51638/US |
| **Receipt Date:** | 17-FEB-2023 |
| **Filing Date:** | 30-MAR-2022 |
| **Time Stamp:** | 10:29:07 |
| **Application Type:** | |

## Payment information:

| Submitted  with  Payment | no |
|---|---|

### File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Concise Description of Relevance | Concise-description-generated.pdf | 32956 <br> bcae66ea240f43b184bf9bf1867d6fcdd0bcb366 | no | 2 |
| **Warnings:** | | | | | |

| Information: | | | | | |
|---|---|---|---|---|---|
| 2 | Third-Party Submission Under 37 CFR 1.290 | Third-party-preissuance-submission.pdf | 52705 89673609686d287b5581ef0320e8186238e62359 | no | 2 |

| Warnings: | | | | | |
|---|---|---|---|---|---|

| Information: | | | | | |
|---|---|---|---|---|---|

| 3 | Request for Notification of Non-compliant Third-Party Submission | Third-party-notification-request.pdf | 23667 b 7d8a2740537c5b22beabcbff564d16acb796123 | no | 1 |
|---|---|---|---|---|---|

| Warnings: |
|---|

| Information: | |
|---|---|

| | Total Files Size (in bytes) | 109328 |
|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of  the  indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If  a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgment Receipt will establish the filing date of the application.
National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and  other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 181   O), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/1   OS) will be issued in due course, subject to prescriptions concerning  national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

PTO/AIA/96 (08-12)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# STATEMENT UNDER 37 CFR 3.73(c)

Applicant/Patent Owner: **Netflix, Inc.**

Application No./Patent No.: **17/709,128**          Filed/Issue Date: **March 30, 2022**

Titled: DISPLAYING A SCENE TO A SUBJECT WHILE CAPTURING THE SUBJECT'S ACTING PERFORMANCE USING M

**Netflix, Inc.** , a __corporation__

(Name of Assignee)                              (Type of Assignee, e.g., corporation, partnership, university, governmen

**EXHIBIT**
**Qa**

states that, for the patent application/patent identified above, it is (choose **one** of options 1, 2, 3 or 4 below):

1. [✓] The assignee of the entire right, title, and interest.

2. [ ] An assignee of less than the entire right, title, and interest (check applicable box):

   [ ] The extent (by percentage) of its ownership interest is _____%. Additional Statement(s) by the owners holding the balance of the interest must be submitted to account for 100% of the ownership interest.

   [ ] There are unspecified percentages of ownership. The other parties, including inventors, who together own the entire right, title and interest are:

   Additional Statement(s) by the owner(s) holding the balance of the interest must be submitted to account for the entire right, title, and interest.

3. [ ] The assignee of an undivided interest in the entirety (a complete assignment from one of the joint inventors was made). The other parties, including inventors, who together own the entire right, title, and interest are:

   Additional Statement(s) by the owner(s) holding the balance of the interest must be submitted to account for the entire right, title, and interest.

4. [ ] The recipient, via a court proceeding or the like (e.g., bankruptcy, probate), of an undivided interest in the entirety (a complete transfer of ownership interest was made). The certified document(s) showing the transfer is attached.

The interest identified in option 1, 2 or 3 above (not option 4) is evidenced by either (choose **one** of options A or B below):

A. [ ] An assignment from the inventor(s) of the patent application/patent identified above. The assignment was recorded in the United States Patent and Trademark Office at Reel _____, Frame _____, or for which a copy thereof is attached.

B. [✓] A chain of title from the inventor(s), of the patent application/patent identified above, to the current assignee as follows:

   1. From: **Stephan Trojansky**                     To: **Eyeline Studios GMBH**

      The document was recorded in the United States Patent and Trademark Office at
      Reel **059668** , Frame **0755** , or for which a copy thereof is attached.

   2. From: **Eyeline Studios GMBH**                  To: **Netflix, Inc.**

      The document was recorded in the United States Patent and Trademark Office at
      Reel **062197** , Frame **0127** , or for which a copy thereof is attached.

[Page 1 of 2]

This collection of information is required by 37 CFR 3.73(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/AIA/96 (08-12)
Approved for use through 11/30/2020  OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(c)

3. From: _____   To: _____

       The document was recorded in the United States Patent and Trademark Office at

       Reel _____, Frame _____, or for which a copy thereof is attached.

4. From: _____   To: _____

       The document was recorded in the United States Patent and Trademark Office at

       Reel _____, Frame _____, or for which a copy thereof is attached.

5. From: _____   To: _____

       The document was recorded in the United States Patent and Trademark Office at

       Reel _____, Frame _____, or for which a copy thereof is attached.

6. From: _____   To: _____

       The document was recorded in the United States Patent and Trademark Office at

       Reel _____, Frame _____, or for which a copy thereof is attached.

☐    Additional documents in the chain of title are listed on a supplemental sheet(s).

☑    As required by 37 CFR 3.73(c)(1)(i), the documentary evidence of the chain of title from the original owner to the assignee was, or concurrently is being, submitted for recordation pursuant to 37 CFR 3.11.

       [NOTE: A separate copy (i.e., a true copy of the original assignment document(s)) must be submitted to Assignment Division in accordance with 37 CFR Part 3, to record the assignment in the records of the USPTO. See MPEP 302.08]

The undersigned (whose title is supplied below) is authorized to act on behalf of the assignee.

| | |
|---|---|
| /Greg Lunt/ | 01 March 2023 |
| Signature | Date |
| Greg Lunt | 57354 |
| Printed or Typed Name | Title or Registration Number |

[Page 2 of 2]

17/709,126 — GAU: 2619

Doc Code: IDS.3P
Document Description: Third-Party Submission Under 37 CFR 1.290

PTO/SB/429(08-12)
Approved for use through 07/31/2015. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| THIRD-PARTY SUBMISSION UNDER 37 CFR 1.290 | Application Number | 17709126 | EXHIBIT Ra |
|---|---|---|---|

### U.S. PATENTS

| Cite No | Patent Number | Kind Code[1] | Issue Date (YYYY-MM-DD) | First Named Inventor |
|---|---|---|---|---|
| 1 | 11577177 | | 2023-02-14 | Matthew Guertin |

### U.S. PATENT APPLICATION PUBLICATIONS

| Cite No | Publication Number | Kind Code[1] | Publication Date (YYYY-MM-DD) | First Named Inventor |
|---|---|---|---|---|
| | | | | |

### FOREIGN PATENTS AND PUBLISHED FOREIGN PATENT APPLICATIONS

| Cite No | Foreign Document Number[3] | Country Code[2] | Kind Code[1] | Publication Date (YYYY-MM-DD) | Applicant, Patentee or First Named Inventor | T[5] |
|---|---|---|---|---|---|---|
| | | | | | | ☐ |

### NON-PATENT PUBLICATIONS (e.g., journal article, Office action)

| Cite No | Author (if any), title of the publication, page(s) being submitted, publication date, publisher (where available), place of publication (where available). | T[5] | E[6] |
|---|---|---|---|
| | | | |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /A.M/

17/709,126 – GAU: 2619

| THIRD-PARTY SUBMISSION UNDER 37 CFR 1.290 | Application Number | 17709126 |
|---|---|---|
| | | |

| | | | | ☐ | ☐ |
|---|---|---|---|---|---|
| | | | | | |

### STATEMENTS

The party making the submission is not an individual who has a duty to disclose information with respect to the above-identified application under 37 CFR 1.56.

This submission complies with the requirements of 35 U.S.C. 122(e) and 37 CFR 1.290.

☐ The fee set forth in 37 CFR 1.290(f) has been submitted herewith.

☒ The fee set forth in 37 CFR 1.290(f) is not required because this submission lists three or fewer total items and, to the knowledge of the person signing the statement after making reasonable inquiry, this submission is the first and the only submission under 35 U.S.C 122(e) filed in the above-identified application by the party making the submission or by a party in privity with the party.

☐ This resubmission is being made responsive to a notification of non-compliance issued for an earlier filed third-party submission. The corrections in this resubmission are limited to addressing the non-compliance. As such, the party making this resubmission: (1) requests that the Office apply the previously-paid fee set forth in 37 CFR 1.290(f), or (2) states that no fee is required to accompany this resubmission as the undersigned is again making the fee exemption statement set forth in 37 CFR 1.290(g).

| Signature | /Amanda M. Prose/ | | |
|---|---|---|---|
| Name/Print | Amanda M. Prose | Registration Number (if applicable) | 72345 |

| Examiner Signature | /ABDERRAHIM MEROUAN/ | Date Considered | 03/07/2023 |
|---|---|---|---|

*EXAMINER: Signature indicates all documents listed above have been considered,except for citations through which a line is drawn. Draw line through citation if not considered. Include a copy of this form with next communication to applicant.  1. If known, enter kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16. See MPEP 901.04(a).  2. Enter the country or patent office that issued the document, by two-letter code under WIPO standard ST.3. See MPEP 1851.  3. For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  4. If known, enter the kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 . See MPEP 901.04(a). 5. Check mark indicates translation attached. 6. Check mark indicates evidence of publication attached.

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /A.M/

# March 10th, 2023  Jill Rogstad's Rule 20 Report - <u>METADATA ANALYSIS</u>
## Page 1 of 2      27-CR-23-1886

**EXHIBIT**
# <u>Sa</u>

Matthew David
Guertin 07/17/1981
27-CR-23-1886



**MINNESOTA JUDICIAL BRANCH**
FOURTH JUDICIAL DISTRICT • HENNEPIN COUNTY

Filed in District Court
State of Minnesota
3/10/2023  4:30  PM

## PSYCHOLOGICAL SERVICES

300 S. 6ᵗʰ Street, Suite C-509, Minneapolis MN 55487-0351 • (612) 348-3723 • FAX (612) 348-3452

March 10, 2023

**CONFIDENTIAL FORENSIC
EVALUATION REPORT**

….it  is reasonable to  conclude his mental health could stabilize and his competency-related abilities improve if a proper treatment regimen was implemented. Given his limited insight into the nature of his symptoms, Mr.Guertin would be an appropriate candidate for **referral for civil commitment as a person who poses a risk of harm due to a mental illness.**  Commitment as a person who is mentally ill and dangerous to the public could also be considered given the  nature of the specific  allegations  included with the current  referral.

Please do not hesitate to contact me if the Court has questions about this report.

Respectfully submitted,

*Jill Rogstad* PhD, ABPP, LP

## Jill E. Rogstad, Ph.D., LP, ABPP (Forensic)
Licensed Psychologist
Board Certified in Forensic Psychology by the American Board of Professional Psychology
Senior Clinical Forensic Psychologist, Fourth Judicial District

```
ExifTool Version Number    : 12.40
File Name                  : Rule-20-Evaluation-Report.pdf
Directory                  : .
File Size                  : 891 KiB
File Modification Date/Time : 2024:01:26 19:07:32-06:00
File Access Date/Time      : 2024:03:27 03:30:36-05:00
File Inode Change Date/Time : 2024:03:24 06:15:13-05:00
File Permissions           : -rwxrwxrwx
File Type                  : PDF
File Type Extension        : pdf
MIME Type                  : application/pdf
PDF Version                : 1.6
Linearized                 : No
Author                     : GuzmanC
Create Date                : 2023:03:10 16:25:34-06:00
Modify Date                : 2023:03:10 16:38:55-06:00
XMP Toolkit                : Adobe XMP Core 5.6-c015 81.159809, 2016/11/11-01:42:16
Format                     : application/pdf
Creator                    : GuzmanC
Title                      : Guertin Report.pdf
Creator Tool               : PScript5.dll Version 5.2.2
Metadata Date              : 2023:03:10 16:38:55-06:00
Producer                   : Acrobat Distiller 22.0 (Windows)
Document ID                : uuid:48d04826-12b3-4202-9923-fcd82ead2fd0
Instance ID                : uuid:872b4605-d7b3-4b88-9ed8-79683aab9005
Page Count                 : 10
```

# March 10th, 2023  Jill Rogstad's Rule 20 Report - <u>METADATA ANALYSIS</u>

**Page 2 of 2      27-CR-23-1886**

| Rule-20-Evaluation-Report.pdf Properties | | | | × |
|---|---|---|---|---|
| Basic | Permissions | Open With | Document | |

| | |
|---|---|
| **Title:** | Guertin Report.pdf |
| **Location:** | Rule-20-Evaluation-Report.pdf |
| **Author:** | GuzmanC |
| **Producer:** | Acrobat Distiller 22.0 (Windows) |
| **Creator:** | PScript5.dll Version 5.2.2 |
| **Created:** | Fri 10 Mar 2023 04:25:34 PM -06:00 |
| **Modified:** | Fri 10 Mar 2023 04:38:55 PM -06:00 |
| **Format:** | PDF-1.6 |
| **Number of Pages:** | 10 |
| **Optimized:** | No |
| **Security:** | No |
| **Paper Size:** | US Letter, Portrait (8.50 × 11.00 inch) |
| **Contains Javascript:** | No |
| **Size:** | 912.4 kB |

## 'Respectfully submitted' by: <u>Dr. Jill Rogstad</u>, Ph.D., LP, ABPP (Forensic)

| |
|---|
| **Author :** GuzmanC |
| **Create Date :** 2023:03:10 16:25:34-06:00 |
| **Metadata Date :** 2023:03:10 16:38:55-06:00 |
| **Producer :** Acrobat Distiller 22.0 (Windows)   *<~~~Doesn't include the E-File 'iText' metadata* |
| **Title :** Guertin Report.pdf |
| **Creator :** GuzmanC |

### Chela Guzman-Wiegert
**Assistant County Administrator – Law, Safety, and Justice**

The assistant county administrator of Law, Safety and Justice is responsible for advising the county board and county administrator on policies and issues related to and involving the Hennepin County justice partners. This position oversees the strategic and fiscal management of the Adult Representation Services, Community Corrections, and Law, Safety and **Justice InformationTechnology** areas. The assistant county administrator also serves as county administration's liaison to the Fourth Judicial District Court, the County Attorney's Office, the Public Defender's Office, and the Sheriff's Office.

https://www.hennepin.us/your-government/leadership/county-administrator

## Committee Members | Hennepin County Criminal Justice Coordinating Committee

Jacob Frey - **Minneapolis Mayor**
Brian O'Hara - **Minneapolis Police Chief**
**Chela Guzman-Wiegert** - **Assistant County Administrator**
Kerry Meyer - **4th Judicial District Court Chief Judge**
Sara Gonsalves - **4th Judicial District Court Administrator**
Dawanna Witt - **Hennepin County Sheriff**
Jason Nelson - **Hennepin Police Chiefs Association**

https://www.hennepin.us/your-government/leadership/county-administrator

## Please forward me psych evaluation report

| | |
|---|---|
| From matt xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx > | |
| To | Bruce Rivers<riverslawyers@aol.com> |
| Date | Saturday, March 24th, 2023 at 8:22 PM |

Bruce,

Just reminding you about sending me the competency report

Sent from ProtonMail mobile

## (No Subject)

| | |
|---|---|
| From Bruce Rivers <riverslawyers@gmail.com> | |
| To | Matt xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx > |
| Date | Saturday, March 25th, 2023 at 6:35 AM |

Sent from my iPhone

891.06 KB    1 file attached

Rule 20 Evaluation Report.pdf  891.06 KB

**EMAIL HEADER DATA OF EMAIL SENT TO DEFENDANT BY BRUCE RIVERS WHICH CONTAINED DR. JILL ROGSTAD'S FORENSIC EXAM REPORT DATED MARCH 10, 2023**

Return-Path: <riverslawyers@gmail.com>
X-Original-To: mattguertin@protonmail.com
Delivered-To: MattGuertin@protonmail.com
Authentication-Results: mailin038.protonmail.ch; dkim=pass (Good 2048
  bit rsa-sha256 signature) header.d=gmail.com header.a=rsa-sha256
Authentication-Results: mailin038.protonmail.ch; dmarc=pass (p=none dis=none)
  header.from=gmail.com
Authentication-Results: mailin038.protonmail.ch; spf=pass smtp.mailfrom=gmail.com
Authentication-Results: mailin038.protonmail.ch; arc=none smtp.remote-ip=209.85.166.174
Authentication-Results: mailin038.protonmail.ch; dkim=pass (2048-bit key)
  header.d=gmail.com header.i=@gmail.com header.b="PmMTPPLi"
Received: from mail-il1-f174.google.com (mail-il1-f174.google.com [209.85.166.174])
  (using TLSv1.3 with cipher TLS_AES_256_GCM_SHA384 (256/256 bits)
  key-exchange X25519 server-signature RSA-PSS (4096 bits) server-digest SHA256) (No
  client certificate requested) by mailin038.protonmail.ch (Postfix) with ESMTPS id
  4PkJTZ3wNMz6H for <mattguertin@protonmail.com>; Sat, 25 Mar 2023 12:36:02 +0000 (UTC)
Received: by mail-il1-f174.google.com with SMTP id e9e14a558f8ab-3230125dde5so101535ab.1
  for <mattguertin@protonmail.com>; Sat, 25 Mar 2023 05:36:02 -0700 (PDT)
Received: from smtpclient.apple ([2601:449:4300:3520:657d:8bc8:116b:5b5a])
  by smtp.gmail.com with ESMTPSA id
  g21-20020a0566380bd500b00408c36fb3acsm2344892jad.39.2023.03.25.05.35.56
  for <mattguertin@protonmail.com>
  (version=TLS1_3 cipher=TLS_AES_128_GCM_SHA256 bits=128/128);
  Sat, 25 Mar 2023 05:35:58 -0700 (PDT)
Dkim-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed;
  d=gmail.com; s=20210112; t=1679747761;
  h=to:message-id:date:mime-version:content-transfer-encoding:from:from
  :to:cc:subject:date:message-id:reply-to;
  bh=k9HKD9Dg/sNDXExkgNlRyJJc6OuruvK2pnF2WU3DiSs=;
  b=PmMTPPLixGauxNTtuJv0SBtkEEKVAaWcBejtrGQN8VN5apAf0xoDgBR+cbvOCHpjU4
  J2IaVxklXJ2T/imOHruitMbGQfAR5uuYJHquNDUVSzx5CurcvApL80BNY2eHFJURFTQZ
  nJOgUS5J2T09OwN545CStkXGY1PyWvEbHq7+vHm3Kx0d4U+dryKr8KlYS41fMcuFPh7f
  s1R54BnfdgjEbowAgUrSCkh+Jl2l2MUwp8LlbfS/ioNQynTVuax74nP7m95aMwak+gxr
  y3rx60PIZ/zT5qZLkGgssshGfxbQmmUyuyYT7hnwyNjrtnICdUXQlzDQG2suvtwBJuqE
  46Ng==
X-Google-Dkim-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed;
  d=1e100.net; s=20210112; t=1679747761;
  h=to:message-id:date:mime-version:content-transfer-encoding:from
  :x-gm-message-state:from:to:cc:subject:date:message-id:reply-to;
  bh=k9HKD9Dg/sNDXExkgNlRyJJc6OuruvK2pnF2WU3DiSs=;
  b=OcHsieygz2v96rvzWlf2fiVJrB0gX2ZTU28npLpWpCB2jSyuBzZUcZHU8YM4TAULyw
  Pr3oWhsVjKu5UGEDv5i+ULJxjy4kMg3rRfy8gOhgo5DTJ8CZweu1r5XuoRBZuHExNCMm
  YUXxeW/e7Pg8zrLq/heCxfEbk1tOpMEtmT/xfauuhXkNdJ4PW8tCquiyp0IQmEfRgref
  eFBeoKJ36Nn+Eq03ZTzDWsIjUp+zi7CsulLrg+hHvgAj3CCsrqZD+ozNZ04SpXNk5vy3
  2k5avR1CmqddtSg1KdlBJHrvPCHtXkvpH3EbU4VI/9Kx7/4r33aKukbFjV7YRHPT2udM
  pY2g==
X-Gm-Message-State: AAQBX9dlx2HSTlOeQwfIGsudSp0ICq3mQRsVgPmzqv9lCSNeZzXsKW49
  qPqN9h52fBGygAzUKCT8baw56/eReMRqrg==
X-Google-Smtp-Source: AKy350bXk0Cifn3yU7cUlf3Wi5JAmvYDeRK8a++VPOc+
  +eVENLHxgV6j+8keik35UhwXvNDx7BRcMA==
X-Received: by 2002:a05:6e02:1c04:b0:325:e065:8bf8 with SMTP id
  l4-20020a056e021c0400b00325e0658bf8mr2990475ilh.0.1679747759665;
  Sat, 25 Mar 2023 05:35:59 -0700 (PDT)

From: Bruce Rivers <riverslawyers@gmail.com>
X-Google-Original-From: Bruce Rivers <Riverslawyers@gmail.com>
Content-Type: text/plain
Content-Transfer-Encoding: 7bit
Mime-Version: 1.0
Date: Sat, 25 Mar 2023 07:35:56 -0500
Message-Id: <D38B1097-5221-467C-B520-B7AD86D03D48@gmail.com>
To: Matthew Guertin <mattguertin@protonmail.com>
X-Mailer: iPhone Mail (20D67)
X-Rspamd-Queue-Id: 4PkJTZ3wNMz6H
X-Spamd-Result: default: False [1.50 / 25.00]; MISSING_SUBJECT(2.00)[]; MV_CASE(0.50)[];
 DMARC_POLICY_ALLOW(-0.50)[gmail.com,none]; R_DKIM_ALLOW(-0.20)[gmail.com:s=20210112];
 R_SPF_ALLOW(-0.20)[+ip4:209.85.128.0/17:c];
 MIME_GOOD(-0.10)[multipart/mixed,text/plain]; NEURAL_HAM(-0.00)[-0.990]; ARC_NA(0.00)[];
 FROM_EQ_ENVFROM(0.00)[]; RCVD_TLS_LAST(0.00)[]; TO_MATCH_ENVRCPT_ALL(0.00)[];
 MIME_TRACE(0.00)[0:+,1:+,2:~,3:+]; DKIM_TRACE(0.00)[gmail.com:+];
 RCVD_COUNT_THREE(0.00)[3]; ASN(0.00)[asn:15169, ipnet:209.85.128.0/17, country:US];
 FROM_HAS_DN(0.00)[]; RCVD_VIA_SMTP_AUTH(0.00)[]; TO_DN_ALL(0.00)[];
 HAS_ATTACHMENT(0.00)[]; RCPT_COUNT_ONE(0.00)[1];
 PREVIOUSLY_DELIVERED(0.00)[mattguertin@protonmail.com]; MID_RHS_MATCH_FROM(0.00)[]
X-Rspamd-Server: cp3-mailin-038.plabs.ch
X-Pm-Spam: 0yezJI6cihyJeYR3pi42biOpJJvbmsCIeI1msjN3X3blJp7IjBlNIIojysEjLIITJ
 oxIjsjULIBlSiQ0TiOx0wiOSPFJUR9FQEVkUUSUN9OSUwjoILJCfiVGZWdfd5maW6yIbeJyQE9kU
 jI7pBfInh3BcbIS6w4CMjMzII1Mz0zAMNgj3zIDMTMsY1vImsGVZXl2k6ICeHM91wifSp3JcZIC6
 0YjIWMIVI1YWhDRMNJjjwAjMmMwIk4Mj9CJNLJCz6ISYyepJ9zc1tGFcIojwzJCL2Yy9I6ZSiiwM
 cN2vkVmcjIyoEsLjlnJIc9Gy6ICdyeSJZEQ1O0IXX10TLIEUVRI9I6Miwy0WLAjswIjISO444xNS
 ujYNMcT0pxGI3clRBpZC3iBbb5CtslWY3cpBUua20mVbI0IsBJkIUWTVIwXzbjpIM4C1zJCL2Yy9
 ogZTwC4MNITxs0IlIIQN9QRlTVNQIpjbuATLFMs0ZSIkNUVRQIUMSZ0X0Ti0swOIsjALIJnpyVmd
 2chxIld3bnNcYRXdh12ZWauw9tY2sI0IlNIQI9IRURPx5PX0ikUTOslwdBjLCLEJINS0B1ZXTIEE
 GV0XjIbpAuLTsV0MIRkLf1USkVMFQiSUtlsOM4CxiwSXERJt9WTVJUxQR9FB6ISVyWw0FdLjECJL
 Sl0NJN1X0RF5I6RCuzAWM0VsJ1kI1UJNdfTkC1VUSVkD6ICVzWuE0sOFfiRIRJlFB1URUSfx9DRE
 E1BXRIi6uAzWFM91fX0=
X-Attached: Rule 20 Evaluation Report.pdf
X-Pm-Origin: external
X-Pm-Transfer-Encryption: TLSv1.3 with cipher TLS_AES_256_GCM_SHA384 (256/256 bits)
X-Pm-Content-Encryption: on-delivery
X-Pm-Spamscore: 2
X-Pm-Spam-Action: inbox
Subject: (No Subject)

## Matthew David Guertin / Preliminary Introduction and discussion of facts

From matt█████████████████████>

To      jill.rogstad@courts.state.mn.us

BCC   Bruce Rivers<riverslawyers@aol.com>

Date   Monday, February 13th, 2023 at 4:59 PM

The yellow highlighted link 'what I have been up to over the past 15 years' was a link to my portfolio website – www.MattGuertin.com

Jill,

It was nice to speak with you on the phone the other day and I am looking forward to our meeting on March 1st.

In what I am sure will be one of many follow-up emails leading up to our meeting I would like to provide you with an initial, short introduction to myself and what I have been up to over the past 15 years as well as a little bit of information about what I currently have taking place in my life in regards to my patent application - the one I filed on March 19th, 2021 and which will officially no longer be an 'application' beginning tomorrow (v-day) as that is when it officially grants - tomorrow is also when my patent will be filed as prior art against this patent here which was invented by Stephan Trojansky and first filed on March 31, 2021.....12 days later than my application.

It's not an exaggeration to say that the situation I have currently found myself in is similar to wining the lottery. I have had patent attorneys tell me this statement is an accurate depiction of my situation as well as I essentially invalidated ('shredded'...made worthless..) not only the most critical parts of the Trojansky application but many of the additional elements included in his application as well. Not only did I cover the core element of the rotating treadmill with the very broad claims I am being granted tomorrow but I also mention in my disclosure a multi-camera photogrammetry rig, emerging photogrammetry technology (which will be able to cover 'neural radiance fields' or 'nerf' which is what I believe Netflix is working on currently, I mention the creation of a 'digital twin', I mention the user wearing sensors, I specifically mention a 'user cue system' multiple times, and on and on and on......once my patent gets handed in as prior art against the Trojansky application (which moving forward I will simply refer to as 'The Netflix patent' as that is who acquired Trojansky's company 'Scanline VFX' for at least 100 million dollars 8 months after he filed his provisional application based on press releases as well as Q12022 Netflix, Inc. Investors report - page 5) it means that they will NEED my patent if they want to be made whole and be able to obtain Intellectual property rights for that which so far they have easily invested a quarter billion dollars into but more likely it is much closer to a half billion dollars.

It is currently my intention to take advantage of the unique situation I am in and outright sell my entire company, InfiniSet, Inc. (a Delaware c-corp which I am the CEO of and which is also the company my patent is assigned to upon its issuance tomorrow), collect my money, and exit stage right. That is especially my intention after all of the crazy shit that has been going on ever since I discovered the Netflix patent - which I only stumbled upon after searching for PhotoRobot to see if they had any patents granted for their 'Virtual Catwalk' which is the product they have been pouring a massive amount of money, time, and effort into fraudulently positioning against my patent - It is when I was sent an email response by the CEO of Mark Roberts Motion Control, Assaff Rawner the first week of November that all of this began....and by 'all of this' I do in fact mean 'ALL OF IT' which would include not only

stumbling upon the Netflix patent (which is so technically written that I had to read it seven times before I realized it was the exact same thing as my patent application) by sheer luck but also my trip down the ultimate rabbit hole as I completely diverted my attention to focus on investigating that which I had the most to lose if I had chosen not to investigate it as it was and still is very obvious that whatever was/is going on is solely for the purpose for trying to fraudulently steal something I have dedicated the last two years of my life bringing to fruition. At the very least they are setting themselves up to be able to steal my patent by being able to build and use it without being found guilty of infringement by creating a false history that would lead one to believe that they have always been heading in a specific and 'obvious' direction which was only established after I shared my patent application with Mark Roberts Motion Control in an email. This 'false history' includes my discovery that the Wayback Machine / Internet Archive was being fraudulently edited with backdated copies of recently created pages, and ultimately I ended up realizing that it involves multiple websites and was obviously being accomplished using chatGPT and/or other sophisticated AI tools (I even go through the fraudulent AI written pages at the end of that video - apparently one of the authors - Samantha McDonald - was able to write at least 2500 articles which were all dated in the same time range near the end of 2020 as you can clearly see in the video.....hint.....those people in the fake Zoom call are also fake - as in completely generated by AI which would include their vocals as well as the subject matter they are discussing...just pay close attention...especially to the repeated use of 'experience' and 'experiential' over and over and over...I will get more into how we logically end up at footwear in follow up emails though) that the general public have been lead to believe do not currently exist. At the very worst what I was investigating and documenting could lead to my patent being challenged and possibly invalidated - which is why it has now turned out to be the 100% correct move on my part to choose to investigate and collect as much evidence as I did. I have close to 100gb of digital forensic evidence I collected in the form of dowloaded full web pages from the archive among others in which I was ultimately able to process and make sense of to the point of being able to lay all of it out in very clear and easy to understand spreadsheets which proved that the internet archive was 100% in fact being fraudulently edited just based on the statistical/mathematical probability of having the same pattern occur over and over for each group of archived pages I collected (I went on a manual collection run where I downloaded every single archived webpage for 61 of the 89 total blog pages archived for PhotoRobot dot com) and I was able to clearly identify an anomalous pattern that points to clear fraud by copying recently published pages and pasting them into the past. I then was able to further support this when I discovered a code that allowed me to download every single page ever archived for PhotoRobot dot com in which I discovered that there were a bunch of WARC files being served which relate specifically to updating duplicate pages (although I will admit I still do not fully understand the general protocol - I do know that it can be considered a 'container file' though - much the same way a .zip file is and it's purpose has to do specifically with updating duplicate pages in an easy to implement 'file dump' of sorts. It was when I was finally able to prove beyond any reasonable doubt that there was in fact fraud taking place that I began trying to alert authorities to what i had discovered. I'm not sure if you are fully aware of exactly 'what' the internet archive is but all you have to know is that it is considered a legit form of court admissible evidence - at least I know it is for the USPTO as it has been cited numerous times in cases - so just the fact that I had been able to collect and establish this proof of fraud at the internet archive by itself is a very big deal and one which I believed put my safety at risk as if this information were to become public it would mean that any cases which involved or heavily relied upon information from the Internet Archive (a non-profit 501c3..) would be able to be re-opened and reexamined which could have massive ramifications involving an untold (but I am sure very large..) amount of money. It is my opinion that there is a system in place at the archive to commit the fraudulent editing I have been able to prove and that this has almost certainly been carried out before.

As you have probably ascertained by now I am not your average client and I have a very unique set of circumstances surrounding the criminal charges responsible for bringing us together. It is my personal opinion based on your profession and education that I am being required to sit down with you so that you can 'classify' me as something...meaning that your ultimate goal I believe is to place some sort of universally understood label on me for the purpose of blaming some sort of mental 'disability' or defect upon me which could then be used to explain the incident that happened at my apartment by blaming it solely on me instead of actually considering the crazy and insane set of circumstances which lead up to the extreme decision of me firing a gun off to essentially 'call the police' as seeming completely logical considering the situation I had suddenly found myself in. To be clear I am not in any way trying to minimize the illegal and obviously 'extreme' nature of what I did nor am I trying to make any assumptions or disrespect you/ your education /career /etc. That is definitely not how I would want to come across before even having a chance to meet you in person - I am simply trying to be very clear and upfront with you about what my current thoughts are in general surrounding everything. Basically these are my personal thoughts and opinions and should be considered only that and nothing more.

I will get into more of this in follow up emails as I mentioned previously as it is quite a bit to unpack - even for me who was/is the one caught in the middle of all of it. It is definitely something that will need to be introduced and documented in multiple parts as I could spend a couple days trying to write all of it down chronologically and lay everything out - which I assure you is what I am ultimately going to accomplish and which will make the actions I took at my apartment seem logical or at the very least it will become very clear to everyone (including perhaps a jury of my peers..) that I was put under so much stress that it would make sense that I could've 'cracked' and basically been launched into a fight or flight state where I was genuinely in fear for my life and my safety as everything involving the AI aspect of the 'operation' being carried out against me as well as many strange coincidences all became dots which I was connecting in my head at a faster and faster pace as everything became crystal clear to me - all of which lead to a bad ending for me as far as I was concerned.

I will leave you with a simple question to ask yourself - "What on earth would cause someone who has been traveling the world and accomplishing some of the most amazing technological, engineering, and programming feats since 2014 after essentially traveling to LA with his entire life in a trailer behind him and who now has now moved back home after covid only to continue accomplishing projects which have gained him a massive amount of attention, including winning awards for my 3D photogrammetry Chicago scan, and who then somehow was able to top all of the projects he worked on in LA and all over the world by inventing, patenting and then proceeding to design, engineer, and fabricate a device and system in his living room which can only be described as a complete paradigm shift in the way movies and film will produced going forward, and which he was/is only days away from being able to record a 'proof of concept' video for just as he is also finally going to officially be granted a patent for to suddenly decide that shooting a gun out of his window to alert police makes logical sense?"

And that is the question......

BUT - I actually have one more question for you which is much less subjective than the previous one I posed to you - that being the following:
I am assuming the interview I conduct with you will be at the very least audio recorded and I would like to check and make sure that it is not a problem if I also record the audio of our interview when it is conducted?

As I mentioned previously this is not just a criminal matter as far as I am concerned but also one which involves my corporation, my patent, my reputation as a CEO, extremely large sums of money, etc, etc and so it is my intention to be sure that I protect myself and my interests by all means possible which is why it seems logical to me that I would also be able to obtain my own personal audio recording of our meeting as well.

I look forward to my continued correspondence with you leading up to our meeting on the 1st.

Sincerely,

Matt Guertin
Inventor / Founder / CEO
InfiniSet, Inc.
Minneapolis, MN
█████████

Sent with Proton Mail secure email.

## RE: [EXTERNAL] Matthew David Guertin / Preliminary Introduction and discussion of facts

From jill.rogstad@courts.state.mn.us <Jill.Rogstad@courts.state.mn.us>

To       Matt ███████████████████ >

Date    Tuesday, February 14th, 2023 at 4:16 PM

Good afternoon, Mr. Guertin:


I appreciate the effort and time you spent constructing your message to me. I want to assure you that this information is definitely relevant, and you will be asked questions and given the chance to discuss these themes during our interview appointment. However, your message suggested that you plan to send more emails like this, and I would respectfully ask that you not. This request is not because I do not want to discuss these matters; rather, I ask that because email is not the best forum in which to have a productive discussion of these issues. You have given me an introduction to some of the matters you referenced on the phone, and I want to emphasize that you will have the opportunity to discuss them during the March 1 interview. However, it is much more conducive to the evaluation process to have these conversations in real time. Please feel free to bring any documentation with you to the appointment. If it would be difficult to bring physical copies of certain things, this is something we can discuss at the appointment to figure out the best way to proceed.


At the March 1 interview appointment, we will discuss many of the points you brought up, including the purpose and parameters of the evaluation, as well as my role in the proceedings. You will also have the opportunity to ask any questions you may have at that time. I do want to take the time to answer one question you mentioned in your message, however, with regard to audio recording. You are NOT permitted to audio record our interview session on March 1. There are a number of reasons for this, which I am happy to discuss with you at the March 1 appointment. Importantly, the Hennepin County District Court also prohibits the use of any recording devices in courtroom areas.


I look forward to speaking with you further on March 1.


Best regards,


Jill E. Rogstad, Ph.D., LP, ABPP (Forensic)

Senior Clinical Forensic Psychologist

## Re: [EXTERNAL] Matthew David Guertin / Preliminary Introduction and discussion of facts

From matt ███████████████ >

To      jill.rogstad@courts.state.mn.us<Jill.Rogstad@courts.state.mn.us>

Date    Wednesday, February 14th, 2023 at 9:40 PM

Jill,

Regarding the other methods of being able to share information at the meeting vs. before the meeting in the form of emails:

Would one of those options include an hdmi cable and a monitor?

~Matt

Sent from ProtonMail mobile

## RE: [EXTERNAL] Matthew David Guertin / Preliminary Introduction and discussion of facts

From jill.rogstad@courts.state.mn.us <Jill.Rogstad@courts.state.mn.us>

To      Matt███████████████████>

Date    Wednesday, February 15th, 2023 at 4:40 PM

Good afternoon, Mr. Guertin:

I'm afraid I cannot provide any materials to you. However, if you have a device (e.g., phone, tablet, or laptop), I believe the Government Center has public Wifi you can access. We can discuss further what makes the most sense at the appointment on March 1, but please feel free to bring any of those devices as well as paper documentation.

Best regards,

Jill E. Rogstad, Ph.D., LP, ABPP (Forensic)

Senior Clinical Forensic Psychologist

Board Certified in Forensic Psychology, American Board of Professional Psychology

(she/her/hers)

Fourth Judicial District and Regional Psychological Services

Phone: (612) 394-0937

# Re: [EXTERNAL] Matthew David Guertin / Preliminary Introduction and discussion of facts

From matt ████████████████████████████>

To     jill.rogstad@courts.state.mn.us<Jill.Rogstad@courts.state.mn.us>

BCC   Bruce Rivers<riverslawyers@aol.com>

Date  Thursday, February 15th, 2023 at 6:11 PM

Jill,

This sounds good / reasonable. Thank you.

One of the other things then which I am wondering then however is the following - which is essentially the same exact question asked in a variety of ways for clarity's sake:

Will you be audio and video documenting our meeting?

If I bring a laptop / device to share with you that which pertains to the topics you would like to discuss with me will my 'presentation' of digital information also be clearly documented in a way where if our meeting was reviewed at a later date for some reason that whoever is viewing it would be able to see, hear, and clearly identify that which I am sharing with you on said device?

In regards to any audio or video recording of our meeting that you and the county obtain from our meeting is there some kind of standard/ protocol/procedure regarding where that data is archived, who can access it and under what circumstances, etc, etc. What is the normal procedure basically?

