## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MATTHEW D. GUERTIN<br><br>Plaintiff,<br><br>v.<br><br>HENNEPIN COUNTY, a municipal entity;<br><br>KEITH ELLISON, in his official capacity as Minnesota Attorney General;<br><br>MARY MORIARTY, in her official capacity as Hennepin County Attorney;<br><br>CHELA GUZMAN-WEIGART, in her official capacity as Assistant County Administrator for Law, Safety, and Justice;<br><br>JULIA DAYTON-KLEIN, in her individual capacity;<br><br>GEORGE F. BORER, in his individual capacity;<br><br>DANIELLE C. MERCURIO, in her individual capacity;<br><br>DR. JILL ROGSTAD, in her official capacity as Senior Clinical Forensic Psychologist in the Fourth Judicial District;<br><br>DR. ADAM MILZ, in his official capacity with Hennepin County Mental Health;<br><br>JACQUELINE PEREZ, in her official capacity as Assistant Hennepin County Attorney;<br><br>BRUCE M. RIVERS, in his individual capacity.<br><br>Defendants. | Case No: 24-cv-02646-JRT-DLM<br><br><br><br><br><br>**EMERGENCY MOTION FOR EXPEDITED PRELIMINARY INJUNCTION AND IMMEDIATE JUDICIAL INTERVENTION** |

# I.  INTRODUCTION

## A.  Overview of the Motion

1.      This motion is being filed with a request for expedited handling due to the unprecedented and compelling nature of the entire case and the serious, irreparable harm faced by the Plaintiff,  Matthew Guertin.

2.      This motion seeks to present new evidence obtained through discovery materials provided to Guertin by Bruce Rivers on July 16, 2024, following Guertin's review hearing.

3.      These materials include fraudulent police photos, the January 2024 exam report, and a June 12, 2024, witness statement prepared by Jaqueline Perez, all of which serve to confirm the civil conspiracy Guertin has been alleging the entire time.

4.      The new evidence is crucial in demonstrating the fraudulent nature of the discovery materials, the blatant falsehoods in the exam reports, and the unjust attempts to commit Guertin to a mental institution.

5.      This motion seeks judicial intervention to prevent the severe and potentially life-threatening consequences that Guertin faces due to the ongoing conspiracy and fraudulent actions against him.

## B.  Background of the Case

6.      Matthew David Guertin is currently facing four felony charges related to firearms, including reckless discharge of a firearm within a municipality and possession of three firearms that he built for personal use, which didn't have serial numbers.

7.      These charges stem from an incident on January 21, 2023, during which Guertin shot into the sky from his bedroom window for the explicit purpose of 'calling' the police in order to be safely extracted from the surreal situation he had suddenly found himself in.

8.      Leading up to the incident, Guertin had been collecting digital forensic evidence proving patent fraud for the prior six weeks. He made numerous attempts to reach out for help, including contacting the Secret Service, his patent attorney, computer forensic specialists, and the FBI.

9.      His patent attorney acknowledged the situation and advised him to contact the FBI through the ic3.gov website.

10.     Additionally, Guertin filed a police report on January 12, 2023, during which he sat down with his laptop and Minnetonka Police Officer Brandon Harris for 45 minutes, with Officer Harris confirming that he had "proof of the fraud" in the resulting report.

11.     During this time, Guertin stumbled across advanced videos that were generated by AI, a technology that was not publicly known to exist at the time.

12.     This discovery made him realize he was up against advanced adversaries, indicating that he was the target of something much bigger than he could have ever imagined.

13.     The subsequent evidence gathered since then has proven this to be correct, and this motion will demonstrate that.

14.     On January 21, 2023, Guertin experienced a legitimate fear for his life when he realized his computer was still being accessed over Bluetooth despite being disconnected from the internet and having the Wi-Fi adapter disabled.

15.     The significance of this Bluetooth access was that its limited range indicated that the source was likely within his building. This realization that the threat was now at his doorstep triggered an acute stress reaction, essentially a panic attack, leaving him frozen in fear for almost two days, unsure of what to do.

16.     Since the incident, Guertin has faced numerous legal battles, including an initial motion for a Temporary Restraining Order (TRO) filed in this Court that was denied.

17.     Despite this setback, Guertin has continued to compile, analyze, and assemble a substantial amount of additional evidence to support his claims of a broader conspiracy against him, involving powerful entities, and his US Patent 11,577,177.

18.     Guertin has been falsely diagnosed with an unspecified psychotic condition, with suggestions of a potential delusional disorder, yet every single claim of his deemed 'delusional' has since been proven as 'fact'.

19.     The newly obtained evidence indicates that the goal is to unjustly commit Guertin to a mental institution and force him to take powerful antipsychotic medications, posing a significant risk to his mental health, and well being.

20.     Given the compelling and irrefutable nature of the new evidence obtained from the discovery materials provided to him on July 16, 2024 and the immediate, irreparable harm faced by Guertin, this motion seeks immediate judicial intervention to prevent further harm and protect his constitutional rights.


## II.   EVIDENCE OF DISCOVERY FRAUD

1.  The evidence of discovery fraud in this case is both extensive and compelling, pointing towards a coordinated effort to manipulate critical evidence and undermine Guertin's defense.

2.  The manipulation of images, the involvement of advanced AI technology, and the role of key individuals suggest a broad conspiracy involving multiple parties.

## A. Manipulated and Missing Images

21.    The initial discovery materials provided by Michael Biglow contained images that were identified as manipulated, particularly those taken inside Guertin's apartment, which exhibited non-standard aspect ratios. This initial set of discovery, assumed to originate from the prosecution or another entity within the court system, already raised significant concerns about authenticity and completeness.



*23-0098_0012_520-TRS_DSC_0209.JPG | Bruce Rivers July 16, 2024 Discovery Materials*



*23-0098_0012_520-TRS_DSC_0217.JPG | Bruce Rivers July 16, 2024 Discovery Materials*



*23-0098_0012_520-TRS_DSC_0220.JPG | Bruce Rivers July 16, 2024 Discovery Materials*

22.     The discovery materials provided to Guertin by Bruce Rivers on July 16, 2024, are even more alarming as the new set of images shows significant variations in laptop icons, corner shapes, and hard drive icons, which should be uniform in police evidence photographs. (Exh. S, Index 05, p. 1-21)



*Bruce Rivers 7/16/2024 Discovery Materials*
*PURPLE | 23-0098_0012_520-TRS_DSC_0190.JPG*
*GREEN | 23-0098_0012_520-TRS_DSC_0194.JPG*
*RED | 23-0098_0012_520-TRS_DSC_0209.JPG*

---

23.     The probability calculation indicated that the alignment of missing images with those initially identified as manipulated is astronomically low, reinforcing the likelihood of intentional exclusion and tampering. (Exh. S, Index 03, p. 1-4)

24.     Guertin produced a video in order to present the discovery fraud in an irrefutable, and easy to understand manner. That video is located at the following URL:

https://drive.proton.me/urls/0C6TA1GPJM#QREuUymnMZof

2. **Comparative Context:**
   Imagine comparing this probability to real-world rare events:

   - The probability of winning the lottery (e.g., Mega Millions) is about 1 in 302.6 million, which is approximately $3.3 \times 10^{-9}$. Our probability is much smaller.
   - The odds of being struck by lightning in a given year are roughly 1 in 1.2 million, or approximately $8.3 \times 10^{-7}$. Again, our probability is far smaller.

3. **Contextual Analogy:**
   Think of it this way: If you were to pick a single grain of sand from all the sand on Earth, and you had to pick the exact grain that someone else randomly chose beforehand, the chances of success would still be significantly higher than $8.16 \times 10^{-17}$.

So, the chance of 28 'non-standard' items in Group A aligning perfectly with 28 of the 33 'missing' items in Group B purely by chance is exceedingly rare, to the point where it's virtually impossible to expect such an event to occur randomly.

## B. Forensic Analysis and AI Manipulation

25.     Forensic analysis of the images revealed several discrepancies, including different-sized icons and pixelation in the new discovery images. This analysis demonstrates that the metadata, which should have been captured directly from the camera, is fraudulent.

| | |
|---|---|
| ExifTool Version Number | : 12.40 |
| File Name | : 23-0098_0012_520-TRS_DSC_0209.JPG |
| File Modification Date/Time | : 2023:01:21 14:23:00-06:00 |
| Make | : NIKON CORPORATION |
| Camera Model Name | : NIKON D7200 |
| Lens | : 18-55mm f/3.5-5.6 |
| Flash Mode | : Fired, External |
| Shooting Mode | : Single-Frame, Auto ISO |
| Creator Tool | : NIKON D7200 Ver.1.02 |
| Lens ID | : AF-P DX Nikkor 18-55mm f/3.5-5.6G VR |
| Lens Spec | : 18-55mm f/3.5-5.6 G VR |

26.     The anomalies in the images confirm that the evidence has been manipulated using advanced AI technology, a capability beyond the means of Bruce Rivers, suggesting involvement by parties with significant resources.  (Exh. T, p. 1-19)



Image 290 From July 16, 2024 Bruce Rivers Discovery    (Exh. T)



Image 290 From July 16, 2024 Bruce Rivers Discovery   (Exh. T)



Image 290 From July 16, 2024 Bruce Rivers Discovery | With Mask Over Window Edges

(Exh. T)



Image 290 From July 16, 2024 Bruce Rivers Discovery | Color Curve 1 Applied   (Exh. T)



Image 290 From July 16, 2024 Bruce Rivers Discovery | Mask Shows Icons 'Bleeding' Over The Edge of the Border   (Exh. T)



Image 290 From July 16, 2024 Bruce Rivers Discovery | Mask Shows Icons 'Bleeding' Over The Edge of the Border   (Exh. T)



Image 290 From July 16, 2024 Bruce Rivers Discovery | Color Curve 3 Applied

Only show pixelization anomalie on window menus and no where else

(Exh. T)


**C.  Chain of Custody and Source of Evidence**

27.     The chain of custody of the initial fraudulent discovery suggests it originated from the prosecution or court system. The new discovery materials handed directly to Guertin by Bruce Rivers establish a direct line of responsibility for their authenticity.

28.     The consistency in the manipulated images across both sets of discovery materials points to a coordinated effort involving both the prosecution and Bruce Rivers.

| page-img# | W-px | H-px | image-ratio | location of photo | Bruce RIvers July 16, 2024 Discovery Images |
|---|---|---|---|---|---|
| 22-39 | 1114 | 1889 | 1:1.696 | inside-Guertin-residence | **MISSING** |
| 23-40 | 1430 | 953 | 3:2 | inside-Guertin-residence | 23-0098_0012_520-TRS_DSC_0197.JPG |
| 23-41 | 1430 | 953 | 3:2 | inside-Guertin-residence | 23-0098_0012_520-TRS_DSC_0196.JPG |
| 24-42 | 1087 | 1885 | 1:1.734 | inside-Guertin-residence | **MISSING** |
| 25-43 | 1430 | 953 | 3:2 | inside-Guertin-residence | 23-0098_0012_520-TRS_DSC_0201.JPG |
| 25-44 | 1430 | 953 | 3:2 | inside-Guertin-residence | 23-0098_0012_520-TRS_DSC_0207.JPG |
| 26-45 | 1430 | 953 | 3:2 | inside-Guertin-residence | 23-0098_0012_520-TRS_DSC_0203.JPG |
| 26-46 | 1430 | 953 | 3:2 | inside-Guertin-residence | 23-0098_0012_520-TRS_DSC_0204.JPG |
| 27-47 | 1134 | 1939 | 1:1.710 | inside-Guertin-residence | **MISSING** |
| 28-48 | 1224 | 2153 | 1:1.759 | inside-Guertin-residence | **MISSING** |
| 29-49 | 1430 | 953 | 3:2 | inside-Guertin-residence | 23-0098_0012_520-TRS_DSC_0189.JPG |
| 30-50 | 1214 | 1967 | 1:1.620 | inside-Guertin-residence | **MISSING** |
| 31-51 | 1109 | 1895 | 1:1.709 | inside-Guertin-residence | **MISSING** |
| 32-52 | 1129 | 1931 | 1:1.710 | inside-Guertin-residence | **MISSING** |
| 33-53 | 1159 | 1960 | 1:1.691 | inside-Guertin-residence | **MISSING** |
| 34-54 | 1431 | 805 | 16:9 | inside-Guertin-residence | **MISSING** |
| 34-55 | 1431 | 805 | 16:9 | inside-Guertin-residence | **MISSING** |
| 35-56 | 1431 | 805 | 16:9 | inside-Guertin-residence | **MISSING** |
| 35-57 | 1431 | 805 | 16:9 | inside-Guertin-residence | **MISSING** |
| 36-58 | 1430 | 953 | 3:2 | inside-Guertin-residence | 23-0098_0012_520-TRS_DSC_0183.JPG |

(Exh. S, Index 04)

| page-img# | W-px | H-px | image-ratio | location of photo | Bruce RIvers July 16, 2024 Discovery Images |
|---|---|---|---|---|---|
| 37-59 | 831 | 1375 | 1:1.655 | inside-Guertin-residence | MISSING |
| 38-60 | 1431 | 805 | 16:9 | inside-Guertin-residence | MISSING |
| 38-61 | 1431 | 805 | 16:9 | inside-Guertin-residence | MISSING |
| 39-62 | 1152 | 1976 | 1:1.715 | inside-Guertin-residence | MISSING |
| 40-63 | 1137 | 1912 | 1:1.682 | inside-Guertin-residence | MISSING |
| 41-64 | 1172 | 1851 | 1:1.579 | inside-Guertin-residence | MISSING |
| 42-65 | 1430 | 953 | 3:2 | inside-Guertin-residence | 23-0098_0012_520-TRS_DSC_0323.JPG |
| 43-66 | 1187 | 1962 | 1:1.653 | inside-Guertin-residence | MISSING |
| 44-67 | 1431 | 805 | 16:9 | inside-Guertin-residence | MISSING |
| 44-68 | 1431 | 805 | 16:9 | inside-Guertin-residence | MISSING |

(Exh. S, Index 04)

## D.  Broader Implications and Civil Conspiracy

29.    The logical connections and the chain of events provide substantial support for Guertin's civil conspiracy claim. If both the prosecution and the defense attorney are involved in presenting manipulated evidence, it indicates a coordinated effort to undermine Guertin's case.

