**A25-0882**
**STATE OF MINNESOTA**
**IN COURT OF APPEALS**

| | |
|---|---|
| In re Matthew David Guertin, | District Court Case: 27-CR-23-1886 |
| Petitioner | Court Order Date: April 29, 2025 |
| v. | **ADDENDUM**<br>**VOLUME II of XVI**<br>**ADD. 33 - ADD. 81** |
| State of Minnesota, | |
| Respondent. | Judge: Hon. Sarah Hudleston |

Contents                                                                              Page

**May 07, 2025 - Emergency Motion to Stay & Vacate April 29 Orders (pp 1-34),**

Index 190...……………………………………………………………… Add. 33-66

**May 07, 2025 - Motion to Confirm Pro Se Status & Discharge Counsel,**

Index 191………………....…………………………………………… Add. 67-81

**STATE OF MINNESOTA**
**COUNTY OF HENNEPIN**

**DISTRICT COURT**
**FOURTH JUDICIAL DISTRICT**

---

| | |
|---|---|
| State of Minnesota, | Court File No. : 27-CR-23-1886 |
| Plaintiff, | **DEFENDANT'S EMERGENCY MOTION TO STAY AND VACATE APRIL 29, 2025 RULE 20.01 COMPETENCY ORDER** |
| vs. | |
| Matthew David Guertin, | |
| Defendant. | Judicial Officer: Sarah Hudleston |

---

TO:    THE HONORABLE SARAH HUDLESTON, JUDGE OF DISTRICT COURT;
MARY F. MORIARTY, HENNEPIN COUNTY ATTORNEY; AND
MAWERDI HAMID, ASSISTANT HENNEPIN COUNTY ATTORNEY

---

## I.   STATEMENT OF RELIEF REQUESTED

Defendant Matthew David Guertin, appearing pro se, respectfully moves this Court, on an emergency basis, for entry of an order that:

**1. Immediately stays enforcement of the Court's April 29, 2025**

**(a)** "Order for Evaluation of Competency to Proceed (Rule 20.01)" (*Index 187*) and

**(b)** "Order for Appointment of Forensic Navigator" (*Index 188*);

**2. Vacates those April 29 orders in their entirety;**

**3.   Quashes and recalls** every subpoena, medical-records request, authorization, or other disclosure instrument issued—or to be issued—under the April 29 orders;

**4.   Expedites disposition** of this motion by **(a)** setting an oral hearing within five (5) business days of filing or, if the Court declines to hold a hearing, **(b)** issuing a written ruling within the same five-day period; and

**5.   In the alternative,** if the Court declines to vacate the April 29 orders, certify under Minn. R. Crim. P. 28.03 the following doubtful question of law to the Minnesota Court of Appeals:

Add. 33

| Whether a district court may order a Rule 20.01 competency evaluation absent any new factual basis, and for the stated purpose of assessing the legal arguments advanced in a defendant's motion to dismiss.

## A    |    Grounds for Emergency Relief

- The April 29 orders contradict Judge Koch's unappealed April 3 2025, written finding that Mr. Guertin is competent to proceed.

- They were entered in retaliation for Mr. Guertin's constitutionally protected motion practice, as the Court acknowledged on the record (*Tr. 17:6-17*).

- They expose him to imminent, invasive, and unlawful psychiatric intrusion and disclosure of privileged medical information.

Enforcement therefore creates irreparable harm that cannot be remedied by a conventional post-judgment appeal.

## B    |    Preservation of Appellate Remedies

If the Court does not grant the stay and vacatur—or certify the question—within five (5) business days, Mr. Guertin will seek immediate appellate intervention by:

- Filing a petition for an extraordinary writ under Minn. R. Civ. App. P. 120, together with a motion for stay under Minn. R. Civ. App. P. 108; and

- Renewing his request that the district court certify the question of law pursuant to Rule 28.03.

## C    |    Related Motion

A companion "Motion to Confirm Pro Se Status and Discharge Counsel" is filed simultaneously and incorporated by reference. If either motion is denied, or not ruled on within the five-day window, Defendant will proceed with the appellate measures outlined above.

## II.   INTRODUCTION

This case presents a fundamental and irreconcilable contradiction at the heart of Mr. Guertin's competency proceedings. On April 29, 2025, the Court itself extolled Mr. Guertin's extraordinary intellectual and technical capabilities. Judge Sarah Hudleston lauded him as "*an extremely intelligent person*" with patented, "*really amazing*" technology, the author of "*AI[-]written, detailed legal memoranda,*" possessing skills that "*surpass 99.9 percent of the*

Add. 34

*population.*" (*see Tr. 4:7-12*) Yet this praise stands in direct conflict with the very premise used to strip Mr. Guertin of his autonomy: a March 10, 2023 Rule 20.01 evaluation (*see Index 28, p. 116*) that diagnosed him with "Unspecified Schizophrenia Spectrum and Other Psychotic Disorder", portraying him as delusional, grandiose, and incapable of rational thought. Dr. Jill Rogstad's report – the foundational document justifying Mr. Guertin's alleged incompetency – claimed he displays "prominent delusional beliefs" that large corporations are conspiring to steal his patented invention and harm him (*see Index 28, p. 121*), and it characterized his reasoning as "unclear, irrational" and rooted in implausible falsehoods. In other words, the official record paints Mr. Guertin as a psychotic fantasist, even as this Court's own words acknowledge his intellectual acumen and legal prowess at a level that eclipses virtually the entire population.

This internal inconsistency is untenable. If Judge Hudleston's assessment of Mr. Guertin's abilities is genuine (and it was stated on the record in open court), then the foundational Rule 20.01 finding of incompetence cannot simultaneously be true – it is either fatally discredited or at least severely undermined by the Court's prima facie observations. Conversely, if Dr. Rogstad's 2023 conclusions were accurate, then the Court's glowing pronouncement is inexplicable and its new order predicated on a logical impossibility. The judiciary cannot have it both ways. Mr. Guertin cannot be, at once, a defendant of exceptional intellect who produces sophisticated legal work and a defendant so irrational that he cannot be permitted to speak for himself. By the Court's own logic, either the Rule 20.01 process has been predicated on a false narrative, or the April 29, 2025 ruling continues a legal fiction. Either scenario renders the April 29 order infirm. A judicial finding that a man is "extremely intelligent" and fully capable of articulating detailed legal arguments (*see Tr. 4:7-12*) inherently negates any prior determination that the same man cannot rationally understand his case or communicate coherently. The contradiction cuts to the core of due process and fair proceedings.

This is more than mere irony; it is a profound violation of Mr. Guertin's constitutional rights. The logical schism between the Court's recent statements and the earlier competency finding implicates Mr. Guertin's Sixth Amendment right to self-representation (see *Faretta v. California*), his due process right to a fair and consistent adjudicative process, and the principle of *Brady v. Maryland* that the State may not secure a conviction (or continued restraint of a defendant) through false or misleading evidence. If the engine of the Rule 20.01 process is built on a lie, it must be halted. The Court's own words prove that something is deeply amiss: either

Add. 35

the competency proceedings to date have been invalid, or the new order is logically and legally insupportable. In either case, fundamental fairness demands that the April 29, 2025 order be stayed and vacated. Mr. Guertin cannot be forced to endure further deprivations of liberty and autonomy under a competency framework that has collapsed under the weight of its own contradictions.

## III.   KEY CONTRADICTIONS AND DISTORTIONS

The record in this case is rife with factual distortions and inconsistencies that underscore the breakdown of the Rule 20.01 competency narrative, now punctuated by the Court's diametrically opposed assessments of Mr. Guertin. Notable contradictions and distortions include:

### A   |   Fraudulent Psychiatric Evaluations vs. Reality

The Rule 20.01 evaluations presented to this Court were engineered to support a foregone conclusion of incompetence. They were ostensibly "independent" assessments, but in truth were orchestrated by conflicted actors and rife with inaccuracies (*see Index 131, p. 1-31*). These so-called forensic reports contain demonstrable falsehoods and omit critical exculpatory facts, all to manufacture the false impression that Mr. Guertin suffers from delusions (*see Index 131, p. 2*) In reality, many of Mr. Guertin's claims (for example, concerning intellectual property theft and surveillance) were backed by hard evidence and credible corroboration – facts the evaluators ignored or downplayed in order to paint him as "psychotic."

### B   |   Evidence Tampering and Withholding

The State's narrative of Mr. Guertin's alleged insanity was bolstered through the manipulation and suppression of evidence. Key discovery materials were tampered with to fabricate support for the competency challenge while concealing the truth. Forensic analysis has shown that crime-scene photographs were "digitally altered to remove or obscure exculpatory elements" (*see Index 131, p. 2*) – for instance, an image of an open laptop (implicating a third-party actor in Mr. Guertin's narrative) was erased from the record, because it substantiated Mr. Guertin's story instead of the State's. Likewise, critical documents were withheld to hobble Mr. Guertin's defense. A pivotal Rule 20 report by Dr. Milz was concealed for over seven months, only produced on July 16, 2024 after Mr. Guertin – the supposedly "incompetent" defendant –

Add. 36

filed a federal lawsuit that forced its disclosure (*see Index 131, p. 11-12*). That it took federal litigation to obtain a report central to his case is not only procedurally aberrant; it is affirmative evidence of a calculated effort to suppress truth.

## C  |  Falsified Court Records and Docket Irregularities

The integrity of the court's own records has been compromised to reinforce the false competency narrative. Official filings and orders were falsified, backdated or hidden from the defense in an effort to obscure misconduct (*see Index 131, p. 2*). For example, hearing notices were inexplicably generated for distant future dates while actual orders (finding Mr. Guertin incompetent or committing him) were filed secretly and withheld, preventing any timely challenge or response (*see Index 131, p. 13*). These administrative sleights-of-hand created confusion and prevented Mr. Guertin from participating in his case, all serving to prop up the façade that he was disengaged due to incapacity rather than being kept in the dark. Such docket manipulation is a direct affront to due process, as it deprived Mr. Guertin of any meaningful opportunity to be heard and to contest the state's actions at the time they occurred.

## D  |  Pathologizing Legitimate Grievances as "Delusion"

Perhaps most pernicious is how Mr. Guertin's legitimate, fact-supported grievances were miscast as symptoms of mental illness. At every turn, genuine evidence of wrongdoing against him was met with the refrain that he's "paranoid" or imagining things. The clearest example is Mr. Guertin's claim that his patented technology was stolen and exploited by powerful entities – a claim substantiated by concrete evidence (including a U.S. patent issued to Netflix that directly references and replicates Mr. Guertin's own patented invention) (*see Index 125, Exhibts M, N*). Rather than address this evidence, the State (and its agents) sought to delegitimize it by labeling Mr. Guertin delusional. His whistleblower allegations of a "bigger level" conspiracy were not refuted with contrary evidence, but dismissed a priori as the ravings of a disordered mind. This tactic of turning a blind eye to corroborating proof and instead using psychiatry as a weapon to silence and discredit Mr. Guertin is a blatant distortion of reality. It exemplifies how the prosecution constructed a false narrative – one that Mr. Guertin was "mentally ill" for asserting truths that were inconvenient to the State's case.

Add. 37

**E    |    Judge's Praise vs. Psychiatric Condemnation (Foundational Contradiction)**

Finally, and most glaringly, the Court's own recent findings flatly contradict the psychiatric findings that have been used to justify Mr. Guertin's ongoing deprivation of rights. In open court on April 29, 2025, Judge Hudleston praised Mr. Guertin's cognitive and technical abilities in the highest terms – noting that his capabilities with technology and legal research "*probably surpass 99.9 percent of the population*" (*see* Tr. *4:7-12*). The Court expressly stated it did "*not doubt*" Mr. Guertin's intelligence "*in any way whatsoever.*" Yet this laudatory assessment cannot be reconciled with Dr. Rogstad's March 10, 2023 Rule 20.01 report, which diagnosed Mr. Guertin with a psychotic disorder and described him as irrational and delusional – a man detached from reality, supposedly unable to reason or understand his circumstances (*see Index 28, p. 121-122*).

The Rule 20 report portrays Mr. Guertin as someone who believes in implausible conspiracies and cannot rationally process information, while the Judge's own observations acknowledge his advanced understanding, coherence, and even legal acumen. This is a direct, line-by-line contradiction: the same record contains a judicial finding that Mr. Guertin is exceptionally competent (indeed, far above average) and a forensic finding that he is incompetent. Both cannot be true. By crediting Mr. Guertin's intellect and the sophistication of his self-prepared legal arguments, the Court has effectively discredited the foundational psychiatric diagnosis underpinning the entire Rule 20 process. This collapse in the State's competency narrative is not a mere procedural quibble – it strikes at the very legality of keeping Mr. Guertin under any competency disability. The Court's praise of Mr. Guertin's abilities thus eviscerates the justification for its own order. It proves that the Rule 20 competency framework used against Mr. Guertin has been rendered incoherent and unjust. In light of the Court's acknowledgement of Mr. Guertin's true capacities, continuing to treat him as legally incompetent is a logical impossibility and a legal dead-end.

