A25-0882
**STATE OF MINNESOTA
IN COURT OF APPEALS**

| | |
|---|---|
| In re Matthew David Guertin, | District Court Case: 27-CR-23-1886 |
| Petitioner | Court Order Date: April 29, 2025 |
| v. | **ADDENDUM<br>VOLUME IV of XVI<br>ADD. 132 - ADD. 181** |
| State of Minnesota, | |
| Respondent. | Judge: Hon. Sarah Hudleston |

<u>Contents</u>                                                                                     <u>Page</u>

**<u>March 05, 2025 - Contested Competency Hearing Transcript (pp 16-61),</u>**

………………….……………………………….…………………………… Add. 132-177

**<u>April 03, 2025 - Findings & Order: Defendant Competent to Proceed,</u>**

Index 127……….………..……………………….…………………………… Add. 178-181

16

```
 1    August 1st hearing.
 2          THE COURT:  Okay.  And the 80 photos that Dr. --
 3    or that Mr. Biglow sent to you, what were they of?
 4          THE WITNESS:  They were of my -- of the police
 5    photographs of the incident that took place on
 6    January 21st, 2023.
 7          THE COURT:  That was from outside, inside, what?
 8          THE WITNESS:  I believe outside and inside, and
 9    it was only the -- the logical very simplistic way of
10    putting the -- the connections of it is that if you
11    consider that -- those 80 photographs Set A, well,
12    when I submitted my April 4, 2024 motion to compel
13    discovery in which I conducted a review of those --
14          (WHEREUPON, connection to the Crestron was
15    lost.)
16          THE COURT:  Back on the record.
17          We lost the Crestron connection to the court
18    reporter during some questioning about the photographs
19    being inside or outside.  I'll try to summarize.  I'm
20    not trying to put words in your mouth, sir, and you
21    can go through and repeat everything you said about
22    that.  But as I understand it you're concerned that
23    the -- you feel that the ratio of some of the photos
24    was not consistent so it indicated to you that some of
25    the photos were cropped, and you believe that, for
```

Add. 132

17

1    instance, a photograph of your medicine cabinet
2    focused unnecessarily and prejudicially on just your
3    prescription medications and didn't capture everything
4    that was in the medicine cabinet to include vitamins
5    and that sort of thing and that that was to put you in
6    a bad light.
7        And that you also felt that photographs, say, of
8    your kitchen didn't properly capture the granite
9    counters, some tarp, apparently there's some work
10   being done.
11       Is that an accurate summary?
12       THE WITNESS:  Yeah, it's excluding relevant
13   context.  And then just as my background I'll also say
14   that I -- I was trained in Crestron systems in
15   California.  My background is in digital media and --
16       THE COURT:  So you didn't fix all the problems
17   then?
18       THE WITNESS:  No, I'm just saying --
19       THE COURT:  So it's your fault is what you're
20   saying?
21       THE WITNESS:  I'm saying that I have a -- my
22   entire background is based in digital and interactive
23   media --
24       THE COURT:  Okay.
25       THE WITNESS:  -- and pixels and photographs and

Add. 133

18

1    video, and while we're on the topic of Crestron I
2    might as well throw it in.
3        So the context that was excluded also includes,
4    for instance, a bunch of books on the floor related to
5    corporate startups and that are in all the other
6    photos but were excluded.  So there's just a general
7    false narrative.
8        But even without the false narrative, or let's
9    say there is the false narrative, that's my theory on
10   why, regardless if the 20 photographs remain that have
11   an inconsistent aspect ratio.  So those 20 images have
12   now been retroactively manipulated to fit into the 16
13   by 9 aspect ratio, and these are in the Hennepin
14   County One Drive official discovery system now, and
15   those are the images that are presented in the first
16   three exhibits that I submitted into the record prior
17   to this trial.  Those are all official so now they've
18   squeezed them and manipulated them to cover up the
19   previous tampering, so that's shows some rather --
20   that shows intent.  It shows effort.
21       THE COURT:  Okay.  With all due respect, I'm not
22   looking at court exhibits or trial exhibits, what I'm
23   focused on is competency and you believe --
24       THE WITNESS:  Yep.
25       THE COURT:  -- as I understand it that the

Add. 134

19

1    photos were intentionally doctored to make you look
2    bad and to make you look incompetent, is that --
3            THE WITNESS:  Yes, by --
4            THE COURT:  Okay.
5            THE WITNESS:  -- excluding relevant context.
6            THE COURT:  Okay.  Anything else that you think
7    I need to know about the photos with regard to
8    competency?
9            THE WITNESS:  Just that -- that the -- that was
10   that thing that I had that there's multiple -- there's
11   multiple direct statements in the second Rule 20 exam
12   submitted to the Court on January 11, 2024 by Dr. Adam
13   Milz that contains multiple statements relating to my
14   claim about fraudulent discovery materials, and
15   actually used as evidence of why I need to be placed
16   on powerful antipsychotic drugs to make me well.
17           Just as there was also in the Dr. Cranbrook's
18   third Rule 20 exam the same exact statements eluding
19   to my belief that there's fraudulent discovery
20   materials as a reason for why I'm psychotic and need
21   to be placed on powerful antipsychotic drugs against
22   my will.
23           And so if there is indeed now substantiated and
24   irrefutable claims that cannot easily be discredited
25   about exactly that, then I would say that that is a

Add. 135

20

1    rather compelling element of my competence, that is

2    all.

3            THE COURT:  Okay.  So the -- you believe that

4    the psychologist who evaluated you discounted your

5    concerns about the photos and used that to find that

6    you were incompetent without understanding that you're

7    right about the photos, I mean, is that --

8            THE WITNESS:  Yes, and --

9            THE COURT:  -- the gist of it?

10           THE WITNESS:  There's that and then there's the

11   origination of before there was the discovery issues

12   of the entire origination of the original Rule 20 exam

13   by Dr. Jill Rogstad that was submitted to the Court on

14   March 10th of 2023 actually excludes the police report

15   that was filed before it.  It's -- I showed up to my

16   very first interaction with the court with labeled

17   exhibits from the very beginning and then it's not --

18   that evidence isn't considered and it is never

19   included in any of the Rule 20 exams, but especially

20   the first one where I have substantiating evidence of

21   trying to get help for the claims that were deemed

22   incompetent and that basically they're implausible

23   claims that I made, right, but so there's a -- there's

24   a --

25           THE COURT:  I lost you there.

Add. 136

21

1          THE WITNESS:  There's a police report of the
2     fraud that I was claiming which was never factored in
3     and which was made to look like there were statements
4     that I was making that were crazy, but they're
5     directly verified in the police report that I provided
6     that's never mentioned.  So she didn't include
7     relevant evidence that she did document as reviewed in
8     the initial Rule 20, but it wasn't submitted or
9     covered in the actual exam in any relevant way.  So it
10    seems to be intentionally excluded.
11         And then the other substantiating or big claim
12    was that I believe that I'm -- my claim that I'm an
13    engineer was claims of me being grandiose, even though
14    there's multiple high profile public -- like
15    publications that say I'm credited as an engineer for
16    very high-profile projects for the King of Saudi
17    Arabia and for the main stage at Coachella in 2019.
18         So she's using -- she used relevant claims of
19    mine that -- that I did in fact substantiate prior to
20    the hearing on July 7th which resulted in the
21    July 13th court order saying that I was incompetent.
22    So that was verified and she says that my -- my
23    prowess with technology is part of my delusions.  My
24    perceived achievements are part of my delusions, even
25    though I provided her with mattguertin.com, which is

Add. 137

22

1   my website, which has plenty of verifiable claims on

2   it.

