## A25-0882
## STATE OF MINNESOTA
## IN COURT OF APPEALS

In re Matthew David Guertin,

                    Petitioner

v.

State of Minnesota,

                    Respondent.

District Court Case: 27-CR-23-1886
Court Order Date: April 29, 2025

**ADDENDUM**
**VOLUME V of XVI**
**ADD. 182 - ADD. 231**

Judge: Hon. Sarah Hudleston

Contents                                                                 Page

**February 28, 2025 - Exhibits M–Q: Netflix Patent Motive & Valuation**
**(pp 6-23),** Index 125………..………………..……………………………… Add. 182-199

**April 21, 2025 - Petition to Proceed Pro Se & Discharge Counsel**
**(pp 1-32, motion only),** Index 133………..………..……………………………… Add. 200-231

# Analysis of Guertin's InfiniSet Patent v. Netflix Patent:

## I. Executive Summary

InfiniSet's US Patent 11,577,177, granted on February 14, 2023, describes a "motorized rotatable treadmill" used within virtual film sets (including green screen and LED environments) to create the illusion of unlimited movement. Netflix's US Patent 11,810,254, granted on November 7, 2023, discloses a system that uses an "omnidirectional treadmill" together with multiple sets of display panels (floor, wall, and ceiling) to achieve a similar effect—namely, allowing a subject to move in 360° within a virtual environment. Crucially, InfiniSet's patent is prior art, having a priority date 12 days earlier than Netflix's application, and InfiniSet's patent was even formally submitted as third-party prior art during Netflix's prosecution.

Our analysis concludes that the technology described in Netflix's patent appears to be essentially the same as that disclosed in InfiniSet's patent, differing primarily in terminology and presentation. We argue that (1) the "rotating treadmill" in InfiniSet's patent inherently provides omnidirectional movement, and (2) the LED volume or virtual film set—comprising distinct LED panels for the floor, walls, and ceiling—is a standard industry configuration that InfiniSet's disclosure already contemplates. As such, the Netflix patent's claims appear to be obvious in view of InfiniSet's disclosure and may fail the novelty and non-obviousness requirements. This report outlines our detailed comparisons and offers the grounds for challenging the validity of Netflix's patent.

---

## VI. Conclusion and Recommendations

Based on the foregoing analysis, the following conclusions are drawn:

1. **Essentially the Same Technology:**
   Both patents describe systems that use a treadmill (whether labeled "rotatable" or "omnidirectional") integrated with an LED virtual film set to create the illusion of unrestricted movement. The key functionality is identical: allowing a subject to traverse a virtual environment without leaving a confined physical area.

2. **Prior Art and Obviousness:**
   InfiniSet's patent not only precedes Netflix's filing by 12 days but was also submitted as prior art during Netflix's examination. This raises a strong argument that the Netflix patent fails to meet the requirements for novelty and non-obviousness.

3. **Terminology Is Largely Superficial:**
   The Netflix patent's use of "omnidirectional treadmill" is a broader, yet functionally equivalent, term compared to InfiniSet's "motorized rotatable treadmill." Similarly, while

Add. 182

Exhibit M | p. 1

Filed in District Court
State of Minnesota
2/28/2025 4:42 PM

Netflix divides the LED virtual film set into three distinct panel groups, this arrangement is standard practice and is implicitly covered by InfiniSet's disclosures.

**Recommendation:**

Given these points, it is our professional opinion that there are strong grounds to challenge the validity of US Patent 11,810,254. The Netflix patent appears to be an obvious extension of the technology already disclosed in US Patent 11,577,177. We recommend that the USPTO be urged to reconsider the grant of the Netflix patent on the basis of:

- **Prior Art:** InfiniSet's patent clearly anticipates and renders obvious the disclosures of Netflix.

- **Obviousness:** The differences in terminology and presentation do not constitute a novel or non-obvious improvement over InfiniSet's technology.

- **Industry Standard Practices:** The LED volume or virtual film set configuration (with separate floor, wall, and ceiling panels) is a known standard and is already encompassed within the InfiniSet disclosure.

In light of these observations, there is a compelling argument that the Netflix patent should not have been granted, and steps should be taken to challenge its validity to protect InfiniSet's intellectual property rights.

---

# VII. Appendices: Direct Excerpts

1. **InfiniSet Patent (US 11,577,177):**

   - **Abstract Excerpt:**

     *"A motorized, rotatable treadmill and a system for creating the illusion of user movement while the user is stationary with respect to an environment…"*

   - **Detailed Description Excerpt:**

     *"The treadmill is configured to provide a user a surface for movement in forward and reverse directions … and wherein the angular direction … is selectively adjustable via rotation of the turntable for directionally unlimited movement in an X-Y plane."*

2. **Netflix Patent (US 11,810,254):**

   - **Treadmill Excerpt:**

     *"…the omnidirectional treadmill allows a subject to perform locomotive motion (e.g., walking, running, etc.) in any direction. This*

Add. 183

Exhibit M | p. 2

> *allows the omnidirectional treadmill to provide a subject with 360 degrees of movement."*

- **Display Panels Excerpts:**

  > *"A system surrounds an area with a first set of display panels."*

  > *"A second set of display panels is positioned above the area…"*

  > *"A third set of display panels is positioned below the area…"*

## Final Summary:

In summary, the evidence strongly suggests that Netflix's US Patent 11,810,254 describes essentially the same technology as InfiniSet's US Patent 11,577,177. Given the 12-day lead in priority, the use of InfiniSet's patent as prior art, and the minimal substantive differences in technology (merely differences in terminology and presentation), there is a robust argument that the Netflix patent is invalid for lack of novelty and non-obviousness. It is recommended that this matter be pursued further through appropriate legal channels to challenge the validity of the Netflix patent.

**The full analysis document is available here:**

https://link.storjshare.io/raw/jvj3zbhx4dc4vxpjuppy2yba2v4q/court-fraud/The-Patent-is-the-Motive/InfiniSet-Patent__Compared-to-Netflix-Patent-Report.pdf

**All of the additional patent background documents are available here:**

https://link.storjshare.io/s/jvqbgvfz7qnvqna53bijp3fpjcba/court-fraud/The-Patent-is-the-Motive/



Add. 184

Exhibit M | p. 3

# Advanced Technology Comparison of Both Patents:

## I. Overview of the Advanced Technologies Disclosed

Both patents present a system in which a specialized treadmill assembly is integrated into a digital environment. Although the virtual film production use case is their common foundation, each disclosure goes on to describe additional advanced functionalities that extend the system's application into several high-tech fields:

1. **Immersive Digital Environments (VR, AR, Metaverse):**
   Both disclosures envision applications beyond traditional film production. They describe environments that can be rendered digitally or virtually—for use in gaming, simulation training, or the metaverse—where a user experiences seamless, immersive movement.

2. **Real-Time Tracking and Cueing for Unnoticeable Treadmill Use:**
   The patents describe systems in which the user's movement is tracked in real time and synchronized with the motion of a camera and/or digital cues. This integration is designed so that the user's experience is natural and immersive, effectively masking the fact that they remain on a treadmill.

3. **Digital Twin Creation:**
   Both patents include provisions for capturing a three-dimensional representation of the user (often referred to as a "digital twin") using multi-camera photogrammetry and other sensor technologies. This digital twin can then be inserted into virtual environments for various applications.

4. **Simulation Training and Gaming Applications:**
   Beyond film production, the systems are envisioned for simulation training exercises and gaming. In such use cases, a realistic digital representation of the user—synchronized with real-time movement data—is critical for effective training simulations or immersive game play.

5. **Remote Connectivity and Multi-System Integration:**
   Both disclosures mention that the treadmill system's components (motors, sensors, display interfaces) can be controlled remotely and integrated with other systems. This supports scenarios in which multiple treadmill assemblies or remote setups are networked together.

# III. Summary of Comparative Findings

The following ordered list summarizes the advanced technological fields and use cases and shows how InfiniSet's disclosure preempts the corresponding aspects in the Netflix patent:

1. **Immersive Environments (VR/AR/Metaverse):**

   - **InfiniSet:** Broadly discloses integration with digital/virtual environments using an animation timeline and cue sequencing.
   - **Netflix:** Uses segmented LED panel arrangements to create an immersive space.
   - **Finding:** InfiniSet already covers the use of virtual environments in a broad, application-independent manner.

2. **Real-Time User Tracking & Cueing:**

   - **InfiniSet:** Details real-time tracking with integrated sensors, wearable devices, and haptic cues.
   - **Netflix:** Captures sensor data and uses repositioning to maintain accurate digital representations.
   - **Finding:** Both systems function similarly, with InfiniSet's disclosure being broad and fundamental.

3. **Digital Twin Creation:**

   - **InfiniSet:** Explicitly describes creating a digital twin or avatar using multi-angle photogrammetry.
   - **Netflix:** Generates a 3D representation and texture mapping for a digital acting performance.
   - **Finding:** The digital twin capability is disclosed in both patents, with InfiniSet's earlier disclosure preempting Netflix's claims.

4. **Simulation Training and Gaming Applications:**

   - **InfiniSet:** Mentions direct applications in simulation training and gaming, including integration with VR systems.
   - **Netflix:** Although focused on digital acting, the underlying technology is applicable to simulation and gaming.
   - **Finding:** InfiniSet's technology is sufficiently broad to encompass these use cases.

Exhibit N | p. 2

5. **Remote Connectivity and System Integration:**

- **InfiniSet:** Provides for remote control and synchronization with other equipment.
- **Netflix:** Similarly describes remote operation of the treadmill and sensor network.
- **Finding:** Remote connectivity is a common feature, with InfiniSet covering it comprehensively.

6. **Additional Advanced Cueing & Multi-Sensor Integration:**

- **InfiniSet:** Uses audio, visual, tactile, and haptic cues in combination with wearable sensors and an animation timeline.
- **Netflix:** Implements similar repositioning and sensor fusion techniques to maintain digital accuracy.
- **Finding:** Both patents disclose similar systems; InfiniSet's approach is broad and foundational.

## IV. Conclusion

Based on the comparative analysis, the advanced technological capabilities disclosed in InfiniSet's US Patent 11,577,177 encompass:

- **Integration with immersive digital environments** (VR, AR, metaverse)
- **Real-time user tracking and seamless movement cueing** that allow a user to traverse a virtual environment without perceiving treadmill constraints
- **Creation of a digital twin (or 3D avatar) of the user** for insertion into digital spaces
- **Applications in simulation training exercises and gaming**
- **Remote connectivity and control** of the treadmill system and associated sensor networks
- **Advanced multi-sensor integration and cueing systems**

Netflix's US Patent 11,810,254, while providing a more detailed description in certain areas (for example, by defining distinct LED panel groups and using the term "omnidirectional treadmill"), essentially discloses the same advanced capabilities as InfiniSet's patent. In many respects, the differences lie in the level of detail or the segmentation of the environment (e.g., breaking down the LED virtual film set into floor, wall, and ceiling panels), rather than in any substantive technical innovation.

**Final Opinion:**

InfiniSet's patent—though presented in a simplified form—broadly and fundamentally discloses the advanced technologies related to virtual reality, augmented reality, simulation training, gaming, real-time tracking, digital twin creation, and remote connectivity. These disclosures essentially preempt and invalidate the corresponding advanced technology claims made in the Netflix patent. In other words, the additional capabilities described in the Netflix patent do not represent a novel or non-obvious departure from the already comprehensive disclosure contained in the InfiniSet patent.

