A25-0882
**STATE OF MINNESOTA**
**IN COURT OF APPEALS**

| | |
|---|---|
| In re Matthew David Guertin, | District Court Case: 27-CR-23-1886 |
| | Court Order Date: April 29, 2025 |
| Petitioner | |
| | **ADDENDUM** |
| v. | **VOLUME VI of XVI** |
| | **ADD. 232 - ADD. 281** |
| State of Minnesota, | |
| | |
| Respondent. | Judge: Hon. Sarah Hudleston |

Contents                                                                 Page

**April 16, 2025 - Motion to Dismiss With Prejudice,**

Index 131………..….….……..….……………….………………………… Add. 232-281

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

| STATE OF MINNESOTA | DISTRICT COURT |
|---|---|
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |

| | |
|---|---|
| State of Minnesota, | Court File No. : 27-CR-23-1886 |
| Plaintiff, | |
| vs. | **DEFENDANT'S MOTION TO DISMISS ALL CHARGES WITH PREJUDICE** |
| Matthew David Guertin, | |
| Defendant. | Judicial Officer: Sarah Hudelston |

TO:   THE HONORABLE SARAH HUDELSTON, JUDGE OF DISTRICT COURT;
MARY F. MORIARTY, HENNEPIN COUNTY ATTORNEY; AND
MAWERDI HAMID, ASSISTANT HENNEPIN COUNTY ATTORNEY

## I.   INTRODUCTION

Defendant Matthew David Guertin, proceeding pro se for this motion only, while also represented by defense counsel, respectfully moves this Court to dismiss all charges with prejudice due to pervasive fraud, prosecutorial misconduct, and constitutional violations that have corrupted every stage of these proceedings. What began as routine criminal charges has metastasized into a coordinated campaign - spearheaded by the prosecution, aided by officers of the court, and shielded by falsified psychiatric evaluations - designed to portray Mr. Guertin as delusional and incompetent. This so-called "conspiracy of commitment" rests on manipulated discovery materials, ghostwritten Rule 20 evaluations, falsified court records, and even misconduct by court-appointed, and privately retained defense counsel. The resulting legal process is not merely flawed; it is structurally broken and fundamentally offensive to the principles of due process.

Specifically, the prosecution and those acting in concert with it have:

1. Orchestrated fraudulent mental health evaluations under Minn. R. Crim. P. 20, authored by unauthorized and conflicted individuals, not independent experts;

Add. 232

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

2. Manipulated digital discovery evidence, including tampered file metadata and AI-generated images, to fabricate inculpatory material while suppressing exculpatory facts;

3. Falsified official court records, including backdating and undisclosed alterations of filings, to obscure misconduct; and

4. Engaged in direct efforts to silence Mr. Guertin, including suppression of evidence, manipulation of the docket, and psychological warfare masquerading as psychiatric diagnosis.

The so-called forensic evaluations contain demonstrable falsehoods and omit critical facts, all in service of manufacturing the false impression that Mr. Guertin suffers from delusions. In reality, his claims - ranging from intellectual property theft to illegal surveillance - are amply documented and independently verifiable. Forensic analysis now confirms that crime-scene photographs were digitally altered to remove or obscure exculpatory elements (*see Index 122, 123, 124*), including an image of an open laptop displaying the face of Mr. Guertin's self-professed "former CIA" welder (*see Index 30, pp. 60-66*) - a detail the State, in likely collusion with external actors directly involved in the theft of the defendant's intellectual property, sought to erase from the evidentiary record entirely.

This Court is in possession of documents and filings that substantially corroborate Mr. Guertin's whistleblower claims, including a U.S. patent issued to Netflix (U.S. Patent No. 11,810,254[1]) that directly references and replicates (*see Index 125*) Mr. Guertin's own patented invention (U.S. Patent No. 11,577,177[2]). Yet instead of protecting his rights, the judicial system has sought to suppress them - using psychiatry as a weapon to delegitimize speech, silence dissent, and justify illegal civil commitment.

The Constitution guarantees that no defendant may be prosecuted while legally incompetent (*State v. Curtis*, 921 N.W.2d 342 (Minn. 2018)), and no conviction may rest upon false evidence deliberately orchestrated by the State (*Mooney v. Holohan*, 294 U.S. 103 (1935)). But for over two years, Mr. Guertin's life, liberty, and legal autonomy have been held hostage under a veil of manufactured mental illness and fraudulent evidence. This is not justice - it is institutional gaslighting on a scale so absurd it borders on the surreal.

---

1   https://patentimages.storage.googleapis.com/45/b8/52/1d18252bded1d8/US11810254.pdf

2   https://patentimages.storage.googleapis.com/10/a8/56/6e9cdf0d67cd6c/US11577177B2.pdf

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

This Motion presents the Court with a structured summary of the factual record and newly uncovered exhibits. Together, they demonstrate a level of misconduct that cannot be ignored:

- Court-appointed experts fabricated or omitted critical findings;

- Evidence was digitally manipulated to support a psychiatric narrative;

- Even Mr. Guertin's own defense counsel engaged in deception and abdicated their duty of loyalty;

- The Court's docket contains anomalies consistent with secretive alteration.

The cumulative impact of these abuses - each independently sufficient to warrant dismissal - renders this case a textbook example of structural error and conscience-shocking misconduct. Mr. Guertin does not raise these issues lightly. He brings forward the receipts: emails [3], patents, forensic reports [4], metadata logs, psychiatric transcripts [5], and court filings - all of which prove, beyond any good-faith dispute, that this prosecution is built on a lie.

Accordingly, Mr. Guertin moves this Court to dismiss all four pending felony charges with prejudice (one count under Minn. Stat. § 609.66, subd. 1a(a)(3), and three counts under Minn. Stat. § 609.667(3)), and to convene evidentiary hearings to determine the full extent of the fraud, identify those responsible, and consider referral for criminal investigation. No lesser remedy can restore the integrity of these proceedings or cure the profound prejudice already inflicted on the defendant.

## II.   FACTUAL BACKGROUND

Mr. Guertin is charged in this case with four felony counts arising from an incident on January 21, 2023, in which he allegedly discharged a firearm from inside his Minnetonka residence and was found in possession of several firearms lacking serial numbers. Shortly after charges were filed, the Court ordered a Rule 20.01 evaluation of Mr. Guertin's competency to proceed, as permitted when the defendant's mental fitness is in doubt. Dr. Jill E. Rogstad, Ph.D., LP, ABPP, a senior clinical forensic psychologist for the Fourth Judicial District, was assigned to evaluate Mr. Guertin and issue a report to the Court. On March 10, 2023, Dr. Rogstad filed a

---

3    All emails between Guertin and: IP, and defense counsel; court - https://tinyurl.com/4hyurs5z

4    https://matt1up.substack.com/api/v1/file/b1cbf1c5-aebe-4df1-84a6-d4939e823a0a.pdf

5    https://matt1up.substack.com/api/v1/file/7a1982ce-9a69-4e5c-8659-b0dd04d71a0e.pdf

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

written report opining that Mr. Guertin was *not competent* to stand trial, diagnosing him with an unspecified psychotic disorder and concluding that "Mr. Guertin's delusional beliefs" about being surveilled and having his intellectual property stolen rendered him unable to rationally participate in his defense. Based on this report, Mr. Guertin was found incompetent in 2023.

Over the next two years, Mr. Guertin contested that finding and consistently maintained that he was competent and that his claims of being targeted were truthful, not delusional. In March 2025, after further proceedings, this Court ultimately found Mr. Guertin *competent* to proceed (while still, perplexingly, referencing findings of mental illness) (*see Index 127*). Trial has not yet occurred. Mr. Guertin is now before the Court having uncovered substantial evidence of misconduct that infected the prior competency process and the State's handling of discovery. The following background details that misconduct, which forms the basis for this motion to dismiss.

## III.   FRAUDULENT RULE 20 EVALUATION'S AND WEAPONIZED PSYCHIATRY

From the outset, the State steered this prosecution away from adjudicating the actual criminal charges and into a parallel track of psychiatric manipulation - weaponizing Rule 20 mental health evaluations to suppress Mr. Guertin's liberty, discredit his defense, and procedurally paralyze him under a false diagnosis. What follows is not merely the product of bad medicine - it is the execution of a coordinated legal strategy to disable a whistleblower through manufactured incompetence.

### A   |   The Rogstad Report: Ghostwritten, Biased, and Deliberately Misleading

The first Rule 20 evaluation, issued by Dr. Jill Rogstad on March 10, 2023, is a cornerstone of the State's psychiatric fiction. However, even the metadata attached to the PDF (*see Index 28, p. 101*) report reveals fatal irregularities: the document was not authored by Dr. Rogstad at all - it was authored by "GuzmanC," later identified as Chela Guzman-Wiegert, an administrative figure with no clinical authority or psychological qualifications. The fact that a county administrator ghostwrote or materially edited a forensic evaluation destined to determine Mr. Guertin's legal capacity is an institutional scandal. It undermines the report's validity entirely and raises the specter of fraud on the court.

Add. 235

**B  |  The Diagnostic Inversion: When Verifiable Evidence Becomes "Delusion"**

Dr. Rogstad's conclusions are internally contradictory and self-discrediting. Her own report states that Mr. Guertin: (*see Index 28, pp. 116-125*)

- "expressed awareness of the nature of the current allegations"

- "spoke cogently about various pleas and the nature of legal proceedings"

- "articulated a defense strategy" and "knew his right not to testify"

These statements directly satisfy the standard for competency under *Dusky v. United States*, 362 U.S. 402 (1960), and *State v. Curtis*, 921 N.W.2d 342 (Minn. 2018) - yet Rogstad dismissed them entirely. Instead, she fixated on Mr. Guertin's belief that his patented invention had been stolen and weaponized against him, labeling it a "persecutory delusion." Crucially, she admitted:

> *"I lack the specialized training in this field to analyze the defendant's reported invention... Nevertheless, even if the technological aspects of the defendant's statements prove true… his views remain consistent with delusions."*

This amounts to a pre-judgment of insanity, regardless of whether the claims are true - which is precisely what courts have long warned against in the misuse of psychiatry (*Moore v. Dempsey*, 261 U.S. 86 (1923)).

Even worse, Rogstad deliberately excluded exculpatory evidence: namely, the Minnetonka Police Report #23-000151 (*see Index 28, p. 78-80*), which Mr. Guertin submitted to her. That report, filed nine days prior to his arrest, documents that Guertin had already gone to law enforcement to report the exact claims of surveillance and intellectual property theft that she later labeled "delusional." A police officer spent 45 minutes interviewing him and did not refer him for a psychiatric hold, but instead advised him to preserve evidence and contact the FBI. Rogstad acknowledged reviewing this report in her appendix - yet omitted it entirely from her analysis, falsely framing Guertin's references to the "Minnetonka Police", and "FBI" as nonsensical. This is textbook suppression of exculpatory material - a *Brady*-style violation committed under the guise of mental health assessment.

Add. 236

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

## C  |  The Emails: Unassailable Proof of Misconduct and Confirmation Bias

What the record now shows - through actual email correspondence with Dr. Rogstad[6] - is that Mr. Guertin sent detailed, articulate, and professionally written messages in advance of his evaluation. He provided:

- Technical descriptions of his patent and engineering process

- Screenshots, timeline evidence, and reference links

- Reasoned concerns about government surveillance and stolen intellectual property

- Legitimate procedural questions regarding HIPAA, consent, and the right to record the session

Rogstad dismissed these well-reasoned inquiries as "evidence of disorganized thinking." When confronted with factual data, she responded by cutting off communication and later pathologized the very same evidence she refused to engage with. These emails, if ever challenged, can be authenticated and forwarded directly to the Court - making them irrefutable evidence that Guertin was lucid, legally engaged, and rational throughout the process. This is not medicine. It is the weaponization of psychiatry as statecraft.

## D  |  Judicial Gaslighting: When Evidence Becomes the Symptom

The Court's July 13, 2023 "Order Regarding Competency to Proceed" (*see Index 19*) is perhaps the most revealing document in the entire proceeding - not for what it proves about Mr. Guertin's mental health, but for what it admits about the State's priorities.

