**A25-0882**
**STATE OF MINNESOTA**
**IN COURT OF APPEALS**

| | |
|---|---|
| In re Matthew David Guertin, | District Court Case: 27-CR-23-1886 |
| Petitioner | Court Order Date: April 29, 2025 |
| v. | **PETITIONER'S EMERGENCY MOTION FOR STAY PENDING APPEAL** |
| State of Minnesota, | |
| Respondent. | Judge: Hon. Sarah Hudleston |

## I.   INTRODUCTION AND REQUEST FOR IMMEDIATE RELIEF

Matthew Guertin, pro se, respectfully moves for an emergency stay pending appeal under Minn. R. App. P. 108. He seeks an immediate stay of the district court's April 29, 2025 Order for Competency to Proceed (*Add. 1–3*) and Order Appointing Forensic Navigator (*Add. 4–5*) until appellate review is complete. Both orders are unlawful and constitutionally intolerable. As detailed below, all four stay factors – (I) Guertin's likelihood of success on the merits, (II) irreparable harm to him absent a stay, (III) minimal harm to the State if a stay is granted, and (IV) the public interest – decisively favor relief.

## II.   THE MANY ESTABLISHED VIOLATIONS OF LAW AND RIGHTS PERTAINING TO THE APRIL 29 RULE 20 EXAM ORDER

The April 29 competency and navigator orders amount to a blatant abuse of discretion, issued in retaliation for Petitioner's exposure of court and prosecutorial misconduct. The district court had no reasonable basis to doubt Petitioner's competency to proceed under Minn. R. Crim. P. 20.01. A defendant may be subjected to competency proceedings only upon a genuine, fact-based doubt about his present ability to understand the proceedings or assist in his defense. Here, the record is devoid of any legitimate

question about Petitioner's mental fitness. To the contrary, Petitioner has been actively and coherently defending himself, uncovering more about the case than perhaps anyone expected, or would like. His vigorous pro se advocacy – including detailed digital forensic analysis, and presenting evidence of thousand's of completely fake MCRO court records (*see Docket Index Map, Add. 684-686, Affidavit A-B, Exhibits A-U6, Index 141-184*) demonstrates keen understanding of the proceedings and an ability to engage with complex issues far beyond that of an incompetent person. In short, nothing about Petitioner's behavior suggested a lack of competence; what it suggested was that he was winning.

The timing and context of the April 29 orders, as well as Judge Hudleston's own order which has since been submitted *after* Petitioner filed this case (*see Index 205*) make their true motive plain: the moment Petitioner revealed evidence of official wrongdoing (after his defense counsel refused to do so), the court moved to declare him insane. Such retaliatory use of Rule 20 is a textbook due process violation. It is axiomatic that "the criminal trial of an incompetent defendant violates due process" – but due process is equally offended when a competent defendant is falsely deemed incompetent to avoid a fair trial, and to avoid having to address one of the most sophisticated judicial fraud's in American history (*see Add. Vol VII – Vol. XV*)

Judge Hudleston invoked Minn. Stat. § 611.42, subd. 2 and Rule 20.01 to block self-representation, declaring that Petitioner's Motion to Dismiss (*Add. 232-281*) "evidences paranoia and conspiracy theories" and therefore proves current incompetence. Petitioner will actually concede that she is partially correct – Petitioner is indeed 'paranoid' about what is, and has been taking place within his proceedings over the past 29+ months within the district court. What would truly be "irrational" however in this case is for the Petitioner *to not be* paranoid, as he has had three previous Rule 20 exam report's submitted to the court about him which are egregiously deceptive, and perpetuate completely false narratives amounting to an entire list of Petitioner's supposed history of

"psychosis", "delusions", "self-harm", "suicide", and "substance abuse" which is all complete lies. (*see 8-25, Add. 130; 1-6, Add. 131*).

As far as the mention of "conspiracy *theories*" the Petitioner would simply point out that there are not any claims, assertions, or legal arguments contained within his April 16 Motion to Dismiss which are not *directly* supported by overwheleming evidence – evidence which does indeed support the existence of a "conspiracy," only it is based upon facts, as opposed to "*theories.*"

If conspiracies *didn't* exist why would there be so many laws on the books to address, and deal with their existence?

## A | Petitioner's Pro Se "Motion to Dismiss" Used as Justification to Order a Fourth Rule 20 Exam

Judge Hudleston departed from both constitutional and Minnesota law when she invoked Minn. R. Crim. P. 20.01 to force a new competency examination based exclusively on what Mr. Guertin wrote in his pro-se Motion to Dismiss, not on any clinical or courtroom behavior.

In Petitioner's May 7, 2025 Emergency Motion for Stay and Vacate he aptly (and competently) posed the following doubtful question of law (*Add. 34*) under Minn. R. Crim. P. 28.03:

> Whether a district court may order a Rule 20.01 competency evaluation absent any new factual basis, and for the stated purpose of assessing the legal arguments advanced in a defendant's motion to dismiss.

This foundational legal question issue is addressed in the following points:

### 1. The Record Admits the Sole Trigger was the Motion Itself

a. In open court the judge stated: "*I reviewed your 50-plus-page motion to dismiss … I can't let you go forward because I have significant concerns*" (*23-25, Add. 9*).

**b.** At the end of the hearing, when Petitioner directly asked if incompetency was being premised solely on his Motion to Dismiss, Judge Hudleston replied that the decision was "*based on what I saw that you filed in your motion to dismiss … as well as looking back into your file*" (*24-25, Add. 21; 1-22, Add. 22*).

**c.** The written order entered May 30, 2025 confirms: "*Based on review of Mr. Guertin's pro se Motion to Dismiss … the Court found that Mr. Guertin … lacked the ability to rationally consult with counsel.*" (*see Index 205, 27-CR-23-1886*)

**2.    Such a Motion-Based Competency Referral is Legally Untenable**

**a.** Under *Dusky v. United States*, 362 U.S. 402 (1960), a defendant's competency hinges on their present ability to consult with counsel "with a reasonable degree of rational understanding" and to understand the proceedings. A competency hearing is mandated only when substantial evidence raises a bona fide doubt about the defendant's competence. Merely filing a vigorous or unconventional pro se motion does not meet this threshold. In *Pate v. Robinson*, 383 U.S. 375 (1966), the Supreme Court underscored that due process requires a competency hearing only when there is substantial evidence of incompetence, such as irrational behavior or prior medical opinions. Ordering a competency evaluation based solely on the contents of a pro se motion (*24-25, Add. 21; 1-22, Add. 22*), without additional supporting evidence, sidesteps this principle and infringes upon the defendant's due process rights.

**b.** Under Minnesota Rule of Criminal Procedure 20.01, subdivision 3, a motion to determine a defendant's competency must be supported by specific facts that raise a reasonable basis to doubt the defendant's competency. The rule stipulates that the motion must provide supporting facts

### 3.    No Objective Evidence Accompanied the Order

The judge cited no contemporaneous disorientation, clinical report, suicide attempt, or inability to interact with counsel - only the motion itself. In *Pate v. Robinson*, 383 U.S. 375 (1966) the Supreme Court underscored that a competency hearing is mandated only when substantial evidence raises a bona fide doubt about a defendant's competence. Ordering such an evaluation based solely on the contents of a pro se motion, without any sort of additional supporting evidence, completely sidesteps this principle, and infringes upon the Petitioner's due process rights.

### 4.    Resulting Prejudice is Structural

#### a.    Chilling of Core Advocacy Rights

Using a defendant's legal brief as the very ground to question his sanity penalises the exercise of the Sixth-Amendment right to present a defense and the First-Amendment right to petition.

#### b.    Automatic Suspension of Proceedings

Once Rule 20 was triggered, adjudication halted and Petitioner faces renewed risk of civil commitment - an extraordinary deprivation imposed without the "objective indicia" Minnesota law requires.

Accordingly, the April 29, 2025 order compelling a Rule 20.01 examination - must be vacated. The district court's action rested on an impermissible, motion-only rationale in clear violation of the *Dusky* standard, Rule 20.01, and controlling Minnesota precedent.

## B    |    Mischaracterization of Motion to Dismiss

During the April 29 hearing Judge Hudelston makes various statements which appear to intentionally micharacterize Petitioner's motion:

**1.** "*Over 50 pages … extreme repetition, paranoia, and conspiracy assertions … a big conspiracy with Netflix … That is not rational*" (*22-25, Add. 9; 7-14, Add. 10; 4-22, Add. 13*)

**a.** The motion is not *over* 50 pages – it is 50. Netflix appears only in Section VI (*Add. 262-267*) of the motion. The rest of the brief details discovery fraud, Brady violations, forged docket items, and suppressed Rule 20 reports (*§ IV/ Add. 8; §§ I-III/ multiple*) .

**2.** "*Hand-written note … 'one million different ways to set me up … They're going to kill me.' Things like that.*" (*1-3, 17-22, Add. 13*)

**a.** The note is quoted once as an illustrative question posed during the 2024 surprise civil commitment scheme (*Add. 243-248*), immediately followed by pages of timeline exhibits showing withheld orders and ex-parte filings.

**3.** "*There are highly illogical assertions in there … no defense to criminal liability*" (*11-14, Add. 10; 15, Add. 13*)

**a.** The motion's Prayer for Relief (*Add. 278-281*) is strictly procedural: dismissal with prejudice for discovery-evidence manipulation, Brady/Trombetta violations, and structural Rule 20 abuse (*§ Intro-I/ Add. 232-235*) - all recognized defenses under Minnesota and federal law.