I know that you are presented as a 'neutral' or 'objective' opinion for all intents and purposes. Based upon the fact that you are a PHD, have published papers, appear in various case law discussions in addition to the most obvious of them all which would be your current position as a clinical forensic psychologist it is obvious to me that you must be very good at what you do as a lot of people trust your opinion. So with all of that said I believe what would be a more unlikely case is if you didn't have a natural bias which weighs in favor of the state and ultimately the prosecution since that's basically your employer. I'm not talking about corruption or intentional deceit, etc... rather I am just discussing simple human nature as far as most people who are happily employed developing a healthy and natural sense of loyalty to those that employ them even if that that loyalty (bias) is on a subconscious level.   To get to the point of my bringing this up what I am wondering then is how exactly does mine and yours relationship defer from that of an ordinary doctor & patient / doctor & client relationship in regards to HIPAA laws...and particularly those that are enforced in MN?

What is any changes/differences are there as opposed to if you were a privately practicing psychologist and I came to your office and said I'd like to pay you your required fee to have you perform a psychological analysis on me for X and Y reasons?

Is the attached PDF that I've read through and took the time to highlight still considered to be 'current' based on your knowledge?

If these HIPAA laws are still current I am assuming that even if I am unable to personally record any audio or video of our meeting on my own that I would still be able to request and obtain the audio and video you record of the meeting as it would ultimately be considered 'doctors notes' correct? If I am wrong please feel free to provide me with the supporting documents which clearly state this so I can lay it to rest as an issue of mine.

Thank you,

Matthew Guertin
Inventor / Founder / CEO
InfiniSet, Inc.
Minneapolis, MN
█████████

Sent from ProtonMail mobile

27-CR-23-1886

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

## RE: [EXTERNAL] Matthew David Guertin / Preliminary Introduction and discussion of facts

From jill.rogstad@courts.state.mn.us <Jill.Rogstad@courts.state.mn.us>

To    Matt ███████████████████████>

Date   Friday, February 17th, 2023 at 2:50 PM

Hi Mr. Guertin,


As to your question about recordings, no, Psychological Services does not audio or video record any of the evaluations the psychologists do, nor do we allow examinees to produce any such recordings. Again, there are a number of reasons for this, which I'm happy to review on March 1. The remainder of your questions will also all be addressed at the outset of the interview on March 1, before you are asked any questions. At that time, the parameters of the evaluation will be reviewed and discussed, including my role and the differences between this kind of court-ordered evaluation and encounters you might have with a psychologist in other settings. You will also be given time to ask any questions you have that may not have been covered during this process. I am happy to discuss these issues at that time. I am going to stop responding to emails at this time, not to be rude, but because the appointment we have scheduled for March 1 is the more appropriate forum to discuss these matters. Please feel free to bring any questions with you on that date.


Thank you, and I look forward to speaking with you on March 1.


Best regards,

Dr. Rogstad


Jill E. Rogstad, Ph.D., LP, ABPP (Forensic)

Senior Clinical Forensic Psychologist

Board Certified in Forensic Psychology, American Board of Professional Psychology

(she/her/hers)

Fourth Judicial District and Regional Psychological Services

Phone: (612) 394-0937

# Matthew Guertin / Language Analysis Matrix

| | |
|---|---|
| From matt███████████████████ > | |
| To | jill.rogstad@courts.state.mn.us |
| CC | Bruce Rivers<riverslawyers@aol.com> |
| Date | Friday, March 2nd, 2023 at 9:44 PM |

Jill,

Per our meeting the other day here is a copy of the language matrix I created using MAXQDA which I had mentioned during our disucssion, but which is too high resolution to have printed out and include with the stack of supporting documents I provided you with.

It is attached. The columns are blog articles from PhotoRobot dot com with the most recent url's/articles on the left hand side and all of the rows are words. The numbers in the matrix and the corresponding colors correlate with the use count as far as how many times a particular word or combination of words was used in each blog post.

This still has the original creation date of December 12th, 2022 which further supports the information I relayed to you about how I had caught on to the fraud taking place early on and had been investigating it for a while leading up to the incident that took place at my apartment resulting in the criminal charges I am currently facing.

It was very nice to meet you and I appreciate you taking the time to listen.

Thanks again,

Matthew Guertin

Sent with Proton Mail secure email.

---

359.24 KB    1 file attached

Matrix.png 359.24 KB

27-CR-23-1886



Filed in District Court
State of Minnesota
3/10/2023 4:30 PM

## PSYCHOLOGICAL SERVICES
**300 S. 6th Street, Suite C-509, Minneapolis MN 55487-0351 • (612) 348-3723 • FAX (612) 348-3452**

### CONFIDENTIAL FORENSIC
### EVALUATION REPORT

March 10, 2023

The Honorable Presiding Judge
Fourth Judicial District Judicial Officer
Hennepin County District Court

| | |
|---|---|
| Re: | Matthew David |
| DOB: | Guertin 07/17/1981 |
| File Number: | 27-CR-23-1886 |

Dear Your Honor:

**REASON FOR REFERRAL**

Matthew Guertin is a 41-year-old man. He is currently charged with four felony counts: (1) dangerous weapons and recklessly discharging a firearm within a municipality and (2) three counts of receiving or possessing a firearm not identified by a serial number. These charges stem from an alleged incident in January 2023 during which the defendant is accused of possessing an automatic rifle, full-size pistol, and compact pistol, and firing shots from his apartment. Pursuant to the court order of the Honorable Lyonel Norris and the Honorable Toddrick Barnette, dated January 25, 2023, Mr. Guertin was referred for an evaluation of his competency to proceed under Minnesota Rules of Criminal Procedure, 20.01, Subd. 2, which addresses his capacity to understand the proceedings, participate in the defense, and consult rationally with counsel. The current report was prepared for this purpose.

**FORENSIC NOTIFICATION**

Mr. Guertin was informed of the nature and purpose of this evaluation at the beginning of the interview. He was told the evaluation concerned his competency to proceed. He was informed the usual doctor-patient relationship did not exist in the context of this court-ordered evaluation, as the information obtained was not confidential. Specifically, he was notified an evaluation report would be prepared and submitted to the Court, and the defense and prosecuting attorneys would also be provided with copies. Mr. Guertin expressed his understanding of this advisement by summarizing its essential components and asking relevant questions. He agreed to participate in the interview.

**SOURCES OF INFORMATION**

*Assessment Procedures*

- An interview session with Mr. Guertin on March 1, 2023, at the Psychological Services office of the Hennepin County Government Center (HCGC) in Minneapolis, Minnesota. For training purposes, Dr. Casey Boland, a forensic psychology postdoctoral fellow with Psychological Services, primarily conducted the interview, which I supervised.

CASE 0:24-cv-02646-JRT-DLM   Doc. 38-4   Filed 08/02/24   Page 117 of 271

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

Guertin, Matthew                         27-CR-23-1886                         March 10, 2023

- Mr. Guertin also sent me seven unsolicited email messages on February 13, 2023; February 14, 2023; February 15, 2023; March 2, 2023; and March 3, 2023.

**Records Reviewed**

- The current criminal complaint, Fourth Judicial District, filed January 24, 2023.
- Incident report from the alleged instant offense, Minnetonka Police Department, dated January 21, 2023.
- An incident report regarding incident number MP23000151, Minnetonka Police Department, dated January 12, 2023.
- MNCIS records from court file number 27-CR-23-1886 and other cases referencing the defendant.
- The following discovery materials related to the alleged instant offense:
    - Audio recording from the statement Mr. Guertin made to law enforcement at the time of his arrest.
    - 104 photographs from the alleged offense.
- Medical records from Mr. Guertin's contacts with Hennepin County Medical Center (HCMC), dated October 3, 2009 to October 7, 2009.
- Custodial records from the defendant's incarcerations at the Hennepin County Jail (HCJ), dated December 17, 2007 to January 25, 2023.
- Documentation provided by the defendant, organized in sections with the following title page headings:
    - "Mark Roberts Motion Control - Email Exchange - Exhibit 'MR0.' "
    - "U.S. Patent #11,577,177- Exhibit 'PT1' "
    - "U.S. Patent #11,577,177- Exhibit 'PA2.' "
    - "U.S. Patent #11,577,177- Exhibit 'PA3.' "
    - "U.S. Patent Application #17/709,126 - Exhibit 'PA1.' "
    - "Trojansky/Netflix - Exhibit 'NF1.' "
    - "Eyeline Studios - Exhibit 'NF3.' "
    - "Virtual Production - Exhibit 'VP1.' "
    - "Mark Roberts Motion Control - www.MrMoCo.com - Exhibit 'MR1.' "
    - "Dimension Studios - Exhibit 'DM1.' "
    - "Dimension Studios - Exhibit 'DM2.' "
    - "Microsoft - Exhibit 'MS4.' "
    - "Microsoft - Exhibit 'MS3 .' "
    - "Microsoft - Exhibit 'MS2 .' "
    - "Microsoft - Exhibit 'MS1 .' "
    - "Photorobot - Exhibit 'PR1 .' "
    - "Photorobot & Internet Archive - Exhibit 'PR2.' "
    - "Photorobot & Internet Archive - Exhibit 'PR3.' "

Filed in District Court
State of Minnesota
3/10/2023 4:30 PM

- The following data were emailed to me by the defendant after the interview session:
    - An electronic photograph of a spreadsheet labeled, "Matrix."
    - Two emails addressed to the defendant from "Internet Archive," dated December 9, 2022.
    - Three files containing website data from www.photorobot.com.
    - Incident report from case number MP23000151, Minnetonka Police Department, dated January 12, 2023.
    - Annotated email exchanges between Mr. Guertin and his patent attorney, dated January 5, 2023 to January 6, 2023.

**Collateral Contacts**

- Tom Prochazka, Assistant Hennepin County Attorney, via email on February 22, 2023.

Three additional sources of data were sought but not available by the time this report was prepared. First, on

2

Guertin, Matthew                    27-CR-23-1886                    March 10, 2023

February 22, 2023, Dr. Boland and I attempted unsuccessfully to reach defense counsel to discuss the current referral. Second, I also tried to reach Mr. Guertin's patent attorney on March 10, 2023, without success. Finally, a request for records from the defendant's reported contacts with the Schuster Medical Research Institute in California was not returned.

## RELEVANT BACKGROUND AND HISTORY

Filed in District Court
State of Minnesota
3/10/2023  4:30 PM

### General History

Mr. Guertin stated he was born and raised in Minnesota. He indicated he was reared by his mother, and did not have contact with his father during his youth. He also disclosed placements in foster care and involvement with youth services organizations, which he attributed to his youthful behavioral misconduct (e.g., running away and juvenile arrests) and his mother's corresponding difficulty coping with his behavior. However, Mr. Guertin reported a good relationship with his mother, with whom he currently lives, at present. He did not endorse any childhood trauma or victimization, which was consistent with information he offered to medical providers in HCMC records.

Mr. Guertin remarked that he withdrew from school during his senior year of high school "to go work," adding that he "was bored" in school. On this point, he added that he participated in special education curricula for attentional and behavioral difficulties, noting he was "bored," "rambunctious," and had trouble focusing on his studies. He underlined perceptions of his high intelligence, however, noting he found school "boring and easy" and "had a super high GPA [grade point average]." He said he subsequently obtained a general education development (GED) degree. Medical records related further that he did not attend college courses.

Regarding employment, the defendant disclosed he currently works as the chief executive officer (CEO) of a startup company. He reported past employment at "one of the top visual effects companies" in the entertainment industry, adding that he lived in Los Angeles, California for about six years before moving back to Minnesota in 2020. Mr. Guertin also spoke of previous positions at night clubs, and HCMC records from a 2009 contact corroborated that he reported work programming lights for these clubs, as well as self-employment with a painting business, at that time. He disavowed receiving any financial assistance.

### Substance Use History

During the current examination, Mr. Guertin endorsed an extensive substance use history. He said he began using alcohol and marijuana around age 14. He estimated he consumes alcohol "every couple of months" at social gatherings, though he acknowledged "isolating himself" recently "to the point [that] people think it's unhealthy." He characterized his more recent marijuana use as occasional and opportunistic, noting he will use the drug "if it's around and someone has it," which he approximated occurs "a few times a month." When asked about other drugs, Mr. Guertin stated he has used "everything but heroin" throughout his lifetime, including "psychedelics" (e.g., dimethyltryptamine [DMT] and lysergic acid diethylamide [LSD]) and stimulants (e.g., methamphetamines and crack cocaine). However, he disavowed the use of these drugs within recent years. HCMC records listed similar substances (i.e., alcohol, methamphetamines, LSD, and other hallucinogens) the defendant reported using during a 2009 encounter, noting he identified at that time his drugs of choice as alcohol and hallucinogens. Although he disclaimed during the current evaluation any past participation in substance abuse treatment, HCMC records listed a program in which he was reportedly enrolled as an adolescent in relation to his marijuana use and its effects (i.e., paranoia).

Mr. Guertin stated he is presently prescribed the psychostimulant medication Adderall for attention-related issues. He indicated the medication was authorized by a doctor based in California whom he has seen for the past six years. Records from this facility were requested but not received to verify this information. Nonetheless, photos included with discovery materials showed prescription bottles purportedly at the defendant's apartment, and one listed Adderall in the defendant's name. On this point, when asked directly, Mr. Guertin specified that he takes this

27-CR-23-1886

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

Guertin, Matthew                         27-CR-23-1886                         March 10, 2023

medication as prescribed. However, he immediately contradicted himself by underlining occasions on which he has taken additional dosages throughout the day, attributing this practice to being "a workaholic."

Filed in District Court
State of Minnesota
3/10/2023 4:30 PM

### Psychiatric Treatment History

As mentioned, Mr. Guertin spoke of attention-related problems dating back to his youth. He stated he was diagnosed with both attention-deficit/hyperactivity disorder (ADHD; a neurodevelopmental disorder that emerges during youth and is characterized by difficulties with attentional and behavioral regulation) and bipolar disorder (i.e., a mood disorder in which one experiences prolonged, abnormally elevated mood states). He expressed disagreement with the latter diagnosis, which was similar to statements he made in collateral records. For instance, in an audio recording included with discovery materials, Mr. Guertin underlined his views on this diagnosis by commenting, "You're supposed to go up and down [if you have bipolar disorder], but I'm always up." He disclosed sleep irregularities (e.g., not sleeping for the two days preceding his arrest) at that time. Likewise, the defendant said during the current evaluation that he needs "not even six" hours of sleep at night, underlining further instances of a decreased need for sleep without associated fatigue. He further characterized himself as a high-energy person, though he disclaimed any perceptions that his energy was excessive. He stated he is presently prescribed Adderall and the anti-anxiety medication Klonopin, describing the former as particularly effective for "keep[ing] focus" and "slowing [him] down."

Mr. Guertin disclosed brief hospital admissions "when [he was] younger" that he attributed to complications of his substance use patterns. Specifically, he related he was held at facilities briefly and involuntarily for making "really stupid decisions" while intoxicated. Although they only reflected one such admission, HCMC records corroborated this account. In particular, these records indicated the defendant was admitted to the hospital for four days in October of 2009, after he threatened to jump from an interstate bridge overpass that led to a "90-minute standoff" with law enforcement. At the hospital, Mr. Guertin explained his actions in terms of his drug use, noting he became paranoid and distrustful after using LSD, called 911, became concerned "the police were out to get him instead," and then tried to escape law enforcement by climbing the overpass structure. Records specified his blood alcohol level was also elevated (i.e., 0.10) at the time. A few days into the hospitalization, a psychiatrist documented that Mr. Guertin's speech was somewhat rapid and pressured, and he could be "over-inclusive" with details, but his thinking and perceptions were otherwise unremarkable. Hospital staff reportedly petitioned to have the defendant civilly committed, but it was not supported, and he was eventually discharged without psychiatric medications. At that time, clinicians attributed his clinical presentation at the time of his admission to the effects of his substance use and intoxication level.

During the current evaluation, Mr. Guertin disclaimed any recent mental health symptoms when asked directly. However, both his statements during the interview session and information from collateral sources contradicted this account. The former will be reviewed in the next section of this report. Regarding the latter, the police report and discovery materials from the alleged offense reflected a number of unusual beliefs the defendant espoused around the time of his arrest. On this point, these sources of data indicated he spoke of a technological invention he patented that was worth a great deal of money (i.e., $250,000,000). He asserted that organizations discovered this invention, and began accessing, "deleting, and changing files in [his] computer." Indeed, the police report and photographs from Mr. Guertin's apartment suggested his electronic devices were wrapped in tinfoil, and he covered his windows and walls with "space blanket material." During an audio recorded statement, the defendant further asserted other persons were trying to "kill [him]," which was corroborated by photographs of statements the defendant had written in a notebook and on the walls throughout his apartment. For instance, he wrote that he believed someone put "a 'hit' out on [him]," adding, "Whoever is behind all of this has one million different ways to set me up or frame me if they want." During the aforementioned audio recording, he said he inferred this nefarious intent by "symbology" he found on websites (e.g., perceived associations with September 11, 2001). He

4

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

Guertin, Matthew                                    27-CR-23-1886                                    March 10, 2023

also spoke at length about contacts he had with artificial intelligence posing as "real people," noting he discerned the impostors with a "word-language analysis" that identified anomalies (e.g., phrases like "3D scanning") in these discussions. He described recent conversations he had in the following way during the recording: "I don't know if I'm talking to real people at this point."

Filed in District Court
State of Minnesota
3/10/2023 4:30 PM

## COURSE OF THE EVALUATION

Mr. Guertin and I spoke prior to the March 1 interview session for the purposes of scheduling. Afterward, he sent me a series of unsolicited email messages in which he asked a number of questions about the upcoming interview, and he offered lengthy descriptions and explanations for the aforementioned belief system accompanied by links he characterized as evidence supporting his assertions. The beliefs in question were consistent with those articulated in both the previous paragraph and the next section of this report. His statements suggested he intended to send me more messages, as he provided the following foreword: "In what I am sure will be one of many follow up emails leading up to our meeting..." I responded by asking that he not send these messages, explaining that both

(a) the information he provided and (b) his questions (which referenced some themes contained in the aforementioned forensic notification) would be reviewed at length during the interview session. I directed him to bring the evidence to which he referred to the interview session, at which time I would review it. He subsequently sent a message with a logistical question, which I answered, but he later sent another long email with several questions. I assured him that he would be provided ample opportunity to make these inquiries (which were again relevant to the evaluation but would be addressed by the forensic notification), and I indicated I would no longer respond to any such messages since the interview session was the appropriate forum in which to discuss these matters. Mr. Guertin adhered to these boundaries, and he did not send more emails before the March 1 session. He supplemented our discussions from the interview session with four additional emails that included annotated attachments, which he asserted supported the statements he made during the interview.

## CURRENT CLINICAL PRESENTATION

As mentioned, the interview session occurred in person at the HCGC. Mr. Guertin arrived approximately 30 minutes late for the appointment, although he called to notify me that he was on the way to the session and would be tardy. I explained the policy regarding examinees' late arrivals, and he replied that he would rather be late and "100% prepared" than arrive on time. As noted, he arrived with a large stock of documents, organized into sections, which he provided for my review and stated supported his assertions.

During the interview session, Mr. Guertin was occasionally difficult to hear given the configuration of these on-site interview rooms, which are equipped with Plexiglas in relation to the recent global pandemic. Nonetheless, these issues were easily surmounted with requests that he repeat the relevant information, which the defendant obliged. As mentioned, a postdoctoral fellow in forensic psychology conducted the bulk of the interview, but I was present in the room throughout the session, supervised its administration, and offered additional inquiries as indicated.

Mr. Guertin was alert. His eye contact was adequate. He remained seated without apparent difficulty during the session, and he did not appear restless or exhibit any abnormal movements. Furthermore, he adhered to the boundaries set and enforced while conducting the interview, although he expressed irritation in a slightly condescending manner on one occasion in response to Dr. Boland's interruption to keep his comments on-topic.

The defendant appeared to be in good spirits. When asked, he disclaimed any suicidal or violent thinking, intent, or plan, and he was not judged to be at imminent risk of harm to himself or others at the time of the interview. Notably, he spoke in a self-aggrandizing manner throughout the session, emphasizing his perceived achievements, abilities, and skills on numerous occasions. Indeed, as an illustrative example, Mr. Guertin repeatedly highlighted perceptions of his high intellect (e.g., "I'm smart. [...] I'm very good at telling stories, and [I am] very smart"). His

5

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

Guertin, Matthew                    27-CR-23-1886                    March 10, 2023

remarks often impressed as grandiose in nature. For instance, he spoke of being "an engineer," describing a recent technological invention in glowing terms and characterizing it as somewhat revolutionary.

Filed in District Court
State of Minnesota
3/10/2023 4:30 PM

Mr. Guertin espoused perceptual disturbances consistent with delusions (i.e., fixed beliefs that deviate markedly from objective reality and are held despite contradictory evidence). He spoke at length about his prowess with technology, including an invention he patented related to visual effects and photography technology.

While some elements of his assertions referenced real technological subjects (e.g., neural radiance fields[1]), the defendant's views in relation to these matters were also consistent with the phenomenology of delusions. In particular, he asserted that large corporations (e.g., Netflix and Microsoft) discovered this technology, realized the financial incentives at stake, and began to target the defendant for nefarious purposes. For instance, he expressed views that these agencies accessed his patented technology through his personal devices, fraudulently implemented it as if created by them, and went to great lengths to cover up the theft. Mr. Guertin further insisted the entities in question intended to harm or kill him, referring to the situation as a "conspiracy" "at a bigger level" in which he perceived his "safety to be at risk," citing "weird coincidences" (e.g., the presence of "two cars behind [him]" at one time[2]) to support his conclusions. His remarks and reasoning in these domains referenced unclear, irrational reasoning and implausible events. On this point, the defendant produced a large volume of documentation, which was reviewed for this examination, that he stated supported his conclusions. However, the links between some of these data and his inferences were not clear. Rather, they showed that his patent had the potential to be lucrative if it was as innovative as others he used as examples. The documentation he identified as most critical[3] did not support his assertions, instead suggesting Mr. Guertin was prone to inferring nefarious intent from benign stimuli. The documentation and supplementary, emailed materials in no way supported or clarified the more improbable (e.g., targeting him individually to harm him) elements of his beliefs. On the contrary, the defendant's statements were commensurate with persecutory and referential (i.e., the belief that random events have personal significance) thinking.

Although his speech was not pressured, Mr. Guertin was verbose, as his responses to our questions frequently included excessive detail not targeted by the question. He was prone to long narratives on themes only peripherally related to the topic at hand. He could be directed with firm interjections and attempts to refocus him to the subject at hand, but these interventions were less successful as the interview progressed. Indeed, the defendant was prone to distraction, often by his own thoughts. He tended to offer fragmented remarks that failed to convey an entire idea before drifting to another subject that was either (a) loosely related to his prior statements or (b) required repeated clarification from Dr. Boland or me to discern the links. This tendency became increasingly prominent as the interview progressed, particularly as we discussed his delusional beliefs in more depth, and occurred especially in response to open-ended questions. It also became increasingly difficult to intervene and redirect his attention

---

[1] For example, see Mildenhall, B., Srinivasan, P. P., Tancik, M., Barron, J. T., Ramamoorthi, R., & Ng, R. (2022). NeRF: Representing scenes as neural radiance fields for view synthesis. *Communications of the ACM*, 65(1), 99-106. DOI: 10.1145/3503250. Accessed from https://dl.acm.org/doi/pdf/10.1145/3503250 on February 28, 2023.

[2] In the discovery materials reviewed for the current evaluation, Mr. Guertin made a similar reference to these observations during his audio recorded interview with law enforcement around the time of his arrest, which involved his presence at the police station on a prior date. Notably, the interviewing detective outlined a reality-based, plausible explanation for the presence of these vehicles, though the defendant continued to assert the nefarious intent signaled by their presence during the current interview.

[3] Mr. Guertin selected a series of email exchanges between a CEO of a related technology company and himself as particularly emblematic of the alleged fraud and conspiracy he discussed. The CEO in question expressed interest in the defendant's patented technology but linked another, similar "system that's been around for years," further inquiring how Mr. Guertin's patent was "unique compared to" this existing technology.

6

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

Guertin, Matthew                              27-CR-23-1886                              March 10, 2023

to the matter at hand during these instances. On this point, Mr. Guertin had difficulty completing a full, coherent narrative without becoming sidetracked by seemingly incidental elements of the story, which rendered the progression of his logic and overall meaning of his statements difficult to discern. As an illustrative example, I asked Mr. Guertin a series of questions toward the end of the session to clarify some information he had provided. I purposefully presented these inquiries in a targeted, directive manner to mitigate the potential for such long, meandering narratives. Nevertheless, his responses remained disjointed, and they often failed to convey the specific information sought despite his tendency to speak for long periods of time. For instance, when I asked him to expand on examples of "coincidences" to which he had previously referred, he spoke of "see[ing] patterns" because he is "very analytical" and repeating his ability to infer "patterns" before launching into a long, meandering narrative during which he referenced a (a) person with whom he spoke at the Central Intelligence Agency (CIA), (b) "special ops gear" related to his "inventions" and a related description, (c) and "weird things" that suggested he might be returning to the point of my question. However, he instead referenced contacts he had with individuals from various agencies (e.g., the CIA, Federal Bureau of Investigations, and Minnetonka Police Department). I attempted to clarify these statements, but Mr. Guertin's circuitous thinking and speech rendered his logic difficult to follow. He also seemed to contradict himself at times. Indeed, on a few occasions, I tried to summarize succinctly my understanding of the broader conceptual themes of his long, disjointed statements. The defendant indicated my inferences were inaccurate, but his attempts to explicate and correct any misconceptions failed to convey his meaning coherently given his propensity for digressions in his thinking and speech.

Filed in District Court
State of Minnesota
3/10/2023 4:30 PM

**FORENSIC ANALYSIS AND OPINION**

According to the Minnesota Rules of Criminal Procedure, 20.01, Subd. 2, a defendant is incompetent to proceed with his legal case if he is presently experiencing symptoms of a mental illness or cognitive impairment that prevent his from understanding the proceedings, participating in the defense, or consulting rationally with counsel. I considered these criteria when developing the current forensic opinion.

***Does the defendant have a mental illness or cognitive impairment?***

Clinical impressions were formed considering information from the above-named sources, which provide sufficient basis to offer the following diagnosis in accordance with the criteria set forth by the *Diagnostic and Statistical Manual of Mental Disorders,* Fifth Edition, Text Revision (DSM-5-TR):

> Unspecified Schizophrenia Spectrum and Other Psychotic Disorder (primary)

Mr. Guertin's current presentation is consistent with diagnosis of a psychotic disorder, a condition characterized by grossly disrupted perceptions of external reality. In particular, he displays prominent delusional beliefs that include persecutory and referential themes, as he is convinced he has been targeted by large corporations who intend to (a) steal a patented technology that could revolutionize the industry and (b) harm him. On this point, the limits of my expertise in relation to technology matters must be acknowledged, as I lack the specialized training in this field to analyze the defendant's reported invention, patent, or any existing technology it resembles. I tried to consult without success with Mr. Guertin's patent attorney to verify any realistic factors underpinning his assertions. Nevertheless, even if the technological aspects of the defendant's statements prove true (i.e., that he has a viable technology that was introduced by others after he received his patent), his views remain consistent with delusions. Specifically, the more improbable elements of Mr. Guertin's beliefs have plausible, alternative explanations offered by collateral sources (e.g., his interpretations of the vehicles he believed were following him), and their content (e.g., being followed and targeted for nefarious purposes, including efforts to harm or kill him; accessing his personal devices at his home) and intensity are highly consistent with the phenomenology of the persecutory delusions that can accompany psychotic disorders. Similarly, the factors he has cited to support his views (e.g., inferences about "symbology" embedded in data he reviewed and "coincidences" with unclear links to

Guertin, Matthew                          27-CR-23-1886                          March 10, 2023

his ultimate conclusions) relied heavily upon referential thinking.

Diagnosis is complex in Mr. Guertin's case, and diagnosis of an unspecified psychotic condition is offered, for two key reasons. First, the defendant's age does not preclude the potential for a recent onset of delusions, which would favor the diagnosis of a delusional disorder (i.e., a condition characterized by prominent delusions that tends to emerge later in life in comparison to other psychotic disorders). However, several confounding factors exist that complicate diagnostic precision. For instance, the defendant endorsed some recent drug use, including marijuana and misuse of his Adderall prescription. As a result, the potential effects of such substance use on the emergence and maintenance of his mental health symptoms cannot be definitively discounted.

Filed in District Court
State of Minnesota
3/10/2023 4:30 PM

Second, and on a related note, the possibility that Mr. Guertin's current condition includes a mood-related component cannot be ruled out, though this analysis is also complex. On the one hand, several aspects of his clinical presentation are consistent with the elevated mood states that typify mania or hypomania. For instance, the defendant presented with inflated self-esteem and grandiosity. Data also reflected instances during which he experienced decreased need for sleep. Although his speech was not pressured, he was quite verbose during the interview, and his frequent digressions and tendency to become distracted by his own thoughts were consistent with flight of ideas (i.e., the tendency to change topics linked by only loose, superficial connections). As mentioned, he was also highly distractible throughout the session to the point that it became difficult to extract meaningful, coherent information from him. These symptoms are consistent with the presentation of a manic or hypomanic episode. On the other hand, Mr. Guertin's reported difficulties with attentional and behavioral regulation during youth (i.e., the reported diagnosis of ADHD) and misuse of his prescribed psychostimulant medications confound diagnostic precision in this area. It is possible his mood-related symptoms are (a) substance-induced, (b) reflective of an underlying personality style in which he exhibits grandiosity and self-aggrandizement, exacerbated by a neurodevelopmental issue related to his attentional and behavioral regulation, or (c) some combination thereof. Collateral records were sparse to confirm the onset of any symptoms and the nature of the defendant's functioning in the relevant domains beyond his self-report, and the reliability of his account is called into question by the limited insight he has into other aspects of his mental health {e.g., delusions). For these reasons, diagnosis beyond an unspecified condition is not offered at the current time.

Fortunately, diagnostic precision is not required to answer the current referral question, which instead relies upon an analysis of *current symptoms* and any corresponding effects on specifically defined, competency-related abilities. These abilities are addressed in the next section of this report. Regarding this question of symptoms, however, the presence or absence of mood-related symptoms is comparatively more ancillary to the current referral question given the pronounced nature of Mr. Guertin's delusions at the present time. In other words, data from the current evaluation support the presence of delusional beliefs. In addition, my clinical observations from the interview session highlight the potential presence of manic or hypomanic symptoms at the current time, which cannot be ruled out based on existing data.

***Does the defendant's mental illness prevent a factual or rational understanding of the legal process or the charges against her? Does the defendant's mental illness presently obstruct his ability to work with an attorney to prepare a reasonable defense?***

Mr. Guertin expressed awareness of the nature of the current allegations. He recognized he is charged with "reckless discharge of a firearm in a municipality" in relation to accusations that he was "shooting a gun out [his] window in Minnetonka." These descriptions coincided with information from charging documents. He was receptive to our education about his remaining charges, which he later stated accused him of "possession of guns without serial number[s]." However, it should be noted that Mr. Guertin's further discussion of the circumstances surrounding his arrest and perceptions of his legal situation were mired in delusional reasoning. For instance, while

8

CASE 0:24-cv-02646-JRT-DLM   Doc. 38-4   Filed 08/02/24   Page 124 of 271

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

Guertin, Matthew                          27-CR-23-1886                          March 10, 2023

he spoke cogently about various pleas and the nature of legal proceedings in general, he identified a preferred defense strategy for his case that relied heavily upon the implausible evidence of his perceived persecution. Dr. Boland and I also introduced discussions of the mental illness defense during the interview. Although the defendant asked relevant questions about the outcomes of this defense strategy (e.g., whether such a defendant would be "committed"), he had difficulty discussing logically the potential applications of this alternative to his own circumstances given his prominent delusions and limited insight into their implausible nature. Moreover, we asked Mr. Guertin about the possibility of testifying on his own behalf should his case proceed to trial. While he recognized he could not be compelled to testify, he spoke about this option as a way to "have the opportunity to make all this stuff [about his perceived persecution] public in the courtroom." His delusions also compromised his capacity to discuss evidentiary factors in relation to the current proceedings. Indeed, he spoke at length about "the stuff [he] collected" to support his persecutory beliefs, asserting further that the "evidence will speak for [sic] itself" if considered by courtroom principals.

Filed in District Court
State of Minnesota
3/10/2023  4:30  PM

**FORENSIC OPINION**

Mr. Guertin presently exhibits pronounced delusional beliefs of a persecutory nature. He is prone to inferring nefarious intent from benign events, and his reasoning is marked by referential thinking. These symptoms are highly consistent with the presentation of a psychotic disorder. The defendant is also verbose, and he is prone to distraction by his own thoughts while providing these narratives. This tendency results in meandering, sometimes incoherent statements in which his meaning is difficult to discern, and even targeted, directive lines of questioning are not consistently successful in clarifying his ideas. This looseness in his thinking is particularly prominent when discussing delusional themes. Although diagnostic precision in this case is difficult, the possibility that his current psychiatric condition includes a mood component beyond the presence of psychotic symptoms cannot be definitively ruled out.

The aforementioned symptoms interfered with our discussions of legal matters during the current evaluation. Indeed, while he knows the nature of his charges, Mr. Guertin's delusional beliefs are inextricably linked to his perceptions of his current legal situation, and they obstruct his ability to apply this factual legal knowledge to discussions of his own case in a rational manner devoid of delusional reasoning. On this point, he spoke of various decisions tasked to criminal defendants, but he supported his choices with impaired perceptions of objective reality. His delusions further impact his perceptions of the evidence relevant to his case. Furthermore, he had difficulty participating in consistently coherent, reality-based discussions about the proceedings during the current evaluation, which calls into question (a) the productivity of his legal exchanges with his attorney when preparing a defense and (b) his capacity to testify in the proceedings. The combination of these factors supports the conclusion that **Mr. Guertin's symptoms presently compromise his capacity to understand rationally the proceedings, participate in the defense, and consult rationally with counsel.**

**FURTHER CONCLUSIONS AND RECOMMENDATIONS**

Psychotic symptoms typically remit with the prolonged administration of an appropriate psychiatric medication regimen. Given the unknown contributions of his psychostimulant medication misuse to his current presentation, his compliance with this medication *as prescribed* would be critical to improving his functioning. His abstinence from substance use is also recommended to improve and maintain his mental health stability. Although his response to such recommended intervention is unknown, research (Pirelli & Zapf, 2020) has demonstrated that nearly all (81%) defendants deemed incompetent to proceed can be restored to adjudicative competency under traditional competency restoration commitment statutes. These statutes do not exist in Minnesota at present, but it is reasonable to conclude his mental health could stabilize and his competency-related abilities improve if a proper treatment regimen was implemented. Given his limited insight into the nature of his symptoms, Mr.Guertin would be an appropriate candidate for **referral for civil commitment as a person who poses a risk of harm due to**

9

27-CR-23-1886

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

Guertin, Matthew                           27-CR-23-1886                            March 10, 2023

**a mental illness.** Commitment as a person who is mentally ill and dangerous to the public could also be considered given the nature of the specific allegations included with the current referral.

Please do not hesitate to contact me if the Court has further questions about this report.

Respectfully submitted,

Filed in District Court
State of Minnesota
3/10/2023  4:30  PM

*Jill E. Rogstad* PhD, ABPP, LP

Jill E. Rogstad, Ph.D., LP, ABPP (Forensic)
Licensed Psychologist
Board Certified in Forensic Psychology by the American Board of Professional Psychology
Senior Clinical Forensic Psychologist, Fourth Judicial District

10

## Re: Matthew Guertin / Language Analysis Matrix

From matt ███████████████████████ >

To      jill.rogstad@courts.state.mn.us

CC      Bruce Rivers<riverslawyers@aol.com>

Date    Friday, March 3rd, 2023 at 12:04 AM

Included here is a copy of an email correspondence between me and my patent attorney discussing the fraud taking place (attached)

The Police report that I filed with the Mntka PD 9 days before the incident at my apartment (attached)

And my automated signup email from the Internet Archive when I signed up for my account 'PatentlyFalse' (attached)

I will follow up with two additional emails - each containing one of the originally dated PDF screen captures I made of the web archives archived (supposedly) version of PhotoRobot.com/blog.

I have to include in two separate emails as they are each 13mb.

That is everything I will send you...meaning I am not going to keep sending any additional documents or files after the two emails following this one but I figured it wouldn't hurt to include a few more additional pieces of the puzzle which help substantiate the stuff discussed in our meeting.

Thanks again!

~Matthew Guertin

Sent with Proton Mail secure email.

---

21.66 MB 3 files attached

Email_correspondence_with_IP_attorney_discussing_fraud.pdf   10.19 MB

WaybackMachine_signup_email__12_09_2023__02_45.pdf   3.26 MB

Mntka_PD_Police_Report__23-000151__1_12_2023__14_02.pdf   8.20 MB

# Re: Matthew Guertin / Language Analysis Matrix

| | |
|---|---|
| From matt ███████████████████ > |
| To | jill.rogstad@courts.state.mn.us |
| CC | Bruce Rivers<riverslawyers@aol.com> |
| Date | Friday, March 3rd, 2023 at 12:07 AM |

First screen capture of archived page

with a 'last modified' date of December 9th, 2022 @ 4:49am - the modification was me adding the wayback url to the top of each of the pages - right click and look at the document properties for additional time and date metadata information.

(attached)

Sent with Proton Mail secure email.

___

13.53 MB    1 file attached

> screencapture-web-archive-org-web-20220811043707-https-www-photorobot-com-blog-2022-12-09-04_... 45.pdf
> 13.53 MB

# Re: Matthew Guertin / Language Analysis Matrix

From matt█████████████████████>

To      jill.rogstad@courts.state.mn.us

CC      Bruce Rivers<riverslawyers@aol.com>

Date    Friday, March 3rd, 2023 at 12:14 AM

Second screen capture of archived page - taken a few minutes later

with a 'last modified' date of December 9th, 2022 @ 4:51am

Pay close attention to the top left and top right of the Wayback Machine date bar header at the top of the pages. See if you notice anything changing....

I included an edited PDF I made pointing out what is happening which also shows the document properties tab opened

(attached)

And that is everything!

Thanks again!

~Matt

Sent with Proton Mail secure email.