30.    This is further substantiated by the detailed forensic analysis of the fraudulent discovery materials and their inconsistencies, directly supporting the argument of a conspiracy to present false evidence and obstruct justice.

## E.  Immediate Risk and Judicial Intervention

31.    The fraudulent nature of the discovery materials and the suggestion to put Guertin on antipsychotic drugs based on these fraudulent exam reports pose a severe and immediate risk of irreparable harm. This strengthens the urgency and validity of filing an expedited motion for preliminary injunction.

32.     The coordinated effort to present and support the fraudulent discovery photographs now clearly indicates the involvement of both the prosecution and Guertin's defense counsel, Bruce Rivers.

33.     This situation presents an unprecedented set of circumstances that necessitates immediate judicial intervention to prevent further harm and protect Guertin's constitutional rights.

**F.  Obscured Laptop Screen and Missing Notepad Image**

34.     A critical piece of evidence involves the intentional obscuring of the laptop screen in the discovery images.

35.     The screen is being covered with fraudulent windows, preventing a full view of the notepad file displayed on the laptop. The notepad file contained the following text: "The person in the photo is who welded my unit for me. He claimed to be with the CIA - either way they have obviously been tracking me and involved with my project every step of the way."

36.     The significance of this text lies in its direct reference to the image of the welder that Guertin had left displayed on the laptop screen prior to making his desperate call for help.



Image 51-75 from Michael Biglow August 3, 2023 Discovery Materials  (Exh. A, Index 29)

37.     It is this image that is being intentionally obscured by the fake application windows.

38.     The welder's claim of being 'former CIA', his proven military background, and his involvement in Guertin's project directly supports Guertin's broader conspiracy claims.

39.






(Exh. C, Index 30, p. 60-61)

40.     The new discovery materials fail to include any images showing a complete view of this notepad file and the accompanying photo, indicating selective omission and tampering.



(Exh. C, Index 30, p. 60-61)

## G. Intentional Exclusion of Professional Workflow

41.     In Guertin's initial discovery fraud analysis of the images emailed to him by Micahel Biglow on August 3, 2023, there seemed to be an intentional exclusion of anything that would portray a professional workflow.

42.     Examples of this include the exclusion of Guertin's Herman Miller office chair, professional workstation, desk, monitor, and books related to corporate start-ups. The discovery materials also appear to have intentionally cropped out items that would indicate a substantial fabrication process, such as light boxes, a roll of black fabric, and a wire-frame shelf containg parts and tools.

43.     The new discovery images, which now include a total of 518 images, serve to confirm Guertin's suspicions, as there are now images showing a more complete view of his workstation and related items.

44. This intentional exclusion in the initial analysis is particularly relevant considering the patent issue at the heart of the case, as it further supports the claim that the evidence was manipulated to undermine Guertin's credibility and the value of his invention.

**Additional photo's for timeline context prior to incident on January 21st, 2023**



June 11th, 2022

October 18th, 2022

October 21st, 2022

October 29th, 2022

October 30th, 2022

October 24th, 2022

November 30th, 2022

December 2nd, 2022

December 3rd, 2022

December 7th, 2022

(Exh. A, Index 29, p. 35)

### III.   WHO IS MATTHEW GUERTIN?

45.     Matthew Guertin's story is one of resilience and overcoming significant challenges from a young age. His mother was only 18 years old when Guertin was born, he never met his father, and spent much of his childhood in various shelters and foster homes. At seven, he lived in 'St. Joseph's Home For Children' in St. Paul, MN, a well-known local shelter for kids.

46.     He spent fourth grade in a foster home, a year in a South Dakota 'boot camp' style facility called Springfield Academy when he was 15, and then another year or so in an Anoka, MN group home during 11th grade. Much of his upbringing was influenced by his mother's personal problems, leading him to mainly be raised by his grandparents in his younger years.

47.     Despite these struggles, Guertin managed to navigate through numerous adversities. His late teens and twenties were marked by run-ins with the law, all related to his fondness for partying - a lifestyle that eventually led him to become a promoter, DJ, and lighting and production designer for many downtown Minneapolis clubs and events starting around 2006.

48.     His charges were never violent; they included disorderly conduct, DWI, and party ordinance violations. Guertin was so proficient at drinking substantial amounts of alcohol and finding creative ways to get into trouble that he even managed to be hauled off by police twice from his own events that he was responsible for organizing.

49.     These years marked a very fun, crazy, and tumultuous time in Guertin's life, yet he doesn't regret a single minute of it. His fondness for partying was transformed into a professional career where he got paid to attend even bigger parties.  (www.MattGuertin.com)

50.     These experiences have shaped him into the person he is today, instilling the unwavering resilience and adaptability that have been crucial to his journey.

18

51.     Notably, Guertin's last run-in with the law before the January 21, 2023, incident was in July 2008. This incident involved breaking a window at a bar valued at $500. When the police officers escorted him to the squad car, Guertin resisted by kicking the door, which resulted in stitches on his chin after the officers slammed his face down into the trunk of their squad car.

52.     Subsequently, he was charged $3500 for supposedly denting the squad car door, making it a felony. However, after successfully completing a diversion program, the felony was reduced to a misdemeanor, meaning Guertin has never technically been guilty of a felony in his life.

53.     Another incident from Guertin's past which is currently being woven into a blatantly false narrative involves a freeway overpass in 2009. Guertin attended a rave party, took LSD, and had a bad trip. His friends initially calmed him down, but as the music stopped and the sun rose, his bad trip returned. Running out of the party, he found himself on the road that crosses a freeway overpass. In his altered state, he actually called the police on himself and said something along the lines of, "You need to come and get me!" only for Guertin to then become convinced that they had come to harm him after they took him up on his offer.

54.     Due to being located on the middle of the overpass road when the police arrived, Guertin climbed the fence lining the overpass to "escape" as he thought he might be able to climb his way to the side, jump down, and run away from the police that he himself had called.

55.     At no point did he ever threaten to jump or harm himself - he simply wanted to get away from the scary police people that had appeared. After some time, Guertin began to realize that maybe the police might not be there to hurt him, at which point he simply climbed back over the fence and calmly walked into the ambulance and sat down.

56.     On the way to the hospital, he finally decided to come clean when he looked at one of the medics and said, "I took some acid," leading to a moment of clarity for everyone as they all collectively exclaimed, "Ahhhhhhh….okay." This adventure resulted in Guertin earning himself a 72-hour hold in the Mental Health section of the Hennepin County Medical Center, after which point he was released as it was clear he was not suicidal or a threat to himself. This was also Guertin's last time ever using LSD.

57.     Following this, Guertin turned his life around. Despite never receiving a formal college education and technically being a high school dropout who obtained his GED, he went on to receive credits as an 'engineer' in major publications for high-profile projects. He traveled the world, pursued his passions, and overcame the numerous battles and struggles of his younger years.

58.     Given his tumultuous childhood, marked by frequent relocations to different schools, foster homes, and shelters, and his mischievous and disobedient teenage years, Guertin should statistically be a negative outcome, as many of his peers from these environments ended up dead or in jail, but he did not. Guertin made it through to a point where he was able to travel and see the world, attend music festivals and concerts most people only dream of, and work on projects he loved, while getting paid to "play with computers" and build cool stuff.

59.     His breakthrough came with the inception of his revolutionary patent idea for InfiniSet, which should have served as the crowning achievement of his life and a testament to all his hard work and perseverance.

60.     This patent was poised to have significant implications, marking the pinnacle of Guertin's journey from a troubled youth to a successful and innovative professional, only to be overshadowed by a coordinated effort to undermine his credibility and steal his invention.



(Exh. X)

61.     This effort involved illegal surveillance operations, the manipulation of evidence, fraudulent discovery materials, and a broader conspiracy against him, turning what should have been his greatest triumph into a prolonged legal battle and personal nightmare.

62.     Guertin candidly admits to having tried every drug except heroin in his life. His openness about his past is a testament to his belief in complete transparency, having nothing to hide. The narrative being constructed against him, portraying him as a dangerous, suicidal individual with no achievements, is blatantly false.

63.     In fact, Guertin has never threatened to harm himself and has never been suicidal at any point in his life. His honesty and resilience are evident in his achievements and the substantial evidence he has gathered to defend himself against these false allegations.

64.     Significantly, the events that are being misrepresented took place 13 to 14 years prior to his current legal troubles. Guertin, who is now 43 years old, was still in his twenties when his previous legal troubles occurred. Nearly a third of his life has provenly been spent on the 'right path' prior to his current legal troubles, standing in stark contrast to the blatantly deceptive narrative being portrayed within the Hennepin County Courts currently.

## IV.   DISCREDITING THE MARCH 2023 EXAM REPORT

65.     The March 2023 exam report, authored by Dr. Jill Rogstad, is a central piece of evidence used to portray Matthew Guertin as mentally incompetent. However, a thorough analysis of this report reveals numerous inconsistencies, falsehoods, and omissions that call into question its credibility and the motives behind its creation.

*March, 2023 Rule 20.01 Exam Report* – (Exh. B, Index 28, p. 116-125)

### A.  Proven Credibility and True Claims

66.     Almost every claim labeled as delusional in the March 2023 exam report has since been irrefutably proven true, highlighting substantial evidence of Guertin's credibility:

| | | | |
|---|---|---|---|
| (12) **United States Patent** | | (10) Patent No.: | **US 11,577,177 B2** |
| **Guertin** | | (45) Date of Patent: | **Feb. 14, 2023** |

| | |
|---|---|
| (54) **MOTORIZED ROTATABLE TREADMILL AND SYSTEM FOR CREATING THE ILLUSION OF MOVEMENT** | (56)              **References Cited** |
| | U.S. PATENT DOCUMENTS |
| (71)  Applicant: **Matthew Guertin**, Minnetonka, MN (US) | 2015/0150522 A1    6/2015  Papaioannou<br>2017/0129105 A1    5/2017  Stephens, Jr.<br>2018/0053349 A1*  2/2018  Chen ................... G06T 19/006<br>2019/0086996 A1    3/2019  Bahrami et al.<br>2019/0307982 A1  10/2019  Brodsky |
| (72)  Inventor:  **Matthew Guertin**, Minnetonka, MN (US) | |
| | FOREIGN PATENT DOCUMENTS |
| (73)  Assignee:  **INFINISET, INC.**, Edina, MN (US) | CN          104740829 A      7/2015<br>CN          105396261 A      3/2016<br>CN          206026963 U      3/2017 |
| ( * )  Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days. | (Continued)<br><br>OTHER PUBLICATIONS |
| (21)  Appl. No.: **17/698,420** | International Search Report and Written Opinion issued for PCT/US2022/020919, dated Jun. 24, 2022. |
| (22)  Filed:      **Mar. 18, 2022** | |

67.     Guertin's name and patent number (US 11,577,177) are listed at the very top of Netflix's patent US 11,810,254, granted on November 7, 2023, due to Guertin's successful third-

party prior art submission. This directly contradicts the report's assertion that Guertin's claims about Netflix and Microsoft are delusional.

| (12) **United States Patent** | | (10) Patent No.: | US 11,810,254 B2 |
|---|---|---|---|
| Trojansky | | (45) Date of Patent: | Nov. 7, 2023 |

| (54) | DISPLAYING A SCENE TO A SUBJECT WHILE CAPTURING THE SUBJECT'S ACTING PERFORMANCE USING MULTIPLE SENSORS |
|---|---|
| (71) | Applicant: **Netflix, Inc.**, Los Gatos, CA (US) |
| (72) | Inventor: **Stephan Trojansky**, Los Angeles, CA (US) |
| (73) | Assignee: **Netflix, Inc.**, Los Gatos, CA (US) |
| ( * ) | Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days. |
| (21) | Appl. No.: **17/709,126** |
| (22) | Filed: **Mar. 30, 2022** |
| (65) | **Prior Publication Data** |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 11,577,177 | B2 † | 2/2023 | Guertin | |
|---|---|---|---|---|
| 2013/0181901 | A1 * | 7/2013 | West | H04N 9/3147 345/1.3 |
| 2015/0055101 | A1 * | 2/2015 | Kim | H04N 9/3147 353/94 |
| 2018/0059528 | A1 * | 3/2018 | Gocke | H04N 9/3147 |
| 2022/0319115 | A1 * | 10/2022 | Trojansky | B25J 19/021 |

OTHER PUBLICATIONS

Enrico Calabrese†, DHP19: Dynamic Vision Sensor 3D Human Pose Dataset, 2019, pp. 1-10.*
PCT/US2022/035002 International Search Report and Written Opinion dated Oct. 10, 2022.