**F    |    Judge's Praise of "detailed legal memoranda" (Fatal Contradiction)**

> "*You are an extremely intelligent person… You've patented valuable technology… You've used AI to write really detailed legal memoranda … I am not doubting your intelligence in any way whatsoever.*"
>
> —Judge Hudleston, 29 Apr 2025 hearing (*see* Tr. *4:7-12*)

Add. 38

Filed in District Court
State of Minnesota
5/7/2025 2:04 PM

Those words eviscerate the rationale for a fourth Rule 20 order. The only "legal memoranda" Mr. Guertin had filed between 17 and 29 April were (1) his 50-page Motion to Dismiss and (2) his carefully drafted Petition to Proceed Pro Se. The Court therefore simultaneously:

1. **Applauded** the very brief it would later cite as proof of mental instability— calling it "really detailed," the product of exceptional technical skill, and beyond what 99.9% of the population could accomplish; yet

2. **Declared** that same brief evidence of psychosis serious enough to override Judge Koch's competency finding and restart the Rule 20 carousel.

If drafting a cogent, citation-rich motion is the act that triggers a competency doubt, then competence has been re-defined into non-existence. A court cannot extol a defendant's intellectual mastery and legal craftsmanship in one breath and, in the next, order psychiatric confinement because that craftsmanship is "not rational." **The contradiction is fatal**: it proves the fourth Rule 20 is not about mental health at all—it is a litigation tactic to bury a dispositive motion the Court would rather not confront.

## G   |   Conclusion

In sum, these contradictions reveal a proceedings so infected by falsity and inconsistency that Mr. Guertin's constitutional rights have been severely violated. The *Faretta* right to self-representation cannot be conditioned on a competency standard that is applied in bad faith or on contradictory grounds. Due process cannot tolerate a competency adjudication that is predicated on manipulated evidence and internally inconsistent findings. And under *Brady*, the State cannot continue to pursue charges (or seek to confine Mr. Guertin) on the basis of a false psychiatric narrative when evidence – including the Court's own statements – has surfaced that undercuts that narrative at its core. Each distortion listed above, and especially the Court's newly illuminated about-face on Mr. Guertin's mental capacity, independently and collectively demand an immediate reexamination of the competency determinations in this case. The only appropriate remedy is to stay and vacate the April 29, 2025 order and to cease relying on a Rule 20.01 process that has proven itself unworthy of this Court's trust. Only by confronting and correcting these contradictions can the integrity of the proceedings be restored and Mr. Guertin's fundamental rights respected.

Add. 39

# IV.   PROCEDURAL HISTORY

## A   |   Charges and Initial Competency Proceedings (2023–2024)

Mr. Guertin is charged with one count of felony reckless discharge of a firearm and three counts of possession of unserialized firearms, stemming from an alleged incident on January 21, 2023. During 2023 and early 2024, questions about Mr. Guertin's mental competence were repeatedly raised. He was found incompetent to proceed on July 13, 2023 (*see Index 19*), and again on January 16, 2024 (*see Index 25*), during which time he underwent court-ordered treatment. On October 15, 2024, Judge Shereen Askalani ordered a *third* competency evaluation (*see Index 108*) pursuant to Minn. R. Crim. P. 20.01. Court-appointed examiner Dr. Kathryn Cranbrook filed a report on December 20, 2024 opining that Mr. Guertin showed signs of psychosis and was "not cooperating" with the evaluation. This report – which Mr. Guertin later discovered contained serious irregularities and was built on disputed evidence – concluded that Mr. Guertin appeared not competent to proceed. Despite these findings, Mr. Guertin consistently maintained throughout 2024 that the State's discovery was being manipulated and that he was being mischaracterized as delusional to cover up misconduct.

## B   |   Defendant's Challenges to Evidence Manipulation

Even as the Rule 20.01 processes were ongoing, Mr. Guertin (who has a professional background in technology) persistently documented anomalies in the evidence. In an April 4, 2024 Motion to Compel Discovery (*see Index 29*), he identified 28 digital images in the State's evidence (photographs of interiors related to the case) that had non-uniform aspect ratios – a red flag suggesting they had been altered or tampered with. Subsequent pro se filings by Mr. Guertin provided increasingly detailed forensic analysis of the discovery materials. For example, in August 2024 he filed a Motion for Preliminary Injunction (in a parallel federal civil rights action) including side-by-side overlays, color-curve analyses, and iconography mismatches which demonstrated that key photo evidence had been manipulated. By September 2024, Mr. Guertin had produced "*Exhibit Y*" laying out a simple logic trap: if the allegedly manipulated images never existed, how did they appear in earlier official discovery productions and court filings? If they did exist, why are they now missing from the latest evidence sets? This catch-22 scenario starkly exposed what Mr. Guertin termed a "conspiracy of commitment" – a coordinated effort to

Add. 40

falsify evidence and use sham psychiatric findings to attempt to commit him to a mental institution.

### C    |    April 3, 2025 Competency Hearing – Defendant Found Competent

On March 5, 2025, an evidentiary hearing was held before Judge William Koch (Probate/Mental Health Division) to finally adjudicate Mr. Guertin's competence. At that hearing, Mr. Guertin personally testified at length and, cogently explained his professional experience and the factual basis for his assertions of tampering, directly countering the assumption that his claims were mere paranoid delusions. He demonstrated a detailed understanding of the charges against him, the court process, and the roles of all participants. He even explained that he had researched competency law and had developed specialized analytical tools to aid in his defense. Although the Court remained skeptical of some of Mr. Guertin's broader claims - at one point labeling his account of corporate patent theft "fantastical and paranoid" (an allegation raised solely to rebut the State's "delusion" narrative, not as a legal defense) - it nevertheless found that Mr. Guertin understands the nature of the proceedings and can rationally consult with counsel. Judge Koch's Findings of Fact, Conclusions of Law, and Order dated April 3, 2025 (*see Index 127*) explicitly concludes: *"Ultimately, the Court finds Mr. Guertin is competent."* The Court noted that Mr. Guertin recognized the value of legal counsel and was capable of working with his attorneys on decisions about his case. In short, as of April 3, 2025, Mr. Guertin was fully restored to competency and the criminal case was cleared to proceed on the merits. This order returned jurisdiction to the criminal division (Judge Sarah Hudleston presiding) with Mr. Guertin deemed competent.

### D    |    Defendant's Motion to Dismiss for Prosecutorial Misconduct

On April 16, 2025, with competency no longer in question, Mr. Guertin – still represented by counsel at that time, but acting on his own initiative – submitted defendant's Motion to Dismiss All Charges with Prejudice (*see Index 131*). In a fifty-page memorandum with extensive exhibits, Mr. Guertin chronicled what he had uncovered over two years: *"What began as routine criminal charges has metastasized into a coordinated campaign – spearheaded by the prosecution, aided by officers of the court, and shielded by falsified psychiatric evaluations – designed to portray Mr. Guertin as delusional and incompetent."* The motion proceeds to detail how the Rule 20.01 competency evaluations were tainted by unauthorized, conflicted actors and

Add. 41

false information; how discovery materials were manipulated and critical evidence suppressed; and how various actors (including even prior defense counsel) contributed to these constitutional violations. Mr. Guertin's motion was not a tirade of unfounded accusations – it was supported by meticulous evidence, including forensic metadata analysis, timestamped photographic comparisons, email records, and limited patent-office correspondence offered only to rebut the State's "delusion" narrative, not as a substantive defense to the firearm counts. His filings were "not only legally coherent, but grounded in verifiable forensic data - metadata chains, chain-of-custody anomalies, and extensive digital documentation." In short, the motion presented a compelling case that the charges against Mr. Guertin should be dismissed due to egregious government misconduct, invoking the Court's inherent authority and constitutional due-process principles. Importantly, the motion to dismiss also argued that the prior competency findings and psychiatric reports were the "fruit of the poisonous tree" – results of the State's deception and therefore invalid under *Mapp v. Ohio*, 367 U.S. 643 (1961). Mr. Guertin demanded an evidentiary hearing and full inquiry into these issues.

**E | April 17, 2025 Hearing – Court Refuses to Hear Motion; Defendant Seeks to Proceed Pro Se**

The next scheduled court date was April 17, 2025, before the Hon. Sarah Hudleston (the assigned criminal division judge). At that hearing, Mr. Guertin's public defender acknowledged the filing of the pro se motion to dismiss and its request for an evidentiary hearing. However, counsel did not adopt the motion, and the Court indicated it would not consider pro se filings from a represented defendant. Judge Hudleston stated:

> *"Mr. Guertin, you have counsel. So they handle the filings. ... We don't generally accept additional pro se motions when someone is represented."*

Mr. Guertin objected strenuously, arguing that it felt like he was "still being held incompetent and having people control my decisions" despite having been found competent. The Court, however, stood firm that it would only entertain motions brought through counsel, effectively shelving the motion to dismiss indefinitely. In response, on April 21, 2025, Mr. Guertin filed a Petition to Proceed as Pro Se Counsel (*see Index 133*), seeking to waive representation so that he could advocate for himself and ensure his motion would be heard. That petition put the court on

Add. 42

notice that a *Faretta* hearing (to confirm his knowing waiver of counsel) needed to be conducted at the next court date.

**F | April 29, 2025 – Court Orders New Competency Evaluation and Forensic Navigator**

Instead of allowing Mr. Guertin to argue his motion or holding a hearing on his request to represent himself, the Court on April 29, 2025, issued two orders that are the subject of this motion. First, Judge Hudleston, sua sponte and without any party's motion, issued an Order for Evaluation for Competency to Proceed under Rule 20.01 (*see Index 187*), directing that Mr. Guertin undergo yet another psychiatric examination and suspending the criminal proceedings until its completion. Second, the Court signed an Order for Appointment of a Forensic Navigator (*see Index 188*) – a court agent tasked under Minn. Stat. §§ 611.42, 611.55 with assisting in competency cases – empowering that agent to gather a broad range of Mr. Guertin's personal records. These orders were entered ex parte, at a proceeding where Mr. Guertin was present but effectively silenced as a pro se litigant (since his counsel was still technically on the case and had not been discharged). The stated rationale for re-opening the competency issue, as reflected in the April 29 transcript, was Mr. Guertin's own recent filings - specifically, the content of his pro se Motion to Dismiss and its exhibits - which the Court recast as evidence of possible mental instability. In other words, the Court treated Mr. Guertin's vigorous legal defense - selectively fixating on his contextual references to patent theft (offered only to rebut the "delusion" label) while ignoring the motion's core Brady/Giglio discovery-fraud arguments - as the sole trigger for doubting his competency anew. No disruptive courtroom behavior, medical episode, or other objective change was cited - only Mr. Guertin's written legal arguments against the State's case. (*see Index 131, Motion to Dismiss at 24-46 - no patent-based affirmative defense asserted*)

The effect of the April 29 orders was immediate and prejudicial. All progress on Mr. Guertin's motion to dismiss and on the case-in-chief is now frozen pending a months-long psychiatric re-evaluation (a review hearing is scheduled for July 15, 2025). Mr. Guertin – who just weeks prior stood ready to finally confront the charges at a hearing or trial – is thrust back into limbo, forced to prove his sanity rather than being allowed to prove his innocence. Meanwhile, the Forensic Navigator Order empowers an agent of the court to collect virtually every record of Mr. Guertin's private life: medical, psychological, chemical dependency, social services, probation, jail, military, employment, and educational records must all be turned over within 96 hours,

Add. 43

"notwithstanding" any privacy laws (including HIPAA and the Minnesota Government Data Practices Act) that would normally protect such information. This sweeping data grab was authorized without any particularized showing of need, and it threatens to expose intimate details of Mr. Guertin's life having no relevance to his competency or the charges. In short, the April 29 orders have inflicted severe and irreparable harm: they punish Mr. Guertin for asserting his rights, chill his ability to continue mounting his defense, and intrude on personal liberty and privacy in a manner grossly disproportionate to any legitimate purpose.