3        And then the main belief is that I believe that

4   Netflix and Microsoft were involved in the theft of my

5   patent, or basically it's eluded in the report that

6   it's crazy for me to even think Microsoft or Netflix

7   would know who I am, and now my name is on top of a

8   Netflix patent at the very top above everyone's with

9   my patent listed on it as prior art for a patent that

10  I would argue shouldn't have been granted because my

11  patent was 12 days prior.  They just happened to --

12  Netflix just happened to file a duplicate patent

13  application just 12 days after I filed mine.

14       And so those are all claims that were made that

15  have now been retroactively post facto substantiated.

16  So I would say that's rather compelling.

17       THE COURT:  Let me -- I'm going to ask a

18  question of counsel, I mean, you're challenging right

19  now the original determination back in July of 2023,

20  aren't we --

21       THE WITNESS:  Yeah, I'm challenging all of it.

22       THE COURT:  Well, I'm asking your attorneys,

23  aren't we well past the time to challenge that or even

24  the '24 determination?

25       MR. DONNELLY:  We would be challenging the

23

1    present opinion.

2          THE COURT:  Right.

3          MR. DONNELLY:  And so I think what Mr. Guertin

4    is getting to is that they've all built on each other

5    and so he -- we're -- he's tracing back the present

6    opinion of incompetency to the original opinions.

7          THE COURT:  Okay.  Well, with all due respect,

8    Dr. Cranbrook's current order or report doesn't

9    actually say he's incompetent, it just says he's still

10   suffering from mental illness.  Okay.

11         Was there a reason, sir, why the July 13th, '23

12   finding of incompetence was not challenged at that

13   time?

14         THE WITNESS:  Because I had ineffective counsel

15   and that's why I replaced Bruce Rivers.

16         THE COURT:  Okay.  And the January 17th, 2024?

17         THE WITNESS:  Because I had ineffective counsel

18   because he refused to -- I didn't even get the 2020 --

19   I didn't even get the January 11th until I filed the

20   federal lawsuit.  So I was asking for it, there was

21   multiple filings and documentation that can prove

22   that, and I wasn't provided with the discovery or the

23   January 2024 Rule 20 exam until July 16th of 2024

24   despite multiple attempts at receiving it, documented

25   attempts from Bruce Rivers.

Add. 139

24

1          THE COURT:  Okay.  So I understand you're -- the
2    two concerns -- the two primary concerns that you've
3    raised now are that the photos were doctored in a way
4    to make you look bad?
5          THE WITNESS:  Correct.
6          THE COURT:  And secondly your experience with
7    electronics and your technical competence was
8    improperly questioned, that whatever --
9          THE WITNESS:  Yeah, me saying --
10         THE COURT:  -- information --
11         THE WITNESS:  Me saying I'm an engineer was used
12   as evidence of me being grandiose because he claims
13   he's an engineer, well, I am.
14         THE COURT:  Okay.  Are you an engineer?
15         THE WITNESS:  Not a licensed engineer but I'm --
16         THE COURT:  Well, okay, so did you --
17         THE WITNESS:  You don't have --
18         THE COURT:  -- go to engineering school?
19         THE WITNESS:  No.
20         THE COURT:  Did you get an engineering degree?
21         THE WITNESS:  No.
22         THE COURT:  So you've worked in the area and
23   built up your expertise that way?
24         THE WITNESS:  I'm credited as an engineer in
25   multiple high-profile publications.

Add. 140

25

1          THE COURT:  What publications would you --
2          THE WITNESS:  PLSN for one, I -- I was done with
3      a one-hour live interview for the BlackTrax computer
4      system that was used for live projection mapping of a
5      50' Falcon I designed and engineered that was puppeted
6      by 24 people and was put on for a UNESCO World
7      Heritage event at Diriyah in Riyadh, Saudi Arabia in
8      November of -- or November of 2019.  And that was
9      broadcast to millions of people on NBC and it was
10     attended by all members of the Saudi royal family
11     including the prince and the king and it was
12     successful.
13         THE COURT:  Okay.  And how long have you worked
14     in that kind of sphere?
15         THE WITNESS:  Well, my -- since 2008 when I
16     started getting into production design in Minneapolis
17     where I worked at the old Quest Nightclub which later
18     became Epic Nightclub.  Prior to that it was Prince's
19     Glam Slam.  So I was the main lighting designer there,
20     and that's kind of where I cut my teeth, so to speak.
21     My interest has always been in lighting.  And then
22     I --
23         THE COURT:  I'm sorry, did you say 2008 or --
24         THE WITNESS:  2008 I was --
25         THE COURT:  Okay.

Add. 141

26

1          THE WITNESS:  -- became the main LD, I did the
2    main LD for the Republican National Convention that
3    was in town just about around the time that I started.
4    And then in 2014 I had the opportunity to go work for
5    my dream job, which was lots of people's dream job,
6    which was V Squared Labs for Vello Virkhaus who's been
7    in multiple publications including *Rolling Stone* and
8    he's well known in the industry.
9          I had no guarantees of nothing, I just had the
10   opportunity so I gave away a bunch of stuff and packed
11   a trailer up, and now I realize in hindsight that I
12   was that guy that was trying to chase a dream, but at
13   the time there was, obviously, no -- it wasn't a dream
14   because I knew it was going to happen basically.
15         And that's where I was working until 2020.  I
16   spent 70 days in Vietnam installing of nightclub.  I
17   went on multiple projects where I was lying around the
18   world with Pelican cases, tons of logistical -- tons
19   of logistics and needing to have every single piece
20   with you to make sure the project happened basically,
21   like there's no second chance to order a new -- a new
22   fiberoptic cable when you're in Vung Tau, Vietnam.
23         So -- And I basically oversaw what a lot of
24   people in the industry would consider crazy projects
25   or crazy for taking on, and I successfully completed

27

1    every single one and never had a failure the entire
2    time, which includes main stage Coachella and multiple
3    events that were seen and broadcast to millions of
4    people live.
5        THE COURT:  And that's, obviously, something I
6    would fail at so --
7        THE WITNESS:  And that's all on my website at
8    mattguertin.com.
9        THE COURT:  Okay.  We have people who can be
10    very, very successful and yet still have mental
11    illness or be incompetent to represent themselves or
12    be incompetent to be tried for criminal charges.
13    They're not mutually exclusive, they're not overlap,
14    okay?
15        When it comes to competence what we basically
16    look at is do you understand the nature of the charges
17    against you.  Are you able to rationally consult with
18    your attorneys to listen to them, to engage with them
19    understanding that they have a role to play.  And then
20    if you are competent if you wish to discharge your
21    attorneys are you in a position to represent yourself
22    basically.
23        Can you articulate for me your understanding of
24    the charges against you?
25        THE WITNESS:  Yes, I'm charged with, what is it,

Add. 143

28

1    reckless discharge of a firearm within a municipality
2    and three counts of possession of a gun without a
3    serial number.  And those three charges are currently
4    awaiting a decision within the Minnesota U.S. Supreme
5    Court for the case *Vagle v. Minnesota* that's A23-0863.
6         THE COURT:  Okay.  And do you know what level
7    charges those are --
8         THE WITNESS:  Felonies.
9         THE COURT:  -- whether they're -- I'm sorry?
10        THE WITNESS:  Felonies.
11        THE COURT:  Okay.  And do you know what a felony
12   means?
13        THE WITNESS:  Felony means that it's punishable
14   by one year and one day or more.
15        THE COURT:  Okay.  Have you been able to talk
16   with your attorneys about kind of the legal issues on
17   how a case is presented?
18        THE WITNESS:  Yeah, I understand how a case is
19   presented.
20        THE COURT:  Okay.  Can you -- I'm not asking you
21   to go into like tremendous detail, but can you outline
22   for me how you think a criminal case proceeds.
23        THE WITNESS:  A criminal case proceeds to -- the
24   basic understanding is that it proceeds to court and
25   you have an opportunity to most likely have a plea

Add. 144

29

1    bargain based on talking to the prosecution so

2    there's no -- there's no guarantee or -- on my part or

3    whatever that it would have to go to trial

4    necessarily.