**The full analysis document is available here:**

https://link.storjshare.io/raw/jvj3zbhx4dc4vxpjuppy2yba2v4q/court-fraud/The-Patent-is-the-Motive/InfiniSet-Patent__Compared-to-Netflix-Patent-Report.pdf

**All of the additional patent background documents are available here:**

https://link.storjshare.io/s/jvqbgvfz7qnvqna53bijp3fpjcba/court-fraud/The-Patent-is-the-Motive/

# Disruptive Technology Report:
# US Patent 11,577,177 – The "Infinite Movement" Treadmill

## 1. Introduction:

- ### A Revolution in Virtual Movement

  Imagine walking, running, or exploring a vast digital world - a jungle, a city, or even outer space - while physically staying in one place. US Patent 11,577,177, granted to InfiniSet, makes this possible with a **motorized, rotatable treadmill** that seamlessly blends real-world motion with virtual environments. This technology is not just a step forward - it's a leap into the future of entertainment, filmmaking, gaming, and beyond.

- ### Key Innovation in Simple Terms

  - #### The Illusion of Infinite Movement:
    The treadmill's belt moves under your feet, while the entire platform rotates like a turntable. This lets you walk in any direction (forward, backward, sideways) without ever leaving the spot.

  - #### Sync with Virtual Worlds:
    Cameras and screens adjust in real-time to match your speed and direction, making it look like you're moving through a digital landscape.

  - #### No Green Screens Required:
    Works with LED walls (like those used in *The Mandalorian*) or traditional green screens, but can also integrate with AI-generated worlds or holograms.

## 2. Why This Technology is Disruptive

- ### Breaks Physical Limits

  - #### Unlimited Virtual Exploration:
    Walk endlessly through AI-generated worlds (e.g., infinite forests, cities, or alien planets) without needing a massive physical studio.

  - #### Filmmaking Revolution:
    Actors can "travel" across digital sets while staying safe and stationary. No more expensive location shoots or bulky equipment.

Exhibit O | p. 1

- **Merges Real and Digital Worlds**

  - **AI-Powered Infinite Worlds:**
    Pair this treadmill with AI tools like **Sora** (OpenAI's video generator) or **Inworld AI**, which can create endless, dynamic environments. As you walk, AI generates scenery in real-time.

  - **Holographic Displays**:
    Future integration with **light field displays** (3D holograms) could let users interact with lifelike virtual objects or characters.

- **Beyond Movies: Universal Applications**

  - **Gaming**: Explore open-world games like *Fortnite* or *Minecraft* by physically walking through them.

  - **Fitness**: Turn workouts into adventures - hike virtual mountains or race through digital obstacle courses.

  - **Training**: Soldiers, pilots, or surgeons can practice in hyper-realistic simulations without real-world risks.

  - **Virtual Tourism**:"Visit" the Pyramids of Giza or the Great Barrier Reef from your living room.

## 3. Emerging Tech Supercharges This Invention

- **AI-Generated Worlds**

  - **Infinite Content**:
    AI tools can create endless landscapes, characters, and stories. The treadmill lets users navigate these worlds naturally, with movements synced to AI-rendered visuals.

  - **Personalized Adventures**:
    AI could tailor environments to your preferences - imagine walking through a forest that changes seasons based on your mood.

- **Light Field Displays**

  - **Holographic Interaction**:
    Emerging 3D displays project light fields, creating depth and realism without glasses. Combined with the treadmill, users could "touch" holographic objects or converse with AI avatars.

Exhibit O | p. 2

- **Digital Twins & Metaverse**
  - ○ **Your Virtual Clone:**
    The patent describes creating a **digital twin** - a 3D avatar that mimics your movements. This twin could attend virtual meetings, star in movies, or explore the metaverse while you control it in real-time.

## 4. Real-World Impact: Who Benefits?

| Industry | How It's Used |
|---|---|
| Film/TV | Shoot epic scenes without leaving the studio. Directors can "move" cameras around actors virtually. |
| Gaming | Physically explore *Fortnite* islands or *Cyberpunk 2077* cities. |
| Fitness | Turn treadmills into immersive adventures - run from zombies or climb virtual mountains. |
| Education | Students "visit" historical events or walk through human anatomy models. |
| Military | Train in hyper-realistic combat simulations. |

## 5. Conclusion: A Gateway to the Future

- US Patent 11,577,177 isn't just a treadmill - it's a **portal** to infinite possibilities. By merging physical movement with AI, holograms, and virtual worlds, it redefines how we create, learn, and play. As these technologies mature, this invention could become as commonplace as smartphones, transforming everyday life into an endless adventure.

- **Final Thought**:
  Imagine a child exploring Mars, an actor filming in Middle-earth, or a grandparent "walking" through their childhood hometown - all from a single room. ***This patent isn't just disruptive; it's the foundation of a new reality.***

Add. 191

Exhibit O | p. 3

# Ballpark Financial Valuation Report:

### US Patent 11,577,177 ("Infinite Movement" Treadmill)
### 20-Year Global Exclusivity Model
*(Hypothetical Worldwide Patent Protection)*

## 1. Key Assumptions

- **Global Patent Protection**: Exclusive rights to manufacture, license, or sell the technology worldwide for 20 years.

- **Market Penaliation**: Technology adoption grows steadily across industries (film/TV, gaming, fitness, military, healthcare, education, etc.).

  - **Revenue Streams**:
  - **Hardware Sales** (treadmill systems).
  - **Licensing Fees** (royalties for patented tech integrated into third-party products).
  - **Software/Service Subscriptions** (AI environment generation, maintenance, updates).

- **Emerging Tech Synergy**: Growth of AI-generated content, light field displays, and metaverse adoption accelerates demand.

- **Discount Rate**: 8% (accounting for inflation, risk, and capital costs).

## 2. Market Size & Revenue Projections

*(All figures in USD billions, cumulative over 20 years)*

| Industry | Addressable Market (2030) | Penetration Rate | 20-Year Revenue |
|---|---|---|---|
| **Film/TV Production** | $150B (virtual production) | 40% | $60B |
| **Gaming & Esports** | $500B (VR/AR gaming) | 25% | $125B |
| **Fitness & Wellness** | $300B (smart fitness) | 15% | $45B |
| **Military/Healthcare** | $200B (simulation training) | 20% | $40B |
| **Education/Tourism** | $100B (virtual learning) | 10% | $10B |
| **Licensing & Royalties** | N/A | — | $70B |
| **Software/Subscriptions** | $200B (AI/content tools) | 20% | $40B |
| **Total** | **$1.45T** | — | **$390B** |

Exhibit P | p. 1

## 3. Breakdown of Key Drivers

- **Film/TV Production**:
  **$60B**: High-margin sales/leases to studios (e.g., Disney, Netflix).

- **Pricing**:
  **$500K/system** (premium tier) for LED-stage integration; 120,000 units sold.

- **Gaming**:
  **$125B**: *Consumer sales* (2,000–$5,000/home system) + arcade/VR café licensing.

- **Adoption**:
  **50M households** (5% of global gaming market).

- **Licensing & Royalties**:
  **$70B**: 5–10% royalty on third-party hardware (e.g., Meta, Sony) using patented tech.

- **AI/Software**:
  **$40B:** *Subscription fees for AI−generated environments* (20/user/month).

## 4. Cost Structure

*(20-Year Cumulative)*

| Category | Cost |
|---|---|
| R&D | $20B |
| Manufacturing | $90B |
| Marketing/Sales | $50B |
| Legal/Patent Defense | $10B |
| **Total Costs** | **$170B** |

## 5. Profitability

- **Gross Revenue**:
  $390B

- **Net Profit (Pre-Tax)**:
  390B–170B = **$220B**

- **Taxes (20% Global Avg)**:
  $44B

- **Net Profit (Post-Tax)**:
  **$176B**

Exhibit P | p. 2

## 6. Net Present Value (NPV)

- **Discount Rate**: 8%
- **NPV of 176B** *over* **20** *Years***: 68B**
  *(Present value of future profits, accounting for inflation and risk)*

## 7. Sensitivity Analysis

- **Best Case** (90% adoption in key markets):
  **500B** *gross revenue* (220B NPV).
- **Worst Case** (Delays, competition, 50% adoption):
  **195B** *gross revenue*(85B NPV).

## 8. Emerging Tech Multipliers

- **AI-Generated Content**:
  Adds **$30B+** in software/subscription revenue if AI tools (e.g., OpenAi, Midjourney) partner to create custom environments.
- **Light Field Displays**:
  **$20B+** from holographic integration (e.g., military training, live concerts).
- **Metaverse Adoption**:
  **$50B+** if the treadmill becomes a default locomotion tool for Meta, Apple, or Roblox.

## 9. Valuation Range

- **Conservative**:
  **68B–100B** (NPV).
- **Aggressive**:
  **$150B+** (with emerging tech multipliers and market dominance).

## 10. Conclusion

- Under the hypothetical scenario of **global patent exclusivity**, US Patent 11,577,177 could generate **68B–150B in net present value** over 20 years. This range reflects:
  - Dominance in film/TV and gaming.
  - Licensing leverage over competitors.
  - Synergy with AI, holograms, and metaverse trends.

Exhibit P | p. 3

## 11.  Risks:

- Theft by the US and Israeli 'Military Entertainment Industrial Complex'

- Illegal surveillance operations being carried out on the inventor by 'intelligence' agencies

- Inventor being declared incompetent and psychotic by a completely corrupt Hennepin County Court system

- Unjust commitment of the inventor to a mental institution, and/or forcibly medicating the inventor with a cocktail of powerful antipsychotic drugs

- Patent litigation

- Competing locomotion tech (e.g., VR treadmills)

- Slower-than-expected adoption of virtual environments

## 12.  Final Ballpark Estimate:

**100B–200B total economic impact** (revenue + ecosystem growth)

**Note**: *This is a simplified, directional estimate. Actual figures would require granular market analysis, partnership terms, and tech adoption curves.*



# National Defense & Investment Opportunities Report:

## US Patent 11,577,177 ("Infinite Movement" Treadmill)

Based on Declaration of Hao Li (Case No. 3:17-cv-04006-JST)

## 1. Key Document Reference

- **Declaration of Hao Li**:
  https://storage.courtlistener.com/recap/gov.uscourts.cand.314347/gov.uscourts.cand.314347.139.7.pdf

- **Relevance**:
  Highlights direct ties between the patent's core technology (virtual movement systems) and defense-funded research in human digitization, simulation, and immersive training.

## 2. Defense Entity Alignment

- **U.S. Army & Army Research Office (ARO)**

  ○ **Existing Investments**:

  $2.8M for *"Avatar Digitization & Immersive Communication Using Deep Learning"* (ARO, 2017–2019).

  $1.4M for *"Capture, Rendering, & Display for Virtual Humans"* (ARO, 2016–2017).

  ○ **Interest in Patent**:

  The treadmill's ability to simulate unrestricted movement in confined spaces aligns with ARO's focus on **immersive soldier training**. The system could enable soldiers to "walk" through virtual combat zones, urban terrains, or disaster scenarios while physically stationary—critical for mission rehearsals in controlled environments.

- **Office of Naval Research (ONR)**

  ○ **Existing Investments**:

  $591K for *"Complete Human Digitization and Unconstrained Performance Capture"* (ONR Young Investigator Award, 2018–2021).