**The order acknowledges that Mr. Guertin is:**

- "well-dressed"

- "intelligent and passionate about his work with technology"

- able to "understand the nature of his charges"

- able to "discuss possible defenses with his attorney"

- and has prior experience with the criminal court process

---

6     ALL Email exchanges between Guertin and Dr. Jill Rogstad - https://tinyurl.com/y9srfxxe

Add. 237

27-CR-23-1886

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

Yet, despite this mountain of evidence supporting competence, the Court reaches a contradictory conclusion - based not on Mr. Guertin's behavior in the courtroom, but on the *content* of his defense itself.

**As the Order states:**

> *"He may understand the factual components of criminal proceedings, but it is evident to the court that he is unable to apply this factual knowledge in his defense."*

## Why?

Because he insisted on presenting *evidence.*

Because he refused to abandon claims involving surveillance, patent theft, and digital intrusion - claims that were later proven valid through patent office filings, email chains, expert analysis, and digital forensics.

**The Court admits as much:**

> *"When Mr. Guertin spoke about his delusional beliefs, <u>he indicated he would present evidence supporting these beliefs.</u>"*

Rather than assess the truth or admissibility of that evidence, the Court simply labels it delusional and makes a circular argument: *Because he believes he can prove these things, he must be mentally ill.*

This inversion of logic is not a clinical determination - it is bureaucratic gaslighting, and it renders the Rule 20 process a tool of narrative control.

Worse, it compounds an already egregious ethical breach. The very first evaluator in Mr. Guertin's case - Dr. Jill Rogstad - excluded his evidence entirely from her analysis, then used his reaction to that exclusion to label him "delusional." The Court now follows suit, declaring Mr. Guertin incompetent not because he cannot participate in his defense, but because he insists on participating - on bringing evidence, on naming names, on refusing to accept the false narrative built around him.

This is not a finding of incompetency. This is the criminalization of dissent.

Add. 238

27-CR-23-1886

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

**As the Order states:**

> *"The court observed Mr. Guertin testify, during which his answers often wandered towards the themes of technology, patents, and competitors."*

But this is not "wandering." This *is* the defense. It is the context, motive, and rationale behind every aspect of the case against him. To pathologize his insistence on telling that story is not an exercise in justice. It is the suppression of truth masquerading as psychiatric concern.

If this order stands, the precedent it sets is chilling:

- Evidence becomes delusion.
- Defending oneself becomes incompetence.
- The truth becomes a symptom.

This is not mental health law. This is the state's attempt to erase a defendant through administrative force.

It is judicial suppression, not a medical diagnosis - and the Court now has the evidence before it to prove just how deep the deception runs.

### E   |   The Milz Evaluation: Video Evidence Rewritten by Bureaucracy

The second Rule 20 exam, conducted via Zoom on January 3, 2024, by Dr. Adam Milz, marked a turning point in the State's fabrication campaign. Unlike the first evaluation by Dr. Rogstad, this meeting was recorded (unbenownst to Dr. Adam Milz at the time) creating an immutable piece of forensic evidence. That video recording, which Guertin actually made public by entering it as '*Exhibit AB*' into the record of his Federal civil rights lawsuit[7], in which Dr. Adam Milz was named as a defendant, depicts Mr. Guertin calmly, cogently, and methodically explaining his legal situation, refuting earlier false claims, and demonstrating superior legal understanding.

---

7    https://www.courtlistener.com/docket/68925331/guertin-v-hennepin-county/

Add. 239

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

## Direct Contradictions Between Milz's Report and the Video Transcript

### Calm, Controlled Behavior Refuted Diagnosis of Mania:

- The transcript[8] spans over 80 minutes, with Guertin speaking at a normal pace, displaying clear, methodical thinking throughout. There is no evidence of pressured speech, racing thoughts, or digressions that would indicate mania.

- Milz's report falsely claims Guertin exhibited "pressured speech" and "perseveration," none of which appear in the actual transcript.

### Clear Legal Acumen and Procedural Awareness:

- Guertin demonstrates deep knowledge of legal rights, quoting Rule 20, citing Miranda protections, due process, and outlining the timeline of his case accurately.

- He references filing motions, outlines the mechanics of evidence review, and discusses the difference between competency determinations vs. civil commitments.

- Milz characterizes this precision as a "delusional belief in his own legal competence," despite it being demonstrably true and supported by court filings.

### Refutation of the Adderall Narrative from Rogstad:

- Guertin directly refutes Dr. Rogstad's suggestion of Adderall misuse, explaining during the Milz interview that her claim was the result of a misleading question asked at the very end of their meeting, without context or follow-up.

- He clearly states: "That was one of the final things she asked me, and I told her I had to take an extra one that night because I worked a full overnight set build at Coachella."

- He then details the situation: After the Week 1 performance at Coachella, a critical set piece he designed and engineered[9] for Bad Bunny's mainstage show was accidentally damaged by a forklift. Guertin drove from Los Angles last minute, and arrived on-site around 10 PM to repair and completely rebuild the centerpiece element - overnight - before the next day's 5:00 PM showtime.

- This wasn't recreational use. It was the decision of a professional operating under extreme time constraints at one of the most high-stakes live events in the world. The narrative that his account represents substance abuse is not just misleading - it's absurd. It erases the reality that Guertin's "extra dose" was taken during a literal do-or-die engineering emergency at the top of the entertainment industry.

---

8    2nd Rule 20 Exam Meeting Transcript Text - https://tinyurl.com/37mpsa6u

9    https://mattguertin.com/portfolio/badbunnyeye/

Add. 240

- Milz ignored all of this context entirely and perpetuated the same distorted claim as Rogstad - reframing a one-time, clearly explained, performance-critical use of prescribed medication as an indicator of ongoing instability or addiction, which was never supported by any evidence, history, or observed behavior.

**Repeated Direct Refutations of Rogstad's Claims**:

- Guertin states that Rogstad's evaluation included numerous falsehoods, including claims of psychosis, delusions, and the idea that he could not understand court proceedings.

- He clearly articulates his belief that her report "was designed to make him look crazy," and points out specific errors, including statements about evidence Guertin shared that wasn't included within the context of the evaluation.

**Technical Expertise On Full Display**:

- Guertin references his TouchDesigner[10] programming work[11], flying business class from Saudi Arabia[12], and describes being part of major immersive productions involving global brands.[13]

- He describes patent filings, image metadata analysis (*see Index 29, p. 14*), and secure PDF construction to protect digital chain of custody.

- These statements establish his credibility as a technologist and inventor - attributes ignored entirely by Milz.

**Misuse of "Delusion" Label for Verifiable Events**:

- Guertin provides detailed, accurate descriptions of government agency interactions (*see Index 28, p. 161-172*), LinkedIn surveillance alerts (*see Index 30, p. 53-59*), and patent filings that are fully supported by records. (*see Index 28, p. 134-158*)

- Milz summarily labels these as "paranoid delusions," despite their objective verifiability.

**No Suicidal Ideation or Harm to Others**:

- Guertin explicitly says multiple times during the interview that he has never harmed himself or others, nor considered suicide. He states: *"I have never attempted, considered, or even thought about suicide, ever."*

- Milz's report states he has a "history of threatening to harm himself" - a fabrication. (*see Exh. S, Index 10*)

---

10  https://derivative.ca/community-post/matt-guertins-epic-never-ending-oculus-rift-kinect-touchdesigner-3d-project/60736

11  https://mattguertin.com/portfolio/bluemoon2016/

12  https://mattguertin.com/portfolio/falcon/

13  https://mattguertin.com/portfolio/ultra/

27-CR-23-1886

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

**Obvious Medical Ethics Breach**:

- Milz makes recommendations for civil commitment and antipsychotic medication, despite:

    - No observed psychosis

    - Full orientation

    - Intact memory

    - Legal understanding and contextual reasoning

- There is no evidence-based justification for such conclusions.

**Suppression of Objective Evidence**:

- Guertin repeatedly references emails, attachments, metadata, PDF files, and patent filings that he sent Milz before the interview. (*see Index 29, p. 36-40*) These are never acknowledged in the final report.

- The report treats these communications as further evidence of "delusion," despite being authentic court exhibits and publicly accessible records.

This was not a medical misdiagnosis. It was deliberate falsification under color of clinical authority - an abuse of psychiatric power to serve judicial objectives. The Rule 20 process was not used to assess Mr. Guertin's mental fitness. **It was weaponized to suppress a credible, inconvenient defendant whose only 'crime' was exposing institutional misconduct and inventing something too valuable to ignore.**

This second evaluation, more than any other, reveals exactly what happens when psychiatry is hijacked by state actors. The more Mr. Guertin demonstrated his legal competence, the more his evaluators labeled it as pathology. The more precise his procedural knowledge, the more dangerous he became. The more accurate his timeline of events, the more urgently they sought to medicate and detain him. Logic became delusion. Evidence became paranoia. Truth became threat.

Finally, and perhaps most damningly, Dr. Milz's January 11, 2024 report was deliberately withheld from Mr. Guertin for over seven months - despite his repeated and increasingly desperate attempts to obtain it through every channel available. Mr. Guertin submitted multiple formal requests to court-appointed counsel, pro se filings into both his criminal (*see Index 36*),

Add. 242

and civil commitment (*see Index 37, 43*) cases, and even cited Rule 26 of the Minnesota General Rules of Practice regarding access to evaluation materials. Yet all efforts were stonewalled.

It was not until Mr. Guertin filed his federal civil rights lawsuit on July 8, 2024 - a complaint that directly challenged the coordinated conspiracy behind his wrongful prosecution and the weaponization of psychiatric evaluations - that the long-withheld report was finally disclosed. Only after Bruce Rivers was explicitly named as a defendant in that lawsuit, and seemingly under pressure from the escalating federal litigation, did Mr. Guertin receive a copy of the Rule 20 report on July 16, 2024 - a document that had been completed more than seven months earlier, on January 11, 2024.

That it took a federal lawsuit filed by a supposedly psychotic and incompetent defendant to force the production of a report central to his own case is not just procedurally unacceptable - it is evidence of knowing suppression. The concealment makes sense only if those responsible knew the report would not withstand scrutiny - especially when placed side-by-side with the video recording of the interview itself. The delay was strategic, malicious, and unconstitutional. It is the clearest possible signal that the psychiatric process had ceased to be forensic and had become purely tactical - a tool to deprive Mr. Guertin of his liberty, not assess his capacity.

In totality, the Milz evaluation represents a structural failure of forensic psychiatry in the justice system. The recording disproves the diagnosis. The transcript refutes the narrative. The emails and patents back up the defendant's story. Yet the official record still reflects a lie.

Such conduct is not merely improper - it is unconstitutional. Courts have held that fabricated mental health findings that prevent a defendant from accessing the trial process violate fundamental rights (see *Jackson v. Indiana*, 406 U.S. 715 (1972), and *Moore v. Dempsey*, 261 U.S. 86 (1923)). The falsehoods authored by Milz, under the authority of Rule 20, are precisely the kind of misconduct that undermines the legitimacy of judicial proceedings and must result in dismissal.

### F | The "Conspiracy of Commitment": A Weaponized Psychiatric Narrative

Mr. Guertin's case does not reflect a good-faith judicial inquiry into mental fitness - it reveals a coordinated *Conspiracy of Commitment*: a multi-actor strategy to suppress his litigation, discredit his credibility, and eliminate his ability to expose institutional misconduct by portraying him as mentally incompetent. **This was not treatment. This was entrapment.**

Add. 243

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

The full scope of this conspiracy is laid out in '*Exhibit P*' of Mr. Guertin's federal civil rights complaint. What that exhibit documents - down to the day and hour - is a meticulously orchestrated deception culminating in the ambush commitment hearing of February 1, 2024. The events unfolded as follows:

**January 15, 2024**

- Mr. Guertin contacts his attorney Bruce Rivers to inquire about the hearing that had long been scheduled for the following day. At 6:26pm Bruce Rivers tells Guertin via text message there is "No court" for his scheduled 1:30 PM hearing the next day. (*see Index 30, p. 35, 83 [Texts-27]*)

**January 16, 2024**

- A 'Waiver of Appearance' is entered into the record of Guertin's criminal case at Index #24 - this is followed up with the submission of an entry which states "Found Incompetent - Judicial Officer: Mercurio, Danielle" which contains no Index #, with neither of these entries having a corresponding PDF document available in the case docket.