## C  |  Prosecutorial Misconduct and Perjury by Mawerdi Hamid

Across the three hearings, Assistant County Attorney Mawerdi Hamid takes a series of mutually-exclusive, procedurally irregular, and overtly coercive positions aimed at (i) blocking Matthew Guertin from placing discovery-fraud evidence before a jury, (ii) resurrecting discredited competency claims, and (iii) ensuring defense counsel—not the client—controls all trial decisions.

1. **Hamid Moves to Prohibit Guertin from Testifying**

    **a.**    Claims Rule 601 automatically bars anyone previously deemed incompetent (*20-25, Add. 125; 1-5, Add. 126*)

    **b.**    When Judge Koch asks for authority, she concedes she has none (*6-13, Add. 126*)

2. **During the March 5 Contested Competency Hearing Hamid Directly Acknowledges the Discovery Fraud**

    **a.**    After Guertin explicitly, and competently goes over the discovery fraud details (*25, Add. 166; 1-25, Add. 167; 1-8, Add. 168*) Hamid responds with: "*Yeah, so you said that these photos have a problem; is that correct?*" (*9, Add. 168*)

    **b.**    She then quizzes Guertin on how he would react "*when those photos are introduced in court*" (*12-20, Add. 168*).

3. **During the April 29 Hearing When Asked About the Discovery Fraud She Directly States:**

    **a.**    "*No, Your Honor. The state is not aware of any of that information.*" (*1-2, Add. 15*)

"*it was briefly discussed during that hearing. But the state is not aware of any manipulation of the evidence, Your Honor.*" (*8-10, Add. 15*)

    **b.**    The sworn denials diametrically oppose her earlier concession—***prima-facie perjury*** and a Brady violation.

4. **Judge Koch Offers Hamid a Chance to Call Dr. Cranbrook; She Declines**

    **a.**    "*The State does not intend to, Your Honor, the State just offers the report.*" (*9-8, Add. 127*)

**b.**    By withholding the witness and relying on hearsay, the State evades cross-examination, violating the Confrontation Clause and undermining the very competency exam she sought to weaponize.

**5.    During the April 17 Omnibus, Judge Hudleston Asks Hamid's View of Guertin's pro-se motion; Hamid Answers:**

**a.**    *"I'm agreeing with defense counsel… it's not properly before the not properly before the Court and should not be addressed."* (*21-25, Add. 285; 1, Add. 286*)

**b.**    This joint effort to bar filings contradicts Faretta and Minn. Stat. § 611.19

**6.    Hamid Repeatedly Tests Whether Guertin Will Cede Control of Evidence Objections to Counsel:**

**a.**    *"If you disagree with your attorney that the photos are not a problem, how would you go about … when those photos are introduced in court?"* (*9-24, Add. 168*)

**b.**    This focused line of questioning mirrors Judge Koch's later lecture that evidence objections are counsel's decisions, revealing coordinated pressure to nullify Guertin's discovery-fraud defense, and make sure that he is not in control of his own defense.

*"There are other decisions that are the attorney's decision like do I object to this piece of evidence, do I make a certain legal argument, do I do whatever. Are you able to, if you're working with your defense team, give them input but then understand that there are certain decisions they make that are not yours to make?"* (*4-10, Add. 169*)

**c.**    Together these statements reveal collusion between all involved.

Therefore, the record itself proves that the State committed prosecutorial misconduct and perjury by first admitting, then denying that key discovery photograph's

were manipulated in violation of Brady, and Minnesota Statute § 609.48, and that there appears to be a coordinated effort to prevent Petitioner from advancing his legitimate legal arguments concerning the discovery fraud.

**D | Guertin's Defense Counsel is Actively Obstructing His Defense and Taking an Adversarial Stance Against Him**

Court-appointed counsel Emmett Donnelly repeatedly undermines Matthew Guertin's defense, takes positions directly adverse to his client's stated objectives, and cooperates with the bench and prosecution to blunt discovery-fraud revelations and derail self-representation.

Key misconduct clusters around (i) surrendering evidentiary objections and cross-examination; (ii) refusing to advance—or even file—meritorious motions; (iii) reversing course on the importance of doctored evidence within a single hearing; (iv) assisting the State's effort to resurrect discredited incompetency claims; and (v) steering the case toward plea negotiations while blocking *Faretta* rights.

Each departure violates the Sixth-Amendment guarantee of conflict-free, zealous advocacy (*Strickland v. Washington*, 466 U.S. 668 (1984)), Minn. R. Prof. Conduct 1.2(a) & 1.3, and Minnesota's standards for public-defender performance.

**1.    Abandonment of Confrontation and Hearsay Objections**

**a.**    Refuses to call or cross-examine Dr. Cranbrook, the sole State expert, and "*would not object to -- if her report was submitted wouldn't object to the hearsay element to that.*" (*3-15, Add. 120*)

**b.**    This flatly violates the Sixth-Amendment Confrontation Clause. When the prosecution seeks to rely on an out-of-court forensic or psychiatric report whose accuracy is in dispute, the author must be produced for cross-examination. See *Bullcoming v. New Mexico*, 564 U.S. 647, 652-58 (2011) (blood-alcohol report inadmissible without live testimony of analyst); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309-11 (2009) (laboratory certificates are

testimonial, triggering confrontation right); *State v. Caulfield*, 722 N.W.2d 304, 311-12 (Minn. 2006) (following *Melendez-Diaz* and reversing where chemist did not testify).

    **c.**    Counsel's waiver of that right is presumptively ineffective assistance.

**2.**    **Contradictory Stance on Doctored Photographs**

    **a.**    Early in the March 5 hearing: *"that there are photographs that have been doctored, that he can show that, and that they are using this basically false claims of evidence against him. So that's the summation of our position." (4-8, Add. 121)*

    **b.**    Same hearing – closing minutes: He urges the court not to enter those same exhibits, saying "*I don't think we need to offer them*" (*14-25, Add. 175*)

    **c.**    Such a 180-degree retreat abandons a pivotal defense and sabotages the record - precisely the sort of breakdown the Supreme Court described in *United States v. Cronic*, 466 U.S. 648, 659-60 (1984), where counsel's complete failure to subject the prosecution's case to meaningful adversarial testing is presumptively prejudicial.

**3.**    **Refusal to Litigate Motion to Dismiss & Evidentiary Hearing**

    **a.**    During the April 17 hearing Emmett Donnelly admits that Guertin drafted a Motion to Dismiss and request for an evidentiary hearing, yet "we have not filed that motion … we do not intend to bring it up for a hearing" (*12-14, Add. 285*).

    **b.**    When a motion is both non-frivolous and outcome-determinative, counsel's failure to pursue it falls below reasonable professional standards and satisfies the first prong of *Strickland*. See *Kimmelman v. Morrison*, 477 U.S. 365, 384-85 (1986) (ineffective where lawyer failed to bring suppression motion that "undermined the reliability of the result"); *Padilla v. Kentucky*, 559 U.S. 356, 371-72 (2010) (counsel must take affirmative steps on critical collateral matters).

Because the proposed motion here challenged fabricated evidence - a defense that, if credited, would end the prosecution - counsel's refusal is presumptively prejudicial.

**4.    Facilitating Competency Reversal & Delay**

   **a.**    During the April 17 hearing, Emmett Donnelly tells Judge Judleston he "*we as his counsel provided representation during that hearing. That doesn't mean that we concur with the ruling.*" (*1-3, Add. 284*)

   **b.**    A review of the March 5 hearing provides no credible basis at all for claiming that Guertin is incompetent. In fact it provides an extensive testimony from someone who is highly competent, and understands all of the details of his case as well as the legal procedure, as required to meet *Dusky* standards, and competency under Minn. R. Crim. P. 20.01 (*Add. 143-159*)

   **c.**    During the April 29 hearing Emmett Donnelly tells Judge hudleston he "*did not agree with Judge Koch's [competency] order*" (*11-15, Add. 11*)

**5.    Steering Toward Plea / Negotiation Against Client Objectives**

   **a.**    During the April 17 hearing Donnelly advises the Court that Guertin "*has some choices … reach a negotiation with the State*" (*2-9, Add. 288*) following everyone colluding on the record to block Petitioner's Motion to Dismiss (*Add. 282-296*), without first resolving the now proven discovery fraud (*see Add. 684, Index 122-124*) or the abuse of Rule 20.01 competency exams (*14-25, Add. 129; 1-25, Add. 130; 1-12, Add. 131*).

   **b.**    Counsel's bargaining overture contradicts Guertin's long-standing insistence on vindication and evidentiary hearings, violating Minn. R. Prof. Cond. 1.2(a) (client controls objectives).

**6.    Email Exchanges Prove Competent Legal Strategy, and a Failure to Act by Defense Counsel**

   Petitioner very clearly, and competently lays out an entire list of issues with his proceedings pertaining to discovery fraud, prosecutrial misconduct, and

judicial misconduct as revealed in his January 2025 email exchanges with his current defense counsel (*Add. 297-320*). Despite this, his defense counsel refuses to adopt, or address any of these injustices, and so Petitioner simply follows through on all of the points, and the exact legal strategy he addresses he addresses in the emails, on his own (*see Docket Index Map, Add. 684, Index 122-125, 128-131, 133*), only for the Court, and his own defense counsel to now use his pro se legal actions themselves addressing these very same issues as its reasoning to support a fourth Rule 20 competency evaluation following  over 29 months of no resolution or adversarial testing of Petitioner's claims, the Petitioner having already completed, and successfully meeting the terms of the stayed order of civil commitement he was granted in August of 2024, and the Petitioner now being found competent to proceed (*Add. 178-181*) following his very competent, and rational testimony on March 5, 2025 (*Add. 117-177*).