---

17.45 MB    2 files attached

> screencapture-web-archive-org-web-20221209090542-https-www-photorobot-com-blog-2022-12-09-04_… 19.pdf
> 13.82 MB

Show_and_tell.pdf  3.63 MB

# RE: [EXTERNAL] Re: Matthew Guertin / Language Analysis Matrix

From jill.rogstad@courts.state.mn.us <Jill.Rogstad@courts.state.mn.us>

To      Matt ███████████████████████████>

CC      Bruce Rivers<riverslawyers@aol.com>

Date    Tuesday, March 7th, 2023 at 10:45 AM

Thank you, Mr. Guertin. I wanted to confirm receipt of four emails with the attachments.


Best regards,


Jill E. Rogstad, Ph.D., LP, ABPP (Forensic)

Senior Clinical Forensic Psychologist

Board Certified in Forensic Psychology, American Board of Professional Psychology

(she/her/hers)

Fourth Judicial District and Regional Psychological Services

Phone: (612) 394-0937

## Electronic Acknowledgement Receipt

**EXHIBIT Ta**

| | |
|---|---|
| **EFS ID:** | 47694230 |
| **Application Number:** | 18108858 |
| **International Application Number:** | |
| **Confirmation Number:** | 6872 |
| **Title of Invention:** | Motorized rotatable treadmill and system for creating the illusion of movement |
| **First Named Inventor/Applicant Name:** | Matthew Guertin |
| **Customer Number:** | 27367 |
| **Filer:** | Amanda Morgan Prose/Megan Neumann |
| **Filer Authorized By:** | Amanda Morgan Prose |
| **Attorney Docket Number:** | G185.0001US2 |
| **Receipt Date:** | 16-MAR-2023 |
| **Filing Date:** | 13-FEB-2023 |
| **Time Stamp:** | 17:01:55 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

### File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Information Disclosure Statement (IDS) Form (SB08) | 2023-03-16_IDS.pdf | 74963 0fec2f70dd7b94ea8745993e4d673b7c9e3 cb80 | no | 4 |

Warnings:

| Information: | | | | | |
|---|---|---|---|---|---|
| This is not an USPTO supplied IDS fillable form | | | | | |
| 2 | Non Patent Literature | Dimension_Named_Microsoft.pdf | 257213 0bff00caec7006364dada5cd12523fbc104afc4f | no | 3 |
| Warnings: | | | | | |
| Information: | | | | | |
| 3 | Non Patent Literature | Microsoft_Stories.pdf | 1625480 77ff933bb0867ed3be12171650247c41c3875cb | no | 7 |
| Warnings: | | | | | |
| Information: | | | | | |
| | | | Total Files Size (in bytes): | 1957656 | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Receipt date: 03/16/2023                                    18/108,858 — GAU: 3711

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 18108858 |
| --- | --- | --- |
| | Filing Date | 2023-02-13 |
| | First Named Inventor | Matthew Guertin |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | G185.0001US2 |

| | 1 | "Dimension named Microsoft Mixed Reality Partner to help others create cutting-edge digital experiences" Microsoft (2020) <https://news.microsoft.com/en-gb/2020/06/01/dimension-named-microsoft-mixed-reality-partner-to-help-others-create-cutting-edge-digital-experiences/#:~:text=No%20results-,Dimension%20named%20Microsoft%20Mixed%20Reality%20Partner%20to,create%20cutting%2Dedge%20digital%20experiences&text=A%20UK%20company%20that%20has,a%20Microsoft%20Mixed%20Reality%20Partner> | ☐ |
| --- | --- | --- | --- |
| | 2 | "Microsoft Stories podcast: episode 8 – Dimension Studio" (2020) <https://news.microsoft.com/en-gb/2020/12/17/microsoft-stories-podcast-episode-8-dimension-studio/> | ☐ |

| If you wish to add additional non-patent literature document citation information please click the Add button |
| --- |

| EXAMINER SIGNATURE |
| --- |

| Examiner Signature | /KIEN T NGUYEN/ | Date Considered | 12/02/2023 |
| --- | --- | --- | --- |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

EFS Web 2.1.18

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /K.T.N/



## Division of Corporations - Filing

Delaware.gov                                                    Governor | General Assembly | Courts | Elected Off



Department of State: Division of Corporations

Allowable    Characters

HOME

View Search Results

### Entity Details

| File Number: | 6917475 | Incorporation Date / Formation Date: | 7/18/2022 (mm/dd/yyyy) |
|---|---|---|---|
| Entity Name: | INFINISET, INC. | | |
| Entity Kind: | Corporation | Entity Type: | General |
| Residency: | Domestic | State: | State: |
| Status: | Good Standing | Status Date: | 3/26/2023 |

**REGISTERED AGENT INFORMATION**

| Name: | CORPORATION SERVICE COMPANY | | |
|---|---|---|---|
| Address: | 251 LITTLE FALLS DRIVE | | |
| City: | WILMINGTON | County: | New Castle |
| State: | DE | Postal Code: | 19808 |
| Phone: | 302-636-5401 | | |

site map  |  privacy  |  about this site  |  contact us  |  translate  |  delaware.gov

https://icis.corp.delaware.gov/Ecorp/EntitySearch/EntitySearchStatus.aspx?i=6917475&d=n





EXHIBIT
Va

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1.
Netflix, Inc.
Bryony Gagan
100 Winchester Circle
Los Gatos, CA 95032

9590 9402 7521 2098 9625 62

2. Article Number (Transfer from service label)
7020 0090 0000 0890 3958

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  ☐ Agent  ☐ Addressee
B. Received by (Printed Name)  C. Date of Delivery
B. Melchor
D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053   Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

Fenwick & West LLP
Robert Hulse
801 California Street
Mountain View, CA 94041

9590 9402 7521 2098 9736 67

2. Article Number (Transfer from service label)
7020 0090 0000 0890 3897

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  ☐ Agent  ☐ Addressee
B. Received by (Printed Name)  C. Date of Delivery
Sean Vokel  3/30/23
D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053   Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

Netflix, Inc.
Amy Reinhard
100 Winchester Circle
Los Gatos, CA 95032

9590 9402 7521 2098 9742 37

2. Article Number (Transfer from service label)
7020 0090 0000 0890 3965

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  ☐ Agent  ☐ Addressee
B. Received by (Printed Name)  C. Date of Delivery
B. Melchor
D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053   Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Netflix, Inc.
Greg Peters
100 Winchester Circle
Los Gatos, CA 95032

9590 9402 7521 2098 9625 55

2. Article Number (Transfer from service label)

7020 0090 0000 0890 3941

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery
B. Melchor

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053   Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

Scanline VFX
Stephan Trojansky
6087 W Sunset Blvd – 4th Floor
Los Angeles, CA 90028

9590 9402 7521 2098 9640 30

2. Article Number (Transfer from service label)

7020 0090 0000 0890 3880

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053   Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

Eyeline Studios
Registered Agent
Stephan Trojansky
330 N Brand Blvd - Ste 700
Glendale, CA 91203

9590 9402 7521 2098 9742 13

2. Article Number (Transfer from service label)

7020 0090 0000 0890 8618

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No
MAR 31 2023

Delivery Service

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053   Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Netflix, Inc.**
Spencer Wang
100 Winchester Circle
Los Gatos, CA 95032

9590 9402 7521 2098 9736 43

2. Article Number (Transfer from service label)
7020 0090 0000 0890 3903

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X BM
☐ Agent
☐ Addressee

B. Received by (Printed Name)
B. Melchor

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Netflix, Inc.**
Ted Sarandos
100 Winchester Circle
Los Gatos, CA 95032

9590 9402 7521 2098 9625 31

2. Article Number (Transfer from service label)
7020 0090 0000 0890 3927

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X BM
☑ Agent
☐ Addressee

B. Received by (Printed Name)
B. Melchor

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Westman, Champlin & Koehler**
Amanda Prose
121 South 8th Street
Suite 1100
Minneapolis, MN 55402

9590 9402 7521 2098 9736 74

2. Article Number (Transfer from service label)
7020 0090 0000 0890 4177

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X B
☑ Agent
☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery
3-28-23

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt













**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®.*

OFFICIAL USE

Certified Mail Fee $

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage $

Total Postage and Fees $

**Eyeline Studios - Scott Miller**
5808 W Sunset Blvd - 12th Floor
Los Angeles, CA  90028

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7020 0090 0000 0890 8625

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Eyeline Studios**
Scott Miller
5808 W Sunset Blvd - 12th Floor
Los Angeles, CA  90028

9590 9402 7521 2098 9625 86

2. Article Number (Transfer from service label)
7020 0090 0000 0890 8625

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent
                         ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery ($)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®.*

OFFICIAL USE

Certified Mail Fee

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage

Total Postage and Fees

**Eyeline Studios - Stephan Trojansky**
330 N Brand Blvd - Ste 700
Glendale, CA  91203

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7020 0090 0000 0890 8618

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Eyeline Studios**
**Registered Agent**
Stephan Trojansky
330 N Brand Blvd - Ste 700
Glendale, CA  91203

9590 9402 7521 2098 9742 13

2. Article Number (Transfer from service label)
7020 0090 0000 0890 8618

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent
                         ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery ($)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt









**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Scanline VFX - Stephan Trojansky
6087 W Sunset Blvd - 4th Floor
Los Angeles, CA  90028

**SENDER: COMPLETE THIS SECTION**
- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

Scanline VFX
Stephan Trojansky
6087 W Sunset Blvd - 4th Floor
Los Angeles, CA  90028

9590 9402 7521 2098 9640 30

2. Article Number (Transfer from service label)
7020 0090 0000 0890 3880

PS Form 3811, July 2020 PSN 7530-02-000-9053

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Netflix Inc - David Hyman
100 Winchester Circle
Los Gatos, CA 95032

**SENDER: COMPLETE THIS SECTION**
- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

Netflix, Inc.
David Hyman
100 Winchester Circle
Los Gatos, CA  95032

9590 9402 7521 2098 9736 50

2. Article Number (Transfer from service label)
7020 0090 0000 0890 3873

PS Form 3811, July 2020 PSN 7530-02-000-9053









**UNITED STATES POSTAL SERVICE.**

LOST LAKE
9705 45TH AVE N
MINNEAPOLIS, MN 55442-2566
(800)275-8777

03/27/2023                     12:58 PM

| Product | Qty | Unit Price | Price |
|---|---|---|---|

Priority Mail®    1                $9.65
Flat Rate Env
    Minneapolis, MN 55402
    Flat Rate
    Expected Delivery Date
       Tue 03/28/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008904177
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9736 74
Total                             $17.15

Priority Mail®    1                $9.65
Flat Rate Env
    Los Angeles, CA 90028
    Flat Rate
    Expected Delivery Date
       Thu 03/30/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008903880
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9640 30
Total                             $17.15

Priority Mail®    1                $9.65
Flat Rate Env
    Los Angeles, CA 90028
    Flat Rate
    Expected Delivery Date
       Thu 03/30/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008903910
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9736 36
Total                             $17.15

Priority Mail®    1                $9.65
Flat Rate Env
    Los Gatos, CA 95032
    Flat Rate
    Expected Delivery Date
       Thu 03/30/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008903873
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9736 50
Total                             $17.15

Flat Rate Env
    Los Gatos, CA 95032
    Flat Rate
    Expected Delivery Date
       Thu 03/30/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008903873
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9736 50
Total                             $17.15

Priority Mail®    1                $9.65
Flat Rate Env
    Los Gatos, CA 95032
    Flat Rate
    Expected Delivery Date
       Thu 03/30/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008903958
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9625 62
Total                             $17.15

Priority Mail®    1                $9.65
Flat Rate Env
    Los Gatos, CA 95032
    Flat Rate
    Expected Delivery Date
       Thu 03/30/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008903965
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9742 37
Total                             $17.15

Priority Mail®    1                $9.65
Flat Rate Env
    Los Gatos, CA 95032
    Flat Rate
    Expected Delivery Date
       Thu 03/30/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008903903
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9736 43
Total                             $17.15

Priority Mail®    1                $9.65
Flat Rate Env
    Los Gatos, CA 95032
    Flat Rate
    Expected Delivery Date
       Thu 03/30/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008903927
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9625 31
Total                             $17.15

Priority Mail®    1                $9.65
Flat Rate Env
    Los Gatos, CA 95032
    Flat Rate

    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008903927
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9625 31
Total                             $17.15

Priority Mail®    1                $9.65
Flat Rate Env
    Los Gatos, CA 95032
    Flat Rate
    Expected Delivery Date
       Thu 03/30/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008903941
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9625 55
Total                             $17.15

Priority Mail®    1                $9.65
Flat Rate Env
    Glendale, CA 91203
    Flat Rate
    Expected Delivery Date
       Thu 03/30/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008908618
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9742 13
Total                             $17.15

Priority Mail®    1                $9.65
Flat Rate Env
    Mountain View, CA 94041
    Flat Rate
    Expected Delivery Date
       Thu 03/30/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008903897
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9736 67
Total                             $17.15

Priority Mail®    1                $9.65
Flat Rate Env
    Los Angeles, CA 90028
    Flat Rate
    Expected Delivery Date
       Thu 03/30/2023
    Insurance                       $0.00
       Up to $100.00 included
    Certified Mail®                 $4.15
       Tracking #:
       7020009000008908625
    Return Receipt                  $3.35
       Tracking #:
       9590 9402 7521 2098 9625 86
Total                             $17.15

Grand Total:                    $205.80

Credit Card Remit               $205.80
    Card Name: VISA
    Account #: XXXXXXXXXXXX5090
    Approval #: 394165
    Transaction #: 193

       9590 9402 7521 2098 9625 86
Total                             $17.15

Grand Total:                    $205.80

Credit Card Remit               $205.80
    Card Name: VISA
    Account #: XXXXXXXXXXXX5090
    Approval #: 394165
    Transaction #: 193

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
1-800-222-1811.

Save this receipt as evidence of
insurance. For information on filing an
insurance claim go to
https://www.usps.com/help/claims.htm
or call 1-800-222-1811

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device,

or call 1-800-410-7420.

UFN: 266323-0442
Receipt #: 840-55530395-1-4365707-2
Clerk: 38

# USPS Tracking®

FAQs ›

**Tracking Number:**

Remove ✕

## 70200090000008908625

Copy    Add to Informed Delivery (https://informeddelivery.usps.com/)

### Latest Update

Your item has been delivered and is available at a PO Box at 8:11 am on March 31, 2023 in LOS ANGELES, CA 90028.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

**Delivered**
**Delivered, PO Box**
LOS ANGELES, CA 90028
March 31, 2023, 8:11 am

See All Tracking History

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

See More ⌄

**Tracking Number:**

Remove ✕

## 9590940275212098962586

Copy    Add to Informed Delivery (https://informeddelivery.usps.com/)

### Latest Update

The U.S. Postal Service has received electronic notification on March 27, 2023 at 12:57 pm that you have associated a return receipt to your item.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

**Pre-Shipment**
**Return Receipt Associated**
March 27, 2023, 12:57 pm

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

See More ⌄

**Tracking Number:**

Remove ✕

## 70200090000008903910

Copy    Add to Informed Delivery (https://informeddelivery.usps.com/)

### Latest Update

Your item has been delivered and is available at a PO Box at 8:11 am on March 31, 2023 in LOS ANGELES, CA 90028.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

**Delivered**
**Delivered, PO Box**
LOS ANGELES, CA 90028
March 31, 2023, 8:11 am

**See All Tracking History**

What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)

See More ⌄

Tracking Number:                                                                 Remove ✕

**9590940275212098973636**

Copy      Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

The U.S. Postal Service has received electronic notification on March 27, 2023 at 12:49 pm that you have associated a return receipt to your item.

**Get More Out of USPS Tracking:**
     USPS Tracking Plus®

● **Pre-Shipment**
   **Return Receipt Associated**
   March 27, 2023, 12:49 pm

What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)

See More ⌄

Tracking Number:                                                                 Remove ✕

**70200090000008908618**

Copy      Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was picked up at a postal facility at 7:54 am on March 31, 2023 in GLENDALE, CA 91209.

**Get More Out of USPS Tracking:**
     USPS Tracking Plus®

**Delivered**
**Delivered, Individual Picked Up at Postal Facility**
GLENDALE, CA 91209
March 31, 2023, 7:54 am

**See All Tracking History**

What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)

See More ⌄

Tracking Number:                                                                 Remove ✕

**9590940275212098974213**

Copy      Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was delivered in or at the mailbox at 11:13 am on April 5, 2023 in MINNEAPOLIS, MN 55436.

**Get More Out of USPS Tracking:**
     USPS Tracking Plus®

**Delivered**
**Delivered, In/At Mailbox**
MINNEAPOLIS, MN 55436
April 5, 2023, 11:13 am

**See All Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

See More ⌄

Tracking Number:                                                                    Remove ✕

## 70200090000008903880

Copy       Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item has been delivered to an agent for final delivery in LOS ANGELES, CA 90028 on April 5, 2023 at 4:02 pm.

Get More Out of USPS Tracking:
  USPS Tracking Plus®

**Delivered to Agent**
**Delivered to Agent for Final Delivery**
LOS ANGELES, CA 90028
April 5, 2023, 4:02 pm

**See All Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

See More ⌄

Tracking Number:                                                                    Remove ✕

## 9590940275212098964030

Copy       Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was delivered in or at the mailbox at 5:33 pm on April 10, 2023 in MINNEAPOLIS, MN 55436.

Get More Out of USPS Tracking:
  USPS Tracking Plus®

**Delivered**
**Delivered, In/At Mailbox**
MINNEAPOLIS, MN 55436
April 10, 2023, 5:33 pm

**See All Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

See More ⌄

Tracking Number:                                                                    Remove ✕

## 70200090000008903897

Copy       Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was picked up at a postal facility at 8:34 am on March 30, 2023 in MOUNTAIN VIEW, CA 94041.

Get More Out of USPS Tracking:

USPS Tracking Plus®

**Delivered**
**Delivered, Individual Picked Up at Postal Facility**
MOUNTAIN VIEW, CA 94041
March 30, 2023, 8:34 am

**See All Tracking History**

**What Do USPS Tracking Statuses Mean?** **(https://faq.usps.com/s/article/Where-is-my-package)**

See More ∨

Tracking Number:                                                                                                Remove ✕

## 9590940275212098973667

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was delivered in or at the mailbox at 10:02 am on April 4, 2023 in MINNEAPOLIS, MN 55436.

**Get More Out of USPS Tracking:**
USPS Tracking Plus®

**Delivered**
**Delivered, In/At Mailbox**
MINNEAPOLIS, MN 55436
April 4, 2023, 10:02 am

**See All Tracking History**

**What Do USPS Tracking Statuses Mean?** **(https://faq.usps.com/s/article/Where-is-my-package)**

See More ∨

Tracking Number:                                                                                                Remove ✕

## 70200090000008903958

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was picked up at the post office at 8:14 am on March 30, 2023 in LOS GATOS, CA 95032.

**Get More Out of USPS Tracking:**
USPS Tracking Plus®

**Delivered**
**Delivered, Individual Picked Up at Post Office**
LOS GATOS, CA 95032
March 30, 2023, 8:14 am

**See All Tracking History**

**What Do USPS Tracking Statuses Mean?** **(https://faq.usps.com/s/article/Where-is-my-package)**

See More ∨

Tracking Number:                                                                                                Remove ✕

## 9590940275212098962562

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was delivered in or at the mailbox at 10:02 am on April 4, 2023 in MINNEAPOLIS, MN 55436.

Get More Out of USPS Tracking:

USPS Tracking Plus®

**Delivered**
**Delivered, In/At Mailbox**
MINNEAPOLIS, MN 55436
April 4, 2023, 10:02 am

See All Tracking History

What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)

See More ⌄

Tracking Number:                                                                          Remove ✕

**70200090000008903941**

Copy      Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was picked up at the post office at 8:14 am on March 30, 2023 in LOS GATOS, CA 95032.

Get More Out of USPS Tracking:

USPS Tracking Plus®

**Delivered**
**Delivered, Individual Picked Up at Post Office**
LOS GATOS, CA 95032
March 30, 2023, 8:14 am

See All Tracking History

What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)

See More ⌄

Tracking Number:                                                                          Remove ✕

**9590940275212098962555**

Copy      Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was delivered in or at the mailbox at 10:02 am on April 4, 2023 in MINNEAPOLIS, MN 55436.

Get More Out of USPS Tracking:

USPS Tracking Plus®

**Delivered**
**Delivered, In/At Mailbox**
MINNEAPOLIS, MN 55436
April 4, 2023, 10:02 am

See All Tracking History

What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)

See More ⌄

Tracking Number:                                                                          Remove ✕

**70200090000008903927**

Copy      Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was picked up at the post office at 8:14 am on March 30, 2023 in LOS GATOS, CA 95032.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

**Delivered**
**Delivered, Individual Picked Up at Post Office**
LOS GATOS, CA 95032
March 30, 2023, 8:14 am

**See All Tracking History**

What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)

See More ⌄

**Tracking Number:**                                                                Remove ✕

## 9590940275212098962531

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was delivered in or at the mailbox at 10:02 am on April 4, 2023 in MINNEAPOLIS, MN 55436.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

**Delivered**
**Delivered, In/At Mailbox**
MINNEAPOLIS, MN 55436
April 4, 2023, 10:02 am

**See All Tracking History**

What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)

See More ⌄

**Tracking Number:**                                                                Remove ✕

## 70200090000008903903

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was picked up at the post office at 8:14 am on March 30, 2023 in LOS GATOS, CA 95032.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

**Delivered**
**Delivered, Individual Picked Up at Post Office**
LOS GATOS, CA 95032
March 30, 2023, 8:14 am

**See All Tracking History**

What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)

See More ⌄

**Tracking Number:**                                                                Remove ✕

## 9590940275212098973643

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

## Latest Update

Your item was delivered in or at the mailbox at 10:02 am on April 4, 2023 in MINNEAPOLIS, MN 55436.

**Get More Out of USPS Tracking:**

    USPS Tracking Plus®

**Delivered**
**Delivered, In/At Mailbox**
MINNEAPOLIS, MN 55436
April 4, 2023, 10:02 am

See All Tracking History

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

See More ⌄

**Tracking Number:**                                                                 Remove ✕
**70200090000008903873**

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

## Latest Update

Your item was picked up at the post office at 8:14 am on March 30, 2023 in LOS GATOS, CA 95032.

**Get More Out of USPS Tracking:**

    USPS Tracking Plus®

**Delivered**
**Delivered, Individual Picked Up at Post Office**
LOS GATOS, CA 95032
March 30, 2023, 8:14 am

See All Tracking History

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

See More ⌄

**Tracking Number:**                                                                 Remove ✕
**95909402752120989073650**

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

## Latest Update

Your item was delivered in or at the mailbox at 10:02 am on April 4, 2023 in MINNEAPOLIS, MN 55436.

**Get More Out of USPS Tracking:**

    USPS Tracking Plus®

**Delivered**
**Delivered, In/At Mailbox**
MINNEAPOLIS, MN 55436
April 4, 2023, 10:02 am

See All Tracking History

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

See More ⌄

**Tracking Number:**                                                                 Remove ✕
**70200090000008903965**

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was picked up at the post office at 8:14 am on March 30, 2023 in LOS GATOS, CA 95032.

---

**Get More Out of USPS Tracking:**
   USPS Tracking Plus®

**Delivered**
**Delivered, Individual Picked Up at Post Office**
LOS GATOS, CA 95032
March 30, 2023, 8:14 am

See All Tracking History

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

See More ⌄

**Tracking Number:**                                                                    Remove ✕

**9590940275212098974237**

Copy        Add to Informed Delivery (https://informeddelivery.usps.com/)

**Latest Update**

Your item was delivered in or at the mailbox at 10:02 am on April 4, 2023 in MINNEAPOLIS, MN 55436.

---

**Get More Out of USPS Tracking:**
   USPS Tracking Plus®

**Delivered**
**Delivered, In/At Mailbox**
MINNEAPOLIS, MN 55436
April 4, 2023, 10:02 am

See All Tracking History

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

See More ⌄

Track Another Package

Enter tracking or barcode numbers

# Need More Help?

Contact USPS Tracking support for further assistance.

FAQs

PTO/AIA/9
Approved for use through 11/30/2020. OMB 0
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF CO
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB contro

EXHIBIT

Wa

## STATEMENT UNDER 37 CFR 3.73(c)

Applicant/Patent Owner: **Netflix, Inc.**

Application No./Patent No.: **17/709,126**    Filed/Issue Date: **March 30, 2022**

Titled: **DISPLAYING A SCENE TO A SUBJECT WHILE CAPTURING THE SUBJECT'S ACTING PERFORMANCE USING MULTIPLE SENSORS**

**Netflix, Inc.** , a **corporation**

(Name of Assignee)    (Type of Assignee, e.g., corporation, partnership, university, government agency, etc.)

states that, for the patent application/patent identified above, it is (choose **one** of options 1, 2, 3 or 4 below):

1. [✓] The assignee of the entire right, title, and interest.

2. [ ] An assignee of less than the entire right, title, and interest (check applicable box):

   [ ] The extent (by percentage) of its ownership interest is _____%. Additional Statement(s) by the owners holding the balance of the interest <u>must be submitted</u> to account for 100% of the ownership interest.

   [ ] There are unspecified percentages of ownership. The other parties, including inventors, who together own the entire right, title and interest are:

   |  |
   |  |

   Additional Statement(s) by the owner(s) holding the balance of the interest <u>must be submitted</u> to account for the entire right, title, and interest.

3. [ ] The assignee of an undivided interest in the entirety (a complete assignment from one of the joint inventors was made). The other parties, including inventors, who together own the entire right, title, and interest are:

   |  |
   |  |

   Additional Statement(s) by the owner(s) holding the balance of the interest <u>must be submitted</u> to account for the entire right, title, and interest.

4. [ ] The recipient, via a court proceeding or the like (*e.g.*, bankruptcy, probate), of an undivided interest in the entirety (a complete transfer of ownership interest was made). The certified document(s) showing the transfer is attached.

The interest identified in option 1, 2 or 3 above (not option 4) is evidenced by either (choose **one** of options A or B below):

A. [ ] An assignment from the inventor(s) of the patent application/patent identified above. The assignment was recorded in the United States Patent and Trademark Office at Reel _____, Frame _____, or for which a copy thereof is attached.

B. [✓] A chain of title from the inventor(s), of the patent application/patent identified above, to the current assignee as follows:

   1. From: **Stephan Trojansky**    To: **Eyeline Studios GMBH**

   The document was recorded in the United States Patent and Trademark Office at
   Reel **059668** , Frame **0755** , or for which a copy thereof is attached.

   2. From: **Eyeline Studios GMBH**    To: **Netflix, Inc.**

   The document was recorded in the United States Patent and Trademark Office at
   Reel **062197** , Frame **0127** , or for which a copy thereof is attached.

[Page 1 of 2]

This collection of information is required by 37 CFR 3.73(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/AIA/96 (08-12)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(c)

3. From: _____   To: _____

    The document was recorded in the United States Patent and Trademark Office at

    Reel _____, Frame _____, or for which a copy thereof is attached.

4. From: _____   To: _____

    The document was recorded in the United States Patent and Trademark Office at

    Reel _____, Frame _____, or for which a copy thereof is attached.

5. From: _____   To: _____

    The document was recorded in the United States Patent and Trademark Office at

    Reel _____, Frame _____, or for which a copy thereof is attached.

6. From: _____   To: _____

    The document was recorded in the United States Patent and Trademark Office at

    Reel _____, Frame _____, or for which a copy thereof is attached.

☐   Additional documents in the chain of title are listed on a supplemental sheet(s).

☑   As required by 37 CFR 3.73(c)(1)(i), the documentary evidence of the chain of title from the original owner to the
    assignee was, or concurrently is being, submitted for recordation pursuant to 37 CFR 3.11.

    [NOTE: A separate copy (i.e., a true copy of the original assignment document(s)) must be submitted to Assignment
    Division in accordance with 37 CFR Part 3, to record the assignment in the records of the USPTO. See MPEP 302.08]

The undersigned (whose title is supplied below) is authorized to act on behalf of the assignee.

/Greg Lunt/                                      27 March 2023
_____          _____
Signature                                        Date

Greg Lunt                                        57354
_____          _____
Printed or Typed Name                            Title or Registration Number

[Page 2 of 2]


FEDERAL   BUREAU OFINVESTIGATION


EXHIBIT
Xa

# Victim Information

| | |
|---|---|
| Name: | Matthew Guertin |
| Are you reporting on behalf of a business? | |
| Business Name: | |
| Is the incident currently impacting business operations? | |
| Age: | 40-49 |
| Address: | 5832 Lincoln Dr Suite 222 |
| Address (continued): | |
| Suite/Apt./Mail Stop: | |
| City: | Edina |
| County: | Hennepin |
| Country: | United States of America |
| State: | Minnesota |
| Zip Code/Route: | 55436 |
| Phone Number: | ███████████ |
| Email Address: | ███████████ |
| Business IT POC, if applicable: Other Business POC, if applicable: | |

# Description of Incident

Provide a description of the incident and how you were victimized. Provide information not captured elsewhere in this complaint form.

Hello,

I emailed the CEO of Mark Roberts Motion Control last fall to get information about their robotic cameras after attending a local workshop in Minneapolis which showcased their 'Bolt Cinecam' robotic camera. My reason for emailing him was in regards to what at the time was my pending patent application but which has since been granted - US Patent 11,577,177

There was a 3 week span of time (approx) between my initial email and when I finally got a direct reply from Assaff Rawner (CEO of MrMoCo.com) at which point he pointed me to www.PhotoRobot.com/robots/catwalk as an example of something that already existed and was similar to my patent.

Long story short ALL of it is entirely generated by AI - This includes all of their youtube videos (3 of which are listed as prior art on my patent - 1 of which they already deleted - but I have saved) as well as all of their false history they fraudulently added to the internet archive (which I have tons of PDF screenshots including a 'real-time' capture of the fraudulent activity which consists of two pdf

screen captures only five minutes apart in which I caught the total archive count going from 45 to 47 and you can clearly see additional date bars being added at the end of 2021 (fraudulent backdating to create a false history)

This fraud spans multiple websites - all of which are being used as references for one another to create a false history that makes it appear they were already practicing that which is contained within my patent for the purpose of stealing it ultimately.

Mark Roberts Motion Control is partnered with Microsoft and Dimension Studios. I would guess all of the AI generated images and videos are Microsoft's handy work. By adjusting the color curves for their website images, PDF product brochures, and all of their various videos I have come up with a method that is able to clearly demonstrate beyond any reasonable doubt that all of it is AI generated - this would include videos which were supposedly uploaded to YouTube in 2012...which presents an obvious issue - As in either AI has been around a lot longer than we've been lead to believe or YouTube as well as Vimeo and other sites (including the internet archive) are allowing the fraudsters to have free reign as far as adding fraudulent backdated content for the purpose of establishing a false history. I have been documenting all of this with multiple attorneys so there is plenty of additional supporting evidence to back up all of my claims.

One other thing worth mentioning is that they forgot to flatten and simplify all of their AI generated PDF catalogs and brochures - meaning all of the layers are exposed and editable if you open it up in Adobe Illustrator. Simply zooming in though to pretty much any of the products or images in their PDF's will make it very obvious that all of it was generated by AI.

My reason for finally deciding to report this stuff 'officially' after some months is that I just established the 'color curve' method which I was able to use to process all of their website images as well as their YouTube videos (I have thousands of full html webpage saves downloaded from the internet archive spanning 201a-current and multiple websites...ALL AI GENERATED FRAUD). The companies, the products, the websites, etc I believe are an entire AI fabrication even though I am sure they have enough know-how and resources to make them appear real from the outside. None of that should matter though since I was able to catch everything so early. I should also mention that I just downloaded the 2 out of 3 videos listed on my patent still on their youtube page a couple days ago and can confirm all of the artifacts you see in the PDF's and videos I analyzed were still present.

Here is a link which proves all of my claims (there is plenty more supporting documents) -

████████████████████████████████████████████

Here is a link directly to their YouTube videos I analyzed which shows AI generation clear as day -

████████████████████████████████████████████

What I want is simple -

I do not want my first ever patent stolen by a giant corporation (or anyone for that matter..) by way of fraud.

I have dedicated the last two years+ solely to my patent, as well as engineering, designing, and fabricating a working prototype which I am about to release my first demo video for and which will also serve as the 'official' launch of my company InfiniSet, Inc.

In addition to the last two  years I have also dedicated a huge portion of  my life learning and gaining as much knowledge as possible which is the reason I am able to  not only come up with a very valuable idea but also able to design, engineer, and fabricate the exact design you see in my patent all on my own without any college degrees or formal education. I learned everything by busting my ass and I REFUSE TO LET ANYONE STEAL WHAT I HAVE WORKED SO HARD TO BRING TO FRUITION - this would include a giant corporation like Microsoft running rampant with their new AI toys (while apparently being given free reign by YouTube, Vimeo, Internet Archive, etc to post whatever backdated and fraudulent internet history they feel like having their AI generate)

Here is my personal portfolio website which very clearly shows how much hard work I have put fourth prior to arriving at this current point in time
www.MattGuertin.com

I want all of these fraudulent, AI generated websites/ companies/ products to be 'officially' recognized as the fraud they are so that I can continue forward with my venture without having to worry about Microsoft/ Mark Roberts Motion Control or any other giant corporation coming after me and trying to invalidate my patent using their fraudulently produced internet history.

If they want that which I have patented so badly they can pay me for it. I'm pretty sure that's how it's supposed to work....I'm also pretty sure they have plenty of financial resources to be able to do so which just makes their attempted theft of my intellectual property that much more pathetic.

That is all.

Thank you for your time,

Matthew Guertin
InfiniSet, Inc.

# Information  About The Subject(s)  Who Victimized You

| | |
|---|---|
| Name: | Assaff  Rawner |
| Business Name: | Mark Roberts Motion Control |
| Address: | |
| Address (continued): | |
| Suite/Apt./Mail Stop: | |
| City: | |
| Country: | United  Kingdom |
| State: | |
| Zip Code/Route: | |
| Phone Number: | 1441342838007 |
| Email Address: | Assaff@MrMoCo.com |
| Website: | https://www.MrMoCo.com |
| IP Address: | |

| | |
|---|---|
| Name: | Bill Gates |
| Business Name: | Microsoft |
| Address: | |
| Address (continued): | |
| Suite/Apt./Mail   Stop: | |
| City: | Seattle |
| Country: | United States of America |
| State: | Washington |
| Zip Code/Route: | |
| Phone Number: | |
| Email Address: | |
| Website: | https://www.microsoft.com |
| IP Address: | |

## Other Information

---

If an email was used in this incident, please provide a copy of the entire email including full email headers.

All emails and headers are included in the files I shared which are here -

██████████████████████████████████████

Are there any other witnesses or victims to this incident?

Yes.
I have been documenting all of this since the original email with various attorneys and there is a very long digital 'paper trail' which includes emails, digital files, etc.   I have thousands of full html pages downloaded directly from the Internet Archive spanning multiple websites - All of which are being used as supporting references to one another for the purpose of establishing a false history.

All digital evidence I collected has been distributed to multiple third parties for safe keeping including disks which have remained untouched since December of 2022

If you have reported this incident to other law enforcement or government agencies, please provide the name, phone number, email, date reported, report number, etc.

<mark>Minnetonka, MN Police Department
Case # 23-000151</mark>

<mark>Prior to filing the police report I approached the FBI at their building located in Brooklyn Center, MN</mark> but was hung up on after telling the person who answered the phone that it involved wire fraud to which he replied "Do you have proof of someone wiring money" to which I replied I did not. Apparently the person who answered doesn't know the definition of wire fraud.

<mark>I also spoke to a Secret Service Agent in Chicago for 24 minutes the Sunday before Martin Luther King Jr Day after calling the Minneapolis field office and being bounced to Chicago. He agreed that I was 100% correct in my assertions about Wire Fraud and Conspiracy based on what I told him.</mark> I also gave him the Minnetonka PD case# but never heard anything back or had any follow up.

There is a possibility however that I wasn't even talking to an actual Secret Service agent as I started having all sorts of weird things happen with my phone as well as computers as the culprits

pulling off  the fraud were very aware that I was downloading and collecting tons of stuff and so
they started hacking into my devices and very well couldv'e been spoofing / intercepting my calls
by way of a Stingray or other similar advanced cellular interception devices.

Fun times

Check here if this an update to a previously filed complaint: ☐

## Who Filed the Complaint

Were you the victim in the incident described above? Yes
Name:
Business Name:
Phone Number:
Email Address:

## Digital Signature

By digitally signing this document, I affirm that the information I provided is true and accurate to the
best of my knowledge. I understand that providing false information could make me subject to fine,
imprisonment, or both. (Title 18, U.S.Code, Section 1001)

Digital Signature: Matthew D Guertin
Thank you. Your  complaint  was  submitted to  the IC3. Please save or print  a copy  of  your  complaint
before closing this window.      *This is the only time you will have to make a copy of your complaint.*

FAQs      Disclaimer      Privacy Notice      About IC3



FEDERAL TRADE COMMISSION
ReportFraud.ftc.gov

## Consumer Report To The FTC

FTC Report Number

159606444

**The FTC cannot resolve individual complaints, but we can provide information about next steps to take.** We share your report with local, state, federal,  and foreign law enforcement   partners.  Your report might   be used to investigate cases in a legal      proceeding. Please read our Privacy Policy to learn how we protect your personal information, and when we share it outside the FTC.