\* cited by examiner
† cited by third party

68.    Evidence of Conspiracy:

Guertin claimed advanced AI was being used against him. This has now been proven true with the discovery of AI-generated evidence used to manipulate his court case, substantiating his claims of a broader conspiracy.

## B.  Misrepresentation of Guertin's Achievements

69.    Dr. Rogstad's report disregards substantial evidence of Guertin's professional achievements, turning his credible claims into false narratives:

70.    Guertin's original email to Rogstad clearly and rationally laid out his situation, beginning with a link to his portfolio website, showcasing substantial achievements. Rogstad used this context to portray him as delusional.

## Matthew David Guertin / Preliminary Introduction and discussion of facts

| | |
|---|---|
| From | matt ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ > |
| To | jill.rogstad@courts.state.mn.us |
| BCC | Bruce Rivers<riverslawyers@aol.com> |
| Date | Monday, February 13th, 2023 at 4:59 PM |

==The yellow highlighted link 'what I have been up to over the past 15 years' was a link to my portfolio website – www.MattGuertin.com==

Jill,

It was nice to speak with you on the phone the other day and I am looking forward to our meeting on March 1st.

In what I am sure will be one of many follow-up emails leading up to our meeting I would like to provide you with ==an initial, short introduction to myself and what I have been up to over the past 15 years== as well as a little bit of information about what I currently have taking place in my life in regards to my patent application - the one I filed on March 19th, 2021 and which will officially no longer be an 'application' beginning tomorrow (v-day) as that is when it officially grants - tomorrow is also when my patent will be filed as prior art against this patent here which was invented by Stephan Trojansky and first filed on March 31, 2021.....12 days later than my application.

---

I will leave you with a simple question to ask yourself - "What on earth would cause someone who has been traveling the world and accomplishing some of the most amazing technological, engineering, and programming feats since 2014 after essentially traveling to LA with his entire life in a trailer behind him and who now has now moved back home after covid only to continue accomplishing projects which have gained him a massive amount of attention, including winning awards for my 3D photogrammetry Chicago scan, and who then somehow was able to top all of the projects he worked on in LA and all over the world by inventing, patenting and then proceeding to design, engineer, and fabricate a device and system in his living room which can only be described as a complete paradigm shift in the way movies and film will produced going forward, and which he was/is only days away from being able to record a 'proof of concept' video for just as he is also finally going to officially be granted a patent for to suddenly decide that shooting a gun out of his window to alert police makes logical sense?"

And that is the question......

(Exh. B, Index 28, p. 105-108)

71.     Guertin provided email proof of his engineering credits in major publications, sent after their meeting and before the July 7, 2023 court hearing, which Rogstad ignored or misrepresented.

Need help overcoming these very realistic "psychotic delusions" I still seem to be experiencing...

| | |
|---|---|
| From | mattguertin <MattGuertin@protonmail.com> |
| To | jill.rogstad@courts.state.mn.us |
| CC | Bruce Rivers<riverslawyers@aol.com> |
| Date | Wednesday, April 26th, 2023 at 1:37 PM |

Dr. Rogstad,

Good afternoon

It would appear as though one or more of the potential mental disorders you diagnosed me as possibly having is starting to affect other people now as well.

https://youtu.be/V6_jCGzR020

Is the whole world going mad now?

I've also been struggling quite a bit since our meeting as I attempt to better understand and come to grips with the fact that you convinced me beyond any reasonable doubt that I'm absolutely not "an engineer" and that the many "perceived" achievements I mentioned to you in our meeting (as a way of providing you with better context) were in fact just very realistic distortions of reality caused by one or more of the many mental deficiencies you were able to so quickly identify me as potentially suffering from. (thanks again for really taking the time and putting in the effort to get to know me so well)

As another example of the conflicted version of reality I currently reside in - here is another one which appears to be some kind of technology based company in which I'm actually credited as some sort of "engineer" again.....   I just don't get it. It seems so crazy and unlikely that someone as mentally ill as I am who is completely detached from reality in such a profound way keeps getting mistakenly put into magazines and online publications as a way of showcasing just some of my many 'perceived' achievments - All of them being ones which are so realistic they seem to have persisted ever since I remember imagining them happening?  It is very strange.

"Falcon Design, Fabrication Direction and  **Engineering:**
Matt Guertin"

https://blacktrax.cast-soft.com/showcase/tracking-a-50ft-falcon-with-xitelabs/

(Exh. D, Index 38, p. 113)

For example I just came across this online article in which the following is stated:

"the set piece was engineered and built in-house at XiteLabs studio by creative technologist Matt Guertin . LED tiles from PRG were dismantled into smaller component modules, custom configured and re-wired by Guertin at XiteLabs to create smaller radius circular elements to create the smooth edges of the eye. Guertin designed and engineered 420 metal parts cut out of eight

(Exh. D, Index 38, p. 113-114)

..to make matters even more confounding I even had ████████████████████████ ████████████████    reply with the following message when she first learned of my patent via fbook messenger.

"extremely impressive and practical product. it should REVOLUTIONIZE THE INDUSTRY." Images are linked here - also attached

And that's the problem Dr. Rogstad.

I know that none of this stuff is real.. .you told me so yourself and I know you're one of the best forensic psychologists ever...I mean I knew that right away just based on our first email interaction.... So all I'm left with is what I would describe as very pronounced and persistent distortions of reality which are so vivid and clear that I'm 99.999% sure that they are memories as opposed to delusions... that's what it feels like anyways...but then again I am also entirely aware that nobody actually knows me like you do - hence my reason for seeking your advice

One of the main substantiating points for your belief that I am 'Schizophrenic and/or possibly Psychotic' and should be committed to a psychiatric ward and placed on powerful antipsychotic drugs until I'm "well" and "competent" (at least enough so that I'm able to understand the charges against me and aid in my own defense...since I am obviously not capable of doing that at all....) was that I have these 'persecutory' delusional beliefs of having invented something so big that it's going to "revolutionize" the industry....and which I somehow believe is so big that companies like Microsoft and Netflix would actually know my name and who I am (obviously crazy...I know this because you told me so)....I like to pretend I know how to build things.....I tell people I'm an "unlicensed engineer" just to make myself feel better about how little I've actually accomplished in my life, etc, etc - and then to really top it all off you still got this website of mine www.MattGuertin.com in which I went so far as to actually organize my delusional experiences into many different pages due to the false perception that I actually accomplished something that real people based in reality would actually care about and want to look at. I mean how crazy is that? Right?

(Exh. D, Index 38, p. 115)

What do I have to do exactly to pretend that none of the real and factual evidence I have even exists at all so I can just go along to get along and not be so abrasive?

If I were to be placed on enough powerful antipsychotic drugs for a long enough time period is there a possibility at some point that I just won't even remember any of this so it won't matter anyways?

Or am I just overthinking this and the powerful 'anti-psychotics' you recommended will make me feel so good that I will not care about anything at all as long as I can have an extra graham cracker and juicebox during afternoon group?

You are the BEST Dr. Rogstad !

Thank you again!

Sincerely,
Matthew Guertin

PS - I also attached proof of the "special ops gear" which I spoke of in our meeting - here is a link for that as well - Apparently it is manufactured by this company in Israel that manufactures .....wait for it...........SPECIAL OPS GEAR !  whowouldvethought ! ?

Sent from ProtonMail mobile

---

19.33 MB    12 files attached

| | |
|---|---|
| lnkedScreenshot_20230426-101243_Messenger.jpg 402.25 KB | lnked20220108_1659422.jpg 238.38 KB |
| ODF_Optronics.jpg 295.89 KB | ODF_Company.jpg 464.39 KB | 20220108_162218.jpg 2.46 MB |

(Exh. D, Index 38, p. 116)

## C.  Omission of Key Information

72.    Police Report #23-000151:

This report, filed nine days before the criminal charges, documented a 45-minute session where Guertin provided substantial evidence of fraud to Officer Brandon Harris. Despite reviewing this report, Dr. Rogstad failed to mention it, ignoring a significant piece of evidence supporting Guertin's claims.

(Exh. B, Index 28, p. 78-80)

Exclusion of Context:

73.     The report omits Guertin's consistent honesty about his past drug use and professional achievements, instead presenting a distorted picture of his mental state.

## D.  Blatant Falsehoods and Misinterpretations

74.     Rogstad falsely claims that Guertin threatened to jump from an interstate bridge overpass in 2009. In reality, Guertin called the police on himself during a bad LSD trip and tried to escape, never intending to harm himself. Police and hospital records can confirm this.

75.     Rogstad portrays Guertin's statements about being an engineer and his revolutionary invention as delusional, despite substantial evidence supporting these claims. Guertin's patent has been estimated to be worth significantly more than $250,000,000. (Exh. W, Index 02, p. 1-5)

## E.  Contradictions and Lack of Expertise

76.     Dr. Rogstad's statements often contradict themselves and reveal her lack of expertise. Rogstad admits she lacks the specialized knowledge to understand Guertin's patent, yet she labels his statements as delusional. If Guertin's claims were purely delusional, specialized knowledge would not be necessary to assess their validity.

77.     Rogstad's report acknowledges that Guertin's patent has the potential to be lucrative but then dismisses his beliefs as delusional even if they prove true, highlighting a significant contradiction.

**F.  Rogstad misinterprets and twists Guertin's statements to fit a false narrative**

78.    Guertin's statement about isolating himself to work on his invention was twisted to suggest unhealthy behavior linked to alcohol use.

79.    Guertin's candid admission of taking additional doses of Adderall during intense work periods was misrepresented as misuse. However, given the high-profile nature of his projects, which often involved substantial amounts of money, significant public attention, and the all-or-nothing stakes of ensuring project success, his actions are entirely logical and justified.

80.    Guertin's career required meeting non-standard and highly demanding schedules, often requiring working around the clock to ensure the successful execution of projects at a consistently high level.

81.    When faced with working more than 24 hours straight, as Guertin was required to do in order to fix Bad Bunny's 2019 main stage set piece that had been struck by a forklift (Exh. B, Index 28, p. 29; Exh. F, Index 27, p. 32-33) before his week two performance, taking additional doses of Adderall, each effective for only 4-5 hours, is simple math. This does not mean that he took 10 pills at one time, but rather was simply ensuring that he maintained the necessary focus and energy to meet the critical demands of his work when extenuating circumstances required it.

**G.  Disregard for Due Process**

82.    Rogstad's report oversteps its bounds by judging Guertin's evidence rather than his competence. The report attempts to discredit Guertin's evidence, which is not its role. Judging the validity of evidence is the responsibility of a jury during a fair trial.

**H.  Conclusion**

83.      The March 2023 exam report is fraught with inconsistencies, omissions, and blatant biases that severely undermine its credibility. By selectively omitting key information, misrepresenting past incidents, and ignoring substantial contradictory evidence, the report fails to provide an accurate and fair assessment of Matthew Guertin's mental state.

84.      Given these flaws, this report should be discredited and not be relied upon in the ongoing legal proceedings against Guertin.

## V.   DISCREDITING THE JUNE 2023 WITNESS STATEMENT

85.      The June 2023 witness statement, prepared by Assistant Hennepin County Attorney Jacqueline Perez, presents several egregious portrayals and mischaracterizations of Mr. Guertin. These misrepresentations, often taken out of context or directly contradicted by evidence, are critical to discrediting this document.

*June 12, 2023 Witness Summary, Dr. Jill Rogstad* – (Exh. S, Index 13, p. 1-2)

**A.  Contradictory Information on Civil Commitment**

86.      "Dr. Rogstad was aware that Mr. Guertin was previously petitioned to be civilly committed but not entirely sure what happened with that process and why he was not committed."