## V.   LEGAL STANDARDS

### A   |   Competency to Stand Trial – Rule 20.01 Requirements

Under Minnesota law and the Due Process Clause of the U.S. Constitution, a criminal defendant may not be subjected to trial if he is legally incompetent. Minnesota R. Crim. P. 20.01 provides the procedure to determine competency. The standard for competence (echoing the U.S. Supreme Court's test in *Dusky v. United States*, 362 U.S. 402 (1960)) is whether the defendant has sufficient present ability to consult with a reasonable degree of rational understanding with counsel and whether the defendant has a rational and factual understanding of the proceedings. Rule 20.01, subd. 1 directs the court to order a competency examination only if there is reason to doubt the defendant's competency. Once a defendant is found competent by the court (after a hearing or by stipulation), that finding stands unless new, significant facts arise suggesting a change in the defendant's mental condition. Competency is not a tactical pawn that can be continuously re-litigated at the whim of the court or the displeasure of the prosecutor – it is a fundamental status finding meant to ensure fairness, not a tool to be used as a sword against the defendant whenever convenient.

### B   |   Constitutional Limits – Due Process and First Amendment

While courts have latitude to order evaluations when genuinely needed, they cannot abuse Rule 20.01 to subvert a defendant's rights. The Due Process Clause forbids state actors – including judges – from taking punitive action against a defendant for exercising constitutional rights. (see, e.g., *Blackledge v. Perry*, 417 U.S. 21 (1974) (the doctrine of prosecutorial vindictiveness, grounded in due process, prohibits "upping the ante" in response to a defendant's exercise of procedural rights).) Retaliating against a defendant by labeling him incompetent and

Add. 44

halting his case because he filed a motion challenging government misconduct is anathema to due process. It is also a direct affront to the First Amendment right to petition the judiciary for redress of grievances. Filing motions and lawsuits – especially motions alleging government wrongdoing – is protected activity. Government action that would "chill" a person of ordinary firmness from continuing to speak or petition is presumptively unconstitutional. Here, the message sent by the April 29 competency order is clear: If you expose our misconduct, we will declare you crazy and strip you of your agency in court. Such a message has a profound chilling effect not only on Mr. Guertin, but on any defendant who might seek to bring uncomfortable facts to light. The judiciary must scrupulously avoid even the appearance of this kind of retaliatory use of process, as it undermines public confidence in the fairness of the system.

## C   |   "Fruit of the Poisonous Tree" Doctrine in Competency Context

The U.S. Supreme Court's decision in *Mapp v. Ohio*, 367 U.S. 643 (1961), cemented the principle that the government may not benefit from evidence obtained through its own illegal acts – all such evidence and its derivatives (the "fruit of the poisonous tree") must be excluded to deter misconduct and uphold the integrity of the courts. While *Mapp* dealt with illegally seized physical evidence, the principle is broader: if the State fabricates or manipulates evidence, any downstream use of that tainted evidence to affect the defendant's case is constitutionally infirm. Minnesota courts likewise recognize that fundamentally unfair tactics in procuring evidence or evaluations violate due process (see *State v. Bauer*, 245 N.W.2d 848, 852 (Minn. 1976), noting a court must inquire further when a defendant's competency evaluation process is suspect). In the context of Rule 20.01 evaluations, this means that if prior competency determinations were influenced by false evidence or misrepresentations by the State, those determinations cannot be relied upon for any purpose and must be set aside. A competency finding (or an examiner's opinion) that is the product of the State feeding examiners manipulated discovery or false narratives about the defendant is no more valid than a conviction based on planted evidence. The law does not permit the State to create a fake aura of "incompetency" by fraudulent means and then invoke that very aura to the defendant's detriment. Any such supposed "evidence" of incompetency is fruit of the poisonous tree and must be disregarded.

Add. 45

**D  |  Right to Self-Representation and Control of Defense**

The Sixth Amendment guarantees a defendant the right to self-representation (after a knowing and voluntary waiver of counsel) and the right to control the objectives of his defense. A court may only deny that right if a defendant is not competent to waive counsel (which requires essentially the same competency as to stand trial) or if the defendant is so disorderly as to disrupt proceedings. Mr. Guertin was in the process of asserting his *Faretta* right to represent himself when the Court short-circuited the issue by re-raising competency. The standard for competence to waive counsel is the same as, or even higher than, competence to stand trial (see *Godinez v. Moran*, 509 U.S. 389 (1993)). Since Mr. Guertin had been undeniably found competent just weeks earlier, the Court cannot evade his Faretta right by suddenly claiming he might not be. Doing so flips the constitutional script: instead of protecting a defendant's rights, it uses a competency inquiry to infringe them. Courts must be extremely cautious not to conflate disagreement with defense strategy or discomfort with a defendant's assertions with genuine incompetence.

In sum, the legal framework makes clear that a Rule 20.01 evaluation must be predicated on genuine doubt arising from objective changes in condition or credible observations of inability to function in court – *not* on a defendant's lawful filings or zealous defense strategy. And even when competency is properly at issue, the Court's authority is bounded by due process and other constitutional rights: the right to advocate and petition, and the right to privacy in personal records, all impose limits that this Court must heed.

# VI.  ARGUMENT

**A  |  The April 29 Competency Order Was Retaliatory - Issued in Response to defendant's Misconduct Allegations, Not Any Legitimate Competency Concern**

The timing and circumstances of the April 29 competency order make its purpose unmistakable: it was a direct response to Mr. Guertin's Motion to Dismiss (*see Index 131*), which boldly accused the prosecution and others of fraud and constitutional violations. That motion – far from being a symptom of mental instability – was a model of diligent pro se advocacy. It presented a coherent narrative of how false evidence and improper evaluations were used to paint Mr. Guertin as "delusional and incompetent" in what he aptly termed a "conspiracy of

Add. 46

commitment." It backed up each allegation with hard evidence, including digital forensic analyses and even metadata proving that one Rule 20.01 report was authored by someone other than the signed doctor (a fact Mr. Guertin uncovered by examining file properties). The motion's allegations, if true, expose a profound abuse of the judicial process by the State – the kind of scandal that could indeed warrant dismissal of charges or other serious sanctions. In short, Mr. Guertin's filings put the State (and by implication, the Court) in a deeply uncomfortable spotlight.

Instead of meeting these contentions head on, the Court shifted focus and trained the spotlight back on Mr. Guertin's mental state. Notably, the April 29 order does not cite any erratic courtroom behavior by Mr. Guertin, nor any medical incident or new information from jail or doctors – nothing except the content of his own pleadings. Effectively, the order treats Mr. Guertin's vigorous legal defense as evidence of incompetence. This is retaliatory on its face. A defendant cannot be penalized for mounting a zealous defense – even a pro se defense that accuses officials of misconduct. To label such advocacy as "crazy" or indicative of mental illness is a profound distortion of the adversarial process and an insult to the First Amendment. Courts are accustomed to pro se litigants who sometimes make far-fetched claims; here, however, Mr. Guertin's claims are supported by objective evidence (e.g., glaring discrepancies in photo metadata, unexplained gaps in successive discovery productions, and documented instances of misrepresentation by officials). There was nothing "crazy" about noticing that 28 images went missing from one discovery version to the next – that is fact, not delusion, as the prosecution tacitly conceded by silently dropping those images from the later evidence set. There was nothing "incompetent" about questioning why a Rule 20.01 evaluator's report appeared to have been drafted by an unknown third party. And there is nothing irrational in asserting that one's fair trial rights are violated by evidence tampering and *Brady* violations – those are legal arguments, not psychiatric symptoms.

The appearance of retaliation is heightened by the sequence of events. Only after the Court was faced with a pro se motion it did not want to hear (and a defendant insistent on representing himself to ensure it was heard) did the idea of resurrecting the competency issue surface. The Court did not simply deny Mr. Guertin's *Faretta* request or decline to hear the dismissal motion – which would have been within its discretion – but instead reached for the extreme tool of declaring a doubt about his sanity. This action effectively sidelines Mr. Guertin entirely: if he is

Add. 47

deemed incompetent, he loses the right to self-represent, his motion to dismiss becomes a nullity (since an incompetent defendant cannot litigate such matters), and the case gets punted into a lengthy limbo where memories fade and momentum is lost. In short, the State benefits enormously from the competency order because it neutralizes the immediate threat posed by Mr. Guertin's motion and evidence. Such a conveniently timed outcome, aligned with the prosecution's interests and unsupported by any demonstrated necessity, raises a strong inference of vindictive intent. Even if the Court subjectively believed it was acting out of caution, the objective reality is that the order functions as a sanction for Mr. Guertin's aggressive defense. Under due process principles, when official action penalizes a defendant for exercising his rights, it is presumptively invalid (*United States v. Goodwin*, 457 U.S. 368, 372 (1982)). Here, the penalty is the derailing of Mr. Guertin's motion and the branding of him (yet again) as incompetent.

Critically, the April 29 transcript confirms that the Court's justification for the Rule 20.01 order rested entirely on Mr. Guertin's litigation conduct, not on any clinical change. Judge Hudelston first acknowledged she was "bound by Judge Koch's competency order" (Apr. 3) but added: "I am only able to follow that competency order unless and until I see evidence of lack of competency. And once I see that, by law I'm required to address that." When pressed for the supposed "new" evidence, she replied: "I reviewed your 50-plus-page motion to dismiss, and I've looked at a number of the cites and exhibits - I can't let you go forward because I have significant concerns." She then cited Minn. Stat. § 611.42, subd. 2, and elaborated: "The big concerns here are you're raising as defenses things related to your patent and a big conspiracy with Netflix and the government and the court… That… is not rational. That would not provide a defense to the charges." Moments later she announced: "I am going to order another Rule 20.01 evaluation." (Judge Hudelston's characterization misstates the motion; *see Index 131, Motion to Dismiss at 24–46; no patent-based affirmative defense*)

Two points follow. First, the judge expressly tied her doubt to the content of the Motion to Dismiss - specifically, Mr. Guertin's allegations of evidence-tampering and corporate misconduct - which she mislabeled as "patent defenses." In reality, the motion's dispositive grounds are Brady/Giglio violations and fraudulent discovery; the patent narrative appears solely as context to rebut the State's "delusion" label. (*see Index 131, Motion to Dismiss at 24–46 (no patent-*

Add. 48

*based affirmative defense asserted)*. Second, Mr. Guertin intentionally confirmed on the record that this mischaracterized motion was the sole basis:

> <u>GUERTIN</u>:  *"And that's what you're basing the incompetency on?"*
>
> <u>COURT</u>**:**  *"It's based on what I saw that you filed in your motion to dismiss… Correct."*
>
> (*<u>Tr.</u> 16:22 – 17:15*)

Thus, the renewed competency evaluation is predicated solely on Mr. Guertin's protected legal advocacy - an impermissible ground under Rule 20.01 and the Constitution.

To be sure, the allegations Mr. Guertin raises are extraordinary - chiefly that key photographic discovery was doctored and suppressed, and, secondarily and only as context, that Netflix exploited his patented work while officials looked the other way - all pointing to a cover-up within the justice system. But extraordinary allegations can nonetheless be true; history is replete with conspiracies that sounded outlandish at first yet proved real. More importantly, a defendant's belief that he is being persecuted or framed by the government is *not* proof of incompetence unless it is wholly delusional and devoid of factual support. Here, Mr. Guertin has assembled significant factual support for his claims. By definition, a delusion is a fixed false belief held despite evidence to the contrary. Mr. Guertin's belief that critical discovery was tampered with is not held despite contrary evidence; every objective datapoint in the record supports that belief, and the State has offered no innocent explanation for the anomalies he has identified. Labeling the belief a "delusion" is therefore premature and unwarranted. Yet the April 29 order does exactly that, treating Mr. Guertin's continued insistence on forensic facts as a sign of mental disorder rather than a claim to be tested in open court. In truth, it is Mr. Guertin who has consistently marshaled verifiable evidence, while the Court's repeated refusal to scrutinize that evidence has left the factual issues unresolved. Under these circumstances, one might fairly ask whether the real departure from reality lies not with Mr. Guertin, but with the judicial process that continues to discount unrefuted proof of discovery fraud.