5          THE COURT:  Okay.

6          THE WITNESS:  And then based upon that it can go

7    to trial where I would have a chance to argue my case

8    in front of a jury of my peers and call witnesses to

9    the stand.

10          THE COURT:  Okay.  And you mentioned the

11   prosecution or the State, are they for you or against

12   you in that case?

13          THE WITNESS:  The prosecution?

14          THE COURT:  Yeah.

15          THE WITNESS:  They're against me.

16          THE COURT:  Okay.  And I'm -- You might think

17   I'm asking very simple questions but they are the

18   basic questions regarding competency, okay?

19          THE WITNESS:  Yeah.

20          THE COURT:  And do you understand that it's up

21   to you whether or not you would agree to any kind of a

22   plea deal with the State, any plea agreement?

23          THE WITNESS:  Yeah, it's always up to me

24   technically.

25          THE COURT:  Okay.  If you take it to trial you

Add. 145

30

1      mentioned that it would most likely be with a jury,

2      you could elect to have a judge trial, have a judge

3      decide it without a jury; do you understand that?

4              THE WITNESS:  I -- Yeah, now, I mean.

5              THE COURT:  Okay.  I mean, just so you know

6      that's a power that you have, the State can't decide

7      that.

8              THE WITNESS:  Yeah, I understand that that's --

9      ultimately all decisions come down to me.

10             THE COURT:  Okay.  Do you believe that you're

11     able to talk in a rational basis with your attorneys

12     about how to approach the case and everything?

13             THE WITNESS:  Yeah.

14             THE COURT:  Okay.

15             THE WITNESS:  I -- I have more to offer, if I

16     can?

17             THE COURT:  I'm sorry?

18             THE WITNESS:  I said I have more to offer if I

19     can?

20             THE COURT:  I'm sorry, I didn't --

21             THE WITNESS:  Oh, I have more to offer if I can,

22     I'd --

23             THE COURT:  Like what?

24             THE WITNESS:  Like my whole -- my whole reason

25     for this and for what's taking place is that

Add. 146

31

```
1       regardless of whatever my claims are regarding
2       fraudulent discovery, et cetera, is that this has been
3       dragging on for two years so far, and regardless of
4       whether or not there's competent whatever or not it's
5       like I want -- I want some kind of resolution to this.
6       And that's what I feel that I've been deprived of, and
7       that's why I am challenging the competency because
8       even if it resulted in something that wasn't
9       necessarily a hundred percent win for me that it would
10      still have closure or would be able to not have this
11      continuing process of mental health which is
12      completely subjective, in my opinion.  Mental health
13      is completely subjective versus, okay, here's --
14      here's what you have this and this and this and then
15      you're done, it's set in stone.  Whereas this -- this
16      non -- this nonstop to make mental health stuff is
17      just like, oh, he's -- it's completely subjective
18      whereas the other path is rules.
19              THE COURT:  Sure, and there's certainty there.
20              THE WITNESS:  Yeah, that's what I -- this is --
21      that's the part that is bothering me so much is the
22      subjective nature of this and the nonstop never ending
23      aspect of it, like, I want closure.  I want to be able
24      to regardless of what happens wrap this up and put it
25      behind me.
```

Add. 147

32

```
 1            THE COURT:  Sure, and I -- There is appeal to
 2      that, I understand.
 3            In looking -- I had another question but I was
 4      trying to listen intently to what you were saying and
 5      I lost my next question there.
 6            THE WITNESS:  That means it was good; right?
 7            THE COURT:  Well, I'm not going to comment on
 8      that, I was following what you were saying and I just
 9      wanted to make sure.  I'm blanking on what my next
10      question was going to be.
11            Let me see if Mr. --
12            MR. DONNELLY:  I have a couple --
13            THE COURT:  Yeah, let me have Mr. Donnelly jump
14      in.
15   Q  (By Mr. Donnelly, continuing)  One of the things that
16      you mentioned was a psychiatrist in California, has the
17      name come back to you at all?
18   A  Yeah, Dr. Martin Schuster.
19   Q  Okay.  And there are -- You mentioned at the beginning
20      of your testimony having filed a motion of some kind in
21      order to get the discovery, where did you learn to file
22      motions?  How did you figure out how to do that?
23   A  I learned of it as I went.  I originally found the
24      Tyler Tech or the Tyler System.
25   Q  Okay.
```

Add. 148

33

1   A   And just figured it was interesting and that I should
2       figure out how to use it and be logged in.  And then it
3       wasn't until I had a reason to -- once I had issues
4       with the discovery then the first process of my first
5       motion was I went and looked at my Bruce Rivers'
6       originally demand for discovery and then just copied it
7       and changed my name.  That was my first motion I ever
8       filed.
9   Q   Okay.  All right.  And, you know, what about the
10      research process involved in having to know when to
11      file something and --
12  A   Well, the research process for all of my filings was
13      extensive for, like, the Minnesota Court of Appeals and
14      the federal case that I filed.  My research process for
15      that was to go and -- well, I have a -- I collected a
16      bunch of case law so I signed up for a website that
17      allows you to look up case law.  So I have -- I have
18      compilations of prosecutorial misconduct found in the
19      court, competency-related case law.  So I have all the
20      direct experts -- experts of case law compiled.
21              And then my other process was that I
22      collected other cases that were similar or related to
23      the same issue, so I downloaded all those cases and I
24      have compilations of other cases.  And then I assembled
25      all that and used that to create my own custom ChatGPT

Add. 149

34

1    computer.  So basically I have multiple custom ChatGPT

2    lawyers that I had working for me that completely have

3    all of the Minnesota Court Rules.

4           So I download every single Minnesota Court

5    Rule pertaining to all criminal court rules, all

6    Minnesota Statutes -- not all Minnesota Statutes but

7    all the Court rules, and so I have all that fed into

8    custom ChatGPT bots basically, you can create a custom

9    ChatGPT and then give it a prompt.  And so it's a

10   defense attorney that's acting on my behalf and that's

11   able to process and analyze various aspects of the case

12   and make recommendations on meeting the qualifications

13   of the court as far as the rules of the court.

14          And so that was, like, for the Minnesota one

15   and for the local one, and then the process to file the

16   federal case was extensive.  And the main thing was to

17   make sure that I properly delineated each of the 11,

18   because there was a Monell claim which just deals with

19   the county and indifference to the issues that were

20   being ignored.

21          And then there was Keith Ellison who was

22   included just basically under the Ex Parte Young Act, I

23   believe, so he was included basically as a symbolic

24   inclusion.  The three judges were included on their

25   personal for acting outside of their judicial

Add. 150

35

1  jurisdiction, which I believe that I've -- that I

2  proved so -- because you can't sue a judge so they were

3  sued in their personal.

4      And then the -- everyone else was included, I

5  don't know, it was extensive -- it was an extensive

6  process.  So it wasn't just me throwing together, there

7  was a ton of, like, hours of research, many hours of

8  research that went into that.