  ○ **Interest in Patent**:

  ONR's funding of unconstrained human digitization directly overlaps with the treadmill's capability to map real-world user motion to virtual avatars. Applications include naval VR training (e.g., shipboard firefighting simulations) and telepresence for remote operations.

Exhibit Q | p. 1

- **DARPA & Intelligence Advanced Research Projects Activity (IARPA)**

  ○ **Existing Investments**:

  **$419K** for *"GLAIVE: Graphics and Learning Aided Vision Engine for Janus"* (IARPA/DoD, 2014–2018).

  ○ **Interest in Patent**:

  DARPA's history of funding AI-driven virtual environments (e.g., *Squad X* program) suggests strong potential for integrating the treadmill into AI-generated "infinite" training worlds. The patent's real-time camera-treadmill syncing could enhance autonomous drone pilot training or mixed-reality battlefield simulations.

- **USC Institute for Creative Technologies (ICT)**

  ○ **Existing Partnerships**:

  Hao Li directs ICT's Vision and Graphics Lab, which has received $8.89M in federal grants (2015–2019) for projects like *"Light Stage Pipeline for High-Fidelity Face Digitization"* (ARO-funded).

  ○ **Interest in Patent**:

  ICT's work on soldier avatars and VR trauma training (e.g., *STRIVE* project) could leverage the treadmill to create hyper-realistic, physically interactive scenarios. The treadmill's compatibility with LED/green screens (as cited in the patent) matches ICT's existing virtual production infrastructure.

## 3. Investment Opportunities

- **Military Training Contracts**

  ○ **Target**:

  U.S. Army's Synthetic Training Environment (STE) program, a $10B initiative to modernize VR/AR soldier training.

  ○ **Use Case**:

  Replace traditional treadmills in STE's One World Terrain system, enabling soldiers to traverse AI-generated global landscapes.

Exhibit Q | p. 2

- **Defense Contractor Partnerships**
  - **Example**:
    **Lockheed Martin** or **Northrop Grumman**, which develop VR training modules for F-35 pilots and ground troops.
  - **Patent Value**:
    Treadmill's real-time haptic feedback (vibration cues for positional awareness) could enhance situational realism in simulations.

- **Dual-Use Commercialization**
  - **Path**:
    License the patent to defense-focused startups (e.g., Anduril Industries) for border security simulations or drone operator training.

---

## 4. Strategic Recommendations

- **Leverage USC ICT's Defense Network**:
  Use Hao Li's existing ARO/ONR grants (declared in the court document) to pilot the treadmill in ongoing projects like *"Digital SHARP Survivor"* (ARO-funded trauma training).

- **Pursue SBIR/STTR Funding**:
  Target DARPA's Small Business Innovation Research program for AI-integrated locomotion systems.

- **Collaborate with Simulation Tech Firms**:
  Partner with CAE or Bohemia Interactive Simulations (military VR providers) to embed the treadmill into their platforms.

---

## 5. Conclusion

- The Declaration of Hao Li underscores ***direct alignment between US Patent 11,577,177 and defense priorities in immersive training, human digitization, and AI-driven virtual environments.***

- With documented funding from ARO, ONR, and DARPA for related technologies, InfiniSet's treadmill is positioned to attract strategic partnerships and contracts within the national defense sector.

---

# 6. Next Step

- Initiate outreach to USC ICT's military liaisons and submit proposals to DoD's Simulation and Training Technology Center (STTC).

---

**Document Citation**:

***Declaration of Hao Li***, *pp. 18–21 (Research Grants), 27–30 (Defense Projects)*

https://storage.courtlistener.com/recap/gov.uscourts.cand.314347/gov.uscourts.cand.314347.139.7.pdf



| STATE OF MINNESOTA | DISTRICT COURT |
|---|---|
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |

| | |
|---|---|
| State of Minnesota,<br><br>Plaintiff,<br><br>vs.<br><br>Matthew David Guertin,<br><br>Defendant. | Court File No. : 27-CR-23-1886<br><br>**DEFENDANT'S PETITION TO PROCEED AS PRO SE COUNSEL**<br><br>Judicial Officer: Sarah Hudelston |

TO:  THE HONORABLE SARAH HUDELSTON, JUDGE OF DISTRICT COURT; MARY F. MORIARTY, HENNEPIN COUNTY ATTORNEY; AND MAWERDI HAMID, ASSISTANT HENNEPIN COUNTY ATTORNEY

## I.  INTRODUCTION

Defendant Matthew David Guertin, by and for himself, hereby petitions this Court for an order permitting him to represent himself (pro se) in the above-captioned case and to discharge his court-appointed counsel. This petition is grounded in the Sixth [1] and Fourteenth [2] Amendments of the U.S. Constitution, which guarantee a criminal defendant's right to self-representation, as recognized in *Faretta v. California*, 422 U.S. 806 (1975) [3], and in Minnesota law (Minn. R. Crim. P. 5.04 [4]; Minn. Stat. § 611.19). [5] The Defendant does not take this step lightly; he fully understands the seriousness of self-representation. However, as detailed below, the Defendant's choice is not truly voluntary in the ordinary sense - it is being forced by circumstances in which his court-appointed attorneys have actively obstructed his defense and the Court has refused to hear his motions while he remains represented. In short, the Defendant's

---

1   6th Amendment of the U.S. Constitution | https://tinyurl.com/3nfsynmd

2   14th Amendment of the U.S. Constitution | https://tinyurl.com/2ducwnwf

3   *Faretta v. California*, 422 U.S. 806 (1975) | https://tinyurl.com/mwvyr4e9

4   Minn. R. Crim. P. 5.04 | https://tinyurl.com/267r3p6j

5   Minn. Stat. § 611.19 | https://tinyurl.com/mtsvz8ad

Add. 200

only remaining avenue to a meaningful defense is to invoke his *Faretta* right and proceed without appointed counsel.

> *"The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction."* - *Faretta*, 422 U.S. at 834-35. [6]

Thus, if the Defendant must bear the consequences, he must also be free to chart his own defense, especially when current counsel and the Court have made it impossible to do so otherwise.

> The Defendant's choice "*must be honored out of that respect for the individual which is the lifeblood of the law.*" [7]

Request for Relief: Through this petition, the Defendant seeks to vindicate his constitutional rights by proceeding pro se. He asserts that his waiver of counsel is made knowingly, intelligently, and voluntarily, with eyes open to the risks. [8] He further asserts that the extraordinary breakdown in the attorney-client relationship, and the collusive actions of counsel and the prosecution (with the tacit approval of the Court), have nullified any benefit of counsel and in fact are depriving him of a fair defense. Under these circumstances, the Defendant has an unconditional right to represent himself. He asks this Court to promptly grant that right so that he can pursue his defense strategy on the record and without further obstruction.

## II.   RELEVANT BACKGROUND AND FACTS

Charges and Proceedings to Date: the Defendant is charged in this matter with multiple felony offenses arising from an alleged incident on January 21, 2023. Despite the case pending for over two years, it has been fraught with irregularities. The Defendant was subjected to a series of Rule 20 competency evaluations at the State's behest. For the entirety of 2023 and 2024, the case remained 'dormant' as the State pursued a narrative that the Defendant was not competent to stand trial - a narrative that conveniently delayed any substantive confrontation of the Defendant's evidence and defenses. Eventually, after a contested competency hearing on

---

6   *Faretta*, 422 U.S. at 834-35 | https://tinyurl.com/45zhxcd5

7   "*respect for the individual which is the lifeblood of the law.*" | https://tinyurl.com/yytdy53m

8   "*his choice is made with eyes open.*" | https://tinyurl.com/22mjmk7f

Add. 201

March 5, 2025, the Court issued an Order on April 3, 2025 finding the Defendant competent to stand trial (*see* Index *127, attached Exhibit B, 'Court Order Declaring the Defendant Competent'*). This April 3 competency ruling should have cleared the way for the Defendant to participate fully in his defense. Indeed, as a matter of law, a defendant presumed competent is entitled to make decisions about his case and have his motions heard.

## A  |  Court-Appointed Counsel's Obstruction

Unfortunately, the Defendant's court-appointed public defenders - Ms. Raissa Carpenter and Mr. Emmett Donnelly - have denied the Defendant any meaningful advocacy since their appointment. The relationship between the Defendant and these attorneys has completely broken down. The Defendant has repeatedly directed counsel to pursue specific defenses and motions, only to be met with silence, refusal, or outright opposition. For example:

- **January 2025 Emails**

  The Defendant sent detailed emails to his attorneys (*see Exhibit A, January 2025 Emails*) outlining his legal strategy and requesting that counsel file a motion to dismiss all charges with prejudice. These emails were cogent and supported by legal authorities (including *State v. Camacho,* 561 N.W.2d 160, 173 (Minn. 1997) [9], *State v. Sabahot,* A10-2174, (Minn. App. Jan. 3, 2012) [10], *State v. Thompson,* 988 N.W.2d 149 (Minn. App. 2023) [11], and others) that the Defendant himself researched. Rather than act on these well-founded requests, defense counsel ignored and stonewalled them. They neither filed the proposed motion nor meaningfully responded to the Defendant's legal points. This betrayal of the Defendant's objectives is evidenced in Exhibit A, which shows counsel's dismissive attitude toward the Defendant's rights. Such conduct violates Minn. R. Prof. Conduct 1.2(a) [12] (requiring a lawyer to abide by the client's decisions concerning the objectives of representation) and Rule 1.4 [13] (duty to communicate). If counsel believed the Defendant's requests were frivolous or objectionable, their ethical course was to discuss it

---

9   *State v. Camacho,* 561 N.W.2d 160, 173 (Minn. 1997) | https://tinyurl.com/3ra8wr54

10  *State v. Sabahot,* A10-2174, (Minn. App. Jan. 3, 2012) | https://tinyurl.com/447bwnj3

11  *State v. Thompson*, 988 N.W.2d 149 (Minn. App. 2023) | https://tinyurl.com/hdhn9pa4

12  Minn. R. Prof. Conduct 1.2(a) | https://tinyurl.com/mws3hcnr

13  Minn. R. Prof. Conduct 1.4 | https://tinyurl.com/2h7x2rfd

Add. 202

with the Defendant candidly or, if irreconcilable, move to withdraw (Minn. R. Prof. Conduct 1.16 [14]), not to simply ignore the client.

- **April 16, 2025 Motion to Dismiss**

  After being found competent, the Defendant himself prepared and electronically filed a Motion to Dismiss All Charges With Prejudice (*see Index 131, attached as Exhibit C*). In the introduction to that motion, the Defendant explicitly stated he was "*proceeding pro se for this motion only, while also represented by counsel*" in an attempt to get his arguments before the Court despite counsel's inaction. The Motion to Dismiss is a substantial brief asserting numerous grounds for dismissal, including pervasive fraud, prosecutorial misconduct, and constitutional violations that have corrupted every stage of this case. It incorporates newly prepared evidence (discussed below) of systemic wrongdoing far beyond the immediate criminal charges. Notably, the Defendant served a copy of this motion , as well as all previous exhibits on his defense counsel for their review. Yet counsel still refused to advocate for it or even acknowledge its merits. They took no action whatsoever in support of their client's motion.