- At 8:27am a court order is signed that states:

    ○ "Prior to the hearing, the parties agreed to a finding of incompetency entered administratively." (*see Index 25, p. 1*)

    ○ "the defendant may be committed directly to an appropriate safe and secure facility"

    ○ "The head of the treatment facility shall submit a written report addressing the Defendant's competency to proceed in the criminal case when the defendant has attained competency, or at least every six months."

    ○ "The criminal conditions of release remain in effect until placement at an appropriate facility can occur." (*see Index 25, Id. 9, 10, 12*)

- At 4:19 PM a 'Notice of Remote Zoom Hearing' is submitted into Guertin's case at Index #26. This notice is for his next review hearing that is six months away - on July 16, 2024.

- This 'Notice of Remote Hearing' being submitted for a date 6 months away, while at the same time the January 16th Court Order is being intentionally withheld are both for the purpose of deceiving Guertin had he had looked at his court case files on January 16th – the day the hearing he had been told there was now "No court" for, was originally scheduled to take place. (*see Index 26*)

    It would cause him to believe he had 'no worries' for the next six months

**Add. 244**

**January 17, 2024**

- At 7:29 AM the court order that was prepared, and signed during the early morning hours of January 16, the previous day, is officially submitted into the record of Guertin's criminal case. Once again things begin moving forward before the court is even open – 7:29 AM in the morning. (*see Index 25*)

- The new 'January 17 Court Order' appears in the timeline of Guertin's criminal case at Index #25 - which is logically, and sequentially OUT OF ORDER

- This is due to the fact that Index #25 appears AFTER the 'Notice of Remote Zoom Hearing' which is filed as Index #26

- This delay was not clerical - it was strategic. Why? Because the order contained language that authorized Mr. Guertin to be detained *on the spot* at his next hearing - should he be deemed "mentally ill, developmentally disabled, chemically dependent, or mentally ill and dangerous to the public" (*see Index 25, Id. 9*) Yet he was never given an opportunity to see or challenge the basis of that order. The Rule 20 report by Milz - the key document which would determine the courts decision - remained withheld.

- Following the intentional withholding of the court order from the previous day, and its early morning submission into Guertin's criminal case record, all further court actions are 'shifted' over to Guertin's civil case proceedings (*27-MH-PR-23-815*) where a sequential series of rapid events, and filings take place as part of a 'surprise' February 1, 2024 civil commitment hearing which Guertin is completely unaware of.

**January 26, 2024**

- Guertin suddenly discovers the surprise civil commitment hearing scheduled for February 1 after reviewing his case files online. Notably the unexpected hearing is scheduled for Thursday of the following week – less than a week away.

- After Guertin reads the January 16-17 Court Order he becomes completely freaked out, as the language used is very straight forward based on his interpretation. What Guertin reads in the order directly implies that he is going to be be detained at court and committed to a "safe and secure facility" where he will be checked up on "at least every six months" until he is "restored to competency".

- Guertin instantly begins seeking the provision of the Rule 20.01 exam report that determined he was 'incompetent to stand trial' as he realizes that the outcome of the surprise court hearing, insofar as whether or not he would be directly detained at court, all centered around this key document – one which he still hasn't been provided with.

- At 12:49 PM Guertin calls Bruce Rivers to try and obtain the exam report. (*see Index 30, p. 85 [Calls-05]*)

- At 12:51 PM Guertin sends text messages to Bruce Rivers requesting his Rule 20.01 exam report.  (*see Index 30, p. 83 [Texts-28-29]*)

- At 1:38 PM Guertin is able to find the email address for his new court appointed attorney, Joel Fisher, in the 'Service Contacts' section of his cases 'E-File and Serve' page. Guertin sends an email to him about the surprise civil commitment hearing to try and determine what exactly is taking place.  (*see Exhibit K, Index 36, p. 7*)

- At 4:38 PM Guertin sends an email to Bruce Rivers requesting the exam report
(*see Index 38, p. 143*)

## January 27, 2024

- At 2:13 PM Joel Fisher replies to Guertins email "I'm hoping to see if there is some sort of an offer from the county." (*see Exhibit K, Index 36, p. 9*)

## January 28, 2024

- At 9:51 PM Guertin replies "An 'offer' for what exactly? I have no idea what is going on.."  (*see Exhibit K, Index 36, p. 10*)

## January 29, 2024

- At 5:46 AM Joel Fisher replies "I'll try to call you this AM."
(*see Exhibit K, Index 36, p. 11*)

- At 11:14 AM Joel Fisher sends Guertin another email which states "What's the best # to reach you. I must have an old # 763-245-0896."
(*see Exhibit K, Index 36, p. 12*)

- The court provided Guertin's new court appointed attorney, with a phone number that has no resemblence at all to his actual phone number – a completely wrong number.

## January 29, 2024

- At 6:37 AM, Guertin scrambled to file a *Motion for Continuance* and a *Motion to Compel Production of Medical Records*. These motions were clear, well-structured, and legally valid. They detailed:

  - That he had not received the Milz report.

  - That his newly appointed civil commitment attorney had not been given the correct phone number to reach him.

  - That he was unaware of the commitment hearing until a few days prior.

  - That a court order now threatened to detain him directly at the hearing based on information he had not seen.

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

- That there were possible scheduling errors and miscommunications with the prepetition screening team.

In his own words, Guertin explained that the order placed him at risk of "potentially losing my freedom by being detained and committed to a facility," based on a fabricated narrative he had no opportunity to confront.

## January 31, 2024

- Guertin signs a 'Waiver' agreeing to extend his 'Stay of Commitment' by an additional 9 months to avoid attending the in-person hearing and being detained at court.

- Following Guertin's signing of the Waiver, and its subsequent presentation to the court, Judicial Referee George Borer submits a 'Taken Under Advisement' notice into Guertin's civil case record. This action appears at Index #39 in Guertin's civil case file.
  (*see Exhibit K, Index 00, p. 1*)

## February 1, 2024

- At 8:39 AM, a court order is submitted into Guertin's civil case for 'Continued Stayed Commitment' (*see Exhibit K, Index 41, p. 1*)

- The order was recommended by Referee George Borer, and was once again subsequently signed by Judge Julia Dayton Klein.

- The order states "The hearing scheduled for February 1, 2024 at 9:00 AM is cancelled and shall be stricken from the court's calendar." (*see Exhibit K, Index 41, p. 2*)

- Even though the February 1 hearing is officially documented within the court order itself as being 'cancelled, and stricken from the court's calendar' it still appears in the 'Hearings' section of Guertin's civil case timeline as being 'Held Off The Record' for some reason. (*see Exhibit K, Index 00, p. 4*)

- Furthermore, the February 1 court order was submitted into Guertin's civil case record at Index #41 - instead of Index #40 as it should've been.

- Index #40 is missing, or was deleted from Guertin's civil case timeline.
  (*see Exhibit K, Index 00, p. 1*)

- Guertin's 'Motion for Production of Medical Records' he filed into his civil case, pro se, on January 30, 2024 was officially 'Dismissed without Prejudice' as part of the February 1, 2024 court order. (*see Exhibit K, Index 41, p. 2*)

This was not oversight. This was entrapment, engineered through layered deception and the calculated withholding of due process.

Add. 247

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

Further compounding the injustice, the court provided Mr. Guertin's newly appointed civil counsel with the *wrong contact information*, delaying any meaningful communication until just days before the hearing. This was not just procedural failure - it was manufactured confusion designed to prevent defense coordination.

And yet, through all of it, Mr. Guertin remained transparent and proactive. He filed his own motions. He tracked the docket. He demanded his records. And he documented every step of the deception in real time, laying it out in '*Exhibit P*' with the kind of precision that makes accidental oversight impossible to believe.

Finally, on July 16, 2024 - was he finally provided the Milz report. Seven months late. A report central to the entire court-constructed diagnosis of mental illness.

This is not psychiatric care. This is administrative fraud masquerading as mental health evaluation. It is an abuse of the Rule 20 process so severe that it demands immediate constitutional remedy.

The false narrative of mental illness - crafted post-arrest and reinforced by concealment, miscommunication, and strategic manipulation of court processes - cannot be allowed to stand. As Mr. Guertin wrote in his federal filing:

> *"The only mental health 'history' in this case is the one that the Court itself created."*

This conspiracy of commitment - documented, timestamped, and exposed - must now be answered not with correction, but with dismissal.

## G | Third Rule 20 Exam Ordered Same Day Guertin Was Granted Public Defender

What transpired on October 15, 2024, was not a legal proceeding - it was a staged maneuver to resurrect a narrative the court had no intention of letting die. After nearly two years of procedural sabotage, misconduct, and fabricated psychiatric claims, Mr. Guertin finally succeeded in removing Bruce Rivers as his attorney and was - at long last - granted the right to proceed with a public defender. But on the same day that this long-fought constitutional milestone was reached, the court triggered another Rule 20 evaluation without cause, without hearing, and without explanation. The context makes this maneuver indefensible:

Mr. Guertin's September 25, 2024, Motion for Substitute Counsel (*see Index 100*), attached with a fully documented OLPR complaint against Rivers (Exhibit A), detailed:

- Rivers' suppression of critical documents (including the Milz report)
- His refusal to withdraw even after repeated requests
- Coordinated delays and obstruction of Guertin's filings
- A complete failure to act in Mr. Guertin's best interest

That motion wasn't just a grievance - it was a strategic turning point, in which Guertin outlined his plan to finally challenge the fabricated psychiatric narrative and confront the fraudulent discovery materials that had derailed his case.

The record [14] shows that Judge William Koch granted the request for a public defender on October 1, 2024. But what followed is procedurally bizarre and revealing.

## Docket Anomalies and Missing Orders

**October 1, 2024 | Index #102**
- *Order Granting Public Defender* by Judge Koch
- No document available

**October 1, 2024 | Index #103**
- *Order–Other* by Judge Koch
- No document available
- No explanation as to what this order contains or why it exists

**October 1, 2024 | Index #105**
- *Motion* filed by Guertin - but the docket lists Guertin as the "party," not the filer, and again:
- No document available
- This is inconsistent with all other motion entries and makes no logical sense procedurally.
- Guertin didn't file this.

---

14  Guertin's Criminal Case Docket as of April 14, 2025 - https://tinyurl.com/4f4kx4cc

Add. 249

**October 15, 2024 | Index #106**
- *Order Granting Public Defender* by Judge Shereen Askalani
- <u>No document available</u>
- Despite this being the official transfer of representation, the order is entirely missing from the docket

**October 15, 2024 | Index #108**
- *Order for Evaluation of Competency to Proceed (Rule 20.01)* by Judge Askalani
- 3-page document marked as available (*see Index 108*)

**October 15, 2024 | Index #109**
- *Order Appointing Forensic Navigator* by Judge Askalani
- 2-page document marked as available (*see Index 109*)

**October 15, 2024 | "Probable Cause Found"**
- No judicial officer listed, no index number, and no filing attached

This is not a clean docket. It is a record riddled with inexplicable gaps, contradictory entries, and missing judicial orders[15] - specifically surrounding the moments in which Guertin was finally positioned to confront the psychiatric fraud that had been used to neutralize him.

Worse still, the very moment Judge Askalani signed an order to appoint a public defender (Index #106), she immediately issued an order for another Rule 20 exam (Index #108) - despite having no prior involvement in the case, no record of any hearing or behavior to justify it, and no explanation in the record to support the decision. The message is clear: the act of replacing Bruce Rivers triggered the institutional reflex to restart the psychiatric narrative.