**E  |  Discovery Fraud and "Fruit of the Poisonous Tree" Doctrine in Competency Context**

The U.S. Supreme Court's decision in *Mapp v. Ohio*, 367 U.S. 643 (1961), cemented the principle that the government may not benefit from evidence obtained through its own illegal acts – all such evidence and its derivatives (the "fruit of the poisonous tree") must be excluded to deter misconduct and uphold the integrity of the courts. While Mapp dealt with illegally seized physical evidence, the principle is broader: if the State fabricates or manipulates evidence, any downstream use of that tainted evidence to affect the defendant's case is constitutionally infirm.

Minnesota courts likewise recognize that fundamentally unfair tactics in procuring evidence or evaluations violate due process (see *State v. Bauer*, 245 N.W.2d 848, 852 (Minn. 1976), noting a court must inquire further when a defendant's competency evaluation process is suspect). In the context of Rule 20.01 evaluations, this means that if prior competency determinations were influenced by false evidence or misrepresentations by the State, those determinations cannot be relied upon for any purpose and must be set

aside. A competency finding (or an examiner's opinion) that is the product of the State feeding examiners manipulated discovery or false narratives about the defendant is no more valid than a conviction based on planted evidence. The law does not permit the State to create a fake aura of "incompetency" by fraudulent means and then invoke that very aura to the defendant's detriment. Any such supposed "evidence" of incompetency is fruit of the poisonous tree and must be disregarded. (*Add. 45*)

1.     **Discovery Fraud Now Proven, but Guertin is Being Prevented from Adjudicating the Issue by the Court and Defense Counsel**

**a.**     Guertin very clearly, competently, and coherently addresses the fraudulent discovery materials, and how they serve to discredit all prior Rule 20 exams and their resulting reports based on *Mapp v. Ohio* in his May 7, 2025 'Emergency Motion for Stay and Vacate of April 29 Orders' (*Add. 33-66*).

**b.**     All of Guertin's claims surrounding the discovery fraud are based on evidence – not on mental illness, delusions, or heresay. The entire issue of discovery fraud serves to retroactively invlaidate all previous competency exams, as detailed in the four different sets of discovery materials presented in Petitioner's May 7 Emergency Motion to Stay and Vacate (*§ VI-ARGUMENT, C-D, Add. 53-56*)

**c.**     This serves to irrefutably establish that all earlier competency finding's are "Fruit of the Poisonous Tree" (*§ VI-ARGUMENT, E, Add. 56-57*), and that unless, and unitl the issue of the discovery fraud is dealt with properly, as Guertin requested in his April 16 Motion to Dismiss (*§ X-RELIEF, Add. 279-280*), that any further Rule 20 exams would be irremediably tainted, and prejudicial without first addressing the evidence, as the previous Rule 20 exams actually use Guertin's claims of discovery fraud itself to support a diagnosis, and recommendation that he be force drugged based on these now proven legitimate claims themselves (*§ VI-ARGUMENT, F, Add. 57-58*)

**2.      Nobody Disputes or Rebuts Petitioner's Discovery Fraud Claims and Evidence – They Only Avoid and Openly Collude to Suppress It**

**a.**      Petitioner's defense counsel, Emmett Donnelly, uses Petitioner's pro se evidence exhibits submitted into the case ahead of the March 5, 2025 contested competency hearing (*see Docket Index Map, Add 684, Index 122-124 [1]*) as the entire argument supporting Petitioner's competency *(16-25, Add. 120; 1-8, Add. 121; 17-24, Add. 122),* and even directly states on the record that Petitioner *"has a right to do that. And if the defendant were to disagree with their lawyer it would seem that they would have a right to have the judge consider the arguments and evidence that they want them to consider."* (*23-25, Add. 124; 1-2, Add. 125*).

**b.**      Emmett Donnelly then addresses Judge Koch at the end of that hearing in order to essentially make sure that Petitioner's evidence of discovery fraud is buried (*14-25, Add. 175*)

**c.**      At the next hearing on April 17, 2025 Donnelly states in open court that Petitioner's defense counsel doesn't "concur with the ruling" (*2-3, Add. 285*) [ruling finding Petitioner competent to proceed, *Add. 178-181*], while at the same time arguing against Petitioner's Motion to Dismiss being ruled on by the Court, in which Petitioner is addressing the very issue of the discovery fraud that is ackowledged, and described in substantial, and great detail during the March 5, 2025 hearing (*Add. 129-136, 151-153, 155-157, 167-172*)

**d.**      At the April 29 hearing Donnely directly srgues against Petitioner's interests by once again stating that he doesn't agree with Judge Koch's order

---

1    Index 122, Exhibits A-E | https://matt1up.substack.com/api/v1/file/5f8e553a-60db-405b-ac5c-2c1c799b91a2.pdf

Index 123, Exhibits F-J | https://matt1up.substack.com/api/v1/file/53f9eeec-0495-43df-9336-6cbce7d02fe4.pdf

Index 124, Exhibits K-L | https://matt1up.substack.com/api/v1/file/8697f857-ef4a-4597-b639-d20d1ad71026.pdf

finding Petitioner competent (*11-15, Add. 11*), and also stating "*competency isn't static*" (*5, Add. 20*).

**e.**     Emmett Donnely's actions serve to directly support not only Judge Hudleston's order for the fourth Rule 20 exam, but the validity of all of the prior Rule 20 exams that have now been proven to be based on the fraudulent discovery materials that Emmett Donnelly, Mawerdi Hamid, and Judge Koch all made a direct, and unrebutted acknowledgment of during the March 5, 2025 hearing (*Add. 117-177*), as well as in the actual order finding Petitioner competent itself (*Add. 178-181*).

### 3.     Judge Hudleston Directly Acknowledges the Discovery Fraud Issue, But Refuses to Address It

**a.**     During the April 29, 2025 hearing which was initially supposed to pertain to Petitioner's request to represent himself (*see April 21 Petition to Proceed Pro Se, Add. 200-231*), but instead was diverted to a fourth Rule 20 exam order (*Add. 1*), Judge Hudelston directly acknowledges the issue of discovery fraud on the record after Petitioner brings it up (*20-22, Add. 15*), by making the statement "*I did read your motion to dismiss, and I know you describe the catch-22 and that you had a logical I guess victory.*" only for her to directly follow up this statement with "*I don't want to do that now because my decision is made*" (*23-25, Add. 15; 1, Add. 16*).

**b.**     Judge Hudleston is therefore admitting that the very Motion to Dismiss that she claims "*is not rational*" (*11-12, Add. 10*), and is not consistent with a "*rational defense*" (*21, Add. 9*) due to involving claims of the court being involved in conspiracy against Petitioner (*17-18, Add. 9; 9-11, Add. 10*), does in fact also contain an explicit mention of the very discovery fraud issue itself (*see Docket Index Map, Add. 684, Index 122-124*) which serves to invalidate the legitimacy of the first three Rule 20 exam reports for Petitioner.

c.      The Petitioner states during this hearing in response to Judge Hudelston, and the discovery fraud topic that "*once the photos existed and then they squished them to put them into the uniform aspect ratio, they can't un-squish them. So, it's a logical trap that proves my claim about it that can't be escaped.*" (*6-9, Add. 16*) but that it is "*being ignored because I'm being sidelined again by being determined incompetent.*" (*10-11, Add. 16*).

d.      Therefore, what is taking place during the April 29 hearing, and currently, is not based on the actions, or claims of someone who doesn't understand the proceedings, or is unable to rationally consult with counsel – but rather a situation involving the Petitioner making very specific, and detailed claims pertaining to discovery fraud, which are all backed up by evidence.

e.      The Petitioner's claims - which are intentionally being buried by the Court, prosecutor, and defense counsel – if allowed to be properly addressed in an evidentiary hearing would end up serving to prove the very "conspiracy" element involving the Court itself which Judge Hudelston is using to label the Petitioner mentally ill, and incompetent. Discovery fraud introduced into a defendant's case by the State, and aided by the Court, and defense counsel is the definition of a "conspiracy" in its most literal, as well as legal sense. Not a conspiracy "theory" but a conspiracy "fact" that is substantiated by evidence already submitted into the record but intentionally being ignored and used to support claims of mental illness.

4.      **Petitioner's Discovery Fraud Claims are Based on Provable Persistence – Not Incompetence**

a.      As decribed in a rather compelling, rational, and legally solid manner in Petitioner's Emergency May 7 Stay Motion (*§ VI-ARGUMENT, C-D, Add. 53-56*), the entire issue of the Petitioner's discovery fraud claims is not a new issue, but is instead the entire reason behind the Petitioner ever filing the first legal motion of his entire life on January 5, 2024, which was a Demand or Request for

Discovery he filed (*see Index 22 [2], 27-CR-23-1886*) – a motion which sought to be provided with all of the authentic discovery photographs that he realized were manipulated. Following this realization, both the Court, as well as his previous defense counsel, Bruce Rivers, all refused to provide him with the discovery photos despite countless requests.

      **b.**    Among these "countless" requests, are the many pro se motions that the Petitioner himself personally prepared and submitted into his criminal docket as part of said attempt to be provided with the discovery materials, as well as multiple filing of pro se legal cases in this Court (A24-0780 [3]), as well as the MN Federal Distrcit Court (24-cv-2646 [4]), and 8th Circuit (24-2662 [5]).