### About you

**Name:** Matthew Guertin

**Address:** 5832 Lincoln Dr Suite 222

**City:** Edina   **State:** Minnesota   **Zip Code:** 55436

**Country:** USA

**Email:** ▇▇▇▇▇▇▇

**Phone:** ▇▇▇▇▇▇



### What happened

I emailed the CEO of Mark Roberts Motion Control last fall to get information about their robotic cameras after attending a local workshop in Minneapolis which showcased their 'Bolt Cinecam' robotic camera. My reason for emailing him was in regards to what at the time was my pending patent application but which has since been granted - US Patent 11,577,177 There was a 3 week span of time (approx) between my initial email and when I finally got a direct reply from Assaff Rawner (CEO of MrMoCo.com) at which point he pointed me to www.PhotoRobot.com/robots/catwalk as an example of something that already existed and was similar to my patent. Long story short ALL of it is entirely generated by AI - This includes all of their youtube videos (3 of which are listed as prior art on my patent - 1 of which they already deleted but I have saved) as well as all of their false history they fraudulently added to the internet archive (which I have tons of PDF screenshots including a 'real-time'capture of the fraudulent activity which consists of two pdf screen captures only five minutes apart in which I caught the total archive count going from 45 to 47 and you can clearly see additional date bars being added at the end of 2021 (fraudulent backdating to create a false history) This fraud spans multiple websites - all of which are being used as references for one another to create a false history that makes it appear they were already practicing that which is contained within my patent for the purpose of stealing it ultimately. Mark Roberts Motion Control is partnered with Microsoft and Dimension Studios. I would guess all of the AI generated images and videos are Microsofts handy work. By adjusting the color curves for their website images, PDF product brochures, and all of their various videos I have come up with a method that is able to clearly demonstrate beyond any reasonable doubt that all of it is AI generated - this would include videos which were supposedly uploaded to YouTube in 2012...which presents an obvious issue - As in either AI has been around a lot longer than we've been lead to believe or YouTube as well as Vimeo and other sites (including the internet archive) are allowing the fraudsters to have free reign as far as adding fraudulent backdated content for the purpose of establishing a false history. I have been documenting all of this with multiple attorneys so there is plenty of additional supporting evidence to back up all of my claims My reason for finally deciding to report this stuff 'officially' though is that I just established the color curve method which I was able to use to process all of their website images as well as their YouTube videos . The results make it 100% clear that ALL of it is AI generated and it is all fraud. The companies, the products, the websites, etc I believe are an entire AI fabrication even though I am sure they have enough know how and resources to make them appear real from the outside. None of that matters though since I was able to catch everything so early. I should also mention that I just downloaded the 2 out of 3 videos still on their youtube page a couple days ago and can confirm all of the artifacts confirming AI still exisit. Here is a link which proves everything I am saying - ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Here is a link directly to their YouTube videos I analyzed which shows AI generation clear as day - ▇▇▇▇▇▇▇▇▇▇▇

### How it started

| Date fraud began: | Amount I was asked for: | Amount I Paid: |
|---|---|---|
| 10/31/2022 | | |
| **Payment Used:** | | **How I was contacted:** |
| | | Email |

## Details about the company, business, or individual

| Company/Person | | |
| --- | --- | --- |
| **Name:**<br>Mark Roberts Motion Control | | |
| **Address Line 1:** | **Address Line 2:** | **City:** |
| **State:** | **Zip Code:** | **Country:**<br>GBR |
| **Email Address:**<br>Assaff@MrMoCo.com | | |
| **Phone:**<br>441342838007 | | |
| **Website:**<br>www.MrMoCo.com | | |
| **Name of Person You Dealt With:**<br>Assaff Rawner | | |

## Your Next Steps

If you think you clicked a link or opened an attachment that downloaded harmful software:

- Update your computer's security software.

- Then run a scan and delete anything it identifies as a problem.

- Learn more about how to get fewer spam emails at ftc.gov/spam.

General Advice:

- **You can find tips and learn more about bad business practices and scams at consumer.ftc.gov.**

- **If you're concerned that someone might misuse your information, like your Social Security, credit card, or bank account number, go to identitytheft.gov for specific steps you can take.**

## What Happens Next



- Your report will  help us in our efforts to protect **all** consumers. Thank You!

- We can't resolve your individual report, but we use reports to investigate and bring cases against fraud, scams, and bad business practices.

- We share your report with our law enforcement partners who also use reports to investigate and bring cases against fraud, scams, and bad business practices.

- We use reports to spot trends, educate the public, and provide data about    what is happening in your community. You can check out what is going on in your state and metro area by visiting    **ftc.gov/exploredata.**

- Investigations and cases do take time, but when we bring cases, we try to get money back for people. Check out **ftc.gov/refunds** to see recent FTC cases that resulted in refunds.

Trademark  Electronic Application  System

**You will not be able to use TEASi**

**This Page Requires JavaScript.**

TEASi web pages require the enablement of JavaScript in your web browser. To enable JavaScript, please follow the steps pro—



PTO-2131
Approved for use through 04/30/2022. OMB  0651-0051
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB  control number

# APPLICATION  FOR  INTERNATIONAL  REGISTRATION

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **FILING DATE** | 06/01/2023 |
| **MARK SECTION** | |
| **MARK IMAGE** | 97699805.jpg |
| **DESCRIPTION OF MARK** | The mark consists of the stylized text "INFINISET"  with a stylized  square  shape  to  the  left of the text, the left side of the  square  being a right-facing triangle. |
| **VERBAL ELEMENT(S)** | INFINISET |
| **OWNER SECTION** | |
| **NAME** | Matthew Guertin |
| **STREET** | XXXXXXXXXXXXXX |
| **CITY** | Plymouth |
| **STATE** | Minnesota |
| **COUNTRY/REGION/JURISDICTION** | United States |
| **ZIP/POSTAL CODE** | 55442 |
| **EMAIL** | ustrademarks@wck.com |
| **LEGAL ENTITY TYPE** | INDIVIDUAL |
| **COUNTRY/REGION/JURISDICTION OF CITIZENSHIP** | United States |
| **ENTITLEMENT SECTION** | |
| **APPLICANT IS U.S. NATIONAL** | |
| **COUNTRY** | YES |
| **REPRESENTATIVE SECTION** | United States |
| **NAME** | Amanda  M. Prose |
| **FIRM** | WESTMAN, CHAMPLIN & KOEHLER, P.A. |
| **STREET** | 121  South Eighth Street, Suite 1100 |
| **CITY** | Minneapolis |
| **STATE** | Minnesota |
| **COUNTRY /REGION/ JURISDICTION** | United States |
| **ZIP/POSTAL CODE** | 55402 |
| **PHONE** | 6123343222 |
| **FAX** | 6123343312 |
| **EMAIL** | aprose@wck.com |
| **BASE APPLICATION/REGISTRATION** | |
| **APPLICATION  NUMBER** | 97699805 |

https://tsdr.uspto.gov/#caseNumber=97699805&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch

| Input Field | Entered |
|---|---|
| **APPLICATION FILING DATE** | 12/01/2022 |
| **PRIORITY APPLICATION** | |
| **COUNTRY/REGION/JURISDICTION** | United States |
| **APPLICATION NUMBER** | **97699805** |
| **APPLICATION FILING DATE** | **12/01/2022** |
| **CLASS CODE** | **009** |
| **CLASS DESCRIPTION** | Cinematographic system for creating or producing video content comprised of cinematographic machines and apparatus in the nature of a rotatable endless track enabling movement along two axes and recorded computer software for syncing the movement of the endless track and video capture with one or more cameras for creating the illusion of movement; system for use in cinematographic or live event staging, namely, cinematographic system comprised of rotatable endless track enabling movement along two axes, video screens; downloadable green screen and imaging software for digital compositing; downloadable computer software for use in video and photo editing and sharing; photographic, cinematographic apparatus, namely, an endless track enabling movement of a camera user along two different axes; apparatus for recording, transmission or reproduction of sound, video, or images; cinematographic machines and apparatus in the nature of rotatable treadmills, namely, a treadmill rotatable about an axis different than the axis of travel of the endless track of the treadmill for purposes of creating the illusion of continuous or dynamic movement of a user on the endless track |
| **CLASS CODE** | 042 |
| **CLASS DESCRIPTION** | Providing online non-downloadable green screen and imaging software for digital compositing; providing online non-downloadable computer software for use in video and photo editing and sharing |

| GOODS AND/OR SERVICES SECTION | |
|---|---|
| Note: If no limitation exists for a designated contracting party, then the extension for that party is for all list█ ███████ and/or services. If a class has been excluded, no information relating to that class will exist. | |
| **CLASS** | 009 |
| **OVERALL DESCRIPTION** | Cinematographic system for creating or producing video content comprised of cinematographic machines and apparatus in the nature of a rotatable endless track enabling movement along two axes and recorded computer software for syncing the movement of the endless track and video capture with one or more cameras for creating the illusion of movement; system for use in cinematographic or live event staging, namely, cinematographic system comprised of rotatable endless track enabling movement along two axes, video screens; downloadable green screen and imaging software for digital compositing; downloadable computer software for use in video and photo editing and sharing; photographic, cinematographic apparatus, namely, an endless track enabling movement of a camera user along two different axes; apparatus for recording, transmission or reproduction of sound, video, or images; cinematographic machines and apparatus in the nature of rotatable treadmills, namely, a treadmill rotatable about an axis different than the axis of travel of the endless track of the treadmill for purposes of creating the illusion of continuous or dynamic movement of a user on the endless track |
| **CLASS** | 042 |
| **OVERALL DESCRIPTION** | Providing online non-downloadable green screen and imaging software for digital compositing; providing online |

| Input Field | Entered |
|---|---|
|  | non-downloadable computer software for use in video and photo editing and sharing |
| DESIGNATED CONTRACTING PARTY(IES) |  |
| 1ST COUNTRY/JURISDICTION |  |
| 2ND COUNTRY/JURISDICTION | Canada China |
| 3RD COUNTRY/JURISDICTION | European Union French |
| SECOND LANGUAGE | Japan |
| 4TH COUNTRY/JURISDICTION | Korea, Republic of United |
| 5TH COUNTRY/JURISDICTION | United Kingdom |
| 6TH COUNTRY/JURISDICTION | Vietnam |
| INTENT TO USE |  |
| 7TH COUNTRY/JURISDICTION |  |
| TOTAL DESIGNATED CONTRACTING PARTY(IES) |  |
| FEE AMOUNT | 3922.00 Swiss Francs |
| PAYMENT INFORMATION | 4320.33 US Dollars |
| PAYER'S NAME | Matthew Guertin |
| PAYMENT DATE | 06/01/2023 |

EXHIBIT
**Ab**

**WIPO I MADRID**
The International
Trademark System

## CERTIFICATE OF REGISTRATION

The International Bureau of the World Intellectual Property Organization (WIPO) certifies that the indications appearing in the present certificate conform to the recording made in the International Register of Marks maintained under the Madrid Agreement and Protocol.

| | |
|---|---|
| *Reproduction of the mark* |  |
| *Registration number* | **1 739 675** |
| *Registration date* | **June 1, 2023** |
| *Date next payment due* | **June 1, 2033** |
| *Name and address of holder* | Matthew Guertin |
| | 4385 Trenton Ln N 202, Plymouth MN 55442 (United States of America) |
| *Legal nature of the holder (legal entity) and place of organization* | INDIVIDUAL,  United States |
| *Name and address of the representative* | Amanda M. Prose, WESTMAN, CHAMPLIN & KOEHLER, P.A., 121 South Eighth Street, Suite 1100, Minneapolis MN 55402 (United States of America) |
| *Classification of figurative elements* | 26.3; 26.4; 27.5 |
| *Certified description of the mark* | The mark consists of the stylized text "INFINISET" with a stylized square shape to the left of the text, the left side of the square being a right-facing triangle. |

*List of goods and services NCL(12-2023)*

9  Cinematographic system for creating or producing video content comprised of cinematographic machines and apparatus in the nature of a rotatable endless track enabling movement along two axes and recorded computer software for syncing the movement of the endless track and video capture with one or more cameras for creating the illusion of movement; system for use in cinematographic or live event staging, namely, cinematographic system comprised of rotatable endless track enabling movement along two axes, video screens; downloadable green screen and imaging software for digital compositing; downloadable computer software for use in video and photo editing and sharing; photographic, cinematographic apparatus, namely, an endless track enabling movement of a camera user along two different axes; apparatus for recording, transmission  or reproduction  of sound, video, or images; cinematographic machines and apparatus in the nature of rotatable  treadmills,  namely, a treadmill rotatable about an axis different than the axis of travel of the endless track of the treadmill for purposes of creating the illusion of continuous or dynamic movement of a user on the endless track.

42  Providing  online non-downloadable green screen  and imaging software for digital compositing; providing online non downloadable computer software for use in video and photo editing and sharing.

*Basic application*  United States of America, December 1, 2022, 97699805

WORLD
**INTELLECTUAL PROPERTY**
ORGANIZATION

34.chemin des Colombettes
1211 Geneva 2D, Switzerland

www.wipo.int

## CERTIFICATE      OF REGISTRATION

| | |
|---|---|
| *Data relating to priority under the Paris Convention* | United States of America, December 1, 2022, 97699805 |
| *Designations under the Madrid Protocol* | Canada, China, European Union, Japan, Republic of Korea, United Kingdom, Viet Nam |
| *Declaration of intention to use the mark* | United Kingdom |
| *Date of notification* | July 13, 2023 |
| *Language of the international application* | English |

Hongbing Chen
Director, Madrid Operations Division
Madrid Registry
Brands and Designs Sector

Geneva, July 13, 2023

# July 13th, 2023  Finding of Incompetency Order - <u>METADATA ANALYSIS</u>
## Page 1 of 2     27-CR-23-1886

<u>EXHIBIT</u>
**Bb**

STATE OF MINNESOTA
COUNTY OF HENNEPIN

27-CR-23-1886

DISTRICT COURT
FOURTH JUDICIAL DISTRICT
PROBATE/MENTAL HEALTH DIVISION

State of Minnesota,
           Plaintiff,
v.

Matthew David Guertin,
           Defendant.

Filed in District Court
State of Minnesota
7/13/2023 1:24 PM

Court File No. 27-CR-23-1886

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
ORDER REGARDING
COMPETENCY TO PROCEED**

The greater weight of the evidence establishes that Mr. Guertin is incompetent to proceed.

**ORDER**

Defendant, Matthew David Guertin, is currently **INCOMPETENT** to proceed.

Order Recommended By:

*George Dowe*

Borer, George
Jul 13 2023 11:00 AM

_____

Referee of District Court

**BY THE COURT:**

*Michael K. Browne*

Browne, Michael
Jul 13 2023 12:13 PM

_____

Judge of District Court

```
ExifTool Version Number        : 12.40
File Name                      : MCRO_27-CR-23-1886_Finding-of-Incompetency-and-Order_2023-07-13_20240313210010.pdf
Directory                      : .
File Size                      : 499 KiB
File Modification Date/Time     : 2024:03:13 21:00:14-05:00
File Access Date/Time          : 2024:03:13 23:57:05-05:00
File Inode Change Date/Time     : 2024:03:13 23:47:08-05:00
File Permissions               : -rw-rw-r--
File Type                      : PDF
File Type Extension            : pdf
MIME Type                      : application/pdf
PDF Version                    : 1.6
Linearized                     : No
Author                         : Danielle C. Mercurio
Company                        : Hewlett-Packard Company
Content Type Id                : 0x0101007059A136461CEB43877A5C39FE5E524A0600427DD0490E6BDB42A8C0B1D5DBB53E2
Create Date                    : 2023:07:13 10:58:23-05:00
Modify Date                    : 2024:03:13 21:00:10-05:00
Source Modified                : D:20230713155733
Subject                        :
Language                       : EN-US
Tagged PDF                     : Yes
XMP Toolkit                    : Adobe XMP Core 5.1.0-jc003
Metadata Date                  : 2023:07:13 14:57:12-05:00
Creator Tool                   : Acrobat PDFMaker 23 for Word
Document ID                    : uuid:af03a228-aeb1-4472-bcad-86c4b1c16418
Instance ID                    : uuid:2b6de574-6a50-4c21-b1c2-48ae7df3bdc7
Format                         : application/pdf
Producer                       : Adobe PDF Library 23.1.175; modified using iText 7.1.16 ©2000-2021 iText Group NV (Minnesota Judicial Branch; licensed version)
Keywords                       :
Title                          : Conservator (All Powers; Unlimited Duration)
Description                    :
Creator                        : Danielle C. Mercurio
Page Layout                    : OneColumn
Page Count                     : 7
Has XFA                        : No
```

# July 13th, 2023  Finding of Incompetency Order - <u>METADATA ANALYSIS</u>
## Page 2 of 2      27-CR-23-1886

## 'Standard' PDF Document Properties -Viewable by anyone



## Metadata Document Properties – Viewable using 'Exiftool'
### Order was signed and recommended by: George Borer

**Author :** Danielle C. Mercurio

**Create Date :** 2023:07:13 10:58:23-05:00

**Metadata Date :** 2023:07:13 14:57:12-05:00

**Producer :** Adobe PDF Library 23.1.175; modified using iText® 7.1.16 ©2000-2021 iText Group NV (Minnesota Judicial Branch; licensed version)

**Title :** Conservator (All Powers; Unlimited Duration)

**Creator :** Danielle C. Mercurio

27-CR-23-1886

Filed in District Court
State of Minnesota
Jul 13, 2023 4:46 pm

Filed in District Court
State of Minnesota
7/13/20231:24 PM

**DISTRICT COURT
FOURTH JUDICIAL
DISTRICT PROBATE/MENTAL
HEALTH DIVISION**

STATE OF MINNESOTA

COUNTY OF HENNEPIN

Court File No. 27-CR-23-1886

State of Minnesota,
              Plaintiff,

v.

Matthew David Guertin,
              Defendant.

**FINDINGS OF
FACT, CONCLUSIONS OF
LAW, AND ORDER
REGARDING COMPETENCY
TO PROCEED**

---

The above-entitled matter came before the district court, on July 7, 2023, for an

evidentiary hearing regarding the Defendant's competency. The hearing took place in person in

Courtroom 456 at the Hennepin County Government Center. Jacqueline Perez, Assistant

Hennepin County Attorney, appeared for the State. The Defendant appeared along with his

attorney, Bruce Rivers, Esq. Jill E. Rogstad, Ph.D., LP, ABPP (Forensic), Senior Clinical

Forensic Psychologist at the Fourth Judicial District Court, testified at the hearing and the court

received into evidence her *Curriculum Vitae* (Exhibit 2), and her Forensic Evaluation Report

dated March 10, 2023 (Exhibit 3). The court also received into evidence a copy of United States

Patent No. 11,577,177 B2 dated February 14, 2023 (Exhibit 1), as well as testimony from the

Defendant.

      The matter was referred for hearing to the undersigned district court referee, who after

considering the evidence, the arguments presented, and all the files and records herein, reports to

the court making the following recommended Findings of Fact, Conclusions of Law and Order:

    1. Defendant is currently **INCOMPETENT** to proceed.

**FINDINGS OF FACT**

      The Defendant, Matthew David Guertin, is charged in MNCIS file 27-CR-23-1886 with

Dangerous Weapons-Reckless Discharge of Firearm Within a Municipality (Felony), Firearm-

1

Filed in District Court
State of Minnesota
7/13/20231:24 PM

27-CR-23-1886

Serial Number-Receive/Possess With No Serial Number (Felony), Firearm-Serial Number Receive/Possess With No Serial Number (Felony), and Firearm-Serial Number-Receive/Possess With No Serial Number (Felony), from an incident alleged to have occurred on January 21, 2023. On January 25, 2023, the Honorable Lyonel Norris, Referee of District Court, found probable cause to believe that the offenses were committed and that Defendant committed them. He then ordered that a Rule 20.01 evaluation be completed. Jill E. Rogstad, Ph.D., LP, ABPP (Forensic), was assigned to complete the evaluation of the Defendant. She filed her report on March 10, 2023, opining that Mr. Guertin is incompetent and provided the following diagnoses:

Unspecified Schizophrenia Spectrum and Other Psychotic Disorder (primary).

Mr. Guertin challenges Dr. Rogstad's conclusion, taking the position that he is competent to proceed in his criminal matters. Mr. Guertin testified that he is currently employed as the Chief Executive Officer (CEO) of a start-up company. His company is listed as the assignee on United States Patent No. 11,577,177 B2, and he, as an individual, is listed as the inventor and the applicant. *Ex. 1.* Mr. Guertin testified that he understands his charges, noting that reckless discharge of a firearm in a municipality is a felony with a maximum of a two-year sentence. He notes that he and his attorney have discussed possible defenses; that he understands the information relayed to him by his attorney; and that there is nothing impeding their relationship. In fact, Mr. Guertin and his attorney, Mr. Rivers, have had a professional relationship for many years. Mr. Guertin also admitted to having been through criminal proceedings in the past. While he acknowledged that he may not understand all the technicalities of criminal proceedings, he indicates that he would ask his attorney if he had questions about the proceedings. Mr. Guertin appeared well-dressed, noting that he wore a tie to court "to be presentable." He presents as intelligent and passionate about his work with technology, including his patent. However, much of his testimony was focused on his

2

27-CR-23-1886

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

technological work and patent, and he required frequent redirection to stay on point. In fact, there were times during his testimony that Mr. Guertin became lost in his answer to a question because of rambling statements about his patent or other unrelated topics. For instance, when discussing the events that led to what he describes as the "most cordial standoff ever" [with the police], Mr. Guertin began discussing his actions in firing his gun in order to attract the police. He did so instead of calling 911 because he could not trust his electronic devices due to his suspicions involving Netflix and Microsoft and protection of his patent. The court appreciates Mr. Guertin's testimony and his participation in the hearing; however, the court has serious concerns regard Mr. Guertin's ability to meaningfully participate in criminal proceedings and understand the process, given his perseveration regarding his patent, and his delusional beliefs about others.

Filed in District Court
State of Minnesota
7/13/20231:24 PM

Dr. Rogstad opines that Mr. Guertin is not competent to proceed in his criminal matters, concluding in her report " ... that Mr. Guertin' s symptoms presently compromise his capacity to understand rationally the proceedings, participate in the defense, and consult rationally with counsel." Ex. 3, p. 9. Dr. Rogstad offers a diagnosis of Unspecified Schizophrenia Spectrum and Other Psychotic Disorder (primary). While Dr. Rogstad testified that this is a legitimate diagnosis, she indicated that additional information would be needed to provide more specificity. Dr. Rogstad notes that Mr. Guertin " ... displays prominent delusional beliefs that include persecutory and referential themes," the content and intensity of which " ... are highly consistent with phenomenology of the persecutory delusions that can accompany psychotic disorders." *Id.* at 7. She further indicates that Mr. Guertin may also suffer from a mood-related disorder, namely mania or hypomania, given"... his frequent digressions and tendency to become distracted by his own thoughts," which"... were consistent with flight of ideas." *Id.* at 8. She also notes that Mr. Guertin was "highly distractible" during the examination, making it " ... difficult to extract meaningful,

3

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

coherent information from him." *Id.* The court observed identical behavior during his testimony on

July 7, 2023, to that exhibited during his examination.  Dr. Rogstad testified  that misuse' of

Adderall could account for some of Mr. Guertin's symptoms, but acknowledged that she was not a

toxicologist or medical doctor and that she did not know how much Adderall Mr. Guertin actually

took. Despite reporting this possibility, Dr. Rogstad opines Mr. Guertin is not competent.

Filed in District Court
State of Minnesota
7/13/20231:24  PM

As a result  of his symptoms, Dr. Rogstad  believes  that Mr. Guertin  is unable  to

participate in the legal process regarding his criminal matters. She credibly testified that while

Mr. Guertin has good factual knowledge, he is unable to apply this knowledge due to delusional

beliefs. For example, when Mr. Guertin spoke about his delusional beliefs, he indicated he would

present evidence supporting these beliefs. In her report, Dr. Rogstad states, " ... while he knows

the  nature  of  his  charges,  Mr.  Guertin's  delusional  beliefs  are  inextricably  linked  to  his

perceptions of his current legal situation, and they obstruct his ability to apply this factual legal

knowledge to discussions of his own case in a rational manner devoid of delusional reasoning."

*Id.* at 9. Specifically, Dr. Rogstad reports that his delusions impacted his perception of relevant

evidence,  that  he  supported  the  choices  he  made"...with  impaired  perceptions  of  objective

reality," and that ultimately, he was unable to participate in "consistently coherent" and "reality-

based" discussions regarding the proceedings. *Id.* Her testimony supports these conclusions when

she states that Mr. Guertin did not understand evidence or the ramifications of making decisions

because of the delusions that emerged as they were discussing legal proceedings. Dr. Rogstad

also testified that Mr. Guertin lacks insight into his mental health, as evidenced by his belief that

he is under duress as opposed to having any impaired perceptions. Finally, Dr. Rogstad testified

that neither her report nor her opinion changed  after observing  Mr. Guertin's  testimony  during

the July 7, 2023 hearing.

1 Mr. Guertin testified that he takes additional dosages of his Adderall medication on long days because the medication is
"fast-acting." He gave one example as working overnight at Coachella  to finish an art piece for the next day.

27-CR-23-1886

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

27-CR-23-1886

The court finds that the greater weight of the evidence establishes that Mr. Guertin is not competent to proceed at this time. He suffers from a mental illness with a diagnosis of Unspecified Schizophrenia Spectrum and Other Psychotic Disorder, as offered by Dr. Rogstad. This may also include a mood component, namely mania or hypomania. This mental illness prevents Mr. Guertin from rationally understanding the legal process and obstructs his ability to prepare a defense or rationally consult with his counsel. Dr. Rogstad persuasively reports that Mr. Guertin's delusions impact his strategical decisions. For instance, he indicated that providing testimony at his trial would serve " ... as a way to 'have the opportunity to make all this stuff [about his perceived persecution] public in the courtroom,'" with similar thoughts regarding evidence he collected. Ex. 3, p. 9. Additionally, the court observed Mr. Guertin testify, during which his answers often wandered towards the themes of technology, patents, and competitors. While it is evident that Mr. Guertin is an intelligent, talented individual with a passion for technology, this does not necessarily make him competent to proceed in his criminal matters. He may understand the factual components of criminal proceedings, but it is evident to the court that he is unable to apply this factual knowledge in his defense. Based upon the totality of evidence before the court including Mr. Guertin's testimony, Dr. Rogstad's testimony, and the exhibits received into evidence, the court concludes that the greater weight of the evidence establishes that Mr. Guertin is not currently competent to proceed and thus, the defense has not met their burden of proof.

Filed in District Court
State of Minnesota
7/13/20231:24 PM

In summary, the court finds the testimony and report of Dr. Rogstad to be the most credible and persuasive evidence regarding Mr. Guertin's competency to proceed. Dr. Rogstad has extensive experience conducting forensic evaluations, including having completed approximately 400 forensic evaluations. *See also* Ex. 2. Her report was thorough and considered several possible factors contributing to Mr. Guertin's symptoms, as well as the significance of those symptoms.

5

27-CR-23-1886

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

The court also notes the similarity in Mr. Guertin's presentation during both his evaluation and at the July 7, 2023 hearing: Mr. Guertin presented as verbose, with responses to questions that included excessive detail. He often brought his responses back to the themes of technology, patents, and competitors; and on occasion, had to ask that questions be repeated due to his extensive responses. Mr. Guertin appears to the court to be unable to separate matters involving his criminal charges from his delusional thoughts regarding his technology. It was evident that he continues to suffer from mental health concerns that impact his ability to fully understand and engage in the proceedings regarding his criminal matters.

Filed in District Court
State of Minnesota
7/13/2023 1:24 PM

## CONCLUSIONS OF LAW

"A defendant has a due process right not to be tried or convicted of a criminal charge if he or she is legally incompetent." *Bonga v. State*, 797 N.W.2d 712, 718 (Minn. 2011). Rule 20.01 of the Minnesota Rules of Criminal Procedure requires that if the court finds by the greater weight of the evidence that the defendant is competent, it must enter an order finding the defendant competent to proceed. Minn. R. Crim. P. Rule 20.01, subd. 5(c). A defendant is incompetent and must not plead, be tried, or be sentenced if the defendant due to mental illness or cognitive impairment lacks ability to: (a) rationally consult with counsel; or (b) understand the proceedings or participate in the defense. *Id.*, subd. 2. The determination of whether a defendant is able to rationally consult with the defense attorney or understand and participate in the proceedings turns on the facts of each particular case. Moreover, fact-finders, including district courts, are not required to accept an expert's testimony or recommendations. *State v. Roberts*, 876 N.W.2d 863, 868 (Minn. 2016). Foremost, throughout the criminal proceedings the trial court must be mindful of its protective duty to ensure that a defendant is competent to proceed. *See State v.*

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

27-CR-23-1886

Bauer, 245 N.W.2d 848, 852 (Minn. 1976) (ruling that the court should have conducted further

inquiry into the important matter of defendant's competency).

The greater weight of the evidence establishes that Mr. Guertin is incompetent to proceed.

## ORDER

Defendant, Matthew David Guertin, is currently **INCOMPETENT** to proceed.

Order Recommended By:                                  **BY THE COURT:**

Borer, George
Jul 13 2023  11:00 AM                                   Browne, Michael
                                                        Jul 13 2023 12:13 PM
_____                                _____
Referee of District Court                              Judge of District Court

Filed in District Court
State of Minnesota
7/13/20231:24  PM

7

State of Minnesota                                                      District Court
Hennepin County                                                Fourth Judicial District
                                                          Probate/Mental Health Division

In the Matter of the Civil Commitment of:     **EXAMINER'S REPORT FOR PROCEEDING FOR**
**Matthew David Guertin**, Respondent          **COMMITMENT AS A PERSON WHO POSES A**
                                               **RISK OF HARM DUE TO A MENTALLY ILLNESS**
                                                          (Minn. Stat. § 253B.02, subd. 13)

**Matthew   David Guertin**
Respondent (DOB: 07/17/1981) Age: 42              Court File Number:  __27-MH-PR-23-815__

---

1. Examiner's Name:  Michael Robertson PsyD, LP
2. Date of Examination: **08/01/2023**
3. Location of Examination:   HCGC video/phone interview:

   | 2:30 MI: Exam 1: 160 162 2355   457186 :-: 3:30: Hon. Judge Gearin   160 121 9402   941267 |

4. Persons present at the examination:

   | Michael Biglow Resp/Def Atty;  Lea De Souza Hosp/Hen Atty; Nadia Garavito |

5. Documents reviewed:

   | Pre-petition Screening Report (PSR), Keith Moore, RN, 7/17/23 |
   | Forensic Evaluation Report, Rule 20.01, Jill Rogstad, PhD., LP, ABPP, 3/10/23 |
   | Findings of facts and Order regarding incompetency to proceed, Hon. M. Browne, 7/13/23 |
   | Copy of a Letter from California Psychiatrist Dr. Shuster, 4/7/23 |
   | Guertin HC Sheriff Forensic Exam Rpt #2 1.21.23 |
   | ==23-815 Guertin - photos of exterior, interior, person 1.21== |
   | Guertin Crystal PD Rpt 08-015226 7.15.08 |
   | Guertin HC Sheriff Forensic Exam Rpt #1 1.21.23 |
   | Email with photos directly from Mr. Guertin on 8/4/2023 around 12Noon. |
   | Records from: Hennepin County Adult Detention Center. |



6. Time spent interviewing Respondent: 45 minutes

7. What was the Respondent's level of cooperation with the examination?

The respondent was cooperative and pleasant. He responded to all the interview questions. He appeared on from tele-video connections from a relatives home but within a room which was appeared to be a multimedia center and included what appeared to be many computer monitors.  He described numerous events with rational and logic explanations but through the exam is speech and was often mildly rapid, mildly pressured and constantly involved Mr. Guertin inserting extraneous detail and unnecessary elaborations as if they might be relevant to answering the questions. Early on the undersigned began to interrupt his descriptions and redirect him to try to not add all the extra unnecessary details. He was unable to easily or quickly get the point of most of the exam questions but with regular prompting and re-direction he was able to provide more relevant information.  Mr. Guertin's extraneous detail and tangents were notable in that they typically and repeatedly includer numerous self-aggrandizing references to his many sophisticated projects and the prestige, notoriety and fame within his area of expertise. He references being CEO and various projects such as one in Vietnam and another Saudia Arabia where he displayed some sort of system he reportedly developed and engineered. He spent much more time detailing his various acclaims and accomplishments, with fragmented and rapid descriptions which were difficult to understand, due to his fragmented and rapid descriptions, which were disjointed.  Beyoind his hypomanic to manic presentation, there was  no evidence of overt symptoms of psychosis or delusions, unless his various descriptions of his hugely successful and sought after patent, turns out to be a delusion itself, but there was no current evidence provided which would suggest any of Mr. Guertins' claims of his engineering prowess and development are false.

Mr. Guertin essentially described he had filed a patent for a program and or something he developed, and he began to believe that through the use of "AI", these large software companies ( such as Netflix and others) were conspiring  to

Court File Number: **27-MH-PR-23-815**

steal his "program" he described he connected the dots to realize what they were doing and reported he shot his firearm off to get the police to come to his home. When asked why he did not simply call the police on the phone he reported that he thought they were monitoring his electronic through AI.

He reports a history of problematic substance abuse which no longer exists. He described that since 2016 he has been taking two different medications, reporting that for several years the dosages have been Adderall **xx** mg per day and Klonopin **xx** mg as needed.  He denied the possibility that his Adderall or Klonopin use might have contributed to his symptoms at the time police were called to his home.  He reported he was incarcerated for several days and released to the community and for the last 7 months has been living in the community. He reported that he sees Dr. Schuster via tele-video for psychiatric follow-up and saw Dr. Schuster over a tele-video appointment a couple weeks ago.[1]

8.  Was the Respondent told that the examination was part of the judicial commitment process; that the examiner would be making a diagnosis and treatment recommendation to the Court; and that the information Respondent divulged in the interview was not confidential and could be disclosed in Court as part of the commitment proceedings.

☒ **Yes**        ☐ **No**        ☐ **Not Applicable (** e.g., report completed from records)

ANSWER  THEFOLLOWING  QUESTIONSBASED UPON  AREASONABLE DEGREE  OFPSYCHOLOGICAL  CERTAINTY:

9.  Summary of relevant psychiatric history:

10.  DSM-5 diagnosis:
A.  Per Med Records:
B.  Per the examiner:

| Unspecified Schizophrenia Spectrum and Other Psychotic Disorder (primary). |
| Forensic Evaluation Report, Rule 20.01, Jill Rogstad, PhD., LP, ABPP |
| Unspecified Schizophrenia Spectrum and Other Psychotic Disorder (primary), versus Medication induced bipolar disorder versus Stimulant use disorder (prescribed stimulants-Adderall). |

11.  Respondent suffers from ☐ an organic disorder of the brain or ☒ substantial psychiatric disorder? ☒ **Yes** ☐ **No**

12.  Respondent's disorder manifests by instances of grossly disturbed behavior or faulty perception?   ☒ **Yes** ☐ **No**

13.  The specific facts that support your opinion (including the specific facts that support your opinion):
A.  ☒ Thought -highly distractible; prominent delusional beliefs that include persecutory & referential themes
B.  ☒ Mood -  mood-related disorder, namely mania or hypomania,
C.  ☒ Perception - Mr. Guertin's delusional beliefs are inextricably linked to his perceptions and they obstruct his ability to apply knowledge in a a rational manner devoid of delusional reasoning
D.  ☐ Orientation -  grossly intact
E.  ☒ Memory - grossly intact intermittently impaired by delusional reasoning and impaired insight

14.  Does Respondent's disorder grossly impair (including the specific facts that support your opinion):
A.  ☒ Judgment - Same as "C. Perceptions above"
B.  ☒ Behavior - Dangerous Weapons-Reckless Discharge of Firearm Within a Municipality (FEL), (multiple others)
C.  ☒ Capacity to recognize reality-  Same as "C. Perceptions above"
D.  ☒ Capacity to reason or understand – Same as "C. Perceptions above"

15.  Does Respondent's disorder pose a substantial likelihood of physical harm to self or others?   ☒ **Yes** ☐ **No**
As  aresult ofthe impairment the    Respondent:
A.  failed to obtain necessary food, clothing, shelter, or medical care?        ☐ **Yes** ☒ **No**
B.  has an inability for reasons other than indigence to obtain necessary food, clothing, shelter, or medical care and it is more probable than not that the Respondent will suffer substantial harm, significant psychiatric deterioration or debilitation, or serious illness, unless appropriate treatment and services are provided?   ☒ **Yes** ☐ **No**
C.  Respondent made a recent attempt or threat to physically harm self or others?        ☒ **Yes** ☐ **No**

---

[1] When telehealth is used, it is considered to be rendered at the physical location of the patient, and therefore a provider typically needs to be licensed in the patient's state.  A few states have licenses or telehealth specific exceptions that allow an out-of-state provider to render service and to prescribe.

16. If "yes" to A, B, or C describe:     Court File Number: **27-MH-PR-23-815**

> 27-CR-23-1886 ; Dangerous Weapons-Reckless Discharge of Firearm Within a Municipality
> on or about January 21, 2023, in Hennepin County, Minnesota, MATTHEW DAVID GUERTIN recklessly discharged
> a firearm within a municipality… .. Upon arriving in the area officers heard shots and were able to confirm where the
> apartment shots were coming from, and that the occupant of the apartment was MATTHEW DAVID GUERTIN, dob
> 7/17/1981, "Defendant" herein. Defendant was yelling "I'm going to die because they stole my patent" and repeatedly
> yelled a Minnetonka Police Department case number. Defendant spoke with a negotiator and after some time threw
> two firearms out of the window: an automatic rifle and a pistol in a case. Defendant eventually came out of the
> apartment and was placed under arrest. In a post-Miranda statement Defendant reported
>
> Dr. Rogstad testified that misuse of Adderall could account for some of Mr. Guertin's symptoms… …Despite reporting
> this possibility, Dr. Rogstad opines Mr. Guertin is not competent.
>
> 4/7/23 copy of a Letter from California Psychiatrist Dr. Shuster, (provided by the respondent):  I reviewed the letter
> (April 7 2023) from Dr. Schuster, with an odd type-set change from page one to page two, and see that Dr. Schuster
> confirms  "There have been times in recent months that he verbalized concerns about his being "scrutinzed" and maybe
> sabotaged by enterprises in the scale of Microsoft and Netflix" Dr. Shuster also asserted "In summary. Mr. Guertin is
> not at risk of harming anyone."

17. Is the impairment solely due to epilepsy; developmental disability; brief periods of intoxication caused by alcohol,
drugs, or other mind-altering substances; or dependence upon or addiction to any alcohol, drugs, or other mind-altering
substances?                                                                                               ☐ **Yes**   ☒ **No**

18. Will Respondent agree to participate in that treatment voluntarily?                ☐ **Yes**   ☒ **No**

19. Do you believe that Respondent will follow through with treatment on a voluntary basis?   ☐ **Yes**   ☒ **No**
      Why or why not?

No the respondent does not believe he has a mental illness or symptoms of a a mental illness. He believes he has ADHD and some
OCD related symptoms and anxiety. He does not believe he needs oversight or treatment and he believes that since he has been
living in the community for several months without close oversight or additional mental health interventions, that he does not
require any oversight or treatment.