87.      This is blatantly false as Dr. Rogstad clearly states in her report, "Hospital staff reportedly petitioned to have the defendant civilly committed, but it was not supported, and he was eventually discharged without psychiatric medications. At that time, clinicians attributed his clinical presentation at the time of his admission to the effects of his substance use and intoxication level."

**B.   False Claims of Suicide Attempts**

88.     "Mr. Guertin acknowledges he has been hospitalized in the past for substance use and suicide attempts."

89.     Guertin has never acknowledged suicide attempts, and this statement is blatantly false. Even if using the bridge incident from 2009 as this statements supposed basis, implying multiple suicide attempts is a dangerous misrepresentation.

90.     This false narrative is concerning, especially given the significant financial figures at play and Guertin's consistent claims of being targeted. One might logically conclude that perhaps a narrative is being constructed that could be used to justify a false claim of Guertin committing suicide, potentially while under a planned, and unjust commitment.

**C.   Validation of Threats and Evidence**

91.     "During the current interview, Mr. Guertin said the threats were real and he has evidence of this belief."

92.     This is true, as confirmed in the police report and by Bruce Rivers, who initially told Guertin he had "powerful people keeping an eye on him," only to deny it later.  (Exh. W, Index 03, p. 1-4)

93.     Guertin's LinkedIn search graph (Exh. C, Index 30, p. 53-59) and patent analysis (Exh. C, Index 30, p. 67- 70, 94-95) further validate these threats and show the substantial implications of his invention.

**D.   Proof of Patent Theft by Netflix**

94.     "Mr. Guertin believes Netflix and Microsoft stole information from one of his patents and covered up their tracks by making it seem like they had gotten it first."

95.     Guertin's patent attorney confirmed in an email that the Netflix patent filed just 12 days after Guertin's is for the exact same thing.  (Exh. D, Index 38, p. 66-67)

96.     The LinkedIn search graph reveals entities directly connected to Netflix searched for Guertin's profile before his patent was published, indicating a likely theft directly from the USPTO itself.

**E.  Advanced Surveillance and Cover-Up**

97.     "That progressed into them accessing his devices in his home. That lead to a cover-up and then stealing his technology"

98.     Guertin's LinkedIn search graph shows that Forcepoint and 3Gimbals searched for him at the same time his criminal charges originated, indicating they were likely involved in responding to the patent theft Guertin uncovered, which serves as rather compelling support of his hacking, and compromised devices claim.  (Exh. N, Index 02, p. 16-22)

**F.  Continuity of Competence**

99.     "Delusions are in the extreme end of the psychotic spectrum. This is what Mr. Guertin is experiencing."

100.    If Guertin were truly delusional, he wouldn't be able to continue with his business dealings, open a corporate bank account, or attempt to set up a manufacturing process in Vietnam as he was simultaneously dealing with his civil commitment proceedings.

'Chronological Continuity of Competence' - (Exh. W, Index 07, p. 1-77)

**G.  Misuse of Medication Narrative**

101.    The witness statement perpetuates the narrative that Guertin's alleged delusions are due to stimulant misuse, despite all of his so-called "delusions" being proven true. This misrepresentation aims to discredit Guertin's credibility and downplay the validity of his claims.

**H.  Self-Aggrandizing Claims**

102.    The statement portrays Guertin as self-aggrandizing for being analytical, ignoring that his analytical skills led to the thorough discrediting of fraudulent reports and the analysis of fraudulent discovery materials.

103.    This biased portrayal disregards Guertin's legitimate achievements and the substantial evidence he has gathered, including the detailed forensic analysis that uncovered significant manipulations and omissions in the discovery provided.

**I.  Delusions and ADHD Medication**

104.    "Delusions were very prominent. Delusions could be a possibility of not taking ADHD as prescribed."

105.    This narrative continues to push the false notion that Guertin's delusions are linked to his Adderall use, despite the fact that all of his supposed delusions have since been proven true. This is a clear attempt to discredit him without basis.

**J.  Antipsychotic Medication Recommendation**

106.    "First course to address this diagnosis is anti-psychotic medications."

107.    In light of the blatantly deceptive report from Rogstad, this recommendation should come across as clear and irrefutable evidence of the intentions and the imminent danger Guertin faces if the federal courts do not intervene.

33

108.    This recommendation is based on a false premise and poses severe risks to Guertin's well-being.

## K.  Understanding of Charges and Evidence

109.    "He understood what he was charged with. When talking about evidence he talked about introducing evidence in criminal trial that he brought to rule 20 interview to let evidence speak for itself."

110.    Guertin clearly understands his charges and the importance of his evidence, yet the courts refuse to let the "evidence speak for itself," further undermining his defense.

## L.  Discussion of Pleas and Delusions

111.    "She discussed consequences of pleas and how that applies to his case. Mr. Guertin spoke about delusions and how that applies to his case. He talked about data related to delusions."

112.    This ignores the substantial evidence provided by Guertin, including the January 12, 2023, police report, which detailed his patent and the proof of fraud he had gathered:

a.    "While reviewing the website over a number of days he realized the website was changing to reflect his patent."

b.    "The website is being updated in real-time with information from his design."

c.    "He has proof of the fraud."

d.    "Photo Robot is effectively stealing his patent by making it look like they have already had the technology."

e.    "He has been downloading the website and has noticed a number of discrepancies between the current version and the old version of the website."

34

f.   "Guertin advised that he has many gigabytes of evidence to show the fraud."

g.   "I advised Guertin to connect with a computer forensicator in order to parse the data into a readable format."

h.   "I advised Guertin to provide the FBI with the case number and the parsed data when he files the report with them."

(Exh. B, Index 28, p. 79-80; Exh. W, Index 06, p. 1-4)

## M.  Contradiction on Patents

113.   "Even if he did have patents approved, this would not change her mind about her ultimate opinion as opinion is based on delusional beliefs and not the patents themselves."

114.   This is a blatant contradiction, as the patents themselves are supposedly part of the delusional beliefs according to Dr. Rogstad's conclusion.

115.   Which is it? The clear evidence of Guertin's patents and their substantial impact should unequivocally disprove the claims of delusion.

## VI.   DISCREDITING THE JANUARY 2024 EXAM REPORT

116.   The January 2024 exam report by Dr. Adam Milz contains numerous inaccuracies and misleading statements that require thorough rebuttal. Below are the key statements from the report, along with detailed rebuttals for each:

117.   *January, 2024 Rule 20.01 Exam Report* – (Exh. S, Index 10, p. 1-6)

## A.  Substance Use History

118.  "Records indicated the defendant has a history of problematic use of several substances, including alcohol, marijuana, methamphetamine, crack cocaine, dimethyltryptamine (DMT), and lysergic acid diethylamide (LSD)."

119.  This statement is blatantly untrue and crafts a misleading narrative based on Guertin's candid honesty about having used various substances in the past. Guertin has been upfront about his past experimentation, but there is no evidence of ongoing substance abuse.

## B.  Adderall Use

120.  "He also has a history of taking additional doses of Adderall (psychostimulant) than what was prescribed."

121.  This narrative continues to misrepresent Guertin's admission of taking additional doses of Adderall during specific instances, such as in 2019, four years prior to the incident. This is not indicative of ongoing misuse but rather a practical response to his demanding work schedule.

## C.  Adolescent Substance Use Treatment

122.  "It also appears he received substance use treatment as an adolescent."

123.  Guertin is currently 43 years old. His adolescent substance use treatment has no relevance to his current situation or the theft of his patent.

## D.  Growing Up in the System

124.  "He stated he 'grew up in the system' and was prescribed numerous psychiatric medications in the past, and is disappointed he is back 'in the system.'"

125.    Guertin's statement about growing up in the system pertains to his childhood experiences, not continuous involvement in the system. His disappointment is justified, considering the current false narrative being perpetuated about him.

**E.  State of Mind**

126.    "Adding that he has been in the 'best, clearest, most focused state of mind in my life.'"

127.    Guertin's documented accomplishments leading up to his patent filing support his statement. He has clearly been functioning at a high level and achieving significant milestones. (Exh. B, Index 28, p. 22, 26-39; Exh. W, Index 08, p. 1-10)

**F.  Medication Effectiveness**

128.    "He described these medications as effective but stated he is 'very particular' about what he puts in his body and does not like being on medications."

129.    Guertin's medications have been effective for nearly ten years, as evidenced by his accomplishments while on the same prescription since 2016. (Exh. W, Index 08, p. 1-10)

**G.  Past Mental Health Treatment**

130.    "Records indicated brief periods of inpatient mental health treatment in the past, including an admission in 2009 prompted by paranoia and threatening to harm himself in the context of alcohol and LSD use."

131.    This is false. Guertin has never threatened to harm himself, and this is confirmed by his medical and police records which are guaranteed to not contain any such statement or incident involving suicide or threatening to harm himself. EVER.

**H.  Delusional Thinking**

132.    "Mr. Guertin exhibited significant delusional thinking (i.e., fixed false beliefs that are inconsistent with external reality and are sustained despite evidence to the contrary) during the course of the previous Rule 20 evaluation."

133.    These so-called delusions have since been proven true. Guertin's claims about his patent, corporate theft, and AI manipulation are all supported by substantial evidence.

**I.  Patent and Corporate Theft**

134.    "Please refer to Dr. Rogstad's report for a full description of these beliefs although in summary the defendant reported that large corporations discovered his patented invention of a technological device worth $250,000,000 and were trying to harm or kill him and steal the technology."

135.    The estimated value of Guertin's patent over 20 years supports his claims (Exh. W, Index 02, p. 1-5)

**J.  Rumination on Previous Evaluation**

136.    "He has demonstrated rumination about the previous Rule 20 evaluation and reported that his invention was stolen by corporate entities."

137.    Guertin's concerns are justified, given the false and deceptive nature of the previous evaluation.

**K.  Searches by Corporations and Government Entities**

138.    "He also indicated corporations and government and international entities have searched for his name and invention."

139.    These claims are substantiated by Guertin's LinkedIn search graph.

(Exh. C, Index 30, p. 53-59, 145-213; Exh. N, Index 02, p. 1-25)

**L.  Altered Discovery Material and External Pressure**

140.    "He has also expressed concern that someone within the Hennepin County District Court altered discovery material related to the present case."

141.    "Mr. Guertin also reported discovery material in the present case has been altered and 'outside pressure is being applied to the courts' by federal government agencies."

142.    "For instance, he wrote, 'Based on everything that I have now uncovered, the obvious as well as confirmed involvement of outside forces applying pressure to the courts and directly monitoring my case...along with the additional discovery I've made of someone within the Hennepin County Court system itself involved in what I would assume is a 'criminal' act by producing an alternate (fraudulent..) version of discovery materials related to my case which was not only missing 24 images but which also contains very clear signs of image manipulation it is fair to say that I do not trust anyone at all.'"

143.    Guertin has provided substantial evidence in this motion proving the alteration of discovery materials and the involvement of external pressures.

144.    Additionally, Bruce Rivers explicitly mentioned to Guertin that "powerful people" were keeping an eye on him, further substantiating his claims

(Exh. W, Index 03, p. 1-4)

**M.  Stalked By Numerous Entities That Include Government Agencies**

145.    "He reported he is being stalked by numerous entities that include government agencies (e.g., CIA, State Department, Army, Air Force, Defense Intelligence Agency, DARPA,

Indo-Pacific Command) and corporations (e.g., Lockheed Martin, Fox Corporation, Forcepoint)."

146.    Guertin's LinkedIn search graph and other evidence support his claims.

(Exh. C, Index 30, p. 53-59, 145-213; Exh. N, Index 02, p. 1-25)

## N.  Insanely Valuable Patent

147.    "He stated the stalking stems from an 'insanely valuable patent' he has for a 'motorized and rotating treadmill to create the illusion of movement,' and he became aware of it when he received unsolicited emails from LinkedIn notifying him that companies had conducted searches of his profile."

148.    The estimated value of Guertin's patent and LinkedIn search data support his claims.   (Exh. W, Index 02, p. 1-5; Exh. C, Index 30, p. 53-59, 145-213)

## O.  Netflix Fraud

149.    "He reported Netflix engaged in fraud by purchasing an invention similar to his that was based on 'fake academic papers' and patented 12 days after his invention."

150.    Guertin's name is at the top of Netflix's US Patent 11,810,254, confirming his claims.

(Exh. B, Index 28, p. 224)

151.    The detailed image analysis of the purported 'Light Stage 6' at USC further supports the claim of fraudulent academic papers.

(Exh. L)

**P.  Reporting Fraud to Authorities**

152.    "He stated he reported this fraud to local and federal law enforcement agencies, which declined to investigate his claims and he is therefore attempting to expose the criminal activity."

153.    Guertin filed a police report nine days before the incident and attempted to arrange a professional forensic analysis, dedicating $5000 towards this effort. A rather significant amount of effort and financial investment for supposed 'delusions'.