In sum, the April 29 Rule 20.01 order was not grounded in any legitimate concern about Mr. Guertin's ability to understand the proceedings or assist in his defense. By the Court's own account, it was grounded in discomfort with the content of Mr. Guertin's defense. That is a constitutionally impermissible basis for a competency inquiry. This Court should not

Add. 49

27-CR-23-1886

Filed in District Court
State of Minnesota
5/7/2025 2:04 PM

countenance any use of Rule 20.01 that even appears to be motivated by a desire to gain tactical advantage or to silence a litigant. The Minnesota Rules of Criminal Procedure do not permit competency evaluations to be weaponized in this manner. On the contrary, Rule 20.01, subd. 2, envisions that a competency exam is ordered only upon a threshold showing that "reason exists to doubt" the defendant's competency. By April 29, absolutely no reasonable doubt existed – Judge Koch's detailed findings of competency were fresh, and Mr. Guertin had demonstrated even more engagement and clarity through his post-competency filings. If anything, his successful navigation of complex e-discovery analysis and legal writing underscored his competence. Thus, the April 29 order was not prompted by any legitimate change in condition; it was an illegitimate move to relieve the pressure that his motion had created for the court and the prosecution. Retaliatory or vindictive judicial actions violate due process just as surely as prosecutorial vindictiveness does. The only appropriate remedy is to vacate the tainted order and put the parties back in the position they were in before – meaning Mr. Guertin remains adjudicated competent (per the April 3 order) and his Motion to Dismiss is restored to the docket as ripe for consideration.

**B  |  Mr. Guertin Was Just Adjudicated Competent on April 3, 2025 - No New Facts Justified Reopening the Competency Issue**

The ink was barely dry on Judge Koch's April 3, 2025 Order declaring Mr. Guertin competent when this Court chose to contradict it on April 29. Minnesota law does not lightly allow one judge to overturn another judge's finding of competency without materially new information. Here, the Court's April 29 order points to no new facts at all – because there were none.

### 1.    March 5, 2025 | "Contested Competency" Evidentiary Hearing

At the March 5 evidentiary hearing, the issue of Mr. Guertin's competency was thoroughly examined. Mr. Guertin's own testimony was taken, and he was questioned and observed directly by Judge Koch. He answered questions about his understanding of the proceedings, demonstrated knowledge of courtroom procedure and the roles of participants, and acknowledged the advantages of counsel even as he asserted his concerns about evidence. Judge Koch had the benefit of Dr. Cranbrook's December 2024 report (which recommended a finding of incompetence) and Mr. Guertin's rebuttal to it,

Add. 50

Filed in District Court
State of Minnesota
5/7/2025 2:04 PM

including the new evidence he presented. Ultimately, Judge Koch found Mr. Guertin's evidence and explanations more persuasive and ruled him competent. The April 3 findings note that, although the Court expressed skepticism about some of Mr. Guertin's broader allegations - e.g., his contention that corporate actors misappropriated his patented technology (a contention offered only to rebut the State's "delusion" label, not as a substantive defense) - and acknowledged a history of prior mental-health concerns, those matters did not prevent him from understanding the proceedings or from rationally collaborating with counsel at present. The Court determined Mr. Guertin had the present capacity to proceed – which is the legal test for competence. That finding was not a close call or a tentative conclusion; it was categorical: *"Ultimately, the Court finds Mr. Guertin is competent."* It resolved the ongoing Rule 20.01 process and returned the case to the criminal trial docket. Under Minn. R. Crim. P. 20.01, subd. 7, once a defendant is found competent, the proceedings "shall resume." The rules do not explicitly contemplate a sua sponte re-opening of competency absent a new motion or truly new cause. Basic principles of finality and judicial consistency strongly suggest that a prior competency adjudication should be respected unless truly new evidence emerges that was not available at the time of the hearing.

2.      **April 3 - April 29, 2025 | Stable, Competent Conduct - No Unusual Behavior**

In Mr. Guertin's case, between April 3 and April 29, 2025, nothing occurred that could plausibly cast doubt on his competency. He did not suffer any intervening mental health crisis; he was not hospitalized; he was not observed decompensating; he did not engage in bizarre or irrational conduct in court. (At the April 17 hearing, by all accounts, he was respectful though firm in asserting his right to be heard.) The only development was that Mr. Guertin filed court documents: specifically, his motion to dismiss (with supporting exhibits) and a petition to proceed pro se. Ironically, both of these actions are consistent with a high degree of competence – they show that Mr. Guertin was actively engaging with his legal case, understood the issues sufficiently to draft pleadings, and was making strategic decisions about his representation. None of that is indicative of incompetence; to the contrary, historically an "incompetent" defendant is one who is detached from reality, unable to communicate rationally, or otherwise behaves in a

Add. 51

manner that undermines his own legal position. Filing a well-reasoned (even if aggressive) motion, no matter how unpalatable its accusations may be to the State or the Court, is not the act of a person who "lacks ability to consult with counsel rationally." In fact, observers noted that Mr. Guertin's April 16 motion to dismiss showed improved focus and rationality compared to some of his much earlier pro se letters long before he was restored to competency – the April 16 motion is organized, cites rules and case law, and sticks to factual evidence of record. If the Court believed Mr. Guertin was competent on April 3, it is illogical to conclude he became incompetent by April 29 simply because he continued to press his legal position vigorously.

**3.    Once Again, Guertin is Competent – It is His Evidence Which is Not**

It appears the Court was swayed not by any change in Mr. Guertin's cognitive functioning, but by the substance of his allegations - namely, that the prosecution doctored critical discovery, that certain prior defense attorneys facilitated a cover-up, and that official records were falsified. Yes, those allegations are extraordinary. But as discussed, extraordinary allegations are not *ipso facto* signs of insanity. And more pointedly, a defendant's belief in extraordinary government misconduct is not proof of incompetence so long as the belief is not completely untethered from reality. Here, Mr. Guertin has provided a substantial factual basis for his assertions. The proper forum to examine such claims is an evidentiary hearing on the motion to dismiss, not a summary psychiatric judgment. Competency doctrine is concerned with whether Mr. Guertin can rationally participate in his defense – which he clearly demonstrated he could. It is *not* meant to serve as a referendum on whether his legal theories will ultimately prevail or whether his view of the evidence is correct. A defendant is allowed to maintain that the evidence against him is fabricated or that he is being framed; those claims must be evaluated through the adversarial process (discovery, motions, trial) – not short-circuited by declaring the defendant mentally ill for making them. If courts were to declare any defendant incompetent simply because he accuses the police or prosecution of manufacturing evidence, we would have seen countless wrongful convictions (where defendants turned out to be right about official misconduct) never come to light. The bottom line is: no rule or precedent permits a competency "do-over" absent new significant information. Here there was none – only the Court's apparent discomfort with

Add. 52

the trajectory of Mr. Guertin's defense. That is not a valid basis to invoke Rule 20.01 again. Therefore, the April 29 competency order was procedurally and substantively improper and must be vacated. The prior adjudication of competence (*see Index 127*) should remain the final word on the matter unless and until some genuine change occurs in Mr. Guertin's mental condition (which has not happened).

**4.      Motion to Dismiss Directly Cited as Evidence of "Incompetence"**

Furthermore, Judge Hudelston's own remarks on April 29 underscore the absence of any genuinely new evidence. She stated on the record that she had "reviewed Judge Koch's order" but believed "things have materially changed" because Koch's finding assumed Mr. Guertin would keep working with counsel, whereas he now wished to discharge them. That rationale is flawed: choosing to discharge lawyers who refuse to advance a client's motions is not incompetence - it is a rational assertion of autonomy. The Court further asserted that it had "now seen new evidence of incompetence," but the only particulars it identified were the contents of Mr. Guertin's Motion to Dismiss and his unrelenting claim that key discovery was manipulated. The Court repeatedly miscast those claims as "patent-related defenses," even though the motion's legal thrust is Brady/Giglio discovery fraud and prosecutorial misconduct, not any patent-based affirmative defense. None of this was new information; the same issues were fully aired at the March 5 competency hearing (indeed, Judge Koch expressly considered Mr. Guertin's patent-theft chronology as context and still found him competent). In short, there is continuity - not change - in Mr. Guertin's position before and after April 3. The Court's about-face rests on the contrived notion that vigorous pursuit of a misconduct motion somehow nullifies the prior competency ruling. No legal authority supports that proposition. Accordingly, the April 29 order is an abuse of discretion and an unwarranted repudiation of a binding competency determination.

**C   |   The State's Misconduct Created a Catch-22: All Prior Rule 20.01 Evaluations Are Tainted "Fruit of the Poisonous Tree," So the Court Cannot Justify a New Competency Exam by Relying on Those Tainted Results**

The impetus for Mr. Guertin's motion to dismiss – and indeed much of the turmoil in this case – is the State's handling of crucial photographic evidence. The 28 missing interior images in

the police evidence archive form the crux of this issue. Mr. Guertin identified these anomalies over a year ago and has doggedly pursued the truth about them ever since. The State has never offered a credible explanation for why those images had irregular metadata (strange aspect ratios) or why they vanished from later discovery disclosures. Instead, actors in the system (including competency examiners, and even some defense counsel) reacted to Mr. Guertin's insistence on this issue by suggesting it was a paranoid fixation – essentially using his *alertness to evidence tampering* as a basis to label him delusional. Now, with the benefit of the forensic exhibits Mr. Guertin filed, it is apparent that his concerns were well-founded.

To clarify the significance of this evidence issue, it is helpful to summarize the evolution of the discovery photo sets (which Mr. Guertin meticulously detailed in prior filings):

### Discovery Set "A"

- This refers to the set of "104" photographs documented in the first Rule 20.01 competency evaluation report by Dr. Jill Rogstad, dated March 10, 2023. In that report, Dr. Rogstad noted she reviewed "104 images" related to the case. Mr. Guertin himself was never given these images at the time; they were known only by the count in the report. Thus, Set A = 104 photos (per Dr. Rogstad's report). (*see Index 28, p. 117*)

### Discovery Set "B"

- This refers to a PDF of 80 crime-scene photos that Mr. Guertin's then-attorney (Michael Biglow) sent to him on August 3, 2023, ostensibly as part of discovery. Mr. Guertin did not request these at that moment (in fact, he had other counsel issues), but they were provided. In the subsequent civil commitment proceedings (which run parallel to criminal incompetency in Minnesota), it was documented that these 80 photos were reviewed. Mr. Guertin quickly noticed something alarming in Set B: 28 out of the 80 images had odd dimensions (non-uniform aspect ratios), whereas the other 52 were in a standard uniform size. Intriguingly, those 28 odd-sized photos were exclusively the ones depicting the inside of Mr. Guertin's apartment. This pattern suggested intentional cropping or alteration. On April 4, 2024, Mr. Guertin filed a pro se motion to compel raising this issue, effectively preserving Set B (80 photos, with 28 suspect images) on the record as evidence of possible tampering. (*see Index 29*)

Add. 54

## Discovery Set "C"

- After Mr. Guertin filed a federal civil-rights lawsuit in mid-2024 (*see* 24-cv-2646) (alleging that fraudulent evidence was being used in his state case), his then-defense attorney (Bruce Rivers, who was named in that civil suit for inaction) finally relented and provided Mr. Guertin with what was purported to be the complete set of discovery photos on a USB drive. This was in July 2024. Set C consisted of 518 images (far more than either 80 or 104). Immediately upon receiving Set C, Mr. Guertin cross-checked those 518 images against Set B. He discovered that every one of the 80 images from Set B appeared in Set C except for the 28 interior photos that had the anomalous aspect ratios. In other words, the very images Mr. Guertin had flagged as potentially altered had now *disappeared entirely* from the "complete" set of evidence. This confirmed his worst suspicions: the State (or those handling evidence) had apparently removed or withheld the problematic photos. Mr. Guertin documented this in an August 7, 2024 filing (in his federal case), noting the exact overlap and the missing 28. He also articulated the logical trap now present: if the 28 photos were legitimate evidence, they should have been in the full Set C but were not – implying a cover-up; if they were not legitimate (never truly existed or were irrelevant), why did they appear in earlier official sets and reports? Either scenario is bad for the State. This is the Catch-22 that Mr. Guertin identified: any move the State makes regarding these images tends to prove his claim of fraud. (*see Exhibit Y*)

## Discovery Set "D"

- Fast forward to early 2025. Mr. Guertin, now with two new public defenders (Raissa Carpenter and Emmett Donnelly, appointed after he forced Mr. Rivers off the case), continued to demand resolution of the fraudulent photo issue. Eventually, on February 13, 2025, an in-person meeting was arranged specifically to address "the missing 28 images." Present were Mr. Guertin, his two new attorneys, and a representative from the Hennepin County Attorney's Office (described as their "discovery handling" specialist). At this meeting, the State produced yet another set of photographs – essentially a corrected or supplemental discovery.

Add. 55

This Set D consisted of a folder containing the same 518 images of Set C *plus* an additional folder of 104 images. In that new 104-image folder were, at long last, the 28 interior photos that had gone missing. (*see Index 122, Exhibits A-E*)

All 104 now share a uniform 16:9 ratio; metadata cloned to "iPhone 12 / flash = No".