9      So it doesn't mean that I necessarily believe

10  that every single filing that I make is -- there is --

11  there's a certain aspect of my filings where I'm

12  assuming that maybe they're not a hundred percent what

13  an attorney would do or maybe that, but there's a

14  certain aspect of my strategy that based on me wanting

15  the truth and simply making sure it's part of the

16  record.

17  Q  It sounds like at the time you made those first filings

18     that you were represented by a lawyer?

19  A  Yeah, Bruce Rivers.

20  Q  Okay.  And also you had a lawyer in mental health court

21     or not at that time?

22  A  There was -- There has been two of them.  Now I have

23     Fisher, I forgot his first name, but then the first one

24     was Biglow, he's the one -- Michael Biglow, he's the

25     one that sent me the discovery, the first 80

Add. 151

36

1    photographs.

2  Q    What -- what prompted you to proceed basically on a pro

3       se passion or on your own to represent -- basically do

4       legal filings and self-representation despite having

5       two lawyers?

6  A    Because -- because I had been asking Bruce Rivers for

7       discovery and he wouldn't provide me with that, and he

8       wouldn't provide me with the first or the second Rule

9       20.  And so as soon as he told me not to file, that I

10      shouldn't file the thing pro se but didn't offer me the

11      discovery I'd been asking for, then that's when I said

12      maybe I should be filing it, right?

13          It was basically, like, if I'm asking for

14      discovery and you're not providing it to me but you're

15      telling me I shouldn't be filing -- shouldn't be

16      submitting a pro se filing asking for discovery but

17      aren't providing me with the discovery even though

18      that's their obligation, then why would you -- there

19      seems to be a inconsistency there with a defense

20      attorney's obligations to their client and me being his

21      client seeking the discovery and not being provided

22      with it.

23          So it basically was a why is he not providing

24      me with this discovery and that's -- and there was the

25      whole issue of him telling me that there's powerful

Add. 152

37

1      people keeping an eye on me which is documented in
2      emails before I was ever declared incompetent.  So I
3      have phone records and I submitted tons of evidence for
4      that.  I text all my friends the next day because I was
5      freaked out.  So there's a whole paper trail of stuff
6      and issues surrounding everything leading up to that
7      point so that's --
8    Q  Was it -- Was it a disagreement basically with your
9      lawyer and not --
10   A  It wasn't --
11   Q  -- the court --
12   A  -- a disagreement it was his -- it was him not
13     following through on his obligations to his client.
14   Q  Okay.  And so it seems like a big step for a non-lawyer
15     to take self-representation into their own hands, what
16     made you feel like you could do that?
17   A  Because I'm very good at --
18   Q  Competent to do that?
19   A  Because I'm very good at putting pieces together and
20     figuring things out.  I'm an unlicensed engineer, I was
21     able to think up ideas in my head that were $2 million
22     in value and have companies trust with me with their
23     dire reputation, and all of that is based on me being
24     able to conceptualize pieces in my head that I could
25     then put out and create 3D designs for all.  It's all

Add. 153

38

1    based on getting it out of my head and into a computer

2    and putting into the real world.

3         So I would say that there's a pretty

4    significant track record of me being able to work with

5    very complex -- a lot of the stuff I built was

6    completely custom so it's -- it's -- I'm -- I have a

7    record of being able to assemble and conceptualize very

8    complex mechanical assemblies, conceptual assemblies

9    whether that be ideas, pieces of -- just putting pieces

10   together basically so I know that if I needed to

11   represent myself that I would be able to given the

12   proper time and consideration and a consideration of

13   competence.

14   Q  So moving forward with the case if you felt that your

15   lawyers were not representing you adequately or not

16   pursuing the strategies that you feel were appropriate,

17   how would you feel about representing yourself?

18   A  I -- I would feel fine representing myself but I

19   wouldn't -- it's not something that even though I

20   understand that hypothetically if I'm determined

21   competent today I would have the right to tell you guys

22   to screw off and represent myself, right, but that

23   doesn't mean that that's what I would do.  If -- It

24   means that I know I have the option, but it's not

25   something that I'm dead set on doing and if there was a

Add. 154

39

1     problem I would probably prefer to -- I wouldn't
2     necessarily think it's a -- regardless of my abilities
3     to understand and put pieces together I wouldn't
4     necessarily -- I understand the risks of proceeding to
5     trial, representing myself for felony charges, so I
6     would feel more comfortable having defense counsel
7     represent me.
8   Q  Okay.  In this -- just before this hearing like a day
9     or a few days before you filed some -- some pleadings,
10    some exhibits?
11  A  Yes.
12  Q  Why did you do that?
13  A  Because I felt they were important.
14  Q  What was important about them?
15  A  The fact that I've -- I've been relentless in my
16    pursuit of the truth and I have never wavered once in
17    my consistency concerning the fraudulent discoveries
18    going all the way back to January 5th, 2024 when I
19    filed my first court motion ever.  And so the fact that
20    now I've -- have all this documentation and have
21    brought it up to that point where now it can't be
22    disputed because it's the advantage, like I said out in
23    the hall, was that if I had a private attorney, which
24    was the case before, that it wouldn't necessary be
25    considered an official legal chain of custody, but now

Add. 155

40

1    it is because it's in the Hennepin County One Drive

2    System, right, because the public defender's office is

3    provided discovery through Hennepin County, right?

4            So that now makes the evidence official, and

5    it's officially manipulated as I've recorded with the

6    manipulated squishing it back into the correct aspect

7    ratios and comparing it with the original -- the

8    original discovery provided on August 3rd by Michael

9    Biglow that I forwarded to you guys.  I feel that it's

10   now in a state where there's no more manipulation or

11   room to maneuver or make any adjustments to fix the

12   problem that exists, and so I feel that it's a rather

13   compelling and significant discovery on my behalf that

14   I took the time to investigate.

15 Q  Why do you -- What of those materials that you filed do

16   you think are relevant to Judge Koch making the

17   decision about whether you're competent or not?

18 A  I feel that they're all technically made relevant based

19   upon the claims solely made -- based upon the fact that

20   they directly pertain to the claims made in --

21   obviously I'm going back retroactively to the first --

22   I'm sort of holistically covering all of these

23   determinations, not just the most recent one, but all

24   of the issues of the fraudulent discovery.  And, for

25   instance, the value of my patent, the relevance to the

Add. 156

41

1       military, all that's made relevant by the claims that
2       are contained in across my various Rule 20 exams that
3       claim that I'm crazy for thinking those things
4       basically, that I'm incompetent or mentally ill because
5       of my claims pertaining to things which I can now
6       validate.
7   Q   So what you're saying is those exhibits support the
8       truth of your assertions here today about your
9       background and about those photographs?
10  A   Yeah, it's pertaining to my claims which were used as
11      evidence against me to claim that I'm incompetent in
12      the Rule 20 exams.
13  Q   Okay.  Do you feel that in the past you've been able to
14      assist your attorneys in your defense?
15  A   Yeah, I know I have.
16  Q   And how do you feel that you would be able to assist
17      your lawyers in your defense moving forward?
18  A   Because I'm highly intelligent and can put pieces
19      together.  I went -- when I went to Bruce Rivers --
20  Q   Review of the discovery?
21  A   On any aspect of the case.  When I went to Bruce
22      River's office initially before everything got strange,
23      so to say, I'm the one that told him about the
24      (indiscernible) brought up in the second Rule 20 exam
25      as well.