- **April 17, 2025 Hearing**

  During the hearing before the Honorable Judge Sarah Hudelston, defense counsel's obstruction came to a head in open court. The Defendant was present and prepared to address his Motion to Dismiss. However, before the Defendant could speak, his attorneys immediately told the Court that they disagreed with the Defendant's motion and would not be pursuing it as part of his defense. Counsel essentially *repudiated their own client's motion* in front of the judge. This left the Defendant in an untenable position – his counsel (ostensibly his advocates) were actively arguing against his interests. Even more egregiously, Mr. Donnelly, one of the public defenders, informed the Court that he disagreed with the finding that Defendant is competent. In other words, counsel openly suggested that their own client should perhaps still be considered mentally incompetent, directly undermining the April 3 competency order (*see Index 127, attached as Exhibit B*) and the Defendant's credibility. This statement was not only disloyal; it was prejudicial to the Defendant and had no purpose except to bolster the State's effort to marginalize the

---

14  Minn. R. Prof. Conduct 1.16 | https://tinyurl.com/49htk3zx

Add. 203

Defendant. Such conduct may violate Minn. R. Prof. Conduct 1.6 [15] (confidentiality / loyalty) and certainly 1.7 [16] (conflict of interest), as counsel effectively aligned themselves with an adverse position (the suggestion that their client is not competent) without any legal basis or authorization.

- Faced with this sabotage by his own attorneys, the Defendant himself addressed the Court at the April 17 hearing. He clearly and unequivocally asserted that his attorneys work for him and are obligated to follow his chosen strategy. He stated on the record that his preferred legal strategy is to have the Court hear and rule on his Motion to Dismiss - a motion raising serious issues of misconduct that go to the heart of the case. He also noted that he had no confidence in counsel if they refused to present this fundamental motion. In response, the Court bluntly stated that it would not consider the Defendant's Motion to Dismiss because the Defendant was still "*represented by counsel who does not agree with the motion*". **The Court thus *endorsed* counsel's obstruction** and used it as a basis to silence the Defendant's pro se filing. At this point, it became evident that the Defendant's defense was effectively being muzzled by the combined actions of his own lawyers and the Court's procedural stance.

## B    |    New Evidence Exposing Systemic Misconduct

It must be emphasized *why* the Defendant is so insistent on getting his Motion to Dismiss heard. After the competency ruling in early April, the Defendant was finally able to actively participate in his case - and he promptly did so by filing the Motion to Dismiss with extensive supporting evidence. Specifically, the Defendant submitted three sets of evidentiary exhibits (*see Index 128, 129, and 130*) that corroborate his claims of fraud and misconduct:

- **Index 128 | "Netflix Whistleblower" Evidence Exhibit**

  This exhibit presents a first-person narrative documenting the events leading up to Defendant's criminal charges, focused on his discovery of a competing Netflix patent filed just days after his own, which cites his patent at the top. The story is constructed from real-time email records, publicly filed patents and trademarks, and LinkedIn activity metadata that suggest Defendant's intellectual property was being monitored and

---

15  Minn. R. Prof. Conduct 1.6 | https://tinyurl.com/4e2u7adz
16  Minn. R. Prof. Conduct 1.7 | https://tinyurl.com/nheez6bu

Add. 204

targeted. The exhibit includes live hyperlinks to original Dropbox archives, attachments, and communications, all of which were preserved and publicly shared as part of Defendant's ongoing transparency strategy. It establishes the foundation of Defendant's claims regarding motive, surveillance, and early-stage retaliation - before any involvement with law enforcement or the court system.

- **Index 129 | 'Brodsky USPTO Patent Fraud' Exhibits**

  This exhibit contains two linked reports that expose strategic patent manipulation centered on U.S. Patent No. 11,383,062 (the "Brodsky Patent"). It presents detailed forensic and legal analysis showing how the Brodsky patent - originally unrelated to locomotion - was retroactively amended to closely mirror the technical innovations of InfiniSet's earlier patent (U.S. 11,577,177). The timeline, claim language, and synchronized publication dates point to insider awareness of InfiniSet's confidential filings. Additional irregularities include a missing Israeli priority document, vague claim definitions, and image inconsistencies in the USPTO file wrapper. Together, the exhibits provide a direct, evidence-based account of high-level IP fraud occurring within the federal patent system - without speculation, and using only publicly accessible, authenticated records.

- **Index 130 | 'Netflix Academic Patent Fraud' Exhibits**

  This exhibit comprises four interlinked evidence sets (*Exhibits D-G*) that expose a coordinated academic fraud involving fabricated research papers attributed to Paul Debevec, and USC-ICT. These papers, which claim groundbreaking virtual production capabilities as early as 2006, are shown through timeline analysis, citation audits, and forensic inconsistencies to be retroactively constructed and technologically implausible for their claimed era. Although these academic documents are not cited in the Netflix patent (U.S. 11,810,254), the exhibit presents compelling evidence that they are now being positioned as a fallback "Plan B" prior art narrative - intended to sidestep the Defendant's successful third-party submission of U.S. Patent 11,577,177, which is currently listed at the top of the Netflix patent itself. The significance of this exhibit lies in the fact that Paul Debevec, author of the suspect papers, is now directly affiliated with Netflix and the very company to which the competing patent is assigned. Together, these

Add. 205

documents reveal a strategic effort to erase the Defendant's contribution by seeding false historical records that could be used to invalidate his invention's novelty and enable the ongoing exploitation of his intellectual property.

This attempt to erase the Defendant's contribution through fraudulent academic backdating directly parallels the Court's own efforts to erase him personally - by portraying him as 'psychotic' and seeking to have him unjustly committed, thereby silencing the only individual capable of exposing the full scope of the scheme.

## C   |   Counsel's Willful Blindness to the Above

All of the above evidence (*see Index 128, 129, and 130*) was served upon defense counsel or otherwise made available in the court file after the competency finding. Yet counsel willfully ignored these materials. They did not discuss them with the Defendant, did not investigate their implications, and certainly did not incorporate them into any defense theory. This abdication of duty is tantamount to a constructive denial of counsel. When an attorney refuses to consider exonerating or favorable evidence - especially evidence that reveals falsified discovery and malicious motives behind a prosecution - that attorney is no longer functioning as defense counsel in any meaningful sense. Instead, they are colluding with the adversary or at least with an outside agenda to ensure the truth never comes to light. The Defendant asserts that his counsel's conduct in this regard violates *multiple* provisions of the Minn. Rules of Prof. Conduct and his Sixth Amendment right to effective assistance. As the U.S. Supreme Court noted in *United States v. Cronic*, 466 U.S. 648 (1984) [17], if the adversarial process breaks down due to counsel's non-representation, prejudice is presumed. Here, counsel's neutralization of the Defendant's defense is so complete that the adversarial process has, in effect, broken down.

## D   |   April 17, 2025 Hearing - Defendant Forced to Choose Self-Representation

At the April 17 hearing, after the Court stated it would not hear the Defendant's motion due to his representation status, the Defendant was put in an impossible Catch-22: either accept the silencing of his defense or fire his attorneys on the spot to free his motion from procedural limbo. The Defendant chose the latter, as any rational person in his position would. During a brief off-the-record break (white noise enabled), the Defendant asked his attorneys directly if he could discharge them and proceed pro se in order to get his motion heard; they admitted he

---

17  *United States v. Cronic*, 466 U.S. 648 (1984) | https://tinyurl.com/4r9yxn3h

Add. 206

could. When proceedings resumed, counsel informed the Court that *"Mr. Guertin has expressed his desire to discharge us and proceed pro se."* The Court reacted with evident concern, warning the Defendant about the seriousness of self-representation and the training that lawyers have. The Defendant affirmed he understood the gravity of the decision. He then reiterated clearly to the judge: *"If I proceed on my own, that means you will have to rule on my motion to dismiss, correct? … That is what I want: to represent myself so that my motion to dismiss will be ruled upon."* The Defendant could not have been more clear that his intent in going pro se is to secure a ruling on a crucial motion that has been obstructed by counsel and the Court's current stance.

At the conclusion of the April 17 hearing, the Court set a further hearing on April 29, 2025 at 11:00 AM to formally address the Defendant's self-representation request. The Court provided the Defendant with a standard *"FORM 11 - PETITION TO PROCEED AS PRO SE COUNSEL"*[18] (a fill-in-the-blank questionnaire) to be completed. The Court also indicated that the Defendant's current attorneys would remain present on April 29, possibly to argue against the Defendant's petition. In essence, the stage is set for an unusual, and surreal scenario in which the Defendant must legally justify his right to fire attorneys who have confessed their inability to support his defense. This petition now follows, in advance of the April 29 hearing, to comprehensively set forth why the Defendant must be allowed to proceed pro se and why any opposition to that request - whether by his appointed lawyers or by the State - has no legal or moral merit.

### III.   THE CONSTITUTIONAL RIGHT TO SELF-REPRESENTATION

It is well established that a criminal defendant has a constitutional right to represent himself at trial. This right is grounded in the Sixth Amendment (applicable to the States via the Fourteenth Amendment's Due Process Clause) and was unequivocally recognized by the U.S. Supreme Court in *Faretta v. California*, 422 U.S. 806 (1975). In *Faretta*, the Supreme Court held that forcing a lawyer upon a defendant against his will violates the defendant's constitutional right to conduct his own defense. The Court explained that the Framers intended the assistance of counsel to supplement, not override, the accused's personal autonomy in conducting his case. [19] *"An unwanted counsel "represents" the defendant only through a tenuous and unacceptable legal*

---

18  FORM 11 - PETITION TO PROCEED AS PRO SE COUNSEL | https://tinyurl.com/ms88t694

19  *"primary right to conduct one's own defense in propria persona."* | https://tinyurl.com/2ukddr9c

Add. 207

*fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense."* [20] id. at 821, and a nearly universal principle of law and history supports that right [21]. Indeed, the *Faretta* Court eloquently noted that although self-representation may often be ill-advised, a defendant's choice in this regard must be respected because *"personal liberties are not rooted in the law of averages. The right to defend is personal." Id.* At 834 [22]. The Defendant alone bears the consequences of a conviction, thus *"he must be free personally to decide whether, in his particular case, counsel is to his advantage." Id.* At 835 [23].

Minnesota law fully embraces the *Faretta* principle. Minn. R. Crim. P. 5.04, subd. 1(4) [24] provides the procedure for waiver of counsel in felony cases, and Minnesota courts have consistently held that a knowing and voluntary waiver of the right to counsel must be honored by the trial court. See, e.g., *State v. Richards*, 456 N.W.2d 260, 263 (Minn. 1990) [25] *"the self-representation right embodies such bedrock concepts of individualism and personal autonomy that its deprivation is not amenable to harmless error analysis.";* *State v. Camacho*, 561 N.W.2d 160, 173 (Minn. 1997) [26] (reiterating that if the waiver is clear, knowing, and voluntary, the court should grant self-representation, even if the decision is foolish). Minnesota has codified the requirement that a waiver of counsel be either in writing or on the record in open court. Minn. Stat. § 611.19 [27] mandates: *"Where counsel is waived by a defendant, the waiver shall in all instances be made in writing, signed by the defendant, except that in such situation if the defendant refuses to sign the written waiver, then the court shall make a record evidencing such refusal of counsel"* In the present case, the Defendant is submitting this Petition in writing (and signing it), thereby satisfying § 611.19's writing requirement. Additionally, the Defendant will orally reaffirm his waiver on the record at the April 29 hearing.