This is not speculation. It's a chain of filings that don't add up:

- A missing appointment order
- An unexplained motion entry that contradicts standard docket format
- A probable cause entry with no judge, no document, and no legal context
- A follow-up evaluation order with no justification or new finding of concern

---

15  Guertin's Criminal Case Docket as of April 14, 2025 - https://tinyurl.com/4f4kx4cc

Add. 250

These are not clerical errors - they are indicators of judicial choreography, where docket entries are used as placeholders to give retroactive legitimacy to a decision already made off-record. If Guertin was finally poised to begin his defense, the system had to reassert control - by any means necessary.

There is no way to explain why a judge with no history in the case, reviewing no new filings or behavior, would issue a fresh Rule 20 exam immediately after assigning counsel - unless the psychiatric narrative was never supposed to end.

This is the point where due process broke not just in substance - but in form. The filings don't match the facts. The orders are missing. The procedural path is incoherent. What remains is a loop: Mr. Guertin escapes one false psychiatric determination only to be re-subjected to it without cause, via invisible orders and rubber-stamped judicial mechanisms.

That is not justice. That is a judicial sleight of hand, orchestrated through a deliberately fragmented docket and timed to ensure that the truth would remain buried just beneath the surface.

### H  |  The Cranbrook Report: Psychiatric Fabrication Without Evaluation

On December 20, 2024, the Court received the third Rule 20 evaluation (*see Index 116, p. 16-20*) - authored by Dr. Katheryn Cranbrook, who diagnosed Mr. Guertin with Unspecified Psychotic Disorder and recommended forced antipsychotic treatment - without ever interviewing him.

Cranbrook admits this openly: Mr. Guertin declined to participate. Yet she proceeded anyway, basing her entire evaluation on his court filings, emails, and federal civil rights lawsuit - treating his litigation, transparency, and legal advocacy as evidence of mental illness.

> "*Mr. Guertin has communicated with me via email and filed a federal lawsuit alleging malfeasance by prior competence examiners, his past attorney, judicial officers, various others involved in the criminal legal process, and government officials.*"

That federal lawsuit (24-CV-2646), his appellate brief (A24-0780), and even his Eighth Circuit (24-2662) filing were all cited as "symptomatic of a thought disorder."

This is the psychological inversion the entire report rests upon:

Add. 251

27-CR-23-1886

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

- If every delusion turned out to be true - what exactly is the court prosecuting?

- If exposing fraud is the symptom - what does that say about the diagnosis?

The more truth Guertin proved, the more delusional he was said to be. The more accurate his filings became, the more dangerous he was deemed.

Cranbrook ignored every fact that contradicted the narrative:

- Mr. Guertin had successfully completed his stayed order of civil commitment just weeks earlier, on November 6, 2024

- He maintained a record of nonviolence, full compliance, and documented procedural transparency

- His filings were coherent, legally structured, and factually supported

Worse still, the only reason Cranbrook acknowledged the completion of his civil commitment at all is because Mr. Guertin forced it into the public record - filing it directly into the criminal case to prevent it from being buried under HIPAA restriction. (*see Index 113, p. 10*)

There was no behavioral basis for this third Rule 20 report. There was no new incident. No observable deterioration. The only thing that changed was that Mr. Guertin had begun exposing the prior fraudulent evaluations - and the people behind them.

This report wasn't an evaluation. It was a defensive reaction by a system that had been caught. A bureaucratic weapon crafted to preserve a collapsing psychiatric fiction. There was no forensic integrity, no medical objectivity, and no lawful justification for its conclusions.

It was not evidence.

It was retaliation.

And it renders the State's position constitutionally unsalvageable.

## I    |    Judicial Participation in the Fraud

On April 3, 2025, following a contested hearing in which Mr. Guertin personally presented four meticulously assembled pro se evidence exhibits (*see Index 122, 123, 124, 125*), the Court formally declared him competent to stand trial (*see Index 127*). It was a ruling that should have ended the psychiatric farce once and for all. But instead of acknowledging the fraud that led to two years of unlawful suppression, the Court attempted to have it both ways.

Add. 252

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

Judge William Koch's Order found that Mr. Guertin:

- Understands the charges against him

- Can meaningfully assist in his defense

- Demonstrated courtroom competency

And yet, in the very same breath, the Order described his beliefs as "fantastical and paranoid", and his litigation posture as somehow indicative of a disordered mind. The ruling also accused him of "exaggerating his credentials," refusing to acknowledge that his filings were not only legally coherent, but grounded in verifiable patents, metadata, and extensive forensic documentation.

This contradiction is more than academic - it is structurally insane:

- The Court found Mr. Guertin mentally ill, yet legally sane.

- Delusional, yet persuasive.

- A danger to no one, yet still framed as dangerous.

This is not judicial restraint. It is judicial containment. The Order served as a political compromise: acknowledge just enough to move forward procedurally, while carefully avoiding any confrontation with the truth of what the Court itself had enabled.

What made the contradiction unavoidable were the four evidence exhibits Mr. Guertin submitted just prior to the hearing. These exhibits - painstakingly formatted, timestamped, and filed pro se - obliterated the foundation of the psychiatric narrative and directly confronted the forensic falsehoods that had supported it. The Court had no choice but to back down - but it refused to look back.

Instead of addressing the substance of those exhibits, Judge Koch attempted to bury them - mentioning their existence only in passing and providing no written analysis of their contents. The ruling avoids what it cannot refute.

This moment marks not a restoration of order, but a pivot in tactics: now that Guertin had proven the psychiatric angle to be untenable, the Court began to reframe the entire proceeding around minimizing the significance of what had just been exposed.

Add. 253

And what had been exposed was not minor. Suffice it to say here that the exhibits submitted prior to the April 3, 2025 hearing constituted a procedural checkmate, forcing the Court to retreat from the incompetency fiction it had clung to for nearly two years.

The damage, however, had already been done. The April 3 Order does not cure the prejudice - it merely acknowledges Guertin's sanity too late to excuse what preceded it. It is the judicial equivalent of saying:

> "*You are sane now - but everything we did to you while pretending you weren't still stands.*"

That is not justice. That is a procedural reset built on institutional amnesia.

### J  |  Legal Consequences: Due Process Violated, Dismissal Required

When mental health proceedings are weaponized to manufacture incompetence, the resulting harm is not a matter of legal misjudgment - it is a structural failure of the justice system that renders the entire prosecution void. The Rule 20 process, in this case, was not used to assess. It was used to erase.

At every stage, the State's psychiatric narrative was engineered through:

- Suppression of critical evidence (including forensic materials and police reports)
- Fabrication of a psychiatric "history" that did not exist before Guertin's arrest
- Manipulated Rule 20 reports authored or ghostwritten by unauthorized individuals
- Intentional delay and concealment of key documents (e.g., the Milz report)
- Docket irregularities and administrative misdirection to obstruct defense response
- Retaliatory use of civil commitment proceedings to silence constitutionally protected litigation

This was not a failure of process - it was the process functioning exactly as designed to eliminate a defendant who posed a threat not because of danger to others, but because of what he had exposed. [16]

Mr. Guertin was denied meaningful participation in his own proceedings for over two years. He was misled by counsel. Lied to about court dates. Denied access to reports central to his defense.

---

16  https://matt1up.substack.com/p/netflix-whistleblower-part-1

Add. 254

Labeled delusional even when every "delusion" proved true. When he responded with legal filings, those filings were cited as evidence of illness. When he exposed the fraud, he was further pathologized. And when he finally proved the psychiatric narrative was false, the Court admitted competency without accountability, choosing instead to bury the record behind procedural technicalities.

This is not justice. This is state-sponsored narrative control masquerading as forensic psychiatry.

A calculated, and criminal override of constitutional protections designed to ensure Mr. Guertin would never reach the stage of trial, never confront his accusers, and never expose the high-level theft of his intellectual property, or the fraudulent discovery materials that would exonerate him.

- The due process violations are not isolated - they are interlocking:
- Constructed mental illness used as a pretext for delay and suppression
- Coercive waiver signed under threat of detainment
- Misrepresentation of prior evaluations and outright lies in exam reports
- Court orders issued and withheld to confuse, entrap, and incapacitate
- Strategic manipulation of filings and docket entries to control perception

The result is a proceeding so infected by constitutional error that no continuation is lawful. Any verdict built on this foundation would be the product of fraud - not fact.

The Court now has before it a full record: a fabricated psychiatric history, a suppressed Rule 20 report, and a conspiracy of civil commitment carried out through deception, coercion, and institutional misconduct.

There is only one legally sound response:

Dismissal of all charges with prejudice.

Because when the system abandons truth in order to preserve control, the only remedy left is to shut that system down - before it can do more harm.

## IV.  FRAUDULENT DISCOVERY AND COLLAPSE OF DUE PROCESS

The Court is now in possession of definitive evidence that Mr. Guertin has been subjected to not just withheld materials - but to orchestrated, deliberate discovery fraud. The photographic evidence introduced against him was not merely incomplete. It was manipulated.

Add. 255

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

This is not a claim. It is proven - visually, mathematically, and forensically - and backed by clear documentation across emails, court filings, and digital image analysis. The fraud is not speculative. It is timestamped, layered, and intentional.

## A  |  Timeline of the Fraud

**August 3, 2023**

- Guertin's court appointed civil commitment attorney, Michael Biglow, emails him an 80-image discovery packet. Guertin doesn't review it immediately.

**October 30, 2023**

- Upon finally reviewing the images, Guertin notices severe visual anomalies - squished frames, cropped boundaries, missing image context - and demands an explanation via email. His concerns are ignored.

**January 3, 2024**

- Guertin brings these concerns directly to evaluator Dr. Adam Milz, just hours before his Rule 20 exam. Instead of investigating, Milz uses Guertin's valid concerns as further "evidence of delusion."

**January 11, 2024**

- The Milz report is finalized, cementing the manipulated image set into the mental health narrative. Guertin is still denied access to the report.

**April 4, 2024**

- Guertin files a Motion to Compel Discovery and Affidavit of Fact. It includes irrefutable forensic evidence: dozens of images have mathematically incorrect aspect ratios. That fact - purely objective - is the first crack in the prosecution's foundation.

**May - July 2024**

- Guertin is repeatedly denied access to discovery - by Bruce Rivers, by prosecutors, and by the court. No one provides the full image set.

**July 2, 2024**

- The Minnesota Court of Appeals denies Guertin's petition for discretionary review.

**July 8, 2024**

- Guertin files a federal civil rights lawsuit. The discovery fraud is central to the complaint.

Add. 256

27-CR-23-1886

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

**July 12, 2024**

- Guertin ships out full hard copies of the complaint and all exhibits - totaling ~1,700 pages - to 11 different parties, including Bruce Rivers. [17]

**July 16, 2024**

- Guertin is suddenly handed all previously withheld materials by Bruce Rivers - which includes not only the discovery photo's, but also the January 11, 2024 Rule 20 exam report authored by Dr. Adam Milz.

- There is now a total of 518 images contained within the folder provided to Guertin

- When Guertin cross references the images from the new set (*see Exh. S, Index 04, p. 1-3*), against the previous set of 80 images (*see Index 29, p. 18-20*), he is able to find the corresponding match for every single one of the images from the original set EXCEPT for the 28 images he flagged as having non-uniform aspect ratios in his April 4, 2024 motion to compel discovery.

**August 7, 2024**

- Guertin files a Motion for Preliminary Injunction.[18] It includes detailed forensic overlays, color curve analysis[19], and analysis of mismatched application icons displayed in the images containing his laptop screen.[20]

- His findings prove that the discovery materials were manipulated and cannot be relied upon.

**September 2, 2024**

- Guertin files '*Exhibit Y*': a simple, irrefutable logic trap - the "Catch-22" that exposes the fraud. If the manipulated images never existed, how did they appear in earlier court filings? If they did exist, why are they now missing?