### 5. Petitioner's Discovery Fraud Claims Stand - They Remain Unchallenged and Without any Rebuttal, Only Obstruction

      **a.**    He has proven the fraudulent discovery materials based on the fourth set ("Set D") provided to him on February 13, 2025 by his current defense counsel, Raissa Carpenter, and Emmett Donnelly. (*Add. 99-109, 315*)

      **b.**    The element of lighting and shadows, which anyone can understand regardless of technical background is perhaps one of the simplest, and most compelling aspects of proving the fraud. (*see Docket Index Map, Add. 684, Index 124, Exhibit L*)

---

2  Index 122, January 5, 2024 Demand or Request for Discovery | https://matt1up.substack.com/api/v1/file/08b640d4-75e6-4fd3-b092-b0715ce143b4.pdf

3  MN Court of Appelas Case A24-0780 | https://storage.courtlistener.com/recap/gov.uscourts.mnd.216796/gov.uscourts.mnd.216796.13.0.pdf

4  24-cv-2646 'Guertin v Hennepin County' | https://www.courtlistener.com/docket/68925331/guertin-v-hennepin-county/

5  24-2662 'Matthew Guertin v hennepin County' | https://www.courtlistener.com/docket/69060054/matthew-guertin-v-hennepin-county/

c.      Petitioner sent an email to his defense counsel, Raissa Carpenter, and Emmett Donnelly, one week after being provided with the fourth set on February 13, 2025, which was titled "My Discovery Fraud Analysis is Complete | URGENT Action is Required" (*Add. 110-112*) in which he provided a competent, and detailed technical overview of his findings, and then also followed up with an email in which he forwarded them the original August 3, 2023 discovery ("Set B") for the purpose of providing the source of "Set B", while ensuring digital chain of custody was maintained (via original email).

d.      Petitioner's defense counsel never replied, or followed-up after this email was sent, and so on February 28, 2025, prior to the March 5 hearing, the Petitioner once again chose to defend himself via submission of four different pro se filings which contained Exhibits A-L proving the fraud (*see Docket Index Map, Add. 684, Index 122-124*), which is now 'inescapable' insofar as serving as a "legal checkmate" of the discovery fraud issue, as there are no further attempts which exist to try and cover it up, or "make it go away"

e.      The exhibits Petitioner submitted on February 28, 2025 prove the following elements as a limited example:

- The new folder of 104 images contained within the discvoery provided on February 13, 2025 contains fraudulent metadata assigned to the photo's within it. This fact can easily be established by the lighting and shadow analysis alone (*see Docket Index Map, Add. 684, Index 124 [6], Exhibit L*), and proves that someone had to carry out the rather extensive, and technically demanding task of both producing all of the fraudulent metadata in the first place, as well as then carrying out the technical task of then 'writing' all of this metadata to the photographs contained in the folder.

---

6  Index 124, Exhibit L | https://matt1up.substack.com/api/v1/file/8697f857-ef4a-4597-b639-d20d1ad71026.pdf

- That the Petitioner's entire "Catch-22" claim, as detailed in "Exhibit Y" of his federal civil rights case [7] was spot-on, as once he was provided with the missing photographs he was able to prove that they were simply "squished" horizontally to force them into a uniform aspect ratio.

- The the Petitioner's many pro se motions, and persistent claims of discovery fraud which have been repeatedly used to support claims that he is "mentally ill" and needs to be force drugged with powerful neuroleptic's to become "competent" were in fact correct, truthful, and competent all along. Among these pro se filings are Petitioner's case he filed in this very Court in May of 2024 (A24-0780), as well as his April 4, 2024, Motion to Compel Discovery in which he provides a detailed, forensic analysis of the fraud he initially identified in "Set B" (*see Index 29* [8], *27-CR-23-1886*)

Petitioner's evidence suggests profound misconduct by officers of the court, and directly supports the very "conspiracy" that is being used as evidence of his supposed "incompetency" to silence him and further aid in its successful completion, as well as to covering it up (both being *criminal actions* that are much more serious than any of the Petitioner's current criminal charges within the court that is currently carrying them out). The district court's reaction – to effectively declare the whistleblower crazy – is anathema to the rule of law. The Minnesota Court of Appeals should not abide it. In sum, every legal and equitable consideration points to success for Petitioner on appeal.

---

7  Exhibit Y of 24-cv-2646 'Guertin v Hennepin County' |
https://storage.courtlistener.com/recap/gov.uscourts.mnd.216796/gov.uscourts.mnd.216796.74.0.pdf

8  Index 29, April 4, 2024 Motion to Compel Discovery |
https://matt1up.substack.com/api/v1/file/96a5de26-014f-459e-b77d-50eeac400400.pdf

### III.   PETITIONER'S APRIL 28 EVIDENCE DUMP

Petitioner's filing of 50 total submissions into the record of his case on April 28, 2025 across Index numbers 135-184 is being used as evidence to support the April 29 Rule 20 order, when it is actually evidence proving, what Petitioner asserts is likely one of the most sophisticated, high-level judicial frauds ever to be uncovered.

The fact that Judge Hudelston's May 30, 2025 order submitted *after* the filing of this case (*see Index 205*) is not only still standing by the unlawful April 29 order she entered against Petitioner, but also includes an explicit mention of these very filings is highly concerning, as it indicates that the 'plan' must be to continue to outright ignore, and not substanatively address what has been uncovered.

**A   |   Judge Hudleston Provided with Docket Index Map During April 29 Hearing**

Notably, Petitioner provided an version of the "Docket Index Map" provided at Add. 684-686, to Judge Hudelston at the end of the April 29 hearing (*24-25, Add. 17; 1-2, Add. 18; 22-25, Add. 23*), yet she has now submitted a court order on May 30, in which she is not only refusing to take any meaningful actions to addres the fraud these filings reveal, but is instead taking the stance that these very filings *still* serve as support for her April 29 Rule 20 order for which this very case is addressing. She has now had over a full month to actually review the contents of these April 28 filings – with all of the exhibits on the "Docket Index Map" provided to her on April 29 being logically arranged based on the Exhibit labels, just as they are at Add. 684-686 of this case docket.

**B   |   Petitioner's January 17, 2024 Order is 'Cloned' Across All of the Fake Cases**

All one has to do in order to easily identify what amounts to very serious problem, that cannot be explained away, or defended in any logical manner is review the contents of "Exhibits L1-L5, Finding of Incompetency and Orders Part 01-05," Index 143-144, 146, 149, and 156 (*Add. 685*) and then compare all of these identical "Finding of Incompetency and Order" filings across all of the synthetic (fake) cases and defendant's against Petitioner's very real January 17, 2024 "Finding of Incompetency and Order"

(*Add. 371-374*) and it becomes clear that all of them are identical clones, only varrying in text as needed to update each supposed order so that it aligns with the purported defendant's and their cases.

In fact, Petitioner's own orders are also included within the filing groupings which make up Exhibits L1-L5, as well. Petitioner's July 13, 2023 order is located at Index 149 [9], Exhibit L(4), p. 482-488; his January 17, 2024 order (an identical clone to all of the other ones) directly follows the July 13 order at Index 149, Exhibit L(4), p. 489-492 (*Add. 685*)

Even if we were to hypothetically assume that all of the cases and defendant's that these duplicate "Finding of Incompetency" orders were submitted for are all real (they're not..) there would still exist a massive legal issue, as it would indicate that instead of judges in the district court writing unique, and legally relevant orders for each case that comes before them, they are instead using an identical template which they are simply modifying so that it appears to be unique – when really it is nothing more than judicial plagerism ultimately – and still amounts to judicial fraud.

### C   |   **Petitioner's Digital Forensic Analysis Now Validates April 28 Filings**

Since submitting these exhibit's on April 28, Petitioner has since carried out an extensive, and professional digital forensic analysis of all of the MCRO document's he downloaded back on April 29-30, 2024 (*see May 3, 2024 Affidavit and MCRO Data Analysis, Add. 438-457; May 15, 2024 Petition for Discretionary Review, MN COA A24-0780, Add. 458-462; May 15, 2024 Supplementary Addendum Information, MN COA A24-0780, Add. 463-466*) in which he has now digitally proven (*Add. 516-555*) that all of the evidence he submitted into the record on April 28, 2025 is indeed exactly what he claimed – that being thousand's of completely fake MCRO case filings, docket's, and defendant's – the logical question now becomes "What is going to be done about it?"

---

9    Petitioner's July 13, 2023 and Jan 17, 2024 Order, Index 149 , Exhibit L(4), p. 482-492 | https://matt1up.substack.com/api/v1/file/63c7c786-c43b-4797-8d01-6a95fc3040c4.pdf

**D    |   An Extensive, and Meticulous Filing Process Was Carried Out on April 28**

Petitioner did not randomly decide on April 28 that he felt like submitting a bunch of meaningless, or "incompetent" filings into his case docket. The entire process he had to carry out before submitting these filings was extensive as it required ensuring that the filings met the proper structure, formatting, 25mb size limitation, page limitations, and were uniquely labeled, and ordered in a way that ensured they maintained some sort logical semblance, as well as were accepted by the court clerk – which they all were. The evidentiary value of these filings have now irrefutably been established. What the Petitioner actually did, was simply submit the court's own fraudulent MCRO filings that were created for fake docket's, and fake defendant's back into his "very real" case docket to make sure they were preserved based on the unprecedented, and profound implications they represent.

Petitioner is very well aware that submitting 50 filings into his case in a single day, consisting of 5,435 individual PDF pages (not "*over 6,000*" as claimed by some..) can be considered "unusual," but so are 128 court order's which are identical clones of his own (*see "Forensic Analysis of Metadata Anomalies in Fraudulent Competency Orders", Add. 549-555; and "Fraudulent Incompetency Order Template Reused in Guertin's Case", Add. 556-559*) and thousand's of ai generated MCRO case files, dockets, and defendant's. Tit for tat.