20. Would a guardianship/conservatorship be an appropriate alternative to commitment?      ☐ **Yes**   ☒ **No**

21. What is the least restrictive, appropriate treatment for Respondent and why?

> Whether due to an underlying independent schizophrenic and or psychotic spectrum disorder or to a psychotic spectrum
> disorder that is substance induced, it seems more likely than not that Mr. Guertin's current symptoms of serious mental
> illness will continue if not treated. Mr. Guertin symptoms will likely intermittently become more acute and contribute
> to symptoms which more substantially impair his perceptions, reasoning, and behaviors – and pose a substantial risk to
> harm self and others without treatment. Therefore, without the ability to differentiate or resolve Mr. Guertin's mental
> health diagnosis with more clarity due to the confounding from his prescribed medications, the undersigned opines that
> Mr. Guertin meets criteria for civil commitment as person with a serious mental illness.
>
> In the undersigned's opinion, the Respondent does not have adequate appreciation or insight to appraise or notice the
> functional impact (e.g., cognitive, perceptual, emotional, behavioral) of their symptoms of mental illness, their need for
> treatment, the risks their symptoms pose to self and others; this impairs the Respondent's decisional capacity related to
> major treatment decisions pertaining to the Respondent's mental illness and or substance use disorder, including
> medications.
>
> The undersigned would suggest/recommend a voluntary trial period (an evaluation period) of 6 months without the
> current class of medications (i.e., stimulant and benzodiazepines), and a method to verify or corroborate the absence of
> the substances such as UDS and re-evaluation – (this is simply a suggestion and would be up to the respondent and the
> treatment team to determine if this might be agreeable). However, considering that a more definitive opinion is
> expected, the following is my opinion.

Revised 06/18/2023-MR                                                                        Page 3 of 5

Court File Number: **27-MH-PR-23-815**

In the undersigned's opinionless restrictive alternatives may be available and appropriate, the undersigned suggest others might consider the following issues to be considered as part of any possible agreement to less restrictive alternatives. Such as **if**
**a)** the Respondent's symptoms continue to resolve/improve and stabilize,
**b)** recommended supportive services such as case management, psychiatric management, other needed treatments (e.g., CD, individual counseling, independent psychiatric evaluation of psychiatric medications and need for them, etc.) housing, and supportive treatment plan can be agreed upon,
**c)** the Respondent demonstrates substantial engagement with and adherence to an agreed upon treatment plan,
**d)** the Respondent agrees to voluntarily follow-through with the agreed-upon treatment options,
**e)** the Respondent has a reasonable likelihood of being able to voluntarily follow-through.
**f)** specifically, there is an agreed upon, time-limited plan regarding use of firearms, and purchasing or access to, etc.
**g)** agreement as to whether there is benefit of the back-up of court oversight were he to drift from the treatment plan.
If any of "a, b, c and d, e f and g", cannot be reasonably agreed upon or do not appear likely the respondent will be able to or willing to adhere to the agreements, the undersigned would support full civil commitment as Mentally ill, with substantial concerns for chemical dependency.

The Respondent is diagnosed with *( Unspecified Schizophrenia Spectrum and Other Psychotic Disorder (primary), versus  Medication induced bipolar disorder versus Stimulant use disorder (prescribed stimulants- Adderall))*  which is or includes an organic disorder of the brain or a substantial psychiatric disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand, which is manifested by instances of grossly disturbed behavior or faulty perceptions and poses a substantial likelihood of physical harm to self or others.  For example:  in the Forensic Evaluation Report, (March 2023, by  Jill Rogstad, PhD., LP, ABPP) And the during testimony pertaining to the competency hearing, as outlined  in the Findings of facts and Order regarding incompetency to proceed, overseen by the Honorable Judge, Michael Browne, (July 2023) there was substantial evidence for ongoing flight of ideas, and either hypomania or mania in Mr. Guertin's presentation, consistent with ongoing serious mental illness.  Moreover, during the current exam, there was evidence for ongoing hypomania to mania and substantially distorted thought processes which verge of delusional, though remained within logical and rational limits during the exam. Separately  regarding the letter from Dr. Schuster. The letter is a very nice clinical letter and helps maintain the Doctor/patient clinical relationship,  Dr. Schuster has with his patient, Mr. Guertin. Although Dr. Schuster appears to have been provided with a copy of Dr. Rogstad's Forensic report (March 2023), it is somewhat concerning and surprising that Dr. Schuster as the prescribing provider of two controlled substances to the respondent, did not comment on the well-known adverse psychotic-spectrum side effects to the medications he is prescribing, particularly when there is credible evidence of psychotic-spectrum symptoms (i.e., a well-credentialed and regarded forensic psychologist's report to the court – Dr. Rogstad's report).  the undersigned would expect most psychiatrist with such information would take step to mitigate their patients risks to psychotic spectrum events due to medications  and take steps to mitigate their own liability in prescribing these medications, after being informed of these types of events (maybe this was done separately).  Dr.  Schuster, is not in the role of properly evaluating this situation and did not appear to have access to all the available information to formulate his conclusion. For example, were he to have seen the extensive, hypergraphia-like, writing on Mr. Guertin's apartment walls (some patients with schizophrenic spectrum symptoms evidence hypergraphia), which include paranoid self-reminders and descriptions which clearly convey that Mr. Guertin was frightened, distressed, and believed large enterprises such as "Microsoft and Netflix", were using Artificial  Intelligence (AI) and had infiltrated his home electronics and he was being conspired against and risked to being harmed due to the revolutionary software patent he developed; the writing on the apartment walls and similar writing on his body (noted when he was booked into the jail) suggest Mr. Guertin knew or believed that he was unable to rely on his own mental status and wrote reminders to himself and/or possibly messages to others in the case he might have been harmed and his patent stolen. Regardless, his inflexible beliefs are conveyed in the writing, Dr. Rogstad's evaluation,  and during the current exam and consistently indicate he held paranoid, grandiose, and delusional beliefs which substantially impaired his perceptions, reasoning, and behaviors, even if there were some elements of the history based in fact.

Mr. Guertin's conclusion (which he described during the exam, were based on his "connecting all the dots") and belief that these large companies might specifically know about his revolutionary and highly sought software, is plausible if he actually had developed this, and still it is somewhat grandiose to believe these companies know about his patent, without any evidence. Mr. Guertin's conclusion that these large companies would try to steal his revolutionary patent,

Court File Number:  **27-MH-PR-23-815**

is also plausible yet rather grandiose to conclude these companies would engage in clandestine illegal activity using AI, to steal his patent rather than simply approach him to purchase it. Mr. Guertin's conclusion, claim, or belief he needed to fire-off a firearm(s) within the city from his apartment to alert the police, is a frightening conclusion and belief which evidences the degree to which he held paranoid, grandiose, and delusional beliefs which substantially impaired his perceptions, reasoning, and behaviors, even if there were some elements of the history based in fact.  The veracity of Mr. Guertin's explanation for firing off the fire-arm, is at least questionable. Whichever thought processes and events led  Mr. Guertin  to fire-off the firearm several times, they appear far more likely than not to indicate he held paranoid, grandiose, and delusional beliefs which substantially impaired his perceptions, reasoning, and behaviors, even if there were some elements of the history based in fact.  He could have easily walked to the police station if he did not trust  his home electronics and the phone lines.  He now admits his decision was a reflection of poor judgment and emphasizes he had not intended to harm others. The problem is that his  delusional beliefs substantially impaired his perceptions, reasoning, and behaviors, and influenced him to takes these extreme and dangerous actions because he was unable to differentiate what was real or not real at the time; this poses a substantial risk to harm self and others.

Whether his delusional thought processes were aggravated by substance misuse/abuse or an independent psychotic spectrum disorder is less clear. During the exam he presented as hypomanic to manic and reportedly continues to be prescribed and take **xx** mg of Adderall per day, which substance is well-known to induce clinically significant symptoms consistent with hypo-mania and mania in some patients; it is also a controlled substance, precisely because of its potential for misuse, abuse, and risk to harm. If Mr. Guertin's hypomanic to manic symptoms and delusional beliefs which substantially impair his perceptions, reasoning, and behaviors, are substance induced (or prescription substance induced – i.e., iatrogenic) then there are likely simple interventions to treat and resolve these symptoms which would very effectively mitigate his risks to harm. For example, discontinuation of the class of prescribed substances known to contribute psychotic spectrum symptoms specifically Adderall and Klonopin (both abuse and withdrawal from each can contribute to severe distress, agitation, and distorted and psychotic thinking). However, if Mr. Guertin's hypomanic to manic symptoms and delusional beliefs which substantially impair his perceptions, reasoning, and behaviors represent an independent schizophrenic and/or psychotic spectrum disorder, the treatment interventions of choice initially include but are not limited to antipsychotic medications and/or a mood stabilizer if there is stronger suspicion of a bipolar affective disorder. Notably, there is substantial evidence that Mr. Guertin's underlying symptoms of a serious mental illness persist, though they appear to have recently remained attenuated, regardless of the cause.

**Capacity  to Waive Rights** Based on the information in the records and the interview, the Respondent appeared to have an adequate understanding of situation the choices available to him/her to waive his/her right to a trial in this matter and enter into treatment agreements with defense attorney assistance.

*Michael Robertson PsyD, LP*

Michael Robertson PsyD, LP         *(Exam Date: 8/1/23)*      Report Date:  08/04/2023

**253B.02 Subd. 13**. A "**person who is mentally ill poses a risk of harm due to a mental illness**" means any person who has an organic disorder of the brain or a substantial psychiatric disorder of thought, mood, perception, orientation, or memory which that grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand, which that is manifested by instances of grossly disturbed behavior or faulty perceptions and who, due to this impairment, poses a substantial likelihood of physical harm to self or others as demonstrated by: (1) a failure to obtain necessary food, clothing, shelter, or medical care as a result of the impairment; (2) an inability for reasons other than indigence to obtain necessary food, clothing, shelter, or medical care as a result of the impairment and it is more probable than not that the person will suffer substantial harm, significant psychiatric deterioration or debilitation, or serious illness, unless appropriate treatment and services are provided; (3) a recent attempt or threat to physically harm self or others; or (4) recent and volitional conduct involving significant damage to substantial property.

### *ADDITIONAL NOTES*

Doc Code: PET.POA.WDRW
Document Description:  Request for withdrawal as attorney or agent

**EXHIBIT**
**Db**

Approved for use through 03/31/
U.S. Patent and Trademark Office, U.S. DEPART
Under the Paperwork Reduction Act of 1995, no persons are required to respond to   a collection of information unless it displays a valid

| | |
|---|---|
| **REQUEST FOR WITHDRAWAL AS ATTORNEY OR AGENT AND CHANGE OF CORRESPONDENCE ADDRESS** | |

| | |
|---|---|
| Application Number | 18/108,858 |
| Filing Date | 2023-02-13 |
| First Named Inventor | Matthew Guertin |
| Art Unit | 3711 |
| Examiner Name | KIEN T NGUYEN |
| Practitioner Docket Number | G185.0001US2 |

To:   **Commissioner for Patents**
      **P.O. Box 1450**
      **Alexandria, VA  22313-1450**

Please withdraw me as attorney or agent for the above-identified patent application, and

☐  all the practitioners of record;

☐  the practitioners (with registration numbers) of record listed on the attached paper(s); or

☑  the practitioners of record associated with Customer Number: 27367

NOTE:  The immediately preceding box should only be marked when the practitioners were appointed using the listed Customer Number.

The reason(s) for this request are those described in 37 CFR:

☐ 11.116(a)(1)          ☐ 11.116(a)(2)          ☐ 11.116(a)(3)

☑ 11.116(b)(1)          ☐ 11.116(b)(2)          ☐ 11.116(b)(3)

☐ 11.116(b)(4)          ☐ 11.116(b)(5)          ☐ 11.116(b)(6)

☐ 11. 116(b)(7) Please explain below:

---

**Certifications**

**Check each box below that is factually correct. WARNING:  If a box is left unchecked, the request will likely not be approved.**

1. ☑  I/We have given reasonable notice to the client, prior to the expiration of the response period, that the practitioner(s)
   intend to withdraw from employment.

2. ☑  I/We have delivered to the client or a duly authorized representative of the client all papers and property (including funds) to which the client is entitled.

3. ☑  I/We have notified the client of any responses that may be due and the time frame within which the client must respond.

Please provide an explanation, if necessary:

[Page 1 of 2]

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless the information collection has a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this form is estimated to average 12 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 or email InformationCollection@uspto.gov. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO:  Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/AIA/83 (04-13)
Approved for use through 03/31/2022. OMB 0651-0035
U.S. Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## REQUEST FOR WITHDRAWAL AS ATTORNEY OR AGENT
## AND CHANGE OF CORRESPONDENCE ADDRESS

**Complete the following section only when the correspondence address will change.** *Changes of address will only be accepted to an applicant.*

Change the correspondence address and direct all future correspondence to:

A. ☐ The address of the applicant associated with Customer Number: _____

**OR**

B. ■ Applicant

Address ████████████████

| City Plymouth | State MN | Zip 55442 | Country US |

| Telephone 763-████████ | Email Matt████████████ |

I am authorized to sign on behalf of myself and all withdrawing practitioners.

Signature /Steven M. KoehleR/

Name Steven M. Koehler                 Registration No. 36,188

Address 121 South Eighth Street, Suite 1100

| City Minneapolis | State MN | Zip 55402 | Country US |

Date 2023-08-21                 Telephone No. 612-334-3222

*NOTE: Withdrawal is effective when approved rather than when received.*

[Page 2 of 2]

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless the information collection has a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this form is estimated to average 12 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 or email InformationCollection@uspto.gov. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*





EXHIBIT
Eb

# *PLYMOUTH POLICE DEPARTMENT*
## *INCIDENT REPORT*

| **ICR#** 23033797 | **AGENCY ORI#** MN0271700 | **JUVENILE:** |
|---|---|---|

**Reported:** 09-07-2023 1715   **First Assigned:**1719  **First Arrived:**1727  **Last Cleared:**1944

**Committed Start:** 09-07-2023 1715 **Committed End:**

**Title:** Information

**Summary:**

 Informational report regarding possible patent fraud.

**Location(s)**

Sagamore Condos  **Address:** 4385  Trenton Ln  APT  202   **City:** Plymouth  **State: MN**  **Zip:** 55442  **Country:** US

---

**Officer Assigned:** Beauchane, Krystal                    **Badge No:** 147             **Primary:** Yes

---

| **MOC:** MISINF | **Literal:** MISCELLANEOUS INFO | **Statute:** | **UCR:** |
|---|---|---|---|

---

**Involvement:** Victim                    **Name:** Guertin, Matthew David          **DOB:** 07-17-1981

**Age:42**

**Address:** (Residence) 10233  34th St  W  APT  304      **City:** Minnetonka   **State: MN**   **Zip:**55305   **Country:** US

**Phone:** (Home)               **Email:** (Home) xxxxxxxxxxxxxxxxxxxxxxxxxx

---

**Involvement:** Mentioned                 **Name:** Guertin, Shelly            **DOB:**

**Age:** 61

**Address:** (Residence) 4385  Trenton Ln  202          **City:** Plymouth    **State:**  **MN Zip:**  55442   **Country:** US

**Phone:** (Cell)                                        .

**Supplemental Report**

**ICR:** 23033797

**Title:** Main - Beauchane #147

On 9/7/23 I responded to 4385 Trenton Ln #202 for a report of patent fraud.

I spoke to Matthew Guertin. He showed me several things on his computer and a set up for the patent he procured that was in the Livingroom of his residence. Due to the amount of information he was providing me and the complexity of the report, I asked that Guertin send me a synopsis of the information he was wishing to report. See media title: "Email - report information". I received several, more in depth, emails explaining the fraud from Guertin. Those emails are attached.

This report is intended to document that Guertin has reported the patent fraud to local law enforcement.

Guertin does wish to press charges but stated he knows it's a process and that he wanted to start by making a report to local law enforcement so he could continue to report the patent fraud to other entities.

Beauchane #147



## Replying to your message

From Senator Amy Klobuchar <senator@klobuchar.senate.gov>

To      Matt xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx >

Date    Wednesday, September 20th, 2023 at 2:03 PM

Thank you for taking the time to contact me. I appreciate hearing from you on this important matter, and I will keep your views in mind as relevant legislation and other decisions related to this issue come before the Senate.

I continue to be humbled to be your Senator, and one of the most important parts of my job is listening to the people of Minnesota. I am here in our nation's capital to do the public's business. I hope you will contact me again about matters of concern to you.

- Amy

Amy,

Good afternoon,

  My friend XXXXXX - Founder of XXXXXX and XXXXXXXX, whom I've known for almost 20 years suggested I reach out to you regarding all of the crazy stuff going on in my life as a result of an extremely valuable patent I have been granted - that being US11577177B2 of which I alone am listed as the sole inventor on and which was officially granted to my company InfiniSet, Inc. on Valentines day of this year.

  Before I dive into the craziness that has become my life as a result of this patent I'll start off with an introduction of who I am - that being a 42 year old born and raised Minnesotan who grew up in Plymouth, MN on the east side of Medicine Lake at the top of the hill on 32nd Ave and who has remained in the general vicinity my entire life except for the period of 2014 - 2020 when I moved to Los Angeles to work at what essentially was my dream job at the company formerly known as V Squared Labs and which is now www.XiteLabs.com where I had the opportunity to travel the world for the first time in my life while being paid to essentially 'play with computers' doing what I loved while also attending some of the biggest concerts and festivals that a lot of people dream of being able to go to. I worked my way up to this after being a DJ and club promoter in downtown Minneapolis (which is how I met XXXXX as well as XXXXXXX of XXXXXXX Studios) where I eventually found my calling working as a lighting designer at many of the downtown nightclubs - Mainly Epic Nightclub from 2008-2013 as well as many others which is where I 'cut my teeth' so to speak. I have contributed and been involved in many different local events and businesses which then turned into me getting worldwide recognition in various publications, etc. after moving to LA where I was involved in such things as putting on a show for the King and Royal Family of Saudi Arabia in 2019 for a UNESCO World Heritage Event as well as designing, engineering, and fabricating Bad Bunny's mainstage Coachella set piece in 2019 among many other impressive feats - many of which I can hardly believe I successfully completed when looking back at all of it.

All of this work I speak of including both the local as well as international projects can be viewed on my personal portfolio site www.MattGuertin.com

Fast forward to now -

  I moved back to Minnesota from Los Angeles in April of 2020 due to Covid and ended up moving into a one bedroom apartment in Minnetonka where I sat aimlessly for a while wondering what I was going to do with my life as I was essentially without any direction or purpose due to Covid and so late 2020/early 2021 is when I actually put together my personal website due to finally having the time to compile everything I had been diligently documenting along the way, with the ultimate goal being to find new employment opportunities - that was until February 3rd, 2021 when I thought up the idea which I have now officially been granted a patent for, along with an 'InfiniSet' word trademark, logo trademark, and which I have been working on nonstop ever since - all made possible by the investment, help, and support of family members that believed in me - mainly my aunt and mom. In addition I just filed my PCT application in Brazil, Canada, Chile, Israel, Japan, Malaysia, Mexico, Nigeria, Philippines, Singapore, and the UAE and will be filing additional international patents in the 31 month countries before the October 19th deadline as I am in the process of securing major investment from my friends in XXXXXXX - whom I met as part of my wordly travels when I was in Los Angeles

---------------------------------------------------------------------------------------------------------------------------------------------------
---------------------------------------------------------------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------------------------------------------------------

  So now that you have a better idea about who I am and what I've been up to I will get to the main reason for contacting you which is in regards to all of the completely surreal and insane things I have been dealing with in terms of being targeted by major corporations due to my patent - which is a VERY big deal due to what it makes possible. As an example I have been directly contacted by XXXXXX who is the XXXXXXX at XXXX XXXX Corporate locally with heavy interest, multiple virtual film studios which all want to talk to me and use my technology, and I have had many people I know in the entertainment industry who are well versed in 'virtual production' tell me that it is "going to revolutionize the industry", etc. - all of which is true as it is essentially a rotating treadmill whose rotation and speed is precisely controlled by the media server / render engine - that mainly being Unreal Engine - with the end result being the ability for a person to travel anywhere they want along the ground plane through a virtual environment/real world pre-filmed environment all while staying in the same, small physical 'real-world' location.

What I invented is essentially the 'holy grail' of VR/AR and virtual production - with the technical term for it being 'Free viewpoint rendering' - Keep in mind that I have not had any formal college education yet I was able to single handedly think up this idea and then design, engineer, fabricate, and program a working prototype of the exact design shown in my patent filing in addition to setting up the company, designing the logo, dealing with all of the patent stuff, etc, etc. It is not an exaggeration to say that I have dedicated my entire life solely to this for nearly the last three years which includes all of my time, money, focus, etc. It's become my whole life - and I currently have two very well known companies in the process of essentially stealing it from me - those being Microsoft as well as Netflix. Both of them are carrying out this fraud using Ai generated content, videos, and websites which are then being fraudulently posted into the past with the help of other major companies including the Xxx archive, XxxTube, Gxxgle, 'official' academic publishing websites, etc, etc. all for the purpose of creating fraudulent prior art and essentially creating a completely fabricated, false history with the end goal being to steal my patent by invalidating it.

It sounds crazy and it is.....it is surreal...even still. I have proof of all of the claims I am making though as I have been collecting and analyzing a massive amount of digital forensic evidence and have also filed two different police reports as well as a report with the FBI through IC3 dot gov, an FTC report, and a report with the SFO in the UK. In regards to Netflix it is very relevant to mention that I ended up in the extremely unlikely 'fluke' of filing my provisional patent application only 12 days before Stephan Trojansky filed a patent for the exact same thing - I filed on March 19th, 2021 and he filed on March 31st, 2021. His company 'Scanline VFX' was acquired by Netflix for at least 100 million dollars 8 months later based on Netflix Q12022 investors report with the official acquisition being announced in a Netflix press release on November 22nd, 2021.  All of this can be verified by searching their website. As a result of his provisional patent and the subsequent acquisition Netflix and Trojansky formed the company 'Eyeline Studios' for the sole purpose of focusing on that which is contained within the Trojansky application (which is currently assigned to Netflix, Inc.)

The other thing which is very relevant is the fact that I expedited my patent filing via USPTO TrackOne which is the reason I was already granted a patent on Feb 14th of this year and the Netflix application is still just an application. Once my patent was granted on the 14th me and my patent attorney filed a 3rd party prior art submission with the USPTO which was officially reviewed, determined as relevant, and entered into the record officially on Feb 20th of this year. I essentially 'destroyed' the Netflix patent as I covered every single one of their claims all the way down to using the exact same language regarding a user cue system, digital twin, etc. It's pretty crazy actually...just as everything else is and has been since discovering the Netflix patent which I only came across randomly due to the Microsoft/Mark Roberts Motion Control fraud which was being carried out by creating a fake website/company called PhotoRobot which is all entirely fake I ended up figuring out but which is officially listed as unpublished prior art on my patent - it is all fraud. The ironic part is that the only reason I even know about PhotoRobot (and in turn the only reason I inadvertently stumbled upon the Netflix patent..) is because the CEO of Mark Roberts Motion Control responded to me 3 weeks later after I had contacted his company to get help with a 3d model of their 'Bolt Cinecam' after attending a local workshop at Cinemechanics in Golden Valley July of 2022 in which he directly pointed me to PhotoRobot in his email due to being so overly confident and excited about the fraud he was involved in carrying out even though it obviously wasn't anywhere near being 'complete' as I ended up not even looking into it at all on the Internet Archive until over a month later. He apparently thought I would never figure any of it out - the same goes for Netflix who is now involved in trying to fraudulently invalidate my patent in one of the most obvious and in my opinion stupid 'plans' ever as opposed to simply approaching me and offering to pay me which I would've been happy to outright sell for a solid offer - but instead they are now choosing to carry out a massive fraud which is very obvious and which should (if there is such thing as any type of actual 'justice' for these mega corporations...) result in their entire company Eyeline Studios being dissolved.

The way all of this criminal fraud is being carried out is that these companies are essentially utilizing Ai to create any type of fake content/images/videos/academic papers/websites they want and then XxxTube, The Xxx Archive (a 501c3), Gxxgle, Xxxxxxx, XxxxxxIn, official academic publishing websites, and a huge consortium of other tech companies are conspiring with them in the fraud by allowing them free reign to fraudulently post back dated content for the purpose of creating whatever false history they want to establish with the end goal being to defraud people/companies (me) of intellectual property or whatever other end goals they want to achieve. I mention not only me and my intellectual property because it is very apparent that this is not only being used to defraud me and is in fact an established system it would seem - this is especially true based on all of the evidence and research I did involving the web archive - which I now

see has been listed on the USPTO website as a credible source that can be used as court admissible prior art for the purpose of establishing the validity of patents and therefore used to invalidate patents - like mine.

In the case of the Netflix fraud currently being carried out against me they now have Paul Debevec working for them which I discovered after viewing a SIGGRAPH 2023 video in which he gives a 1 hour presentation openly representing Eyeline Studios in which he presents a rotating treadmill at the 59 minute mark which he claims that he invented in 2006 as part of his 'Light Stage' which is in fact 'real' as he has been granted 3 patents for it - granted in 2006, 2008, and 2015. The thing is that the treadmill he is claiming to have already created in 2006 is essentially the exact same technology as well as achieves the exact same end result as that which is contained in both my patent as well as the Trojansky/Netflix application - meaning it would not only invalidate my already granted patent if it were in fact authentic but also the still pending patent application which was the entire reason for the company he is working for being formed in the first place and which the CEO, Stephan Trojansky is listed as the sole inventor of. So this is apparently their brilliant plan to deal with the fact that my already granted patent has been filed and accepted as 3rd party prior art against their patent application. Just on its face they have an obvious and very clear issue related to their duty of candor as they have a person now working for them who supposedly already invented the same exact thing they have a pending patent application for but which is not included as prior art. Even if it was though it makes no sense. I am not sure if their plan is to try and invalidate my patent and then have all of the fraudulent content and academic papers taken down and then they still try to obtain a patent for their pending patent application - but even this doesn't make any sense.

Regardless - besides the already very obvious and clear issue that exists in my opinion (as well as others I have conferred with..) I have been able to collect a very large amount of academic papers spanning early 2000's to current (3.5gb...around 248 total articles – I say 'around' because there are some duplicates mixed in as well) as well as a large amount of content from the Russian search engine Yandex (which I collected from Yandex because much of the results remained authentic as opposed to the USA/Google search results). What the 'authentic/original' search results clearly show is that Paul Debevec's 'Light Stage' is in fact real but that it is was specifically focused on capturing the human face as opposed to a moving person on a treadmill, and in addition I have also spent my own time analyzing and making sense of all of this data I collected using MAXQDA as my main tool which allowed me to conduct language analysis and search for various words and analyze the use of words and language. One of the things I was able to figure out is that even though Paul Debevec clearly states in one of his fraudulent 2006 papers that "at the center of the setup is a rotating treadmill" the word treadmill is never mentioned once in any of the 3 patents he was granted for his 'Light Stage' - in fact I actually downloaded every single one of the patents which Paul Debevec is listed as an inventor on and the word 'treadmill' is not ever mentioned in any of them at all even though it is obviously the 'key' element that makes the entire subject matter of his claimed paper possible. Besides this obvious red flag I have a whole bunch of other evidence and proof I've established in addition such as being able to very clearly prove that his claimed 2006 papers contain images that are 100% Ai generated which is an obvious problem if they were really from 2006 as is being claimed. I figured out that the images (as well as the video being presented as authentic from 2006 as part of the research and academic papers) by adjusting color curves in Adobe After Effects and Photoshop - I essentially devised my own Ai detection method which I have yet to see anyone else cover but regardless it very clearly highlights a well known artifact of Ai generated images and video content - those being 'checkerboard artifacts' (which I also have all of the documentation and research compiled for the purpose of substantiating that it is in fact all fake, ai created content)

I also have proof in the form of emails from LinkedIn that USCCinema - the school where Paul Debevec is a professor at searched for my LinkedIn profile two separate times, etc, etc. It's a lot of stuff to cover which is why I will simply provide you with some links which in fact proves every single claim I am making without any doubt whatsoever.

In addition to all of the digital evidence I have collected I also have a large amount of email communication between me and my patent attorney, the web archive, the CEO of Mark Roberts Motion Control on October 31st (which is what kicked this whole thing off - MrMoCo is partnered with Microsoft)

It is a very long story and a lot to try to explain which is why I will try to wrap this up in the interest of time and instead provide you with some links to the various reports I filed as well as to solid proof that all of the stuff being presented as authentic is in fact generated by Ai - mainly CNN and GAN being used to generate completely fake images and videos.

Long story short I am currently in fear for my life insofar as not wanting to go outside at all until I am at least able to secure my investment and get some additional shareholders assigned to my company so that I am not the main 'problem' standing between Netflix and the 500 million + dollars plus they have invested so far into their endeavor - the one which is technically infringing on my patent - WHICH THEY KNOW THEY ARE. I have no idea why the hell they would rather risk everything by attempting to carry out a large criminal conspiracy as opposed to paying me a large sum of money which in turn would make them 'whole' as far as still being able to continue forward with their business while also retaining all of the intellectual property rights they thought they originally owned for the next 20 years and both of us would be happy.

The main problem and my reason for refusing to back down no matter what happens is because they are trying to steal everything from me. I have dedicated a massive amount of time and effort throughout my life in order to be able to have all of the knowledge and skills required to arrive at this point where I thought up this insanely valuable idea along with all of the skills needed to design, engineer, and build all of it without any college education at all. I am now at a point where I have spent the last three years straight working on this and used up all of the money my family is able to afford and they are trying to outright steal all of it from me instead of simply compensating me a very large, yet fair sum of money so that I can have all of my hard work pay off and retire and relax and enjoy my life. Instead I am essentially being forced into being a whistleblower due to the fact that I am being forced into exposing not just Netflix but an entire massive criminal conspiracy involving some of the largest companies in the world which is not exactly my idea of a good time or any part of what I intended when I simply thought up a good idea and worked hard to make it a reality.

I am reaching out to you in the hopes that you can 'shine some light' on all of this and help me in resolving this rather large problem. It should also be noted that the US Government helped with initial funding and holds an interest in Paul Debevecs Light Stage research and the resulting patents which may explain why there is an Army dot mil site hosting Paul Debevecs fraudulent 2006 papers for the purpose of helping to carry out and aid in this fraud. This may also explain why I have had government agencies like DARPA, Defense Intelligence Agency, US Army Reserves, US Air Force, INFOPACOM, etc all directly search for me on LinkedIn (which I have proof of) yet none of them have felt the need to message me and say hi at all. I feel like I am up against a rather large machine and it is complete bullshit as they have access to unlimited money essentially and I would be more than happy to sell them my company along with the intellectual property.

My ultimate goal is simply to be able to retire and live the rest of my life not having to worry about money any longer. I say this as someone who grew up having never met my father who grew up in foster homes, and shelters, etc and inbetween was raised by my single mom who was on goverment assistance. I've busted my ass and fought hard to earn everything I've achieved in my life which includes the current point I am at where I have single handedly interrupted business dealings involving hundreds of millions of dollars and am currently sitting on a patent that is worth billions of dollars and all I really want is to be paid and left alone to live my life. I just want all of my hard work to pay off - not stand by and let it be stolen from me.

Regardless of what happens I am not going to simply give up. Not at all.

I am going to continue forward no matter what and turn this into a valuable business and then Netflix can end up bidding against Disney and Universal Studios to buy back what they could've had for 5% of the price had they simply been honest instead of being thieves and criminals.  I am worried about my safety currently because I am smart and understand the high stakes game I have inadvertently ended up having to play - but at the same time I am pissed off because this is such bullshit that I am even having to deal with this to begin with. Pardon the language but just having to even spend the time writing this along with all of the other stuff I have had to deal with is pissing me off because I don't deserve this and it's shady af that all these companies are essentially nothing more than a bunch of criminals. They picked the wrong person and severely underestimated my abilities as I am guessing they are doing this to many other people but I bet I am the only one who has figured it all out.

Here is a video edit I just recently made which does a good job showing where I am at with my actual invention and what I have been able to design, engineer, fabricate, program, etc while also simultaneously dealing with all of the other crap that has now become 'my life' due to simply filing a patent for a really good idea -https://link.storjshare.io/jwpcita3o7lj2i5gu55ahelusudq/docs2%2FSample_cut.mp4

PhotoRobot Ai generated youtube videos 1 - https://link.storjshare.io/jx6bicxngzh6cshf4hkxelnn64la/micro-sd-shared-with-police%2FMicrosoft%20Fraud%2FAi%20YouTube%20Videos

PhotoRobot Ai generated youtube videos 2 - https://link.storjshare.io/jwllntordwjbs34rooankqlnykfa/micro-sd-shared-with-police%2FMicrosoft%20Fraud%2FAi%20YouTube%20Videos%201

PhotoRobot Ai generated youtube videos 3 - https://link.storjshare.io/juhetavggjwuzqfyaauzruvnos2q/micro-sd-shared-with-police%2FMicrosoft%20Fraud%2FAi%20YouTube%20Videos%202

Proof of 3rd party art filing against Netflix Patent - https://link.storjshare.io/jwzzvqikszb77z6ldxab74pvew3q/docs2%2F3rd-part-art-filed

Here is the FTC Report I Filed - https://link.storjshare.io/jw4i3t3z3r2uqtj4pdfpj3yceqmq/micro-sd-shared-with-police%2FOther%20Reports%2FMay_3rd_2023__FTC_Report.pdf

SFO Report # I filed in the UK - https://link.storjshare.io/jx3cqpfl5yjk3tvqtxnojl5xdhfa/micro-sd-shared-with-police%2FOther%20Reports%2FSFO%20Report.pdf

Here are both of Paul Debevec's claimed 2006 papers along with my color curve Ai analysis and MAXQDA word analysis proving he is a liar and involved in crimanl fraud with Netflix - https://link.storjshare.io/jxfirnh2ooduzxgexsshkjvjr4qq/docs2%2Fpaul-debevecs-fraudulent-papers

March 19th, 2021 - Matthew Guertin Patent Application US20220297024A1 - https://tinyurl.com/2p96bn8c   https://patents.google.com/patent/US20220297024A1/en

March 31st, 2021 - Stephan Trojansky Patent Application US20220319115A1 - https://tinyurl.com/ypnfuybf  https://patents.google.com/patent/US20220319115A1/en

June 30th, 2021 - Eyeline Studios is registered with CA Secretary Of State - https://tinyurl.com/4axw745d  https://link.storjshare.io/s/jvttjep2g3blhmsmgoak6gcoheiq/document-list/California%20Secretary%20of%20State_Eyeline_Studios.pdf

Nov 22nd, 2021 - Netflix Press Release announcing Scanline VFX Acquisition - https://tinyurl.com/5dpcchuh  https://about.netflix.com/en/news/bringing-more-vfx-magic-to-our-members-with-scanline-vfx

April 19th, 2022 - Netflix Q1-2022 Shareholders Letter - https://tinyurl.com/4k3auzw3  https://s22.q4cdn.com/959853165/files/doc_financials/2022/q1/FINAL-Q1-22-Shareholder-Letter.pdf

Oct 31st, 2022 - Email Response from CEO of Mark Roberts Motion Control - https://tinyurl.com/43sm945x  https://link.storjshare.io/s/jvyso2r57dfmcw5r2twarrytktsa/document-list/Oct_31st_2022__The_Email_That_Started_All_Of_This.pdf

Jan 12th, 2023 - Minnetonka, MN Police Report - Case # 23000151 - https://tinyurl.com/y8yvmc2c  https://link.storjshare.io/s/jwds7ien6sa3jzyo65vztq4if5yq/document-list/Minnetonka%20MN%20Police%20Report%2023000151.pdf

USPS Certified Mail Receipt # 70200090000008908625 - Mailed To: Eyeline Studios - Chief Operating Officer - Scott Miller - 5808 W Sunset Blvd - 12th Floor - Los Anges, CA 90028
USPS Certified Return Receipt # 9590940275212098962586  for Certified Mail # 70200090000008908625 - Mailed To: InfiniSet, Inc. - 5832 Lincoln Dr #222 - Edina, MN 55436
https://tinyurl.com/5cwvstbf  https://tinyurl.com/sx9dvuea

USPS Certified Mail Receipt # 70200090000008903910 - Mailed To: Eyeline Studios - CEO - Stephan Trojansky - 5808 W Sunset Blvd - 12th Floor - Los Angles, CA 90028
USPS Certified Return Receipt # 9590940275212098973636  for Certified Mail # 70200090000008903910 - Mailed To: InfiniSet, Inc. - 5832 Lincoln Dr #222 - Edina, MN 55436
https://tinyurl.com/3ts8sk3c  https://tinyurl.com/5dk77md2

USPS Certified Mail Receipt # 70200090000008908618 - Mailed To: Eyeline Studios Registered Agent / Stephan Trojansky - 330 N Brand Blvd - Ste 700 - Glendale, CA 91203
USPS Certified Return Receipt # 9590940275212098974213  for Certified Mail # 70200090000008908618 - Mailed To: InfiniSet, Inc. - 5832 Lincoln Dr #222 - Edina, MN 55436
https://tinyurl.com/4psr5m4k  https://tinyurl.com/yc67fpw4  https://tinyurl.com/yy8vsmzb

USPS Certified Mail Receipt # 70200090000008903880 - Mailed To: Scanline VFX - Stephan Trojansky - 6807 W Sunset Blvd - 4th Floor - Los Angeles, CA 90028
USPS Certified Return Receipt # 9590940275212098964030  for Certified Mail # 70200090000008903880 - Mailed To: InfiniSet, Inc. - 5832 Lincoln Dr #222 - Edina, MN 55436
https://tinyurl.com/3875s6cw  https://tinyurl.com/89dva8rj  https://tinyurl.com/yjbyaw8d

USPS Certified Mail Receipt # 70200090000008903897 - Mailed To: Fenwick & West LLP - Robert Hulse - 801 California Street - Mountain View, CA 94041
USPS Certified Return Receipt # 9590940275212098973667  for Certified Mail # 70200090000008903897 - Mailed To: InfiniSet, Inc. - 5832 Lincoln Dr #222 - Edina, MN 55436
https://tinyurl.com/bddph88t  https://tinyurl.com/yxc2cmvv  https://tinyurl.com/bdd6zwzk

USPS Certified Mail Receipt # 70200090000008903958 - Mailed To: Netflix, Inc. - Bryony Gagan - 100 Winchester Circle - Los Gatos, CA 95032
USPS Certified Return Receipt # 9590940275212098962562  for Certified Mail # 70200090000008903958 - Mailed To: InfiniSet, Inc. - 5832 Lincoln Dr #222 - Edina, MN 55436
https://tinyurl.com/mwyy4b32  https://tinyurl.com/y7dtmvda  https://tinyurl.com/52z2wd3n

USPS Certified Mail Receipt # 70200090000008903941 - Mailed To: Netflix, Inc. - Greg Peters - 100 Winchester Circle - Los Gatos, CA 95032
USPS Certified Return Receipt # 9590940275212098962555  for Certified Mail # 70200090000008903941 - Mailed To: InfiniSet, Inc. - 5832 Lincoln Dr #222 - Edina, MN 55436
https://tinyurl.com/mtybfpv5  https://tinyurl.com/wtr3j2sk  https://tinyurl.com/2p95dnsh

USPS Certified Mail Receipt # 70200090000008903927 - Mailed To: Netflix, Inc. - Ted Sarandos - 100 Winchester Circle - Los Gatos, CA 95032
USPS Certified Return Receipt # 9590940275212098962531  for Certified Mail # 70200090000008903927 - Mailed To: InfiniSet, Inc. - 5832 Lincoln Dr #222 - Edina, MN 55436
https://tinyurl.com/55ewzwtm  https://tinyurl.com/yruc8mm3  https://tinyurl.com/49kf65jw

USPS Certified Mail Receipt # 70200090000008903903 - Mailed To: Netflix, Inc. - Spencer Wang - 100 Winchester Circle - Los Gatos, CA 95032
USPS Certified Return Receipt # 9590940275212098973643  for Certified Mail # 70200090000008903903 - Mailed To: InfiniSet, Inc. - 5832 Lincoln Dr #222 - Edina, MN 55436
https://tinyurl.com/yc4ue67v  https://tinyurl.com/2hd53stk  https://tinyurl.com/2p8ffsbh

USPS Certified Mail Receipt # 70200090000008903873 - Mailed To: Netflix, Inc. - David Hyman - 100 Winchester Circle - Los Gatos, CA 95032
USPS Certified Return Receipt # 9590940275212098973650  for Certified Mail # 70200090000008903873 - Mailed To: InfiniSet, Inc. - 5832 Lincoln Dr #222 - Edina, MN 55436
https://tinyurl.com/yckhs4cy  https://tinyurl.com/283schum  https://tinyurl.com/yuzmfps3

USPS Certified Mail Receipt # 70200090000008903965 - Mailed To: Netflix, Inc. - Amy Reinhard - 100 Winchester Circle - Los Gatos, CA 95032
USPS Certified Return Receipt # 9590940275212098974237  for Certified Mail # 70200090000008903965 - Mailed To: InfiniSet, Inc. - 5832 Lincoln Dr #222 - Edina, MN 55436
https://tinyurl.com/r9rd3rhc  https://tinyurl.com/mun6u63y  https://tinyurl.com/uvrsj8ta

EXHIBIT
Gb

## Privacy Act Release Form

From Welch, Hanna (Klobuchar) <Hanna_Welch@klobuchar.senate.gov>

To     Matt xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx >, xxxxxxx@xxxxxx

Date   Tuesday, October 3rd, 2023 at 2:32 PM

Hello,

Thank you for contacting the office of U.S. Senator Amy Klobuchar. Before we are able to take any action, the person in need of assistance will need to complete and sign the enclosed Privacy Act Release Form. This form grants our office permission to act on your behalf, and gives the relevant federal agency or agencies permission to discuss your situation with our staff and release any pertinent information to our office.