(Exh. B, Index 28, p. 79-80; Exh. W, Index 06, p. 1-4)

**Q.  Former CIA Welder**

154.    "He also stated on numerous occasions that a welder he hired to complete work at his apartment was ex-military and a former CIA agent."

155.    Guertin has proof of his self-professed 'former CIA' and military-affiliated welder.

(Exh. C, Index 30, p. 60-61; Exh. W, Index 04, p. 1-11)

**R.  Psychosis History**

156.    "According to the available information, the defendant has a history of psychosis characterized by prominent delusional thinking as well as impaired thought processes."

157.    This is blatantly false. Guertin has a letter from his longtime California doctor directly stating no history of psychotic or psychosis disorders, directly discrediting Rogstad's report.

(Exh. C, Index 30, p. 113-114)

**S.  Anti-Psychotic Medication**

158.    "He is presently under a stayed order of civil commitment although it is unclear if he is receiving treatment designed to specifically address psychotic symptoms (e.g., antipsychotic medications)."

159.    This is further proof of the intention to harm Guertin. He is not psychotic, yet there is an insistence on forcing him to take powerful antipsychotic drugs, posing imminent danger.

**T.  Delusional Disorder Diagnosis**

160.    "Although his current presentation is consistent with a diagnosis of delusional disorder, he also has a history of symptoms consistent with mania as well as a history of consuming illicit and mood-altering substances that can result in, or exacerbate, psychotic symptoms."

161.    There is no history of mania, as confirmed by his doctor. Guertin's last 'issue' was 13-14 years prior to his current charges, with a proven history of substantial accomplishments and success.

([www.MattGuertin.com](http://www.MattGuertin.com))

**U.  Conflict of Interest**

162.    "He identified his attorney as 'Bruce Rivers' but also stated he is representing himself in this matter because his defense counsel is a 'big YouTube star,' which represents a conflict of interest because of the companies that are stalking him."

163.    Guertin has significant proof of YouTube backdating videos. Additionally, Google stole Guertin's trademarked name and named the dataset for their BardAi 'Infiniset,' disrupting any traction Guertin would be able to get.   (Exh. B, Index 28, p. 41, 45-48)

## V.  Competency Prognosis

164.    "Although psychotic disorders are typically chronic and relapsing conditions that require long-term treatment, such disorders often respond positively to psychiatric medications."

165.    This prognosis is based on the false premise that Guertin has a psychotic disorder. His substantial achievements and lack of any psychotic history, as confirmed by his longtime California doctor, indicate that this diagnosis is incorrect and the proposed treatment is unnecessary and harmful. (Exh. C, Index 30, p. 113-114)

## W.  History of Threatening Self-Harm

166.    "Mr. Guertin has a history of threatening to harm himself, which elevates his long-term risk of similar behavior."

167.    This statement is blatantly false. Guertin has never threatened to harm himself, and there is no evidence to support this claim. The narrative being perpetuated is both dangerous and misleading.

## X.  Additional Considerations

168.    "It is my opinion he requires psychiatric treatment in order to stabilize his mental status."

169.    Guertin does not require psychiatric treatment for a non-existent psychotic disorder. The insistence on this course of action, despite substantial evidence disproving the

diagnosis, highlights the intent to cause him harm and underscores the need for immediate judicial intervention.

**Y.   Summary and Conclusion**

170.    The January 2024 exam report by Dr. Adam Milz is replete with inaccuracies and misleading statements that continue to perpetuate a false narrative about Matthew David Guertin.

171.    This narrative is not only harmful but also unsupported by the substantial evidence Guertin has gathered. The report's recommendations for treatment and commitment are based on erroneous conclusions and must be rejected.

172.    The court must recognize the blatant falsehoods and manipulations in these reports and the irrefutable evidence Guertin has provided. Immediate judicial intervention is necessary to prevent further harm and protect Guertin's constitutional rights.


**VII.   SUBSTANTIAL EVIDENCE OF PATENT FRAUD CLAIMS**

173.    The substantial evidence presented in this section demonstrates the extensive and irrefutable proof of patent fraud against Matthew David Guertin. This evidence not only validates Guertin's claims but also exposes the broader conspiracy aimed at undermining his work and discrediting his credibility.

**A.   Initial Discovery of Patent Fraud**

174.    Guertin's journey began with the discovery that his patented invention, a motorized and rotating treadmill designed to create the illusion of movement, had been stolen. He meticulously collected digital forensic evidence proving that large corporations, including Netflix were involved in the theft and subsequent cover-up.

175.     Guertin's patent, US 11,577,177, is listed at the very top of Netflix's patent, US 11,810,254, which was granted on November 7, 2023. This listing is due to Guertin's successful filing of a third-party prior art submission, further substantiating his claims.

(Exh. B, Index 28, p. 90-95, 134-158)

## B.  Proof of Prior Art Submission

176.     Guertin's proactive steps to protect his intellectual property included filing an Information Disclosure Statement (IDS) related to his patent, which directly named Microsoft and Dimension Studios.   (Exh. B, Index 28, p. 130-132)

177.     This submission is crucial as it demonstrates Guertin's diligence and awareness of potential infringements by major corporations. His actions were not those of a delusional individual but of a rational inventor protecting his work.

## C.  Estimation of Patent Value

---

**ANNUAL REVENUE ESTIMATE:**

- $1 billion (gaming) + $100 million (film) + $1 billion (military) + $8 billion (metaverse) = $10.1 billion / year

- Total Revenue Over 20 Years = $10.1 billion / year × 20 years

   = $202 billion

**CONSERVATIVE BALLPARK FIGURE:**

Considering a conservative estimation and potential market fluctuations, we can round this down to provide a conservative ballpark figure:

   *Conservative Estimate = $150 billion over 20 years*

The technology covered by US Patent 11,577,177 could potentially generate a conservative revenue of around $150 billion over its 20-year patent life, factoring in its broad application across various high-growth industries.

---

(Exh. W, Index 02)

178.    Guertin's patented technology has been estimated to be worth significantly more than the $250,000,000 initially claimed. The detailed analysis of the estimated patent value over 20 years showcases the revolutionary nature of his invention and its vast implications in various industries, **including military training simulations.** (Exh. C, Index 30, p. 67-70)

179.    **This substantial ballpark valuation of over 100 billion dollars underscores the motive behind the concerted efforts to undermine and steal Guertin's invention.**

(Exh. W, Index 02, p. 1-5)

**D.  Evidence of Advanced AI Manipulation**

180.    Guertin's claims of advanced AI technology being used as part of the conspiracy have been proven through the analysis of fraudulent discovery materials. The discrepancies in metadata and image manipulation techniques indicate the involvement of sophisticated AI tools.

181.    This manipulation directly aligns with Guertin's assertions of his electronic devices being compromised and his work being surveilled.

(Exh. T, p. 1-5)

**E.  Professional Validation and Communications**

182.    Guertin's initial email to Dr. Rogstad, which included a link to his portfolio website, rationally and clearly laid out his situation. Despite this, Rogstad's report portrayed his statements as evidence of mental health problems, blatantly ignoring the substantial professional achievements and validation from industry experts.

183.    Additionally, Guertin sent her proof of his many engineering credits in major publications and the 'special ops gear' on his prototype, further validating his claims.

## F. Analysis of Netflix Patent

184.   The detailed analysis of Netflix's patent, which was filed just 12 days after Guertin's, reveals significant overlaps and potential infringements.

### Reference to InfiniSet Patent in Netflix Patent:

**The InfiniSet patent is cited at the top of the Netflix patent as a third-party prior art submission, indicating its relevance and potential influence on the Netflix patent.**

### Arguments for USPTO Consideration:

#### Substantial Similarity in Technology:
Both patents describe a system that integrates LED panel setups with a specialized treadmill for creating realistic virtual filming environments. The Netflix patent appears to be a more technical and segmented description of essentially the same technology covered in the InfiniSet patent.

#### Prior Art Consideration:
Given that the InfiniSet patent is acknowledged in the Netflix patent, it suggests that the Netflix patent may not meet the novelty requirement due to the prior existence of similar technology.

#### Obfuscation in Patent Writing:
The Netflix patent's detailed focus on panel arrangements and the omnidirectional treadmill seems to obfuscate the core technology, which is fundamentally similar to the InfiniSet patent's simpler and more direct description.

#### Overlap in Filming Technology Applications:
Both patents aim to achieve the same outcome - allowing free movement and realistic filming within a confined virtual set, utilizing a combination of physical and digital elements.

### Conclusion:

**Given these points, it is arguable that the Netflix patent does not sufficiently differentiate itself from the InfiniSet patent in terms of innovation and application. The similarities in the core technology and intended use of the system suggest that the Netflix patent may not meet the criteria of novelty and non-obviousness required for a valid patent grant. Therefore, it's recommended to challenge the Netflix patent's validity based on these grounds.**

(Exh. C, Index 30, p. 95)

185.    Guertin's patent attorney also confirmed the identical nature of the Netflix patent after he had first found it.  (Exh. D, Index 38, p. 66-67)

186.    This analysis, combined with the fraudulent academic papers supporting the Netflix patent, underscores the coordinated effort to appropriate Guertin's invention.  (Exh. L)

## G.  Professional Acknowledgments



(Exh. C, Index 30, p. 107)

187.    Guertin's patent attorney acknowledged the situation and advised him to contact the FBI through the IC3.gov website, demonstrating professional recognition of the severity of the fraud. This acknowledgment, along with the substantial evidence presented, further legitimizes Guertin's claims and discredits the false narrative being perpetuated by the courts.

**H.  Age Discrepancies Support Claim of YouTube Backdating Videos to Support Fraud**

188.    Guertin's personally conducted investigation into the patent fraud conspiracy resulted in compelling evidence of backdated videos being uploaded to YouTube.

189.    Backdating in this context refers to videos that have been recently produced, being added to accounts with false upload dates that make it appear the viedeo being presented has existed prior to its true date of creation.

190.    This results in the creation of a completely fraudulent historical record – one which is being used to support fraudulent prior art that is meant to discredit the novelty of the technology contained in Guertin's US Patent 11,577,177 by making it appear that entities whom Guertin has proven are directly connected to, with Paul Debevec actually working directly for Netlfix supposedly, have already been advancing Guertin's technology previously.

191.    Obvious Age Discrepancies Based on Purported Video Dates:



(Exh. N, Index 01, p. 9)

192.    Light Stage: Amazing avatars worthy of the Army, and Hollywood

   https://youtube.com/watch?v=sHVq4toVSVg

193.    Munich SIGGRAPH Chapter: Light Fields & Presidential Scanning 2015

   https://youtube.com/watch?v=A2HEMNpTwQ0



(Exh. N, Index 01, p. 10)

194.   Light Stage: Amazing avatars worthy of the Army, and Hollywood

https://youtube.com/watch?v=sHVq4toVSVg

195.   Digitizing Photorealistic Humans Inside USC's Light Stage

https://youtube.com/watch?v=c6QJT5CXl3o



(Exh. N, Index 01, p. 11)

196.   Light Stage: Amazing avatars worthy of the Army, and Hollywood

https://youtube.com/watch?v=sHVq4toVSVg

197.   Light Field Imaging: The Future of VR-AR-MR-Part 1: Paul Debevec

https://youtube.com/watch?v=Raw-VVmaXbg



(Exh. N, Index 01, p. 12)

198.   OTOY | GTC – The Convergence of Cinema and Games

https://youtube.com/watch?v=etoS6daj20c

199.   How USC's Automultiscopic 3D Display Works

https://youtube.com/watch?v=CIo-epgTjCs

## I. Two Differently Aged, Matchingly Dressed Versions of Paul Debevec in the Same Video

200.   Overview: USC ICT Graphics Lab

Skip Rizzo Clinical VR

https://www.youtube.com/@SkipRizzoClinicalVR

https://www.youtube.com/watch?v=k_6LL0DUdFI

201.   YouTube Upload Date – **8/14/2014**

Metadata - Google Inc Creation Date - **2023:07:18 01:52:26**

202.   This video has two different Paul Debevec's shown in it – One which appears much younger, and one which appears to be much older, with a much larger face and neck due to weight gain.

YET THEY ARE BOTH WEARING THE SAME EXACT OUTFIT



(Exh. N, Index 01, p. 49-52)



(Exh. N, Index 01, p. 49-52)


https://www.youtube.com/watch?v=k_6LL0DUdFI



(Exh. N, Index 01, p. 49-52)


https://www.youtube.com/watch?v=k_6LL0DUdFI

**I.  Consistency of Competence**

203.    Despite the false portrayal of Guertin as delusional, his ability to continue with business dealings, open a corporate bank account, and set up a manufacturing process in Vietnam during his stayed order of civil commitment demonstrates his competence.