At least 24 of the 28 interior shots are horizontally squished; shadows in several images prove a flash was actually used, contradicting metadata. (*see Index 122, 123, and 124*)

The State's attempt to "fix" the anomaly is self-indicting: even a first-grader can see that shadows don't lie. (*see Index 124, Exhibit L*)

## D | State's "Brilliant Fix" Back-fires and Retroactively Discredits Set A as Well

Set A was never contested—only a head-count ("104 photos") that Rogstad said she reviewed. By February 2025 the State thought it could seal every leak by handing over a brand-new folder of exactly 104 images and saying, in effect, "Here's what Dr. Rogstad must have seen all along." That one move forges a direct chain: Set D ↔ Set A. If the 104 new files are doctored (and the squished shadows prove they are), then whatever Rogstad claimed to review in March 2023 either never existed or was equally doctored.

Thus the State's own "final fix" detonates every link in the chain:

- Set A is now suspect, because Set D claims to be its mirror image.

- Set B is suspect, because the 28 anomalies it contained had to be erased from Set C to make room for the doctored Set D versions.

- Set C is suspect by omission.

- Set D is suspect by commission.

The dominoes fall straight through all Rule 20 reports—Rogstad, Milz, Cranbrook—and straight into the April 29 order: if the evidence base is rotten, every psychiatric "conclusion" grown from it is rotten too.

## E | Earlier Competency Findings Are Now Tainted "Fruit of the Poisonous Tree"

Every examiner after Dr. Rogstad's 104-photo reference in March 2023—Dr. Adam Milz (Jan 2024) and Dr. Kathryn Cranbrook (Dec 2024)—diagnosed Mr. Guertin as "psychotic" solely because he maintained that key crime-scene photographs had been altered or suppressed. Set D

Add. 56

(produced Feb 2025) now indisputably confirms the fraud he described: the 28 interior images were first cropped, then removed, then re-inserted with doctored metadata.

Because those Rule 20.01 opinions rested on falsified evidence, they are classic fruit of the poisonous tree. The State created a false picture—literally and figuratively—and then cited Mr. Guertin's accurate objection to that picture as evidence of mental illness. Under *Mapp v. Ohio*, 367 U.S. 643 (1961), and its exclusionary-rule progeny, judicial action that depends on tainted proof cannot stand. Just as an illegally seized weapon is inadmissible at trial, a psychiatric conclusion procured through evidence-tampering cannot be invoked to keep a defendant in perpetual competency limbo. Consequently, the Rogstad, Milz, and Cranbrook reports—having sprouted from doctored discovery—cannot supply "good cause" for a fourth Rule 20.01 evaluation and must be disregarded in toto.

### F   |   Further Rule 20.01 Examinations Would Be Irremediably Tainted

The April 29 order threatens to drag the case backwards based on residual taint from those prior, now-suspect Rule 20.01 evaluations. If this new evaluation goes forward, on what basis will the examiner proceed? Presumably, the examiner will be provided with Mr. Guertin's court files and prior Rule 20.01 reports as background. But those reports (e.g., Dr. Rogstad's, Dr. Cranbrook's) are infused with the "poisonous" conclusion that Mr. Guertin's claims have no basis in reality. Any new examiner reading them will inherently inherit the bias that Mr. Guertin's well-founded claims are delusions – unless that bias is explicitly cured.

The only way to cure it would be for the Court to also provide the examiner with the evidence of official fraud that Mr. Guertin has presented, to ensure the examiner does not repeat the mistake of dismissing Mr. Guertin's assertions as fantasy. But introducing such evidence of police/prosecutorial misconduct to a Rule 20.01 examiner would put the State in an impossible position – essentially forcing an admission that evidence tampering occurred (something the State vehemently denies). The State is hardly likely to stipulate to Mr. Guertin's claims in order to facilitate a cleaner competency exam. Thus, the competency re-evaluation process is hopelessly entangled with the merits of Mr. Guertin's allegations.

This entanglement is precisely why the proper course is to litigate the merits (via the motion to dismiss and an evidentiary hearing) before entertaining any further psychiatric inquiries. If Mr. Guertin proves, as he asserts, that the State engaged in evidence manipulation and other

Add. 57

misconduct, that finding would not only vindicate him but would likely dispose of the case entirely (via dismissal or other sanctions), mooting any need for another competency evaluation. Conversely, if the State somehow refuted Mr. Guertin's claims with actual evidence, then – and only then – might one question whether Mr. Guertin's continued insistence in the face of that hypothetical refutation was a sign of mental illness. Right now, all signs point to Mr. Guertin being right, not ill. The Court should not force him through another degrading and intrusive Rule 20.01 process just to buy time or avoid a confrontation with the State's actions. The law will not abide a competency evaluation born of, and steeped in, the fruit of gross prosecutorial misconduct. In short, the prior Rule 20.01 findings are inadmissible and unusable, and without them, there is no plausible basis for a new evaluation.

**G | The April 29 Competency and Navigator Orders Violate Due Process, Chill Protected Advocacy, and Authorize an Unwarranted Intrusion into defendant's Personal Records**

Even setting aside the retaliatory motive and lack of factual basis, the form and scope of the April 29 orders offend constitutional principles. Together, the Evaluation Order (*see Index 187*) and the Forensic Navigator Order (*see Index 188*) create a regime that places nearly every aspect of Mr. Guertin's life under scrutiny, without adequate justification or safeguard. This Court should recognize these orders for what they are: an overreach that must be corrected.

### 1.    Violation of Procedural and Substantive Due Process

Procedurally, due process requires notice and an opportunity to be heard at meaningful times when important rights are at stake. Here, Mr. Guertin was given no meaningful opportunity to contest the renewed suspension of his rights – the decision to re-open competency was made sua sponte by the Court, without any adversarial hearing or prior notice that the issue was even under consideration again. Substantively, due process is violated when a defendant is deprived of a fundamental right or liberty interest by arbitrary government action. The April 29 competency order deprives Mr. Guertin of his right to make decisions about his defense (including the right to represent himself and push his chosen motions), and potentially threatens his liberty (since a finding of incompetence can lead to involuntary commitment for treatment), all on a capricious basis. The risk of error in this summary proceeding is extremely high – indeed, we

Add. 58

contend the Court has already erred by mistaking advocacy for insanity. The interest at stake – Mr. Guertin's right to defend himself and to avoid unwarranted psychiatric intervention – is fundamental. And there is minimal countervailing state interest in forcing an unnecessary competency process; the only "interest" arguably served is a tactical delay benefiting the prosecution, which is not a legitimate interest at all. Applying the *Mathews v. Eldridge*, 424 U.S. 319 (1976) factors (private interest, risk of error, probable value of additional safeguards, and government interest) yields a decisive conclusion that the summary imposition of a new Rule 20.01 proceeding here fails due process. Moreover, by aligning the timing of the Rule 20.01 order directly with Mr. Guertin's exercise of his petitioning rights (filing motions and seeking self-representation), the Court's action takes on the character of a penalty, which is forbidden absent the most compelling justification (and none exists here).

### 2.    Chilling of First Amendment Advocacy

Mr. Guertin's motion to dismiss and his insistence on self-representation are classic forms of petitioning the government and speaking on matters of public concern – indeed, alleging government misconduct is inherently a matter of public interest and import. The First Amendment vigorously protects such speech and petitioning. Government retaliation against a speaker for his expression is both actionable and unconstitutional. While one might not typically think of a competency exam as "punishment," in this context it absolutely functions as such. It is not hyperbole to say that, from Mr. Guertin's perspective (and that of any reasonable person in his shoes), the Court's message appears to be:

*"If you continue to press these accusations, we will declare you mentally ill."*

This threat carries severe consequences, including stigma, loss of autonomy (through guardianship or forced counsel), and even possible confinement in a mental facility. Few actions by the state could be more chilling to a citizen's willingness to speak truth to power. The U.S. Supreme Court has long warned against the chilling effect of laws or actions that deter people from exercising free speech and petition rights (see *Dombrowski v. Pfister*, 380 U.S. 479 (1965)). Here, the chilling effect is not theoretical – Mr. Guertin

Add. 59

Filed in District Court
State of Minnesota
5/7/2025 2:04 PM

is experiencing it in real time. To proceed with the competency re-evaluation under these circumstances sends a loud and clear signal:

> "*drop your claims or we will brand you insane*."

This Court, as a guardian of constitutional rights, should recoil from any action that even appears to send such a message. Even the appearance of a First Amendment violation undermines the judiciary's role as a neutral arbiter. The proper course to avoid this chilling effect is to immediately stay and vacate the competency order, thus removing the cloud of potential psychiatric punishment from over Mr. Guertin's head and allowing his claims to be heard on their merits.

### 3.  Unjustified Intrusion into Privacy (Forensic Navigator Order)

The April 29 Order Appointing a Forensic Navigator (*see* Index *188*) represents a drastic invasion of privacy and personal security. By its terms, this order commands that any and all agencies or entities possessing information about Mr. Guertin – including his *medical history, psychological treatment records, chemical dependency records, social services files, probation files, jail records, military records, Social Security records, employment records, and educational records* – must turn over those records to the navigator upon request, within 96 hours. It further suspends virtually every privacy protection (state or federal) that might apply to those records, explicitly overriding laws such as HIPAA and the Minnesota Government Data Practices Act. This is a sweeping authorization usually reserved for the most serious of cases where a defendant's long-term mental illness history is directly at issue. Here, its use is wholly disproportionate and unnecessary. Mr. Guertin's competency at present is not in legitimate doubt, so there is no need for a forensic navigator at all – much less one armed with a court order to vacuum up the most sensitive documents of Mr. Guertin's life.

The breadth of the navigator order raises independent constitutional concerns. The Fourth Amendment protects against unreasonable searches and seizures; while one might argue that obtaining records for a court-ordered exam is not a traditional "search," it certainly implicates Mr. Guertin's reasonable expectation of privacy in his medical and personal information. This order was issued with no showing of particularized need – the form recites boilerplate "good cause," but no specific cause related to Mr. Guertin was

Add. 60

Filed in District Court
State of Minnesota
5/7/2025 2:04 PM

documented. It amounts to a general warrant for information, something anathema to the Fourth Amendment. Likewise, under substantive due process, any governmental intrusion into personal privacy (a liberty interest) must be balanced and non-arbitrary. Here it is arbitrary in the extreme: had the Court not sua sponte raised competency, none of these records could have been accessed without Mr. Guertin's consent or a specific court process demonstrating relevance. Now, simply because the Court decided (wrongly) to invoke Rule 20.01, everything is suddenly up for grabs. If this is not an abuse of the competency process, it is hard to imagine what would be.

**4.    Conclusion**

In sum, the April 29 orders offend multiple constitutional values: procedural fairness, free expression, and privacy. They are overbroad and unjustified responses to a situation that, at most, required a far more measured approach. (For instance, if the Court had concerns about Mr. Guertin's claims, the appropriate step would have been to hold a hearing on the motion to dismiss to examine those claims – shining light on the facts is a known antidote to confusion – rather than reflexively treating the claims as evidence of insanity and reopening competency.) Because these orders violate Mr. Guertin's rights and cast a pall over the legitimacy of the proceedings, they should not be allowed to stand.

**H    |    A Stay and Vacatur Are Necessary to Restore Fairness and Proper Procedure in this Case**

The defense respectfully submits that the only way to restore fairness and regularity in this case is to undo the April 29, 2025 orders. This Court has the inherent authority to reconsider and vacate orders that were improvidently granted or that have become unjust to enforce. It also has clear authority to stay any order – especially one related to a collateral matter like a competency evaluation – if doing so is necessary to prevent irreparable harm or to allow higher court review. Here, both vacatur and a stay are warranted: vacatur because the orders were wrong from the start (and issued in excess of the Court's proper authority), and a stay because even temporary enforcement of them will cause irreparable injury (once Mr. Guertin's confidential records are released and his psyche poked and prodded under false pretenses, that bell cannot be unrung).

Add. 61

1.    **Vacatur of the Rule 20.01 Competency Evaluation Order (Index 187)**

The Court should vacate (rescind) the order requiring a new competency evaluation. Vacating that order would formally reinstate the April 3, 2025 finding of competency (*see Index* *127*) as the operative status of Mr. Guertin. It would signal that the Court recognizes that no adequate grounds ever existed after April 3 to doubt Mr. Guertin's competency. As detailed above, the Rule 20.01 order was issued in error and in abuse of discretion – indeed, in abuse of the Rule 20.01 process itself. By vacating it, the Court corrects the course of the proceedings and ensures that any further litigation focuses on the merits of the case (including the serious allegations of evidence tampering and misconduct) rather than detouring into an unnecessary psychiatric sideshow. This criminal case is now over two years old; the alleged offense dates back to January 2023. Mr. Guertin has spent much of that time trapped in competency limbo due to circumstances not of his making. The April 3 competency ruling should have ended that chapter for good. The Court's April 29 order reopened it without cause – a mistake that can and must be rectified.