Add. 157

42

1          I'm the one that told him about the Minnesota
2     Statute pertaining to building your own guns and not
3     being illegal for the intire serial number issue, and
4     he started looking it up in a book, and I told him what
5     he was going to find was that the Minnesota Statute
6     essentially points you to the federal statute and says
7     look over here, and that the federal statute does not
8     have any requirement at all for someone building a
9     firearm for personal use to maintain a -- to put a
10    serial number on it, and that that was verified by
11    things Biden put out pertaining to it and it's still
12    verified.
13          And now that's been retroactively -- Number
14    one he looked it up and goes you're right, and then
15    number two now it's been validated by the fact that the
16    Supreme Court apparently agrees with me because they
17    accepted the exact same charges in the exact same case
18    and with the entire argument outlining exactly what I
19    told Bruce Rivers initially.  That was the argument
20    made by Anderson, I forgot, he does a lot of appellate
21    cases, Anderson.
22          They argued it in front of the Supreme Court
23    at the capitol on June 5th of 2024 and it's in a
24    decision phase currently, but the arguments that they
25    put forward are rather compelling because the argument

Add. 158

43

1    says that if the current -- if the current overturning

2    that was overturned in the Court of Appeals were to

3    stand it would mean that every single citizen that has

4    an old firearm would be -- currently be guilty of a

5    felony.  It would mean that even the police and

6    sheriffs that are, like, reselling specific -- they

7    have, like, collections of firearms and sales,

8    whatever, all of that would be illegal.  So it

9    basically makes everyone a felon, a bunch of

10    law-abiding citizens, just like I was law abiding

11    because I specifically researched to make sure that I

12    wasn't breaking the law before I purchased the parts

13    and made my own guns during the summer of --

14  Q  Okay --

15  A  -- 2020.

16        MR. DONNELLY:  Let's cut it off there, Judge, I

17    don't have any other questions.

18        THE COURT:  Okay.  I remembered my questions,

19    I'm going to ask them before I turn it over to the

20    State.

21        You mentioned earlier your stayed commitment,

22    you were civilly committed but it was a stay and then

23    you successfully completed the stay?

24        THE WITNESS:  Correct.

25        THE COURT:  Do you recall when you completed

44

1    that roughly?

2          THE WITNESS:  November 8th of 2024.  There was a

3    letter submitted by my worker at Vail Place I'm still

4    seeing.

5          THE COURT:  Yep.  And do you agree that you

6    suffer from a mental illness?

7          THE WITNESS:  I have ADHD and generalized

8    anxiety disorder.

9          THE COURT:  Okay.

10         THE WITNESS:  I've been -- and that was -- I've

11   been self-treated for that meaning since 2016 when I

12   was in California I've been seeing the same doctor on

13   my own for nearly ten years.

14         THE COURT:  And are you following all the

15   recommendations of that doctor?

16         THE WITNESS:  Yeah, it's worked out great for

17   me, I don't even -- I haven't had a sip of alcohol in

18   I don't even know how long.  I'm like literally at the

19   most, like, responsible and grown up, so to speak,

20   I've been in my life thus far.  So besides all this

21   stuff going on I'm doing great, that's why this is all

22   so disappointing.

23         THE COURT:  And are you on any medication for

24   that?

25         THE WITNESS:  Yeah, I take Adderall and Klonopin

Add. 160

45

1    as needed.

2        THE COURT:  Okay.  What is the status of the

3    federal case?

4        THE WITNESS:  It got dismissed or -- and then --

5    and then the -- it got dismissed and whatever, I

6    forgot, it was -- because I appealed one of the

7    interlocutory, or however it's pronounced, to the

8    Eighth Circuit, both of those got dismissed on the

9    same day which was the day before I came -- went and

10   saw you last.

11       And then the -- I -- Bruce Rivers never

12   responded to it so I successfully got an entry of

13   default against him and then he -- he hired an

14   attorney and had that attorney, whatever, and I think

15   it just got -- I haven't read any of it, but it looks

16   like he just got dismissed like a couple days ago.  I

17   never -- I never participated in the -- in the

18   arguments once he hired the attorney to fight back

19   against.  He was just trying to clear his name

20   basically off the case for an entry of default filed

21   against him.

22       THE COURT:  And you mentioned that you built

23   your own kind of custom ChatGPT AI defense attorney, I

24   think you called it, just so you know, ChatGPT even if

25   it's something you created isn't always right.

Add. 161

46

```
 1            THE WITNESS:  Oh, I know.
 2            THE COURT:  Okay.  We've had court cases where
 3       folks are setting a --
 4            THE WITNESS:  There -- there's major attorneys
 5       that are --
 6            THE COURT:  Yeah.
 7            THE WITNESS:  -- in hot shit right now for using
 8       ChatGPT and --
 9            THE COURT:  Well, I wouldn't put it that way
10       but, right, there are people that --
11            THE WITNESS:  I've read up on --
12            THE COURT:  -- blindly go with it and don't do
13       their research.
14            Okay.  Let me see if the State has questions.
15            MS. HAMID:  Thank you, Your Honor.  They're just
16       going to be very quick questions, a very few
17       questions.
18                      EXAMINATION
19  BY MS. HAMID:
20  Q  I'm sorry that this case has taken almost three years,
21       and I just want to tell you that before I ask you some
22       questions.  When the Judge asked you earlier about the
23       commitment case being successfully completed, do you
24       remember what you had to do?
25  A  The stipulations of the --
```

47

1    Q   Yes.
2    A   Yeah, it was a plan for care agreement that I initially
3        signed after the August 1st, and it was meet with my
4        case worker that I've been doing with Vail Place, not
5        have any guns or ammunition, remain law abiding, follow
6        the recommendations of my current doctor I've been
7        seeing for -- in California.
8    Q   And how often were you supposed to meet with him?
9    A   There isn't a -- I meet with my caseworker from Vail
10       Place once a month.  My doctor in California I meet
11       with about every two or three months because I pay cash
12       and I've been seeing him so long he gives me a break
13       on -- so I don't have to pay $200 every month.  But
14       there was -- it basically was just -- said to follow
15       those rules and just behave, right?
16   Q   And you have met with them --
17   A   Yeah --
18   Q   -- and the required --
19   A   -- I completed all of that, and then initially there
20       was a -- after the January 11th, 2024 Rule 20 exam by
21       Dr. Adam Milz that was submitted into the record there
22       was a -- there was a -- This is my first time spacing
23       out.  For the -- What was the question again?
24   Q   You have been meeting with the caseworker; is that
25       correct?

Add. 163

48

1    A    Oh, yeah, no, so they -- they recommended that it be

2         extended when -- that it be extended for another nine

3         months during -- after the second Rule 20 exam at the

4         beginning of January.  So that completed in -- on

5         November something but the -- I believe that the

6         document was committed -- or submitted to the court in

7         my other case which is 27-MH-PR-815 which is the civil

8         case.  So that was submitted into that record I believe

9         on November 8th from the worker at Vail Place saying

10        that -- that I have been abiding by everything and that

11        they have met with the team at Vail Place and they

12        agree that I have successfully completed and no longer

13        need to have any -- that they were -- that basically

14        they were fine with the state ordered civil commitment

15        expiring.

16   Q    Okay, thank you.  And you mentioned your doctor in

17        California, that was Dr. Schuster; is that correct?

18   A    Martin Schuster.

19   Q    What is he, a psychologist or psychiatrist?

20   A    He's a psychiatrist, he's a -- He does a bunch of

21        studies and stuff.  I don't know, he has a pretty big

22        practice if you look him up.  He's, like, reputable.