---

20  *"not the defense guaranteed him by the Constitution"* | https://tinyurl.com/44k6jfzr

21  *"forcing a lawyer…. is contrary to his basic right"* | https://tinyurl.com/4zf9n2ew

22  *"The right to defend is personal."* | https://tinyurl.com/yz8zdxv2

23  *"It is the defendant…. who must be free personally to decide"* | https://tinyurl.com/45zhxcd5

24  Minn. R. Crim. P. 5.04, subd. 1(4) | https://tinyurl.com/3p9yzk8f

25  *State v. Richards*, 456 N.W.2d 260, 263 (Minn. 1990) | https://tinyurl.com/38cwm29z

26  *State v. Camacho*, 561 N.W.2d 160, 173 (Minn. 1997) | https://tinyurl.com/3y594c5h

27  Minn. Stat. § 611.19 | https://tinyurl.com/3kj8bfds

Add. 208

To comply with Rule 5.04 and constitutional standards (see *Faretta*, 422 U.S. at 835-36 [28]), a court must ensure that a defendant's waiver of counsel is made with knowledge of the dangers and disadvantages of self-representation. The Defendant preemptively acknowledges those dangers here: He understands that if allowed to proceed pro se, he will be solely responsible for defending himself, will need to follow court rules and procedures, and will lose the benefit of a lawyer's training and experience. The Defendant is prepared to accept these conditions. He is a highly literate, extremely competent adult who has demonstrated a devastatingly effective ability to research law and articulate arguments (as evidenced by his filings). He understands the charges against him (including their statutory elements) and the potential maximum penalties (including that the most serious charge could carry a 5 year prison term). He understands that if he proceeds pro se, he cannot later claim ineffective assistance of counsel regarding his own performance. In short, the Defendant knows what he is doing, and his choice is made "with eyes open." *Faretta*, 422 U.S. at 835 [29] (quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942) [30]).

The Court's role, upon this *clear and unequivocal* request, is limited to ensuring the waiver is knowing and voluntary - not to evaluate the wisdom of the Defendant's decision or the content of his beliefs. *Faretta* expressly forbids denying self-representation simply because the court thinks the defendant is making a poor choice. 422 U.S. at 834 [31]. Here, the Defendant's choice is rational given the circumstances (as detailed in the next section). But even if the Court harbors reservations, the law requires that the Defendant's autonomy be respected once he demonstrates understanding of his rights. Stated differently, self-representation is the Defendant's constitutional right - he does not need anyone's permission to exercise it, so long as he is competent and informed.

The Defendant also notes that under Minnesota law, a court may (but is not required to) appoint advisory or standby counsel for a self-represented defendant. *See* Minn. R. Crim. P. 5.04, subd. 2. However, Minnesota statutes prohibit a district public defender from serving as standby counsel.

---

28  *Faretta*, 422 U.S. at 835-36 | https://tinyurl.com/bdhd3anj
29  *Faretta*, 422 U.S. at 835 *"his choice is made with eyes open."* | https://tinyurl.com/matztxys
30  *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942) | https://tinyurl.com/34nzrfc5
31  *Faretta*, 422 U.S. at 834 | https://tinyurl.com/yz8zdxv2

Add. 209

Minn. Stat. § 611.26, subd. 6 [32] *"The district public defender must not serve as advisory counsel or standby counsel."*. Thus, if the Court grants this petition, the Defendant's current public defenders must be fully discharged from the case (consistent with the Defendant's wishes). The Court could consider appointing conflict-free standby counsel from outside the public defender's office, but the Defendant is not requesting standby counsel at this time. The Defendant is confident in his ability to present his motions and arguments. Indeed, given his counsels' overt antagonism to his defense, he sadly trusts that he will represent his interests far better alone than with any court-appointed lawyer whose loyalties might be divided.

## IV.   DEFENDANT IS BEING DENIED A MEANINGFUL DEFENSE BY HIS COURT-APPOINTED COUNSEL

A fundamental purpose of the right to counsel is to ensure the accused a meaningful defense. When counsel refuses to advocate the defense that the client and the facts require, the right to counsel becomes an empty formality. In this case, the Defendant's public defenders have not merely been ineffective; they have been adversarial to their own client. The record already demonstrates this in several undeniable ways (detailed in Section II above), which can be further summarized, and expanded upon:

### A   |   Refusal to Present Critical Motions/Evidence

Counsel has flatly refused to file or argue the Motion to Dismiss (*see Index 131, attached Exhibit C*) that the Defendant views as vital. They took this stance despite the motion being well-researched and supported by evidence. By doing so, counsel deprived the Defendant of any advocacy on what may be a dispositive issue (if the motion's allegations of pervasive misconduct are even *partially* true, dismissal or other severe sanctions would be warranted). Counsel similarly ignored the *trove* of evidence (*see Index 122, 123, 124, 125, 128, 129, and 130*) supporting the Defendant's claims. This is not a strategic decision within the bounds of reasonable professional judgment – it is wholesale abandonment of the client's case. No competent, loyal attorney would ignore evidence of falsified discovery or theft of intellectual property that serves to irrefutably prove the very conspiracy which has been used for the past 26+ months as evidence of their client's supposed 'incompetence', and 'psychotic' disorder. The

---

32  Minn. Stat. § 611.26, subd. 6 | https://tinyurl.com/yc2dzxyf

Add. 210

only plausible explanation for counsel's inaction is that their interests (or instructions from superiors) are not aligned with the Defendant's interest in revealing the truth. In effect, defense counsel have been acting as gatekeepers for the prosecution, keeping exculpatory and scandalous information out of the Court's view.

## B    |    Opposing the Client in Open Court

At the April 17 hearing, defense counsel took the extraordinary step of advocating *against* their client's position. By telling the judge they disagreed with the competency finding *and* with the Defendant's motion, counsel joined forces with the State to paint the Defendant as *delusional or misguided*. This poisoned the well against the Defendant's pro se efforts and signaled to the Court that counsel had no intention of helping the Defendant pursue his chosen defense. It is difficult to imagine a more glaring conflict: the Defendant wanted his motion heard; his attorneys wanted it buried. The Minnesota Rules of Professional Conduct provide that if a fundamental disagreement arises, a lawyer "shall withdraw" if the client requests it (Rule 1.16(a)(3) [33]), or may withdraw if the representation has become unreasonably difficult or the client insists on action the lawyer fundamentally disagrees with (Rule 1.16(b)(4), (6) [34]). Here, counsel did not withdraw on their own – likely because withdrawing would allow the Defendant to speak for himself. Instead, they stayed on the case to actively obstruct. This is a gross ethical violation. It also effectively denied the Defendant the assistance of any genuine counsel at that hearing. For Sixth Amendment purposes, when an attorney sides against his client on a core issue, the client is left without counsel in substance.

## C    |    Lack of Communication and Good Faith

The January 2025 emails (*see attached Exhibit A*) show the Defendant diligently attempting to communicate his strategy and even citing relevant case law to his attorneys. The response? As the Defendant notes, counsel provided virtually no meaningful reply and certainly did not act on his requests. The professional norm is that a defense attorney should consult with the client about important decisions and keep the client informed (Rule 1.4 [35]). Here, counsel's silence and inaction speak volumes. They did not explain why they refused to file the motion;

---

33  Minn. R. Prof. Conduct 1.16(a)(3) | https://tinyurl.com/664up495

34  Minn. R. Prof. Conduct 1.16(b)(4), (6) | https://tinyurl.com/b8832smv

35  Minn. R. Prof. Conduct 1.4 | https://tinyurl.com/e8fxve4t

Add. 211

they simply ignored the client's directives. This lack of engagement is tantamount to a constructive severance of the attorney-client relationship. By the time of the April hearing, there was no trust or communication left - counsel and client were operating at cross-purposes. Such a breakdown by itself can justify granting a motion for self-representation (or at least substitution of counsel), because a complete communication breakdown means the Defendant is not receiving the benefit of counsel in any meaningful sense. See *State v. Clark*, 722 N.W.2d 460, 464 (Minn. 2006) [36] (noting that an irreconcilable conflict or a total breakdown in communication may require appointment of substitute counsel; a fortiori, it should allow self-representation if the defendant so chooses).

## D  |  Discovery Fraud Alone Justifies Immediate Discharge of Counsel

This case cannot lawfully proceed to trial due to the deliberate and irrefutable manipulation of discovery materials by the State, compounded by defense counsel's repeated refusal to act after being specifically notified. As documented in attached Exhibit A (*January 2025 Emails*), the Defendant raised these concerns multiple times - detailing falsified metadata, aspect ratio anomalies, OneDrive inconsistencies, and lighting/reflection discrepancies that irrefutably proved fabrication. Rather than investigate or pursue a motion to dismiss, counsel - specifically Raissa Carpenter - repeatedly downplayed the issue, insisting that discovery was "*not a big deal*" in Minnesota courts and discouraging any effort to challenge the falsified evidence.

This assertion was false, and any attorney competent in Minnesota criminal law knows that discovery tampering is not only a legitimate issue - it is grounds for dismissal with prejudice when proven.

Under *Brady v. Maryland*, 373 U.S. 83, 86-87 (1963) [37], the suppression or manipulation of evidence favorable to the defense constitutes a due process violation. Here, the discovery was not just suppressed - it was fabricated. This includes images with falsified timestamps, images altered to conceal cropping and distortion, and metadata that contradicts the physical lighting environment - specifically, flash shadow direction and object reflection analysis. These issues are extensively documented in Exhibits A–L of Defendant's pro se evidence submissions, which

---

36  *State v. Clark*, 722 N.W.2d 460, 464 (Minn. 2006) | https://tinyurl.com/4b9kmam4

37  *Brady v. Maryland*, 373 U.S. 83, 86-87 (1963) | https://tinyurl.com/3uawcpb6

Add. 212

were presented in support of his competency during the March 5, 2025 contested hearing before Judge Koch. (*see Index 122, 123, and 124*)

The State's final maneuver - embedding the manipulated images directly into the official Hennepin County OneDrive discovery system - now binds them to the fraud. This is not an allegation; it is digitally verifiable. Under *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 250 (1944) [38], this conduct constitutes fraud on the court, which requires vacatur or dismissal regardless of procedural posture.

Moreover, as held in *Giglio v. United States*, 405 U.S. 150, 153-154 (1972) [39], even passive use of false evidence by the prosecution - without correction - violates the defendant's rights and warrants reversal or dismissal. That principle applies here with full force.

The fraud also fatally tainted the Rule 20 psychiatric evaluations, which relied on these manipulated images to justify findings that the Defendant's claims were delusional. This triggers the exclusionary rule under *Mapp v. Ohio*, 367 U.S. 643, 655 (1961) [40] : all downstream products of that falsified discovery must be deemed inadmissible.

The Defense counsel's role in this is equally damning. Despite receiving detailed forensic analyses from the Defendant - including PDF exhibits, annotated flipbooks, and a narrated explanation - counsel refused to take action. This constitutes a failure of the most basic Sixth Amendment obligations under *Strickland v. Washington,* 466 U.S. 668 (1984) [41], and a constructive denial of counsel as articulated in *United States v. Cronic,* 466 U.S. 648 (1984) [42]. Per *Cronic,* when defense counsel fails to subject the prosecution's case to adversarial testing, prejudice is presumed.