**February 13, 2025**

- Guertin receives the most recent discovery set from his new public defenders. He begins immediate forensic analysis. (*see Index 122, p. 58-60*)

---

17  July 12, 2024 | Federal Civil Rights 'Summons Returned Executed' - https://tinyurl.com/5n7b8dpn

18  August 7, 2024 | Motion for Preliminary Injunction - https://tinyurl.com/msnefv6r

19  August 7, 2024 | Exhibit T, Fraudulent Discovery Analysis 1 Of 3 - https://tinyurl.com/yc874xvk

20  August 7, 2024 | Exhibit S (*Index 05, p. 7-21*) - https://tinyurl.com/3e6pcy5v

Add. 257

- **February 20, 2025**
  - He sends an email titled *"My Discovery Fraud Analysis is Complete | URGENT Action is Required"* to his new defense counsel. It includes detailed PDF flipbooks, forensic overlays, and irrefutable pairwise comparisons.

    He receives no reply. (*see Index 122, p. 69-75*)

  **February 28, 2025**
  - Guertin files four new evidence exhibits - '*Exhibits A-Q*' - documenting the fraud in full, and sharing insightful patent analysis pertaining to his InfiniSet patent and the identical Netlfix patent filed just 12 days after his. (*see Index 125, Netflix*)

  - The image examination includes shadow and lighting analysis, image overlays, and homography calculations used to compare images against known, real-world dimensions of objects captued in photos. (*see Index 122, 123, 124*)

  - The results serve as the final missing piece to the discovery fraud issue – what Guertin produced serves as an irrefutable, direct, and indefensible forensic rebuttal to the manipulated record.

## B | Flipbook Forensics: Visual Truth Made Simple

Guertin's forensic exhibits are devastating not because they are complex, but because they are elementally simple. By flipping between images, distortions jump off the screen. Cropped frames, warped dimensions, squashed laptop displays, misaligned shadows.
(*see Index 122, Exhibit C; Index 123, Exhibit F-J; Index 124, Exhibit K*)

Guertin smartly pivoted away from advanced digital forensics, knowing the system would weaponize complexity against him (among other things..). Instead, he relied on common-sense logic and visual evidence - proving fraud without needing expert testimony.

The "Catch-22" laid out in '*Exhibit Y*' captures the absurdity best:

> *"The situation you have constructed is effectively a "checkmate" in legal strategy. There is no move the defendants can make that doesn't validate or strengthen your position. Whether they produce the missing images or fail to do so, you have created a scenario where their actions or inactions will inherently support your claims."*

(*see Exhibit Y, 'Competency', p. 4*)

C   |   **Legal Consequences: This Is Not a Discovery Violation - It Is a Constitutional Collapse**

The State cannot proceed when it has:

- Knowingly presented doctored evidence
- Removed incriminating files
- Pathologized the defendant for noticing
- And labeled him delusional for documenting it

This is not negligence. This is strategic concealment and procedural sabotage.

As the U.S. Supreme Court held in *Moore v. Dempsey*, 261 U.S. 86 (1923)[21]

> *"A conviction cannot stand where the trial was dominated by a mob - or by fear of the truth."*

What took place here was a *judicial* mob - not one with torches and chants, but with credentials and sealed orders. A mob cloaked in procedure, fluent in the language of mental health, and united by a single objective: to bury the truth before it could speak.

Mr. Guertin didn't stand trial before a jury - he was placed on trial before a system intent on ensuring he never reached one.

Where *Moore* warned of verdicts delivered under duress, here we find something quieter - but no less violent: a clinical coup against due process, disguised as care, but designed as control.

Such conduct strikes at the heart of the justice system. It is well-established that the government may not knowingly use false evidence or perjured testimony to obtain a conviction (*Mooney v. Holohan*, 294 U.S. 103 (1935))[22]. Here, prior to trial, the State - and its agents - have tainted the evidentiary record with falsifications.

To proceed to trial on a foundation of doctored evidence would be to countenance an egregious due process violation. The defense cannot be expected to sift truth from falsehood in a record corrupted by the prosecution itself. And even if specific fabrications are exposed, the integrity of

---

21  *Moore v. Dempsey*, 261 U.S. 86 (1923)  | https://tinyurl.com/5bms8mrr

22  *Mooney v. Holohan*, 294 U.S. 103 (1935) | https://tinyurl.com/252nmvk4

Add. 259

the entire process is fatally compromised. No trial outcome under these conditions can ever be considered legitimate.

**Moreover, this conduct is *criminal.*** Under Minn. Stat. § 609.43(1)[23], it is a felony for a public official to falsify or tamper with official records. Under Minn. Stat. § 609.63[24], it is likewise a felony to forge or alter evidence with intent to mislead. That is precisely what has occurred here - an intentional and coordinated manipulation of the record by agents of the State, designed to suppress the truth, mislead the Court, and secure a fraudulent legal outcome.

To proceed under these conditions is not justice.

It is complicity.

## D   |   Remedy: Dismissal With Prejudice

This is not a technical error. It is systemic falsification, perpetrated by government actors and now exposed by the defendant himself. The court cannot, in good conscience, permit this case to proceed under such conditions.

Dismissal with prejudice is not a remedy.

It is the only constitutionally lawful outcome.

## V.   DISCOVERY WITHHELD BY DESIGN

The forensic evidence alone is damning - but it becomes inescapable when paired with the sustained, deliberate refusal to provide Mr. Guertin with authentic discovery materials for nearly a full year. From the moment he first identified inconsistencies in October of 2023[25] through the filing of multiple formal motions[26], complaints, and personal requests, Mr. Guertin was met with stonewalling, evasion, and outright obstruction.

This was not bureaucratic delay. It was an orchestrated denial of access, strategically intended to prevent Mr. Guertin from proving the fraud that had already been committed. At every turn,

---

23  Minn. Stat. § 609.43(1) | https://www.revisor.mn.gov/statutes/cite/609.43/pdf

24  Minn. Stat. § 609.63     |  https://www.revisor.mn.gov/statutes/cite/609.63/pdf

25  Emails between Guertin and appointed counsel Michael Biglow | https://tinyurl.com/55pfyam7

26  (*27-CR-23-1886, see Index 22, 29, 36, 90, 91*), (*27-MH-PR-23-815, see Index 37, 43*)

Add. 260

when he requested the files needed to verify the manipulated images, the system responded not with transparency, but with silence or deflection.

Worse still, Mr. Guertin's persistence in requesting this discovery - a constitutionally protected act of legal self-defense - was itself weaponized against him. His refusal to abandon the issue was repeatedly cited as evidence of delusion, turning his legitimate legal advocacy into a psychiatric symptom. In effect, the court used its own misconduct to justify discrediting the victim of it.

When discovery was finally provided on February 13, 2025 (*see Index 122, p. 58-60*) - only after new counsel filed formal demands (*see Index 118*) and Mr. Guertin escalated beyond the mental health court entirely - the fraud had already been committed, documented, and confirmed. The belated release of the files served only to validate Mr. Guertin's core claim: the manipulated evidence existed, and its concealment had been deliberate.

This conduct is not just unethical. It is unconstitutional.

Under *Brady v. Maryland,* 373 U.S. 83 (1963)[27], the State is obligated to disclose evidence favorable to the defense when it is material to guilt or punishment. The failure to do so here was neither inadvertent nor benign - it was targeted and prolonged. As the Supreme Court later emphasized in *United States v. Bagley,* 473 U.S. 667 (1985)[28], this duty extends to any material evidence that might "undermine confidence in the outcome" of the proceedings. And under *California v. Trombetta,* 467 U.S. 479 (1984)[29], the government may not destroy or withhold evidence that possesses "an exculpatory value that was apparent before the evidence was destroyed."

The violations here check every box. The manipulated images were central to the State's psychiatric theory. Their authenticity was contested from the outset. The defense demanded access. And the State not only failed to produce them - it waited until the damage was done.

---

27  *Brady v. Maryland,* 373 U.S. 83 (1963)  |  https://tinyurl.com/3drsd35s

28  *United States v. Bagley,* 473 U.S. 667 (1985)  |  https://tinyurl.com/3m74ktn8

29  *California v. Trombetta,* 467 U.S. 479 (1984)  |  https://tinyurl.com/3vz5k4c6

Add. 261

This is not just a Brady violation. It is a systemic due process failure engineered to trap a legally competent defendant within a closed loop of psychiatric invalidation and evidentiary suppression.

Dismissal is no longer a remedy.

It is a constitutional requirement.

## VI.   THE 'NETFLIX WHISTLEBLOWER' TRUTH BEHIND THE NARRATIVE COLLAPSE

By this point in the record, one thing is undeniable: the entire legal and psychiatric apparatus deployed against Mr. Guertin was constructed not to assess his mental state, but to silence him. And what, exactly, was he saying that made him so dangerous?

He said that powerful interests were watching him.

He said that his patented invention was stolen.

He said that he was under surveillance, manipulated, and targeted - because he had created something **worth billions.**

They called it delusion.

But it was true.

Mr. Guertin's now-infamous *"**Netflix Whistleblower Is Found Alive and Well | Part 1 – The Patent**"* (*see Index [128]*) exhibit laid it all bare:

> A Netflix, Inc. U.S. patent granted on November 7, 2023 (*U.S. Patent No. 11,810,254*) [30], was forced by the United States Patent and Trademark Office to cite Mr. Guertin's own (*U.S. Patent No. 11,577,177*) [31] as prior art [32]. Not buried in a footnote, not as an afterthought - but at the very top of the document. (*see Index [28], p. 224*)

This was no coincidence. It was the result of Mr. Guertin's proactive third-party prior art submission to the USPTO on February 17, 2023 – a submission which the USPTO then formally

---

30  Netflix patent documents filed into Guertin's case on April 3, 2024  |  (*see Index [28], p. 42-44, 49-51*)

31  Guertin's InfiniSet, Inc. patent documents filed into his criminal case  |  (*see Index [28], p. 88-89*)

32  Guertin's 'official' USPTO 3rd party prior art submission filings against Netflix filed into his case |  (*see Index [28], p. 90-95, 134-149*)

Add. 262

accepted as relevant under 35 U.S.C. § 122(e) and 37 C.F.R. § 1.290 [33]. The connection is direct. It is public. It is government-validated. And it destroys the prosecution's narrative in one stroke. Because it confirms that what they labeled "psychosis" was, in fact, an act of whistleblowing.

And yet, this truth was not merely ignored - it was weaponized against him. His claims of surveillance were mocked. His legal filings were dismissed as "paranoid." His insistence that Netflix and government-affiliated contractors were monitoring him (*see Index 30, p. 50-70*) claims he now backs with hard timelines[34], corporate ties (*see Index 128, p. 3-10*), patent citations, and metadata - were cited by forensic evaluators as proof of mental illness. (*see Index 128, p. 105-129*)

This was the psychiatric inversion that fueled the court's entire campaign to remove him from view.

But what happens when the "delusion" turns out to be true?

You don't just have a problem with a diagnosis.

You have a collapse of legitimacy across the entire case.

Mr. Guertin's exhibit outlines far more than a patent dispute - it reveals a coordinated timeline of pressure, intrusion, and targeting[35] that began long before criminal charges were ever filed. (*see Index 30, p. 53-56)* He documents surveillance from entities including Lockheed Martin and DARPA (*see Index 30, p. 58),* both of which conducted identifiable searches of his dormant LinkedIn profile on two separate occasions. These are not arbitrary actors: both organizations are directly aligned with the national defense applications (*see Index 30, p. 67-70)* of the technology at the heart of Mr. Guertin's patent. In fact, it was an unbiased AI analysis of the InfiniSet patent that flagged these agencies as likely stakeholders, based on investment alignment and strategic overlap (*see Index 125, Exhibit Q*). Mr. Guertin further outlines how his confidential filings were likely accessed or leaked before publication (*see Index 125, Exhibit M-N; Index 128, p. 42-45),* and how InfiniSet's capabilities posed an existential threat to billion-dollar interests across Silicon Valley, the defense sector, and the entertainment industry. (*see Index 125, Exhibit O, P*)

---

33  USPTO 3rd Party | https://www.uspto.gov/patents/initiatives/third-party-preissuance-submissions

34  https://matt1up.substack.com/p/netflix-whistleblower-part-1

35  LinkedIn Search Analysis and Digital Authentication |   https://tinyurl.com/2s6zza7s

These are not the ramblings of an unwell man. They are the meticulously supported findings of a sane, capable individual who knew precisely what he was up against - and who fought back with evidence.