## IV.   EXTRAORDINARY CLAIMS REQUIRE EXTRAORDINARY EVIDENCE

Extraordinary claims require extraordinary evidence, extraordinary motives (*see Add. 182-199*) lead to extraordinary crimes, and extraordinary crimes leave behind extraordinary evidence. Likewise, extraordinary crimes are also known to lead to extraordinary cover-ups.

It is precisely this keen knowledge of the entire "cover-up" element that lead Petitioner to carry out the extensive digital forensic analysis that he did prior to the filing of this case. Had he not, he was well aware of the fact that the sheer volume of filings,

and the entire "crazy" aspect of the current situation itself, and what is taking place would simply be used to easily dismiss his claims themselve's as "crazy" once again – the very same tactic, which the conspirators have been taking advantage of throughout the entirety of his district court proceedings, by continuing to unjustly claim he is "incompetent" and "mentally ill" based on his many persistent, pro se attempts to address the now irrefutable evidence of the very fraud, which they themselves are in fact responsible for creating, perpetuating, and injecting into his proceedings.

This entire, surreal series of events has now reached literal "peak absurdity," to the point of being almost comical if it wasn't for the fact that it is the Petitioner's life which currently hangs in the balance.

**A | Petitioner's Evidence Meets the Standard of Federal Rules of Evidence 902(14)**

The 2017 amendment to the Federal Rules of Evidence 902(14)[10] contains the following statement within it:

> "*electronic files are ordinarily authenticated by "hash value". A hash value is a number that is often represented as a sequence of characters and is produced by an algorithm based upon the digital contents of a drive, medium, or file. If the hash values for the original and copy are different, then the copy is not identical to the original. If the hash values for the original and copy are the same, it is highly improbable that the original and copy are not identical.*"

This key excerpt from this rule amendment directly attests to not only the digitally forensic "sound" nature of the Petitioner's evidence proving the fraudulent MCRO case files (*see "Master Evidence URL Directory", Add. 695-700*), but also serves to validate the authenticity, and digitally signed PDF MCRO document's themselves which Petitioner downloaded April 29-30, 2024, and on which the entire digital forensic process was actually carried out on – meaning the thousand's of MCRO source document's themselves are provably "authentic" (non-modified, original PDF files, which are exactly what was downloaded from the MCRO website by Petitioner).

---

10 Rule 902 – Evidence That Is Self-Authenticating |
   https://www.rulesofevidence.org/fre/article-ix/rule-902/

**B   |   Simplified Overview of SHA-256 Hashing Algorithm**

SHA-256 hashing can best be described as a mathematically produced 'code' that is so large, as to never produce the same output value twice. It was first published in 2001, and was developed by the US Government's National Security Agency (NSA). It is the same, cryptographic algorithm that Bitcoin uses, as well as the same algorithm that serves to provide digital security for a large range of daily use-cases, ranging from Wi-Fi access passwords, to digital signatures of PDF document's. [11]

- The SHA-256 algorithm, like other hash functions, takes any input and produces an output (often called a hash) of fixed length.

- It doesn't matter if the input is a single word, a full sentence, a page from a book, or an entire book, the output of a hashing algorithm like SHA256 will always be the same length.

- Specifically, it will be 256 bits, which is displayed as 64 alphanumeric characters.

- AN important characteristic of SHA-256 is the fact that it is deterministic (it will always produce the same output when given the same input) and the fact that it is a one-way function.

- There is no way to reverse engineer an input from knowledge of the output.

- "*Hash functions are like the digital fingerprints for pieces of data. Just like a person's fingerprints are unique to them, the hash value of a piece of data is unique to that data. If the data changes, the hash value changes. This is why hash functions are so important in digital forensics — they help maintain data integrity.*" [12]

---

11 SHA-256 Cryptographic Hash Algorithm |
   https://komodoplatform.com/en/academy/sha-256-algorithm/
12 Hash Functions in Digital Forensics: Best Practices |
   https://blog.daisie.com/hash-functions-in-digital-forensics-best-practices/

**C | The Results of Petitioner's Digital Forensic Analysis of MCRO Fraud Inherently "Self-Authenticate" His Work Based On Outputs Alone**

The resulting datasets, and the many csv tables (spreadsheets) that serve to digitally prove Petitioner's claim that there are "thousand's of fake MCRO case files, docket's, and defendant's contained within the MCRO case files he downloaded" ends up "self-authenticating" based on all of the duplicate copies of the same 371 judicial timestamps[13] and 1,183 judicial signatures[14] (*Add. 544-555*), 40 duplicate 'Returned Mail' filings[15] (*Add. 573-587*), and scores of image based PDF's scattered across multiple MCRO document's that have all been uncovered, and matched based on his investigation.

That is to say, that the only logical way that he would've been able to produce these many detailed spreadsheets containing thousand's of rows of data, and the many digital forensic report's which serve to prove the fraud is if he properly carried out the entire process to begin with. If this wasn't the case, he wouldn't have been able to produce the csv tables at all, and certainly would not have been able to identify thousand's of cloned PDF elements by opening up each PDF and visually inspecting them, and trying to somehow manually produce the same results.

Not only do Petitioner's results serve to authenticate the very process itself by which he has now digitally proven the fraud, but they also serve to validate and legitimize all of the April 28 filing's he submitted into his district court docket – the very same filing's still being referenced by Judge Hudleston in her May 30, 2025 order submitted at Index 205 of Petitioner's case docket as evidence of suuposed "incompetency" and

---

13 371 Judicial Timestamp SHA-256 Duplicates |
https://link.storjshare.io/raw/jw7oudujbk5wn6vtfa7ijaqxwd7a/evidence/Judicial-Signatures-and-Timestamps/SHA-256_371-judicial-timestamp-duplicates.csv

14 1,183 Duplicate SHA-256 Judicial Signatures |
https://link.storjshare.io/raw/jwox2hvjse4enc7sz64ezg5f3c6a/evidence/Judicial-Signatures-and-Timestamps/SHA-256_1183-judicial-officer-signature-duplicates.csv

15 40 Duplicate SHA-256 'Returned Mail' Filings |
https://link.storjshare.io/raw/jxufdtgvrnu2pcl46dt7hhhqs45a/evidence/USPS-Mail-Fraud/SHA-256_returned_mail_scans_duplicate-hash.csv

"mental illness" she is standing by, even after his filing of this very case, and the unprecedented content of its many Addendum volumes [16].

**D  |  99.6% of MCRO Case Files Maintain the Courts Digital Signature**

### 1.  Court-Applied Cryptographic Seals

**a.**  A digital-signature sweep of all 3,629 PDFs shows 3,613 bear the original Hennepin County Courts certificate.

**b.**  These signatures are X.509 SHA-256 certificates added by the e-filing system; any post-download change would break validation.

**c.**  Only 16 files lacked a signature (listed in *08_MCRO_files-with-no-signature.csv*).

### 2.  Timestamp Consistency Check

**a.**  Every signed PDF's internal signature timestamp matches the time-stamp embedded in its file name and in the download log, closing the chain-of-custody loop.

**b.**  The detailed audit (*07_MCRO_digital-signature-report.csv*) records "Is_Digitally_Signed," signing time, sub-filter, and reason for every file, so any reviewer can reproduce the results with off-the-shelf PDF tools.

### 3.  Practical Evidentiary Impact

**a.**  With 99.6 % of the documents passing cryptographic verification, the MCRO corpus is forensically sound; it is the court itself vouching for the integrity of the evidence.

**b.**  Any forged or altered PDF would (i) fail signature validation, or (ii) appear on the 16-item unsignatured list - neither event occurred.

---

16 Bookmarked PDF Addendum Volumes |
   https://link.storjshare.io/s/jxbbwkxbd6tjth3x2wfkvqg6i6bq/evidence/Add/

   **c.**     This  built-in  authenticity  far  surpasses  ordinary  hash-only collections: here the court's own digital seal is the guarantor, <u>making the dataset courtroom-ready without further expert testimony</u>.

**E   |   Verification of May 3, 2024 Affidavit Figures**

**1.     Why This Matters**

Petitioner's May 3, 2024 sworn affidavit laid the numerical foundation for his synthetic-docket claim. A full forensic cross-check against the present MCRO corpus shows that all of those numbers remain accurate, save for a harmless two-percent undercount in the grand-total file figure. The side-by-side reconciliation is preserved  in  "*06_MCRO_2024-05-03-affidavit-figures.csv*"[17],  allowing  any reviewer to replicate the validation.

**2.     Case-and-Defendant List: 163 of 163 Perfectly Matched**

Pages 10–13 of the affidavit (*Add. 438-457*)  listed each of the 163 criminal dockets and their defendants. The master case index confirms an exact, character-for-character match: no case has been added, dropped, or misspelled. This locks the evidentiary scope and assures the Court the dataset is identical to what the affidavit described.

**3.     Breakdown by Year Counts Re-Confirmed**

The  same  year-stratified  tallies  emerge  from  the  current  download  logs. Their accuracy is important because the fraud analysis hinges on the improbable clustering of judges across those years.

**4.     Breakdown by Document Type - 100 % Concordance**

Every  category  in  the  affidavit's  "MCRO  Document  and  Judicial  Order Analysis" still aligns one-for-one with today's dataset — e.g.,

---

17 /evidence/MCRO/ (folder) |
     https://link.storjshare.io/s/jxhmrcnhsa2tdo5xfusewkoadnqq/evidence/MCRO/

| Filing Type (sample) | Affidavit Count | Current Count |
|---|---|---|
| E-Filed "Comp Order for Detention" | 79 | 79 |
| "Law-Enforcement Notice of Release & Appearance" | 48 | 48 |
| "Order for Conditional Release" | 222 | 222 |
| "Notice of Hearing" | 434 | 434 |
| "Notice of Remote Hearing w/ Instructions" | 644 | 644 |
| Rule 20 Order – Evaluation for Competency | 488 | 488 |
| Findings of Incompetency & Order | 130 | 130 |

The verification CSV lists every filing type, showing "Affidavit Reported" versus "Current Forensic Count"—and the columns are identical from top to bottom.