Please complete the enclosed form and return it to our office by fax at (202)-XXX-XXXX or by postal mail at 1200 Washington Avenue South, Suite 250, Minneapolis, MN 55415.  Feel free to include copies of documents which are particularly relevant to your case.  If you have any questions please contact our office at (612) XXX-XXXX and we will be happy to assist you.


Sincerely,


Hanna Welch

Constituent Advocate & Intern Coordinator

Office of U.S. Senator Amy Klobuchar

1200 Washington Avenue South, Suite 250

Minneapolis, MN 55415

Office: 612-XXX-XXXX

Fax: 202-XXX-XXXX


490.49 KB 1 file attached

Klobuchar PAR.pdf 490.49 KB

**U.S. SENATOR AMY KLOBUCHAR**
1200 Washington Avenue South #250
Minneapolis, MN 55415
Phone: (612) 727-5220 Fax: (202) 224-1792

## PRIVACY ACT RELEASE

The Privacy Act requires your written consent before a government agency will release information to our office regarding your records. To better serve you, please complete this form and return it to my Minnesota office. Please be aware that the person requesting assistance must sign this form.

Mr. _X_    Mrs.__    Ms.__    Dr.____

Name: _Matthew David Guertin_    Date of Birth: _07/17/1981_
                                                    mm/dd/yyyy

Mailing Address: ██████████████████

City: _Plymouth_    State: _MN_    Zip: _55442_

Phone (H): _Me-_███████ (W): _Mom-_██████ Cell:_____

Email Address: ████████████████    ████████████████

Federal Agencies involved: _F.B.I., F.T.C., US Secret Service, USPTO, US Army_

Social Security Number*: ██████████████

*Do not provide SSN for immigration or housing issues

| **Military or Veteran's Issues:** |
| --- |

Branch of Service: _US Army_    Are you currently serving? Yes __  No _X_

What agency does your issue concern? If other, please specify: _US Army_

Veterans Benefits Administration __    Veterans Health Administration ___    Other _X_

Type of Claim Filed _Fraud_ — 

| **Social Security Issues:** |
| --- |

Type of Claim Filed:_____

| | | | |
| --- | --- | --- | --- |
| Initial Claim: | Pending: __ | Approved:_____ | Denied:_____ |
| Reconsideration: | Pending:_____ | Approved:_____ | Denied: __ |
| ALJ Hearing: | Pending:_____ | Approved:_____ | Denied:_____ |
| Appeals Council: | Pending:_____ | Approved:_____ | Denied:_____ |

1

**Immigration Issues:**

Petitioner:

    Country of Birth:_____ Alien Number (if any):_____

Beneficiary Name (if applicable):_____

    Date of Birth:_____ Country of Birth:_____

    Alien Number (if any):_____ Date of Filing: _____

Application type:_____ **Receipt Number:**_____

**Please provide a detailed account of your situation and state how you would like Senator Klobuchar to assist you.** Use a separate sheet if necessary and provide copies of any relevant correspondence regarding this issue.

Have you contacted another Congressional office?                    Yes _____   No ✕

If yes, which office have you contacted? _____

I certify, under penalty of perjury, that 1) I provided or authorized all of the information in this privacy release and any document submitted with it; 2) I reviewed and understand all of the information contained in my privacy release submitted with it; and 3) all of this information is complete, true, and correct. I hereby authorize the office of U.S. Senator Amy Klobuchar to access my records and act on my behalf with any and all agencies necessary to resolve the matters listed above.

Signature: _____   Date: 10/5/23

2

Everything regarding my situation can be found at the following web link -

mattguertin.substack.com/?sort=top

All one has to do is start out by reading through the 'InfiniSet CEO Uses chatGPT for first time' and it's highly likely you will keep on reading everything else I have been able to figure out and decided to simply make public. The post and my page has over two thousand views and if it were candle sticks on a market chart it gives me the vibes of wanting to break-out pretty soon in terms of the past few days of activity.

If you would like to get a much clearer picture more quickly below is another link where I show how my granted patent could be used in terms of military training simulations - if you read through the other stuff however and then arrive at the information below (which is essentially the 'end' output of everything currently in terms of flow) you will also realize that the whole military aspect and Netflix, once clearer, actually serves to almost self-substantiate what I believe to be the very obvious and clear (100% certainty in my opinion) images and video content generated by a CNN ai model in all of the papers - which they could come up for an actual excuse for if it wasn't all claimed to be from 2006 due to ai not existing at the time that was capable of generating the imagess and video) Even just the content iitself though is ridiculous just at first glance to many I have shown it to based simply on what they are trying to pass off as 'authentic' while claiming such a far ago date as far as what technology actually existsted back then - long story short it is way too overproduced and perfect and also in my opinion too high resolution for some of the elements if they were actually from 2006 - this doesn't even take into account the obvious CNN artifacts I uncovered very clearly using digital forensic detection methods involving color curve analysis. It would be laughable if I wasn't the one it was directed at...

mattguertin.substack.com/p/potential-military-and-ai-applications

Simply providing you with these web links is the easiest way for me to convey the information in terms of 'big picture' to you otherwise I would spend too much time focused on this as I need to 'move on' and refocus my attention back to the actual business itself and what I need to accomplish.

I would be happy to provide any additional information required in terms of any and all digital forensic evidence if something actually ends up being done regarding what I believe is very clear, obvious, and blatant fraud taking place. Regardless I only mention all of this for the purpose of letting you know that I have all of the 'proof' to back up everything I am claiming 100x over. It's just that I am not going to be able to meet the next deadline of October 19th which is my deadline to come up with enough money to file the remainder of my interneational PCT 31 month country filings - which includes Europe. I cannot fail. Plus I am really just getting sick of all of this stuff. It is exhausting.

No one has done anything. Attorneys don't want to even touch it. I have reached out to so many people and it seems pointless as it appears they are either intimidated or being intimidated by outside forces and pressures. Something I believe is likely due to the obvious military involvement in what is all taking place regarding my patent - which has literally turned my life into kind of a surreal nightmare at this point even though I still always try to stay positive and focused.

I don't deserve any of what I have gone through for nearly the past year straight at this point and the fact that it also appears to very clearly involve at least elements of the US Military / Army who I am supposed to believe are my fellow citizens, and whose job definition involves serving and protecting the country in which I live isn't only 'worrisome' for me in terms of concerns for my personal safety but also just kind of sad in a way to realize that I literally feel like one of my 'enemies' in all of this are people I believed were there to actually help and protect me at one point in time...not that long ago actually.

https://MattGuertin.substack.com/p/potential-military-and-ai-applications

## Amy Klobuchars assistance -

I would like for Amy Klobuchar to assist me in demonstrating the belief that our society upholds equitable principles for all, regardless of status or resources.

I would like for Amy Klobuchar to assist me in addressing the perception that powerful corporations, agencies, legal entities, and individuals are seemingly invincible and unconcerned with the law due to their vast financial resources and teams of attorneys. This situation presents significant challenges for an independent inventor, US Patent holder, and CEO of a small startup like myself when defending intellectual property rights in proceedings involving small businesses, large corporations, and the USPTO.

I would like Amy Klobuchar to assist me in addressing, and possibly reducing, some of the prevalent stereotypes in the realm of small businesses and intellectual property rights. These stereotypes are not indicative of a judicial process that genuinely upholds impartiality and the principle of justice being 'blind'. Yet, for some reason, many people readily accept and even perpetuate them without giving them much critical thought.

I would like for Amy Klobuchar to assist small businesses, not only in Minnesota but also across the country, as they seek redress and defend themselves against corporate fraud, criminal fraud, and other forms of fraud tied to the misuse of rapidly evolving large language models and various AI image/video generation tools that are being employed for AI-assisted white-collar crime and deceptive business practices.

I would like for Amy Klobuchar to assist me in being able to trust that the digital information which all of us as a fair, functional and collective 'society' rely on as a whole in order for 'society' to even exist in the first place is in fact truthful, authentic, and without deception for everyone equally even though much of it is ultimately actually controlled by only the few.

Sincerely,

Matthew David Guertin
Inventor/Founder/CEO
InfiniSet, Inc.

US11577177B2

10/5/23

## Re: Privacy Act Release Form

From matt xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx >

To      Welch, Hanna (Klobuchar)<Hanna_Welch@klobuchar.senate.gov>

Date    Friday, October 6th, 2023 at 4:55 PM

Hanna,

Form is signed and attached.

Thank you very much.

~Matt

19.67 MB    1 file attached

KlobucharRelease.pdf  19.67 MB

# Congressional Response:

From Welch, Hanna (Klobuchar) <Hanna_Welch@klobuchar.senate.gov>

To      Matt xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx >

CC      xxxxxxxxx@msn.com

Date    Tuesday, October 10th, 2023 at 1:02 PM

Good afternoon Mr. Guertin,

Thank you for contacting the office of U.S. Senator Amy Klobuchar. We have received your privacy release form and your written letter regarding your concerns. I am sorry to hear of the difficult issues you are experiencing with numerous agencies. Our office is limited to contacting federal agencies on behalf of Minnesota constituents. With that being said, we may contact the U.S. Patent and Trademark Office regarding the product. At your earliest convenience, please provide any supporting documents that would be helpful in sending to the USPTO along with the congressional inquiry. This may be an application submitted to the USPTO or how the product/service has suffered loss/revenue. If you have additional questions or concerns, please feel free to contact me directly by email or by our office's main line at (612) XXX-XXXX.

Sincerely,

## Hanna Welch

Constituent Advocate & Intern Coordinator

Office of U.S. Senator Amy Klobuchar

1200 Washington Avenue South, Suite 250

Minneapolis, MN 55415

Office: 612-XXX-XXXX

Fax: 202-XXX-XXXX

# Re: Congressional Response:

From matt xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx >

To     Welch, Hanna (Klobuchar)<Hanna_Welch@klobuchar.senate.gov>

CC    xxxxxxxxxx@msn.com

Date   Tuesday, October 10th, 2023 at 3:36 PM

Hanna,

https://mattguertin.substack.com/p/none-of-them-ever-say-hello
These are only the ones that show up in my email inbox as I do not pay extra on LinkedIn
So if we go off that alone the other agencies involved in all of this are DARPA, Army, State Department, Defense Intelligence Agency, INDOPACOM. Just the fact that Paul Debevec searched for me twice should be a huge red flag as he is the 'face' of the fraud as he has legitimate accomplishments and worked at Google, etc.

https://mattguertin.substack.com/p/dr-paul-debevec-fruad
this right here should serve to instantly discredit the entire validity of their operation as well as their patent as they are 100% all involved in a massive criminal conspiracy as well as wirefraud if you want to get technical - but they simply do not care because no does anything. Is someone at Netflix or Paul Debevec really ever going to be worried about 'truly' getting into trouble for what ultimately is blatant fraud being carried out ?

I am not sure if I was emailed this on purpose and perhaps if the authors saw what was happening to me and put this story up to help me or if it is a complete fluke. Regardless this discredits everything while also lining up perfectly with the patents Paul Debevec does in fact have for his Light Stage (which is what they are trying to say his fraudulent research was based on)

So if there is anything to specifcally 'hone in on' it is the link above as they have gotten rid of everything else in terms of the 'true and authentic' history they were able to completely wipe off the internet.

https://mattguertin.substack.com/p/the-internet-archive-fraud
This is me proving that the InternetArchive were the ones carrying out the first round of fraud I experienced near the beginning of this year. This is mathematically sound insofar as the odds that the pattern you see would ever happen to all of the different page groups. I actually made a custom program to be able to parse all of the data you see and put it into spreadsheets. I

https://mattguertin.substack.com/p/ai-generated-youtube-videos-from
I have these completely synthetic, ai generated references on my official patent in the form of ai generated youtube videos which ultimately serves to add credibility to the fake 'PhotoRobot' entity should they somehow appear to legitimize it through various methods I could imagine they have the resources to accomplish/work out. This stuff almost certainly had to have been created by Microsoft as they are partnered with Mark Roberts Motion

Control in addition to the fact that they were able to produce almost all of this in three weeks - those 3 weeks being the time inbetween me firsy contacting the CEO of Mark Roberts Motion Control and him finally responding - which was on October 31st of 2022. I believe these videos are still currently much more advanced than what your average person even thinks is possible at all as I never would've even thought to look more closely at them had I not first been dealing with images.

https://mattguertin.substack.com/p/a-closer-look-at-the-photorobot-fraud
Speaking of here are those images. This is from their fake product brochures. The method I am using to bring all of this stuff to the surface is basic color curve analysis which anyone remotely capable of using a computer could do pretty easy. In addition there iis some of my additional very early captures as well as I witnessing everything keep changing. Just so you realize the woman you see where it says 'Page 5 from 'Virtual Catwalk' is the same 100% synthetic/not real woman that you see in the videos - with the same artifacts if you look more closely at it.

https://mattguertin.substack.com/p/dr-jill-rogstads-official-diagnosis
Here is the blatantly deceptive forensic psychologist I had to go see after being messed with so much and then stumbling across a video of completely fake people which I had never encountered before that I was literally frozen in fear and thought there may very well be people waiting to kill me outside my apartment if I left at all. They knew I was downloading all of the evidence because why would anyone else care? It was literally only me that they were trying to steal from. My life has literally never been the same since that email from the CEO. It's not just related to business...I am currently afraid of going outside at all or going anywhere and the people I am afraid of all appear to be in positions of power or have access to plenty of it. What other explanation would there possibly be for all of those government/military agencies searching for me on LinkedIn? They never send me a message. Everything I have been going through directly relates to the insane value of my patent and the fact that I was unlucky enough to end up filing it 12 days before Netflix. It is safe to assume they have probably invested billions of dollars into the whole military aspect of it by now. That just makes it that much more insane though that they would be willing to just steal from me as opposed to paying me. The entire USPTO may as well be pointless now - especially in the new age of ai. They don't even send out hard copies of patents anymore.

So to be clear about what was carried out just in relation to the Netflix stuff (round 2) they were essentially able to scrub the entire internet of conflicting content and then they distributed a very large amount of completely fake/ai generate images  and videos, flooded YouTube with it, accredited academic publishers,etc. YouTube even let them upload edits of original / authentic content which contained the fraudulent stuff edited in the middle of the video. It is insane. It means that IP is essentially pointless because if you end up like me and come up with an idea that is actually hard to calculate in value due to 100% being a 'breakthrough' 'disruptive' revolutionary concept that there is nothing at all one can do if the people with all the power, money, and digital control of the 'gates' so to speak are able to literally do anything at all they want in terms of very easily just creating fake prior art with a date that's earlier than your and it is game over. That is what they were trying to do to me now two different times and I caught them both times - which is crazy in itself as both times were kind of 'luck' or some type of 'devine' aspect I believe.

This is just exhausting. It has sucked so much of my time and focus away but I would've been foolish not act once I realized what was taking place. I was literally all lined up, opened up my bank account, was happy again and getting outside, etc and then literally all that happened was me seeing the fake video, knowing it was fraud, and

then my whole life has literally been uprooted again suddenly as I am thrown onto a completely different trajectory. When I speak of being worried about my safety I mention that because there have been very clear signs I am/was being surveiled. As an example of all the questionable and strange shit that has now become my 'life' due to this patent just take a look at this - https://link.storjshare.io/XxxXxxxxxXxxxXxXxxXxxxxXXx/round-1-photo-robot%2FspecialOpsGearInvention%2FspecialOpsGear

Somehow I end up with a welder that is also in the CIA...or said he was...but even though he was cool I always got sketchy vibes for some reason...theres a whole lot more 'stuff' in regards to the welder but I will spare you. There is also Google taking my trademarked name 'InfiniSet' and then naming their dataset 'InfiniSet' for their new ai after the fact for the purpose I believe of flooding the internet so that I can't get any traction or hits as they literally have a massive amount of ai generated fake news stories constantly being posted where some of them will use the word 'InfiniSet' 8 times in one pointless article. Just go on Google and type in 'InfiniSet' and you will see exactly what I mean. I am 100% being targeted and messed with. The biggest tell in the case of Google is that they are purposefully and intentionally constantly pumping out new pages / stories so that the search results always stay flooded with the name of my company! It is so crazy. Just go on Google and use a search filter for the last week or month and search for InfiniSet and you will see a bunch of pointless stories. Try clicking on the author. You will realize there is no actual author and the little twitter logo and LinkedIn logo aren't even clickable.

I could literally go on and on and on. I am literally swimming in digital forensic evidence along with all sorts of crazy stuff that was or is going on.

https://mattguertin.substack.com/p/images-from-2006 <~~these are actual images from their fake papers. The little squares prove it is 100% ai generated yet they claim it is all from 2006 when ai wasn't capable of this

They have went to such extreme yet obvious lengths that why wouldn't they also be intentionally making sure certain calls don't get connected as it relates to being able to successfully move my business forward?

The US Army was/is hosting one of these completely fabricated academic papers which was even a completely customized version geared specifically towards simulation training even though it had the exact same authors.

If I had a magic wand and Amy Klobuchar had unlimited powers in terms of reach and ability to affect an outcome she would be calling up the USPTO and making them explain who/what/why etc was involved with the netflix patent suddenly being raced through the USPTO somehow even though they all knew about my 3rd party prior art which was entered into the official record, signed off on, but subsequently ignored, just as my patent attorney firm in Minneapolis had decided to drop me as a client without reason as a direct response to an email I sent clearly showing the fraud taking place and then after that Ms. Klobuchar would drive over to DARPA or the Defense Intelligence Agency and drag whoever is running it out by their ear and not let them leave until they provide some sort of valid reason as to why they are all searching for a private citizen that has absolutely no ties / affiliations / reason to be interacting with them. It would be a different story if they were searching for me and then sending me a message saying hello or something. I am of the opinion that the whole linkedIn search thing should be a cause for concern or something that should be looked into. They are paying attention to me for some reason obviously...?  And then you even have the US State Department searching for me? Ummmmmm......I don't even know what I am supposed to think any more..

Regardless my substack page is getting a lot of attention and hits now and so at some point it is going to have to be addressed in a meaningful way because there are a whole lot of people who understand what is all taking place as well as can clearly see that for all intents and purposes I have in fact 'proven my case' in the court of public opinion beyond any reasonable doubt. Netflix knows it. I know it. And a whole lot of other people also know it or will soon. I am essentially discrediting the entire system. It sounds like I am being hyperbolic perhaps but I am openly showing everyone all of the evidence and it would be fair to say that it is all rather compelling. If nothing is done or nothing becomes of it somehow in a way where people know that some sort of justice has been carried out or there actually were some ramifications it will cause an inherent distrust in a variety of ways and things in my opinion.

I am just clacking away on this keyboard and I could keep going and going but I have to try and stop and get focused now. Plus I gave you more than enough to read I'm guessing. :-)

I hope it comes across as somewhat organized when read. I will follow up shortly with some additional docs related to USPTO, etc. within a half hour.

Thank you,

Matthew Guertin

# Re: Congressional Response:

| From | matt xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx > |
|------|------|
| To | Welch, Hanna (Klobuchar)<Hanna_Welch@klobuchar.senate.gov> |
| CC | xxxxxxxx@msn.com |
| Date | Wednesday, October 11th, 2023 at 11:18 AM |

Hanna,

I am just finishing up the documents right now and will have over before noon.

I wanted to make sure to include my notes as well in regards to making it as easy and obvious as possible for anyone to see that the patents are the exact same thing as far as the core elements are concerned - that being the rotating treadmill.

I wasn't sure how quickly you needed so just wanted to update you

Thanks,

Matthew Guertin

# Re: Congressional Response:

From matt xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx >

To    Welch, Hanna (Klobuchar)<Hanna_Welch@klobuchar.senate.gov>

CC    xxxxxxxxxx@msn.com

Date   Wednesday, October 11th, 2023 at 11:39 AM

Hanna,

Here is a link with everything I believe you would want or need in regards to what I have going on as it relates to the USPTO aspect of all of this including an overview of the fraud in addition to various official documents including patents, certified mailers, etc.

https://link.storjshare.io/xXxXxXxXxXxXxXxXxXxXxXxXxXxXxXxX/amy%2FInfiniSet_Inc_USPTO_share

If you can confirm receipt and no issues downloading it would be much appreciated.

Thank you for your time and please tell Amy I said thank you as well when you have the chance.

Sincerely,

Matthew Guertin
Inventor/Founder/CEO
InfiiniSet, Inc.
Minneapolis, MN 55436
763-XXX-XXXX

## Re: Congressional Response:

From matt xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx >

To      Welch, Hanna (Klobuchar)<Hanna_Welch@klobuchar.senate.gov>

CC      xxxxxxxxx@msn.com

Date    Wednesday, October 11th, 2023 at 12:07 PM

Hanna,

One final thing.

I actually happened to inadvertently stumble upon exactly what I had mentioned to you in the other email regarding YouTube allowing them free reign to upload edits of existing videos.

The absurdity involved in what they are attempting to pull off doesn't get any clearer than this in my opinion. Here is the ONE remaining source article which is authentic as far as accurately portraying Paul Debevec's true and authentic history -

https://www.motionpictures.org/2013/10/uscs-paul-debevecs-role-in-the-matrix-avatar-gravity-more/

If you look at that article and click on the video YouTube video embedded which is titled 'Animating a Photo-Real Human Face' I would suggest you sit and watch the whole thing to arrive at the ending for the purpose of context - but regardless the ending has the fraudulent, ai generated content added in at the end.

- The video has a claimed uploading date to YouTube of July 17th, 2013

- The actual date/year of the claimed TedTalk with Paul Debevec is sometime in 2009 which is apparent due to the year being written in the titles on the screen

- The publishing date of the article I linked above is Oct 29th, 2013 - approximately 3 months AFTER the supposed upload date, 3+ years after the supposed TedTalk occurred, and 6+ years after Paul Debevec's claimed 2006 academic papers, videos, and research.

- If you notice the way Paul speaks about what he is presenting to his supposed audience it seems he is referring to them having just created this marvelous new idea as far as his mention of continuing further work on it, etc

- None of this at all lines up with the contents of the 2013 MotionPictures dot org article linked above.

- AND - I think it is highly relevant to point out the fact that even though Paul is supposedly presenting that to an audience in 2009 (all unequivocal facts based on what they are representing as authentic and want us to

believe is 'real') for some reason the video that is shown is the exact same one being used in the fraudulent 2006 papers as well as videos - this includes both the video of 'Bruce' on the treadmill as well as the video of a bunch of 'Bruce's' running through the scene.

• This means that even though there would've had to have been at least 3 years approximately between Debevec's claimed 2006 accomplishments - which would in fact have been very large and noteworthy accomplishments if they were in fact authentic, especially for the year 2006 - that for some reason the only content Paul Debevec now has available to share with his make believe audience in 2009 is THE SAME EXACT CONTENT- IDENTICAL - to that which was supposedly created and produced for the original research.

• This is ridiculous on its face in my opinion just as the the inclusion of that video at the end of a short video titled 'Animating a Photo-Real Digital Face' is ridiculous insofar as how completely out of place and unrelated it is to the entire substance as well as the title itself of the video it is included with.

I believe this is something that is obvious to anyone using basic logic and reasoning skills without any need for a technical background - as in blatantly obvious. Hence my reasoning for following up and making mention of it. It is an excellent 'introduction' if you will to the fraud that is being carried out against me which involves a massive amount of resources, people, and companies.

I also attached the document to this email (included in the files I provided as well ) which I believe is the entire reason WHY they are so focused on the whole 'rotating treadmill' aspect which will help to make everything more clear regarding what I have shared above.

Thanks again,

Matthew Guertin
Inventor/Founder/CEO
InfiniSet, Inc.
Minneapolis, MN 55436
763-XXX-XXXX

## Re: Congressional Response:

From matt xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx >

To      Welch, Hanna (Klobuchar)<Hanna_Welch@klobuchar.senate.gov>

CC      xxxxxxxxx@msn.com

Date    Monday, October 16th, 2023 at 3:43 PM

Hanna,

Just checking in to see if anything ever became of this as I have not heard back at all. I also sent a large amount of the various posts from my Substack page outlining the fraud and what is all going on via certified mail as well to make sure you also obtained an 'analog' version as well.

I am very aware of the fact that things don't happen overnight so not trying to bother you about it but I figured it wouldn't hurt to at least see if there are any updates or things actually taking place? (as opposed to also considering the possibility that my email reply - in which I suddenly throw the US State Department, DARPA, Defense Intelligence Agency, US Army, INDOPACOM, etc. into the mix may have quickly halted any of the things which may in fact have been in the process of taking place in regards to my situation..)

Besides the US State Department looking me up on LinkedIn 'sticking out' for obvious reasons, especially relative to the timing relative to the entire 'patent situation' - I think the other HUGE red flag would be the fact that both Paul Debevec and the US Army both looked me up during the same week which was right after I had signed up for the Internet Archive on December 9th, 2022 to take a snapshot of the entire PhotoRobot.com website and really began my whole 'investigation mission' upon the realization of the fraud that was taking place surrounding all of that ('Round 1')

Besides the obvious 'craziness' in general surrounding all of this the other thing I still cannot wrap my head around at all is why I was able to figure any of this stuff out in the first place? Meaning if Paul Debevec, Netflix, and elements of various US Federal Government agencies (many apparently..) all colluded to carry out this fraud why would they all be so stupid in terms of making it so openly visible to me in the first place? It is absolutely mind boggling in terms of still being completely surreal just in terms of how many people and agencies are obviously focused solely on me, my company, and my patent - but also because I can't help being completely confused as to why they would be making such 'amateur hour' mistakes such as choosing to look me up on LinkedIn from logged in and 'official' government LinkedIn accounts for example? When you consider just the names and purpose for some of these government agencies that are so interested in me it's completely absurd.

If they were going to carry out such a large 'operation' against me why didn't they at least execute it successfully so that I at least never knew it existed in the first place instead of being so careless that I have instead been essentially forced into either having to call it out - regardless of the massive implications involved - or simply stand by and allow the theft of my intellectual property to take place because I'm too scared and fearful to act due to the implications involved?

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

All of this is still completely unbelievable for obvious reasons...as in I literally have a hard time accepting that this really is in fact all actually happening and is actually 'my life' right now due to how insane all of this is. It is surreal....like I am living in a real life movie script now.

I just hope this movie has a good ending or at the very least there are some sort of actions being taken (which perhaps maybe I am unaware of or not privy to..) to try and ensure that ends up being the case anyways.

Thanks for your time,

Matthew Guertin
Inventor/Founder/CEO
InfiniSet, Inc.
Minneapolis, MN 55436
763-XXX-XXXX

# RE: Congressional Response:

From Welch, Hanna (Klobuchar) <Hanna_Welch@klobuchar.senate.gov>

To      Matt xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx >

CC      xxxxxxxx@msn.com

Date    Monday, October 23rd, 2023 at 12:51 PM

Good afternoon Matthew,

Thank you for your messages and my apologies for the delayed response. Are you able to clarify further how our office can of assistance in this matter? As I mentioned previously, we are limited to contacting federal agencies on behalf of Minnesotans. If this is something you would like our office to address with the USPTO, please let me know.

Sincerely,

Hanna Welch

Constituent Advocate & Intern Coordinator

Office of U.S. Senator Amy Klobuchar

1200 Washington Avenue South, Suite 250

Minneapolis, MN 55415

Office: 612-XXX-XXXX

Fax: 202-XXX-XXXX





**UNITED STATES POSTAL SERVICE.**

GOLDEN VALLEY
7701 GOLDEN VALLEY RD
MINNEAPOLIS, MN 55427-9998
(800)275-8777

10/12/2023                          12:48 PM

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| Priority Mail® Flat Rate Env | 1 | | $9.65 |
| Minneapolis, MN 55415 Flat Rate Expected Delivery Date Fri 10/13/2023 | | | |
| Insurance | | | $0.00 |
| Up to $100.00 included | | | |
| Certified Mail® | | | $4.35 |
| Tracking #: | | | |
| 70221670000302716105 | | | |
| Total | | | $14.00 |

Grand Total:                        $14.00

Cash                                $14.00

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
1-800-222-1811.

Save this receipt as evidence of
insurance. For information on filing an
insurance claim go to
https://www.usps.com/help/claims.htm
or call 1-800-222-1811

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device,



or call 1-800-410-7420.

UFN: 266318-0427
Receipt #: 840-55530389-2-5515306-2
Clerk: 20

---

**UNITED STATES POSTAL SERVICE.**

LOST LAKE
9705 45TH AVE N
MINNEAPOLIS, MN 55442-2566
(800)275-8777

10/12/2023                          12:25 PM

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| First-Class Mail® Large Envelope | 1 | | $4.23 |
| Minneapolis, MN 55415 Weight: 0 lb 12.10 oz Estimated Delivery Date Sat 10/14/2023 | | | |
| Certified Mail® | | | $4.35 |
| Tracking #: | | | |
| 70223330000650650050 | | | |
| Total | | | $8.58 |

Grand Total:                        $8.58

Cash                                $20.00
Change                             -$11.42

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
1-800-222-1811.

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device,



or call 1-800-410-7420.

UFN: 266323-0442
Receipt #: 840-55530395-4-4944022-2
Clerk: 20





10/13/23, 6:26 PM
27-CR-23-1886
CASE 0:24-cv-02646-JRT-DLM   Doc. 38-4 - Filed 08/02/24   Page 219 of 271
USPS.com® - USPS Tracking® Results
Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

# USPS Tracking®

FAQs ❯

Tracking Number:

## 70223330000065385050

Copy     Add to Informed Delivery (https://informeddelivery.usps.com/)

### Latest Update

Your item was delivered to the front desk, reception area, or mail room at 1:24 pm on October 13, 2023 in MINNEAPOLIS, MN 55415.

**Get More Out of USPS Tracking:**

   USPS Tracking Plus®

Feedback

### Delivered
**Delivered, Front Desk/Reception/Mail Room**

MINNEAPOLIS, MN 55415
October 13, 2023, 1:24 pm

**Out for Delivery**

MINNEAPOLIS, MN 55415
October 13, 2023, 6:10 am

**Arrived at Post Office**

MINNEAPOLIS, MN 55401
October 13, 2023, 4:38 am

**Departed USPS Regional Facility**

MINNEAPOLIS MN DISTRIBUTION CENTER
October 13, 2023, 2:51 am

**Arrived at USPS Regional Facility**

MINNEAPOLIS MN DISTRIBUTION CENTER
October 13, 2023, 1:21 am

**Departed USPS Facility**

10/13/23, 6:26 PM
27-CR-23-1886
USPS.com® - USPS Tracking® Results
Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

CASE 0:24-cv-02646-JRT-DLM   Doc. 33-4   Filed 08/02/24   Page 220 of 271

SAINT PAUL, MN 55131
October 12, 2023, 10:40 pm

**Arrived at USPS Facility**

SAINT PAUL, MN 55131
October 12, 2023, 10:07 pm

**Departed Post Office**

MINNEAPOLIS, MN 55442
October 12, 2023, 5:06 pm

**USPS in possession of item**

MINNEAPOLIS, MN 55442
October 12, 2023, 12:23 pm

**Hide Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

| Text & Email Updates | ⌄ |
|---|---|

| USPS Tracking Plus® | ⌄ |
|---|---|

| Product Information | ⌄ |
|---|---|

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

# Need More Help?

Contact USPS Tracking support for further assistance.

FAQs

10/13/23, 6:21 PM                                    USPS.com® - USPS Tracking® Results

CASE 0:24-cv-02646-JRT-DLM   Doc. 38-4 - Filed 08/02/24   Page 221 of 271

27-CR-23-1886
Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

# USPS Tracking®

FAQs >

Tracking Number:                                                    Remove ✕

## 70223330000065385050

Copy          Add to Informed Delivery (https://informeddelivery.usps.com/)

## Latest Update

Your item was delivered to the front desk, reception area, or mail room at 1:24 pm on October 13, 2023 in MINNEAPOLIS, MN 55415.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

### Delivered
**Delivered, Front Desk/Reception/Mail Room**

MINNEAPOLIS, MN 55415
October 13, 2023, 1:24 pm

### Out for Delivery

MINNEAPOLIS, MN 55415
October 13, 2023, 6:10 am

### Arrived at Post Office

MINNEAPOLIS, MN 55401
October 13, 2023, 4:38 am

### Departed USPS Regional Facility

MINNEAPOLIS MN DISTRIBUTION CENTER
October 13, 2023, 2:51 am

### Arrived at USPS Regional Facility

MINNEAPOLIS MN DISTRIBUTION CENTER
October 13, 2023, 1:21 am

### Departed USPS Facility

10/13/23, 6:21 PM
27-CR-23-1886
USPS.com® - USPS Tracking® Results

CASE 0:24-cv-02646-JRT-DLM   Doc. 38-4   Filed 08/02/24   Page 222 of 271

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

SAINT PAUL, MN 55131
October 12, 2023, 10:40 pm

**Arrived at USPS Facility**

SAINT PAUL, MN 55131
October 12, 2023, 10:07 pm

**Departed Post Office**

MINNEAPOLIS, MN 55442
October 12, 2023, 5:06 pm

**USPS in possession of item**

MINNEAPOLIS, MN 55442
October 12, 2023, 12:23 pm

**Hide Tracking History**

**What Do USPS Tracking Statuses Mean? (https://faq.usps.com/s/article/Where-is-my-package)**

Text & Email Updates                                                                    ⌄

USPS Tracking Plus®                                                                     ⌄

Product Information                                                                     ⌄

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

# Need More Help?

Contact USPS Tracking support for further assistance.

FAQs

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

 # MINNESOTA JUDICIAL BRANCH

 **EXHIBIT Ib**

Back to Previous Page

# Referee Danielle C. Mercurio

**Hennepin County Courthouse »**
Fourth Judicial District
(612) 348-2040

**Fourth Judicial District Judicial Officers »**



**Appointed:**

April 19, 2021

**Education:**

- B.A., 2006, University of Minnesota-Morris
- J.D., 2010, William Mitchell College of Law
- J.A. Cert, 2014, University of Virginia, The Judge Advocate General Legal Center and School

**Employment:**

- Mercurio Law LLC, Owner/Attorney, 2014-2021
- City of Minneapolis, Administrative Hearing Officer, 2016-2021
- United States Army-National Guard, Judge Advocate, 2011-2020

  - Recipient of the Army Commendation Medal for excellence in trial defense as trial defense counsel for the 474 field trial defense team.
  - Recipient of the Meritorious Service Medal for excellence as Brigade Judge Advocate for the 84th Troop Command and Trial Defense Counsel for the 474 Field Trial Defense Team.

**Professional Memberships:**

Admitted to practice 2011
Minnesota State Bar Association
Hennepin County Bar Association

https://www.mncourts.gov/About-The-Courts/Overview/JudicialDirectory/Bio.aspx?jid=1896

EXHIBIT

Jb

(12) **United States Patent**

**Trojansky**

(10) Patent No.: **US 11,810,254 B2**

(45) Date of Patent: **Nov. 7, 2023**

(54) **DISPLAYING A SCENE TO A SUBJECT WHILE CAPTURING THE SUBJECT'S ACTING PERFORMANCE USING MULTIPLE SENSORS**

(71) Applicant: **Netflix, Inc.,** Los Gatos, CA (US)

(72) Inventor: **Stephan Trojansky,** Los Angeles, CA (US)

(73) Assignee: **Netflix, Inc.,** Los Gatos, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/709,126**

(22) Filed: **Mar. 30, 2022**

(65) **Prior Publication Data**

US 2022/0319115 Al    Oct. 6, 2022

**Related U.S. Application Data**

(60) Provisional application No. 63/168,558, filed on Mar. 31, 2021.