---

### Re: Settlement Documents

| | |
|---|---|
| From | mattguertin <MattGuertin@protonmail.com> |
| To | Michael Biglow<michael@biglowlaw.com> |
| CC | Michael Biglow<Michael@biglowlaw.com> |
| Date | Saturday, August 5th, 2023 at 2:42 AM |

Mike,

I plan on signing these but I have a some rather new questions now -

1 - Will I be able to travel out of the country if I need to during the initial 6 months mentioned?

2 - Is there anyone that's able to tell me what my 'actual' legal status is during the first six months?

Or what about after the first six months?.. if I satisfy the requirements of case?

'Legal status' in this context would be referring to the generalized question of "What is going to pop up on the monitor after a foreign country (Vietnam) does a search to clear me for a visa?

Is there still felony charges pending during the initial 6 months? After? (Again assuming I satisfy the requirements..)

My investors are based in Vietnam. I will almost certainly need to be flying to Vietnam and spending time there during the initial 6 month phase of this agreement (if I'm able to obviously..) as it is my plan to go over there and establish a production line for my product - and if not an actual 'production line' at the very least a supply chain for the main components of my product with ultimate assembly possibly taking place in the USA...local most likely... so it wouldn't necessarily be delusional for me to make the claim that if I end up staying put in Minneapolis/MN as my home base for all of this that I may very well end up creating jobs for people.. and tax revenue for the state ...

The ultimate goal right now is to produce 20 or so units as quickly as possible so that I am able to get them into film studios as quickly as possible as it is this along with inking a bunch of licensing agreements that's going to end up raising the value of my company the fastest - This is based on a couple meetings I've had with ~~Xxxxxx Xxx~~ Financial.

If you have any insight into this in general it would be much appreciated. If it's easier to just hop on a quick call sometime Monday that would work as well. Whatever you prefer sir.

Thank you very much,

~Matt Guertin

---

(Exh. S, Index 08, p. 4)

## Stay Conditions

| From | Michael Biglow <michael@biglowlaw.com> |
| --- | --- |
| To | mattguertin<MattGuertin@protonmail.com> |
| CC | Michael Biglow<Michael@biglowlaw.com> |
| Date | Tuesday, August 8th, 2023 at 10:14 AM |

Matt,

I sent an email to the county attorney regarding your general concerns about the conditions of the stay agreement.

She wants to know what specific conditions that you are concerned about and that any conditions would not prevent you from traveling or running your business.

Please advise.

Mike

--

Michael J. Biglow, Esq

Attorney at Law

Biglow Law Offices

895 Tri Tech Office Center

331 Second Ave South

Minneapolis, MN 55401

(Exh. S, Index 08, p. 16)

204.    This continuity of competence contradicts the claims of mental incompetence and supports the argument of a broader conspiracy against him.

205.    In conclusion, the substantial evidence presented in this section irrefutably proves the patent fraud against Mr. Guertin. The manipulation of evidence, the involvement of major corporations, and the sophisticated techniques used to undermine his work all point to a coordinated effort to steal his invention and discredit his credibility.

206.    Immediate judicial intervention is necessary to address these substantial issues and ensure justice for Guertin.

## VIII.   SUBSTANTIATING SURVEILLANCE CLAIMS

207.    The evidence presented in this section meticulously outlines the substantial proof supporting Matthew David Guertin's claims of surveillance. This surveillance is deeply intertwined with the broader conspiracy to undermine his work and credibility, involving sophisticated and coordinated efforts by various entities.









Text message exchanges between Guertin and his welder | (Exh. C, Index 30, p. 62)

208.    Guertin's LinkedIn search graph serves as compelling evidence of the orchestrated efforts to monitor and steal his intellectual property. The search spikes, which perfectly correlate with Guertin's filing of both his provisional, as well as his actual patent application, along with searches being conducted by various entities long before Guertin's patent application was ever published on September 22, 2022, that can all be directly linked back to Netflix, when further combined with the duplicate patent filing that took place just 12 days after Guertin's initial filing couldn't possibly serve to make a clearer case for what has, and what still is currently taking place in Guertin's life ever since he stumbled upon the Netlfix patent application by chance back in November of 2022.

This evidence is critical in establishing the timeline and extent of the conspiracy against Guertin.



(Exh. C, Index 30, p. 53)



(Exh. C, Index 30, p. 55)

## A.   Validation of Bruce Rivers' Comment



(Exh. C, Index 30, p. 58)

209.   Guertin compiled a detailed LinkedIn search graph based on automated emails which began around 8 months AFTER his criminal charges originated, providing compelling post-facto validation of Bruce Rivers' previous comment about "powerful people" keeping an eye on him.



(Exh. C, Index 30, p. 91)

## Re: Update

| | |
|---|---|
| From | mattguertin <MattGuertin@protonmail.com> |
| To | Amanda Prose<aprose@wck.com> |
| CC | Megan Neumann<mneumann@wck.com> |
| Date | Saturday, May 27th, 2023 at 5:42 AM |

Amanda,

If the forensic analysis services were to hypothetically not work out or be ideal for some reason (meaning that I would no longer be incurring any financial obligations related to such...) then I would like to move forward as originally planned with the trademark filings I selected in my v3 version of the Madrid pdf I sent.

Apparently there are "powerful people keeping an eye on me" but that is literally all that I was told and so I have no idea if I should be more or less worried as a result of this revelation.

I'm of the opinion that pretty soon I'm either going to be very dead or very rich. I'm leaning more towards the latter but if I'm going to be completely honest then I must admit that there definitely exists an inherent bias on my part.

I hope you are doing well.

(Exh. S, Index 09, p. 02)

## Re: Update

| | |
|---|---|
| From | mattguertin <MattGuertin@protonmail.com> |
| To | Amanda Prose<aprose@wck.com> |
| CC | Megan Neumann<mneumann@wck.com> |
| Date | Wednesday, May 30th, 2023 at 8:27 PM |

Amanda,


I'd recommend that when you have the time available you go talk to my criminal defense attorney IN PERSON asap.

I have no idea what exactly is going on but it's not good if he's afraid to talk on the phone to me about it. He is the one that told me there are "very powerful people keeping an eye on me"

Keep in mind that he's a well known attorney who works in the federal court system. You'd think he knows plenty of "powerful people"

I'm afraid I'm going to be disappeared or killed.

(Exh. S, Index 09, p. 03)

210.    This analysis spans 31 months into the past, covering significant events in Guertin's life, and perfectly matches the timing of these events despite Guertin's non-existent activity on LinkedIn during this period due to the fact that he was busy building his prototype and company.

**B.   Background Investigation into Companies Searching for Guertin**

211.    Guertin's data analysis went beyond merely noting the names of companies. He cross-linked multiple entities, establishing a broader conspiracy.

**US State Department and DARPA**

212.    On August 11, 2023, the US State Department searched for Guertin's LinkedIn profile. Subsequently, on September 28, 2023, Henry Street Settlement and DARPA also searched for his profile.

213.    Jeremy Reiss, Executive Vice President of Henry Street Settlement, serves as a Fulbright Specialist with the US Department of State. This connection between Henry Street Settlement and the US State Department, supports the broader surveillance narrative. (Exh. N, Index 02, p. 23-25)

**Triple Inc. and Raytheon**

214.    On April 8, 2023, Triple Inc. searched for Guertin's profile. Triple Inc. produces aircraft parts and has direct connections to Raytheon, the previous parent company of Forcepoint.

215.    **Forcepoint searched for Guertin during the same week leading up to his criminal charges on January 21, 2023**. This linkage underscores a network of entities with interests aligned with military and defense sectors. (Exh. N, Index 02, p. 16)

## 1/21/23 – 'Forcepoint, FOX, and 3Gimbals' conduct a search for Guertin's LinkedIn page

"We provide intelligence, investigations, and information solutions for statecraft, national security, and law enforcement missions."



https://www.forcepoint.com/

(Exh. N, Index 02, p. 16)

```
48px; background-color: #eae6df; display: block !important;" width="48" height="48"> </a> </td> <td
class="pl-1 w-6 inline-block" style="-webkit-text-size-adjust: 100%; -ms-text-size-adjust: 100%; -moz-
text-size-adjust: 100%; text-size-adjust: 100%; mso-table-lspace: 0pt; mso-table-rspace: 0pt; display:
inline-block; width: 48px; padding-left: 8px;" width="48"> <a
href="https://www.linkedin.com/comm/company/forcepoint?
lipi=urn%3Ali%3Apage%3Aemail_notification_single_search_appearance_01%3B5ravs%2FDJSm26rlUbSgZZXw%3D%
3D&amp;midToken=AQHC-TETmN46ow&amp;midSig=1939VSTrlwPGA1&amp;trk=eml-
email_notification_single_search_appearance_01-search_appearance_card-0-
organization_logo&amp;trkEmail=eml-email_notification_single_search_appearance_01-search_appearance_card-
0-organization_logo-null-5kegzu~ld6hlnlz~10-null-null&amp;eid=5kegzu-ld6hlnlz-10" target="_blank"
style="color: #0a66c2; cursor: pointer; display: inline-block; text-decoration: none; -webkit-text-size-
adjust: 100%; -ms-text-size-adjust: 100%; -moz-text-size-adjust: 100%; text-size-adjust: 100%;"> <img
class="inline-block relative bg-color-entity-ghost-background w-6 h-6 !block"
src="https://media.licdn.com/dms/image/C4E0BAQF5cblwopViuQ/company-logo_100_100/0/1578841978415?
e=2147483647&amp;v=beta&amp;t=jDbvPFjkTrpy0VSYpBINPOYryUGX1AsZi_NNQ6OrckI" alt="Forcepoint"
style="outline: none; text-decoration: none; -ms-interpolation-mode: bicubic; position: relative; height:
48px; width: 48px; background-color: #eae6df; display: block !important;" width="48" height="48"> </a>
</td> <td class="pl-1 w-6 inline-block" style="-webkit-text-size-adjust: 100%; -ms-text-size-adjust: 100%;
```

# Guided by recognized experts

The Executive Advisory Board (EAB) of
Forcepoint Global Governments and
Critical Infrastructure (G2CI) provides our
leadership with objective guidance.
Advisors' expertise spans all facets of the
United States government relating to
civilian, defense and intelligence
agencies.



**Marianne Bailey**
NSA, DoD



**Robert Bigman**
CIA



**Major General Joseph
Brendler (Retired)**
USCYBERCOM



**Deborah Diaz**
NASA, DHS, U.S. PTO, GSA



**Rear Admiral William
Leigher (Retired)**
DoD, U.S. Navy



**Richard Schaeffer**
NSA, DoD



**Barry West**
DHS, FDIC, PBGC, DOC,
FEMA, NWS, GSA



**Chris Williams**
DoD

(Exh. N, Index 02, p. 17)

# A proven leader in defense-grade security



**BROCHURE**
**Forcepoint Global Governments**

Forcepoint experts consistently pioneer new standards, develop distinct products and adapt to rapidly changing threats and advances.

Our human-centric approach is ideally suited to the complexities of government objectives and culture, helping us earn the trust of national security professionals at every level.

Forcepoint technology is built from the ground up to meet four essential needs:

## Access anywhere

Securely access mission critical data and business processes in the office, in the field or in the cloud

## End-to-end visibility and control

Protect data everywhere it resides and moves across the enterprise, wherever your people work

## Advanced analytics

Rapidly transform information from across the network into accurate insights to inform the right actions

## Adaptive security

Stay ahead of evolving threats and prevent data loss in high-risk instances with behavioral-driven risk identification and real-time enforcement

# 3GIMBALS

**accelerates innovation to solve the most formidable challenges for a safer future.**

We provide intelligence, investigations, and information solutions for statecraft, national security, and law enforcement missions. Our team transforms the latest data, tools, and technology into operational capability faster than anyone else. 3GIMBALS is delivering the future, today.

"Asking better questions and adopting new technologies to support intelligence gathering and operations"

https://3gimbals.com/

(Exh. N, Index 02, p. 18)

```
10" target="_blank" style="color: #0a66c2; cursor: pointer; display: inline-block; text-decoration:
none; -webkit-text-size-adjust: 100%; -ms-text-size-adjust: 100%; -moz-text-size-adjust: 100%; text-
size-adjust: 100%;"> <img class="inline-block relative bg-color-entity-ghost-background w-6 h-6
!block" src="https://media.licdn.com/dms/image/C4D0BAQHVY9bC1pkzRg/company-
logo_100_100/0/1635715256264?e=2147483647&amp;v=beta&amp;t=23S28f35upNMGGWtjo-
zwJtQbVMs5dnRxtUOUfvcFF0" alt="3GIMBALS" style="outline: none; text-decoration: none; -ms-
interpolation-mode: bicubic; position: relative; height: 48px; width: 48px; background-color: #eae6df;
display: block !important;" width="48" height="48"> </a> </td> </tr> </tbody> </table> </td> </tr>
<tr> <td class="pt-2 text-md leading-regular text-center" style="-webkit-text-size-adjust: 100%; -ms-
text-size-adjust: 100%; -moz-text-size-adjust: 100%; text-size-adjust: 100%; mso-table-lspace: 0pt;
mso-table-rspace: 0pt; padding-top: 16px; text-align: center; font-size: 16px; line-height: 1.25;">
You were found by people from these companies </td> </tr> <tr> <td class="pt-2 text-center" style="-
```

Leaders need to turn new tools, data and research into operational capability, quickly.