2.    **Vacatur of the Order Appointing Forensic Navigator (Index 188) and Quashing of Resulting Record Demands**

Likewise, the Court should vacate the forensic navigator appointment order. If no Rule 20.01 evaluation is proceeding, there is no statutory basis for a forensic navigator at all (Minn. Stat. § 611.55 is predicated on an ongoing competency proceeding). Moreover, as discussed, that order authorizes an alarming invasion of privacy that should never have been allowed. The defense specifically requests that the Court also quash any subpoenas or record requests issued under the authority of the navigator order or the evaluation order. This includes any communications that may already have been made to hospitals, clinics, government agencies, or others to gather Mr. Guertin's information. Those requests should be withdrawn immediately. If any records have already been produced, the Court should order that they be sealed and not viewed by anyone pending further direction, and ultimately destroyed if the competency process is terminated. Mr. Guertin should not have to bear the indignity of his private life being dissected on a baseless hunch of incompetency. Quashing these derivative demands is necessary to make Mr.

Add. 62

Filed in District Court
State of Minnesota
5/7/2025 2:04 PM

Guertin whole and to prevent the unlawful April 29 orders from continuing to have effect in any way.

### 3.    Stay Pending Decision and/or Appellate Review

In an abundance of caution, the defense also asks that the Court enter an immediate stay (*see Minn. R. Civ. App. P. 108*) of the April 29 competency and navigator orders while this motion is pending, and (if this motion is denied) while any prompt appellate action is filed. The timeline is critical: the navigator order demanded records within 96 hours of April 29 (four days), meaning agencies could be turning over documents at any moment. Similarly, the new Rule 20.01 process presumably would involve scheduling an evaluator interview with Mr. Guertin and possibly taking him into custody for an evaluation if he does not comply voluntarily. These actions should be paused at once. A short stay will prejudice no one – if the Court ultimately decides not to vacate the orders, a brief delay in the competency evaluation is of little consequence (the review date is in mid-July, months away). But if no stay is granted and the intrusive processes go forward now, Mr. Guertin's rights will be irreparably harmed before a higher court can review the situation. Thus, the Court should issue an order that no further action be taken under the April 29 orders (no evaluations, no record-gathering) pending the resolution of this emergency motion and, if necessary, pending expedited appellate review. This is a reasonable interim measure to protect the status quo and ensure meaningful relief can still be granted.

## I  |  Notice of Imminent Appellate Action if Relief Is Denied

Finally, to preserve the record, Mr. Guertin notes that if relief is not granted by this Court, he intends to seek immediate appellate intervention. This could take the form of a petition for an extraordinary writ (mandamus or prohibition) under Minn. R. Civ. App. P. 120, together with a stay motion under Minn. R. Civ. App. P. 108 or other expedited appeal to the Minnesota Court of Appeals (and/or Supreme Court). The Minnesota appellate courts have authority to correct lower court abuses of discretion and to enforce constitutional rights without waiting for final judgment, particularly in matters where waiting would effectively deny those rights – competency orders being a prime example, as they can stall a case indefinitely and cause irreparable harm. By raising this now, Mr. Guertin means no disrespect; rather, he is putting the Court on notice that he

Add. 63

will pursue every avenue to protect his rights. Of course, a ruling by this Court in his favor – staying and vacating the orders – would obviate the need for any appellate involvement at this juncture.

## VII.  CONCLUSION

For the foregoing reasons, Mr. Guertin respectfully requests that the Court **STAY and VACATE** the April 29, 2025 Order for Rule 20.01 Competency Evaluation (*see Index _187_*) and the April 29, 2025 Order Appointing a Forensic Navigator (*see Index _188_*). In so doing, the Court should declare that the prior adjudication of competency (*see Index _127_, April 3, 2025*) remains in effect and that all proceedings may resume on the merits. The Court should further **QUASH** any subpoenas, orders, or requests for information issued under the now-void April 29 orders, thereby protecting Mr. Guertin's personal records from disclosure. If the Court for any reason declines to vacate outright, Mr. Guertin in the alternative asks for a stay of enforcement of the April 29 orders pending appellate review, and he hereby preserves his right to seek immediate relief from the Court of Appeals or Minnesota Supreme Court to prevent irreparable harm to his constitutional rights.

Mr. Guertin does not make this request lightly. He fully appreciates the gravity of alleging that a court order was retaliatory and unconstitutional. But the record here – as extensively documented above – reveals an extraordinary situation that demands an extraordinary remedy. This Court's highest duty is to the integrity of the justice system and the protection of constitutional rights. By granting the requested relief, the Court will reaffirm those principles, correct a profound injustice, and allow this case to return to the path of truth and fairness rather than abuse and obfuscation. Mr. Guertin stands ready to proceed with litigating his motion to dismiss and, if necessary, proceeding to trial – he has never sought to avoid the normal process of adjudication, only to ensure that the process is *fair*. It is the State, not Mr. Guertin, that has sought to avoid a fair fight on the merits by hiding evidence and, when caught, shifting the focus to Mr. Guertin's mental state. This Court should not countenance that tactic any longer. By vacating the April 29 orders, the Court will restore the proper balance and uphold the rule of law, and Mr. Guertin respectfully asks the Court to do so without delay.

Add. 64

Dated:  May 7, 2025　　　　　　　　　Respectfully submitted,


 /s/ Matthew D. Guertin 

Matthew David Guertin
*Defendant Pro Se*
4385 Trenton Ln. N 202
Plymouth, MN  55442
Telephone: 763-221-4540
MattGuertin@protonmail.com
www.MattGuertin.com

Add. 65

# VIII.   CERTIFICATE OF SERVICE

(Minn. R. Crim. P. 33.02; Minn. R. Civ. App. P. 125.04)


I, Matthew David Guertin, certify under penalty of perjury pursuant to Minn. Stat. § 358.116 that on May 7, 2025, I served the following document(s):

- DEFENDANT'S EMERGENCY MOTION TO STAY AND VACATE APRIL 29, 2025 RULE 20.01 COMPETENCY ORDER

- April 29, 2025 Hearing Transcript (attached)

by filing and electronically serving them through the Minnesota Odyssey E-File and E-Serve System (EFS).  E-service via EFS constitutes service under Minn. R. Crim. P. 33.04, and EFS automatically generates proof of service to all registered recipients.

**Recipients served:**

- Mawerdi Hamid, Assistant Hennepin County Attorney

- Raissa Carpenter, Assistant Public Defender

- Emmett Donnelly, Assistant Public Defender

No paper copies were mailed because all counsel of record are registered EFS users.


**Dated:  May 7, 2025**                              **Respectfully submitted,**

                                                     _/s/ Matthew D. Guertin_

                                                     Matthew David Guertin
                                                     ***Defendant Pro Se***
                                                     4385 Trenton Ln. N 202
                                                     Plymouth, MN  55442
                                                     Telephone: 763-221-4540
                                                     MattGuertin@protonmail.com
                                                     www.MattGuertin.com

Add. 66

| **STATE OF MINNESOTA** | **DISTRICT COURT** |
| **COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT** |

| | |
|---|---|
| State of Minnesota,<br><br>                    Plaintiff,<br><br>    vs.<br><br>Matthew David Guertin,<br><br>                    Defendant. | Court File No. : 27-CR-23-1886<br><br>**DEFENDANT'S MOTION TO CONFIRM PRO SE STATUS AND DISCHARGE COURT APPOINTED COUNSEL**<br><br>Judicial Officer: Sarah Hudleston |

TO:    THE HONORABLE SARAH HUDLESTON, JUDGE OF DISTRICT COURT; MARY F. MORIARTY, HENNEPIN COUNTY ATTORNEY; AND MAWERDI HAMID, ASSISTANT HENNEPIN COUNTY ATTORNEY

## I.   INTRODUCTION

Defendant Matthew David Guertin, by and for himself, hereby moves this Court for an order confirming his status as a pro se litigant and discharging his court-appointed counsel, Raissa Carpenter and Emmett Donnelly. This motion is brought alongside Mr. Guertin's concurrently filed Emergency Motion to Stay and Vacate the April 29, 2025 Rule 20.01 Competency Order, and both motions seek to vindicate Mr. Guertin's fundamental rights and prevent further irreparable harm to his defense.

Mr. Guertin asserts his constitutional and state-law right to self-representation – a right guaranteed by the Sixth and Fourteenth Amendments (as recognized in *Faretta v. California*, 422 U.S. 806 (1975)) and by Minnesota law (Minn. R. Crim. P. 5.04, subd. 1(4); Minn. Stat. § 611.19) – and respectfully asks this Court to honor that right immediately. Mr. Guertin does not take this step lightly; he fully understands the seriousness and risks of waiving counsel. However, as detailed below, extraordinary circumstances have forced his hand. His court-appointed attorneys have obstructed his defense and openly conflicted with his interests, and the

Add. 67

Filed in District Court
State of Minnesota
5/7/2025 2:07 PM

Court has thus far refused to hear his pro se motions while he remains represented. In short, continuing with the current counsel arrangement would deprive Mr. Guertin of any meaningful opportunity to defend himself. The only remedy is to formally acknowledge his pro se status and remove counsel from the case.

Mr. Guertin has already demonstrated his competence, legal knowledge, and commitment to representing himself. Within the past month, he has personally drafted and filed dozens of pages of detailed motions, legal memoranda, and forensic exhibits in this case (*see Index 122, 123, 124, 125*), including a comprehensive 50-page Motion to Dismiss All Charges with Prejudice (*see Index 131*) and a meticulous Petition to Proceed as Pro Se Counsel (*see Index 133*) with supporting exhibits. These filings – all prepared by Mr. Guertin – are cogent, well-researched, and show his fluency with legal procedure and precedent. Indeed, this Court itself found Mr. Guertin competent to stand trial after a contested hearing, issuing an Order on April 3, 2025 declaring him competent (*see Index 127, attached as Exhibit B to Mr. Guertin's Petition*). In light of that finding and Mr. Guertin's demonstrated ability to advocate for himself, there is no legitimate question as to his competence to make a knowing and intelligent waiver of counsel.

Accordingly, Mr. Guertin asks this Court to immediately confirm that he may represent himself and to discharge Ms. Carpenter and Mr. Donnelly as counsel of record. To the extent the Court deems any further inquiry necessary under *Faretta* and Minn. R. Crim. P. 5.04, Mr. Guertin requests that the Court promptly conduct a Faretta hearing (waiver-of-counsel colloquy) *within the next few days* to formally verify the knowing and voluntary nature of his waiver on the record. This request is made on an urgent basis. As set forth in the accompanying motion to stay/vacate, the April 29, 2025 hearing in this matter failed to address Mr. Guertin's pending self-representation petition at all, and was instead diverted to a new Rule 20.01 competency evaluation – an evaluation that appears to have been ordered *solely in reaction to the content of Mr. Guertin's Motion to Dismiss*. Such a diversion not only trampled Mr. Guertin's Faretta rights, but also threatens to delay and derail the proceedings unjustifiably. Mr. Guertin is entitled to steer the course of his own defense, and he should not be subjected to further competency proceedings or any other obstruction aimed at preventing him from exercising his rights.

In summary, Mr. Guertin respectfully moves this Court to: (1) confirm that he has validly waived counsel and is proceeding pro se; (2) order the immediate discharge of Attorneys Carpenter and Donnelly; and (3) if the Court deems it necessary, conduct a prompt Faretta colloquy to place the

Add. 68

waiver on the record.  He further requests that the Court act on this Motion on the same expedited schedule set in his companion Emergency Motion—that is, hold the hearing or issue a written ruling within five (5) business days of filing.  Should the Court fail to do so, Mr. Guertin will deem the Motion denied and will seek immediate appellate relief, including a petition for an extraordinary writ under Minn. R. Civ. App. P. 120 and an emergency stay under Minn. R. Civ. App. P. 108.02.