23   Q    Okay.  And how long have you been seeing him?

24   A    Since 2016.

25   Q    Okay.  And did he diagnose you with anything?

Add. 164

49

1  A  Yes, it's generalized anxiety disorder and I don't know
2     if it's ADD or ADHD but I've -- he agreed with my take
3     on -- I was in a lot of -- I was, like, grew up in the
4     system, so to speak or whatever, there was a lot of
5     interactions when I was younger that weren't of my own
6     issues.  But there was a diagnosis at some point of
7     bipolar, which I have never agreed with, and which he
8     agreed with because apparently -- you're supposed to go
9     up and down and I've always just been kind of
10    high-strung.
11            And if, for instance, if I -- if I -- when I
12    don't take Adderall or whatever you would think that I
13    was on Adderall, and if I am on Adderall then I appear
14    calm like I'm not on Adderall.  It basically organizes
15    my thoughts in a more logical way or without me being
16    scatterbrained kind of to put it.
17            But the entire reason of the bipolar, which
18    is also mentioned in the Rule 20, is that there was
19    never any time where I've been depressed or down which
20    is something that apparently from what I understand is
21    part of bipolar, like, you go up mania and then you go
22    down depression and it's kind of like a rollercoaster.
23    That's never been my life, my life has just always been
24    up, right?
25 Q  And what do you -- What's the Adderall for?

50

1  A  For the ADD.

2  Q  Okay.  Do you take any other medication?

3  A  I take the lowest dose of Klonopin as needed.

4  Q  What is that for?

5  A  Anxiety, like if I -- if I'm feeling nervous or, like,

6     bite my fingers or something like that I just take it.

7     I could get -- I could get it filled every month but,

8     like, the last ones lasted me two months.  Like I told

9     one of the Rule 20 examiners that I'm aware that -- of

10    the addiction potential of Benzodiazepines so it scares

11    me so I treat it with respect, I've never taken more

12    than one pill ever the entire time I've been on it, so

13    it's something that I treat with respect and don't

14    abuse at all.

15  Q  So you don't take anything for the bipolar because you

16    said you --

17  A  No, I'm just saying that was mentioned in the --

18    because I was very candidly honest in my first Rule 20

19    exam which is the reason why I said I've tried every

20    drug in my life besides heroin.  So I was just honest

21    about everything because I wasn't -- I was expecting

22    them to be honest in their report, right?

23  Q  Yeah.

24  A  Which they didn't seem to be.

25  Q  Okay.  And just talking about the photos you mentioned

Add. 166

51

1    earlier when the Judge was asking you questions, you
2    said there were 80 photos that had problems in them; is
3    that correct?
4  A  No, there were 80 photos -- technically there was a set
5    of discovery before that because in Jill Rogstad's --
6    in Dr. Jill Rogstad's initial Rule 20.01 she -- she
7    mentioned 104 photographs.  I never saw those
8    photographs, I just know the number that's documented.
9    So technically the 80 photographs are the second set of
10    discovery that was what was given to me on August 3rd
11    via email after the August 1st actual civil commitment
12    exam by Dr. Michael Robertson where he documents those
13    80 photographs as being reviewed as part of his
14    examination process.
15            And those 80 photographs are -- if you look
16    at them compared to all the discovery that exist now
17    there's, what, over 700, I don't know, there's 518 --
18    518 images in the one set that matches the set that
19    Bruce Rivers gave me on July 16th, but now there's a
20    new folder that appeared that contains all of the other
21    photos, including the 28 images that were missing.  And
22    those are, if we exclude eight of those because of the
23    16 by 9 now apparently being uniform across the whole
24    folder, that leaves 20 images that match my April 4th
25    motion that's been consistent, that has a chronological

52

1    connected timeline to it.

2             Those 20 images now with all inconsistent

3    aspect ratios now all appear consistent with 16 by 9

4    aspect ratios because they've all been squished, some

5    of them significantly to the point of you flip through

6    them and it's blatantly obvious what that -- so the

7    question becomes why have the -- they've -- Someone had

8    to sit down and do that is what I'm saying.

9  Q  Yeah, so you said that these photos have a problem; is

10    that correct?

11 A  Yeah, they have a problem.

12 Q  If you disagree with your attorney that the photos are

13    not a problem how would you go about --

14 A  If they --

15 Q  -- when those photos are introduced in court?

16 A  If I disagreed with my attorneys --

17 Q  Yes.

18 A  -- if they -- So what do you mean?

19 Q  If they think that their photos don't have any

20    problems?

21           THE COURT:  Basically I think what, and I don't

22    mean to put words in your mouth but I'm going to try

23    to rephrase --

24           MS. HAMID:  Yes.

25           THE COURT:  -- it just a little bit.  There are

Add. 168

53

1    some decisions at trial which are your decisions --

2            THE WITNESS:  Yep.

3            THE COURT:  -- like whether or not you testify,

4    things like that.  There are other decisions that are

5    the attorney's decision like do I object to this piece

6    of evidence, do I make a certain legal argument, do I

7    do whatever.  Are you able to, if you're working with

8    your defense team, give them input but then understand

9    that there are certain decisions they make that are

10   not yours to make?

11           THE WITNESS:  Oh, I understand that, but that

12   doesn't mean that I would necessarily for sure abide

13   by that if I vehemently -- if I vehemently disagreed

14   with something.

15           THE COURT:  Okay.

16           THE WITNESS:  But I don't understand -- but I

17   don't understand how I -- I don't know, I've listened

18   to their advice before for the most part, but if there

19   was something that was a big issue I would at least

20   clarify and discuss it or address it, I wouldn't just

21   ignore it.

22 Q  (By Ms. Hamid, continuing)  Yes, I'm just giving you a

23   scenario in a situation where that would happen, you

24   know, those images that you disagreed with will be

25   admitted into court and will be in evidence against

Add. 169

54

1    you, how would you handle that?

2  A  I don't know yet, I haven't -- I haven't thoroughly

3    investigated, we're still at this phase.

4  Q  And you mentioned that that the custom ChatGPTs are defense

5    attorneys, and I know that you filed some papers on

6    Friday, did you use the ChatGPT to file those

7    documents?

8        THE COURT:  You mean to draft them?

9        MS. HAMID:  Yes.

10        THE COURT:  Okay.

11        THE WITNESS:  I drafted all of that stuff, some

12     of it -- some of it was used for that but the -- I

13     completed all of the forensic exams on my own and

14     then, yes, some of the forensic examinations were

15     completed with ChatGPT.

16  Q  (By Ms. Hamid, continuing)  Okay.

17  A  And they're mathematical -- they're mathematically --

18    My background is in projection mapping and that

19    involves using points to mathematically convert space

20    with projection matrixes.  So basically by me doing all

21    the leg work and defining a red, green, blue, and

22    orange point I'm then able to use ChatGPT to conduct

23    the mathematical formula that any expert -- any expert

24    would tell you is sound --

25  Q  Yeah.

Add. 170

55

1  A  -- evidence.

2  Q  And you mentioned that there are defense attorneys that

3     are acting on your behalf; is that correct?

4  A  Yeah, they're right there (indicating.)

5  Q  Okay.  I thought you were mentioning -- you were

6     talking about the custom --

7  A  No, I was -- I was referring to me knowing -- seeing

8     news stories pop up about attorneys that are in a lot

9     of hot water for using ChatGPT and pretending like

10    they're not.

11  Q  Okay.  So when you filed these documents on Friday did

12     you have a disagreement with your counsel, is that why

13     you filed it or you just filed it on your own?