> *"What remains is not a prosecution - it is a procedural corpse propped up by falsified images and ethical evasion."*
>
> *- Paraphrasing Hazel-Atlas Glass, 322 U.S. at 246*

---

38  *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 250 (1944) | https://tinyurl.com/3s4etfjy

39  *Giglio v. United States*, 405 U.S. 150, 153-154 (1972) | https://tinyurl.com/r79cdtau

40  *Mapp v. Ohio*, 367 U.S. 643, 655 (1961) | https://tinyurl.com/znp6rrfw

41  *Strickland v. Washington*, 466 U.S. 668 (1984) | https://tinyurl.com/4y3sj9r5

42  *United States v. Cronic*, 466 U.S. 648 (1984) | https://tinyurl.com/4r9yxn3h

Add. 213

No legitimate court can allow this case to proceed to trial under these circumstances. The Court must acknowledge that the Defendant's counsel was confronted with irrefutable fraud and knowingly chose inaction, thereby forfeiting any credibility or justification for continued representation.

## E | Counsel of Record, But Not in Reality

In sum, the Defendant's court-appointed lawyers have failed to provide a defense and instead have impeded one. The Sixth Amendment guarantees the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). But more fundamentally, it guarantees the loyal assistance of counsel, untainted by conflicts of interest or ulterior motives. *See id.* At 692 [43] (prejudice presumed when counsel is burdened by an actual conflict of interest). Here, counsel's actions exhibit a conflict of interest - whether due to personal belief that the Defendant's claims should be squelched, pressure from the public defender hierarchy, collusion with the State, or perhaps even collusion with the very same "powerful people" the Defendant's previous, privately retained defense counsel, Bruce Rivers, told the Defendant "were keeping an eye on him". This Court need not find the precise cause; the effect is clear: the Defendant has no true advocate as long as these attorneys remain his representatives.

It bears emphasis that the Defendant did attempt less drastic remedies before resorting to self-representation. He repeatedly asked his lawyers to do their job. He essentially begged the Court on April 17 to hear his motion without having to fire counsel (*"perhaps a continuance to allow the judge to review it since it was only filed at 3:15 PM yesterday"*). These pleas were unavailing. The procedural paradox forced upon the Defendant is this: He cannot get a ruling on his motion *because he has counsel*, and he cannot get counsel to act *because they disagree with his motion*. The only escape from this circular trap is to remove counsel from the equation.

Minnesota courts have recognized that a defendant should not be left defenseless or forced to proceed with counsel who is working against him. *State v. Gillam*, 629 N.W.2d 440, 449 (Minn. 2001) [44] (reversible error to deny substitution of counsel when conflict is so great it results in a total lack of communication). In the present case, however, substituting one public defender for another would likely not cure the problem, as the obstruction appears to be institutional. The

---

43  *"prejudice….when counsel is burdened….conflict of interest"* | https://tinyurl.com/3a956f75

44  *State v. Gillam*, 629 N.W.2d 440, 449 (Minn. 2001) | https://tinyurl.com/yc6jpear

Add. 214

public defender's office has had the case for many months and has never pursued the Defendant's leads; moreover, one of the Defendant's attorneys, Emmett Donnelly, explicitly stated on April 17 that he thinks the Defendant should not have been found competent. This suggests an entrenched view within the defense team that the Defendant's own perspective is not to be taken seriously. At this juncture, the Defendant reasonably fears that any attorney appointed by the State (whether current counsel or a new one) will similarly resist his defense strategy, especially since that strategy involves exposing misconduct by government actors. There is also the reality of timing - the case is headed toward trial, and the Defendant's motion to dismiss is time-sensitive. Injecting a new attorney now (even if one could be found who truly supports the Defendant's aims) would cause further delay and, potentially, new clashes. Therefore, the Defendant asserts that proceeding pro se is not only his right but the most practical and just solution. Only by representing himself can he ensure that the suppressed evidence and arguments are finally brought to light in open court.

To allow the current situation to continue - with counsel ostensibly representing the Defendant while actually suppressing his defense - would be a travesty of justice. It would deny the Defendant any defense at all, which the Sixth Amendment cannot tolerate. The Court should thus find that the Defendant's dissatisfaction with counsel is fully justified and that his waiver of counsel is made advisedly, out of necessity. His request to discharge his lawyers and proceed pro se should be granted forthwith.

## V.   THE JUDICIAL PARADOX: COMPETENCY FINDING VS. DENIAL OF DEFENDANT'S VOICE

On April 3, 2025, this Court entered an order declaring the Defendant competent to stand trial (*see Index 127, attached Exhibit B*). That order followed extensive psychological evaluations and a full competency hearing. The legal effect of the order is that the Defendant is presumed capable of understanding the proceedings and assisting in his own defense. Indeed, from that date forward, the Defendant stood on equal footing with any other competent defendant - with full rights to participate in his defense, make decisions about his case, and have his motions heard. Yet the events that immediately ensued have contradicted and undermined the competency ruling, creating a profound judicial paradox.

Add. 215

Filed in District Court
State of Minnesota
4/21/2025 7:48 AM

If the Defendant is competent (as the Court's own order says he is), then the Defendant's motions and filings are entitled to judicial consideration on their merits. The Court cannot simply ignore a pro se motion to dismiss that was properly filed, especially when that motion raises serious claims of misconduct. By rule, even pro se filings by represented defendants may be accepted or at least made part of the record (Minn. R. Crim. P. 1.04 provides courts flexibility to relieve a party from the strict application of rules "in the interest of justice"). Here, rather than engage with the substance of the Defendant's motion, the Court chose to hide behind the shield of representation: *"I won't consider it because you have a lawyer who doesn't agree with you."* This stance, in context, appears to be a deliberate tactic to dodge inconvenient facts. The Court knew the Defendant had been declared competent and was actively trying to be heard; it also knew defense counsel wouldn't champion his motion. By siding with counsel's refusal, the Court effectively nullified the Defendant's post-competency participation. This raises a stark question of due process under the Fourteenth Amendment. A defendant has a due process right to be heard at meaningful times and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976)[45]. Declaring someone competent but then not allowing them any meaningful hearing of their claims is a form of procedural bait-and-switch.

## A  |  The Courts Self-Inflicted Contradiction

Now, if the Court (or the prosecution, or defense counsel) takes the position that the Defendant's filings (such as the Motion to Dismiss and supporting evidence) are so outlandish that they indicate a lack of competency, then the Court faces a self-inflicted contradiction. The April 3 competency finding has not been vacated or challenged through proper channels. Defense counsel's offhand remark that they "disagree" with it is not a legal motion, and the State has not moved for reconsideration of competency. **Absent new evidence of incompetence, the Court is bound by its prior determination that the Defendant is competent.** Any attempt now to declare the Defendant incompetent *simply because he insists on raising issues that embarrass the State* would appear blatantly pretextual. It would also violate due process, as it would imply that the competency process is being used as a *weapon* to silence a defendant rather than to ensure his understanding. The Minnesota Rules of Criminal Procedure, Rule 20.01 [46]

---

45  *Mathews v. Eldridge,* 424 U.S. 319, 349 (1976) | https://tinyurl.com/4bbafx4a

46  Minn. R. Crim. P. 20.01 | https://tinyurl.com/79e6kwm5

Add. 216

require that competency evaluations be ordered only upon a showing of reason to doubt the defendant's competence. Here, the Court has no reason to doubt the Defendant's competence - if anything, the Defendant's articulate motion and strategic acumen at the April 17 hearing confirm his competence, as he navigated a complex situation to preserve his rights, which a truly incompetent person could not do.

To put it bluntly: The Court cannot have it both ways. Either the Defendant is competent, in which case he has the right to represent himself and to have his motions decided on their merits; or the Court now wants to assert he is incompetent, in which case it would be contradicting its own ruling and depriving the Defendant of due process. Any reversal on competency at this juncture, lacking substantive new evidence, would reek of an attempt to avoid addressing the Defendant's claims. It would also invite scrutiny under *Pate v. Robinson*, 383 U.S. 375 (1966) [47] (due process violated where competency procedure is misused or ignored). Moreover, declaring the Defendant incompetent again would not magically erase the evidence he has put forth; it would merely delay the day of reckoning and likely bolster the Defendant's eventual claims of judicial abuse.

It is also worth considering the optics and implications currently at play:

## B    |    If this Petition to Proceed Pro Se is denied

The Court will be effectively saying that the Defendant must remain shackled to lawyers who refuse to defend him, meaning his Motion to Dismiss will never be heard. In that scenario, the Defendant's constitutional right to *any* defense is eviscerated. The record would show that the Court knowingly left a competent defendant with no avenue to raise serious legal challenges. This would be an appealable issue in its own right (structural error).

## C    |    If this Petition is granted

The Court implicitly acknowledges that the Defendant's appointed counsel have not served him adequately (otherwise, why permit the discharge?). Granting the petition also means the Court can no longer dodge the Motion to Dismiss; once the Defendant is pro se, his filings are properly before the Court. The Court will have to confront the merits of the Defendant's

---

47  *Pate v. Robinson*, 383 U.S. 375 (1966) | https://tinyurl.com/yc32vvdx

Add. 217

allegations of fraud and misconduct, which may prove highly embarrassing or inconvenient for the judicial system and other actors.

**D  |  If the Court or State attempt to question the Defendant's competency again**

It will be transparently seen as a tactic to avoid the two outcomes above. It would signal that the Court is so unwilling to hear the Defendant's case that it would rather invalidate him as a person. This route would undermine confidence in the judiciary's integrity, appearing as an act of reprisal or suppression. It could also open the door to federal civil rights liability, as continually tagging someone as "incompetent" after they've been found competent - merely because they persist in whistleblowing - could be viewed as an unlawful deprivation of rights under color of law (42 U.S.C. § 1983 [48]).

**E  |  The Court and State are Procedurally Trapped**

The only lawful and logical path is to honor the Defendant's rights: recognize his competency and allow him to represent himself, thereby letting his motions be heard. The Court should remember that justice must not only be done, but be seen to be done. To any neutral observer, the Defendant's insistence that his Motion to Dismiss be ruled upon is entirely reasonable - he simply wants a judge to address his evidence and arguments. The refusal to do so thus far (under cover of procedure) appears unjust. By granting this Petition, the Court can correct course and eliminate the "Catch-22" that currently imperils the Defendant's rights.

**F  |  The Right to be Heard According to Law**

Finally, the Defendant notes that the Minnesota Code of Judicial Conduct expects a judge to uphold the law and ensure every litigant's right to be heard. Rule 2.6(A) [49] of the Code states: *"A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law."* Up to now, the Defendant has *not* been accorded the right to be heard according to law - his lawyers wouldn't speak for him, and he was not allowed to speak for himself. This has in fact been the case for the past 26+ months and counting. Granting this Petition will align the Court's actions with its ethical duty to ensure the Defendant can be heard. Conversely, continuing to block the Defendant's voice (either by

---

48  42 U.S.C. § 1983 | https://tinyurl.com/mpkzudvv

49  Minnesota Code of Judicial Conduct Rule 2.6(A) | https://tinyurl.com/yjah7yw8

Add. 218

denying self-representation or by misusing competency assessments) would violate this judicial duty and further the appearance that the Court is suppressing the truth to avoid embarrassment.