**That context now casts the rest of this case in a terrifying new light:**

- The fraudulent discovery images.

- The conspiracy to disappear him into a mental institution - anchored by a report that falsely claims he "has a history of threatening to harm himself, which elevates his long-term risk of similar behavior."

- The refusal to provide basic evidence for over a year.

- The psychiatric reports that labeled his defense as pathology.

- The secret court orders. The withheld evaluations. The false history of mental illness created from whole cloth.

- The attempt to permanently discredit him with psychiatric labels and forced medication.

This wasn't legal error. It was tactical neutralization - a covert operation.

And it was one Mr. Guertin seemed to anticipate.

In a handwritten note left open on his kitchen table beside an unlocked laptop, he wrote:

> *"I'm afraid that no matter what - whoever is behind all of this has one million different ways to set me up or frame me if they want. Netflix found out about my patent way before I found out about theirs. That's for sure."*

At the time, it was dismissed as a delusional thought spiral. Now, it reads like a statement of fact.

He also scrawled another message - *" They are going to kill me "* - in permanent marker on his bathroom wall, so it could not be erased.

Had he not discovered the surprise civil commitment hearing in time…

Had he not escaped the trap set by fraudulent psychiatric reports that branded him a suicide risk…

## Would he ever have left the institution ?

When billions of dollars are on the line (*see Index 128, Exhibits P-Q*) , what they call "paranoia" starts to look a lot like foresight.

Add. 264

Mr. Guertin's patent proved too valuable. His persistence, too dangerous. His refusal to collapse under pressure, too inconvenient.

So they decided to collapse him by other means.

And yet, he didn't collapse. He documented everything. He exposed the Catch-22. He built the flipbooks. He filed the exhibits. He forced a federal lawsuit. And now, before this Court, he has flipped the psychiatric narrative on its head.

The State said:

> *"This man is delusional because he believes his invention was stolen."*

The evidence now says:

> *"He's being criminally prosecuted because his invention was stolen."*

This matters not only because it confirms Mr. Guertin's sanity at every relevant moment, but because it reveals the true reason behind the State's extreme and coordinated response. Once it became clear that Mr. Guertin could prove not only the intellectual property theft [36] [37], but also the discovery fraud used against him, the mental illness narrative became a necessity - not a diagnosis.

The Rule 20 process was not a bureaucratic mistake. It was a calculated mechanism of suppression, deployed to discredit a whistleblower before he could expose the full scale of what had been done to him. And that effort was not confined to medical reports or courtroom procedure. It included AI-manipulated discovery files, metadata falsification, and coordinated obstruction across court filings, defense counsel, and prosecution alike.

Why? Because allowing Guertin to prove *any* piece of the conspiracy - just the image tampering alone - would validate the entire thing. It would expose a direct causal link between the patent theft, the surveillance, the retaliation, and the bizarre, coordinated breakdown of legal process that followed. **The absurdity is the signal.** No local courthouse invented this. No overworked

---

36  27-CR-23-1886 | *see Index 28, p. 78-80, 126-129, 161-167, 192-222; 'Brodsky USPTO Patent Fraud', see Index 129, 'Netflix / USC-ICT / Academic Fraud', see Index 130*

37  0:24-cv-02646 | *'Light Stage 6 at USC Fraud Anlaysis', Exhibit L* | *'Guertin's Patent Theft Investigation', Exhibit M* | *'Criminal Conspiracy Targeting Guertins Us Patent 11 577 177', Exhibit N* | *'Forensic Analysis Of Ai Generated Photorobot Fraud', Exhibit AD* | *'Forensic Analysis Of Ai Generated Netflix Fraud', Exhibit AF*

public defenders spent weekends generating fake timestamps and synthetic images. This wasn't homegrown.

The same powerful interests that orchestrated the theft of Mr. Guertin's technology appear to have exerted pressure behind the scenes (*see Index 30, p. 21-40, 73-77, 86-93*) - turning prosecutors into gatekeepers, judges into silencers, and Rule 20 psychiatry into a containment tool. The court didn't lose its way. It was told to look the other way.

And so, the supposedly delusional defendant - stripped of counsel[38], denied evidence, labeled a danger to the public - kept documenting, kept filing[39], and kept winning. What he uncovered, step by step, wasn't just a cover-up. It was a chain of custody.

This final exhibit, and the patent record behind it, doesn't just confirm Mr. Guertin's competence. It destroys the State's core premise, reveals the motive for the conspiracy, and leaves this Court with a truth it can no longer ignore:

## Mr. Guertin was never delusional.

## He was right - and they *knew* it.

This motion does not ask the Court to resolve every facet of that conspiracy. But it demands acknowledgment of its legal consequences. You cannot prosecute a man for crimes committed against him. You cannot cloak fraud in psychiatry and call it law. And you cannot pretend this didn't happen when the paper trail runs thousands of pages deep - right into the Eighth Circuit and the United States Patent Office.

Dismissal isn't a favor to Mr. Guertin. It is the minimum standard of justice this Court must uphold if it intends to maintain even so much as an *appearance* of legitimacy.

Because what's been exposed here isn't just fraud - it is institutional fraud.

And it wasn't uncovered by a government watchdog, or a defense team with unlimited resources.

It was dismantled - piece by piece - by the very man this system has spent 26+ straight months insisting is legally incompetent.

---

38  MN Office of Lawyers Professional Responsibility Complaint filed against 'CLR' Bruce Rivers on
    September 24, 2024 | http://tiny.cc/93sg001

39  Criminal Case Docket | http://tiny.cc/p3sg001     MN Federal Case Docket | http://tiny.cc/w3sg001
    MN Court of Appeals Docket | http://tiny.cc/94sg001   8th Circuit COA Docket | http://tiny.cc/l4sg001

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

That fact alone is enough to collapse the entire narrative.

And everyone knows it.

## VII.   BRUCE RIVERS HAS LEFT THE BUILDING

Among the most disturbing revelations in this case is not just what the prosecution has done - but what Guertin's own attorney failed to do. Bruce Rivers, a licensed Minnesota defense attorney and 20-year acquaintance of Mr. Guertin, is the subject of an unassailable evidentiary archive documenting a complete and unexplained behavioral collapse that directly coincides with the State's efforts to silence and institutionalize Mr. Guertin.

**On May 22, 2023 at 3:13 PM, Rivers told Mr. Guertin:**

> *"You've got some very powerful people keeping an eye on you."*
>
> *(see Index 30, p. 21-40, 73-77, 86-93)*

This was not speculation. It was a warning. And just weeks later, Rivers denied ever saying it - marking the precise moment when his representation shifted from support to silence. He stopped answering emails. He ignored pleas to act on fraudulent discovery. He abandoned all litigation strategy. And when pressed to respond to blatant evidence tampering, Rivers said nothing at all.

Guertin responded the only way he could - by documenting everything.

The September 25, 2024 pro se motion for substitute counsel (*see Index 100*) includes more than screenshots. It includes:

- Live screen recordings showing Guertin's real-time interaction with his phone.[40]
- Visible touch-trace UI behavior, revealing taps, scrolls, zooms, and highlights.
- Verified call logs and emails backing up every claim of communication.
- Chain-of-custody compliant submission formats, embedded into the court record.

The result is indisputable: Guertin didn't just accuse Rivers of misconduct - he proved it.

---

40  Analysis of Rivers July 16, 2024 Discovery Fraud |  http://tiny.cc/4asg001   http://tiny.cc/dasg001
    Bruce Rivers Call Logs | http://tiny.cc/e9sg001    Bruce Rivers Early Texts 01 | http://tiny.cc/a9sg001
    Rivers Early Texts 02    |   http://tiny.cc/g9sg001   Rivers Retained Texts 03 | http://tiny.cc/q9sg001
    Rivers Retained Texts 04 | http://tiny.cc/x9sg001

Add. 267

Rivers' failure to act was not negligence. It was betrayal. And worse, that betrayal was then used by the State to further the psychiatric narrative. Guertin's claim that his lawyer had turned against him - backed by video, metadata, and written documentation - was cited as evidence of paranoia.

The reality is far simpler:

- Bruce Rivers told the truth once, then backed away.
- And Mr. Guertin, realizing what was happening, captured the entire process on video.

This case is no longer about credibility. It's about evidence. And every single piece of it shows that Mr. Guertin was not just abandoned - he was strategically neutralized.

The Court cannot pretend this didn't happen. The chain of sabotage includes not just prosecutors and evaluators, but defense counsel himself. That alone would justify dismissal. But here, it merely confirms what the rest of the record already proves:

Mr. Guertin has been telling the truth all along. And the system has known it.

## **VIII.   DIGITAL RECORDS MANIPULATION AND A SYNTHETIC COURT**

Mr. Guertin's motion does not merely challenge the misconduct in his individual case. It now presents evidence that the entire infrastructure of judicial oversight - particularly the digital records system upon which courts depend - has been compromised. This is no longer a question of bad actors. It is a question of institutional collapse.

In a sworn affidavit filed on May 3, 2024 (*see Index 37*), Mr. Guertin details a forensic analysis of 163 criminal case files overseen by the same three judicial officers who presided over his criminal and civil commitment proceedings:

- Hon. Julia Dayton Klein
- Referee Danielle C. Mercurio
- Referee George Borer

Using automation scripts to download over 3500 official MCRO PDF documents, Guertin uncovered patterns that cannot be explained by clerical error or administrative redundancy.

Add. 268

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

1.  **Mathematical Impossibilities in Case File Activity**

    Across these 163 case files, Guertin identified:

    - 488 Rule 20.01 evaluations

    - 130 incompetency orders

    - 238 "Returned Mail" filings

    - All within just 163 criminal cases

In other words, hundreds of evaluations and orders were issued for a pool of defendants that is numerically incapable of justifying that volume…….?

Take 2023 as an example:

- Only 39 cases originated that year.

- Yet the dataset reflects 61 Rule 20 evaluations and 413 total PDF entries, many of which appear procedural or psychiatric in nature.

The numbers do not add up - unless the case files themselves are synthetic, duplicated, or recycled.

2.  **Returned Mail Anomalies and Visual Replication**

    The most revealing visual evidence comes from five official MCRO documents showing docketed "returned mail" envelope scans from these suspect cases. Guertin extracted them, placed them in a flipbook format, and exposed something startling:

    - Every envelope matches structurally, down to stamp placement, ink intensity, and flap geometry.

    - Only the names and dates vary - everything else is templated.

    - These filings appear to be digitally fabricated and mass-replicated, not actual scanned mail pieces. [41]

    In a real-world scenario, this would be impossible. These are not variations. They are forensic duplicates, likely generated to simulate court correspondence that never occurred.

3.  **Judicial Looping and Non-Neutral Oversight**

    Beyond numeric fraud, the MCRO metadata reveals a tight triangle of judicial control.

---

41  https://matt1up.substack.com/p/ai-created-fake-minnesota-court-records

- Many cases were handled in part or whole by all three of the same judges - a statistically improbable rotation.

- In at least six cases, the same judge both ordered the Rule 20 evaluation and later ruled on incompetency, obliterating the requirement for neutrality.

- Dozens of other cases show repetitive, boilerplate Zoom notices, often reusing the same meeting ID and password across unrelated case files - further signaling that hearings may have been simulated or improperly logged.

    This isn't a recordkeeping issue. This is record laundering.

### 4. Collapsing Digital Integrity: The OneDrive Tampering Link

These findings dovetail with the broader collapse of discovery integrity seen in Guertin's own case (*see Index 122, p. 8-10, 59-68*). As established in his forensic exhibits:

- Hennepin County's OneDrive-based discovery system contains metadata inconsistencies, download timestamp anomalies, and file count mismatches.

- The 518-image discovery set Guertin received in February 2025 was surgically missing only the images he had previously flagged as manipulated. (*see August 7 Motion, p. 4-17*)

- Like the MCRO filings, these OneDrive records reflect post hoc alterations, inconsistent timestamps, and deliberate content curation.