**5.      Total Document Count: Corrected from 3,556 to 3,629**

The affidavit's only inaccuracy was the aggregate file count: 3,556 reported vs. 3,629 now verified (a difference of 73 PDFs, ≈ 2 %). All sub-counts were already correct; the discrepancy arose solely in the summation and has been corrected in the record. Multiple independent tallies - file-tree enumeration, digital-signature index, and the master metadata table - converge on 3,629 as the definitive total.

**6.      Take-away**

Every granular statistic Petioner swore to has been independently validated. The lone adjustment strengthens, rather than weakens, the affidavit's credibility: it shows the underlying spreadsheets and scripts were precise, and that the dataset has been preserved intact from the time of filing to the present forensic audit.

It also serves to prove that the Petioner is not just competent, but *very* competent – as well as proof that some of his earliest pro se filings are now proving to be extremely important to his entire case, even as those in the court labeled, and continue to label them as "mental illness" instead of what they truly are: self preservation, and relentless legal advocacy for ones self.

# V.  SYNTHETIC DOCKET SCHEME DIRECTLY LINKED TO PETITIONER

Notably, the Petitioner has not only produced digital forensic proof of the thousand's of synthetic MCRO case files, but he also has produced irrefutable evidence that serves to directly link all of it back to himself, and his case district court case through a multitude of ways. The following key elements supporting this claim are as follows:

**A  |  Statistical Proof of Attorney-Status Manipulation Linking Petitioner's Case to the Synthetic Docket Matrix**

**1.  Observational Facts**

**a.  Judith Cole**

Appears in 53 criminal dockets. In 52/53 (98.1 %) she is marked "Active"; *only* in Mr. Guertin's case (27-CR-23-1886) is she tagged "Inactive."

**b.  Thomas Prochazka**

Appears in 7 criminal dockets. In 6/7 (85.7 %) he is "Inactive." The *sole* docket where he is "Active" is again 27-CR-23-1886 - the exact inverse of Cole's pattern.

**c.  Individual Probabilities** (Assuming Neutral Assignment)

Cole - with one "Inactive" slot randomly distributed among 53 files, the probability it lands on Mr. Guertin's is ( $P_{Cole} = 1/53 \approx 1.9\%$ )

Prochazka - with one "Active" slot among seven files, the probability it lands on Mr. Guertin's is ( $P_{Prochazka} = 1/7 \approx 14.3\%$ )

**d.  Joint Probability of Both Anomalies Coinciding**

$P_{joint} = P_{cole} \times P_{Prochazka} = ( (1/53) \times (1/7) ) = 1/371 \approx 0.27\%$.

Put differently, the odds are less than 1 in 370 that these opposite-status outliers would *both* single out case 27-CR-23-1886 by chance.

**e.  Contextual Significance**

- Mirror-image outliers
  - Each attorney's *only* atypical status occurs in the very same docket—one "Inactive" amid 52 Actives, the other "Active" amid

six Inactives—creating a "yin-yang" anomaly that statistical noise cannot explain.

- Network marker
  - ○ Both attorneys also appear across the cluster of synthetic dockets. Their coordinated role-flipping uniquely flags Mr. Guertin's file as part of that cluster.

Source: "*04_CASE_listed-attorneys.csv*"

https://link.storjshare.io/raw/jutxluotoect3hstmiq4nsrutmta/evidence/CASE/04_CASE_listed-attorneys.csv

## B  |  The Mother's Letter Event - Smoking Gun Evidence of Active Obstruction

### 1.  Duplicated Timeline Proves Real-Time Court Manipulation

| Time | Event | Add. |
|------|-------|------|
| **2:03 PM** | **Fake "inmate" letter**<br>filed in Case 27-CR-23-2480 (Sandra Vongsaphay) | 560 |
| **2:10 PM** | **Mother's genuine letter**<br>filed in Guertin's case, pleading for help | 562 |
| **2:28 PM** | **Judge Julia Dayton Klein**<br>inserts an "Order Denying Petition to Proceed Pro Se" into Guertin's docket—18 min after the real letter, *before* any responses | 562 |
| **4:38 PM** | **Clerk Lee Cuellar**<br>issues boiler-plate response to the *fake* letter | 563 |
| **4:42 PM** | **Same clerk**<br>files an almost-identical response to the *real* letter | 564 |

Key point:

One judge, one clerk, two "handwritten" pleas, and two cookie-cutter replies issued four minutes apart—while Guertin's case was officially assigned to a different judge. Such choreography is impossible without deliberate coordination.

### 2.  Digital Fingerprints - SHA-256 Hashes Match Across "Separate" Cases

Petitioner's analysis of the two response-letter PDFs shows that the court-header image and letterhead graphic are byte-for-byte identical, sharing the unique

30

SHA-256 values debcc04a…d764a6 and f609be80…15a1eee - hashes not found in any other court PDF reviewed in a 3,601-document dataset (*Add. 567-568*)

**3.    Forensic Handwriting & Envelope Analysis Confirms Synthetic Forgery**

**a.**    The Vongsaphay letter displays mechanically uniform "handwriting," copy-cat wording, and an envelope whose printed font and stamp placement match dozens of fake "returned-mail" scans (*Add. 565-566*).

**b.**    Michelle Guertin's letter shows natural pen-stroke variation and unique envelope features - hallmarks of genuine correspondence (*Add. 565*).

**c.**    Conclusion of the report: the fake letter was generated after interception of the real one and used as a template to dilute its impact (*Add. 566*)

**4.    "Mid-Sequence" Judicial Order and Real-Time Cover-Up**

Judge Klein's order - entered between receipt of the mother's plea and the twin replies - "effectively staked claim over the case's narrative" and ensured her chamber, not Judge Quam's, handled the correspondence (*Add. 562, 565*). This strategic insertion demonstrates conscious interference, not clerical happenstance.

**5.    Legal Significance**

**a.**    Mail-interception & forgery violate 18 U.S.C. § 1702 and Minn. Stat. § 609.625 (Obstruction of Correspondence).

**b.**    Fabrication of judicial records constitutes intrinsic fraud on the court (*Hazel-Atlas Glass v. Hartford-Empire*, 322 U.S. 238 (1944)).

**c.**    The event supplies "smoking-gun" proof that the same actors generating synthetic dockets actively manipulated Guertin's live case—"a criminal conspiracy within the court aimed at obstructing justice" (*Add. 571*)

6.    **Why This Matters to the Present Petition**

a.    **Direct Nexus**

The only reason the mother's plea was neutralized is Guertin's pending challenge to a Rule 20 commitment; the synthetic echo served to bury an inconvenient, exculpatory document.

b.    **Structural Prejudice**

Because the fraud emanates from the court itself, no curative instruction or post-trial remedy can purge its effects. Dismissal or a writ of prohibition is the sole adequate relief.

In sum, the "Mother's Letter" intercept proves that the synthetic-docket machinery is not a passive database glitch but an active weapon deployed inside Petioner's case. The synchronized filings, cryptographic matches, and mid-stream judicial intervention together form irrefutable evidence of deliberate tampering and active obstruction.

## C    |    Alisha Nehrings's Metadata Trail - The "Order for Continuance" That Hard-Wires Petitioner's Case Into the Synthetic Docket Scheme

*(This evidence is not yet in the Addendum; the court can replicate it in seconds by downloading the "Order for Continuance" at MCRO Index 16 for case 27-CR-23-1886 and inspecting the PDF properties.)*

| Metadata Field | Value Displayed in Properties Pane | Evidentiary Impact |
|---|---|---|
| **Title** | Contested Competency for Adrian Wesley (incompetent) (doctors disagree) | Hard-coded reference to *synthetic* defendant (Adrian Michael Wesley) and to a Rule 20 competency dispute, proving copy-paste fabrication. |
| **Author / Creator** | Nehring, Alisha | Links the filing to a Minnesota Department of Health lawyer who has no courtroom role in Guertin's prosecution. |
| **Company** | MN Judicial Branch | Appears in only 1 of Nehring's 27 filings - the one lodged in Guertin's case - underscoring bespoke authorship. |
| **File Name** | MCRO_27-CR-23-1886_Order for Continuance_2023-06-14_… | Bears Judge Julia Dayton Klein's signature block, though Klein is not the metadata author. |

Because these fields are inside the PDF's official, certified digital signature, the values are cryptographically locked and cannot be altered without invalidating the court's digital, cryptographic seal.

**1.      Why This Filing Is the "Odd One Out"**

   **a.**      Only "Order for Continuance" in 3,601-document corpus

Probability a random case receives the sole instance of that Filing Type:

P= 1/3,601 ≈ 0.028% (1 in 3,600).

   **b.**      Only Nehring-authored document that cancels a hearing absent any motion. The docket shows no "Request for Continuance" entries - judicial action on a non-existent motion is itself irregular.

   **c.**      Only Nehring file signed by Judge Klein

Of Nehring's 27 ghost-written orders: 18 carry Judge Janzen, 5 Judge Lamas, 3 Judge Browne, and 1 (this one) Judge Klein - mapping neatly onto the synthetic-signature network already before the Court.

**2.      Metadata Cross-Link to the ADRIAN WESLEY 2017 Synthetic Case Cluster**

   **a.**      Search of the master metadata table (*09_MCRO_file-metadata.csv*) for the exact Creator value ['Nehring, Alisha', 'Nehring', 'Alisha'] returns 27 hits - Petitioner's plus 26 others.