(51) **Int. Cl.**
| | |
|---|---|
| *G06T 17/20* | (2006.01) |
| *G06T 7/73* | (2017.01) |
| *G06T 1/00* | (2006.01) |
| *B25J 19/02* | (2006.01) |
| *G06T 15/04* | (2011.01) |

(52) **U.S. Cl.**
CPC................ ***G06T 17/20*** (2013.01); ***B25J 19/021*** (2013.01); ***G06T 1/0014*** (2013.01); ***G06T 7/74*** (2017.01); ***G06T 15/04*** (2013.01)

(58) **Field of Classification Search**
CPC............. G06T 17/20; G06T 7/74; G06T 1/0014; G06T 15/04; B25I 19/021
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 11,577,177 B2 t | | 2/2023 | Guertin | |
| 2013/0181901 Al* | | 7/2013 | West | H04N 9/3147 345/1.3 |
| 2015/0055101 Al* | | 2/2015 | Kim. | H04N 9/3147 353/94 |
| 2018/0059528 Al* | | 3/2018 | Gocke. | H04N 9/3147 |
| 2022/0319115 Al* | | 10/2022 | Trojansky................. | B25J 19/021 |

OTHER PUBLICATIONS

Enrico Calabreset, DHP19: Dynamic Vision Sensor 3D Human Pose Dataset, 2019, pp. 1-10.*
PCT/US2022/035002 International Search Report and Written Opinion dated Oct. 10, 2022.

\* cited by examiner
t cited by third party

*Primary Examiner* - Abderrahim Merouan

(74) *Attorney, Agent, or Firm* - Greenberg Traurig, LLP

(57) **ABSTRACT**

A system surrounds an area with a first set of display panels. A second set of display panels is positioned above the area, and a third set of display panels is positioned below the area. A subject is positioned within the area and may be on an omnidirectional treadmill within the area. A controller communicates content to the first set of display panels, the second set of display panels, and the third set of display panels that presents a multidimensional scene when displayed. A set of sensors capture sensor data of the subject within the area while content is displayed. One or more of the sensors may be coupled to a repositioning system that repositions sensors so the subject remains in a field of view of different sensors. From sensor data of the subject, a representation of the subject may be generated for insertion into other video content.

**19 Claims, 8 Drawing Sheets**





EXHIBIT
Kb



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/108,858 | 02/13/2023 | Matthew Guertin | G185.0001US2 | 6872 |

7590          12/05/2023

InfiniSet, Inc.
██████████████
Plymouth, MN 55442

| EXAMINER |
|---|
| NGUYEN, KIEN T |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3711 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/05/2023 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| *Office Action Summary* | Application No.<br>18/108,858 | Applicant(s)<br>Guertin, Matthew | |
|---|---|---|---|
| | Examiner<br>KIEN T NGUYEN | Art Unit<br>3711 | AIA (FITF) Status<br>Yes |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☐ Responsive to communication(s) filed on _____.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☐ This action is **FINAL.**    2b) ☑ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) <u>1-16</u> is/are pending in the application.
    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☑ Claim(s) <u>14-16</u> is/are allowed.

7) ☑ Claim(s) <u>1-13</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

\* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
    a) ☐ All    b) ☐ Some**    c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____.
      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)

2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
Paper No(s)/Mail Date <u>02/13/23, 03/16/23.</u>

3) ☐ Interview Summary (PTO-413)
Paper No(s)/Mail Date _____.

4) ☐ Other: _____.

U.S. Patent and Trademark Office

PTOL-326 (Rev. 11-13)           Office Action Summary          Part of Paper No./Mail Date 20231202

Application/Control Number: 18/108,858                                              Page 2
Art Unit: 3711

### *Notice of Pre-AIA or AIA Status*

1.      The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.

### *Claim Rejections - 35 USC § 103*

1.      In the event the determination of the status of the application as subject to AIA 35

U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any

correction of the statutory basis for the rejection will not be considered a new ground of

rejection if the prior art relied upon, and the rationale supporting the rejection, would be

the same under either status.

2.      The following is a quotation of 35 U.S.C. 103 which forms the basis for all

obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed
> invention is not identically disclosed as set forth in section 102, if the differences between the
> claimed invention and the prior art are such that the claimed invention as a whole would have
> been obvious before the effective filing date of the claimed invention to a person having
> ordinary skill in the art to which the claimed invention pertains. Patentability shall not be
> negated by the manner in which the invention was made.

3.      The following is a quotation of 35 U.S.C. 103 which forms the basis for all

obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed
> invention is not identically disclosed as set forth in section 102, if the differences between the
> claimed invention and the prior art are such that the claimed invention as a whole would have
> been obvious before the effective filing date of the claimed invention to a person having
> ordinary skill in the art to which the claimed invention pertains. Patentability shall not be
> negated by the manner in which the invention was made.

4.      Claim(s) 1-13 is/are rejected under 35 U.S.C. 103 as being unpatentable over

Brodsky US 2019/0307982 in view of KR 10-2020-0091594 ('594).

        Brodsky discloses an immersive multisensory simulation system comprising a

travel deck (102) supporting a treadmill belt (111) arranged in an endless loop

Application/Control Number: 18/108,858                                    Page 3
Art Unit: 3711

(Fig. 14A) wherein the treadmill belt is configured for linear movement in forward

and reverse directions and wherein the travel deck is configured for angular

movement in forward and reverse directions; a turntable for rotating the travel

deck, wherein the turntable is rotatable 360 degrees or more in both or a forward

and reverse direction [0180]; a motor or cordless rotating mechanism for

operation of the turntable and allowing for infinite rotation of the turntable and

travel deck (Fig. 14A); ; and a floor base (ground surface) for supporting the

travel deck and turntable [180], [0201], [0218].  It is noted that Brodsky fails to

teach the use of one or more sources of vibration as claimed.  However, KR

('594) teaches it is known in the art an earthquake evacuation training system

using virtual reality, and a treadmill with one or more sources of vibration (11) for

providing selected vibration to one of more locations on the belt as shown in Fig.

3, [0018]-[0019].   Therefore, it would have been obvious to one of ordinary skill in

the art to provide the treadmill of Brodsky with the one or sources of vibration as

taught by KR ('594) for the purpose of providing an additional simulated vibrating

motion.

Claim 2, KR ('594) discloses a control unit for controlling the operation of the

vibrating treadmill such as providing adjustable motors for adjusting the vibration.

[0018].

Claim 3, KR ('594) also discloses a vertical drive cylinder (111), an elastic body

(112) which is equivalent to a phenolic resin sheet, and a support plate (113)

[0041].

Application/Control Number: 18/108,858                                    Page 4
Art Unit: 3711

Claim 4, Brodsky discloses a controller in communication with the force applying

unit for controlling the amount of positive or negative force [0055] to provide

movement in forward and reverse directions via the belt; and wherein the angular

direction of the forward and reverse movement is selectively adjustable via

rotation of the turntable for directionally unlimited movement in an X-Y plane

[0218]-[0219].

Claim 5, KR ('594) discloses a plurality of vertically driven cylinders that allow

vibration to be transmitted to specific positions of the treadmill which means the

cylinders can certainly be positioned in a grid formation to provide any specific

haptic feedback to a user on the treadmill.

Claim 6, KR ('594) discloses that the vibration of the earthquake output through

the virtual reality device is transmitted to the vibrating treadmill through

wire/wireless communication between the vibrating treadmill and the virtual

reality device [0016] for controlling the operation of the vibrating treadmill.

Claim 7, Brodsky discloses the omnidirectional treadmill surface is removable

which provides a floor space to a user [0198]; and one or more edges of the

surface can be considered a handle for removing the surface from the floor base.

Claims 8 and 9, Brodsky discloses in Fig. 14a the floor base operably supports

the turntable thereon and the base comprises roller wheels for centering and

supporting the turntable thereon, wherein the turntable operably supports the

travel deck and the turntable supports a motor or actuator for controlling

operation of the belt [0218].

Application/Control Number: 18/108,858                                    Page 5
Art Unit: 3711

Claim 10, Brodsky discloses the floor base houses a motor/actuator or other lift and/or retraction members at various locations beneath the surface, to raise and depress the surface.

Claim 11, Brodsky discloses a battery, which is equivalent to a slip ring, provides power to all of the electrical components of the omnidirectional treadmill [0192].

Claim 12, Brodsky discloses the user wearing a VR headset which is equivalent to one or more monochrome surfaces [0228] which allowing digital isolation of a user on the treadmill.

Claim 13, Brodsky discloses the harness design conforms to a very wide range of user shapes and sizes with minimal adjustment [0271] such disclosure is equivalent to dimensions sufficient to allow the treadmill to replace a section LED flooring from a pre-existing LED floor tile system of an LED virtual film set which does not pertain any specific dimension.

### *Allowable Subject Matter*

Claims 14-16 are allowed.


Any inquiry concerning this communication or earlier communications from the examiner should be directed to KIEN T NGUYEN whose telephone number is (571)272-4428. The examiner can normally be reached M-F 7:00 AM- 3:00 PM.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

Application/Control Number: 18/108,858                                      Page 6
Art Unit: 3711

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Melba Bumgarner can be reached on 571-272-4709. The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is

available to registered users. To file and manage patent submissions in Patent Center,

visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-

center for more information about Patent Center and

https://www.uspto.gov/patents/docx for information about filing in DOCX format. For

additional questions, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/KIEN T NGUYEN/
Primary Examiner, Art Unit 3711

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM



**Mr. Matthew David Guertin**

XXXXXXXXXXXXXXXXXX
Plymouth, MN 55442
Mattxxxxxxxxxxxxxxxxxxx.com
(**XXX**) **XXX-XXXX**

January 5th, 2024

**27-CR-23-1886**
Filed in District Court
State of Minnesota
1/5/2024 4:25 AM

**Ms. Jacqueline Perez**
300 South 6th Street  C2000
Minneapolis,  MN 55487

Re:    _**State of Minnesota** **v. Matthew David Guertin**_
         **Court File No:        27-CR-23-1886**

Dear Ms. Perez,

As the defendant in the above named case whom is facing criminal charges received in Hennepin County of which you are named as the prosecuting attorney responsible for said charges, I would respectfully ask that I please be provided with the following discovery materials related to my case pursuant to the Minnesota Rules of Criminal Procedure, Rule 9:

i.    All Brady material
ii.   Squad video
iii.  Audio tapes
iv.   All 104 police photographs (as is listed in Dr. Jill Rogstad-'s '"Confidential Forensic Evaluation Report' pertaining to my case) which were taken by the Minnetonka  Police Department of 10233 West 34th Street #304, on January 21st 2023. I would please ask that I receive these in their original, and non-compressed digital file format. If there are in fact physical, photographic quality prints those would also suffice.

I would appreciate receiving these materials as soon as possible. Please forward all correspondence to my email address. If any of these materials require postal mail for whatever reason they can be mailed to my address as listed at the top of this filing. Do not hesitate to contact me should you have any questions.

Sincerely,

_/s/ Matthew David Guertin_

State of Minnesota
Hennepin County

District Court
Fourth Judicial District

Court File Number: 27-CR-23-1886

Case Type: Crim/Traf Mandatory



**EXHIBIT Mb**

## Notice of Remote Zoom Hearing

**MATTHEW DAVID GUERTIN**
**XXXXXXXXXXXXXXXXXXXXXX**
**XXXXXXX**
**PLYMOUTH MN  55442**

Filed in District Court
State of Minnesota
1/16/2024

_____

State of Minnesota vs MATTHEW DAVID GUERTIN

You are notified this matter is set for a remote hearing. This hearing will not be in person at the courthouse.

| Hearing Information |
| :---: |
| July 16, 2024 |
| Review Hearing |
| 1:30 PM |

**The hearing will be held via Zoom and appearance shall be by video unless otherwise directed** with Judicial Officer, Hennepin County District Court.

If you fail to appear a warrant may be issued for your arrest.

The Minnesota Judicial Branch uses strict security controls for all remote technology when conducting remote hearings.

You must:
Notify the court if your address, email, or phone number changes.
Be fully prepared for the remote hearing. If you have exhibits you want the court to see, you must give them to the court before the hearing. Visit https://www.mncourts.gov/Remote-Hearings.aspx for more information and options for joining remote hearings, including how to submit exhibits.
Contact the court at 612-348-2040 if you do not have access to the internet, or are unable to connect by video.
If you need an interpreter, contact the court before the hearing date to ask for one.
If you cannot afford to hire a lawyer and would like to apply for a court-appointed attorney before this appearance visit https://pdapplication.courts.state.mn.us or scan the QR code to start the application.



MNCIS-PAN-104                    STATE      Notice of Remote Zoom Hearing                    11/22

**To join by internet:**
1. Type https://zoomgov.com/join in your browser's address bar.
2. Enter the **Meeting ID and Meeting Passcode (if asked):**
   Meeting ID: 160 223 0876
   Passcode: 1234
3. Update your name by clicking on your profile picture. If you are representing a party, add your role to your name, for example, John Smith, Attorney for Defendant.
4. Click the **Join Audio** icon in the lower left-hand corner of your screen.
5. Click **Share Video**.

Para obtener más información y conocer las opciones para participar en audiencias remotas, incluido cómo enviar pruebas, visite www.mncourts.gov/Remote-Hearings.

Booqo www.mncourts.gov/Remote-Hearings oo ka eego faahfaahin iyo siyaabaha aad uga qeybgeli karto dacwad-dhageysi ah fogaan arag, iyo sida aad u soo gudbineyso wixii caddeymo ah.

**To receive an eReminder for future court dates via e-mail or text, visit www.mncourts.gov/Hearing-eReminders.aspx or scan the QR code to enroll.**



Dated: January 16, 2024

Sara Gonsalves
Hennepin County Court Administrator
300 South Sixth Street
Minneapolis MN  55487-0419
612-348-2040

cc:



MNCIS-PAN-104          STATE     Notice of Remote Zoom Hearing          11/22

Case Details (Register of Actions)

Search executed on 03/29/2024 05:02 PM



MINNESOTA
JUDICIAL BRANCH
MINNESOTA COURT RECORDS ONLINE (MCRO)

---

### Case Information

Case Number: 27-MH-PR-23-815
Case Title: In the Matter of the Civil Commitment of MATTHEW DAVID GUERTIN, Respondent
Case Type: Commitment - Mentally Ill
Date Filed: 07/20/2023
Case Location: Hennepin County, Hennepin Probate Mental Health
Case Status: Under Court Jurisdiction

### Related Cases

27-CR-23-1886



EXHIBIT
Nb

---

### Party Information

**Petitioner**
HENNEPIN COUNTY ATTORNEY'S OFFICE
Minneapolis, MN 55487

**Attorneys Active**
• DE SOUZA, LEA MARIE - Lead Attorney

**Respondent**
GUERTIN, MATTHEW DAVID
DOB: 07/17/1981
Plymouth, MN 55442

**Attorneys Active**
• FISHER, JOEL A - Lead Attorney

**Attorneys Inactive**
• BIGLOW, MICHAEL J
• ENGH-LISKA, MELANIE ANNE

---

### Case Events

| | |
|---|---|
| 02/16/2024 | Affidavit of No Service<br>Index #42 |
| 02/01/2024 | Order for Continued Commitment<br>Judicial Officer: Borer, George<br>Index #41 |
| 01/31/2024 | Taken Under Advisement<br>Judicial Officer: Borer, George<br>Index #39 |
| 01/31/2024 | Waiver<br>Index #38 |
| 01/30/2024 | Motion for Production of Medical Records<br>Index #37 |
| 01/30/2024 | Request for Continuance Needing Judicial Approval<br>Index #36 |

Case Details (Register of Actions)
Search executed on 03/29/2024 05:05 PM



MINNESOTA
JUDICIAL BRANCH
MINNESOTA COURT RECORDS ONLINE (MCRO)

### Case Information

Case Number: 27-CR-23-1886
Case Title: State of Minnesota vs MATTHEW DAVID GUERTIN
Case Type: Crim/Traf Mandatory
Date Filed: 01/24/2023
Case Location: Hennepin County, Hennepin Criminal Downtown
Judicial Officer:  Quam, Jay
Case Status: Dormant

### Related Cases

27-MH-PR-23-815



### Party Information

**Jurisdiction**
State of Minnesota

**Attorneys Active**
• PEREZ, JACQUELINE - Lead Attorney
• ARNESON, THOMAS STUART
• PROCHAZKA, THOMAS JAMES

**Defendant**
GUERTIN, MATTHEW DAVID
DOB:  07/17/1981
Plymouth, MN 55442

**Attorneys Active**
• RIVERS, BRUCE MICHAEL - Lead Attorney

### Case Events

| Date | Event | Pages |
|------|-------|-------|
| 01/17/2024 | Finding of Incompetency and Order<br>Judicial Officer: Mercurio, Danielle<br>Index #25 | 4 pages |
| 01/16/2024 | Notice of Remote Hearing with Instructions<br>Index #26 | 2 pages |
| 01/16/2024 | Found Incompetent<br>Judicial Officer: Mercurio, Danielle | |
| 01/16/2024 | Waiver of Appearance<br>Index #24 | |
| 01/11/2024 | Rule 20 Evaluation Report<br>Index #23 | |
| 01/11/2024 | Rule 20 Report Distributed | |
| 01/05/2024 | Demand or Request for Discovery<br>Index #22 | 1 page |
| 11/15/2023 | Order-Evaluation for Competency to Proceed (Rule 20.01)<br>Judicial Officer: Dayton Klein, Julia<br>Index #21 | 2 pages |

EXHIBIT

# Pb

Filed in District Court
State of Minnesota
Jan 17, 2024 7:29 am

**STATE OF MINNESOTA**

**COUNTY OF HENNEPIN**

**DISTRICT COURT**
**FOURTH JUDICIAL DISTRICT**
**CRIMINAL DIVISION**

---

State of Minnesota,

                 Plaintiff,

vs.

Matthew David Guertin,

                 Defendant.

Court File No. 27-CR-23-1886

**<u>FINDINGS OF FACT,
CONCLUSIONS OF LAW
AND ORDER REGARDING
COMPETENCY</u>**

---

       This matter was scheduled to come before the undersigned Referee of District Court on January 16, 2024. Tom Arneson, Assistant Hennepin County Attorney, represented the plaintiff. Defendant was represented by Bruce Rivers, Esq.

       Prior to the hearing, the parties agreed to a finding of incompetency entered administratively. Based on all the files, records and proceedings in this case, the Court makes the following:

## FINDINGS OF FACT

1. Defendant (date of birth 07/17/1981), was charged in MNCIS file 27-CR-23-1886 with Dangerous Weapons (Felony) and three counts of Firearm-Serial Number-Receive/Possess With No Serial Number (Felony) arising from an incident alleged to have occurred on January 21, 2023.   On January 25, 2023, Referee Lyonel Norris found probable cause to believe that the offenses were committed and that Defendant committed them.

2. On November 15, 2023, Judge Julia Dayton Klein ordered that Defendant undergo an evaluation to assess Defendant's competency to proceed in this matter pursuant to Minn.R.Crim.P. 20.01.

3. Dr. Adam A. Milz, PhD, LP, ABPP, Psychological Services of Hennepin County District Court, reviewed Defendant's records, interviewed Defendant, and filed a written report with this Court.

4. Dr. Adam A. Milz, PhD, LP, ABPP, Psychological Services of Hennepin County District Court, opined that Defendant, due to mental illness or cognitive impairment, lacks the ability

to rationally consult with counsel; or lacks the ability to understand the proceedings or participate in the defense. This opinion was uncontested by either party.

## CONCLUSIONS OF LAW

Defendant is presently incompetent to stand trial.

## ORDER

1. The criminal proceedings in this matter are suspended until Defendant is restored to competency to proceed. While suspended, the criminal court retains authority over the criminal case including, but not limited to, bail or conditions of release.

2. Copies of this Order shall be served upon counsel for the parties and any objections to this Order shall be filed with the Court within ten (10) days of the date of service.

   Jacqueline Perez, Assistant Hennepin County Attorney - Criminal Division; Bruce Rivers, Attorney for Defendant

3. The Hennepin County Prepetition Screening Program (PSP) must conduct a prepetition screening pursuant to the Minnesota Commitment and Treatment Act and make a recommendation as to whether the defendant should be civilly committed under the Act.

4. PSP shall investigate whether civil commitment should be pursued and forward a recommendation in a written report supporting or not supporting civil commitment to the Hennepin County Attorney's Office - Adult Services Division ("HCAO-ASD") within five (5) days of receiving this Order.

5. Prepetition Screening shall provide copies of the Rule 20 Competency Evaluation, the criminal Complaint(s), and the underlying police report(s) along with its written recommendation to the Hennepin County Attorney's Office - Adult Services Division.

6. Defendant is ordered to cooperate with the civil commitment process including appearing at all court appearances in the civil and criminal cases.

7. Members of PSP shall have access to all Defendant's files and records, including those protected by Federal regulation or law. This Order grants the members of PSP access to the records of any individual or entity that has provided observation, evaluation, diagnosis, care, treatment, or confinement of the Defendant. This Order applies to, but is not limited to, records maintained by: Minnesota Fourth Judicial District Court Psychological Services; chemical

2

dependency evaluators and treatment providers; health clinics; medical centers and hospitals; physicians; psychologists; mental health care providers; case managers; parole and probation agencies; residential and nonresidential community mental health treatment facilities or programs; regional treatment centers; the Minnesota Department of Corrections; the correctional authority for any other state; schools and school districts; law enforcement agencies; and the Court's own records.

8. This Order also authorizes employees or officers of the record keepers described above to discuss the Defendant's condition, history, treatment, and/or status with the members of PSP. Information collected by PSP pursuant to this Order shall be considered private data on the Defendant, but it may be included in the written report produced by PSP and forwarded to the HCAO-ASD.

9. If the Fourth Judicial District Court -  Probate/Mental Health Division finds the Defendant to be mentally ill, developmentally disabled, chemically dependent, or mentally ill and dangerous to the public, the Defendant may be committed directly to an appropriate safe and secure facility.

10. The head of the treatment facility shall submit a written report addressing the Defendant's competency to proceed in the criminal case when the Defendant has attained competency, or at least every six months.

11. Psychological Services of Hennepin County District Court, or the Department of Human Services Forensic Evaluation Department if the defendant is civilly committed, shall have access to Defendant's treatment records to prepare the required report(s) on the defendant's mental condition with an opinion as to competency to proceed. By presentation of a copy of this order, whether mailed, sent electronically, discussed verbally, or personally delivered, the custodian of records for any agency, department, or health care provider shall release all information and/or records related to Defendant, including medical, psychological, behavioral, social service, probation/correctional, developmental disability, military, Social Security, employment, and educational records, to the agency requesting the records within 72 hours. This Order shall be sufficient to require an agency, department, entity, or health care provider  to release the requested information and/or records related to treatment Defendant has received in connection with that facility. Any of the defendant's records released pursuant to this order

3

may not be disclosed to any other person without court authorization or Defendant's signed consent.

12. The criminal conditions of release remain in effect until placement at an appropriate facility can occur.

13. Defendant's next appearance in Hennepin County District Court - Criminal Division on this matter and status review of Defendant's competence to proceed is July 16, 2024. One week prior to that date, reports regarding Defendant's competency and mental status shall be e-filed and e-served to:

    a. Fourth Judicial District Court - 4thCriminalRule20 email list;

    b. Bruce Rivers, Attorney for Defendant (riverslawyers@aol.com);

    c. Jacqueline Perez, Assistant Hennepin County Attorney (jacqueline.perez@hennepin.us);

    d. Hennepin County Attorney's Office - Adult Services Division (if a commitment is ordered);

    e. The Commitment Defense Panel attorney appointed to represent Defendant by the Fourth Judicial District Court - Probate/Mental Health Division.

14. A copy of this Order, the Rule 20.01 Competency Evaluation, the criminal complaint(s), and the underlying police report(s) shall be delivered via email to the Prepetition Screening Program of Hennepin County's Human Services and Public Health Department.

Order Recommended By:

BY THE COURT:

Mercurio, Danielle
Jan 16 2024 8:27AM
_____
Referee of District Court

Dayton Klein, Julia
Jan 16 2024 9:22 AM
_____
Judge of District Court

4

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

**Mr. Matthew David Guertin**
XXXXXXXXXXXXXXXX
Plymouth, MN 55442
XXXXXXXXXXXXXXXXXXX
(**XXX**) **XXX-XXXX**

January 30th, 2024



**Hennepin Goverment Center**
Attn: Civil Court Division
300 South Sixth St
Minneapolis, MN 55487

27-MH-PR-23-815

Filed in District Court
State of Minnesota
1/30/2024 6:37 AM

**STATE OF MINNESOTA
COUNTY OF HENNEPIN
DISTRICT COURT
FOURTH JUDICIAL DISTRICT
CIVIL DIVISION**

**In The Matter of the Civil Commitment of:
Matthew David Guertin,
Respondent**

**Court  Case#  27-MH-PR-23-815**

# MOTION FOR CONTINUANCE

I, Matthew David Guertin, the respondent in the above-referenced civil commitment proceeding, hereby respectfully request a continuance of the court hearing currently scheduled for February 1, 2024. This request is based on several critical factors that significantly impact my ability to adequately prepare for the hearing.

1.  I have only recently become aware of the scheduled  court date, giving me less than a week to prepare, which is insufficient given the complexity of the case.

2.  I have not received crucial medical records, including the psychological evaluation report by Dr. Adam Milz, despite repeated requests to my legal representatives.

Email communications showing my attempts at receiving my exam report are included with this motion

3.  There has been a lack of effective communication with my civil court-appointed attorney, possibly due to errors in information provided by the court or an oversight on the part of the attorney. Regardless I was just alerted via email yesterday that he did not have a correct phone number to reach me.

Email from Joel Fisher indicating that he was not provided with or did not have my correct phone number on record is included with this motion.

4.  I am considering the possibility of seeking advice from private counsel to ensure a comprehensive defense.

5.   Confusion and potential misinformation about my case have been indicated in communications I had with someone from the Hennepin County Prepetition Screening Program, whom I spoke with on the phone yesterday after receiving a call, further complicating my situation

Pursuant to Rule 122 of the Hennepin County Civil Court Rules, a continuance can be requested by motion in situations  where the parties have not had adequate time to prepare due to emergent issues. Additionally, Rule 115 of the Special Rules of Practice for the Hennepin County Civil Court governs civil motion practice and supports the consideration of such requests to ensure proper preparation and fair proceedings.

**REASONS FOR REQUEST:**

1.   **Lack of Essential Medical Records:** Non-receipt of crucial medical records directly hinders my understanding of the case and defense preparation.

2.   **Need for Effective Communication with Legal Counsel:** The apparent miscommunication with my appointed attorney affects my right to effective legal representation.

3.   **Exploring Options for Private Legal Counsel:** The serious nature of the case compels me to consider additional legal opinions to ensure the best possible defense. In regards to the 'seriousness'  that I mention I am specifically referring to the contents of the court order that was filed in criminal court as a result of Dr. Adam Milz's psychological evaluation report which makes mention of me potentially  losing my freedom by being detained and committed to a facility.

The mentioned court order filed in criminal court is included with this motion for reference.

4.   **Requirement for Clarity and Fairness in Proceedings:** The confusion and potential errors in the handling of my case by the involved agencies necessitate additional time for clarification and appropriate preparation.

I kindly request that the court reschedule the hearing to a date at least 30 days later to allow sufficient time for these preparations.

In the interest of justice and a fair hearing, I respectfully request the Court to grant this motion for continuance. Adequate preparation time is essential to ensure that my rights are fully protected and that I can effectively participate in my defense. All communication regarding this motion is to be directed to myself via the email listed at the top of this motion please.

Thank you for your attention to this matter.

Respectfully,

*Isl  Matthew David Guertin*

Filed in District Court
State of Minnesota
1/30/2024 6:37 AM

**STATE OF MINNESOTA**

**COUNTY OF HENNEPIN**

**DISTRICT COURT**
**FOURTH JUDICIAL DISTRICT**
**CRIMINAL DIVISION**

---

State of Minnesota,

Court File No. 27-CR-23-1886

                    Plaintiff,

        vs.

Filed in District Court
State of Minnesota
Jan 17, 2024 7:29 am

**FINDINGS OF FACT,**
**CONCLUSIONS     OF LAW**
**AND ORDER REGARDING**
**COMPETENCY**

Matthew  David Guertin,

                    Defendant.

---

This matter was scheduled to come before the undersigned Referee of District Court on January 16, 2024. Tom Arneson, Assistant Hennepin County Attorney, represented the plaintiff. Defendant  was represented  by Bruce Rivers, Esq.

Prior to the hearing, the parties agreed to a finding of incompetency entered administratively. Based on all the files, records and proceedings in this case, the Court makes the following:

### FINDINGS OF FACT

1. Defendant (date of birth 07/17/1981), was charged in MNCIS file 27-CR-23-1886 with Dangerous Weapons (Felony) and three counts of Firearm-Serial Number-Receive/Possess With No Serial Number (Felony) arising from an incident alleged to have occurred on January 21, 2023.   On January 25, 2023, Referee Lyonel Norris found probable cause to believe that the offenses were committed and that Defendant committed them.

2. On November 15, 2023, Judge Julia Dayton Klein ordered that Defendant undergo an evaluation to assess Defendant's competency to proceed in this matter pursuant to Minn.R.Crim.P. 20.01.

3. Dr. Adam A. Milz, PhD, LP, ABPP, Psychological Services of Hennepin County District Court, reviewed Defendant's records, interviewed Defendant, and filed a written report with this Court.

4. Dr. Adam A. Milz, PhD, LP, ABPP, Psychological Services of Hennepin County District Court, opined that Defendant, due to mental illness or cognitive impairment, lacks the ability

27-MH-PR-23-815

Filed in District Court
State of Minnesota
1/30/2024 6:37 AM

to rationally consult with counsel; or lacks the ability to understand the proceedings or participate in the defense. This opinion was uncontested by either party.

## CONCLUSIONS OF LAW

Defendant is presently incompetent to stand trial.

## ORDER

1. The criminal proceedings in this matter are suspended until Defendant is restored to competency to proceed. While suspended, the criminal court retains authority over the criminal case including, but not limited to, bail or conditions of release.

2. Copies of this Order shall be served upon counsel for the parties and any objections to this Order shall be filed with the Court within ten (10) days of the date of service.

   Jacqueline Perez, Assistant Hennepin County Attorney - Criminal Division; Bruce Rivers, Attorney for Defendant

3. The Hennepin County Prepetition Screening Program (PSP) must conduct a prepetition screening pursuant to the Minnesota Commitment and Treatment Act and make a recommendation as to whether the defendant should be civilly committed under the Act.

4. PSP shall investigate whether civil commitment should be pursued and forward a recommendation in a written report supporting or not supporting civil commitment to the Hennepin County Attorney's Office - Adult Services Division ("HCAO-ASD") within five (5) days of receiving this Order.

5. Prepetition Screening shall provide copies of the Rule 20 Competency Evaluation, the criminal Complaint(s), and the underlying police report(s) along with its written recommendation to the Hennepin County Attorney's Office -Adult Services Division.

6. Defendant is ordered to cooperate with the civil commitment process including appearing at all court appearances in the civil and criminal cases.

7. Members of PSP shall have access to all Defendant's files and records, including those protected by Federal regulation or law. This Order grants the members of PSP access to the records of any individual or entity that has provided observation, evaluation, diagnosis, care, treatment, or confinement of the Defendant. This Order applies to, but is not limited to, records maintained by: Minnesota Fourth Judicial District Court Psychological Services; chemical

27-MH-PR-23-815

Filed in District Court
State of Minnesota
1/30/2024 6:37 AM

dependency evaluators and treatment providers; health clinics; medical centers and hospitals; physicians; psychologists; mental health care providers; case managers; parole and probation agencies; residential and nonresidential community mental health treatment facilities or programs; regional treatment centers; the Minnesota Department of Corrections; the correctional authority for any other state; schools and school districts; law enforcement agencies; and the Court's own records.

8. This Order also authorizes employees or officers of the record keepers described above to discuss the Defendant's condition, history, treatment, and/or status with the members of PSP. Information collected by PSP pursuant to this Order shall be considered private data on the Defendant, but it may be included in the written report produced by PSP and forwarded to the HCAO-ASD.

9. If the Fourth Judicial District Court - Probate/Mental Health Division finds the Defendant to be mentally ill, developmentally disabled, chemically dependent, or mentally ill and dangerous to the public, the Defendant may be committed directly to an appropriate safe and secure facility.

10. The head of the treatment facility shall submit a written report addressing the Defendant's competency to proceed in the criminal case when the Defendant has attained competency, or at least every six months.

11. Psychological Services of Hennepin County District Court, or the Department of Human Services Forensic Evaluation Department if the defendant is civilly committed, shall have access to Defendant's treatment records to prepare the required report(s) on the defendant's mental condition with an opinion as to competency to proceed. By presentation of a copy of this order, whether mailed, sent electronically, discussed verbally, or personally delivered, the custodian of records for any agency, department, or health care provider shall release all information and/or records related to Defendant, including medical, psychological, behavioral, social service, probation/correctional, developmental disability, military, Social Security, employment, and educational records, to the agency requesting the records within 72 hours. This Order shall be sufficient to require an agency, department, entity, or health care provider to release the requested information and/or records related to treatment Defendant has received in connection with that facility. Any of the defendant's records released pursuant to this order

27-CR-23-1886

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

27-MH-PR-23-815

Filed in District Court
State of Minnesota
1/30/2024 6:37 AM

may not be disclosed to any other person without court authorization or Defendant's signed consent.

12. The criminal conditions of release remain in effect until placement at an appropriate facility can occur.

13. Defendant's next appearance in Hennepin County District Court - Criminal Division on this matter and status review of Defendant's competence to proceed is July 16, 2024. One week prior to that date, reports regarding Defendant's competency and mental status shall bee-filed and e-served to:

    a. Fourth Judicial District Court - 4thCriminalRule20 email list;

    b. Bruce Rivers, Attorney for Defendant (riverslawyers@aol.com);

    c. Jacqueline Perez, Assistant Hennepin County Attorney (jacqueline. perez@hennepin.us);

    d. Hennepin County Attorney's Office - Adult Services Division (if a commitment is ordered);

    e. The Commitment Defense Panel attorney appointed to represent Defendant by the Fourth Judicial District Court - Probate/Mental Health Division.

14. A copy of this Order, the Rule 20.01 Competency Evaluation, the criminal complaint(s), and the underlying police report(s) shall be delivered via email to the Prepetition Screening Program of Hennepin County's Human Services and Public Health Department.

Order Recommended By:

**BY THE COURT:**

_____
Mercurio, Danielle
Jan 16 2024 8:27AM
Referee of District Court

_____
Dayton Klein, Julia
Jan 16 2024 9:22AM
Judge of District Court

27-MH-PR-23-815

Filed in District Court
State of Minnesota
1/30/2024 6:37 AM

# Matthew Guertin - Hello

| From (senders in message print header) | matt |
|---|---|
| To | Joel Fisher |
| Date | Friday, January 26th, 2024 at 1:38 PM |

Joel,

Apparently you are my newly assigned attorney since I am still incompetent and unable to understand the nature of the charges against me or aid in my own defense...

I found your contact information by logging into my Hennepin County Case file and reviewing the service contacts....you know....since I am incompetent and whatnot.

I tried calling you but did not get an answer. Just wanted to touch base.

I am also wondering if my court proceedings are going to be over Zoom?

I assembled the timeline and graph you see below based on automated emails I received from LinkedIn and added personal events to it as well. In addition I have also attached all of the irrefutable, digitally authenticated 'PROOF' to this email in the form of all of the corresponding email headers, raw html, .EML exports, and PDF prints for every search date which serves to forensically verify the entire graph including the search count numbers listed as well as the actual entities that conducted searches of my LinkedIn profile.

In addition I have also attached my original psychological evaluation from Jill Rogstad along with all email communication between myself and her, my psychological evaluation conducted by Michael Robertson, My granted patent, the Netflix granted patent (that my name and patent are listed at the very top of...) along with the letter my California psychiatrist I have been seeing for over 7+ years wrote as a response to Dr. Jill Rogstad's egregious report.

I look forward to talking with you and meeting you prior to my court hearing that is coming up. If you are available for a call or a Zoom sometime soon (before my court appearance...) let me know what works and I will make it work on my end.

Thanks for your time,

Matthew David Guertin
Inventor/ Founder/ CEO
InfiniSet, Inc.
Minneapolis, MN
www.MattGuertin.com
US 11577177B2

**Also - Please email me my newest psychological evaluation as soon as you are able. Please and thank you..  :-)**

27-MH-PR-23-815

## Re: Matt Guertin/ LinkedIn Search Graph

| | |
|---|---|
| From (senders in message print header) | matt |
| To | Bruce Rivers |
| Date | Friday, January 26th, 2024 at 4:38 PM |

Bruce,

Can you please email me my psychological evaluation report?

Thank you.

-Matt

## Re: Matthew  Guertin - Hello

| | |
|---|---|
| From (senders in message print header) | Joel Fisher |
| To | matt |
| Date | Saturday, January 27th, 2024 at 2:13 PM |

Hi, Mr. Guertin--I wanted to let you know that I received your email. I'm hoping to see if  there is some sort of an offer from the county.

Joel Fisher
Attorney at Law
2642 University Avenue
Suite 214A
St. Paul, Minnesota 55114
612-XXX-XXXX

27-CR-23-1886

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

## Re: Matthew Guertin - Hello

27-MH-PR-23-815

Filed in District Court
State of Minnesota
1/30/2024 6:37 AM

| | |
|---|---|
| From (senders in message print header) | matt |
| To | Joel Fisher |
| Date | Sunday, January 28th, 2024 at 9:51 PM |

Joel,

An 'offer' for what exactly? I have no idea what is going on..

Thanks,

-Matt

## Re: Matthew  Guertin - Hello

| | |
|---|---|
| From (senders in message print header) | Joel Fisher |
| To | matt |
| Date | Monday, January 29th, 2024 at 5:46 AM |

I'll try to call you this AM.