3GIMBALS is home to the leading technologists, analysts, data scientists, change management experts, and communicators who bring transformational insights to the mission every day.

Our team transforms the latest data, tools, and technology into operational capability faster than anyone else.

## How We Serve Our Clients

3GIMBALS is a leading analytic services firm serving Federal government and the military. We have led our partners through the commercial geospatial revolution, and continue to accelerate innovation adoption to create disruptive capabilities for real-world missions. Our method is simple: collaborate, assess, integrate, communicate.

3GIMBALS helps leaders unlock the potential of the commercial marketplace, creating one-of-a-kind solutions to the world's hardest challenges. Our work includes: assessing the commercial marketplace to identify the best technology for today's national security missions; testing new approaches to fusing information resulting in practical application for government partners; engineering data science solutions and building disruptive capabilities; accelerating technology adoption through change management; and providing national security partners immersive training experiences to revolutionize national security.

(Exh. N, Index 02, p. 19)

## What Makes Us Unique

3GIMBALS has deep experience and expertise within defense, intelligence and law enforcement missions. Our analysts partner directly with you to tailor solutions using the best mix of tools and data for the mission. We acquire and build open-source tools and datasets to quickly and flexibly deploy to public or private cloud environments. Our expertise in big data cannot be replicated using traditional analytics and data tech because our method of flexibly deploying commercially available open-source tools allows us to customize to a mission every time. We are driven by real-time requirements and urgent mission sets. 3GIMBALS employees are TS-SCI-cleared military veterans, civil servants and PhDs who are obsessed with the mission.

https://3gimbals.com/about

"This is one of the best unclassified products I have seen in years. This product could not have been received any better by the SC Military Deputy Commander and General Officers who took the briefing today."

Our solutions not only promise technological leaps to ensure overmatch, we promise large-scale transformation to ensure that those better, disruptive technologies make it to the field. Our team knows what it takes to implement innovation and guarantee its adoption.

(Exh. N, Index 02, p. 20)

**US Air Force and Inhance Digital**

216.    The US Air Force searched for Guertin's profile multiple times, with the earliest search on November 28, 2021, and the latest on August 11, 2023. Inhance Digital, which has clients including the US Air Force, Microsoft, and Booz Allen, searched for Guertin's profile on April 16, 2022.

217.    The interest from the US Air Force, a client of Inhance Digital, highlights coordinated surveillance efforts. This is further significant as Guertin's patent application was unpublished and should have remained confidential.

(Exh. C, Index 30, p. 146, 153, 160, 206; Exh. N, Index 02, p. 1-2)

**Uptv and InterMedia Advisors/Partners**

218.    On May 21, 2022, Uptv searched for Guertin's LinkedIn profile. Uptv's parent company, InterMedia Advisors/Partners, is led by Tom Daschle and Alan Sokol, who have direct connections to Netflix and significant defense contractors.

219.    Tom Daschle's ties to the US Air Force and Alan Sokol's connections to Netflix establish a direct link to entities with a vested interest in Guertin's invention, further supporting the surveillance claims.   (Exh. C, Index 30, p. 58; Exh. N, Index 02, p. 8-11)

**Gentle Giant Studios and MOVA Contour Technology**

220.    On April 23, 2022, Gentle Giant Studios, whose clients include Netflix and Marvel, searched for Guertin's profile.

221.    Gentle Giant Studios is linked to MOVA Contour technology, with historical ties to Paul Debevec's Light Stage, which Guertin claims is fraudulently represented. This

connection underscores the broader conspiracy involving multiple high-profile entities in the entertainment industry.

(Exh. N, Index 02, p. 3-7; Exh. M, Index 02, p. 5-6, 11-12; Exh. M, Index 03)

**Conclusion**

222.    The extensive and detailed LinkedIn search graph, combined with the cross-linked evidence, substantiates Guertin's claims of surveillance by powerful entities. These connections reveal a coordinated effort to monitor, undermine, and steal Guertin's groundbreaking invention.

223.    The evidence presented in this section clearly demonstrates the broader conspiracy against him and underscores the urgent need for judicial intervention to protect his rights and ensure justice.


**IX.   THE PARADOX OF INCOMPETENCE AND LEGAL PROFICIENCY**

224.    The claim that Matthew David Guertin is incompetent is directly contradicted by his demonstrated legal proficiency and the substantial efforts he has made in defending himself.

**A.   Self-Representation and Legal Filings**

225.    Despite being labeled as incompetent, Guertin has personally prepared and filed every single document, motion, appellate case, and federal case in his ongoing legal battle. This includes:

a.   His Minnesota Court of Appeals petition for discretionary review case A24-0780

b.   The initial motion for a Temporary Restraining Order (TRO).

c.   The comprehensive federal complaint filed pro se.

d.   Multiple motions and appeals in both state and federal courts.

226.     Guertin's ability to navigate the complex legal system, formulate compelling arguments, and effectively present his case contradicts the assertion that he lacks the mental capacity to understand and participate in his defense.

**B.  Consistent Legal Strategy and Evidence Gathering**

227.     Guertin has consistently demonstrated a clear and coherent legal strategy, focused on exposing the conspiracy against him and discrediting the fraudulent evidence used to undermine his credibility. This includes:

    a.  Meticulous gathering and presentation of digital forensic evidence proving the theft and fraudulent manipulation of his patent.

    b.  Detailed analysis of discovery materials, identifying inconsistencies and manipulations indicative of advanced AI tampering.

    c.  Systematic discrediting of the exam reports and witness statements that falsely portray him as delusional and incompetent.

**C.  High-Level Achievements and Professional Accomplishments**

228.     Guertin's professional background further undermines the claim of incompetence. Despite a challenging upbringing and lack of formal education, he achieved significant success in his field, including:

    a.  Filing a revolutionary patent that has been validated by third-party prior art submissions.

    b.  Receiving credits as an 'engineer' in major publications for high-profile projects.

    c.  Traveling the world and working on complex, high-stakes projects that required exceptional technical skills and problem-solving abilities.

    d.   These accomplishments reflect a high level of intelligence, focus, and capability that is inconsistent with the portrayal of Guertin as mentally incompetent.

## D.  Evidence of Cognitive and Legal Competence

229.   Guertin's coherent and logical approach to his defense, combined with his ability to engage in complex legal processes, demonstrates his competence. This includes:

    a.   His detailed understanding of the charges against him.

    b.   His ability to articulate his defense strategy and present evidence in a rational manner.

    c.   His proactive efforts to gather and present substantial evidence supporting his claims.

## E.  Contradictions in the Court's Narrative

230.   The court's narrative that Guertin is delusional and incompetent is directly contradicted by the substantial and compelling evidence he has gathered, which validates his claims. Key contradictions include:

    a.   The court's reliance on exam reports that dismiss Guertin's well-founded claims as delusions, despite irrefutable proof to the contrary.

    b.   The portrayal of Guertin's achievements and professional background as delusional, while simultaneously acknowledging the validity of his patent and professional success.

## F.  Conclusion

231.   The paradox between the claims of incompetence and Guertin's demonstrated legal proficiency and cognitive abilities is stark and undeniable.

232.     His ability to self-represent, gather substantial evidence, and articulate a coherent legal strategy underscores the fallacy of the incompetence narrative.


## X.   THE DANGER OF MISDIAGNOSIS AND FORCED MEDICATION

233.     The case of Mr. Guertin highlights a critical concern regarding the potential for misdiagnosis and the severe consequences of forced medication.

### A.   Adverse Effects of Antipsychotic Medications

234.     Research indicates that antipsychotic medications, while sometimes necessary for managing severe psychotic symptoms, carry significant risks, including irreversible brain damage and other severe side effects.  (Exh. S, Index 12)

235.     These medications are typically prescribed only when the benefits of symptom control clearly outweigh these potential risks.  (Exh. S, Index 11, p. 1-3)

### B.   Documented Competence and Rationality

236.     A detailed chronological timeline of Mr. Guertin's accomplishments demonstrates his ongoing competence and rational behavior. This timeline includes significant achievements in highly technical and creative fields, such as his involvement in major events and the successful development of a groundbreaking patented technology. Key milestones include:

    a.   Programming a custom media server for the 100th Anniversary of the LA Philharmonic Orchestra in 2018 at the Hollywood Bowl

    b.   Designing, and Engineering Bad Bunny's 2019 Coachella Set Piece

    c.   Engineering a 50-foot wide falcon a UNESCO World Heritage Site inauguration in 2019

(Exh. B, Index 28, p. 26-34)

d. Development and patenting of the InfiniSet technology from 2021 onwards.

(Exh. E, X)

## C. Inconsistencies in Psychosis Diagnosis

237.   The thorough documentation of Mr. Guertin's daily activities and professional milestones directly contradicts the diagnosis of severe psychotic disorders.

238.   According to clinical guidelines, individuals with untreated psychotic disorders would exhibit profound impairments in daily functioning, such as neglect of personal hygiene, severe social withdrawal, and significant cognitive deficits affecting job performance.  (Exh. S, Index 11)

239.   Mr. Guertin's ability to continuously engage in complex and high-level professional tasks over several years demonstrates a clear inconsistency with such a diagnosis. (Exh. W, Index 07, 08; Exh. X)

## D. Expert Opinions and Evidence of Misdiagnosis

240.   Mr. Guertin has also provided a letter from his long-time physician, which states there is no history of psychosis, schizophrenia, or bipolar disorder.

241.   This letter highlights Mr. Guertin's history of ADHD and Generalized Anxiety Disorder, treated successfully with medication for many years.

242.   The physician notes Mr. Guertin's remarkable intuition for complex technical tasks and substantial professional achievements, emphasizing that any recent behavioral changes are likely a result of extreme pressure and not indicative of psychotic disorders. (Exh. C, Index 30, p. 113)

**E.   Timeline of Events**

243.    The detailed timeline of Mr. Guertin's activities, which includes numerous specific dates and achievements, supports his claim of rational and coherent behavior. This extensive record makes it implausible that he could be suffering from severe psychosis.

It raises the question:

**244.   If Mr. Guertin is psychotic, at which point in this thorough and well-documented timeline is he actually experiencing these supposed delusions?**

**(Exh. W, Index 7, p. 1-77)**

The timeline includes:

      a.  Specific dates and descriptions of professional projects and patent filings.

      b.  Documented interactions with various professionals and institutions.

      c.  Continuous development and refinement of his patented technology.

245.    The potential for irreparable harm through misdiagnosis and forced medication is substantial in Mr. Guertin's case. The evidence overwhelmingly supports his claims of competence and rationality, calling into question the accuracy and motivations behind the psychiatric evaluations he has undergone.


**XI.   MOTION FOR WITHDRAWAL OF DEFENSE COUNSEL**

**A.   Evidence of Ineffective Assistance of Counsel**

246.    Bruce Rivers has been accused, with irrefutable evidence, of ineffective assistance of counsel. His refusal to withdraw, despite these accusations and being a defendant in the civil case, raises significant concerns about his impartiality and competence.

**B. Failure to Withdraw Despite Multiple Requests**

247.   Guertin has directly requested Rivers withdraw three separate times, yet Rivers continues to represent him. This refusal, especially in light of the new evidence of fraudulent discovery, suggests Rivers is compromised and unable to provide an effective defense.



Text message to Bruce Rivers from Guertin in which he asks him to withdrawal from his case a second time - (*Exh. D, Index 38, p. 148*)



June 6, 2024 – First group of text messages sent to Bruce Rivers by Guertin demanding that he WITHDRAWAL FROM HIS CASE - (*Exh. N, Index 04, p. 26*)



June 6, 2024 – Second group of text messages sent to Bruce Rivers by Guertin demanding that he WITHDRAWAL FROM HIS CASE - (*Exh. N, Index 04, p. 26*)



June 6, 2024 – Third group of text messages sent to Bruce Rivers by Guertin demanding that he WITHDRAWAL FROM HIS CASE - (*Exh. N, Index 04, p. 27*)



June 6, 2024 – Fourth and final group of text messages sent to Bruce Rivers by Guertin demanding that he WITHDRAWAL FROM HIS CASE - (*Exh. N, Index 04, p. 27*)

## C.  Lack of Informed Consent

248.    On January 15, 2024, Rivers told Guertin "no court," leading to an order the next day stating "all parties agree to a finding of incompetency prior to the hearing." This indicates there was no informed consent, and Guertin was misled about the proceedings and their outcomes.



(*Exh. C, Index 30, p. 83 [Texts-27]*)

BRUCE RIVERS TELLS GUERTIN THERE IS **"NO COURT"** FOR HIS 1:30PM HEARING THE NEXT DAY – after finally contacting him just hours before it was scheduled...