## II.   BACKGROUND AND BREAKDOWN OF ATTORNEY-CLIENT RELATIONSHIP

### A   |   Mr. Guertin's Competency and Pro Se Filings

This case (No. 27-CR-23-1886) has been pending for over two years, during which time questions of Mr. Guertin's competency have repeatedly been raised and answered. Most recently, on April 3, 2025, after a full Rule 20.01 evaluation process and contested hearing, the Court issued an order finding Mr. Guertin competent to stand trial (*see Index 127*). This April 3 competency ruling should have cleared the way for Mr. Guertin to participate actively in his defense going forward. Indeed, once a defendant is found competent, he is entitled as a matter of law to make decisions about his case and to have his motions heard in the ordinary course. Following that ruling, Mr. Guertin immediately began exercising his right to direct his defense: between early April and mid-April 2025, he personally prepared and submitted numerous pro se filings, including the substantive motions and exhibits noted above. These filings cover complex legal issues (e.g., allegations of evidence tampering, prosecutorial misconduct, fraudulent evaluations, etc.) and cite numerous authorities. They evidence Mr. Guertin's ability to research the law, understand court procedures, and articulate coherent legal arguments. Notably, on April 21, 2025, Mr. Guertin filed his formal Petition to Proceed as Pro Se Counsel (*see Index 133*), a detailed document laying out the legal and factual basis for his self-representation request (the very request this motion now presses). In that petition, Mr. Guertin affirmed *in writing* his desire to waive counsel and proceed pro se, thereby satisfying the requirement of Minn. Stat. § 611.19 that any waiver of counsel be made in writing and signed by the defendant. He also affirmed that his waiver is made knowingly, intelligently, and voluntarily – with "eyes open" to the risks of self-representation – and he invoked his rights under *Faretta* and related authorities. In short, by

Add. 69

April 21, Mr. Guertin had done everything the law requires to invoke and perfect his right to represent himself.

## B   |   Breakdown in Communication and Trust with Court-Appointed Counsel

Unfortunately, the relationship between Mr. Guertin and his court-appointed public defenders (Ms. Carpenter and Mr. Donnelly) has completely broken down. From the time of their appointment, these attorneys have failed to provide meaningful advocacy or to adhere to Mr. Guertin's wishes for his defense. Mr. Guertin has repeatedly directed counsel to pursue specific strategies, file certain motions, and challenge the State's evidence – only to be met with silence, refusals, or outright opposition from his attorneys. The Court is respectfully referred to Exhibit A to Mr. Guertin's Petition (*see Index 133*), which is a series of detailed email communications in January 2025 between Mr. Guertin and Ms. Carpenter. In those emails, Mr. Guertin outlines a proposed legal strategy and asks his attorneys to file a motion to dismiss all charges with prejudice based on substantial grounds he identified (including egregious government misconduct and violations of his rights).

Mr. Guertin even cited relevant legal authorities in support of his request – for example, he pointed out favorable precedents such as *State v. Camacho*, 561 N.W.2d 160, 173 (Minn. 1997), *State v. Sabahot*, No. A10-2174 (Minn. App. Jan. 3, 2012), and *State v. Thompson*, 988 N.W.2d 149 (Minn. App. 2023), among others, to substantiate his arguments. These citations and the reasoning behind them were the product of Mr. Guertin's own research and clearly showed a legitimate basis for the requested motion. Yet, defense counsel ignored and stonewalled Mr. Guertin's requests. They neither filed the proposed motion nor gave any meaningful response or explanation. Instead, as the email thread reflects, counsel responded with dismissiveness and inaction. Ms. Carpenter essentially refused to engage with the legal merits raised by Mr. Guertin, and the matter was dropped against Mr. Guertin's wishes. Such conduct not only contravenes basic attorney-client communication standards, but it also violates counsel's ethical duties under the Minnesota Rules of Professional Conduct (see Minn. R. Prof. Conduct 1.2(a) requiring a lawyer to abide by the client's decisions concerning the objectives of representation, and Rule 1.4 requiring prompt communication with the client). If counsel honestly believed Mr. Guertin's proposed motion was frivolous or improper (and there is no indication of that here), the proper course would have been to discuss those concerns with Mr. Guertin, or to seek withdrawal.

Add. 70

Simply ignoring a client's central request in a serious felony case is unacceptable. This January 2025 episode was an early red flag indicating that Mr. Guertin's appointed lawyers were not willing to advocate zealously on his behalf.

### C    |    April 17, 2025 Hearing – Open Conflict on the Record

The simmering conflict between Mr. Guertin and his attorneys came to a head at a court hearing on April 17, 2025 before the Honorable Sarah Hudelston. At that hearing, Mr. Guertin was present and prepared to address his recently filed Motion to Dismiss with Prejudice (*see Index 131*). However, the Court indicated it would not hear Mr. Guertin's pro se motion so long as he was represented by counsel. This put Mr. Guertin in an impossible position – his critically important motion (which detailed pervasive misconduct in the case) was going to be "buried" unless he somehow supplanted his attorneys. In response, Mr. Guertin clearly and unequivocally asserted on the record that his attorneys work for him and are obligated to follow his chosen defense strategy. He made it known that he wanted his motion heard, and that if counsel refused to advance his arguments, he would have no choice but to represent himself.

Rather than supporting their client's position, Mr. Guertin's court-appointed counsel openly opposed him in front of the judge. In an extraordinary breach of loyalty, Mr. Donnelly actually argued *against* Mr. Guertin's interests during the April 17 hearing: he stated to the Court that he disagreed with the Court's April 3 competency finding (i.e. he expressed his belief that Mr. Guertin was not competent) and further indicated he disagreed with Mr. Guertin's motions and strategy. In doing so, counsel essentially joined the prosecution in portraying Mr. Guertin as delusional or misguided. This shocking stance by defense counsel poisoned the well for Mr. Guertin's efforts to proceed pro se – it signaled to the Court that even his own attorneys considered his motions baseless and his perspective unsound.

It is difficult to imagine a more glaring conflict: the client (Mr. Guertin) desperately wanted his motion to be heard and his rights to be respected, while his attorneys wanted the motion quashed and even questioned the client's sanity for bringing it. At that moment, for all practical purposes, Mr. Guertin had no counsel willing to advocate for him – his attorneys of record had positioned themselves in opposition to their client on a core issue (his competency and right to direct his defense). Under the Sixth Amendment, if an attorney openly undermines and contradicts the client's position in this manner, the client is effectively left without the assistance of counsel. The

Add. 71

Rules of Professional Conduct recognize that in such a scenario of fundamental disagreement, the attorney *must* withdraw if the client so requests (Minn. R. Prof. Conduct 1.16(a)(3)), and even permissively may withdraw if the representation has become unreasonably difficult or if the client insists on a course with which the lawyer has a fundamental disagreement (id. 1.16(b)(4), (6)). Here, however, Ms. Carpenter and Mr. Donnelly did not withdraw on April 17 – despite the obvious breakdown – presumably because their continued presence on the case would prevent Mr. Guertin from being heard. By staying on the case only to thwart Mr. Guertin's aims, counsel created an untenable situation. The April 17 hearing ended with the Court handing Mr. Guertin a blank "Form 11 – Petition to Proceed Pro Se" (a standard questionnaire for self-representation requests) and scheduling a follow-up hearing on April 29, 2025 specifically to address Mr. Guertin's desire to proceed pro se. The Court made clear that Mr. Guertin's motions would not be entertained until his representation status was resolved. Mr. Guertin left the April 17 hearing having effectively discharged his attorneys in substance (he stated on record that he no longer wished for their representation if they would not follow his directives), and he immediately proceeded to formalize that in writing by filing his Petition to Proceed Pro Se on April 21.

### D | April 29, 2025 Hearing – Petition Ignored, New Competency Order Issued

Despite the expectations set on April 17, the subsequent hearing on April 29, 2025 did not vindicate Mr. Guertin's rights – instead, it resulted in further obstruction. At the April 29 hearing, Mr. Guertin's Petition to Proceed Pro Se (and the discharge of counsel) was supposed to be addressed. Instead, the proceeding was abruptly steered in a different direction: the Court, at the prosecution's urging, ordered a new Rule 20.01 competency evaluation of Mr. Guertin *without* ever hearing or ruling on the pending self-representation request. From Mr. Guertin's perspective, this development was wholly improper and punitive. The trigger for the renewed competency evaluation appears to have been the content of Mr. Guertin's Motion to Dismiss (*see Index 131*) – a motion which details serious allegations of fraud and misconduct by the State and others. It seems that because Mr. Guertin dared to assert a "grand conspiracy" (backed by evidence) in his dismissal motion, the reaction by the Court and counsel was to question his sanity rather than to address the substance of his claims. Mr. Guertin maintains that everything in his motion to dismiss is grounded in fact and law (indeed much of it is documented by exhibits and prior court records). But even if the Court found the allegations unusual or difficult to believe, that is *not* a valid basis to summarily subject Mr. Guertin to another competency

Add. 72

Filed in District Court
State of Minnesota
5/7/2025 2:07 PM

examination – especially mere weeks after he was adjudicated competent. A defendant's vigorous accusations against the State, or his exposure of irregularities in the process, do not equate to incompetence; if anything, they indicate he is actively engaged in his defense. The April 29 decision to initiate a new Rule 20 evaluation (essentially delaying the case and sidelining Mr. Guertin's motions) violated Mr. Guertin's rights in multiple ways. It ignored his *Faretta* request entirely (the Court did not even inquire into his desire to represent himself), and it appeared to leverage the competency process as a means to delay or avoid grappling with Mr. Guertin's serious allegations. Mr. Guertin objected to this turn of events and has now filed the Emergency Motion to Stay and Vacate that very order, arguing that the order is unlawful and must be immediately halted. For purposes of this Motion to Confirm Pro Se Status, the April 29 hearing underscores why urgent action is needed: Mr. Guertin's ability to control his defense is being thwarted by procedural maneuvers (like unwarranted competency re-exams) and by counsel who do not support his goals. This Court should correct course by granting Mr. Guertin the autonomy the Constitution guarantees him.

In sum, the factual record establishes that Mr. Guertin's relationship with his court-appointed lawyers has irretrievably broken down and that he has the competence and capability to represent himself. Far from enhancing his defense, the continued involvement of Ms. Carpenter and Mr. Donnelly is now a direct obstacle to justice: they have opposed Mr. Guertin's motions, questioned his competence without basis, and aligned themselves with the prosecution's interests to the detriment of their client. Under these circumstances, Mr. Guertin's invocation of his right to self-representation is not only justified, but imperative to ensure a fair process. The Court should therefore promptly formalize Mr. Guertin's pro se status and relieve current counsel of their duties.

### III.    DEFENDANT'S RIGHT TO SELF-REPRESENTATION UNDER CONSTITUTIONAL AND MINNESOTA LAW

Both the United States and Minnesota Constitutions guarantee a criminal defendant's right to represent himself when he knowingly and voluntarily waives the right to counsel. The U.S. Supreme Court in *Faretta v. California*, 422 U.S. 806 (1975), recognized that the Sixth Amendment implies a personal right of the accused to defend himself. The Court held that a State may not force a lawyer upon a defendant who validly waives counsel, stating: "The right to

Add. 73

defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant who must be free personally to decide whether in his particular case counsel is to his advantage." *Id.* at 834-35. The choice of self-representation may sometimes be foolish, but it must be honored out of "that respect for the individual which is the lifeblood of the law." *Id.* at 834 (internal quotation omitted). In short, once a defendant clearly asserts the right to proceed without counsel and the court ensures the waiver is knowing and intelligent, the defendant "*must be allowed* to represent himself" (*Faretta, supra* at 821). The denial of this right is structural error not subject to harmless-error analysis because it affects the framework of the trial itself. Minnesota courts fully embrace these principles. Minnesota Rule of Criminal Procedure 5.04, subd. 1(4) provides the procedure and mandates specific on-the-record advisories before a waiver of counsel can be accepted in a felony case. In particular, the court should ensure the defendant understands the nature of the charges, the possible punishments, potential defenses, mitigating circumstances, and "all other facts essential to a broad understanding of the consequences" of proceeding without counsel[1]. Minnesota has also codified in statute the requirement that a felony defendant's waiver of counsel be executed or acknowledged formally: Minn. Stat. § 611.19 provides that whenever a defendant waives the assistance of counsel, the waiver "*shall in all instances be made in writing, signed by the defendant,*" or if the defendant refuses to sign, the court must make a record of the refusal. The purpose of these rules is not to obstruct the defendant's choice, but to ensure it is made with eyes open. Indeed, even if a waiver does not strictly comply with the preferred procedure, it is deemed valid so long as the record as a whole shows a knowing, intelligent, voluntary relinquishment of counsel. Once that threshold is met, the defendant's decision to represent himself must be respected. The Minnesota Supreme Court has repeatedly instructed that a valid self-representation waiver must be honored by the trial court, even if the court subjectively believes the defendant is making a poor decision. Minnesota courts "should grant self-representation, even if the decision is foolish, where the waiver is clear, knowing and voluntary." *State v. Camacho*, 561 N.W.2d 160, 173 (Minn. 1997). See, e.g., *State v. Richards*, 456 N.W.2d 260, 263 (Minn. 1990) (emphasizing that the right of self-representation embodies "bedrock concepts of individualism and personal autonomy" such that its wrongful deprivation is not subject to harmless error). In Mr. Guertin's case, there is no doubt that his request is clear and that he is

---

1   A24-1149 at 6 | https://cases.justia.com/minnesota/court-of-appeals/2025-a24-1149.pdf

Add. 74

aware of the dangers and disadvantages of self-representation – he has explicitly so affirmed in his filings, and his conduct shows he is proceeding with eyes open.