14  A  I didn't hear back from them so I -- I learned that --

15     I did research and learned that there's -- you're

16     supposed to basically -- technically I'm -- I think it

17     was supposed to be entered through a different system,

18     Minnesota Evidence, there's like a separate system to

19     enter evidence in.

20        THE COURT:  Minnesota Digital Exhibit System.

21        THE WITNESS:  Yeah, that, and I also learned

22    something about that --

23        THE COURT:  That's, just so you know, that's for

24    the parties to put things in so you work through your

25    attorneys.

Add. 171

56

1          THE WITNESS:  Yeah, and that there was a
2     seven-day window normally that I -- that I realized
3     that I was past so that's why I filed them.  The
4     entire main reason I went down and met with them
5     originally was because I've still been talking about
6     the fraudulent discovery, that's all I've been talking
7     about the entire time.
8          THE COURT:  Okay.  Folks, we're at 12:15 or
9     12:20, are there many more questions because --
10          MS. HAMID:  No --
11          THE COURT:  -- we need to break for lunch.
12          MS. HAMID:  -- two more questions, Your Honor,
13     and then I'll be done.
14  Q  (By Ms. Hamid, continuing)  Do you think you'll be
15     filing documents on your own when you have attorneys or
16     if they don't -- you don't hear from them or you
17     disagree with them?
18  A  That depends on how things proceed.
19  Q  Okay.
20          THE COURT:  Well, that's not really a great
21     answer, just so you know.  You've got attorneys, you
22     should be filing things with them, I'm just --
23          THE WITNESS:  Well, I get it.
24          THE COURT:  -- letting you know.
25          THE WITNESS:  I get it, I'm just saying -- I

Add. 172

57

1     don't know, that's my answer.

2   Q  (By Ms. Hamid, continuing)  Okay.  And you mentioned

3      earlier a law change, if there is a current law right

4      now and your attorney gives you advice on what the law

5      is currently would you be able to follow it even if you

6      don't agree with it?

7   A  Are you referring to the Minnesota Supreme Court?

8   Q  Yeah, but I'm -- In general if there is a law that you

9      believe should be changed but if your attorney gives

10     you advice on what the current law is would you be able

11     to follow it?

12  A  Yeah, the current law is what abides by until the

13     decision comes out from the Supreme Court.

14          MS. HAMID:  Okay.  Thank you.  That's all I

15      have, Your Honor.

16          THE COURT:  All right.  Anything else from the

17      defense?

18          MR. DONNELLY:  No, Your Honor.

19          THE COURT:  All right.  Thank you, sir, you can

20      step down.

21          Folks, it is 12:20, I need to give my court

22      reporter a break.

23          Are there any other witnesses that the defense

24      wishes to call?

25          MR. DONNELLY:  No, Your Honor.

Add. 173

58

```
1            THE COURT:  Are there any witnesses the State
2       would like to call?
3            MS. HAMID:  No, Your Honor.
4            THE COURT:  So it's just argument?  How long do
5       you think your argument would be if we did it right
6       now?
7            MS. HAMID:  Your Honor, if it's possible I would
8       like to come back after lunch to do it.
9            THE COURT:  Okay.  Sure.
10           Why don't we go off the record just to talk
11      about this.
12           (WHEREUPON, a discussion was held off the
13      record.)
14           THE COURT:  Back on the record.
15           So we can get the closing arguments of counsel
16      let's start with defense counsel, and then the State,
17      and then defense can have a short rebuttal since you
18      carry the burden.
19           Mr. Donnelly.
20           MR. DONNELLY:  Judge, I really don't have a
21      whole lot to supplement in terms of argument, I mean,
22      you're an experienced judge, you know the legal
23      standard, I don't really need to educate you on that.
24           Mr. Guertin has testified as to, you know, why
25      he believes that he is competent and has carried that
```

Add. 174

59

1    burden and that is that he can assist counsel in his

2    defense and analyze the evidence and make reasonable

3    choices about how to move forward with the case.

4            THE COURT:  All right.  Ms. Hamid.

5            MS. HAMID:  Your Honor, mine is also going to be

6    short.

7            The State would just request that the Court look

8    at Dr. Cranbrook's evaluation report on December 20th,

9    2024, and all the evidence that's provided before Your

10   Honor and defer to the Court's decision, Your Honor.

11           THE COURT:  Okay.

12           MR. DONNELLY:  Can I say one thing?

13           THE COURT:  Sure.

14           MR. DONNELLY:  One piece of housekeeping that's

15   left undone is the exhibits that were filed by

16   Mr. Guertin on Friday.

17           THE COURT:  Um-hum.

18           MR. DONNELLY:  He did reference in his testimony

19   what he thought the relevance of those were.  Those

20   weren't really offered here or were discussed, and I

21   don't think we need to offer them outside of the

22   record that has already been made.

23           THE COURT:  Okay.  So just the testimony about

24   it?

25           MR. DONNELLY:  I think so.

60

1          THE COURT:  Okay.  All right.  Thank you all

2     very much.

3          MS. HAMID:  Thank you.

4          THE COURT:  We'll be adjourned.

5          (WHEREUPON, the proceedings were adjourned.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Add. 176

61

1

2

3

4

5

6          I hereby certify that the foregoing is a true

7     and correct transcript from my original stenographic

8     notes taken at the time and place in the

9     above-entitled matter and prepared under my direction

10    and control.

11

12

13

14                              /s/ Melinda K. Anderson

15                              Melinda K. Anderson
                                Official Court Reporter
16                              Government Center MC 422
                                300 South Sixth Street
17                              Minneapolis, MN  55487.
                                (612) 348-7685
18

19

20

21

22

23

24

25

Add. 177

STATE OF MINNESOTA                                  FOURTH JUDICIAL DISTRICT
COUNTY OF HENNEPIN                                  PROBATE/MENTAL HEALTH DIVISION

---

State of Minnesota,
    Plaintiff.                    **FINDINGS OF FACT, CONCLUSIONS OF LAW,**
                                            **AND ORDER REGARDING DEFENDANT'S**
v.                                          **COMPETENCY TO PROCEED**

Matthew Guertin,                                      27-CR-23-1886
    Defendant.

---

This matter came on before the undersigned judge on March 5, 2025, for an evidentiary hearing regarding Mr. Guertin's competency.  The hearing was held in-person at the Hennepin County Government Center in room C457.

- Assistant Hennepin County Attorney Mawerdi Hamid appeared for the State.
- Assistant Hennepin County Public Defenders Raissa Carpenter and Emmett Donnelly represented Mr. Guertin, who appeared out of custody.

At the hearing, the Court took judicial notice of Dr. Katheryn Cranbrook's December 20, 2024, Examiner's Report without objection from the parties and heard testimony from Mr. Guertin.[1]

The Court, having considered the matter, now makes the following:

## BACKGROUND

1. Mr. Guertin is charged with the following:

   - One count of Reckless Discharge of a Firearm within a Municipality (Felony) arising from an incident alleged to have occurred on January 21, 2023.

   - Three counts of Receiving/Possessing a Firearm with no Serial Number (Felony) arising from an incident alleged to have occurred on January 21, 2023.

---

[1] Mr. Guertin uploaded several exhibits into MNCIS before the hearing.  During his testimony, Mr. Guertin referenced several of these exhibits.  During closing, the Defense informed the Court they would not be offering these exhibits outside of the testimony received at the hearing.

Add. 178

2.      On October 15, 2024, Judge Shereen Askalani ordered Mr. Guertin to undergo an Evaluation for Competency to Proceed pursuant to Rule 20.01 of the Minnesota Rules of Criminal Procedure to determine if he is competent to proceed to trial.