## VI.    "TRUTH-AS-PSYCHOSIS" - THE OPPOSITION'S MISUSE OF PSYCHIATRY TO SUPPRESS DEFENDANT'S EVIDENCE

Throughout these proceedings, whenever the Defendant has attempted to expose the extraordinary misconduct underlying his case, the response from the State (and, at times, from the Court and even his own counsel) has been to dismiss those revelations as products of a disordered mind. This strategy might be dubbed *"Truth as Psychosis."* [50] Instead of addressing the content of the Defendant's claims, the opposition attributes them to mental illness, thereby avoiding any investigation into whether the claims are true. Such a tactic is a cynical abuse of the mental health system and Rule 20, and it must be called out and rejected in this context.

The Defendant is acutely aware that some of the information he has brought forward sounds alarming: multi-billion-dollar corporations, patent theft, high-ranking officials, and coordinated cover-ups are not the stuff of a routine criminal case. But sometimes, reality is alarming. Whistleblowers often face disbelief when they first expose corruption, precisely because the truth is so far from ordinary expectations. The evidence the Defendant has submitted speaks for itself - and notably, no party has actually refuted or disproven *any* of it. Instead of confronting the evidence, the opposition has tried to shoot the messenger's sanity. The Court should not be swayed by this improper tactic.

To drive this home: If the Defendant's assertions were truly delusional, one would expect them to be internally inconsistent, unsupported by external evidence, or outright fantastical (e.g., involving aliens, magic, or other hallmarks of true 'psychosis'). Instead, what do we have? We have a Motion to Dismiss (*see Index 131, attached Exhibit C*) with 56 footnotes, containing a total of 78 different links, and a meticulous inclusion of index citations. We have exhibits including real emails, patent filings, corporate records, and timelines. We have forensic metadata, timestamps, and image forensic reports which irrefutably establish fraudulent discovery materials, and an attempt at covering it up. **This is not how delusions present. This is how** *evidence* **presents.** The opposition's unwillingness to engage with the substance of this evidence

---

50  The Defendant's *"Truth as Psychosis"* analysis posted on his Substack | https://tinyurl.com/ybw53x6j

Add. 219

speaks volumes. They know that if a court of law actually scrutinizes these materials, the implications are explosive: it would unveil serious misconduct by the State, mental health experts, and possibly even judicial officers who may have been complicit in an effort to unjustly 'disappear' the Defendant into a mental institution to cover up the high-level theft of his patent.

Thus, rather than deal with that fallout, the strategy is to declare, "*He's crazy - nothing he says can be believed.*" Such a declaration might find initial traction in a system predisposed to doubt a lone individual against institutions. But now that the Defendant has been found competent, the "crazy" label is legally much harder to apply. Competency is a low bar - it means one is not so impaired as to be unable to participate in the proceedings. Defendant more than clears that bar; in fact, by any fair assessment, he appears highly intelligent and knowledgeable about his case. There is no evidence that the Defendant suffers from 'delusions' or 'psychosis'. His beliefs about the case's backstory are based on evidence and lived experience. They may be unusual, but so too are the facts of what happened to him leading up to the origination of his criminal charges on January 21, 2023 (*see Index 128*, '*Netflix Whistleblower is Found Alive and Well | Part 1 − The Patent'*). One person's whistleblower is another person's madman - until the evidence is laid out. Here, the Defendant has laid out that evidence. Calling him crazy without refuting the evidence is an admission of intellectual bankruptcy.

The Court should also be mindful of the incentives at play. If the Defendant's allegations are correct, multiple careers and reputations are on the line. There are individuals who might face professional discipline, civil liability, even criminal charges, if the Defendant's story is validated. Those individuals have every motive to use *any means necessary* to shut the Defendant down. That could include pressuring this Court, the public defenders to keep him under wraps, and leaning on psychiatric evaluations to declare him 'psychotic'. It is not a far-fetched scenario - history is replete with examples of dissidents or inconvenient persons being labeled mentally ill by regimes to discredit them. We do not usually think of that happening in American courts, but the Defendant's case bears an unsettling resemblance to exactly that.

The Defendant urges this Court to break from that pattern. The Rule 20 process should be used to protect a defendant's rights (ensuring he isn't tried while unable to defend himself), not to strip him of rights because he is defending himself *too well*. The notion that the Defendant must be crazy because he believes in a conspiracy against him is a logical fallacy - sometimes people really are conspired against. The question should always come down to evidence, not armchair

Add. 220

psychology. And on the evidence, the Defendant has made a prima facie showing of serious wrongdoing by specific people. Neither his defense counsel nor the prosecution has countered that showing with any substantive rebuttal - they've relied solely on characterizing it as 'delusional', and 'psychotic'. That tactic has run its course. With competency established, the Court should no longer entertain dismissive psychiatric labels in lieu of argument.

To illustrate the absurdity of the "truth-as-psychosis" approach: the Defendant's Motion to Dismiss details multiple instances of deliberate discovery fraud and evidentiary tampering, including falsified image metadata, manipulated aspect ratios, embedded forgeries in the official Hennepin County OneDrive system, and a provable effort to suppress or fabricate material evidence central to the State's case. Instead of addressing these allegations, the prosecution and defense counsel simply ignore them. If those allegations were false, one would expect the State to come forward with affidavits or evidence to the contrary, or at least an explanation. The silence is telling. The plan, evidently, was to *never* have to answer those points because the Defendant's own lawyers wouldn't press them, and the Defendant himself would be sidelined as "incompetent," and "psychotic." Now that that plan has failed (due to the April 3 competency ruling), the backup plan is to apparently fight the Defendant's self-representation and keep the case on a track where none of these issues get aired.

This Court must not allow itself to remain complicit in a criminal conspiracy to suppress exculpatory evidence and silence the Defendant through psychiatric suppression. The Fourteenth Amendment's guarantee of due process includes the idea that a person can't be adjudged insane in order to strip him of rights without robust procedures. *Cf. Jackson v. Indiana*, 406 U.S. 715, 731 (1972) [51] (indefinite commitment of a criminal defendant who cannot be tried violates due process). Here, repeatedly questioning the Defendant's sanity whenever he asserts his rights is a form of harassment that offends due process. The Court's responsibility is to independently evaluate whether the Defendant's perspective has grounding in reality - and the record evidence shows that it does. This petition itself is an example of the Defendant's clarity: it cites rules, cases, emails, orders, and evidence. There is a very clear, consistent, and cohesive logic to the Defendant's complaints, even if they allege shocking misconduct. Simply put, nothing in the Defendant's presentation suggests a disorganized or irrational mind. To the contrary, he has

---

51  *Cf. Jackson v. Indiana*, 406 U.S. 715, 731 (1972) | https://tinyurl.com/nhjpcfmh

Add. 221

shown remarkable composure and strategic thinking under very stressful and surreal circumstances.

By granting this Petition to Proceed Pro Se, the Court will send a message that it will judge this case on facts and law, not on stigma or facile character assassination. The Defendant will then be able to directly marshal the evidence of misconduct in open court, where it can be scrutinized properly. If the Defendant's claims truly lack merit, the State should have no fear of meeting them head-on in motions or at trial. The State's fear of the Defendant speaking for himself indicates that his claims likely *do* have merit - otherwise, letting him rant would only undermine him. It is precisely because the Defendant's claims are credible and supported that the State (and his conflicted defense counsel) have been so keen to prevent him from bringing them to light. This Court's duty is to ensure a fair process, not one rigged to avoid inconvenient truths. Enough with the "*he must be crazy*" dodge - let's proceed with the Defendant in charge of his defense, and let the truth come to light via adversarial testing and judicial rulings.

## VII.   FORM 11 IS UNNECESSARY AND INTRUSIVE; DEFENDANT SUBMITS THIS PETITION INSTEAD

At the conclusion of the April 17 hearing, the Court handed the Defendant a paper form titled "*FORM 11 - PETITION TO PROCEED AS PRO SE COUNSEL.*" This appears to be a boilerplate questionnaire given to defendants who express a wish to represent themselves. It asks a series of mostly check-the-box or short-answer questions, including personal inquiries about the defendant's background. Having reviewed that form, the Defendant has serious reservations about its relevance and lawfulness in this context.

### A   |   Forced Disclosure of Medical History Violates HIPAA and Due Process

The form requests irrelevant personal information and potentially sensitive medical history. For example, questions 6–9 on the form ask about the Defendant's mental health history, any treatments or medications, etc. While the Court may have an interest in ensuring a defendant isn't currently incapacitated by medication or illness, a broad inquiry into medical history goes beyond what is necessary for a *Faretta* waiver. The Defendant asserts his HIPAA [52] right to privacy regarding medical information. Forcing him to disclose medical history in a public court

---

52  HIPAA Privacy Rules | https://tinyurl.com/yksctxdy

Add. 222

file (or to prosecutors) as a condition of self-representation is unwarranted. The Rules of Criminal Procedure do not stipulate that a defendant must reveal such history to waive counsel; they only require that the court ensure the defendant is making an informed decision. The Defendant's medical history is either already known to the Court via the fraudulent Rule 20 reports he made public (in which case further disclosure is redundant) or not relevant if he is presently competent (which he has now 'officially' been determined to be, by this very Court).

**B    |    This Petition Is the Waiver - Form 11 Is Legally Superfluous**

The form is not a substitute for the court's colloquy and findings on the record. It is not signed by any judge, nor does any rule explicitly require its use. It appears to be an administrative convenience at best. Minnesota law requires a written waiver (Minn. Stat. § 611.19), but this Petition, signed by the Defendant, serves that function. A simplistic form with checkboxes cannot capture the nuance of the Defendant's situation. Worse, it might be used against him if he answers questions in a way that the State tries to twist (for instance, if he mentions a past diagnosis, the State may pounce on that to renew competency challenges). The Defendant should not be compelled to self-incriminate or arm his adversaries under the guise of a procedural form.

**C    |    A Strategic and Qualified Invocation of Faretta Rights**

The Defendant is entitled under *Faretta* and *McKaskle v. Wiggins*, 465 U.S. 168 (1984)[53], to assert and exercise his self-representation right in a manner that preserves his autonomy and strategy. *McKaskle* emphasizes that one of the core rights of a pro se defendant is to maintain actual control over the case, without undue interference by standby counsel or procedural hurdles. Requiring the Defendant to fill out a form that oversimplifies his case does not respect the complexity of his legal strategy. It treats him like a routine defendant making a whimsical choice, rather than what he is: an individual *forced* to self-represent due to obstruction. Given these unique circumstances, a fully briefed, narrative petition (such as this document) is far more appropriate to place before the Court. It ensures the Court is aware of the context and reasons for the Defendant's decision, thereby enabling a truly knowing acceptance of his waiver. A checkbox form cannot convey how this is not a typical *Faretta* scenario, but a qualified *Faretta* scenario - one compelled by the denial of a meaningful defense by counsel.

---

53  *McKaskle v. Wiggins*, 465 U.S. 168 (1984) | https://tinyurl.com/mtsex5yd

Add. 223

**D  |  The Constitution Doesn't Require a Checkbox**

In light of the above, the Defendant has opted to file this comprehensive Petition in lieu of merely submitting Form 11. This Petition contains all the information the Court needs to determine that the Defendant is knowingly and voluntarily waiving counsel (*see especially Section III*). If the Court has additional questions for the Defendant, he will address them at the hearing on April 29. The Defendant is not categorically refusing to answer pertinent questions (such as "Do you understand you must follow rules?" or "Do you know the charges?"). He is simply declining to memorialize potentially prejudicial personal information in a written form not required by law. Indeed, given the legal and factual complexity of this case, filling out Form 11 with a straight face would likely require a trip to the store for a fresh box of color crayons. Nothing about the Defendant's choice to use this format prejudices the State or the Court - on the contrary, it provides far more insight into the Defendant's decision-making than a bare form would.