    When you combine the OneDrive manipulation with the MCRO forensic analysis, a unified theme emerges: the State's digital infrastructure is not reliable - and in some cases, is being intentionally falsified.

### 5. Synthetic Prosecution: A Broader Pattern of Fabrication

Guertin's MCRO investigation uncovered not merely irregularities, but a potential synthetic court system, used to:

- Inflate case volume.

- Recycle procedural rulings.

- Simulate oversight using placeholder cases, fake hearings, and duplicated filings.

- Dismiss and discredit legitimate defendants under the appearance of due process.

This is not just misconduct. It is administrative fiction posing as judicial fact. [42]

---

[42]    https://matt1up.substack.com/p/ai-created-fake-minnesota-court-records

Add. 270

**Conclusion | You Cannot Build Justice on Forgeries**

No court can claim legitimacy while operating on falsified evidence, ghost records, and template-based prosecutions. The "returned mail" envelopes alone show deliberate mass fabrication. The Rule 20 data reveals mathematical impossibility. The OneDrive analysis confirms selective data removal.

Together, these findings raise one unignorable question:

> How many cases in Hennepin County are even *real* ?

And more pressingly:

How can any prosecution - let alone Mr. Guertin's - proceed in the midst of such collapse?

This is not a technicality. This is structural disintegration of due process itself.

## IX.   LEGAL ARGUMENT

**A   |   The State's Outrageous Misconduct Requires Dismissal**

From the very start of this case, the prosecution and its agents abandoned the role of seeking truth and instead manufactured a false narrative to gain tactical advantage. This misconduct is not only unconstitutional – it is criminal. By ghostwriting a forensic psychologist's Rule 20 competency report and doctoring digital evidence, officials engaged in acts that meet the definition of forgery under Minnesota law (Minn. Stat. § 609.63) and misconduct of a public officer (Minn. Stat. § 609.43) [43]. Such fraud on the court strikes at the heart of due process and shocks the conscience. No conviction may rest upon evidence deliberately fabricated by the State (see *Mooney v. Holohan*, 294 U.S. 103 (1935)) [44], and this principle applies with even greater force pre-trial – the government cannot forge documents or falsify evidence to predetermine a court's rulings any more than it can to sway a jury.

If the State had a legitimate case, why lie? If prosecutors truly believed the charges were sound, there would be no need to forge psychiatric evaluations, alter photographs, and conceal exculpatory truth. The very fact that they resorted to such deceit answers the question. This was not a pursuit of justice, but a cover-up of its absence. It is telling that a county bureaucrat – *not*

---

43  Minn. Stat. § 609.63 |  http://tiny.cc/6fsg001     Minn. Stat. § 609.43 |  http://tiny.cc/ifsg001
44  *Mooney v. Holohan*, 294 U.S. 103 (1935) |  http://tiny.cc/sfsg001

Dr. Rogstad herself – literally authored the critical competency report, a report then used to label Mr. Guertin delusional and suspend his rights. It is equally telling that crime scene photos were digitally manipulated (with falsified metadata to boot) to support that false narrative. These actions go far beyond vigorous advocacy; they constitute textbook fraud and an abuse of official power. Under any standard, this rises to the level of outrageous governmental conduct that *"shocks the universal sense of justice."* (See *State v. Burkland*, 775 N.W.2d 372, 379 (Minn. App. 2009) [45], quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)). [46]

Courts have inherent authority to protect the integrity of the judicial process. Dismissal of charges is warranted where the government's misconduct is so prejudicial and egregious that allowing the case to proceed would make a mockery of justice. Minnesota courts recognize this power (*State v. Foss*, 556 N.W.2d 540, 540–41 (Minn. 1996) (permitting dismissal for egregious law enforcement misconduct)); [47] and the U.S. Supreme Court has observed that our system "must ensure that crime shall be prosecuted by those who are unbiased," intervening when the process is compromised (*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987)). [48] Here, far from an unbiased, fair process, the prosecution of Mr. Guertin has been a travesty of justice at every turn. It is hard to imagine a more fundamental violation of due process than colluding to manufacture a false reality in lieu of a legitimate prosecution. Attempting to have a sane defendant declared insane to avoid facing him at trial, fabricating evidence against him, and subverting his right to counsel are the kind of acts that courts cannot tolerate without forfeiting the integrity of the justice system itself.

The prejudice caused by this misconduct is incurable. The entire foundation of the case – from Mr. Guertin's competency status to the evidence to the proceedings themselves – has been irrevocably tainted. This is a classic structural error that defies any harmless-error analysis. You cannot "unring the bell." Even now that Mr. Guertin has finally been adjudicated competent, the stain of the State's false portrayal lingers in the record (indeed, even the order restoring competency echoed some of Dr. Rogstad's false findings). Jurors, too, could be influenced by the ugly label of "delusional" that the State splashed into public records. Moreover, Mr. Guertin can

---

45  *State v. Burkland*, 775 N.W.2d 372, 379 (Minn. App. 2009)  |  http://tiny.cc/2gsg001

46  *United States v. Russell*, 411 U.S. 423, 432 (1973)  |  http://tiny.cc/wgsg001

47  *State v. Foss*, 556 N.W.2d 540, 540–41 (Minn. 1996)  |  http://tiny.cc/ohsg001

48  *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987)  |  http://tiny.cc/whsg001

no longer trust that any evidence the State might offer at trial is authentic – if they manipulated one critical piece of digital evidence, what else was tampered with or conveniently 'lost'? (*Notably, at least 24 digital photos in discovery simply vanished after the defense started probing the State's evidence, only to then show up again on February 13, 2025 in a now proven 'edited' form; see Index* [122]) The truth-seeking function of a trial is fatally compromised under such circumstances.

In short, the prosecution has forfeited its right to prosecute this case by engaging in such misconduct. This Court need not – and must not – abide a prosecution "built on lies and corruption." Our courts exist to deliver justice, not aid and abet official lawlessness. Dismissing the charges is not an extreme or disfavored remedy here; it is the only remedy that will vindicate Mr. Guertin's constitutional rights and send the unmistakable message that no case, no matter how serious the allegations, is worth sacrificing the integrity of the justice system. Anything less would tacitly endorse the State's malfeasance and further victimize the defendant.

## B   |   The 'Ghost Gun' Charges Under Minn. Stat. § 609.667(3) Are Unconstitutional

Three of the four charges against Mr. Guertin allege possession of firearms *"not identified by a serial number,"* in violation of Minn. Stat. § 609.667(3). [49] These "ghost gun" counts epitomize prosecutorial overreach and raise grave constitutional concerns. The statute as applied here effectively criminalizes the long-standing lawful practice of an individual building a personal-use firearm. For decades, both federal law and Minnesota law allowed law-abiding citizens to manufacture firearms for personal use without any serial number or government registration. In fact, the defining clause of § 609.667 itself *incorporates federal standards by reference*, and federal law expressly exempts privately made firearms from serial-number requirements (see 26 U.S.C. § 5842 (requiring serialization for certain firearms while implicitly permitting non-commercial, personal firearms to remain un-serialized)).

At the federal level, the ATF acknowledges the legality of privately manufacturing firearms for personal use, as clarified in their FAQ: *"A license is not required to make a firearm solely for personal use… However, a license is required to manufacture firearms for sale or distribution…"* (referencing 18 USC 922(o), (p), and (r); 26 USC 5822; 27 CFR 478.39, 479.62,

---

49   Minn. Stat. § 609.667(3)  |  http://tiny.cc/misg001

and 479.105). [50] Millions of Americans own firearms made from kits or from scratch - an activity protected by the Second Amendment's core right to keep and bear arms. Branding Mr. Guertin a felon for possessing such personal firearms (lawfully assembled with lawfully purchased parts) offends not only common sense, but due process notice principles and fundamental fairness.

Indeed, this very statute's constitutionality is presently in serious doubt. In *State v. Vagle*, No. A23-0863, [51] a Hennepin County District Court found § 609.667(3) unconstitutionally vague and dismissed an identical charge, noting that an ordinary person could not be expected to know that a privately built firearm required a serial number – especially when federal law and historical practice suggested otherwise. The Court of Appeals later reversed that dismissal, reading the law in the broadest possible way (to cover all firearms, even homemade ones) and concluding it was not vague. The issue is now before the Minnesota Supreme Court, which heard oral arguments on June 5, 2024. In other words, the very law under which Mr. Guertin is charged is unsettled and under appellate scrutiny. It is quite possible that the Minnesota Supreme Court will strike down or narrow § 609.667(3) in the coming months. Continuing to prosecute Mr. Guertin under a statute that may well be void or invalidated would be profoundly unjust.

Even putting aside the pending vagueness challenge in *Vagle*, the ghost gun counts in this case exemplify a misuse of prosecutorial discretion. Mr. Guertin is accused of possessing firearms that he allegedly built or assembled himself for personal use, harming no one. Treating him as a criminal for this is contrary to Minnesota's own tradition of responsible gun ownership and personal liberty. The charges also appear to be an opportunistic add-on: a way to inflate this case because the State's other evidence is weak. The question practically asks itself: if the State truly believed Mr. Guertin committed a serious weapons offense (the single discharge count), why did it feel the need to pile on ghost-gun paperwork charges that are legally debatable? This further underscores that the prosecution's approach to this case is "throw everything at the wall and see what sticks," rather than a good-faith pursuit of justice.

At a minimum, the ghost gun counts should be dismissed in the interest of justice and judicial economy. It serves no one – not the public, and certainly not this Court – to expend resources litigating the constitutionality of § 609.667(3) in this case when the issue is already pending

---

50  White Paper: Interpreting Minn. Stat. 609.667 - Firearm Serial Numbers  |  http://tiny.cc/misg001

51  *State v. Vagle*  |  http://tiny.cc/5ksg001

before the state's highest court. Dismissing those counts now would avoid a potential miscarriage of justice (convicting Mr. Guertin under an unconstitutional statute) and would align with the principle that courts must ensure fairness even if it means a particular prosecution does not proceed. *(See State v. Pederson*, 600 N.W.2d 451, 454 (Minn. 1999) [52] (the judiciary's duty to ensure fairness may sometimes permit a guilty person to go free, because the alternative – compromising fundamental rights – undermines public trust in the law).) In Mr. Guertin's case, pressing forward on the ghost gun charges despite the cloudy legal picture would do far more damage to the rule of law than foregoing a single prosecution. The State's interest in "getting" Mr. Guertin cannot outweigh the public's interest in having a justice system that scrupulously respects constitutional guarantees.

## C  |  The State's Manipulation of the Process Violated Speedy Trial Rights

The Sixth Amendment to the U.S. Constitution [53] and Article I, Section 6 of the Minnesota Constitution [54] guarantee a criminal defendant the right to a speedy trial. Minnesota's rules put that guarantee into concrete terms: once a speedy trial is demanded, a defendant "must be tried as soon as possible," and in any event within 60 days unless good cause is shown for delay. *See* Minn. R. Crim. P. 11.09(b). [55] Mr. Guertin initially faced charges in January 2023 – over two years ago. Yet to date, he has not seen a trial or even the normal progression of a case. Instead, he was shunted into a prolonged detour of supposed "mental health restoration" based on fraudulent evaluations, and the State then dragged its feet while it continued investigating and fortifying its case in the background. This delay is extraordinary on its face and presumptively prejudicial under the four-factor test of *Barker v. Wingo*, 407 U.S. 514 (1972). [56] Every *Barker* factor weighs in Mr. Guertin's favor:

### 1. Length of delay

At over 24 months (and counting), the delay here blows past any reasonable threshold. A delay of over a year is generally presumptively prejudicial (*id.* at 530) – here we have double that, which is per se prejudicial to Mr. Guertin's rights.