   **b.**      3 of the 27 belong to "Adrian Michael Wesley," each titled "Findings of Fact–Order, Pet. Commitment - Dfd Found Incompetent" and all filed May 8 2020 under three separate docket numbers (27-CR-17-1555, 27-CR-8342, 27-CR-22909).

   **c.**      Those Wesley dockets are "Dormant" or "Closed," yet they list Chief Judge Kerry Meyer as presider - a rather 'prominent' name already implicated via 7 duplicate signatures.

> Inference: *The accidental insertion of Wesley's working title into Guertin's live case shows Nehring was batch-generating fake mental-health orders across unrelated dockets and mis-slotted one of the templates into a real proceeding.*

### 3.    Convergence with the Amanda Burg Overlap Matrix

| Person | Real/Front-End Role | Back-End Metadata Role | Case-Overlap with Nehring |
|---|---|---|---|
| **Amanda Burg** | "Saint Peter State Hospital" liaison (purported) | Appears as *Author* in dozens of mental-health transport orders | Shares **23 docket numbers** with Nehring despite distinct public identities — indicating a single production pipeline. |

The "*Alisha-Nehring_Amanda-Burg__CASE-OVERLAP.csv*" table [18] lists only dockets where both names surface inside the PDFs. A two-party overlap that large from two allegedly unrelated actors is statistically implausible unless they are aliases, collaborators, or both.

### 4.    Legal Consequences and Requested Relief

#### a.    Fraud on the Court

Fabricating a judicial order under a forged title and false author—falls squarely within the doctrine of *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245-48 (1944) (vacating judgment procured "by the presentation of fabricated documents" as "a wrong against the institutions set up to protect and safeguard the public").

#### b.    Brady / Napue Violations

Suppression of the order's true provenance - a state health-department lawyer moonlighting as ghost-writer - deprives Petitioner of exculpatory impeachment material.

---

18  /evidence/Alisha-Nehring/ (new folder) |
  https://link.storjshare.io/s/jvkciogrsybpscbqvmrrv426zhfa/evidence/Alisha-Nehring/

### c. Structural Due-Process Breach

A proceeding tainted by internally generated forgeries cannot be "cured" post-trial; the only adequate remedy is dismissal or an extraordinary writ. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238, 246-48 (1944) (vacating judgment obtained through fabricated documents as "a wrong against the institutions set up to protect and safeguard the public" that "not even the passage of time can eradicate"); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991) (courts have inherent power to dismiss actions or set aside judgments procured by fraud on the court).

> Requested Action: (1) Order the State to produce all communications between Alisha Nehring, Judges Lamas / Janzen / Browne / Klein, and court administration regarding mental-health filings, (2) strike the June 14 2023 continuance order, (3) dismiss or stay proceedings pending a fraud-on-the-court evidentiary hearing.

### 5. Bottom Line

The June 14 2023 "Order for Continuance" is a digital Rosetta Stone. Its metadata ties the real prosecution of Matthew Guertin to the *synthetic* Wesley incompetency orders, exposes a Minnesota Department of Health attorney as the unseen author of 27 covert mental-health filings, and provides a self-authenticating, tamper-proof artifact of systemic docket manipulation.

## VI.   ARGUMENT - RULE 108 FACTORS

Under Minn. R. Civ. App. P. 108, subd. 2, this Court considers four factors in determining whether to issue a stay pending appeal: (1) the likelihood that the appellant will succeed on the merits; (2) whether the appellant will suffer irreparable injury absent a stay; (3) whether a stay will substantially harm other parties; and (4) whether a stay is in the public interest. All four factors strongly favor Mr. Guertin's request.

**A  |  Likelihood of Success on the Merits**

Mr. Guertin is overwhelmingly likely to win reversal because the orders he challenges flout black-letter law and rest on no competent evidence.

### 1.     Rule 20 "Do-Over" With Zero New Facts

On April 3 2025, after a full evidentiary hearing, Judge Koch found Petioner competent. Under Minnesota Rule of Criminal Procedure 20.01, subd. 3, the court is mandated to order a competency examination only if there is reason to doubt the defendant's competency. Nothing of the sort occurred between April 3 and April 29: Petitioner merely filed a well-sourced, evidence rich, 50-page motion, appeared in court, and - by the judge's own description - was "*extremely intelligent*" and produced "*detailed legal memoranda*" (*7-13, Add. 9*). Notably, the April 17 hearing was the first time Petitioner, and Judge Hudleston ever met – meaning that the only "detailed legal memoranda" she would logically be referring to is either the Petitioner's April 16 Motion to Dismiss (*Add. 232-281*), or his April 21 Petition to Proceed Pro Se (*Add. 200-231*). Re-opening competency on that record contravenes Bauer's objective-evidence requirement and is reversible error.

### 2.     Content-Based Punishment of Advocacy

Judge Hudleston ordered a new exam not because Petitioner lacked the capacity to understand the proceedings, but because she characterized his fraud allegations as "not rational" (*11-12, Add. 10*). Competency, however, turns on a defendant's present ability "to consult with his lawyer with a reasonable degree of rational understanding and… a rational as well as factual understanding of the proceedings against him," not on the perceived plausibility of his defense. *Dusky v. United States*, 362 U.S. 402, 402 (1960). Courts therefore may not declare a defendant incompetent merely for advancing conspiracy or Brady-fraud claims; doing so is classic viewpoint discrimination and violates due process and the Sixth Amendment right to conduct one's defense.

### 3.    Structural Faretta Violation

**a.**    The competency pretext simultaneously extinguished Petitioner's unequivocal demand to proceed pro se. "The right of self-representation embodies such bedrock concepts of individualism and personal autonomy that its deprivation is not amenable to harmless error analysis." (*State v. Richards*, 456 N.W.2d 260, 263 (Minn.1990)) and the Supreme Court has held that a criminal defendant's waiver of the right to counsel must be effectuated "competently and intelligently" *Johnson v. Zerbst*, 304 U.S. 458, 468-69, 58 S.Ct. 1019, 1024-25, 82 L.Ed. 1461 (1938); *Faretta v. California*, 422 U.S. 806, 834-36 & n.46 (1975) (trial court's refusal to honor a valid Faretta waiver requires reversal without a prejudice inquiry).

**b.**    Petitioner's April 21, Petition to Proceed Pro Se (*Add. 200-231*) which he prepared, and submitted into his case files is not only "competent and intelligent," but goes into great detail surrounding the completely surreal set of circumstances that played out during the April 17 hearing that essentially forced him into proceeding pro se in the first place, as well as a detailed breakdown of defense counsels ineffective assistance via an entire list of Minn. R. of Prof. Cond. cited. (*see Table of Authorities, Add. 230-231*)

### 4.    Navigator Order Rises and Falls With the Defective Rule 20 Referral and is Independently Unlawful

Forensic-navigator appointments are authorized only after a defendant has been adjudicated incompetent or incompetent-and-unrestorable. See Minn. Stat. § 611.361, subd. 1(a) (county "shall assign a forensic navigator to a defendant who has been found incompetent to proceed"). Because the underlying referral here is void, the navigator order necessarily collapses. Even if it survived, its blanket authority to seize "medical, employment, Social-Security, and educational records … notwithstanding any privacy laws" (Add. 4-5) without findings or notice constitutes an abuse of discretion and an unreasonable search under *Camara v.*

*Municipal Court*, 387 U.S. 523, 534-39 (1967) (administrative inspections require individualized justification or a warrant).

### 5. Undisputed Brady / Perjury Evidence Underscores Merits Strength

The State conceded on March 5 that key photos were "a problem" yet denied any manipulation on April 29 (2-20, *Add. 168 vs. 1-10, Add. 15*). That contradiction is unrebutted and alone warrants relief under *Brady/Giglio*.

### 6. Bottom Line

The April 29 competency and navigator orders collide with Rule 20's text, longstanding precedent, and core constitutional guarantees. On this record Petitioner's prospects for success are stronger than merely "substantial"; they are compelling.

## B  |  Irreparable Injury to Appellant Absent a Stay

### 1. Forced Psychiatric Intrusion Cannot be Unwound

If the April 29 Rule 20 order is executed, Petitioner must submit to a fourth competency interview plus possible psychological testing. That compels disclosure of intimate thoughts, medical history, and privileged communications.

### 2. Navigator Order Triggers Irreversible Data-Harvesting

The forensic-navigator mandate authorizes an agent of the State to obtain "medical, Social-Security, employment, and educational records… notwithstanding any privacy laws" (*Add. 4-5*). The instant those files leave their custodians, the privilege and privacy attaching to them is permanently lost; appellate vacatur months later cannot erase digital copies already disseminated to the court or prosecution.

### 3. Risk of Involuntary Commitment and Forced Medication

**a.** A fresh Rule 20 evaluation can spiral into an ex-parte detention order and involuntary psychotropic medication - intrusions the courts have characterized as a "grievous loss" requiring the strongest procedural safeguards. The Minnesota

Supreme Court in *Jarvis v. Levine*, 418 N.W.2d 139 (Minn. 1988), recognized that the involuntary administration of neuroleptic medication to committed individuals implicates fundamental privacy and bodily integrity interests. The court held that, absent an emergency, such treatment requires prior judicial approval to ensure that the individual's due process rights are protected.

**b.**    Therefore, ordering a renewed competency evaluation without new, objective evidence not only contravenes procedural standards but also exposes the defendant to the risk of significant liberty deprivations without the necessary due process protections.