Joel Fisher
Attorney at Law
2642 University Avenue
Suite 214A
St. Paul, Minnesota 55114
612-XXX-XXXX

27-MH-PR-23-815

Filed in District Court
State of Minnesota
1/30/2024 6:37 AM

# Phone

| | |
|---|---|
| From (senders in message print header) | Joel Fisher |
| To | matt |
| Date | Monday, January 29th, 2024 at 11:14 AM |

What's the best # to reach you. I must have an old # 763-245-0896.

Joel Fisher
Attorney at Law
2642 University Avenue
Suite 214A
St. Paul, Minnesota 55114
612-XXX-XXXX

**Mr. Matthew David Guertin**
XXXXXXXXXXXXXXXX
Plymouth, MN 55442
~~xxxxxxxxxxxxxx@Xxxxxxxxx.com~~
~~(XXX) XXX-XXXX~~

January 30th, 2024



**Hennepin Goverment Center**
Attn: Civil Court Division
300 South Sixth St
Minneapolis, MN 55487

**STATE OF MINNESOTA**
**COUNTY OF HENNEPIN**
**DISTRICT COURT**
**FOURTH JUDICIAL DISTRICT**
**CIVIL DIVISION**

**In the Matter of the Civil Commitment of:**
**Matthew David Guertin,**
**Respondent**

**Court Case # 27-MH-PR-23-815**

# MOTION FOR PRODUCTION OF MEDICAL RECORDS

I, Matthew David Guertin, the respondent in the above-referenced civil commitment proceeding, hereby respectfully request the production of medical records pertaining to my psychological evaluation conducted by Dr. Adam Milz. This motion is made pursuant to the relevant rules and regulations governing the disclosure and production of medical records in the State of Minnesota and Hennepin County.

    **1.** As part of the ongoing proceedings in my case, I underwent a psychological evaluation conducted by Dr. Adam Milz on January 3rd 2024

    **2.** The findings and details of this evaluation are critical to my understanding of the case and preparation for my defense.

    **3.** Despite multiple requests, I have not yet received these essential documents.

Pursuant to Rule 15 of the Special Rules of Practice for the Hennepin County Civil Court, which allows for the admission of relevant and reliable evidence including medical records without requiring foundation witnesses, and in accordance with Rules 11.03(a) and 14.06 of the General Rules of Practice for the District Courts, I request the production of my medical records.

I specifically request the Court to direct Dr. Adam Milz, or the custodian of his records, to produce the following:

    **1.** The complete psychological evaluation report conducted by Dr. Adam Milz of myself on January 3rd 2024

    **2.** All notes, observations, and any other documents or records related to the evaluation.

    **3.** Any other relevant medical or psychological records that pertain to my mental health evaluation and treatment.

**REASONS FOR REQUEST:**

    Access to these records is essential for a comprehensive understanding of the evaluation's conclusions, which are instrumental in formulating my defense strategy in the civil commitment proceedings**.**

In light of the above, I respectfully request the Court to order the production of the specified medical records at the earliest convenience. This is necessary to ensure that I have a fair opportunity to review and respond to the information contained within these documents, which are critical to my case. All communications and correspondence pertaining to this motion can be directed to me via my email address included at the top of this motion.

Thank you for your attention to this matter.

Respectfully,

/s/ *Matthew David Guertin*

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM



STATE OF MINNESOTA

COUNTY of HENNEPIN

DISTRICT COURT  FOURTH

JUDICIAL DISTRICT MENTAL

HEALTH DIVISION

**In Re: the Civil Commitment of**

**Matthew Guertin**

**DOB:   7/17/1981**

**Respondent.**

**Court File: 27-MH-PR-23-815**

**WAIVER**

_____

  After a full consultation  with my attorney who has explained my rights to me and discussed with me the various alternatives available to me, I do hereby knowingly and voluntarily consent to the Court extending my Stay of Commitment  for a period of  9 months, without the hearing provided by Minn. Stat. §253B.05 subd.3, 08 and .09.

Dated:  __1 /31/2024__

__Matthew David Guertin__
Respondent

CERTIFICATION

 I have advised the Respondent of all rights affected by the foregoing waiver, including the various options available and the consequences  flowing from each option. The Respondent understood the rights involved and willingly signed the Waiver.

Dated:_____          _____

  Attorney ID# 29579                              Joel Fisher



2/20/24, 12:52 PM                                    Business Filing Details

## Business Record Details »

Minnesota Business Name
### InfiniSet Inc.

**Business Type**
Business Corporation (Foreign)

**File Number**
1348699500021

**Filing Date**
11/13/2022

**Renewal Due Date**
12/31/2024

**Registered Agent(s)**
Minnesota Registered Agent Services LLC

**Home Business Name**
InfiniSet, Inc.

**MN Statute**
303

**Home Jurisdiction**
Delaware

**Status**
Active / In Good Standing

**Registered Office Address**
202 N Cedar Ave Suite #1
Owatonna, MN 55060
USA

**Chief Executive Officer**
Matthew Guertin
202 N CEDAR AVE STE 1
OWATONNA, MN 55060-2306
USA

**Mailing Address**
5832 Lincoln Dr
Suite 222
Edina, MN 55436
United States

---

**Filing History**

# Filing History

Select the item(s) you would like to order:

| | Filing Date | Filing | Effective Date |
|---|---|---|---|
| ☐ | 11/13/2022 | Original Filing - Business Corporation (Foreign) (Business Name: InfiniSet Inc.) | |

---

© 2024 Office of the Minnesota Secretary of State - Terms & Conditions

The Office of the Secretary of State is an equal opportunity employer

https://mblsportal.sos.state.mn.us/Business/SearchDetails?filingGuid=07fe809a-af63-ed11-906c-00155d32b947



Approved for use through 05/31/20
U.S. Patent and Trademark Office; U.S. DEPARTMEN
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid O

Docket Number (Optio

## PETITION FOR EXTENSION OF TIME UNDER 37 CFR 1.136(a)

| Application Number 18/108,858 | Filed Feb. 13, 2023 |
|---|---|

For MOTORIZED ROTATABLE TREADMILL AND SYSTEM FOR

| Art Unit 3711 | Examiner KIEN T NGUYEN |
|---|---|

This is a request under the provisions of 37 CFR 1.136(a) to extend the period for filing a reply in the above-identified application.

The requested extension and fee are as follows (check time period desired and enter the appropriate fee below):

| | | Fee | Small Entity Fee | Micro Entity Fee | |
|---|---|---|---|---|---|
| ☐ | One month (37 CFR 1.17(a)(1)) | $220 | $88 | $44 | $ _____ |
| ☑ | Two months (37 CFR 1.17(a)(2)) | $640 | $256 | $128 | $ 128 |
| ☐ | Three months (37 CFR 1.17(a)(3)) | $1,480 | $592 | $296 | $ _____ |
| ☐ | Four months (37 CFR 1.17(a)(4)) | $2,320 | $928 | $464 | $ _____ |
| ☐ | Five months (37 CFR 1.17(a)(5)) | $3,160 | $1,264 | $632 | $ _____ |

☐ Applicant asserts small entity status. See 37 CFR 1.27.

☑ Applicant certifies micro entity status. See 37 CFR 1.29.
Form PTO/SB/15A or B or equivalent must either be enclosed or have been submitted previously.

☑ A check in the amount of the fee is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The Director has already been authorized to charge fees in this application to a Deposit Account.

☐ The Director is hereby authorized to charge any fees which may be required, or credit any overpayment, to
Deposit Account Number _____

☐ Payment made via USPTO patent electronic filing system.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

☑ applicant.

☐ attorney or agent of record. Registration number _____

☐ attorney or agent acting under 37 CFR 1.34. Registration number _____

| Signature | Date March 4th 2024 |
|---|---|
| Matthew D Guertin, CEO - InfiniSet, Inc | ███████ |
| Typed or printed name | Telephone Number |

**NOTE:** This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. Submit multiple forms if more than one signature is required, see below*.

☑ * Total of 1 _____ forms are submitted.

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless it displays a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this information is estimated to average 6 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 or email

**Matthew D Guertin**

CEO, InfiniSet, Inc.
5832 Lincoln Dr Suite 222
Edina, MN 55436

██████████████████
██████████████

03/04/2023

**Mail Stop AF**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

**Subject: Request for Extension of Time to Respond to Non-Final Office Action**

Dear Commissioner for Patents,

I, Matthew Guertin, CEO of InfiniSet, Inc., hereby request an extension of time to respond to the
Non-Final Office Action for the following application:

- **Application Number:** 18/108,858
- **Confirmation Number:** 6872
- **Title of Invention:** MOTORIZED ROTATABLE TREADMILL AND SYSTEM FOR
  CREATING THE ILLUSION OF MOVEMENT
- **NFOA Mailing Date:** 12/05/2023

As the assignee and micro entity, we find it necessary to request additional time to adequately
address the issues raised in the office action. Accordingly, we are requesting a two month extension
under 37 CFR 1.136(a).

**Micro Entity Status Declaration:** We affirm that InfiniSet, Inc., qualifies for micro entity status
under 37 CFR 1.29, and all criteria for this status continue to be met.

**Fee Enclosed:** In accordance with the micro entity status, the fee for the requested extension is
enclosed in the form of a money order in the amount of $128.00

Please find attached:

- Form PTO/AIA/22 for the extension request, duly filled.
- A money order in the amount of $128.00 made out to 'Director of the United States Patent
  and Trademark Office' for the required 'Extension Request Fees'

We appreciate your consideration of our request and look forward to your favorable reply. Should
you require any additional information, please do not hesitate to contact me at ███████████ or

█████████████ Email communication is currently the most efficeint and reliable communciation method to reach me.

Sincerely,

Matthew D Guertin
CEO, InfiniSet, Inc.





FROM: (PLEASE PRINT)
Matthew D Guertin
InfiniSet, Inc
Plymouth, MN 55442

TO: (PLEASE PRINT)
Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA
2 2 3 1 3 - 1 4 5 0













# USPS Tracking

Tracking Number:

## EI914173116US

Scheduled Delivery by

## TUESDAY

# 5 March 2024

by 6:00pm

Your item was delivered to the front desk, reception area, or mail room at 3:30 pm on March 5, 2024 in ALEXANDRIA, VA 22314. The item was signed for by E BARFIELD.

Get More Out of USPS Tracking:
USPS Tracking Plus

● **Delivered**
Delivered, Front Desk/Reception/Mail Room
ALEXANDRIA, VA 22314
March 5, 2024, 3:30 pm

● Arrived at Post Office
ALEXANDRIA, VA 22314
March 5, 2024, 12:33 pm

● Arrived at USPS Regional Destination Facility
DULLES VA DISTRIBUTION CENTER
March 5, 2024, 7:57 am

● Arrived at USPS Origin Facility
SAINT PAUL, MN 55111
March 4, 2024, 8:00 pm

● Arrived at USPS Regional Origin Facility
MINNEAPOLIS MN DISTRIBUTION CENTER
March 4, 2024, 6:21 pm

● USPS in possession of item
MINNEAPOLIS, MN 55442
March 4, 2024, 4:53 pm

Filed in District Court
State of Minnesota
4/3/2024 7:56 AM

Committee Members | Hennepin County Criminal Justice Coordinating Committee

# Committee Members



# Committee members

## Chair

Jeffrey Lunde, Commissioner, Hennepin County

## Vice Chair

Eric Werner, Chief, Maple Grove Police Department

## Hennepin County

Jeffrey Lunde, Commissioner
Mary Moriarty, County Attorney
Marion Greene, Commissioner
Dawanna Witt, Sheriff
**Chela Guzman-Wiegert, Assistant County Administrator**
Michael Berger, Chief Public Defender
Leah Kaiser, Director Behavioral Health & Justice Strategies
Catherine Johnson, Director Community Corrections & Rehabilitation

## City of Minneapolis

**Jacob Frey, Mayor**
Brian O'Hara, Police Chief
Michael Rainville, Council Member
Robin Wonsley, Council Member
Kristyn Anderson, City Attorney

## Fourth Judicial District Court

**Kerry Meyer, Chief Judge**
Todd Fellman, Juvenile Court Presiding Judge
Hilary Caligiuri, Criminal Court Presiding Judge
**Sara Gonsalves, Judicial District Administrator**

## Hennepin County Suburbs and Specialty Law Enforcement

Nikki Appelbaum, Suburban Prosecutors Association
Jason Nelson, Hennepin Police Chiefs Association
Tim Busse, Mayor, City of Bloomington
Eric Werner, Chief, Maple Grove Police Department
Julie Maas-Kusske, Mayor, City of Maple Plain
Specialty Law Enforcement

https://www.hennepin.us/cjcc/members

<u>Office of the county administrator | Hennepin County</u>



# Chela Guzman-Wiegert

## Assistant County Administrator – Law, Safety, and Justice

Email: chela.guzman@hennepin.us
Phone: 612-348-4249
Fax: 612-348-9777

The assistant county administrator of Law, Safety and Justice is responsible for advising the county board and county administrator on policies and issues related to and involving the Hennepin County justice partners. This position oversees the strategic and fiscal management of the Adult Representation Services, Community Corrections, and Law, Safety and Justice Information Technology areas. The assistant county administrator also serves as county administration's liaison to the Fourth Judicial District Court, the County Attorney's Office, the Public Defender's Office, and the Sheriff's Office.

# Lisa Cerney

## Assistant County Administrator – Public Works

Email: lisa.cerney@hennepin.us
Phone: 612-348-3054
Fax: 612-348-9777

The assistant county administrator for Public Works is responsible for advising the county board and county administrator on policies and issues and ensuring coordination among Public Works departments, public and private agencies, community organizations and partnerships. The assistant county administrator also serves as deputy executive director of the Hennepin County Regional Railroad Authority and the Hennepin County Housing and Redevelopment Authority.

## <u>Appointed offcials</u>

State law requires the county to appoint qualifed individuals to fill certain roles.

- Assessor: Joshua R. Hoogland
- Auditor: Daniel Rogan
- Chief Medical Examiner: Andrew M. Baker, M.D.
- Highway Engineer: Carla Stueve
- Chief Public Defender: Vacant
- Examiner of Titles: Susan Ledray

https://www.hennepin.us/your-government/leadership/county-administrator

## Generative Artificial Intelligence, LLMs, And Fair Use After *Warhol*:
## The Copyright Office and Accountability
## By Thomas L. Hamlin



### Introduction

Generative Artificial Intelligence (AI)[1] has been characterized as the greatest invention since the Internet, the new new thing, a plagiarism engine, and a technology that will destroy civilization. Even Sam Altman, the founder and CEO of OpenAI, has called it an alien intelligence. While some or all of these descriptions may or may not be accurate, one thing is abundantly clear: the technology raises serious copyright infringement and fair-use issues that the United States Copyright Office must address to introduce accountability to a handful of Silicon Valley entrepreneurs and large tech companies who control this technology. The Office has begun this process by recently publishing Registration Guidance: Works Containing Material Generated by Artificial Intelligence, which presented criteria for granting copyrights to works generated by AI, as long as the product was the result of human authorship.

The Office has also held Listening Sessions this spring in which representatives from the literary, music, software, and visual-art worlds offered opinions about how the Copyright Office should address this new technology while protecting the rights of creatives in these various industries. The Listening Session participants offered a variety of comments, but the major concern was that AI companies scrape the internet for huge volumes of information to train Large Language Models (LLMs), which, in turn, power chatbots such as ChatGPT. Much of this information is protected by copyrights, but these AI companies offer no compensation to creators. This raises the issue of whether training these LLMs and producing their outputs infringe copyrights under 17 U.S.C. § 601, or are fair use under 17 U.S.C. § 701. The Copyright Office has not yet proposed regulations on the training of LLMs, or when fair use may apply. It plans to do that after seeking even more comments from the various stakeholders, and other interested parties. While the Office itself does not litigate fair-use issues, it does publish a best-practices guideline on fair use, as part of its statutory mandate to administer the Copyright Act.

Recently, the United States Supreme Court issued a decision on at least one of the statutory factors for fair use that must be considered as a defense to copyright infringement: the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.[2] While the facts in *Andy*

---

*Mr. Hamlin is a partner with Robins Kaplan LLP in its Minneapolis office. He has received State and National awards and recognition for his work in the areas of intellectual property and business litigation.

Article is dated November 8, 2023 - as indicated on the website of Robins Kaplan
https://www.robinskaplan.com/resources/publications/2023/11/generative-artificial-intelligence-llms-and-fair-use-after-warhol
https://www.robinskaplan.com/-/media/pdfs/publications/generative-artificial-intelligence-llms-and-fair-use-after-warhol-v2.pdf?la=en

**Federal Communications Commission**                                   **FCC 23-101**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**



| In the Matter of | ) | |
| --- | --- | --- |
| | ) | |
| Implications of Artificial Intelligence Technologies | ) | CG Docket No. 23-362 |
| on Protecting Consumers from Unwanted | ) | |
| Robocalls and Robotexts | ) | |

**NOTICE OF INQUIRY**

**Adopted: November 15, 2023**                                   **Released: November 16, 2023**
**Comment Date:** December 18, 2023
**Reply Comment Date:** January 16, 2024

By the Commission: Chairwoman Rosenworcel and Commissioner Starks issuing separate statements.

## I.    INTRODUCTION

1.      In this *Notice of Inquiry* (*NOI*), we seek to better understand the implications of emerging artificial intelligence (AI) technologies as part of our ongoing efforts to protect consumers from unwanted and illegal telephone calls and text messages under the Telephone Consumer Protection Act (TCPA).[1] Complaints regarding unwanted and illegal robocalls and robotexts are consistently the top category of consumer complaints that we receive.[2] As a result, it is critical that the Commission stay abreast of new technologies that may impact the privacy protections afforded to consumers under the TCPA.

2.      In the spirit of our longstanding efforts to protect consumers from unwanted robocalls, this *NOI* represents an opportunity to gather information and prepare for changes in calling and texting practices that may result from new AI-influenced technologies.[3] Specifically, we seek to understand how these technologies might affect the existing regulatory landscape that protects consumers from unwanted and illegal robocalls and robotexts. In this context, we seek information that could inform policies that anticipate how AI could help protect consumers against unwanted communications and how it could do the opposite. Our inquiry includes defining AI in this context, the current state of AI use in calling and texting, the impact of emerging AI technologies on consumer privacy rights under the TCPA, and, if appropriate, the Commission's next steps to address these issues.

## II.    BACKGROUND

3.      The TCPA protects consumers from unwanted calls made using an artificial or prerecorded voice.[4] The legislative history of the TCPA suggests that Congress considered calls

---

1 *See* Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227.

2 The Commission received approximately 157,000 TCPA-related complaints in 2020, 164,000 in 2021, 119,000 in 2022, and 77,420 in 2023 as of Oct. 23, 2023. FCC, *Consumer Complaint Data Center*, www.fcc.gov/consumer-help-center-data (last visited Oct. 23, 2023).

3 As discussed in more detail below, the TCPA regulates any call made using an "automatic telephone dialing system" or containing an artificial or prerecorded voice. Any such call is considered a "robocall" or "robotext" for purposes of this proceeding. *See* 47 U.S.C. § 227(b)(1).

4 *See* 47 U.S.C. § 227(b)(1).

https://docs.fcc.gov/public/attachments/FCC-23-101A1.pdf

**Federal Communications Commission**                    **FCC 23-101**

defines AI as "a machine-based system that can for a given set of human-defined objectives, make predictions, recommendations, or decisions."[16] The National Institute of Standards and Technology (NIST) defines AI as "the capability of a device to perform functions that are normally associated with human intelligence such as reasoning, learning, and self-improvement."[17] The European Union has defined AI technologies as "software that is developed with one or more of the techniques and approaches . . . for a given set of human-defined objectives, [and that] generate outputs such as content, predictions, recommendations, or decisions influencing the environments they interact with."[18] The Kansas Office of Information Technology Services recently defined "Generative artificial intelligence" as "advanced technologies such as predictive algorithms, machine learning, and large language models to process natural language and produce content in the form of text, images, or other types of media."[19] An executive order from the governor of Pennsylvania defines generative AI as "technology or tools that use predictive algorithms to create new content including audio, code, images, text, simulations, and videos."[20]

9.      The Commission's authority under the TCPA encompasses current uses of AI in robocalling and robotexting as we understand them, e.g., emulating human speech and interacting with consumers as though they were live human callers when generating voice and text messages. We seek comment on whether one or more of the above examples provides a basis to define AI technologies as used in the context of making robocalls and robotexts in a manner that is consistent with the TCPA's consumer protections.

10.      Are there any other definitions that we should consider for this purpose? Do specific AI technologies provide some insight as to how to define the term AI in the context of the TCPA? ==Voice cloning, for example, is a type of generative AI technology which attempts to emulate a human voice to generate speech using a recording of that voice.==[21] "Large Language Models" seek to interpret and generate speech with the same level of proficiency as a human.[22] In particular, does the ability of AI technologies to emulate a human voice and interact with consumers through telephone calls and text messages as though they were a live person provide a basis to define these technologies under the TCPA?

11.      As discussed further below, AI technologies may also enhance the analytics that allow consumers and networks to detect and block unwanted and fraudulent calls and text messages via AI generated algorithms and software. Should that factor into the definition of AI technologies in this

---

(5) An artificial system designed to act rationally, including an intelligent software agent or embodied robot that achieves goals using perception, planning, reasoning, learning, communicating, decision making, and acting.

16 *See* National Artificial Intelligence Initiative Act of 2020. Pub. L. 116-283 (2020) (codified at 15 U.S.C. § 9401(3)).

17 National Institute of Standards and Technology, *Computer Security Resource Center* https://csrc.nist.gov/Topics/technologies/artificial-intelligence (last visited Aug. 15, 2023) (citing ANSI INCITS 172-220 https://www.incits.org/html/ext/ANSDIT/a3.htm (R2007)).

18 European Union Artificial Intelligence Act, Title I Art. 3(1).

19 *See* Kansas Office of Information Technology Services, Generative Artificial Intelligence Policy, https://governor.kansas.gov/wp-content/uploads/2023/08/P8200.00-Generative-Artificial-Intelligence-Signed.pdf (July 25, 2023) (noting that "[g]enerated content is typically remarkably similar to what a human creator might produce, such as text consisting of entire narratives of naturally reading sentences").

20 *See* Executive Order 2023-19, Expanding and Governing the Use of Generative Artificial Intelligence Technologies Within the Commonwealth of Pennsylvania, https://www.governor.pa.gov/wp-content/uploads/2023/09/20230920_EO-2023-19_AI_Final_Executed.pdf (Sept. 20, 2023).

21 *See, e.g.*, Anisha Kohli, *From Scams to Music, AI Voice Cloning is on the Rise* (Apr. 29, 2023) https://time.com/6275794/ai-voice-cloning-scams-music/.

22 *See* Mariusz Flasiński, Introduction to Artificial Intelligence 229 (2016).

4

AI technologies to avoid detection by analytic systems designed to protect consumers by blocking certain types of calls? Is there a risk that AI technologies might be used in such a way as to inadvertently block legitimate calls and messages? If so, are there steps the Commission or industry could take to prevent this? Does AI technology reduce the potential costs to make or send high volumes of robocalls and robotexts by eliminating the need to hire and train any human agents? Would AI technology add to the costs of those industry stakeholders proactively attempting to detect and reduce high volumes of robocalls and robotexts in their networks? Should the Commission be concerned about these potential harms?

20.    Is there a risk that AI technology can be used in ways to make the public more susceptible to fraudulent calls by appearing to be from someone the consumer knows or trusts, or otherwise tailored to convince the recipient that the call is from a legitimate source? Similarly, is there a risk that increased use of AI could make it easier for bad actors to place a higher volume of calls that appear to be from a real person, making call recipients more likely to trust the caller? For example, are bad actors cloning the voices of specific persons to persuade consumers of call legitimacy-and will bad actors do so with increasing frequency and impact as the quality of voice cloning increases and the cost decreases?[36] What is the effect? As discussed below, should the Commission consider ways to verify the authenticity of legitimately generated AI voice or text content from trusted sources, such as through the use of watermarks, certificates, labels, signatures or other forms of labels? Is there a potential for AI technologies to be used in ways that defraud consumers, introduce harmful bias, disrupt elections, perpetuate the commission of crimes, or induce widespread panic such as by making false emergency robocalls mimicking the voices of public officials or other trusted sources in ways that violate the TCPA or other consumer protection statutes?[37]

21.    Are there current examples of how AI technologies are used in such disruptive ways that might inform our future policy decisions as we attempt to protect the public from such callers via our authority under the TCPA and Communications Act? Are there any examples of AI being used to generate content for robocalls and text messages and to make calls and send messages for the purpose discussed above? What are the risks of such calls? Is the use of this technology particularly pernicious such that we should treat AI-assisted robocalls and robotexts differently than traditional robocalls and robotexts? Are there any benefits of using AI technology in this way that we should seek to preserve or encourage?

22.    As noted above, unwanted calls and text messages are already the top source of consumer complaints with the Commission. By some estimates, consumers are scammed by fraudulent robocalls that cost them billions of dollars each year.[38] Does AI technology have the potential to make these unwanted and often fraudulent communications more effective by targeting specific demographics that are more susceptible to scams, such as the elderly? Similarly, does the use of AI technology have the potential to increase the risk of unwanted and fraudulent calls and texts to individuals for whom English

---

[36] *See, e.g.,* Federal Trade Commission, *Scammers Use AI to Enhance Their Family Emergency Schemes,* Consumer Alert (Mar. 20, 2023), https://consumer.ftc.gov/consumer-alerts/2023/03/scammers-use-ai-enhance-their-family-emergency-schemes ("All [a scammer] needs is a short audio clip of your family member's voice—which he [or she] could get from content posted online—and a voice-cloning program."); Joe Hernandez, *That Panicky Call from a Relative? It Could Be a Thief Using a Voice Clone, FTC Warns,* NPR Technology (Mar. 22, 2023), https://www.npr.org/2023/03/22/1165448073/voice-clones-ai-scams-ftc.

[37] *See, e.g.,* See Faith Karimi, *'Mom, these bad men have me.': She believes scammers cloned her voice in a fake kidnapping* (April 29, 2023), https://www.cnn.com/2023/04/29/us/ai-scam-calls-kidnapping-cec/index.html; Keep Your AI Claims in Check, FTC Business Blog, https://www.ftc.gov/business-guidance/blog/2023/02/keep-your-ai-claims-check (Feb. 27, 2023); Michael Atleson, Chatbots, Deepfakes, and Voice Clones: AI Deception for Sale, FTC Business Blog, March 20, 2023, https://www.ftc.gov/business-guidance/blog/2023/03/chatbots-deepfakes-voice-clones-ai-deception-sale (Mar. 20, 2023).

[38] Yudhijit Bhathacharee, *Who's Making All These Scam Calls?* (Jan. 27, 2021) (estimating that Americans lose from $3.5 billion to $20 billion every year from fraudulent call scams): https://www.nytimes.com/2021/01/27/magazine/scam-call-centers.html.

is a second language?  Is there evidence that the use of generative AI technology has already increased the number of unwanted calls and text messages?

23.    Are there potential negative consequences for other consumer protection statutes enforced under the Commission's rules such as the CAN-SPAM Act which protects consumers from unwanted mobile service electronic mail messages?[39]  Are there other potential negative consequences to consumers from AI technologies that will allow callers to evade the TCPA's consumer protections?  What is the estimated timeframe before AI technologies begin to have a substantial impact on the TCPA and other consumer protections?

### C.    Future Steps to Address AI Technologies

24.    We seek comment on what steps, if any, the Commission should consider to further this inquiry.  As noted above, the TCPA specifically authorizes the Commission to make "technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone."[40]  In addition, the legislative history contemplated the Commission's need for the flexibility to address future technologies that impact the TCPA's consumer privacy protections from unwanted robocalls.[41]  The TCPA also prohibits the use of an "artificial" voice message in calls to a residential or wireless telephone number absent the prior express consent of the called party or a recognized exemption.[42]  Is there any reason to conclude that these existing legal authorities do not provide the Commission with sufficient statutory authority to ensure that the use of emerging AI technologies does not erode consumer protections under the TCPA or other consumer protection statutes when used to communicate via robocall or robotexts?  Are there consumer education or outreach initiatives that the Commission could conduct to raise awareness of the risks posed by emerging AI technologies including the targeting of elderly and non-English speaking populations?

25.    We believe that certain AI technologies such as "voice cloning" appear to fall within the TCPA's existing prohibition on artificial or prerecorded voice messages because this technology artificially simulates a human voice.  We seek comment on whether it is necessary or even possible to determine at this point whether future types of current AI technologies fall within the TCPA's existing prohibitions on artificial or prerecorded voice messages.  As noted above, "voice cloning" and other similar technologies involve emulating human voices for telephone calls to consumers, but such calls may not involve actual direct interaction with a live person.  What factors, if any, other than the participation of a live person on the call should we take into consideration in reaching any conclusions?  For example, should we consider the extent to which such technology provides the functional equivalent to interacting with a live person?  What factors would be included in any such analysis to determine if a particular technology is providing the functional equivalent of an interaction with a live person?  Should, or may, we consider the character of the voice clone—*e.g.*, a clone of a call recipient's personal contact, a public official, a celebrity, etc.—as relevant to our analyses under the TCPA?  To what extent does the potential liability for substantial regulatory fines and private rights of action encourage AI user compliance with the TCPA's consumer protections?[43]

26.    Alternatively, as the Commission suggested in the Soundboard ruling, does the TCPA not allow any carve out for functional equivalency of a live person for any technology if the call uses an artificial or prerecorded voice?  Should voice alteration technologies that can alter a live speaker's voice

---

[39] *See* Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, Pub. L. No. 108-187, 117 Stat. 2699 (2003) (*CAN-SPAM Act*), *codified at* 15 U.S.C. § 7701-7713, 18 U.S.C. 1037 and 28 U.S.C. § 994.  *See also* 47 CFR § 64.3100.

[40] *See* 47 U.S.C. § 227(d)(3).

[41] 137 Cong. Rec. S18784 (1991) (statement of Sen. Hollings) ("The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies").

[42] *See* 47 U.S.C. § 227(b)(1).

[43] *See* 47 U.S.C. § 227(b)(3) (authorizing private rights of action for TCPA violations); 47 CFR § 1.80.

9

## STATEMENT OF
## CHAIRWOMAN JESSICA ROSENWORCEL

Re:     *Implications of Artificial Intelligence Technologies on Protecting Consumers from Unwanted Robocalls and Robotexts*, CG Docket No. 23-362, Notice of Inquiry (November 15, 2023)

If Tom Hanks called, I would pick up the phone.  If he spoke in a familiar way during that call, I would definitely listen.  To be clear, the star of Big and Saving Private Ryan is not dialing me anytime soon.  But a video using his voice is on the internet hawking dental plans.  None of this is happening with his permission.  This is happening because scam artists are playing with artificial intelligence and testing our ability to separate vocal fact from fiction in order to commit fraud.

Now imagine instead a call from a friend or family member.  Of course you pick up.  But maybe that voice sounds off and something feels wrong.  Maybe it is because the individual you think is on the other end of the line is telling you about an imminent emergency and pleading with you to send money.  Like the hard sell from Tom Hanks, it is also a scam.  Because you are not actually talking to who you think you are, you are speaking with a con artist using artificial intelligence to clone the voice of someone you know.

If this future sounds far off, think again.  We see on the internet how fraudsters are already playing with this technology.  We know that scam artists want to explore ways to use this technology over the phone.

I recently had the opportunity to sit down with AARP and talk about what the combination of unwanted robocalls and robotexts and artificial intelligence will mean for consumers.  I learned about how voice cloning scams are growing and how they can cause special harm for older adults.  Imagine, for instance, a grandparent fearing they will get a call from their grandchild, only to learn it was fraudster on the other end of the line, preying on their willingness to forward money to family.

The anxiety about these technology developments is real.  Rightfully so.  But I think we make a mistake if we only focus on the potential for harm.  We need to equally focus on how artificial intelligence can radically improve the tools we have today to block unwanted robocalls and robotexts.  We are talking about technology that can see patterns in our network traffic unlike anything we have today.  This can lead to the development of analytic tools that are exponentially better at finding fraud before it ever reaches us at home.  Used at scale, we can not only stop this junk, we can help restore trust in our networks.

That is why today we are launching an inquiry to ask how artificial intelligence is being used right now to recognize patterns in our network traffic and how they could be used in the future.  We know the risks that this technology involves, but we also want to harness the benefits—just like the recently released Executive Order on the Safe, Secure, and Trustworthy Development and Use of Artificial Intelligence recommends.

That is not to say this will be easy.  Like Tom Hanks said as the ragtag coach Jimmy Dugan in A League of Their Own, "the hard . . . is what makes it great."  We have work to do to harness artificial intelligence for good.  But I am an optimist and I believe this is possible.  So let's get to it.  Let's see how we can use artificial intelligence to get this junk off the line.

I want to thank the staff responsible for our efforts today, including Jerusha Burnett, Zac Champ, Aaron Garza, Josh Mendelsohn, Michael Scott, Suzy Rosen Singleton, Richard Smith, Mark Stone, Kristi Thornton, and George Phelan from the Consumer and Governmental Affairs Bureau; Kristi Thompson from the Enforcement Bureau; Richard Mallen, Marcus Maher, Michele Ellison, Jeff Steinberg, Royce Sherlock, and Wade Lindsay from the Office of General Counsel; Michelle Schaefer and Andrew Wise from the Office of Economics and Analytics; Martin Doczkat and Dana Shaffer from the Office of Engineering and Technology; Michael Antonino, Maureen Bizhko, Kenneth Carlberg, Shawn Cochran, Gerald English, John Evanoff, David Furth, David Sieradzki, Austin Randazzo, and James Wiley from

13

## STATEMENT OF
## COMMISSIONER GEOFFREY STARKS

Re:    *Implications of Artificial Intelligence Technologies on Protecting Consumers from Unwanted Robocalls and Robotexts*, CG Docket No. 23-362, Notice of Inquiry (November 15, 2023)

Over the last few months, I've been proud to see our government convene quickly and effectively to explore the implications of artificial intelligence ("AI"). Congress is deeply engaged on this issue, convening hearings and introducing bills on the implications of AI for sectors from healthcare to homeland security. The White House is as well, with President Biden issuing a landmark executive order ("EO") aimed at seizing the promise and managing the risks of AI for the American people. Our miliary is engaged. Our scientists are engaged. And so are our agencies.

This intersectionality is critical. Because while the future of AI remains uncertain, one thing is clear: it has the potential to impact, if not transform, nearly every aspect of American life. Because of that potential, each part of our government bears a responsibility to better understand the risks and opportunities presented within its mandate, while being mindful of the limits of its experience and its authority. And in this era of rapid technological change, we must collaborate, lending our learnings and sharing our expertise across agencies to better serve our citizens and consumers.

That is what the Biden EO charges us with doing, and what the Chairwoman has done by circulating the item before us today.

Specifically, the EO charges the FCC with examining the impact of AI on unwanted robocalls and robotexts. As the EO – and today's notice of inquiry ("NOI") – acknowledges, AI holds both promise and risk when it comes to our ongoing efforts against spam calls. AI technologies can be leveraged to block unwanted robocalls and robotexts. In fact, wireless carriers use various algorithms for this purpose today, and we ask them for more information about that usage in the NOI. But AI can also facilitate or exacerbate spam – and scam – calls.

The clearest example of this to date is voice cloning – generative AI technology that uses a recording of a human voice to generate speech sounding like that voice. In one recent news story, a mom in Arizona believes bad actors cloned her daughter's voice in what was ultimately a fake kidnapping phone scam.[1] White House Deputy Chief of Staff Bruce Reed, charged with developing the administration's AI strategy, says "[v]oice cloning is one thing that keeps me up at night.[2]"The NOI asks about the frequency and impact of voice cloning in robotexts and robocalls, and how the Commission might address it, such as by verifying the authenticity of legitimately-generated AI voice or text content from trusted sources.

Of course, voice cloning is an already-known issue, and one that falls within our existing statutory authority (i.e., the Telephone Consumer Protection Act's ("TCPA") prohibition on calls using artificial or prerecorded voices without consent).[3] AI is a powerful, and evolving, technology. We do not know all of the issues that it may trigger – or all the benefits it may hold. So this item seeks to explore and find out. It poses some questions that will be best answered by our regulatees, such as whether AI technology can be used to reduce burdens associated with TCPA compliance measures, and how AI can work effectively within telecommunications relay services. But it also seeks information from AI developers and others who may be less familiar with our regulations, yet may still find themselves within them. For example, the NOI asks how the FCC might cooperate with AI developers to ensure they are aware of the TCPA's obligations so they can develop their products in ways consistent with the statute, and with safeguards in place to

---

[1] *See* Faith Karimi, "'Mom, these bad men have me': She believes scammers cloned her daughter's voice in a fake kidnapping," CNN (Apr. 29, 2023), https://www.cnn.com/2023/04/29/us/ai-scam-calls-kidnapping-cec/index.html.

[2] Nancy Scola, "Biden's Elusive AI Whisperer Finally Goes on the Record. Here's His Warning." Politico (Nov. 2, 2023), https://www.politico.com/news/magazine/2023/11/02/bruce-reed-ai-biden-tech-00124375.

[3] *See* 47 U.S.C. § 227(b)(1)(A)-(B).

15



EXHIBIT
Zb

Tackling Tough Business Litigation Matters            VOLUME 4.1  | 2024

# Navigating the Legal Landscape: Generative AI and Copyright Law



BRYAN MECHELL

Generative artificial intelligence captivated the world in 2023 and is firmly positioned to remain center stage in the coming year. In the United States, the introduction and early-stage use of generative AI have been plagued with legal disputes and speculation. This presents challenges for companies protecting their generative AI innovations as well as for users understanding rights and risks associated with generative AI tools.

In this Q&A, Robins Kaplan attorney Bryan Mechell provides some guidance to understanding the many copyright controversies that have accompanied the introduction of generative AI systems and take-aways for technology companies leveraging and licensing generative AI innovations.

READ MORE ON PAGE 2

Article is dated January, 2024 - as indicated on the website of Robins Kaplan

https://www.robinskaplan.com/resources/legal-updates/the-robins-kaplan-quarterly-business-litigation-update/2024/the-robins-kaplan-quarterly-business-update/navigating-the-legal-landscape

https://www.robinskaplan.com/-/media/pdfs/newsletters/business-litigation-quarterly/robins-kaplan-business-litigation-quarterly-volume-4.pdf?la=en