**On January 16:** Guertin never attempted to call Bruce Rivers, and Rivers never attempted to call or contact Guertin following this exchange.

A **'Waiver of Appearance'** is entered into the record of Guertin's criminal case at Index #24 - this is followed up with the submission of an entry which states **"Found Incompetent Judicial Officer: Mercurio, Danielle"** which contains no 'Index #', with neither of these entries having a corresponding PDF document available.

| 01/16/2024 | Found Incompetent<br>Judicial Officer: Mercurio, Danielle |
| 01/16/2024 | Waiver of Appearance<br>Index #24 |
| 01/11/2024 | Rule 20 Evaluation Report<br>Index #23 |

(*Exh. A, Index 00, p. 7*)

**January 16 at 8:27am:** A court order with a displayed title of 'FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER REGARDING COMPETENCY' is signed by Referee Danielle C. Mercurio.

**January 16 at 9:22am:** The same order is subsequently signed by Judge Julia Dayton Klein

| STATE OF MINNESOTA | DISTRICT COURT<br>FOURTH JUDICIAL DISTRICT |
|---|---|
| COUNTY OF HENNEPIN | CRIMINAL DIVISION |
| State of Minnesota,<br><br>　　　　　　Plaintiff,<br><br>　　vs. | Court File No. 27-CR-23-1886<br><br>**FINDINGS OF FACT,<br>CONCLUSIONS OF LAW<br>AND ORDER REGARDING<br>COMPETENCY** |
| Order Recommended By:<br><br>Mercurio, Danielle<br>Jan 16 2024 8:27 AM<br>Referee of District Court | BY THE COURT:<br><br>Dayton Klein, Julia<br>Jan 16 2024 9:22 AM<br>Judge of District Court |

(*Exh. A, Index 25, p. 4; Exh. C, Index 30, p. 36*)

**The January 16, 2024 court order contains the following key statements:**

This matter was scheduled to come before the undersigned Referee of District Court on January 16, 2024. Tom Arneson, Assistant Hennepin County Attorney, represented the plaintiff. Defendant was represented by Bruce Rivers, Esq.

Prior to the hearing, the parties agreed to a finding of incompetency entered administratively. Based on all the files, records and proceedings in this case, the Court makes the following:

January 16, 2024 Court Order - (*Exh. A, Index 25, p. 1*)

**FINDINGS OF FACT**

2. On November 15, 2023, Judge Julia Dayton Klein ordered that Defendant undergo an evaluation to assess Defendant's competency to proceed in this matter pursuant to Minn.R.Crim.P. 20.01.

3. Dr. Adam A. Milz, PhD, LP, ABPP, Psychological Services of Hennepin County District Court, reviewed Defendant's records, interviewed Defendant, and filed a written report with this Court.

4. Dr. Adam A. Milz, PhD, LP, ABPP, Psychological Services of Hennepin County District Court, opined that Defendant, due to mental illness or cognitive impairment, lacks the ability to rationally consult with counsel; or lacks the ability to understand the proceedings or participate in the defense. This opinion was uncontested by either party.

January 16, 2024 Court Order - (*Exh. A, Index 25, p. 1, Id. 2, 3, 4*)

6. Defendant is ordered to cooperate with the civil commitment process including appearing at all court appearances in the civil and criminal cases.

January 16, 2024 Court Order - (*Exh. A, Index 25, p. 2, Id. 6*)

GUERTIN NEVER 'AGREED' TO, OR HAD A CHANCE TO 'CONTEST' ANYTHING... HE WAS TOLD THERE WAS "NO COURT" BY BRUCE RIVER'S THE NIGHT BEFORE

**D.  Conflict of Interest**

249.    Rivers' status as a defendant in Guertin's civil case creates a clear conflict of interest. His ability to defend Guertin impartially is compromised, and this relationship undermines the integrity of Guertin's defense.

## E.  Connection to Fraudulent Discovery

250.    Rivers' involvement in presenting and supporting fraudulent discovery photographs now implicates him in a coordinated effort with the prosecution to undermine Guertin's case. This situation necessitates his immediate withdrawal to preserve the fairness of the legal process.

## F.  Failure to Follow Through on Promises

251.    On July 28, 2023, Rivers promised to represent Guertin in his civil commitment proceedings. However, starting the morning of August 1, 2023, Guertin sent panicked texts and emails to Rivers, receiving no follow-through on these promises. This failure to act on a critical legal promise further underscores Rivers' ineffective assistance and compromised position.

252.    Rivers' failure to respond and act during a critical period left Guertin vulnerable and without proper legal representation.



(Exh. C, Index 30, p. 81)



(Exh. C, Index 30, p. 82)



(Exh. C, Index 30, p. 83)

## G.   Statement Indicating External Influences and Subsequent Denial

253.   On May 22, 2023, at 3:13 PM, Bruce Rivers told Guertin that he had some very

powerful people keeping an eye on him. Rivers later denied making this statement, despite

substantial evidence supporting Guertin's claim. This contradictory behavior further undermines Rivers' credibility and raises serious concerns about his role in the case.

(Exh. W, Index 03)

**Conclusion**

254.   Given these points, it is clear that Bruce Rivers must withdraw as Guertin's defense attorney to ensure an impartial and competent defense. The evidence of Rivers' compromised position and the conflict of interest is undeniable, and his continued representation poses a significant risk to Guertin's right to a fair trial.

## XII.   LEGAL AND CONSTITUTIONAL ARGUMENTS

255.   This section addresses the legal and constitutional arguments that underpin Guertin's motion, particularly in response to the judge's reasons for denying the initial motion for a Temporary Restraining Order (TRO).

**A.   Argument's Against Denial of Initial TRO**

256.   The judge denied the initial TRO on several grounds, including the purported lack of immediate irreparable harm, the adequacy of legal remedies, and the improbability of success on the merits. Each of these points is addressed below:

**B.   Immediate Irreparable Harm**

257.   The judge claimed that Guertin did not demonstrate immediate irreparable harm. However, the danger of misdiagnosis and forced medication presents a clear and present threat to his mental and physical health.

258.   Research shows that antipsychotic medications can cause significant and permanent changes to brain structure, which constitutes irreparable harm.

259.   The forced administration of such drugs, based on a flawed and biased examination, violates Guertin's bodily autonomy and due process rights.

## C.   Adequacy of Legal Remedies

260.   The judge argued that legal remedies were adequate. However, no monetary or subsequent legal remedy can undo the permanent brain damage caused by forced antipsychotic medications.

261.   The U.S. Supreme Court has recognized that certain harms, such as those affecting constitutional rights, are inherently irreparable because no adequate compensatory remedy exists.  (Elrod v. Burns, 427 U.S. 347, 373 (1976)).

## D.   Probability of Success on the Merits

262.   The judge doubted the probability of Guertin's success on the merits. However, substantial evidence, including the LinkedIn search graph and documented proof of patent fraud, supports Guertin's claims.

263.   The timeline of events and the cross-linked connections between government agencies and corporations searching for Guertin substantiate his surveillance claims and the broader conspiracy against him (Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008)).

## C.   Constitutional Violations

264.   The forced administration of antipsychotic drugs without a legitimate and well-founded diagnosis violates Guertin's due process rights under the Fourteenth Amendment.

265.    The precedent set by cases such as Washington v. Harper, 494 U.S. 210 (1990), where the Supreme Court recognized the necessity of due process protections before involuntary medication, supports this argument.

266.    The ongoing surveillance and targeted efforts to undermine Guertin's credibility and mental health status interfere with his First Amendment rights.

267.    The targeting and retaliation for his claims of patent fraud and his attempts to expose these issues violate his right to free speech and to petition the government for redress of grievances (Elrod v. Burns, 427 U.S. 347, 373 (1976)).

268.    The potential for cruel and unusual punishment is apparent if Guertin is subjected to forced medication and institutionalization based on false pretenses.

269.    The use of powerful antipsychotic medications, given the significant evidence of a conspiracy against him, can be viewed as punitive and disproportionate (Furman v. Georgia, 408 U.S. 238, 282 (1972)).

**D.  Legal Precedents and Case Law**

270.    In Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008), the Supreme Court established that a plaintiff seeking a preliminary injunction must demonstrate that irreparable harm is likely, not just possible. Given the permanent and severe effects of forced medication, this criterion is unquestionably met.

271.    In Elrod v. Burns, 427 U.S. 347, 373 (1976), the Supreme Court held that the loss of First Amendment freedoms, even for minimal periods, constitutes irreparable injury. The ongoing efforts to silence and discredit Guertin's claims directly infringe upon his First Amendment rights.

272.     The precedent set by Washington v. Harper, 494 U.S. 210 (1990), emphasizes the requirement for rigorous due process before the state can administer antipsychotic drugs involuntarily. The flawed and biased nature of the reports used to justify Guertin's forced medication fails to meet these due process standards.

### E.   Conclusion

273.     Given the substantial and compelling evidence presented, it is clear that immediate irreparable harm, the inadequacy of legal remedies, and the high probability of success on the merits necessitate immediate judicial intervention to prevent further constitutional violations and irreparable harm to Guertin.

274.     The court must grant this motion to uphold the fundamental rights guaranteed by the Constitution and protect Guertin from the ongoing conspiracy against him.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff Matthew Guertin respectfully requests that this Court grant the following relief:

A.   Immediately enjoin the prosecution from proceeding with the current charges against Mr. Guertin based on the substantial evidence of discovery fraud and the manipulated evidence presented.

B.   Prohibit any forced administration of antipsychotic medication to Mr. Guertin, recognizing the imminent danger and irreparable harm this would pose based on the presented evidence.

C.  Recognize the substantial conflict of interest and ineffective assistance of counsel as demonstrated in the motion.

D.  Appoint new, independent defense counsel to represent Mr. Guertin, ensuring his constitutional right to effective legal representation is upheld.

E.  Initiate an independent investigation into the fraudulent discovery materials and the involvement of both the prosecution and defense in this matter.

F.  Investigate the broader conspiracy claims involving government and corporate entities as substantiated by the evidence presented.

G.  Acknowledge the constitutional violations that have occurred, including due process violations, and take appropriate measures to rectify these injustices.

H.  Issue declaratory relief recognizing the constitutional violations and their impact on Mr. Guertin's state court proceedings.

I.  Ensure Mr. Guertin's constitutional rights are protected moving forward in this case.

J.  Order that the findings and evidence of constitutional violations be forwarded to the Hennepin County District Court and relevant authorities to inform their proceedings.

K.  Request that the state court reconsider the charges against Mr. Guertin in light of the federal court's findings and the evidence of prosecutorial and defense misconduct.

L.  Any other relief that the Court deems just and equitable in light of the compelling evidence and arguments presented.

## XIV.   CONCLUSION

275.   Plaintiff Matthew Guertin has demonstrated through substantial and compelling evidence that his constitutional rights have been egregiously violated, that there is a coordinated effort to undermine his credibility and steal his invention, and that he is facing the imminent danger of an unjust commitment, and forced medication based on fraudulent exam reports. Immediate judicial intervention is necessary to prevent further harm and to ensure justice is served.

Dated:  August 7, 2024                    Respectfully submitted,

                                          _/s/ Matthew D. Guertin_

                                          Matthew David Guertin
                                          Pro Se Plaintiff
                                          1075 Traditions Ct.
                                          Chaska, MN  55318
                                          Telephone: 763-221-4540
                                          MattGuertin@protonmail.com
                                          www.MattGuertin.com

## XV.   VERIFICATION OF MOTION

Matthew D. Guertin, under penalty of perjury, states the following:

I affirm that the contents of this motion and all corresponding exhibits are true to the best of my

knowledge and belief.

I further declare that the information contained within this motion and all corresponding exhibits

consists of content that I, as the pro se Plaintiff, personally prepared and compiled.


      Dated:  August 7, 2024            Respectfully submitted,

                                           * /s/ Matthew D. Guertin*

                                           Matthew David Guertin
                                           Pro Se Plaintiff
                                           1075 Traditions Ct.
                                           Chaska, MN  55318
                                           Telephone: 763-221-4540
                                           MattGuertin@protonmail.com
                                           www.MattGuertin.com

## XVI.   CERTIFICATE OF COMPLIANCE

I certify that the foregoing motion complies with the word limit set forth in Local Rule 7.1(f) of the United States District Court for the District of Minnesota as it contains 11,446 words, excluding the signature, caption, this certificate of compliance, and Guertin's verification of motion declaration.


Dated:  August 7, 2024                                    Respectfully submitted,

                                                            _/s/ Matthew D. Guertin_

                                                          Matthew David Guertin
                                                          Pro Se Plaintiff
                                                          1075 Traditions Ct.
                                                          Chaska, MN  55318
                                                          Telephone: 763-221-4540
                                                          MattGuertin@protonmail.com
                                                          www.MattGuertin.com