Applying the law to the facts here leads to one conclusion: Mr. Guertin has an unconditional right to represent himself, which the Court is obliged to uphold at this juncture. Mr. Guertin has satisfied the written waiver requirement by filing his signed petition (*see Index 133*) declaring his wish to proceed pro se. He is willing to also state his waiver on the record (and indeed attempted to do so on April 29 before being cut off by the competency issue). The Court can readily observe that Mr. Guertin understands the charges against him (he has been living with this case for over two years), is intimately familiar with the facts, and has shown understanding of the legal process through his filings. There is simply no valid legal basis to deny Mr. Guertin's Faretta right. Concern that a defendant is making a mistake or that proceedings may be slower or more awkward with a pro se defendant are *not* grounds to deny self-representation. Nor can speculative concerns about competency override a recent actual adjudication of competence – unless new evidence of incapacity emerges, which it has not. To the contrary, Mr. Guertin's proactive legal work demonstrates his lucidity. The law presumes a competent defendant may waive counsel if proper procedure is followed. Mr. Guertin asks only that the Court follow the law: acknowledge his waiver and allow him to proceed without the hindrance of unwanted counsel.

## IV.    IMMEDIATE NEED FOR RELIEF AND REQUEST FOR FARETTA HEARING

Given the history above, Mr. Guertin's situation is urgent. Each day that his request to go pro se remains ungranted is a day in which his case is effectively in limbo and his rights are curtailed. As of now, despite his clear assertion of the right, Mr. Guertin is *de facto* still represented by counsel with whom he has no communication or trust, and a new round of competency proceedings looms – proceedings that Mr. Guertin contends are baseless and retaliatory. It is crucial that the Court act swiftly to restore proper order: Mr. Guertin must be given control of his defense, and only then can the case proceed on the merits (including addressing the Motion to Dismiss and any other pending matters). Time is of the essence for several reasons:

Add. 75

Filed in District Court
State of Minnesota
5/7/2025 2:07 PM

## A  |  Continuing Prejudice

Mr. Guertin is currently caught in a procedural trap. Because he is still officially represented by counsel, the Court and clerk's office have refused to accept or hear further pro se motions from him, yet his counsel have made clear they will not advocate his positions. This effectively muzzles Mr. Guertin and leaves him without any advocate at all. Every day that passes with this arrangement is a denial of Mr. Guertin's right to be heard and to defend himself. The Court's April 29 decision to order a competency re-evaluation (now stayed pending further review) only exacerbates the delay. Mr. Guertin has important substantive arguments (such as those in his dismissal motion) that he is trying to bring before the Court. He cannot litigate those issues until his pro se status is confirmed. Swift action on this motion will prevent further prejudice and ensure that Mr. Guertin's case can move forward under his direction.

## B  |  Faretta Hearing

If the Court has any remaining concerns about Mr. Guertin's understanding of the consequences of self-representation, those can be addressed in a Faretta colloquy, which Mr. Guertin welcomes. Mr. Guertin is prepared to answer the Court's questions to confirm on the record that his waiver of counsel is knowing and voluntary. He has already articulated his understanding in writing (in the Petition) and has past courtroom experience in this case (through multiple hearings) that has given him insight into the challenges ahead. A brief hearing for this purpose can easily be held within the next few days. Mr. Guertin requests that the Court schedule such a hearing *immediately* (and no later than 5 business days from now) to formally inquire into his waiver and then grant the motion, or to submit an official order into the record granting the request without a hearing if Guertin's petition to proceed as pro se counsel already satisfies the terms. Notably, at the April 17 hearing, Judge Hudelston appeared inclined to do exactly this (hence providing the Form 11 and setting the matter for April 29). The opportunity was simply lost when the April 29 hearing was derailed. There is no reason to delay a Faretta inquiry any further – the issue is ripe and critical to resolve before any other steps (such as competency evaluations or trial preparations) occur.

## C  |  Avoiding Unnecessary Competency Litigation

Granting this motion now will also clarify the path forward regarding the disputed Rule 20.01 competency order. If Mr. Guertin is allowed to proceed pro se, he can directly address the

Add. 76

Court regarding any claimed competency concerns, and the Court can judge his lucidity firsthand in colloquy. Often, a defendant's ability to articulate his position in a Faretta hearing itself demonstrates competence. Here, Mr. Guertin believes the renewed Rule 20 order was unfounded and resulted from misunderstanding his filings. By hearing from Mr. Guertin directly in a Faretta context, the Court may find that further competency proceedings are truly unnecessary. In any event, formally confirming Mr. Guertin's pro se status will ensure that any future proceedings (be it motions, hearings, or even a competency re-examination if it persists) will be handled with Mr. Guertin having the primary voice, rather than through counsel who do not represent his views.

## D  |  Preservation of Appellate Rights

If the Court does not promptly address Mr. Guertin's self-representation request, Mr. Guertin will have no choice but to seek relief from the appellate courts. The Minnesota Rules of Civil Appellate Procedure provide mechanisms for extraordinary relief when a fundamental right is being denied or an action unreasonably delayed. Mr. Guertin is prepared to file a petition for a writ of mandamus and/or other extraordinary writ under Rule 120, as well as to seek emergency intervention under Rule 108 (such as a writ of prohibition to halt the competency proceedings and compel a Faretta ruling), should this Court fail to act by the timeline requested. It is in the interest of judicial economy and justice for this Court to resolve the issue now, rather than burdening the appellate courts with a dispute that squarely belongs in the trial court at this stage. Mr. Guertin sincerely hopes such appellate action will not be necessary and that this Court will uphold his rights without further prodding.

## E  |  Conclusion

For all these reasons, immediate relief is warranted. Mr. Guertin emphasizes that he is not seeking delay – in fact, he is seeking the opposite: to eliminate the delays and distractions that have plagued this case (many of which, in his view, have been artificially created by the State's tactics and counsel's inaction). By confirming his pro se status and removing conflicted counsel, the Court will empower Mr. Guertin to bring his case to a resolution on the merits. The Court will also send a clear message that Mr. Guertin's constitutional rights are being respected, which may alleviate some of the tension that has arisen from his feeling unheard in the process to date.

Add. 77

# V.  RELIEF REQUESTED

**WHEREFORE**,

Mr. Matthew David Guertin respectfully requests that this Court enter an Order granting the following relief:

1. **Confirming Pro Se Status**

   A declaration that Mr. Guertin has knowingly and voluntarily waived his right to counsel and confirming that he may proceed pro se in Case No. 27-CR-23-1886 henceforth. The Order should acknowledge that Mr. Guertin himself is now acting as his own counsel of record.

2. **Discharge of Court-Appointed Counsel**

   An order discharging Attorneys Raissa Carpenter and Emmett Donnelly as defense counsel in this case, effective immediately. Given the complete breakdown in the attorney-client relationship and the ethical conflicts described above, their continued involvement (even as standby counsel) would be counterproductive. Mr. Guertin specifically requests that these attorneys not be appointed as standby or advisory counsel (see Minn. Stat. § 611.26, subd. 6 (stating that a public defender may be appointed as standby counsel *with the defendant's consent*)). Mr. Guertin does not consent to Ms. Carpenter or Mr. Donnelly serving in any standby capacity. If the Court deems it necessary to appoint standby/advisory counsel going forward, Mr. Guertin requests that such counsel be an independent attorney with no prior involvement in this case and no stake in the matters that have been in dispute (i.e., someone who will truly act in an advisory role, not as an opponent of Mr. Guertin's strategy). Mr. Guertin also reserves the right to waive standby counsel as well, preferring to maintain full control over his defense if the Court will allow.

3. **Faretta Waiver Hearing (If Needed)**

   Defendant requests that, if the Court believes additional oral record is necessary to confirm his knowing and voluntary waiver of counsel, it set (or convert an already-scheduled proceeding into) a Faretta colloquy to be held within five (5) business days of this filing.  Mr. Guertin is prepared to answer questions about the charges, possible penalties, and the challenges of self-representation.  If the Court finds the existing written

Add. 78

record sufficient, he asks that an order granting pro se status be entered immediately, without a hearing.

### 4.    Scheduling and Deadlines

Consistent with the companion Emergency Motion to Stay and Vacate, Mr. Guertin respectfully requests that the Court (a) conduct the Faretta hearing, or (b) issue a written ruling on this Motion, **no later than five (5) business days after filing**.  If, by the close of the fifth business day, the Court has neither held the hearing nor entered an order granting the requested relief, Mr. Guertin will deem the Motion denied and will seek immediate appellate intervention—specifically, a petition for an extraordinary writ under Minn. R. Civ. App. P. 120 and a motion for stay under Minn. R. Civ. App. P. 108— together with a renewed request for certification under Minn. R. Crim. P. 28.03. Addressing both this Motion and the Emergency Motion on the same accelerated schedule will conserve judicial resources and avert unnecessary appellate litigation.

### 5.    Further Relief

Any other relief that the Court deems just and appropriate to effectuate Mr. Guertin's rights. This may include an order that Mr. Guertin's previously filed pro se motions (*e.g., see Index 131, Motion to Dismiss with Prejudice*) be placed on the calendar for hearing or at least taken under advisement once his pro se status is confirmed. Mr. Guertin stands ready to litigate those motions on their merits as soon as he is allowed to do so in his own capacity.

## VI.   CONCLUSION

For all the foregoing reasons, Mr. Guertin prays that this Court grant his motion and promptly enter an order confirming that he may represent himself and discharging his court-appointed counsel. This relief is necessary to preserve Mr. Guertin's constitutional rights and to ensure the integrity of these proceedings. Mr. Guertin has shown that he is competent, determined, and capable of presenting his case. He acknowledges that proceeding pro se is a weighty responsibility, but it is one he knowingly chooses because, in his judgment, no counsel is better than conflicted counsel. As the U.S. Supreme Court observed in *Faretta*, *"[i]t is the defendant, after all, who suffers the consequences if the defense fails."* Here, Mr. Guertin is

Add. 79

prepared to accept that responsibility. He simply asks to be given the agency and dignity to steer his own defense, as the Constitution guarantees. He respectfully asks this Court to honor that fundamental right without further delay.

**Dated:  May 7, 2025**                              **Respectfully submitted,**

                                                             _/s/ Matthew D. Guertin_

                                                             Matthew David Guertin
                                                             ***Defendant Pro Se***
                                                             4385 Trenton Ln. N 202
                                                             Plymouth, MN  55442
                                                             Telephone: 763-221-4540
                                                             MattGuertin@protonmail.com
                                                             www.MattGuertin.com

Add. 80

# VII.   CERTIFICATE OF SERVICE

(Minn. R. Crim. P. 33.02; Minn. R. Civ. App. P. 125.04)

I, Matthew David Guertin, certify under penalty of perjury pursuant to Minn. Stat. § 358.116 that on May 7, 2025, I served the following document(s):

- DEFENDANT'S MOTION TO CONFIRM PRO SE STATUS AND DISCHARGE COURT APPOINTED COUNSEL

by filing and electronically serving them through the Minnesota Odyssey E-File and E-Serve System (EFS).  E-service via EFS constitutes service under Minn. R. Crim. P. 33.04, and EFS automatically generates proof of service to all registered recipients.

**Recipients served:**

- Mawerdi Hamid, Assistant Hennepin County Attorney

- Raissa Carpenter, Assistant Public Defender

- Emmett Donnelly, Assistant Public Defender

No paper copies were mailed because all counsel of record are registered EFS users.

Dated:  May 7, 2025                     Respectfully submitted,

                                         _/s/ Matthew D. Guertin_

                                        Matthew David Guertin
                                        **_Defendant Pro Se_**
                                        4385 Trenton Ln. N 202
                                        Plymouth, MN  55442
                                        Telephone: 763-221-4540
                                        MattGuertin@protonmail.com
                                        www.MattGuertin.com

Add. 81