3.      Mr. Guertin has previously been found incompetent to proceed on July 13, 2023, and January 16, 2024.

4.      Dr. Katheryn Cranbrook was assigned to evaluate Mr. Guertin.  In her December 20, 2024, Report, Dr. Cranbrook opined Mr. Guertin "declined to participate in [the] evaluation due to ongoing symptoms of mental illness" and "defendant's prognosis for attaining the capacity for competent participation in the legal process appears poor."[2]

## FINDINGS OF FACT

1.      The Court's findings are based on the information and opinions provided by Dr. Cranbrook in her Rule 20.01 Evaluation Report ("Report") dated December 20, 2024, and on the testimony of Mr. Guertin at the hearing.

2.      Dr. Katheryn Cranbrook filed her report with this Court on December 20, 2024.  In her report, Dr. Cranbrook diagnosed Mr. Guertin with Unspecified Schizophrenia Spectrum and Other Psychotic Disorder based on available records.[3]  Dr. Cranbrook reported Mr. Guertin failed to cooperate with an examination despite several attempts.[4]  Dr. Cranbook opined Mr. Guertin "has a history of psychosis characterized by prominent delusional thinking, as well as impaired thought processes."[5]  Furthermore, Dr. Cranbrook reported Mr. Guertin has recently demonstrated symptoms of psychosis during previous competence evaluations which "has persisted in his recent communications and allegations."[6]  Dr. Cranbrook has opined these symptoms "have been noted to compromise his capacity to rationally engage in the evaluation and effectively communicate."[7]  Dr. Cranbrook further notes Mr. Guertin's paranoid beliefs and persistent allegations of violations of his constitutional rights are consistent with the "impaired thought processes that have previously rendered him incompetent to proceed."[8]  Dr. Cranbrook ultimately opined Mr. Guertin "declined to participate in [the] evaluation due to ongoing symptoms of mental illness" and "defendant's prognosis for attaining the capacity for competent participation in the legal process appears poor."[9]  The Court finds Dr. Cranbrook's report to be generally reliable based upon his presentation, or lack thereof.

---

[2] Report, p.4.

[3] *Id*. at 3.

[4] *Id*.

[5] *Id*.

[6] *Id*.

[7] *Id*.

[8] *Id*. at 4.

[9] *Id*.

Add. 179

3.      Mr. Guertin testified at the hearing in opposition to Dr. Cranbrook's report and a finding of incompetency.  Mr. Guertin testified he has had three Rule 20 exams which have determined he is incompetent.  Mr. Guertin also testified about what he believes to have been manipulated discovery materials in his previous civil commitment case and a motion he filed in that case seeking "authentic" discovery materials.  Mr. Guertin provided extensive testimony at the hearing challenging Dr. Cranbrook's opinion he is suffering from mental illness. Mr. Guertin testified Netflix and Microsoft were involved in the theft of his patent, and these beliefs were not based in delusions.  He testified about his extensive professional background to support his assertion of the corporate wrongdoing toward him.  While the Court has no basis upon which it can discount Mr. Guertin's apparently credible testimony about his past professional career, he did attempt to inflate his past work by ascribing an "engineering" label to his work, although he acknowledged he was not educated or certified/licensed as an engineer.  Still, he appears to have extensive experience in his chosen work.  The pride he has in his past work was discussed at great length in an apparent attempt to show his past evaluators improperly did not believe the reported work history was valid.  The Court believes his criticism of the past diagnoses misses the mark.  While his work history may be beyond reproach, his claims that Netflix and Microsoft have engaged in theft of intellectual property does not appear to have support.  His beliefs in that regard appear to be fantastical and paranoid.

4.      Regarding the current charges against him, however, he is more realistic.  He said he is charged with reckless discharge of a firearm in a municipality and three counts of possession of a gun without a serial number.  He understands how a case is presented in criminal court, a criminal case might not go to trial, he may have a chance to argue a case in front of a jury, and he has a right to call witnesses.  Mr. Guertin testified the prosecution is against him.  He said he would like a resolution to his case.  Mr. Guertin testified he has conducted research on competency-related case law and Minnesota Court rules and has created custom Chat GPT bots which can help him analyze various aspects of his case.  Mr. Guertin also testified if he were to be found competent, he would not necessarily proceed to trial without an attorney since he has felony charges.  He understands the nature of the charges against him.  He understands the roles of the many parties.  He understands the severity of the allegations against him.  He understands the benefits of having counsel.  He understands the nature of a trial, and the plea bargain process.

5.      While this Court finds Mr. Guertin to be unsupported in his claims of corporate fraud against him and the foundation for the earlier incompetency findings against him, Mr. Guertin has demonstrated an understanding of Court processes and the charges he is facing, as well as the ability to consult with his counsel about his defense.  He may have his own thoughts about how best to defend his case—whether he can rationally consult with counsel is the crux of any incompetency determination involving Mr. Guertin—but he has said he recognizes the value of having legal representation.  He will work with his legal team, and he understands there are some decisions he gets to make, while there are other decisions reserved for his counsel. Ultimately, the Court finds Mr. Guertin is competent.

## CONCLUSIONS OF LAW

1.    "A defendant has a due process right not to be tried or convicted of a criminal charge if he or she is legally incompetent."[10]  Rule 20.01 of the Minnesota Rules of Criminal Procedure requires the court to find a defendant not competent unless the greater weight of the evidence shows the defendant is competent to proceed.[11]  A defendant is not competent if, due to mental illness or cognitive impairment, he is unable to "(a) rationally consult with counsel or (b) understand the proceedings or participate in the defense."[12]  The determination of whether a defendant is able to rationally consult with the defense attorney or understand and participate in the proceedings turns on the facts of each particular case.

2.    Foremost, throughout the criminal proceedings, the trial court must be mindful of its protective duty to ensure a defendant is competent to proceed.[13]

3.    Mr. Guertin is contesting the report prepared by Dr. Cranbrook which opines his declination to participate in an evaluation was due to his symptoms of mental illness and his prognosis for obtaining legal competency appears poor.  While Dr. Cranbrook does not provide a conclusive opinion regarding Mr. Guertin's competency, Mr. Guertin bears the burden to prove, by a preponderance of evidence, he is competent.[14]

6.    Here, Mr. Guertin has met that burden.  He demonstrated in testimony he understands the charges, role of counsel and the Court, and the proceedings.  Based on the record before the Court, the Court ultimately finds Dr. Cranbrook's conclusion that Mr. Guertin is suffering from a mental illness credible.  However, Mr. Guertin has demonstrated an understanding of Court processes and the charges he is facing, as well as the ability to consult with his counsel about his defense.

## ORDER

Matthew Guertin is **COMPETENT** to proceed to trial.

BY THE COURT:


<u>April 3, 2025</u>                    _____
Date                                              William H. Koch, Judge of District Court

---

[10] *Bonga v. State*, 797 N.W.2d 712, 718 (Minn. 2011)
[11] Minnesota Rules of Criminal Procedure Rule 20.01, subdivision 5(c).
[12] *Id.*, subdivision 2.
[13] *See State v. Bauer*, 245 N.W.2d 848, 852 (Minn. 1976) (ruling the court should have conducted further inquiry into the important matter of defendant's competency).
[14] *See State v. Curtis*, 921 N.W.2d 342, 348 (Minn. 2018); see also *State v. Thompson*, 988 N.W.2d 149, 154 ("when a defendant assert their own competence in a contested competency proceeding under Rule 20.02, the defendant bears the burden to prove competence") (Minn. App. 2023).

Add. 181