The Defendant respectfully asks the Court to accept this Petition as substantial compliance with any requirement for a written waiver of counsel. Insisting on the Form 11 under these circumstances would elevate form over substance to an extreme degree. The key point is that the Defendant's waiver is intelligent and voluntary - which this Petition amply demonstrates. Forcing the Defendant to also divulge private medical details or check some boxes would add nothing to that determination, except possibly to create side-issues or ammunition to cloud the real issues. The Court should focus on the big picture painted here, not on bureaucratic formalism. Indeed, insisting on extraneous disclosures could itself be seen as an "unnecessary barrier" to self-representation, which *Faretta* forbids. 422 U.S. at 835-36 (warnings are needed, but a defendant need not possess technical legal knowledge; the focus is on knowing the general disadvantages). The Defendant has shown he knows the disadvantages and still chooses this path. That is sufficient.

Accordingly, the Defendant respectfully requests that this Court proceed to rule on this Petition on its merits and not delay or complicate matters by quibbling over Form 11. The Constitution is the supreme law, and under it, the Defendant has a right to represent himself when he makes a clear informed choice. This Petition is an embodiment of that choice.

Add. 224

## VIII.   FORMAL RECORD OF APRIL 17, 2025 HEARING

Defendant notes that the April 17, 2025 hearing appeared to proceed without a court reporter or standard transcription equipment. In response, he has submitted a formal request for a transcript to the Hennepin County Court Reporter Unit via email at:

**4thCourtReporterUnit@courts.state.mn.us**

This step was taken to ensure that a formal record exists of what transpired - specifically, the Court's and defense counsel's coordinated efforts to obstruct Defendant's legal strategy and avoid addressing his pending Motion to Dismiss.

## IX.   EXHIBITS ATTACHED TO THIS PETITION

The Defendant attaches the following exhibits in support of this Petition (all of which are referenced in the above text):

- **Exhibit A | Email Record Between Defendant and Defense Counsel**

  This exhibit is a comprehensive January 2025 email thread in which the Defendant repeatedly alerts court-appointed counsel to specific, high-stakes issues - namely, discovery fraud, falsified Rule 20 evaluations, and constitutional violations - while also laying out a multi-step legal strategy, complete with citations and procedural recommendations. Defense counsel fails to engage meaningfully, offers dismissive replies, and in some cases directly misleads the Defendant about the legal significance of the discovery violations. The exchange proves not only the collapse of the attorney-client relationship, but the willful obstruction of a meritorious legal defense. It also establishes that the Defendant was the only party actively investigating, documenting, and addressing discovery fraud - well before his contested competency hearing - and that counsel's inaction was not strategic, but suppressive.

- **Exhibit B | Order Determining Defendant Competent**

  This is the April 3, 2025 Order signed by Judge William Koch formally declaring the the Defendant competent to proceed. The ruling follows an in-person evidentiary hearing in which the Defendant testified extensively, demonstrated understanding of the charges, court procedure, and the roles of counsel, and directly rebutted the psychiatric opinion

Add. 225

offered by Dr. Cranbrook. The Court ultimately found that the Defendant had met his burden to prove legal competency under Rule 20.01. The Court acknowledged the Defendant's grasp of due process, and his ability to consult with counsel, affirming his right to proceed. This Order confirms that as of April 3, 2025, the Defendant is legally competent, fully capable of directing his own defense, and any continued efforts to suppress his filings or silence his legal strategy must now be viewed as constitutionally indefensible.

- **Exhibit C | Defendant's Pro Se Motion to Dismiss with Prejudice**

  This is the 50-page motion that the Defendant personally authored and filed pro se after court-appointed counsel refused to do so. The motion is a comprehensive legal and evidentiary brief detailing the full scope of misconduct in this case, including: falsified Rule 20 evaluations, manipulated discovery evidence, altered court records, a "conspiracy of commitment" carried out by this Court, and the Defendant's previous defense counsel, *Brady* and *Mooney* violations, prosecutorial suppression, and defense counsel obstruction. It is supported by meticulous citations to Minnesota and federal case law, direct hyperlinks to forensic reports and digital evidence, and organized across a structured framework of constitutional claims. The motion demonstrates not only that the Defendant is legally competent and factually correct, but that his filings exceed the strategic quality of those submitted by many licensed attorneys. This document serves as both a legal demand for dismissal and the foundational basis for the Defendant's Petition to Proceed Pro Se.

These exhibits are submitted to give the Court a full factual record on which to base its decision. They objectively corroborate the Defendant's descriptions in this Petition. The Defendant believes that any fair review of these materials will reinforce the necessity and reasonableness of granting the relief sought.

Add. 226

# X.  PRAYER FOR RELIEF

**WHEREFORE,**

the Defendant, Matthew David Guertin, respectfully requests that this Court grant the following relief:

1. **Permit Self-Representation**

   Enter an Order granting this Petition and allowing the Defendant to proceed pro se, effective immediately and in any event no later than the next scheduled hearing on April 29, 2025 at 11:00 AM. The Defendant asks that the Court affirm on the record that his waiver of counsel is accepted as knowing, intelligent, and voluntary, pursuant to Minn. R. Crim. P. 5.04 and applicable law.

2. **Acknowledge Motion to Dismiss is Pending**

   In the same Order (or a concurrent Order), acknowledge that the Defendant's Motion to Dismiss with Prejudice (*see Index 131, attached Exhibit C*) is properly before the Court and remains pending, and that upon the Defendant being recognized as pro se, the Court will schedule or otherwise address that motion for a formal ruling. (The Defendant suggests the Court set a prompt hearing or briefing schedule on the Motion to Dismiss so it can be decided on the merits without further delay. The issues raised are time-sensitive and central to the case's integrity.)

3. **Discharge Current Counsel**

   Permit the Defendant's court-appointed attorneys, Ms. Carpenter and Mr. Donnelly, to withdraw from representation of the Defendant. They have been effectively discharged by the Defendant as of April 17, 2025. The Order should relieve them of any further duties to the Defendant in this matter. (Consistent with Minn. Stat. § 611.26, subd. 6, they should not be appointed as standby counsel, nor do they wish to be, presumably. Should the Court insist on appointing standby or advisory counsel, the Defendant requests it be an independent attorney with no prior involvement in the case or vested interest against the Defendant's strategy.)

Add. 227

4.  **Clarify Basis of Petition - Obstruction, Not Mere Preference**

    It is important for the record and any higher review that the Court recognize the unique context of this Petition. The Defendant asks that the Order or hearing transcript reflect that the Defendant's invocation of self-representation is made *not simply as a waiver of counsel in the abstract*, but as a response to the obstruction of the Defendant's constitutional legal strategy by his court-appointed counsel and by procedural rulings to date. In other words, the Court should acknowledge that the Defendant did not lightly waive counsel, but did so because he was left with no other way to pursue his fundamental rights. This clarification will ensure that this move is not mischaracterized as the Defendant "gaming the system" or vacillating on counsel  - in truth, it is the system that forced his hand.

5.  **Any Other Relief Deemed Just**

    Grant such further relief as may be just and proper to guarantee the Defendant's rights are protected. (For example, the Defendant would welcome an explicit statement that no adverse inference about competency or credibility will be drawn from the mere fact of him representing himself, and that his evidence will be judged on its merits. While such a statement should be unnecessary, given the presumption of competency and innocence, it could help dispel any remaining prejudice from the blatantly false, prior "psychosis" narrative perpetuated about him.)

# XI.  CONCLUSION

The Defendant submits that granting this Petition is not a favor - it is a constitutional necessity. It restores this case to the only path that honors due process: one where evidence is weighed, misconduct is confronted, and the Defendant is not silenced for uncovering inconvenient truths. Denial of this Petition would not merely preserve the record of injustice - it would escalate it, signaling that this Court is prepared to shield institutional actors rather than confront constitutional violations already in plain view.

This Court has both the authority and the obligation to intervene before this case becomes a permanent stain on the judicial record. The Defendant urges the Court to exercise that authority now - because the precedent being set is already underway. History will judge how this justice

Add. 228

system responds to detailed, evidence-backed allegations of fraud, psychiatric suppression, and digital manipulation. The question is whether this Court will meet those facts with accountability - or with obstruction.

Let the Defendant speak. Let him make his case. Let the truth emerge in open court - no matter how disruptive it may be to prosecutors, public defenders, judges, the State, corporate interests, political interests, or "powerful people."

**Dated:  April 21, 2025**

*Respectfully submitted,*

*  /s/ Matthew D. Guertin*

Matthew David Guertin
*Defendant Pro Se*
4385 Trenton Ln. N 202
Plymouth, MN  55442
Telephone: 763-221-4540
MattGuertin@protonmail.com
www.MattGuertin.com

Add. 229

# XII.   TABLE OF AUTHORITIES

**A  |  Federal Cases**

*Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942)

*Brady v. Maryland*, 373 U.S. 83 (1963)

*Giglio v. United States*, 405 U.S. 150 (1972)

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)

*Jackson v. Indiana*, 406 U.S. 715 (1972)

*Mapp v. Ohio*, 367 U.S. 643 (1961)

*Mathews v. Eldridge*, 424 U.S. 319 (1976)

*McKaskle v. Wiggins*, 465 U.S. 168 (1984)

*Mooney v. Holohan*, 294 U.S. 103 (1935)

*Pate v. Robinson*, 383 U.S. 375 (1966)

*Strickland v. Washington*, 466 U.S. 668 (1984)

*United States v. Cronic*, 466 U.S. 648 (1984)

**B  |  Minnesota Cases**

*State v. Camacho*, 561 N.W.2d 160, 173 (Minn. 1997)

*State v. Clark*, 722 N.W.2d 460, 464 (Minn. 2006)

*State v. Gillam*, 629 N.W.2d 440, 449 (Minn. 2001)

*State v. Richards*, 456 N.W.2d 260, 263 (Minn. 1990)

*State v. Sabahot*, A10-2174 (Minn. App. Jan. 3, 2012)

*State v. Thompson*, 988 N.W.2d 149 (Minn. App. 2023)

**C  |  Statutes**

*42 U.S.C. § 1983*

*Minn. Stat. § 611.19*

*Minn. Stat. § 611.26, subd. 6*

Add. 230

Filed in District Court
State of Minnesota
4/21/2025 7:48 AM

**D | Rules & Professional Conduct**

Minn. R. Crim. P. 1.04

Minn. R. Crim. P. 5.04

Minn. R. Crim. P. 5.04, subd. 1(4)

Minn. R. Crim. P. 5.04, subd. 2

Minn. R. Crim. P. 20.01

Minn. R. Prof. Conduct 1.2(a)

Minn. R. Prof. Conduct 1.4

Minn. R. Prof. Conduct 1.6

Minn. R. Prof. Conduct 1.7

Minn. R. Prof. Conduct 1.16

Minn. R. Prof. Conduct 1.16(a)(3)

Minn. R. Prof. Conduct 1.16(b)(4), (6)

Minnesota Code of Judicial Conduct, 2.6(A)

Add. 231