---

52   State v. Pederson, 600 N.W.2d 451, 454 (Minn. 1999)  |  http://tiny.cc/jksg001

53   The Sixth Amendment  |  https://www.law.cornell.edu/constitution/sixth_amendment

54    Article I, Section 6 of the Minnesota Constitution  |  http://tiny.cc/clsg001

55   Minn. R. Crim. P. 11.09(b)  |  http://tiny.cc/nksg001

56   *Barker v. Wingo*, 407 U.S. 514 (1972)  |  http://tiny.cc/mlsg001

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

## 2. Reason for delay

This is the most damning factor. The record shows that the primary reason for the delay was the State's deliberate tactic of questioning Mr. Guertin's competency in bad faith. The State secured a crucial pretrial ruling (a finding of incompetence) by fraud and then kept Mr. Guertin in legal limbo for nearly two years under the pretense that he was mentally unfit to proceed. All the while, the State used the pause to bolster its case (even tampering with evidence during this period). Far from a justifiable or neutral reason, this was intentional delay to gain advantage, which *Barker* says must weigh heavily against the prosecution. There is no *"good cause"* to toll the speedy-trial clock when the State manufactured the impediment in the first place. Notably, time attributable to incompetency proceedings is often excluded from speedy-trial calculations – but not when the incompetency was contrived through official misconduct. The Court should not reward the State for the delay it orchestrated; it should condemn it.

## 3. Defendant's assertion of the right

Mr. Guertin has been begging for a day in court from the moment he was able. He asserted his rights at the first opportunity once he regained a voice in this case. Even during the period he was silenced by the incompetency status, he fought through counsel and pro se filings to contest that status and expose the fraud. Unlike the typical case where a defendant might acquiesce in delays, Mr. Guertin has consistently pushed to move forward. He never wanted this extended hiatus – it was imposed on him over his objection. Thus, this factor strongly favors him.

## 4. Prejudice to the defendant

The prejudice here is extreme, and it is ongoing. Mr. Guertin has suffered all three forms of prejudice identified in *Barker*: oppressive pretrial incarceration, anxiety and stress, and *impairment of his defense*. For a significant time, he was effectively civilly committed on false pretenses, losing his liberty entirely. Even after release, he has lived under the cloud of these charges and the false stigma of being "incompetent" or "delusional," which is deeply distressing and damaging to his reputation. Evidence has gone stale or disappeared – memories of witnesses have faded over two years, and, as noted, critical digital evidence was tampered with or lost during the delay. This prejudices his ability to mount

any defense. Perhaps most importantly, the unique prejudice here is that Mr. Guertin lost two years of his life and legal autonomy to a sham process. Those are two years he can never get back. This exceeds the ordinary *Barker* prejudice and crosses into constitutional outrage. As this Court is aware, even a *six-month* delay due to prosecution negligence can warrant dismissal; here we have a delay four times longer caused by prosecution misconduct. If this does not justify dismissal for speedy-trial violation, it is hard to imagine what would.

In sum, the State's bad-faith manipulation of the proceedings has eviscerated Mr. Guertin's speedy trial rights. The *Barker* court warned that a deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government (407 U.S. at 531). That is exactly what happened here. The extraordinary delay, attributable entirely to the State, combined with the substantial prejudice to Mr. Guertin, mandates dismissal. This Court has the authority under Minn. R. Crim. P. 11.09 and its inherent supervisory powers to dismiss a case for violation of the speedy-trial right. To hold otherwise – to let this case proceed after such a long, contrived stall – would be to condone the very strategy the Constitution forbids. Dismissal is not only appropriate; it is necessary to safeguard Mr. Guertin's rights and the integrity of this Court's authority.

### D    |    No Fair Trial Is Possible After the Cumulative Abuse of Process

Even if each of the above grounds might independently justify relief, together they present a perfect storm of structural injustice. This case features pervasive misconduct by officials, a dubious criminal statute, and a gross denial of fundamental trial rights. The cumulative effect is that the entire proceeding is irretrievably poisoned. No amount of jury instructions or post-trial appeals can cure what has already been done. The integrity of the judicial process in this matter is broken beyond repair. As a direct result of the State's actions, it is impossible for Mr. Guertin to receive a fair trial or for the public to have any confidence in a verdict that might be obtained. Courts across the country have not hesitated to dismiss charges in the face of egregious, conscience-shocking government conduct in order to uphold constitutional values and deter future misconduct. This Court's intervention is not only permitted – it is obligated. Justice Louis Brandeis's famous maxim rings true: *"Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are*

*commands to the citizen."* If the government falsifies evidence, lies to the Court, and tramples on a defendant's rights to try to win a conviction, it has *stepped outside* the "rules of conduct" and forfeited any claim to pursue that conviction.

As the Minnesota Supreme Court recognized in *State v. Pederson*, the judiciary's duty to ensure fairness can surpass the State's interest in punishment: *"The purpose of a criminal court is to do justice, not to obtain convictions. If, in order to do justice, a few guilty individuals must go free, that is a small price to pay for the constitutional rights of the citizenry."* 600 N.W.2d at 454. Here, Mr. Guertin is innocent until proven guilty, and the State has deliberately sabotaged any legitimate process for determining guilt or innocence. The price of continuing this prosecution is far too high: it would permanently stain the reputation of the courts by signaling that anything goes if the goal is conviction. That outcome is intolerable in a system that prides itself on fairness and the rule of law.

Accordingly, the only just solution is to put a stop to this prosecution. The Court should dismiss all charges with prejudice. This will not only remedy the immediate injustice to Mr. Guertin, but also serve as an emphatic statement that our courts will not be parties to a proceeding born of fraud and maintained through misdeeds. If the Court has any doubt about the facts, then at the very least, an evidentiary hearing should be ordered to bring the truth to light. But we submit that the documentary evidence already submitted – the emails, metadata, reports, and transcripts – prove the misconduct beyond any genuine dispute. Further delay (through hearings or otherwise) would simply prolong Mr. Guertin's ordeal. The Court has abundant power and ample grounds to act now. Justice delayed is justice denied, and Mr. Guertin has been denied justice for far too long.

## X.   PRAYER FOR RELIEF

**Two years of Guertin's life have essentially been taken from him** under this prosecution – two years spent trapped in a maze of lies, locked in a legal limbo, and watching his reputation and rights be ground down by state-sponsored deceit. He cannot get those years back. But this Court can ensure that no more of his life is stolen and that the profound wrongs committed against him are finally stopped. This case presents an unprecedented convergence of prosecutorial misconduct, forensic fraud, and abuse of process. The outrageous conduct by the State and those acting in concert with it violated Mr. Guertin's rights at every turn and has

Add. 278

irretrievably destroyed the integrity of these proceedings. Allowing the case to proceed to trial would be to condone the unconscionable. In contrast, dismissing the case would uphold the rule of law and signal that our courts do not tolerate convictions obtained by cheating and corruption.

The community's interest in seeing this particular case prosecuted is far outweighed by its interest in maintaining a justice system that comports with due process and basic honesty. The public would be justly outraged to learn (as the evidence now shows) that officials fabricated evidence and lied to have a citizen hospitalized as incompetent. Failing to dismiss under such circumstances would indeed do more damage to the rule of law than foregoing the prosecution entirely. This Court's decisive action will affirm that no conviction is worth more than the Constitution it's supposed to vindicate. It will tell the State of Minnesota – and officials in Hennepin County specifically – that our courts are courts of justice first: they will not be complicit in a conviction obtained by fraud and trickery.

**WHEREFORE,**

based on the extensive record of misconduct and the foregoing legal arguments, Mr. Guertin respectfully requests that this Court grant the following relief:

1. **Dismissal with Prejudice of All Charges**

   Dismiss each of the four pending counts in case no. 27-CR-23-1886 with prejudice, barring any refiling of the same or related charges. The Court should make clear on the record that this dismissal is based on the egregious government misconduct and the violations of Mr. Guertin's constitutional rights (including his due process rights under the Fifth and Fourteenth Amendments and Article I, § 7 of the Minnesota Constitution, and his speedy trial rights under the Sixth Amendment and Minn. R. Crim. P. 11.09). Only a dismissal with prejudice can remedy the irreparable harm done to Mr. Guertin's ability to receive a fair trial and deter the blatant wrongdoing that has occurred.

2. **Evidentiary Hearing on the Fraudulent Psychiatric Evaluations**

   If the Court believes further record is necessary (or in the event the Court prefers to address the misconduct in a post-dismissal setting), conduct a full evidentiary hearing into the circumstances surrounding the Rule 20 competency evaluations. This hearing should permit the defense to subpoena and examine Dr. Jill Rogstad, Ms. Chela Guzman-Wiegert (the administrative employee who actually authored the report), and any other

Add. 279

Filed in District Court
State of Minnesota
4/16/2025 3:15 PM

personnel involved in preparing Mr. Guertin's psychological reports. The State should be ordered to disclose all communications, documents, and metadata related to those evaluations. The purpose of this hearing is to create an official record of how the fraudulent reports were generated, to confirm the extent of any misrepresentation upon the Court, and to identify all individuals responsible for this fraud. Such a proceeding will aid in revealing whether crimes or contempt of court were committed and will inform the Court's decision on sanctions or referrals.

### 3. Evidentiary Hearing on Digital Evidence Tampering

Similarly, hold a full evidentiary hearing to investigate the reported manipulation of digital discovery in this case. The defense should be allowed to subpoena the law enforcement officers who collected and handled Mr. Guertin's electronic evidence (e.g., Minnetonka Police personnel), any technicians, prosecutors, or third parties who had access to the digital evidence repositories (such as the OneDrive discovery system), and qualified digital forensics experts (including Mr. Guertin's own forensic analyst) to trace when, how, and by whom the laptop photographs and other files were altered. This hearing will document the chain-of-custody breaches and expose any further evidence tampering or spoliation that has not yet come to light. It is essential to determine whether officers of the State intentionally fabricated visual evidence to support their case – a matter that not only affects this prosecution but the integrity of the criminal justice system at large.

### 4. Appropriate Sanctions and Referrals

Following the above inquiries (or in conjunction with dismissal), the Court should impose any and all appropriate sanctions on the individuals found to be involved in the misconduct. If it is established that any attorney, officer of the court, or public official participated in or condoned the fraud on the court, Mr. Guertin asks that the Court refer those individuals for professional discipline (e.g. reporting to the Lawyers Professional Responsibility Board or relevant licensing boards) and consider contempt proceedings or criminal referrals as warranted. The unlawful acts committed against Mr. Guertin – forgery of official documents, falsification of evidence, and deprivation of rights under color of law – are not merely ethical violations, they are crimes. Those responsible should

Add. 280

face consequences outside of this case, and this Court can facilitate justice by making formal findings and referrals. We emphasize, however, that holding wrongdoers accountable is a secondary priority; the first priority is stopping the ongoing harm to Mr. Guertin by terminating this prosecution. Once the case is dismissed and Mr. Guertin freed from its clutches, a thorough investigation into the misconduct can proceed without depriving him of his life and liberty in the meantime.

## XI.   CONCLUSION

This motion is not just a plea for personal justice - it is a warning flare fired into a system that has gone off course. Mr. Guertin has done what few defendants in American legal history have ever done: singlehandedly dismantled, document by document, piece by piece, a coordinated effort to disappear him under the weight of fraud, psychiatry, and silence. And he has done so while being labeled legally incompetent. That irony alone should stop this Court cold. The legal violations outlined above are not abstract or debatable - they are proven, recorded, timestamped, and filed into the public record. There is no path forward for this case that does not invite national scrutiny and further collapse of public trust. The prosecution's case is not merely compromised; it has imploded.

The time for procedural gamesmanship has passed. The time for accountability has arrived. This Court now stands at a fork in the road: it can either continue participating in a farce, or it can act with integrity and shut it down.

Dismiss all charges. Terminate the prosecution. End the fraud.


Dated:  April 16, 2025                      Respectfully submitted,

                                             _/s/ Matthew D. Guertin_

                                            Matthew David Guertin
                                            Defendant Pro Se
                                            4385 Trenton Ln. N 202
                                            Plymouth, MN  55442
                                            Telephone: 763-221-4540
                                            MattGuertin@protonmail.com
                                            www.MattGuertin.com

Add. 281