**4.    Continued Tolling of Speedy-Trial and Faretta Rights**

The case has languished for 29 + months while Mr. Guertin, fully at liberty and posing no public risk, has pressed pro-se motions. Every additional day trapped in an unjustified competency loop prolongs the denial of (i) his constitutional autonomy to conduct his own defense, and (ii) his Sixth-Amendment right to a speedy trial - harms no post-hoc money judgment or remand can cure.

**5.    No Adequate Legal Remedy**

Monetary damages are unavailable against the State for these constitutional injuries, and suppression of ill-gotten evidence would not restore privacy already breached. Stay relief is therefore the only vehicle to prevent the harm before it occurs.

**6.    Net Result**

The April 29 orders threaten immediate, irreversible violations of bodily autonomy, mental privacy, and trial rights; a later appellate win cannot undo a completed psychiatric invasion or the public release of confidential records. Thus the second Rule 108 factor weighs heavily - and uniquely - in Petitioner's favor.

**C  |  Lack of Substantial Harm to Other Parties**

**1.     Status Quo Has Already Been Frozen for 29+ Months**

Since its very inception during January of 2023 the case has been stalled by three prior Rule 20 cycles even as Petitioner has successfully completed a stayed order of civil commitment, and has now been deemed competent to proceed to trail via the April 3, 2025 order; the State has proceeded on bail terms without claiming public-safety risk. Maintaining that same posture during appellate review imposes no new burden on prosecution or community.

**2.     Stay Merely Defers an Unrequested, Legally Dubious Procedure**

The April 29 competency "reset" was court-initiated; the State filed no written motion and offered no new evidence. Postponing an evaluation that may ultimately be ruled unlawful cannot prejudice the State, which remains free to try the case the moment competency is affirmed.

**3.     Navigator Order's Data Sweep Serves No Trial Function**

Collecting Petitioner's medical, employment, and Social-Security records (*Add. 4-5*) does nothing to advance the merits and risks tainting the prosecution with privileged material. Pausing that intrusion actually protects the State from later suppression motions.

**4.     Public Safety Unaffected**

Mr. Guertin has appeared at every hearing and has lived peaceably in the community throughout the 29 + month pendency. The trial court set no additional conditions when it reopened competency, confirming it saw no danger.

**5.     Balance of Equities**

A stay spares the State nothing it legitimately needs now, while a denial would inflict non-compensable constitutional injury upon Petitioner. Rule 108's third factor therefore tilts decisively toward interim relief.

**D** | **Public Interest Considerations**

### 1. Preserving Confidence in the Courts by Halting a Procedure Rooted in Fraud

The record reveals "Mother's Letter" document-cloning (identical SHA-256 header images across dockets, *Add. 560-572*), the PDF-title blunder linking Petitioner's live case to synthetic defendant Adrian Wesley, and the Cole/Prochazka status "yin-yang" anomaly. Proceeding with a competency dragnet that appears designed to bury those revelations would broadcast to the public that Minnesota courts respond to whistle-blowing with forced psychiatric exams. Granting a stay shows the Judiciary will first examine allegations of systemic docket fabrication before subjecting a citizen to invasive mental-health processes.

### 2. Guarding the Integrity of Minnesota's New Competency-Reform Regime

Forensic navigators and community-restoration programs were created to help defendants who are genuinely mentally ill - not to harvest medical, Social-Security, and employment records from litigants the court itself called "*extremely intelligent*" and told him he's produced "*detailed legal memoranda*" (*7-13, Add. 9*). Allowing a questionable referral to go forward would squander limited statewide resources and set a precedent for weaponizing Rule 20. A stay protects the reform's credibility.

### 3. Encouraging Robust Exposure of Governmental Misconduct

The public benefits when defendants can air claims of Brady fraud, perjury, and fabricated court orders - no matter how "extraordinary." Staying the April 29 orders ensures those claims are tested in the adversarial arena instead of being discredited by a psychiatric label; that supports the First Amendment value of petitioning the government for redress.

### 4.    No Countervailing Public-Safety Downside

Petitioner has lived peacefully in the community for 29 + months, appearing at every hearing. Maintaining the pre-April 29 status quo presents zero risk to victims (there are none technically) or society while the appellate court decides whether the Rule 20 restart is lawful.

### 5.    Systemic Guidance for Trial Courts

An appellate ruling on whether content-based skepticism can trigger competency proceedings will provide urgently needed instruction to courts statewide. Clarity on this issue serves prosecutors, defense counsel, and trial judges alike - and thereby the public.

Taken together, the unprecedented "WTF" elements of this case, and the constitutional stakes transform this case from an individual grievance into a litmus test of Minnesota's commitment to transparent, lawful judicial process. The public interest overwhelmingly favors a stay while that commitment is scrutinized on appeal.

## E    |    Conclusion

All four Rule 108 factors converge in Petitioner's favor.

### 1.    Likelihood of Success

The April 29 competency "redo" and navigator order collide with Rule 20's plain language, established precedent, and core constitutional protections.

### 2.    Irreparable Injury

Compelled psychiatric evaluation and unrestricted records-harvesting would inflict privacy, autonomy, and speedy-trial harms no later ruling can undo.

### 3.    No Substantial Harm to the State

A stay merely maintains the 29-month status quo, postponing an unrequested procedure while leaving the prosecution free to proceed once competency is lawfully settled.

### 4. Public Interest

Halting a process apparently triggered by Petitioner's exposure of docket fabrication safeguards judicial integrity and preserves public confidence in Minnesota's new competency-reform system.

Because Petitioner has made a compelling, four-square showing, this Court should exercise its authority under Minn. R. Civ. App. P. 108 and enter an immediate stay of the April 29 2025 competency-evaluation and forensic-navigator orders pending resolution of the appeal.

## VII.  PRAYER FOR RELIEF

**WHEREFORE,**

for the reasons set forth above and pursuant to Minn. R. Civ. App. P. 108.02, 127, and this Court's inherent supervisory authority, Appellant MATTHEW GUERTIN respectfully asks that the Court enter an order that:

**1.** **GRANTS an immediate stay** of the Hennepin County District Court's April 29 2025 Order for Evaluation of Competency to Proceed (Rule 20.01) (*Add. 1-3*) and its companion Order Appointing Forensic Navigator (*Add. 4-5*), including a stay of every action authorized or required by those orders, pending final disposition of this appeal.

**2.** **DIRECTS** the district court, the State, and all affiliated agencies or contractors to **take no steps whatsoever** to implement, enforce, or rely upon the stayed orders—specifically:

- no psychiatric, psychological, or competency examination of Mr. Guertin;

- no appointment, engagement, or activity by any "forensic navigator"; and

- no collection, disclosure, or review of Mr. Guertin's medical, Social-Security, employment, educational, or other personal records.

3.      **PRESERVES the pre-April 29 2025 status quo** - including existing bail conditions - so that Mr. Guertin may continue to prepare his defense without further mental-health proceedings or record sweeps pending appellate review.

4.      **EXPEDITES this appeal** by (a) setting an accelerated briefing schedule, or, in the alternative, (b) transferring the matter to the Special Term calendar for summary disposition, and by granting any additional procedural accommodations needed to resolve the merits promptly.

**AWARDS such other and further relief** as this Court deems just and proper to safeguard Appellant's constitutional rights and to maintain public confidence in the integrity of the judicial process.

Dated:  **June 4, 2025**                                  *Respectfully submitted,*

                                                                  */s/ Matthew D. Guertin*

                                                                  Matthew David Guertin
                                                                  *Petitioner Pro Se*
                                                                  4385 Trenton Ln. N 202
                                                                  Plymouth, MN  55442
                                                                  Telephone: 763-221-4540
                                                                  MattGuertin@protonmail.com
                                                                  www.MattGuertin.com

# VIII.   PROPOSED ORDER

[PROPOSED] ORDER OF THE COURT OF APPEALS:

On consideration of Appellant's Emergency Motion for Stay,

**IT IS HEREBY ORDERED**:

**1.**     Enforcement of the Hennepin County District Court's April 29, 2025 Order for Evaluation of Competency to Proceed (Rule 20.01) and Order Appointing Forensic Navigator in State v. Matthew D. Guertin, No. 27-CR-23-1886, **is STAYED**. These orders shall have no force or effect until final disposition of the appeal or further order of the appellate courts.

**2.**     All proceedings or actions to implement the stayed orders – including any court-ordered psychiatric evaluation of Appellant and any efforts by a forensic navigator to obtain Appellant's records or information – are hereby suspended pending the appeal.

**3.**     No bond or security is required for this stay, as the relief sought is equitable in nature and necessary to preserve Appellant's fundamental rights.

**It is so ordered.**

**A25-0882**
**STATE OF MINNESOTA**
**IN COURT OF APPEALS**

| | |
|---|---|
| In re Matthew David Guertin, | District Court Case: 27-CR-23-1886 |
| Petitioner | Court Order Date: April 29, 2025 |
| v. | **PETITIONER'S CERTIFICATE** **OF DOCUMENT LENGTH** |
| State of Minnesota, | |
| Respondent. | Judge: Hon. Sarah Hudleston |

The undersigned hereby certifies that this EMERGENCY MOTION FOR STAY PENDING APPEAL conforms to the requirements of the applicable rules, is produced with 13-point type and proportional font, and the length of this document is 11,943 words excluding the caption, signature block, and this Certificate of Document Lenth. This EMERGENCY MOTION FOR STAY PENDING APPEAL was prepared using LibreOffice Writer for Linux.

**Dated:  June 4, 2025**

*Respectfully submitted,*

 */s/ Matthew D. Guertin*

Matthew David Guertin
*Petitioner Pro Se*
4385 Trenton Ln. N 202
Plymouth, MN  55442
Telephone: 763-221-4540
MattGuertin@protonmail.com
www.MattGuertin.com